# In the United States Court of Federal Claims

**No. 94-522C**

**(Filed August 23, 2006)**

* * * * * * * * * * * * * * * * * * * * * * * *

**FIRST ANNAPOLIS BANCORP, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

* * * * * * * * * * * * * * * * * * * * * * * *

Winstar; Hearsay; Admission by Party Opponent; Federal Rule of Evidence 801(d)(2); Proof of Agency

Dale A. Cooter, James E. Tompert, Cooter, Mangold, Tompert & Karas, LLP, 5301 Wisconsin Avenue, N.W., Suite 500, Washington, D.C., for Plaintiff.

Richard B. Evans, Commercial Litigation Branch, Civil Division, Department of Justice, 1100 L Street, N.W., Washington, D.C., for Defendant; Timothy Abraham, Melinda Hart, Mark Pittman, James R. Whitman, Department of Justice, Civil Division, Washington, D.C., Of Counsel.

---

**MEMORANDUM OPINION AND ORDER SUSTAINING PLAINTIFF'S OBJECTION TO HEARSAY**

---

**WILLIAMS**, Judge

As in many Winstar cases, Plaintiff claims that the passage of the Federal Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) breached its contract with the Government because the Act prohibited it from treating goodwill as capital which counted toward its regulatory capital requirements and from meeting relaxed capital benchmarks. This Winstar case departs from the mainstream somewhat in that Defendant claims Plaintiff committed a prior material

breach of the contract by making loans to shareholders to purchase stock in the institution.[1] Because a prior material breach would preclude Plaintiff's recovery, the Court conducted an initial trial limited to this issue.

This matter comes before the Court on Plaintiff's objections to hearsay elicited during the trial on prior material breach.[2] Plaintiff claims that testimony from shareholders recounting statements of a deceased attorney, Edward O. Wayson, regarding the solicitation of shareholder loans are hearsay and must be stricken from the record. Specifically, Plaintiff objects to statements made by Mr. Wayson to potential shareholders regarding the investment and his role at First Annapolis.[3] Defendant argues that because Mr. Wayson was an agent of Plaintiff, his statements are admissions of a party opponent and not hearsay. Federal Rule of Evidence (FED. R. EVID.) 801(d)(2)(D).

During trial, the Court deferred ruling on Plaintiff's objections until hearing all the evidence with regard to agency.[4] Because Defendant failed to prove that Mr. Wayson was an agent or subagent of Bancorp with respect to shareholder loans, his out-of-court statements are not admissions by Bancorp and are inadmissible.[5]

---

[1] Defendant claims that First Federal made loans to individuals to purchase stock in Bancorp in violation of 12 C.F.R. § 563b.3(C)(22) and 12 C.F.R. § 563b.9, essentially resulting in the bank being capitalized by itself with no infusion of new, unfettered funds.

[2] Trial was conducted from June 19-22, 2006.

[3] Defendant attempts to use this hearsay to prove that Mr. Wayson was an agent of Bancorp and orchestrated the illegal shareholder loans to raise funds for the conversion.

[4] The existence of an agency relationship must be established before an alleged agent's own statements demonstrating such a relationship can be received as evidence. 4 Wigmore, Evidence § 1078 (Chadbourn rev. 1972); Shuell v. London Amusement Co., 123 F.2d 302, 306 (6th Cir. 1941) (holding statements made by alleged agent standing alone cannot be admitted to prove agency, but are admissible to show in what capacity he acted when accompanied by other evidence establishing agency); see also United States v. Ziegler Bolt, 111 F.3d 878, 881-82 (Fed. Cir. 1997) (Government could not show agency with reference only to the agent's actions). In this instance, the Court conditionally admitted hearsay statements with the understanding that such hearsay would be stricken if no other proof establishing the agency relationship was adduced.

[5] The Court also excludes as hearsay Defendant's Exhibit (DX) 677, an affidavit of shareholder William Jones created six years after the conversion in support of a separate lawsuit relating to his then-defaulted loan, as well as portions of DX 548, a similar affidavit of shareholder Paul Jones.

## Background[6]

### The Conversion and Merger

First Federal Savings & Loan Association of Annapolis (First Federal) was a savings and loan institution in Annapolis, Maryland. In order to recapitalize, First Federal converted from a federal mutual savings and loan association to a stock savings bank and then merged into the newly formed federal stock savings bank, First Annapolis Savings Bank, F.S.B. (First Annapolis). Plaintiff, First Annapolis Bancorp, Inc. (Bancorp), was formed for the purpose of acquiring the stock of the merged institutions, thereby infusing capital into the converted thrift.

Bancorp alleges that a contract was formed when First Federal applied for the voluntary conversion and Defendant agreed to the amortization of goodwill[7] and modified regulatory capital requirements for the resulting institution. Bancorp contends that the enactment of FIRREA breached this agreement by no longer honoring relaxed capital benchmarks and disallowing goodwill to be counted as capital, thereby causing First Annapolis to fail to meet its capital requirements and eventually to go into receivership.

### Edward O. Wayson's Relationship with Bancorp and the Shareholders in 1988

In 1988, Mr. Wayson's law firm, Blumenthal, Wayson & Offutt, was general counsel to First Federal, but the firm's representation of the bank was limited to real estate work. Tr. at 402. Mr. Offutt performed approximately 90% of the firm's legal work for First Federal, handling real estate settlements. Id. Douglas Parran, a Director and Executive Vice President of both First Federal and Bancorp, testified that at the time of the conversion and shortly before, Mr. Wayson was general counsel to First Federal "in the fact that he handled loan settlements" for the bank. Id. at 340. There is no evidence that Mr. Wayson performed any other type of legal work for First Federal at this time. Another unrelated law firm represented First Federal in the conversion. Id. at 324-25, 339-40. Anchor Brokerage Services, a subsidiary of First Annapolis "acted as the broker for the conversion in the sale of Bancorp stock." Id. at 353; see id. at 352.

Mr. Wayson was also "one of the original investors" in Bancorp. Id. at 341. As of August 19, 1988, Mr. Wayson owned 750,000 shares of Bancorp representing approximately 5.29% of ownership. DX 171.

Many of the shareholders knew Mr. Wayson outside of First Federal and had participated in

---

[6] This background is derived from the parties' stipulation and the evidence elicited at the trial on shareholder loans. The factual background for the instant litigation is more fully set forth in First Annapolis Bancorp, Inc. v. United States, 54 Fed. Cl. 529 (Fed. Cl. 2002).

[7] Goodwill was an intangible asset recorded on the acquiring institution's books representing the excess of the acquired entity's liabilities over its assets on a marked-to-market basis.

other investments with him. Shareholder Paul Jones testified that he was a good friend of Mr. Wayson in 1988 and that they had practiced law together in the past. Tr. at 231, 236. Broughton Earnest, another shareholder, testified that Paul Jones and Mr. Wayson were "both social and business friends" and that "Ed [Wayson] had participated in investments with Paul Jones . . . [and] one of those investments . . . that Ed Wayson had brought to Paul and Paul, in turn, had brought to his partners, including myself." Tr. at 283-84. David Thompson, a shareholder and law partner of Paul Jones, testified that Mr. Wayson "was a long-time client and . . . a social friend of [Paul Jones]" in 1988. Deposition of David Thompson (Thompson Dep.), June 14, 2006 at 11.[8]

**Bancorp's Methods of Raising Capital**

In order to raise capital for Bancorp to buy the stock of First Annapolis, the Board of Directors of Bancorp and First Federal at one point planned to work out an agreement whereby National Capital Group/Continental Financial (Confin) would be a majority shareholder in Bancorp. Joint Exhibit (JX) 25 at PFA 011 1856-57. At a meeting of the First Federal Board of Directors on May 18, 1988, "Mr. Parran informed the board that there [were] alternatives to proceeding with the majority stockholder in the conversion. Mr. Wayson, Mr. Blumenthal's law partner, could raise 5 to 7.5 million needed, but it would take additional time and there [would be] unknowns that come with that extended time." DX 113 at WOQ 396 0554.

At a joint meeting of the Boards of Directors of Bancorp and First Federal on June 22, 1988, the Boards decided that a majority shareholder would "not provide the necessary level of protection for the minority stockholders to ensure their participation in the stock offering." Id. at PFA 011 1857.[9] Accordingly, the Board passed a resolution limiting the investment of any one entity in the total offering of Bancorp stock to no more than 9.9 percent. Id. at PFA 011 1859.

After the Board chose not to have a majority shareholder, Bancorp had to continue to raise money for the conversion. Mr. Parran testified:

> Q. How did Bancorp at that point in time plan to raise the funds if not through selling a large block of stock to Continental Financial Holdings?
>
> A. Well, the exact same method that we had raised the initial funds. That had been mostly through friends of Tom Norris, who was

---

[8] By agreement of the parties, Mr. Thompson's trial testimony was elicited via a de bene esse deposition.

[9] Each director of First Federal was also an officer or director of Bancorp. JX 86 at WOT 415 1127. All directors attending the First Federal Board of Directors meeting on May 18, 1988, also attended the joint meeting on June 22, 1988. Compare DX 113 at WOQ 396 0553 with JX 25 at PFA 011 1855.

chairman of the board, and friends of -- my personal friends. We knew that we were going to have to expand that out into the community to deal with businesspeople and accredited investors[[10]] that we knew.

Q. Pretty much by this time, you had exhausted all of your avenues of potential investors; correct, sir?

A. From a friendship base, yes.

Tr. at 335-36.

Mr. Parran further testified as follows:

Q: And you asked that [Mr. Wayson] try to solicit as many investors as possible to raise the necessary capital needed to complete the transaction, that amount being at least $12 million, correct?

A: Well just let me explain how . . . this started.

Q: Could you give me a yes or no first, and then if you want to amplify?

A: Well I did meet with him, yes.

Q: Okay. And did you ask him to raise – to solicit as many investors as possible to raise the necessary capital to complete the conversion?

A: I asked him to help raise capital, yes. . . . I had approached Mr. Wayson as one of the original investors in this transaction, and when I did that, he expressed his interest and volunteered that he had acquaintances that may also be interested in purchasing stock. And I simply asked him at that time, you know, we would be glad to have their referrals, we'd send them a private placement memorandum, see if – have it back, see if they were accredited investors and we would consider them.

. . .

Q. Now, as we saw in the May 13, 1988 board minutes, you informed the board of directors that Mr. Wayson indicated that he had an ability to raise between 5 and $7-1/2 million in investors for purchase of

---

[10] Mr. Parran explained that an accredited investor had at least a million dollars in net worth.

Bancorp stock; correct?

A. Correct.

Q. And, in fact, you met with Mr. Wayson several times before the June 22 board meeting to discuss his efforts to raise capital for the conversion; correct?

A. I don't know how many times, but yes, we met.

. . .

Q. And following the June 22, 1988 board meeting, Mr. Wayson gave you names of potential investors, and you provided them with copies of the private placement memorandum; correct?

A. Yes, we mailed or delivered private placement memorandums to the individuals that he identified.

Q. And you met with most of these individuals then; correct?

A. I'm not sure. I met with most of the investors, if they had a question about the business plan or viability of the institution. I couldn't tell you if I personally met with the investors that Mr. Wayson actually sent in.

Tr. 339-42.

**Shareholder Loans**

Between August 10 and August 12, First Federal approved loans totaling $1.6 million to E. Patrick Cole, Roger L. Howard, F. Patrick Horrigan, M. Marvin Taylor, Paul J. Jones, Jr., William F. Jones, Roy B. Cowdrey, and Arthur H. Schwartz. Stipulations of Fact ¶¶ 11, 19, 21, 26, 34, 38. Within a day or two, each of these individuals used the proceeds of these loans to purchase stock in Bancorp and, as of August 12, 1988, owned stock in Bancorp equal to the amount of the loan he had taken with First Federal. Id. ¶¶ 13, 29, 39; DX 171.

**Testimony of the Shareholders**

Paul J. Jones, Jr., one of the investors who purchased Bancorp stock, testified that Mr. Wayson informed him about the opportunity to invest in Bancorp. Tr. at 227. Paul Jones described his impression of Mr. Wayson's relationship with Bancorp as follows:

Q. What did Mr. Wayson represent to you in terms of his position with Bancorp at the time?

. . .

A. Mr. Wayson's firm represented the bank, and he said he would be in there every day working on this bank.

Id. at 235.

Mr. Jones did not say that Mr. Wayson had represented that he held or was going to hold a specific position with Bancorp. Tr. at 221-71. Nor did Mr. Jones elaborate as to what work Mr. Wayson was going to be doing for the bank "every day." Id. The application for conversion listed the management of the new institution, but did not include Mr. Wayson as part of management. JX 86 at 13; Tr. at 316-318. Nor was there any other evidence suggesting that at the time of the conversion Mr. Wayson was to be employed by Bancorp or that his role as an outside counsel doing real estate loan settlements was to change.

Paul Jones testified that Mr. Wayson told him that he "could get the [100 percent] financing" from First Federal for the purchase of his Bancorp shares. Id. at 236-37. Mr. Jones further testified that when he executed the loan documents relating to his stock purchase, "Mr. Wayson brought in aides and agents . . . and Mr. Parran may have been one of them." Id. at 229-30. Furthermore, Paul Jones testified that if Mr. Wayson instructed Mr. Jones to do something with respect to this investment, he did it. Id. at 230. Mr. Jones did not elaborate or give any examples as to what instructions Mr. Wayson may have given. Id.

William Jones, another investor, testified that he became aware of the opportunity to invest in Bancorp through his brother, Paul Jones, and that his brother learned about the investment opportunity through Mr. Wayson. Id. at 424-25. William Jones explained: "I respected Mr. Wayson, I knew him as an attorney and a banker. And I knew he was investing in the institution, and I believed it was a wonderful opportunity of an excellent investment." Id. at 431. William Jones also testified: "[i]f there had been no involvement of Ed Wayson in [Bancorp], I would have never heard of the institution, and I don't believe I would have invested in the institution." Id. at 434. Like his brother, William Jones testified that if Mr. Wayson gave him any instructions with respect to this investment, he followed them, but did not say what such instructions were. Id. at 431.

David Thompson purchased stock in Bancorp through a partnership put together by Paul Jones. Thompson Dep. at 10. Mr. Thompson testified: "Ed Wayson was a Second National board member. He was knowledgeable in the banking industry. He presented this proposed investment to Paul Jones. I was present . . . on at least one occasion, perhaps two, in which Ed Wayson was present and this investment was discussed." Id. at 12. Mr. Thompson invested through a partnership with Paul Jones because "[his] net worth was not sufficient for [him] to participate directly." Id. at 14-15. Mr. Thompson testified that "there was a settlement of sorts, in that Mr. Pat Cole and a group

associated with him in the business, Paul Jones and Ed Wayson, were [in Mr. Thompson's office] one mid morning, at which there was some discussion about the investment and Ed's role, and papers were signed and delivered to Ed Wayson." Id. at 21.[11]

Dr. Arthur Schwartz, another shareholder in Bancorp, first became aware of the investment opportunity through William Jones, who had been informed about the investment by Mr. Wayson. Schwartz Dep. at 12-13. Dr. Schwartz "was told Ed Wayson was putting up about a million dollars of his own money." Schwartz Dep. at 14. Dr. Schwartz testified: "I handed [Mr. Wayson] a check for $150,000 the day that I signed whatever documents I was asked to sign." Id.

**The Draft Complaint**

In late 1990, seven of the shareholders[12] began contemplating filing a lawsuit against Mr. Wayson in connection with the loans from First Federal and the purchase of their shares in Bancorp. Tr. at 257; Tr. at 291; Tr. at 446-55. A draft complaint was drawn up on behalf of six of the shareholders naming Mr. Wayson and Second National Bank as defendants -- not Mr. Parran, First Annapolis or Bancorp. Tr. 257-58; DX 481. The draft complaint states, in relevant part:

> 16. Commencing with the issuance and dissemination of the Offering [of Bancorp's stock], [Mr. Wayson] embarked on a scheme and course of conduct to misrepresent the nature and extent of the severe financial problems confronting [Bancorp and First Federal] and to conceal the violations of the Supervisory Agreement.
>
> * * * *
>
> 22. [Mr. Wayson] vigorously pressed [Plaintiffs] Jones and Cole to invest in the private offering of [Bancorp's] stock. [Mr. Wayson] told them that he was the de facto chief executive officer of the Holding Company and would serve in a similar capacity at FASB [First Annapolis Savings Bank], taking a day-to-day, "hands-on" role in the Bank's operations.[[13]]
>
> * * * *
>
> 26. As a further inducement to Cole, P. Jones and the other investor

---

[11] Mr. Thompson did not elaborate on what Mr. Wayson's "role" was. Thompson Dep.

[12] The seven shareholders were Patrick Cole, William Jones, Paul Jones, Peter Horrigan, Roger Howard, Dr. Arthur Schwartz, and Marvin Taylor.

[13] Mr. Wayson's name was redacted in the version of the draft complaint introduced into evidence. DX 481 at 2170; see Tr. at 257-58.

> plaintiffs, [Mr. Wayson] proposed that [First Federal] offer to plaintiffs 100% financing of funds to be invested. [Mr. Wayson] failed to disclose to plaintiffs that such a loan was likely to be cause for violation of the Supervisory Agreement and FSLIC rules and regulations.
>
> * * * *
>
> 31. [P]laintiffs purchased stock in [Bancorp] . . . Plaintiffs other than Schwartz each received a loan from FASB [First Annapolis Savings Bank] in the amount of the stock purchase.

DX 481.[14] The draft complaint was never filed. Tr. at 455. Mr. Wayson, however, filed his own lawsuit against these six shareholders based on their draft complaint. Tr. at 258-59; DX 481. Mr. Wayson's complaint denied "each and every allegation of wrongdoing set forth in the Draft Complaint," and sought a declaratory judgment that "Wayson did not commit, is neither guilty nor liable for the allegations set forth in the Draft Complaint" and sought an injunction prohibiting the filing of the Draft Complaint pending the resolution of Mr. Wayson's suit. DX 481; Tr. at 258-59. Mr. Wayson's lawsuit was dismissed without prejudice by agreement of the parties. JX 137. The parties agreed that if the lawsuit were reinstituted, or if any party took action on the Draft Complaint, then that action would have to be brought in the Circuit Court for Anne Arundel County in Maryland. Id.

**Mr. Wayson's Post-Conversion Involvement with Bancorp**

In an August 1991 examination of Second National, where Mr. Wayson was a director, the examiner stated that Mr. Wayson was "clearly representing First Annapolis" in a loan swap transaction between First Annapolis and Second National. DX 498A at FFA 012 0457. William Crompton, the examiner in charge of the 1991 Examination of Second National explained that this statement came from a letter in Second National's files in which the Executive Vice President of Second National requested First Annapolis documents from Mr. Wayson. Tr. at 706-07. However, this letter is not in the record.

Mr. Crompton also testified that Mr. Wayson was the bank's general counsel, i.e., he was "the attorney representing the bank." Tr. at 748-49; see also DX 397 at WOT 315 0174. Mr. Crompton testified that he met with Mr. Wayson during his examination of First Annapolis in 1990 with regard to "their capital position and capital plan that they had submitted to the OTS . . . regarding how they viewed themselves as working out of their capital problem." Id. However, Mr. Crompton did not meet with Mr. Wayson with respect to the shareholder loans. Id.

---

[14] Mr. Wayson's complaint against the shareholders was admitted for the limited purpose of showing that the complaint was filed, not for the truth of the matter asserted therein. Tr. at 260.

Gregory Jones, a supervisory agent with the Federal Home Loan Bank Board and the OTS during and immediately following the conversion of First Federal, also testified to meeting Mr. Wayson. According to Mr. Gregory Jones, Mr. Wayson "came to Atlanta sometime in 1989 to discuss the institution's capital plan after FIRREA required that certain institutions that were undercapitalized submit capital plans. So he came in a representative capacity to the company." Tr. at 566; see also id. at 570 ("The fact that [Mr. Wayson] was there with Mr. Parran led me to believe he was there in a representative capacity for the institution, or the holding company.").

**The Jones Brothers' Affidavits**

Defendant proffered affidavits which Paul Jones and William Jones executed in connection with subsequent litigation involving their loans from First Federal. Paul Jones' affidavit was dated April 24, 1992 -- almost four years after the conversion. Second National, which had acquired Paul Jones' loan,[15] sued Mr. Jones in March 1992, after he had stopped making payments on the loan, and won a confessed judgment. Tr. 261-63. Paul Jones' affidavit was an attachment to his motion to vacate the confessed judgment. Id. at 264. The Court conditionally admitted this affidavit subject to Plaintiff's continuing objection to hearsay. Tr. at 263-64; see Tr. at 234.

Paul Jones's affidavit stated, in part:

> In late July 1988 Wayson in his capacity as attorney for Second National and as a director of Second National vigorously pressed the Defendant Jones to invest in the private offering of the holding company stock. Wayson told Jones that he was a de facto chief executive officer of the holding company and would serve in a similar capacity at FASB, taking a day-to-day, hands-on role in the bank's operations.
>
> As a further inducement to Jones and other investors, Wayson proposed that FASB offer to Jones 100 percent financing of the funds necessary to purchase the bank's stock. Wayson who was counsel to FASB/FFSLAA and Second National and was a director of Second National, intentionally failed to disclose to Jones that such a loan arrangement was likely to be cause for violation of the supervisory agreement and FSLIC rules and regulations and was illegal and would render the stock valueless.

DX 548 at 51; Tr. at 265.

William Jones' affidavit was executed on September 8, 1994, some six years after the conversion and also was attached to a motion to vacate a confessed judgment against him in connection with his loan from First Federal. DX 677; Tr. 461-62. William Jones' affidavit was

---

[15] Paul Jones' loan was sold to Second National when he became a board member of First Annapolis. Tr. at 256.

substantially similar to Paul Jones' affidavit with regard to statements of Mr. Wayson. See DX 677 at 18, 20.

Plaintiff objected to the William Jones affidavit as a whole as hearsay. Id. at 462. William Jones testified during trial that he had been advised of Mr. Wayson's statements in the affidavit either by his brother Paul or by his counsel who had represented Paul Jones in his litigation. Tr. at 465-66.[16]

## Discussion

Hearsay is a "statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). A statement is not hearsay, however, if it "is offered against a party and is . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." FED. R. EVID. 801(d)(2)(D); see also 2 Charles McCormick, *McCormick on Evidence* § 254, at 137 (John W. Strong ed., 5th ed. 1999) ("admissions are outside the framework of hearsay exceptions, classed as nonhearsay and excluded from the hearsay rule"). In the present case, Defendant contends that Mr. Wayson's out-of-court statements, presented at trial for the truth of the matter asserted, are admissible as nonhearsay because Mr. Wayson was an agent or subagent of Bancorp and the statements are admissions by a party opponent.

### Mr. Wayson Was Not Bancorp's Agent for Raising Capital for the Conversion

Defendant has the burden of proving that an agency relationship existed between Bancorp and Mr. Wayson. See Great Am. Ins. Co. v. United States, 481 F.2d 1298, 1309 n.21 (Ct. Cl. 1973) ("Whenever the existence of the relationship of principal and agent is in issue, the burden of proving

---

[16] William Jones testified:

Q. The next sentence states, "Wayson told Paul Jones and Cole he was the de facto chief executive officer of Bancorp and would serve in a similar capacity at First Annapolis Savings Bank, taking a day-to-day, hands-on role in First Annapolis Savings Bank's operations." How did you become aware of that fact or those facts?

A. It would have been the same way. I did not have contact with Ed Wayson. I had contact with Paul Jones. I had contact with [my counsel] Martin Klein as well. Martin Klein had represented Paul Jones, so whether a statement I would have learned directly from Paul Jones or from Paul Jones to Martin Klein, I would have learned it from Martin Klein. It would have been either.

Tr. at 467.

the issue rests with the party who asserts the affirmative -- that is, the party asserting the existence of the relationship.") (citing 3 Am.Jur.2d Agency § 348 (1962)); see also Hofherr v. Dart Industries, Inc., 853 F.2d 259, 262 (4th Cir. 1988). An agency relationship must be clearly demonstrated and cannot be presumed. Kuenzle v. HTM Sport-Und Friezeitgerate AG, 102 F.3d 453, 459 (10th Cir. 1996); Karl Rove & Co. v. Thornburgh, 39 F.3d 1273, 1296 (5th Cir. 1994). However, agency may be proved by implication or by inference from the acts of the agent and principal. Karl Rove & Co., 39 F.3d at 1296-97 ("agency can be implied from the conduct of the parties under the circumstances"). Further, Defendant must establish the scope of the agency because, in order to constitute an admission under FED. R. EVID. 801(d)(2)(D) the statements of the agent must concern a matter within the scope of the agency, made during the relationship. Nekolny v. Painter, 653 F.2d 1164, 1171-72 (7th Cir. 1981).

Agency is "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control; and consent by the other so to act." B&G Enterprises, Ltd. v. United States, 220 F.3d 1318, 1323 (Fed. Cir. 2000) (quoting Restatement (Second) of Agency § 1(1) (1958)); O'Neill v. Department of Housing and Urban Dev., 220 F.3d 1354 (Fed. Cir. 2000); Erikson v. United States, 12 Cl. Ct. 754 (1987).

Formation of a valid agency relationship is dependent upon: 1) the manifestation by the principal that the agent acts on his behalf subject to the principal's control, and 2) the agent's acceptance of this duty. See Restatement (Second) of Agency § 1(1) cmt. b; see § 15 (stating that "an agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act"); see also Erikson, 12 Cl. Ct. at 756; Al Johnson Constr. Co. v. United States, 19 Cl. Ct. 732, 735 (1990) (an agent cannot act without the authority of the principal). An agency relationship does not require a contract. See Restatement (Second) of Agency § 1(1) cmt. b.

Defendant contends that Edward Wayson was Bancorp's agent for purposes of raising capital for the conversion and that hearsay statements of Mr. Wayson are admissions by a party opponent, not subject to exclusion as hearsay. Defendant has not proven such an agency relationship. While there is ample evidence that Mr. Wayson and his law firm were counsel to the bank handling loan settlements, there is insufficient evidence to demonstrate that Mr. Wayson's representation of, or agency on behalf of, Bancorp extended beyond this.

As proof that Bancorp manifested its consent to have Mr. Wayson raise capital for the conversion, subject to the bank's control, Defendant cites two passages of Mr. Parran's trial testimony. First, Mr. Parran testified that he met with Mr. Wayson after the May 18, 1988 Board meeting and prior to the June 22, 1988 Board meeting. Tr. 341. Mr. Parran testified:

> Q. And, in fact, you met with Mr. Wayson several times before the June 22 board meeting to discuss his efforts to raise capital for the conversion; correct?

A. I don't know how many times, but yes, we met.

Second, when Mr. Parran was asked if he asked Mr. Wayson "to raise - to solicit as many investors as possible to raise the necessary capital to complete the conversion," Mr. Parran responded: "I asked him to help raise capital, yes." Tr. 339.

However, Mr. Parran further explained both of these statements and Mr. Wayson's overall role:

> I had approached Mr. Wayson as one of the original investors in this transaction, and when I did that, he expressed his interest and volunteered that he had acquaintances that may also be interested in purchasing stock. And I simply asked him at that time, you know, we would be glad to have their referrals, we'd send them a private placement memorandum, see if – have it back, see if they were accredited investors and we would consider them.

Tr. at 340. This testimony as a whole indicates that Mr. Wayson was asked to help raise capital in his capacity as an original investor to provide "referrals" to Mr. Parran, who would take it from there -- evaluate their creditworthiness and "consider them." There is no indication that Mr. Parran authorized Mr. Wayson to induce his acquaintances to invest in Bancorp by touting his own involvement with Bancorp or by marketing the investment on behalf of the bank. The extent of Mr. Parran's authorization was limited to Mr. Wayson's "helping" to raise capital by "referring" individuals to the bank and Mr. Parran for their -- not Mr. Wayson's -- consideration. A statement to the effect that "we would be glad to have their referrals" does not constitute manifest consent that Mr. Wayson solicit individuals and market the investment on behalf of the bank subject to its control.[17]

Indeed, there was no control by Bancorp over Mr. Wayson evidenced here. This is fatal to Defendant's agency theory. "The cornerstone of an agency relationship is the power of the principal to control the day-to-day functions of the agent." Larson v. United States, 26 Cl. Ct. 365, 370 (1992); see Chemtool, Inc. v. Lubrication Techs., 148 F.3d 742, 745 (7th Cir. 1998) ("Principal among [the consideration of evidence of agency] is the right to control the manner that the work is done."). As the Restatement of Agency explains:

> The right of control by the principal may be exercised by prescribing what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times. The principal's right to control is continuous and continues as long as the agency relation exists, even though the principal agreed that he

[17] Nor are the regulators' testimony that Mr. Wayson was representing the bank in conjunction with the recapitalization over a year after the conversion evidence of Mr. Wayson's purported different agency, earlier in time.

> would not exercise it. . . . Further, the principal has power to revoke the agent's authority, although this would constitute a breach of his contract with him. . . . The control of the principal does not, however, include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective.

Restatement (Second) of Agency § 14, cmt. a.

Mr. Parran's request of Mr. Wayson to help raise capital by providing him with referrals does not demonstrate the requisite level of control to demonstrate that Mr. Wayson was an agent of the bank. In Karl Rove & Co. v. Thornburgh, 39 F.3d 1273 (5th Cir. 1994), the Fifth Circuit, in finding agency, noted that the principal "retained the ultimate authority over [the agent] and [his] activities within the Committee" and "retained control over the content of the fundraising letters and whether the letters would be mailed at all." 39 F.3d at 1297. Here, there is no evidence that Bancorp or Mr. Parran controlled or even authorized the content of Mr. Wayson's statements to the investors.

In Nekolny v. Painter, 653 F.2d 1164 (7th Cir. 1981), the Seventh Circuit found that an alleged agent's statements were properly admitted as admissions against the defendant. In finding agency, the Court noted that the principal testified that the agent was her "liaison" and "advisor" and acknowledged that she met with the agent "almost every day," that she had directed the agent to communicate with the plaintiffs and that "she herself had had almost no contact with any of the plaintiffs." Id. at 1172. In contrast, here there is no evidence that Mr. Parran authorized Mr. Wayson to serve as his liaison or communicate with the shareholders on his behalf or on behalf of Bancorp, or that he met with Mr. Wayson with any frequency or authorized Mr. Wayson to contact the shareholders in his stead without his involvement. Rather, Mr. Parran himself had the private placement memoranda sent, met with most of the investors, and considered whether they were qualified investors.

Although Mr. Wayson was at the bank the day that Paul Jones took out one of his loans and also collected the loan documents from Mr. Thompson and Mr. Schwartz, there is no evidence that Mr. Parran controlled, authorized or even knew of these contacts with the potential investors. Further, there is no evidence that Mr. Parran or Bancorp authorized Mr. Wayson to make a promise on behalf of the bank to provide 100% financing or that they exercised any control over Mr. Wayson in this regard.

While Mr. Wayson apparently was authorized to refer potential investors for the Bancorp conversion, Defendant has not proven that the scope of his agency included meeting with potential investors or making statements of the ilk Defendant seeks to admit here -- touting both the investment and his own role with the bank. As such, Mr. Wayson's statements do not fall within FED. R. EVID. 801(d)(2)(D).[18]

---

[18] Nor was Mr. Wayson a subagent of Bancorp and an agent of Mr. Parran. A subagent is "appointed by an agent empowered to do so, to perform functions undertaken by the agent for the

## Conclusion

Mr. Wayson was not an agent or subagent of Bancorp for purposes of raising capital for the conversion and communicating with potential investors. Therefore, the Court grants Plaintiff's motion to strike the hearsay statements of Mr. Wayson.

1. The following testimony is hereby stricken from the record:

Tr. at 231:3 - 231:4
233:19 - 233:20
235:3 - 235:4
235:10 - 235:11
236:4 - 236:6
237:14 - 237:15
265:1 - 265:19
282:15 - 282:18
283:8 - 283:9
425:13 - 425:14
425:23 - 425:24
426:14 - 426:20
431:9
431:11 - 431:17
431:20
431:22 -25
432:9 - 432:10
432:15 - 432:16
433:2 - 433:8
433:10 - 433:12
433:14
465:21 - 466:2
466:18 - 467:17
469:15 - 470:4

---

principal, but for whose conduct the agent agrees with the principal to be primarily responsible." Restatement (Second) of Agency § 5(1). Moreover, the subagent is "the agent of the appointing agent," and the appointing agent therefore has the responsibility of a principal with respect to the subagent. Id. § 5 cmt. a. An agency relationship exists between the subagent and the appointing agent. See id. When a subagency is created, the subagent agrees to be subject to the control of the appointing agent. See Restatement (Second) of Agency § 406 cmt. a. Defendant's inability to prove a principal-agent relationship between Messrs. Parran and Wayson precludes finding an agent-subagent relationship between them as well.

2. The following is hereby stricken from the de bene esse depositions:

**Deposition of Dr. Arthur Schwartz, April 20, 2006**

12:12 - 14:6
21:13 - 25:2
23:25 - 24:12
48:23 - 49:3
60:12 - 63:15

**Deposition of David R. Thompson, June 14, 2006**

10:21 - 13:2; 14:25 - 15:22
17:2-13; 19:21 - 20:9; 22:5 - 23:12
24:10 - 26:2

3. Paragraphs 12 and 13 of Paul Jones' Affidavit (DX 548) are not admitted into evidence.

4. William Jones' affidavit (DX 677) is excluded.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**