**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 94-522C**
**(Judge Williams)**

---

**FIRST ANNAPOLIS BANCORP, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFF'S POST-TRIAL BRIEF ON PRIOR MATERIAL BREACH OF CONTRACT AND WAIVER

---

**Dale A. Cooter**
**COOTER, MANGOLD, TOMPERT & KARAS, L.L.P**
**5301 Wisconsin Avenue, N.W.**
**Suite 500**
**Washington, D.C. 20015**
**(202) 537-0700**

**Attorney for Plaintiff**
**First Annapolis Bancorp, Inc.**

**Of Counsel:**
**James E. Tompert**
**COOTER, MANGOLD, TOMPERT & KARAS, L.L.P.**
**5301 Wisconsin Avenue, N.W.**
**Suite 500**
**Washington, D.C. 20015**
**(202)537-0700**

**Dated: September 18, 2006**

# TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . 2

I. The Formation Of Bancorp. . . . . . . . . . . 2

II. The Contract By And Between Bancorp And The Government. . . . . . . . . . . 3

III. The Conversion. . . . . . . . . . . 5

IV. Breach Of The Contract By The Government. . . . . . . . . . . 6

V. Loans To Shareholders. . . . . . . . . . . 7

VI. The Examination Reports. . . . . . . . . . . 10

A. The 1988 Examination. . . . . . . . . . . 10

B. The 1990 Special Limited Examination. . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . 12

I. The Government Did Not Prove A Breach Of Any Term Of The Contract By And Between Bancorp And The Government. . . . . . . . . . . 12

II. The Government Did Not Prove A Breach Of Contract By Bancorp. . . . . . . . . . . 17

III. Any Breach Of Contract By Bancorp Was Not A Material Breach. . . . . . . . . . . 18

IV. The Government Has Waived Its Defense Of A Prior Material Breach Of Contract. . . . . . . . . . . 22

A. Substantive Waiver. . . . . . . . . . . 22

B. Procedural Waiver. . . . . . . . . . . 30

V. The Government's Other Defenses Of A Failure Of Condition Precedent And Fraud Should Be Rejected. . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF AUTHORITIES

## FEDERAL CASES

Acme Process Equip. Co. v. United States,
171 Ct. Cl. 324 (1965),
rev'd on other grounds, 385 U.S. 138 (1966) . . . . . 27

Atraqchi v. GUMC Unified Billing Services,
788 A.2d 559 (D.C. 2002) . . . . . 37

Barron Bancshares, Inc. v. United States,
53 Fed. Cl. 310 (2002),
aff'd, Barron Bancshares, Inc. v. United States,
366 F.3d 1360 (Fed. Cir. 2004) . . . . . 23

Bell BCI Co. v. HRGM Corp.,
2004 WL 3222885 (D.Md.) (D.Md. 2004) . . . . . 14

Burton v. Northern Dutchess Hospital,
106 F.R.D. 477 (S.D.N.Y.1985) . . . . . 34

California Federal Bank v. United States,
39 Fed. Cl. 753 (1997) . . . . . 32

Campana v. Eller,
755 F.2d 212 (1st Cir. 1985) . . . . . 35

Caroline Hunt Trust Estate v. United States,
65 Fed. Cl. 271 (2005) . . . . . 23, 28, 30

Castle v. United States, 42 Fed. Cl. 859 (1999),
aff'd in part, rev'd in part, on other grounds,
Castle v. United States, 301 F.3d 1328 (Fed. Cir. 2002) . . . . . 12

Choice Hotels Int'l, Inc. v. Madison Three, Inc.,
83 F.Supp.2d 602 (D.Md.2000) . . . . . 14

Cities Service Helix, Inc., v. United States,
543 F.2d 1306 (Ct. Cl. 1976) . . . . . 22-23

Cross Petroleum, Inc. v. United States,
54 Fed. Cl. 317 (2002) . . . . . 14

Eddy v. Virgin Islands Water and Power Auth.,
256 F.3d 204 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Effects Associates, Inc. v. Cohen,
980 F.2d 555 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Fifth Third Bank of Western Ohio v. United States,
55 Fed. Cl. 372 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

H. N. Bailey & Assocs. v. United States,
196 Ct. Cl. 156 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Hometown Financial, Inc. v. United States,
409 F.3d 1360 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

Jacob Maxwell, Inc. v. Veeck,
110 F.2d 749 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Jones v. Childers,
18 F.3d 899 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Lauder v. First UNUM Life Ins. Co.,
284 F.3d 375 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

Melrose Associates, L.P. v. U.S.,
43 Fed. Cl. 124 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 30

Mobil Oil Exploration & Producing Southeast, Inc. v. United States,
530 U.S. 604 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

In re Newbridge Networks Securities Litigation,
962 F.Supp. 166 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-37

Redmond v. Birkel, 933 F.Supp. 1 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Spectrum Holobyte California, Inc. v. Stealey,
885 F.Supp. 138 (D.Md. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Stone Forest Industries v. United States,
973 F.2d 1548 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Stoner-Caroga Corp., Inc. v. United States,
3 Cl. Ct. 92 (1983) . . . . . . . . . . 14

Sun Cal, Inc. v. United States,
21 Cl. Ct. 31 (1990) . . . . . . . . . . 26-27

Thomas v. Dep't of Housing & Urban Development,
124 F.3d 1439 (Fed. Cir. 1997) . . . . . . . . . . 18, 20

U.S. Ex Rel. Alexander v. DynCorp, Inc.,
924 F.Supp. 292 (D.D.C. 1996) . . . . . . . . . . 37

In Re U.S. Office Products Co. Securities Litigation,
251 F. Supp.2d 58 (U.S.D.C. 2003) . . . . . . . . . . 37

Youngdale & Sons Constr. Co. v. United States,
22 Cl. Ct. 345 (1991) . . . . . . . . . . 28, 30

**FEDERAL REGULATIONS AND RULES**

12 C.F.R. §563b . . . . . . . . . . 16

12 C.F.R. §563b.3(c)(22) . . . . . . . . . . 16, 17

12 C.F.R. §563b.9 . . . . . . . . . . 16

**MISCELLANEOUS**

17 Am. Jur.2d *Contracts* §§ 446-47, 489, 503, 510 (1964) . . . . . . . . . . 23

5 *Corbin on Contracts* §1104 (1964) . . . . . . . . . . 18

Restatement of Contracts §§ 309-10 (1932) . . . . . . . . . . 23

Restatement of Contracts §§ 317 (1932) . . . . . . . . . . 23

5 S. Williston, Contracts §§ 683-88 (3d ed. W. Jaeger 1961) . . . . . . . . . . 23

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 94-522C** |
| | ) | **(Judge Williams)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFF'S POST-TRIAL BRIEF ON PRIOR**
**MATERIAL BREACH OF CONTRACT AND WAIVER**

Plaintiff, First Annapolis Bancorp, Inc. ("Bancorp"), by and through counsel, hereby submits this Brief on Prior Material Breach of Contract and Waiver, and states as follows:

**INTRODUCTION**

During the course of the trial in this case, the Government did not sustain its burden to prove a prior material breach of contract by Bancorp. Instead, the Government merely presented evidence of shareholder loans, and attempted to argue, through innuendo, that there was a prior material breach of the contract by Bancorp. As discussed below, the Government did not prove that there was a breach of any term of the contract by and between Bancorp and the Government. Nor did the Government prove that there was a breach of contract by Bancorp, rather than, at best for the Government, a regulatory violation by First Annapolis Savings Bank, F.S.B. ("First Annapolis"). Moreover, assuming *arguendo* that there was a breach of a term of the contract by Bancorp, the Government did not prove that any such breach of contract was a material breach. The Government did not prove that the shareholder loans used to purchase stock in Bancorp went to the essence of the contract or to a matter

of vital importance to the contract. Instead, any loss to the Government as a result of the shareholder loans was *de minimus.*

The Government has also waived its defense of a prior material breach during the course of its dealings with Bancorp. After the Government learned of the shareholder loans in January 1990, it did not inform Bancorp that it had breached its contract with the Government on grounds of shareholder loans, or give any notice to Bancorp as required by Section V of the Regulatory Capital Maintenance/Dividend Agreement ("RCMA"), that Bancorp had committed a default of its obligations under the RCMA. Instead, it treated the shareholder loans as a regulatory violation by First Annapolis. The Government also waived its defense of a prior material breach on grounds of shareholder loans as a matter of procedure in this case because it waited until September 14, 1999 to raise the defense in this case**,** in violation of numerous orders issued by this Court.

Furthermore, the Government cannot rely on any defenses of a failure of condition precedent or fraud by Bancorp, which counsel for the Government alluded to at trial. During the course of its dealings with Bancorp and the course of these proceedings, the Government never raised these defenses, and for the same reasons it waived its defense of a prior material breach of contract, it has also waived these defenses. Even if the defenses are considered, the Government did not prove failure of a condition precedent which would allow it to void the contract, it did allege fraud with particularity and did not prove fraud with clear and convincing evidence.

## FACTUAL BACKGROUND

### I. The Formation Of Bancorp.

On November 19, 1987, Bancorp was incorporated under the laws of the state of Delaware to act as a savings and loan holding company. Joint Stipulations of Fact ("JS") at ¶1. Bancorp was authorized to issue 30,000,000 shares of common stock. Id. at ¶2.

Bancorp was formed for the purpose of acquiring First Federal Savings and Loan Association of Annapolis ("First Federal") pursuant to its voluntary supervisory conversion into a stock savings bank. Id. at ¶3. It was contemplated that First Federal would convert from a federal mutual savings and loan association into a federal capital stock savings bank by way of merger into a new entity, First Annapolis. Id. Bancorp intended to sell at least 12,000,000 shares of its common stock at $1.00 per share through a private placement to accredited investors, and then use the net proceeds from the stock sale to purchase all of the stock in First Annapolis, in a minimum amount of $11,000,000, immediately prior to the conversion. Id. This cash infusion was designed to provide First Annapolis with sufficient capital to achieve a one percent (1%) capital to liabilities ratio. Id.

**II. The Contract By And Between Bancorp And The Government.**

The relevant terms of Bancorp's contract with the Government are:

A. In Resolution 88-602, dated July 21, 1988, the Federal Home Loan Bank Board ("FHLBB") approved the supervisory conversion of First Federal "subject to any conditions, that may be imposed by the FHLBB in any concurrent resolution or action issued as of the date of this resolution." JX 92[1]; JS at ¶4.

B. Resolution No. 88-603, dated July 21, 1988, provides that:

---

1 As used herein, "JX" refers to a Joint Exhibit, "PX" refers to a Plaintiff's Exhibit, "DX" refers to a Defendant's Exhibit, and "Tr." refers to the trial transcript.

> On the date of consummation of the acquisition, merger and conversion, [Bancorp] shall make a capital contribution to the New Institution [First Annapolis] through the purchase of common stock **in a minimum amount equal to the greater of $11,000,000 or an amount sufficient to raise the net worth of the New Institution [First Annapolis] to 1% of the total liabilities on a GAAP basis** as specified in 12 C.F.R. Part 563b.26(b)(2).

JX 93 at 11 ¶13 (emphasis supplied); JS at ¶5.

C. There are two provisions of the RCMA, dated August 12, 1988, which are relevant to the present dispute. First, Section III A of the RCMA (relied upon by the Government as the basis for its defense of a prior material breach) provides that Bancorp represents, covenants and warrants to the FSLIC that "[t]he information given to the FSLIC by the Acquiror [Bancorp] and **relied upon thereby in connection with the acquisition of control of the New Institution** [First Annapolis] is true, accurate, complete and current in all **material** respects." JX 99 at 3 (emphasis supplied). During the trial, the Government did not present any evidence whatsoever that the FSLIC relied upon any information given by Bancorp in connection with the acquisition of control of First Annapolis. Second, the RCMA provides for an opportunity for Bancorp to cure any "Default," as defined in the agreement. Id. at 2, 4. The RCMA defines a "Default," as "the failure of the Acquiror [Bancorp] to comply with Section II. or III. of this Agreement or the breach of any representation or warranty set forth in Section III. of this Agreement." Id. at 2. Section V.A then provides that "[i]f the FSLIC shall determine that a Default has occurred, it **shall give notice of such Default to the Acquiror [Bancorp] and to the new Institution [First Annapolis] and afford the Acquiror [Bancorp] an opportunity to cure such Default** as follows" and then further provides in subparagraph 2 that "[i]f the Default arises under Section II.B or III. of this Agreement, the Acquiror shall correct the situation giving rise to the Default."

Id. at 4 (emphasis supplied). During the trial, the Government did not present any evidence that it complied with the foregoing default provision of the RCMA.

D. In its letter dated February 9, 1988, the FHLBB confirmed "**that all conditions precedent have been met and the Conversion has been completed in accordance with the foregoing Resolution [No. 88-602]** and the effective date of the conversion was August 13, 1988." JX 101 (emphasis supplied); JS at ¶6.

During the trial, the Government did not present any evidence that there was any term or condition in the contract by and between Bancorp and the Government, which provided that there would be a material breach of the contract by Bancorp if First Federal or First Annapolis made loans to shareholders to purchase stock in Bancorp.

The essence of the contract, or matter of vital importance of the contract, as supported by all the relevant evidence and testimony at trial, was for Bancorp to invest new capital into First Annapolis, which, as set forth in Resolution 88-603, was to be "in a minimum amount equal to the greater of $11,000,000 or an amount sufficient to raise the net worth of First Annapolis to 1% of its total liabilities on a GAAP basis," in exchange for the promises made by the Government. See, e.g., JX 93 at 11; JS at ¶3; JX 87 at WOT4150497; 6/19/06 Tr. at 43/25-44/6; 6/19/06 Tr. at 139/6-140/5.

On February 9, 1989, Gregory B. Jones ("Jones"), the Supervisory Agent for First Annapolis at the time, on behalf of FHLBB, in a letter addressed to First Annapolis, confirmed "**that all conditions precedent have been met and the Conversion has been completed in accordance with"** Resolution No. 88-602, and stated that "**the effective date of the conversion was August 13, 1988**." JX 101 (emphasis supplied); JS at ¶6.

**III. The Conversion.**

Bancorp was capitalized through the sale of 14,165,874 shares of its common stock at the price of one dollar per share. DX 118 at WOT3150007; DX 397 at WOT3150156. Bancorp then purchased 100% of the stock of First Annapolis, for a capital investment of $13,665,907. DX 397 at WOT3150156; 6/21/06 Tr. at 626/13 - 626/18**.**

First Federal thereby converted from a mutual savings and loan association, and merged into First Annapolis, as a federal stock savings bank. JX 93.

At or about the time of the conversion, 1% of the liabilities of the bank on a GAAP basis was $7,300,000. 6/22/06 Tr. at 765/9-766/23. Therefore, pursuant to the terms of Resolution No. 88-603, the minimum amount of capital Bancorp had to raise for the conversion was $11,000,000. JX 93 at 11; 6/22/06 Tr. at 765/9-765/2. Accordingly, Bancorp raised $3,165,874 more in capital than it was required to invest in First Annapolis (14,165,874.00 - 11,000,000 = 3,165,874). By the same token, Bancorp exceeded the minimum amount it was required to invest in First Annapolis by $2,665,907 (13,665,907 - 11,000,000 = 2,665,907). Id; see also 6/21/06 Tr. at 632/16-632/22 (Jones admitted that the bank exceeded the monetary obligation under the contract by $2.6 million) and 6/22/06 Tr. at 826/18-827/2 (where counsel for Defendant conceded this fact).

On August 19, 1988, Bancorp sent a list of the shareholders who had purchased stock in Bancorp to the Government. DX 171.

On February 9, 1989, the FHLBB confirmed "**that all conditions precedent have been met and the Conversion has been completed in accordance with"** Resolution No. 88-602. JX 101 (emphasis supplied); JS at ¶6.

**IV. <u>Breach Of The Contract By The Government</u>.**

On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which, among other things, abolished FSLIC and created the Office of Thrift Supervision ("OTS"). JS at ¶7. FIRREA also established three new capital standards applicable to savings and loan institutions, "core capital," "tangible capital," and "risk-based capital," and restricted the ability of thrifts to continue to use intangible assets to meet those requirements. 12 U.S.C. § 1464(t)(2); 54 Fed. Reg. 46,845 (Nov. 8, 1989). <u>Id</u>. Pursuant to FIRREA, supervisory goodwill could not be included in satisfying the tangible capital requirement. <u>Id</u>. at ¶8. In addition, supervisory goodwill had to be phased out by December 1994 when calculating core capital, and had to be amortized over a maximum of twenty years when calculating both risk-based and core capital. <u>Id</u>; 12 U.S.C. § 1464(t)(3)(A), (9)(B) and (C). On December 7, 1989, the regulations issued by the OTS under FIRREA became effective. <u>Id</u>; 54 Fed. Reg. 46,845 (Nov. 8, 1989).

Because First Annapolis could not meet FIRREA'S new capital requirements, on January 5, 1990, it submitted a capital plan to the OTS. JS at ¶9. By letter dated February 27, 1990, FHLBB informed First Annapolis that it was rejecting the thrift's capital plan. <u>Id</u>. at ¶10.
First Annapolis failed to meet the new capital requirements under FIRREA, and then, in June 1990, First Annapolis was placed into receivership. Tr. 6/21/06 at 618/07-618/11. From that time forward, obviously, the Government was in exclusive possession of all the books and records of First Annapolis, including all of the promissory notes, deeds of trust and other documents that related to any loans to shareholders.

**V. <u>Loans To Shareholders</u>.**

The loans to shareholders, which the Government contends constitute a prior material breach of contract, were all made by First Federal or First Annapolis, not Bancorp. See, e.g., JX 106, 108, 111, 115, 116, 122, 123.

To the extent any of the shareholder loans were procured by Edward O. Wayson ("Wayson") in the Summer of 1998, the Court has now ruled that "Wayson was not an agent or subagent of Bancorp for purposes of raising capital for the conversion and communicating with potential investors." Memorandum Opinion and Order Sustaining Plaintiff's Objection to Hearsay, filed August 23, 2006 ("August 23, 2006 Opinion"), at 15. Accordingly, none of the actions undertaken by Wayson, including his communications with potential investors, can be attributed to Bancorp.

The loans, identified by the Government as loans to purchase stock in Bancorp, were all commercial loans that were made at market rates, to qualified borrowers. See, e.g., JX 106, 108, 111, 115, 116, 121, 122, 123. The loan to Rental Management Associates ("RMA") in the amount of $1,000,000 was documented with a Promissory Note and secured by a Deed of Trust, which were executed by Patrick Cole ("Cole"), Peter Horrigan ("Horrigan"), Roger Howard ("Howard") and Marvin Taylor ("Taylor") . JX 106, 108; JS at ¶¶12, 14. The loan to Paul J. Jones, Jr. ("Paul Jones") in the aggregate amount of $275,000, was documented by a Commercial Promissory Note, and secured by a Deed of Trust. JX 122, 123; JS at ¶¶23, 24. The loan to William F. Jones ("William Jones") in the amount of $125,000 was documented by a Commercial Promissory Note and secured by a Deed of Trust. JX 115, 123; JS at ¶¶24, 28. The loan to Roy B. Cowdrey ("Cowdrey") in the amount of $50,000 was documented by a Commercial Promissory Note and secured by a Deed of Trust. JX 111, 123; JS at ¶¶24, 35.

Arthur H. Schwartz, M.D. ("Schwartz") testified in his deposition that he did not recall whether or not he actually took out a loan, and did not "recall signing a loan document." April 20, 2006 Arthur H. Schwartz deposition ("Schwartz Deposition") at 16/2-18/8. He did recall though, that, at the time of the settlement, "when I came in there that day I brought a check from my equitable line of credit for $150,000." Id. at 17/9-17/10.

The total number of shares of common stock in Bancorp purchased by Paul Jones, William Jones, Cowdrey, Schwartz, Cole, Horrigan, Howard and Taylor, was 1,600,000 shares, representing 11.29% of the total number of shares sold by Bancorp (14,165,874/1,600,000 = 11.29%). See DX 171; JS at ¶¶13, 22, 29, 39.

The loans made to the Daugherty Family Trust ("Daugherty Trust"), Daniel and Elizabeth Fitzgerald ("the Fitzgeralds") and Michael O'Brien ("O'Brien") were all made after John T. Daugherty, the Fitzgeralds and O'Brien had purchased their stock in Bancorp. DX 171; DX 397 at WOT3150147-0148. The Daugherty Trust and O'Brien were not shareholders in Bancorp. DX 171. During the course of the trial, the Government did not present any direct evidence that the loans to the Daugherty Trust, the Fitzgeralds and O'Brien were used by the borrowers to purchase of stock in Bancorp at or about the time of the conversion.

In April 1989, First Annapolis entered into an agreement with Second National Bank ("Second National") to purchase the loans made to RMA and Paul Jones. JS at ¶40; JX 140. By letter dated April 11, 1989, Second National informed First Annapolis that Second National had approved the purchase of the $275,000 loan to Paul Jones and the $1,000,000 loan to RMA at par. JS at ¶42; JX 140. The loan to RMA was sold to Second National **without recourse**. JX 106 at 2; 6/20/06 Tr. at

373/2-373/11. In return, First Annapolis agreed to purchase two of Second National's loans at par. JS at ¶43; JX 140. The loan to RMA was paid in full. 6/21/06 Tr. at 542/23-543/7.

In 1992, the loan to William Jones, on behalf of the RTC as Receiver for First Federal, was ultimately transferred to the Key Federal Savings Bank ("Key Federal"). PX 29 at 7-8. In 1997, the loan went into default, and William Jones settled the claim by Key Federal for the outstanding balance of the loan in exchange for a payment of $75,000. PX 29 at 8.

On October 16, 1992, Key Federal informed Cowdrey that it had purchased his loan from the RTC. PX 29 at 6. In November 1994, Cowdrey executed a Mutual Release with Key Federal, as successor-in-interest to the RTC as receiver for First Federal, pursuant to which he made a payment of $28,000 to Key Federal to settle the claim by the bank for the outstanding balance of the loan. Id.

The Government did not present any evidence at trial of the consideration received by First Annapolis for the transfer of either the William Jones loan or the Cowdrey loan to Key Federal.

## VI. The Examination Reports.

### A. The 1988 Examination.

On July 11, 1988 through August 19, 1988, FHLBB conducted a regular examination of the affairs of the bank. DX 118 at 1. The report for this examination was concluded on August 19, 1988, which was six days after the effective date of the conversion on August 13, 1989, and after the loans to RMA, Paul Jones, William Jones, Cowdrey and Schwartz had been made. DX 118. The report notes that "[o]n August 12, 1988, while this examination was in process, the institution consummated a supervisory stock conversion at the time its holding company, First Annapolis Bankcorp [sic], was capitalized through the sale of 14,165,874 shares of common stock at one dollar per share." Id. at

WOT3150007. During the course of the examination, a "schedule of stockholders [was] provided to the examiner," and the bank's "loan application register" was reviewed by the examiner. Id. at WOT3150008 and WOT3150030. Although the report made no mention of the shareholder loans which are the subject of this dispute, the report was critical of a variety of other loans made by the bank. Id. at WOT3150012, 0018, 0057-0059, 0062 and 0064.

**B. The 1990 Special Limited Examination.**

In January 1990, the Government conducted a special limited examination of the affairs of First Annapolis. DX 397. During the course of this examination, the Government learned of loans that were made to shareholders to purchase stock in Bancorp. PX 28 at 4 (the Government stated in its Interrogatory Answer that "[t]he Office of Thrift Supervision first became aware of the improper loans to shareholders during its examination for First Annapolis in January 1990"). William B. Crompton ("Crompton") testified that during the course of the 1990 examination in January 1990, the examiners discovered "that the bank had made a series of loans to a group of individuals who we knew had also purchased stock in the bank." 6/22/06 Tr. at 674/14-674/21.

In the examination report, there were comments that loans were made to shareholders to purchase stock in Bancorp. DX 397 at WOT3150147-0148.

Subsequent to the examination, in a letter dated April 18, 1990, the OTS notified First Annapolis of "specific issues of supervisory concern" in the examination report, including the loans to shareholders. DX 439. In this letter, OTS did not inform Bancorp that it had breached its contract with the Government on grounds of shareholder loans, or give any notice to Bancorp under Section V of the RCMA that it had committed a "Default" of its obligations under the RCMA. Id.

## ARGUMENT

### I. The Government Did Not Prove A Breach Of Any Term Of The Contract By And Between Bancorp And The Government.

The Government did not sustain its burden to prove that there was a prior material breach of any term of the contract by and between Bancorp and the Government. In order for there to be a prior material breach of contract, there first must be a breach of a term of the contract by the plaintiff. See Castle v. United States, 42 Fed. Cl. 859, 866 (1999) ("the documents relied upon by the government argue against there being a breach, material or not"), aff'd in part, rev'd in part, on other grounds, Castle v. United States, 301 F.3d 1328 (Fed. Cir. 2002).

During the course of the trial, the Government did not present any evidence that there was any term of the contract by and between Bancorp and the Government which prohibited loans to shareholders to purchase stock in Bancorp. A review of the three relevant documents, Resolution 88-602, Resolution 88-603 and the RCMA, confirms that there is no such term in the contract. See JX 92, 93 and 99.

In order to concoct a defense of a prior material breach of contract, the Government tries to bootstrap language in paragraph "X" of the Plan of Conversion attached to the Application H-(e)1 by Bancorp, dated November 5, 2987. JX 87 at WOT4150499. Paragraph X, under the heading, "Miscellaneous," on page 8 of the Plan of Conversion, states that "the association [First Federal] shall not loan funds or otherwise extend credit to any person to purchase shares of holding company stock offered in the conversion." Id. The Government though did not present any evidence that this

application was part of the contract by and between Bancorp and the Government.[2] The Government instead contends that this language in paragraph X of the Plan of Conversion should be considered because of the warranty provision in Section III.A of the RCMA. Section III.A of the RCMA provides that Bancorp "represents, covenants and warrants that the information given to the FSLIC by the Acquiror [Bancorp] and **relied upon thereby in connection with the acquisition of control of the New Institution** [First Annapolis] is true, accurate, complete and current in all material respects." JX 99 at 3 (emphasis supplied). The Government therefore asserts that there has been a breach of Section III.A of the RCMA on grounds that the statement in paragraph X of the Plan of Conversion is not accurate.

This contention by the Government fails for the simple reason that the Government presented no evidence that the FSLIC relied on the statement in paragraph X in the Plan of Conversion in any way whatsoever. None of the witnesses called by Government testified that the FSLIC "relied upon" this statement "in connection with the acquisition of control of" First Federal in any way whatsoever. Indeed, the Government did not call any witnesses from the FSLIC that were directly involved in the conversion. The Government did not even present any evidence as to whom the application was submitted to, or who reviewed the application. There is also nothing in the exhibits received in evidence which demonstrates that the FSLIC relied upon the statement in paragraph X "in connection with the acquisition of control of" First Federal in any way whatsoever. Thus, the assertion by the Government

---

[2] Indeed, a review of the documents submitted by Bancorp as exhibits to its Short Form Motion for Summary Judgment, confirms that the application was not part of the contract by and between Bancorp and the Government. See Plaintiff's Short Form Motion for Partial Summary Judgment, filed on May 23, 1997, and exhibits thereto.

that there has been a breach of Section III.A of the RCMA on grounds that the statement in paragraph X of the Plan of Conversion is untrue, must fail because of a failure of proof.

Moreover, assuming *arguendo* , that the foregoing omission of proof by the Government can be ignored and that somehow there was a breach of the warranty provision in Section III.A of the RCMA, does not mean that there was a material breach of contract by Bancorp. Instead, the RCMA merely provides that if there is a "default," that notice must be sent to Bancorp with an opportunity to cure. JX 99 at 4. Such default provisions are enforced by the Courts. See Cross Petroleum, Inc. v. United States, 54 Fed. Cl. 317, 325-327, 330 (2002) (finding that the government wrongfully terminated a gasoline supplier's contract when, prior to termination, it failed to issue a 10-day notice of default, as required by the contract); Stoner-Caroga Corp., Inc. v. United States, 3 Cl. Ct. 92, 94-95 (1983) ("Since the government failed to give the plaintiff such written notice [of default] at least 15 days before it appropriated and resold the mobile homes, it follows that the government breached the contract"); Bell BCI Co. v. HRGM Corp., 2004 WL 3222885, *5 (D.Md.) (D.Md. 2004) ("However, although HRGM's failure to provide adequate assurances may justify Bell's termination by default, **it cannot excuse Bell's failure to comply with the cure provisions**. While the default rule of the Restatement may permit immediate termination for anticipatory repudiation, this rule has been displaced by the explicit contract provision agreed to by the parties requiring a cure period of three working days. See Choice Hotels Int'l, Inc. v. Madison Three, Inc., 83 F.Supp.2d 602, 608 (D.Md.2000), Cross Petroleum v. United States, 54 Fed. Cl. 317, 325-26 (2002)" (emphasis added)). As such, under the express terms of the RCMA, there arguably could only be a breach of contract by Bancorp, if, there was breach of the warranty provision in Section III.A of the RCMA by Bancorp, notice was sent to

Bancorp with an opportunity to cure, and Bancorp failed to cure the violation. The Government presented no evidence that any notice of default was sent to Bancorp as required in the RCMA. Instead, both Park Zimmerman ("Zimmerman") and Gregory Jones ("Jones") confirmed that no such notice was sent to Bancorp. See, e.g., 6/19/06 Tr. at 115/1-115/21 (Zimmerman admitted that he never saw a notice of default tendered by the Government); 6/21/06 Tr. at 643/1-643/25. (Jones testified that, to his knowledge, "there was no separate letter that would constitute a default").

The testimony of Zimmerman in this regard confirms the failure by the Government to comply with default provision in the RCMA. Zimmerman agreed that the RCMA sets forth a procedure as to how a default under the agreement should be handled by the bank and the Government. 6/19/06 Tr. at 113/12-113/20. He confirmed that, in practice, this procedure happened all the time. Id. at 113/21-113/22. He agreed that this procedure controlled what the bank was required to do and what the Government was required to do. Id.

The additional argument by the Government, that there was a material breach of contract because of a regulatory violation, is fundamentally flawed for two reasons. First, nowhere do the Resolutions or the RCMA provide that if there is a violation of the regulations that there has been a material breach of contract by Bancorp. See JX 92, 93 and 99.

Second, even if it is assumed that somehow the regulations are incorporated into the contract, there still has not been a breach of any term of the contract by and between Bancorp and the Government because Bancorp complied with the regulations. At the time of the conversion, the FHLBB's rules and regulations regarding conversions of savings and loan institutions into a federal stock savings bank were found at 12 C.F.R. §563b. Subpart C to Part 563b of those regulations

governed voluntary stock conversions. Id. The relevant regulation under Subpart C to Part 563b in effect at the time of the conversion, 12 C.F.R. § 563b.3(c)(22) (1989), only applies to a "converting insured institution," and not a holding company. Moreover, the regulation is *not* a prohibition against shareholder loans to purchase stock in a holding company. Instead, it merely requires a provision in the plan[3] of conversion "[t]hat the converting insured institution shall not loan funds or otherwise extend credit to any person to purchase the capital stock of the institution." Id. It is undisputed, as set forth above, that there is a provision, paragraph X, in the Plan of Conversion which provides exactly what is required by the regulation, namely that "the association [First Federal] shall not loan funds or otherwise extend credit to any person to purchase shares of holding company stock offered in the conversion." JX 87 at WOT4150499.

Also, the regulation pertaining to holding companies, 12 C.F.R. §563b.9 does not make any prohibition against shareholder loans applicable to holding companies. Instead, the regulation is entitled "Conversion of an insured institution in connection with the formation of a holding company" and provides, in pertinent part, that "[u]nless clearly inapplicable, all of the requirements of this Subpart A [which would include 12 C.F.R. § 563b.3(c)(22)] shall apply to a conversion under this section." 12 C.F.R. §563b.9 (1989) (meaning that there is a requirement to have a provision in the plan of conversion "[t]hat the converting insured institution shall not loan funds or otherwise extend credit to

---

[3] Subparagraph (22) is preceded by Section 563b.3(c) which states: "(c) Required provisions in a plan of conversion. The plan of conversion shall:" (and thereafter 23 subparagraphs are listed, including subparagraph (22)).

any person to purchase the capital stock of the institution" as set forth in 12 C.F.R. § 563b.3(c)(22)(1989)). Since this is exactly what Bancorp did, Bancorp complied with the regulation.

## II. <u>The Government Did Not Prove A Breach Of Contract By Bancorp</u>.

The Government did not sustain its burden to prove that there was a breach of contract by Bancorp. Indeed, the Government did not present any evidence whatsoever that Bancorp was involved with any of the loans to shareholders used to purchase stock in Bancorp. None of the shareholders testified about any involvement by any representative of Bancorp with the loans they received to purchase stock in Bancorp. In this regard, Parran testified, without contradiction, that "I was not aware of any loans made to those individuals to purchase stock." 6/20/06 Tr. at 403/20-403/21. He further testified that he did not know of anyone else at the bank that was aware of those shareholders borrowing money to purchase stock in Bancorp. <u>Id</u>. at 403/23-404/1. None of the exhibits entered into evidence show any involvement whatsoever by Bancorp in the shareholder loans used to purchase stock in Bancorp. The only possible hope that the Government had to somehow prove that Bancorp was involved in the shareholder loans used to purchase stock in Bancorp was through the purported actions by Wayson. The Court's August 23, 2006 Opinion closed the door to that possibility.[4]

To the extent that any loans to shareholders constitute a violation at all, such violation was a regulatory violation by First Annapolis, not a prior material breach of contract by Bancorp. As explained in detail above, Bancorp actually complied with the regulations. Moreover, it is undisputed

---

[4] As the Court commented during the trial, without Wayson, the case is in a "hugely different posture." 6/22/06 Tr. at 821/7.

that all of the loans in question were made by First Annapolis, not Bancorp. It is also undisputed that Bancorp, as a duly organized holding company, is an entity separate and distinct from First Annapolis. As such, any improper loans that were made by First Annapolis cannot be imputed to Bancorp, and there is no evidence to the contrary. Furthermore, the letter from the OTS to First Annapolis, dated April 18, 1990, confirms that the issue of shareholder loans was an issue of "supervisory concern" over a possible regulatory violation by First Annapolis, not a breach of contract by Bancorp. DX 439. The letter informs First Annapolis of its "a number of specific issues of supervisory concern" in the January 1990 examination report, and provides in paragraph 6 that First Annapolis "shall remove all loans to stockholders, the purposes of which were to purchase stock in [Bancorp], from the Institution's books without material loss and without reciprocal lending arrangements with other financial institutions." Id. at 2. As such, the letter can only be construed as a notice to First Annapolis of a "supervisory concern" over a possible regulatory violation, with instructions to First Annapolis to remove the loans from its books, which does not constitute a prior material breach of contract by Bancorp. Id.

**III. Any Breach Of Contract By Bancorp Was Not A Material Breach.**

A breach of a contract "is material when it relates to a matter of vital importance or goes to the essence of the contract." Hometown Financial, Inc. v. United States, 409 F.3d 1360, 1370 (Fed. Cir. 2005); Thomas v. Dep't of Housing & Urban Development, 124 F.3d 1439,1442 (Fed. Cir. 1997) (citing 5 *Corbin on Contracts* §1104 (1964)). The issue is whether the breach substantially deprived the non-breaching party of the benefit of the bargain it struck. Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 620-21 (2000).

In determining whether or not a prior breach of contract is a material breach, the Court may consider "the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." Stone Forest Industries v. United States, 973 F.2d 1548, 1551 (Fed. Cir. 1992).

Even if *arguendo* there was a breach of the contract by Bancorp on grounds of shareholder loans, such a breach would not be a matter of vital importance and would not go to the essence of the contract. As explained above, the matter of vital importance or the essence of this contract was for Bancorp to invest new capital into First Annapolis, as set forth in Resolution 88-603, "in a minimum amount equal to the greater of $11,000,000 or an amount sufficient to raise the net worth of First Annapolis to 1% of its total liabilities on a GAAP basis." JX 93 at 11; JS at ¶3; JX 87 at WOT4150497; 6/19/06 Tr. at 43/25-44/6; 6/19/06 Tr. at 139/8-140/5. Even the Government witnesses confirmed that the matter of vital importance or the essence of the conversion was to get new capital. In this regard, Zimmerman testified that the "whole point of" the conversion was to get new capital. 6/19/06 Tr. at 43/25-44/3. He explained that "this conversion would not have been allowed were it not for the fact that it held a promise of bringing in new capital." Id. at 44/4-44/6. Rolf Nordstrom testified that "[i]t was critical" to raise new capital for a supervisory conversion. Id. at 139/23-140/5. He explained that "the whole reason that the institution was attempting to raise new capital is because it didn't have adequate capital to operate safely." Id. at 140/3-140/5. Jones testified, based on his experience, that the purpose of the supervisory conversion was "[e]ssentially, to raise capital for the institution to improve its capital position" and explained that capital is "the lifeblood of the thrift." 6/21/06 Tr. at 572/13-572/19.

Consistent with the foregoing, Bancorp raised $14,165,874 in capital and invested $13,665,907 in First Annapolis. Bancorp therefore raised $3,165,874 more in capital than it had to, and invested in First Annapolis $2,665,907 than it was required to. See JX 99 at 11; 6/21/06 Tr. at 632/16-632/22 (Jones admitted that the bank exceeded the monetary obligation under the RCMA by $2.6 million) and 6/22/06 Tr. at 826/18-827/2 (where counsel for Defendant conceded this fact). This over investment by Bancorp of $2,665,907 exceeds the total amount of the loans to RMA, Paul Jones, William Jones, Cowdrey and Schwartz, which was $1,600,000.[5] As such, even if the total amount of the loans to the foregoing shareholders is deducted from the amount of the investment Bancorp made in First Annapolis, there is still an over investment of $1,065,907 (2,665,907 - 1,600,000 = 1,065,907).

---

[5] During the trial, counsel for the Government attempted to argue that the total amount of the loans to shareholders was not $1,600,000 but rather $3,975,00 because of the loans to the Daughtery Trust, the Fitzgeralds and O'Brien. These other loans though should not be counted, because they were not made "to purchase shares of Holding Company stock offered in the Conversion," as set forth in paragraph X of the Plan of Conversion. JX 87 at WOT4150499. Instead, they were made well after the effective date of the conversion on August 13, 1988. For the same reason, the loans could not have been made "in connection with the acquisition of control of the New Institution," as required by the RCMA JX 99 at 3. Moreover, the Government presented no competent evidence that the loans to the Daughtery Trust, the Fitzgeralds or to O'Brien were loans that were made to purchase stock in Bancorp as part of the conversion. During cross examination, Crompton admitted he had no evidence that the loans were part of a pre-existing agreement to use funds from the bank to buy stock. 6/22/06 Tr. at 726/12-726/16, 727/24-728/2, 737/6-737/12. He also admitted that he had no objection to the underwriting or the quality of the loans. Id. at 724/9-724/14, 732/5-732/11, 738/18-738/20. He did not recall if he even looked at the documents with regard to the loan to the Daugherty Trust, and admitted that he did not ask to look at the work papers for the loans before he testified Id. at 730/14-730/20, 731/19-732/2, 735/17-735/18. The Government did not even provide any information about these loans in its Interrogatory Answers, where the Government simply stated that it "believes that The Daugherty Family Trust, Daniel J. Fitzgerald, Elizabeth B. Fitzgerald, and Michael O'Brien also received loans to purchase stock in Bancorp." PX 28 at 8. Furthermore, neither the Daugherty Trust, nor O'Brien, were shareholders in Bancorp. See DX 171 (instead John T. Daugherty and O'Brien Home Sales were listed as the shareholders).

As such, there can be no material breach of contract by Bancorp. Hometown Financial, 409 F.3d at 1370; Thomas, 124 F.3d at 1442; Mobil Oil, 530 U.S. at 620-21.

Also, in January 1990, which was soon after FIRREA's regulations became effective, the matter of the shareholder loans was not considered by the Government as a significant matter. Jones even testified that, because of other problems at the bank, "this issue was at that point in time not as significant." 6/21/06 Tr. at 635/7-635/10. Obviously, if it is not "significant" to the Government at the time, it should not serve as grounds for a prior material breach of contract, over **nine years later**.

Furthermore, as set forth in detail above, any loss to the Government resulting from the shareholder loans to RMA, Paul Jones, William Jones, Cowdrey and Schwartz is, at best for the Government, *de minimus* . The loan to RMA in the amount of $1,000,000 and the loan to Paul Jones in the amount of $275,000 were sold to Second National at par. JS at ¶43; JX 140. In return for the purchase of these two loans, First Annapolis purchased a loan from the Sunset Development Corporation in the amount of $1,900,000. JX 140. The loan to RMA was also sold to Second National, **without recourse**. JX 106 at 2; 6/20/06 Tr. at 373/2-373/11. The loan to RMA was paid in full. 6/21/06 Tr. at 542/23-543/7. Taylor testified that the loan was "paid in full, I'm sure." Id. at 543/1. Taylor explained "I know they had liens on our properties through Second National, and those properties were released and they were paid in full. So Second National was paid every penny of the million dollars." Id. at 543/4-543/7. After the loan to Paul Jones was sold to Second National, Paul Jones made payments to the RTC in the total amount of $135,000. PX 29 at 6. The unpaid principal balance of the $125,000 loan to William Jones was approximately $50,000. Id. at 8. The $50,000 loan to Cowdrey was sold by the RTC to the Key Bank Id. at 6. The Government did not provide

any evidence of the consideration received by the RTC for the sale of the loan to the Key Bank. Cowdrey settled the claim by the Key Bank in exchange for a payment of $28,000. Id. The Government also did not prove that there actually was a loan to Schwartz or that it sustained any loss resulting from the loan. Instead, Schwartz testified that he purchased his stock, or paid for his loan, if there was a loan, with a check in the amount of $150,000 from his home equity line of credit. Schwartz Deposition at 17/9-17/10.

As such, any actual loss to the Government, at most, should be no more than $100,000 ($50,000 for the unpaid balance of the loan to William Jones, plus the $28,000 unpaid balance of the loan to Cowdrey, minus the consideration received from Key Bank for the sale of the loan). The loan to RMA does not count because it was sold at par to Second National, without recourse, and was paid in full. The loan to Paul Jones does not count because it was sold at par to Second National. The loan to Schwartz does not count because of a failure of proof by the Government, and the testimony by Schwartz that he paid $150,000. Under this scenario, there can be no legitimate dispute that any breach of the contract by Bancorp was not a material breach.

## IV. The Government Has Waived Its Defense Of A Prior Material Breach Of Contract.

The Government has waived its defense of a prior material breach of contract in two ways. First, it waived its defenses during the course of its dealings with Bancorp, referred to below as substantive waiver. Second, it has waived its defense as a matter of procedure in this case, referred to below as procedural waiver.

### A. Substantive Waiver.

A material breach does not automatically and *ipso facto* end a contract. Cities Service Helix, Inc., v. United States, 543 F.2d 1306, 1313 (Ct. Cl. 1976). It merely gives the injured party the right to terminate the contract; the injured party can choose between canceling the contract and continuing it. Id. If the injured party decides to terminate the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). Id.

If the injured party elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach. Id. (citing 5 S. Williston, Contracts §§ 683-88 (3d ed. W. Jaeger 1961); Restatement of Contracts §§ 317, 309-10 (1932); 17 Am. Jur.2d *Contracts* §§ 446-47, 489, 503, 510 (1964)); Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271, 309-310 (2005) ("through its continued performance of the contract, the government waived any claim for prior material breach or material misrepresentation giving rise to the right to terminate the contract."); Barron Bancshares, Inc. v. United States, 53 Fed. Cl. 310, 322-323 (2002) (finding government's election to continue under the contract resulted in waiver of the prior breach by the plaintiff), aff'd, Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1383 (Fed. Cir, 2004) ("We agree with the court that through its continued performance of the contract, the government waived any claim for prior material breach or material misrepresentation giving rise to the right to terminate the contract"); Spectrum Holobyte California, Inc. v. Stealey, 885 F.Supp. 138, 140 (D.Md. 1995) ("A party who continues to accept benefits of a bilateral contract after breach generally waives the breach as a defense to his own failure to perform the contract").

Under the foregoing case law, even if the Government had a right to terminate the contract on grounds of a prior material breach, then the Government had an option to choose between canceling the contract or continuing with the contract. The undisputed evidence at trial was that the Government chose to continue with the contract. In this regard, Zimmerman testified that after the Government discovered the shareholder loans in early 1990, "[t[hey had several approaches," and the option to void the conversion was "not the one they chose to act on."[6] 6/19/06 Tr. at 108/18-108/23. Zimmerman was also not aware of any instance where he suggested to anyone that the conversion should be undone as a result of any regulatory violation. Id. at 110/8-110/17. Even after the Government learned of the loans in January 1990, it still did not inform Bancorp that it had breached its contract with the Government on grounds of shareholder loans, or give any notice to Bancorp under Section V of the RCMA that it had committed a "Default" of its obligations under the RCMA. Jones confirmed that, to his knowledge, a default letter was not sent out, as set forth in the RCMA. 6/21/06 Tr. at 643/1-643/25. Zimmerman also admitted that he never saw a notice of default tendered by the Government. 6/19/06 Tr. at 115/1-115/21. Jones even verified that when the Government found out

---

[6] As Crompton testified, there was a remedy where the Government could exclude the funds from loans to shareholders who purchased stock in the holding company. 6/22/06 Tr. at 750/18-750/22. Several years prior to the 1990 examination of First Annapolis, where another bank had undergone a stock conversion, the Government discovered that loans had been made for the purchase of stock, and after the loans were disclosed in an examination report, the Government required the bank "to exclude any of those funds from their capital base until such time as those loans were paid off." Id. Crompton explained "because they had financed their own stock conversion, they weren't allowed to count the funds for capital." Id. at 750/23-750/25.

about the shareholder loans, it elected to treat the matter as a regulatory violation. 6/21/06 Tr. at 649/15-649/25.

Moreover, as mentioned above, on April 18, 1990, Jones sent a letter to First Annapolis informing the bank "of specific issues of supervisory concern" in the January 1990 examination report. DX 439. The letter provides, in item 6, that First Annapolis "shall remove all loans to stockholders, the purposes of which were to purchase stock in [Bancorp], from the Institution's books without material loss and without reciprocal lending arrangements with other financial institutions." Id. at 2. As such, the letter can only be construed as a notice to First Annapolis of a "supervisory concern," of a possible regulatory violation, with instructions to First Annapolis to remove the loans from its books, which does not constitute a prior material breach of contract by Bancorp. Id. Jones described this request in item 6 as a request "[f]or them to get the loans that had been made to shareholders off the institutions books." 6/21/06 Tr. at 605/13-605/14. He further testified:

> Q. Yea. Your response to this phenomenon for the reasons that you've described was you went to the bank, not you personally, although it may well have been you, and said get those loans off the books of First Annapolis, right?
>
> A We conveyed that as the transmittal of the exam report to the institution in April of 1990, yes.
>
> Q. And that may be the document I was looking for. And among the ways that they could do that, as you recall the event, was that they could simply finance those loans somewhere else? Actually, its Exhibit 439. I thank you for the help, sir, which is your transmittal letter of the report. And the corrective action that the government required as a result of this violation is as set forth in paragraph number 6 of your cover letter, is it not? "The institution shall remove all loans to stockholders, the purposes of which were to purchase stock in the institution, from the institution's books, without material loss and without reciprocal lending arrangements with other financial institutions." Right?
>
> A. That's not paragraph 6. It's item 6. But yes, that's where we -

Q. Item 6, I'm sorry. Item 6.

A. Yes.

Q. Now, other than that, did the government require any curative action as a result of this regulatory violation called shareholder loans?

A. No.

Q. Now, you can confirm for me, will you, that the government never took action to revoke the effect of the conversion?

A. At the time that was not the most pressing issue to the solvency of the institution, and resolution of that was not as critical as some of these other matters.

Q. And I understand what you say. I'm simply trying to get on this record that the government never took any steps to revoke the effectiveness of this conversion.

A. No.

Q. And it never took any action at the time to, I don't know, impair the bargained-for forbearances that the holding corporation had gotten in exchange for new money, right?

A. Correct.

Q. In fact, it's true, is it not, that the government in its deliberations never even considered such a thing at the time. Isn't that so?

Mr. Pittman: Objection, calls for speculation.

The COURT: He was there. Overruled.

MR. PITTMAN: I'd ask for a foundation.

THE COURT: He already testified about the deliberations.

Mr. Pittman: Thank you, your honor.

Witness: No, there was no other measure.

Id. at 636/24-638/24. Jones then admitted that when the report was transmitted, nobody ever suggested to invalidate the conversion. Id. at 640/9-640/12.

As such, the April 18, 1990 letter, coupled with the foregoing testimony by Jones, is sufficient evidence of waiver by the Government. See H. N. Bailey & Assocs. v. United States, 196 Ct. Cl. 156, 163 (1971) (in holding that the Government had waived its right to terminate a contract, the Court found: "[t]herefore, telling plaintiff what the defects were, without more, not accompanied by a termination, in effect was a notice of election that defendant would not terminate and plaintiff was to make the second submission"); Sun Cal, Inc. v. United States, 21 Cl. Ct. 31, 41 (1990) (in holding that the harshness of contract termination requires unambiguous notice, the Court stated: "[t]he various correspondence from the contracting officer indicate that the government would not accept the premises until the build-out was adequately completed. But none clearly advises plaintiffs that a new default date was being established and that plaintiffs' contract would, or could be, terminated for default").

Even after the April 18, 1990 letter was sent, and First Annapolis was taken over by the Government, the Government still did not choose to cancel the contract. It, admittedly, did not do so until September 14, 1999, when the Government raised, for the first time, its defense of a prior material breach of contract by Bancorp on grounds of shareholder loans in its Motion to Dismiss Counts II, V, VI And VII Of Plaintiff's Complaint And Motion For Summary Judgment As To Counts I, III and IV, at pages, 26-27, filed herein on September 14, 1999. PX 33 at 4. This **nine year delay**, by itself, is also sufficient evidence of a waiver by the Government. See Acme Process Equip. Co. v. United States, 171 Ct. Cl. 324, 337 (1965), rev'd on other grounds, 385 U.S. 138 (1966) (the Court held

that the Government, by inexcusably delaying for one year, lost its right to terminate the contract for prior material breach when it did not expressly reserve the right. The Court noted that because the cancellation of a contract has serious financial effects, "[t]o avert extreme hardship, we think that the Government is obliged to take such a course within a reasonable time after it has discovered the breach"). Under any circumstance, a **nine year delay** from the discovery of the breach in early 1990 until September 14, 1999, is not a reasonable period of time to give notice of a prior material breach. Instead, it is an inherently unreasonable period of time, and, as such, the Government has waived its defense of a prior material breach. Id.

Furthermore, the Government waived its defense of a prior material breach because it should have had constructive knowledge of the loans, prior to February 9, 1989 when it confirmed that "all conditions precedent have been met." JX 101. In this regard, waiver of a right to terminate a contract on grounds of prior material breach does not require "actual knowledge," but whether the party knew, or should have known, of the breach. Caroline Hunt, 65 Fed. Cl. at 309-310 ("After hearing testimony in this regard, the court finds that the regulators' extensive reviews, audits, and particularly their interest in establishing additional loan loss reserves, both pre- and post-merger, as well as their comments about SSA's loan process and portfolios, that **they knew or should have known** of the financial conditions of which the government now complains) (emphasis supplied); Melrose Associates, L.P. v. U.S., 43 Fed. Cl. 124, 149 (1999) ("Waiver requires (1) the existence at the time of the waiver a right, privilege, advantage or benefit that may be waived; (2) **the actual *or constructive* knowledge thereof**; and (3) an intention to relinquish such right, privilege, advantage or benefit.") (emphasis supplied) (quoting Youngdale & Sons Constr. Co. v. United States, 22 Cl. Ct. 345, 346 (1991)); see

also Lauder v. First UNUM Life Ins. Co., 284 F.3d 375, 381-382 (2d Cir. 2002) (finding actual or constructive knowledge satisfied the knowledge requirement for waiver, the Court held: "By giving First UNUM all the information she had to prove her case, Lauder met her obligation under the policy. Any complaints First UNUM now has about the sufficiency of such evidence are a direct result of its decision not to investigate Lauder's claim").

Constructive knowledge of the loans should be attributed to the Government because between August 13, 1988 and February 9, 1989, it had a full and fair opportunity to discover the loans, including access to any of the loan documents or records of the bank pertaining to the loans. Indeed, at the very time the loans were being made, examiners from the Government were conducting the 1988 regular examination of the bank. DX 118. The 1988 examination report even notes that "[o]n August 12, 1988, while this examination was in process, the institution consummated a supervisory stock conversion at the time its holding company, First Annapolis Bankcorp [sic], was capitalized through the sale of 14,165,874 shares of common stock at one dollar per share." Id. at WOT3150007. During the course of the examination, a "schedule of stockholders [was] provided to the examiner," and the bank's "loan application register" was reviewed by the examiner. Id. at WOT3150008 and WOT3150030. Although the report made no mention of the shareholder loans, the report was critical of a variety of other loans made by the bank. Id. at WOT3150012, 0018, 0057-0059, 0062 and 0064. Crompton even testified that "[t]he timing of the [1988] examination corresponded with the bank's supervisory stock conversion." 6/22/06 Tr. at 666/2-666/7. He further noted that, at the time of the 1988 exam, "we were familiar with who the shareholders were." 6/22/06 Tr. at 675 13/676/2. Also, Jones admitted that the examiners in the normal course of that examination, would have had full

and complete access to the personnel of the bank to whatever questions they wanted to ask and full access to all of the records of the bank, including the loan files. 6/21/06 Tr. at 623/2-623/14. Moreover, on January 24, 1989, Jones even wrote a letter to counsel for First Annapolis, in which he stated "[w]e acknowledge receipt of the conversion material submitted in accordance with" Resolution 880602, and that "[w]e require no additional information and deem the material to be satisfactory." DX 287. Considering all of the foregoing, the Government, if it was sincerely interested in shareholder loans, should have known that there were loans to shareholders used to purchase stock in Bancorp, and thereby waived its defense of a prior material breach of contract. Caroline Hunt, 65 Fed. Cl. at 309-310; Melrose Associates, 43 Fed. Cl. at 149; Youngdale & Sons, 22 Ct. Cl. at 346; Lauder, 284 F.3d at 381-382.

**B. Procedural Waiver.**

On August 10, 1994, Bancorp filed its Complaint herein and alleged its claims for breach of contract in Count I, for violation of law (12 U.S.C. § 1441a(b)(10)(B) & (c) in Count II, breach of Contract in Count III, breach of implied-in-fact contract in Count IV, promissory estoppel in Count V, failure of consideration and frustration of purpose in Count VI, and Fifth Amendment taking in Count VII.

On September 18, 1996, Chief Judge Loren A. Smith issued the Omnibus Case Management Order ("CMO") herein. The CMO states that "[t]his Order applies to all Winstar-related cases ("Winstar cases" or "cases"), including any claims, special pleas in fraud, **defenses**, **affirmative defenses**, setoffs, counterclaims, or other issues raised in those cases . . . " Id. at 1 (emphasis

supplied). Pursuant to the CMO, plaintiffs in the Winstar cases were permitted to file motions for summary judgment on two issues: "(1) whether a contract existed in each case; and (2) whether the Government acted inconsistently with that contract." Id. at 6. The Government was given 60 days to respond to those issues. Id. The CMO further provided that within 120 days of the filing of a motion for partial summary judgment, the Government was also ordered to "set forth, in accordance with the requirements of the rules of this Court, any defenses of which it knows or has reason to know that relate to the two issues asserted in the motion." Id. at 7.

On May 23, 1997, Bancorp filed its Short Form Motion for Partial Summary Judgment, including all of the exhibits that constitute the contract by and between Bancorp and the Government. On July 22, 1997, the Government filed its Response to the Motion and merely argued that the Government's regulatory approvals did not establish a contract, that the FHLBB did not have authority to enter into a contract and that, even if there were a contract, First Annapolis was expressly advised that First Annapolis would have to meet the capital benchmarks set forth in the Business Plan after five years. July 22, 1997 Response by Defendant at 12-24. The Government did not raise any defense of a prior material breach of contract on grounds of shareholder loans or otherwise.

On August 21, 1997, Judge Smith entered an Order in all Winstar cases, including this case, which clarified the requirements for the Government's 120-day response to a motion for partial summary judgment, set forth in the CMO. Judge Smith prefaced the order with the explanation that "[p]ursuant to the remarks made by the Court on July 23, 1997 regarding the adequacy of the

Government's 120-day response generally, and regarding the motion of the Coast plaintiff's Proposal for Entry of Judgment in particular the following is ORDERED." Id. at 1. The Order then provides:

> 1) It has always been the court's understanding that, under the procedures established in the Omnibus Case Management Order, the 120-day response to a motion for partial summary judgment must contain more than a mere listing of possible or theoretical defenses that could conceivably exist. Such a filing is of no use, either to the parties or to the court, in advancing these cases towards resolution. It is the court's understanding that the 120-day response is intended to require more than mere assertions, and should be consistent with RCFC 56(d), which requires a respondent to "state the precise nature of its disagreement and give its version of the events, supported by record citations."

Id. at 1-2.

On October 1, 1997, the Government responded to paragraph 5.d of the CMO, as clarified by Judge Smith, and filed a pleading entitled "Supplemental Filing Pursuant to Paragraph 5.d of the Omnibus Case Management Order," in which it merely referred to the defenses raised in its July 22, 1997 memorandum. Once again, the Government did not raise any defense of a prior material breach on grounds of shareholder loans or otherwise.

On December 22, 1997, Judge Smith issued his decision in California Federal in which he found for the plaintiffs in the four consolidated cases on all eleven of the common issues identified by the plaintiffs' coordinating committee as common to the Winstar cases. California Federal Bank v. United States, 39 Fed. Cl. 753 (1997) ("Cal Fed. I"). Judge Smith also ordered the Government in all Winstar cases, including this one, to show cause why the Court should not grant the pending short form motions for summary judgment. Id.

After discovery commenced, on February 20, 1998, the Government filed its response to the Show Cause Order. Once again the Government merely reiterated the arguments raised in its July 22, 1997 pleading. For the third time, the Government did not raise any defense of a prior material breach on grounds of shareholder loans or otherwise.

On March 23, 1998, this Court ordered Bancorp to submit a proposed order entering summary judgment on the issue of liability and ordered the Government to identify specific facts in this case which distinguish it from the holding in the Court's December 22, 1997 decision in Cal Fed I. On March 31, 1998, Bancorp submitted its proposed order and memorandum in support thereof. In its response, filed on April 30, 1998, the Government failed to set forth any facts to distinguish this case from Cal Fed I, and, for the fourth time, did not raise any defense of a prior material breach on grounds of shareholder loans or otherwise.

On July 30, 1998, the Government filed another pleading entitled "Supplemental Filing Pursuant to Paragraph 5.d of the Omnibus Case Management Order," in which it merely referred to the defenses raised in its prior pleadings. For the fifth time, the Government did not raise any defense of a prior material breach on grounds of shareholder loans or otherwise.

In reliance upon the above-mentioned pleadings filed by the Government, during the course of discovery (up until the discovery deadline of July 31, 1999), Bancorp did not take, at that time, any discovery from the Government concerning the defense of a prior material breach of contract on the grounds of shareholder loans. The discovery deadline herein was July 31, 1999. On September 3,

1999, the Government filed a motion to reopen discovery to take the depositions of various shareholders. On November 24, 1999, Judge Hodges denied that Motion.

On September 14, 1999, the Government raised, for the first time, its defense of a prior material breach of contract by Bancorp on grounds of shareholder loans. See Defendant's Motion to Dismiss Counts II, V, VI and VII of Plaintiff's Complaint and Motion for Summary Judgment as to Counts I, III, IV, filed September 14, 1999 (on pages 26-28 Defendant argued that there is a material fact in dispute which precludes summary judgment in favor of Plaintiff). In addition to the foregoing, prior to September 14, 1999, nowhere in the myriad of other pleadings filed by the Government in this case, and at no time during the numerous status conferences and hearings before the Court, did the Government ever raise the defense that Bancorp was not entitled to summary judgment on grounds of shareholder loans.

After this case was reassigned to the Honorable Mary Ellen Coster Williams, at the invitation of the Court, on December 9, 2005, the Government filed a Motion to Reopen Discovery to conduct depositions of shareholders on the issue of shareholder loans. On January 20, 2006, the Court, over objection by Bancorp, granted that Motion.

In determining whether a defense has been waived, "the Court must inquire whether the defendants violated any scheduling orders in raising the defense for the first time in their summary judgment motions." Eddy v. Virgin Islands Water and Power Auth., 256 F.3d 204, 210 (3d Cir. 2001). Where a party has violated such scheduling orders and been dilatory in raising a substantive defense, any right that the party may have had to raise that defense can be waived. Id.; see also Fifth

Third Bank of Western Ohio v. United States, 55 Fed. Cl. 372, 377 (2003) ("The Government may not interpose the defense that plaintiff is not the real party in interest seven years after filing of the complaint. Defendant has waived its right to raise this issue."); Burton v. Northern Dutchess Hospital, 106 F.R.D. 477, 481-82 (S.D.N.Y.1985) (failure to argue dispositive issue of deficient service of process over three and one-half years waives defense, even though defense was asserted in answer).

Because the Government did not comply with the CMO, it did not comply with the August 21, 1997 Order, it did not comply with the December 22, 1997 Show Cause Order, it did not comply with the March 23, 1998 Order, it did not comply with Rule 56 of this Court, and failed to raise its defense of a prior material breach until approximately **eleven years** after the loans to shareholders were made, **nine years** after its discovery of the loans, and **five years** after this case was filed, it has waived its defense of a prior material breach on grounds of shareholder loans. Id.

**V. The Government's Other Defenses Of A Failure Of Condition Precedent And Fraud Should Be Rejected.**

During closing argument after the conclusion of the trial, counsel for the Government alluded to two new affirmative defenses, a failure of condition precedent and some sort of unspecified fraud by Bancorp. For the same reasons that the Government has waived its defense of a prior material breach of contract discussed in detail above, the Government has also waived these two new defenses. Indeed, the assertion of these two new defenses is even more egregious than the assertion by the Government of its defense of a prior material breach. Not once during the course of dealings between Bancorp and the Government, or during the course of these proceedings, did the Government ever take the position that Plaintiff's claims are barred because of these two new defenses. This last minute

attempt by the Government to interject two new defenses should not be tolerated. See Jones v. Childers, 18 F.3d 899, 909 (11th Cir. 1994) (District Court did not abuse its discretion in refusing to allow defendants to add affirmative defenses less than one week prior to pretrial conference, considering that defendants' attempt to add such defenses came nearly four years after filing of original answer, after completion of discovery, and after trial was set) .

Moreover, Bancorp would be unduly prejudiced, if the Court were to allow the Government to amend its pleadings at the close of the trial to, somehow, conform to the evidence. See Campana v. Eller, 755 F.2d 212, 215 (1st Cir.1985) (amendment of pleadings to conform to the evidence may be allowed at the discretion of the court, but only to the extent that the opposing party will not be unduly prejudiced). These two new affirmative defenses are based on entirely different legal theories. Bancorp was denied any opportunity to take discovery of the facts in support of these theories, and based its presentation of the evidence and cross examination during the course of the trial solely on the defense of a prior material breach.

Moreover, even if these defenses are considered, they should be summarily rejected. As to a purported failure of condition precedent, as set forth above, on February 9, 1989, the Government expressly confirmed "**that all conditions precedent have been met and the Conversion has been completed in accordance with"** Resolution No. 88-602. JX 101 (emphasis supplied); JS at ¶6. During the period of time from the effective date of the conversion on August 13, 1988 and February 9, 1989, the Government had ample time and means to investigate compliance with any conditions

precedent by Bancorp. It cannot now, **seventeen years later**, wholeheartedly reject its prior finding that "all conditions precedent have been met." Id.

Moreover, there is no express condition precedent in the contract documents, which expressly states that the contract is void and Bancorp must forfeit its investment if First Annapolis made loans to shareholders to purchase stock in Bancorp. In this regard, "[c]onditions precedent are disfavored and will not be read into a contract unless required by plain unambiguous language." Effects Associates, Inc. v. Cohen, 980 F.2d 555, 559 n7 (10th Cir. 1990); accord Jacob Maxwell, Inc. v. Veeck, 110 F.2d 749, 754 (11th Cir. 1997).

As to fraud, aside from waiver, the Government has not complied with Rule 9(b) of the Rules of this Court, which provides that "[i]n **all averments of fraud or mistake**, the circumstances constituting fraud or mistake shall be stated with particularity." Emphasis supplied. Accord In re Newbridge Networks Securities Litigation, 962 F.Supp. 166, 170-72 (D.D.C. 1997) (interpreting Rule 9 of the Federal Rules of Civil Procedure).[7] To sustain a fraud claim, a plaintiff must also identify the persons making the alleged misrepresentations. U.S. Ex Rel. Alexander v. DynCorp, Inc., 924 F.Supp. 292, 303 (D.D.C. 1996) (and cases cited therein). The case law for negligent misrepresentation also provides that each element of a claim of negligent misrepresentation, like fraud claims, must be particularly pleaded. In Re U.S. Office Products Co. Securities Litigation, 251 F. Supp.2d 58, 74 & n.9 (U.S.D.C. 2003).

---

[7] Rule 9 of the Federal Rules of Civil Procedure is identical to Rule 9 of the Rules of this Court.

In addition to a wholesale failure to comply with Rule 9(b), counsel for Defendant even acknowledged during closing argument that the Government has not filed a fraud counterclaim in this case and has not obtained any authorization from the Fraud Section of the Department of Justice to allege a claim of fraud. 6/22/06 Tr. at 821/10-821/14.

Moreover, the Government has not proven fraud with clear and convincing evidence, as required under the case law. Atraqchi v. GUMC Unified Billing Services, 788 A.2d 559, 563 (D.C. 2002) (citations omitted) (each element of fraud must be proven by clear and convincing evidence); see also Redmond v. Birkel, 933 F.Supp. 1, 3 (D.D.C. 1996) (fraud is never presumed; if there is a lack of proof as to any one element, the fraud claim must fail). During the trial, the only witness to even remotely suggest fraud, was Zimmerman, who suggested that the managers of First Annapolis may have been dishonest. On cross examination, however, he was not able to identify the names of any persons he thought were dishonest and conceded that he did not have any evidence, other than what is in the documents, to support his conclusion. 6/19/06 Tr. at 125/6-126/5. As such, Zimmerman's testimony falls far short of proving any type of fraud by clear and convincing evidence. Even if the Government intends to fashion its assertion of fraud in the form of fraudulent inducement, or even some sort of negligent misrepresentation, there is no evidence whatsoever that any representative of Bancorp made any statement to the Government as the basis for such a defense. This never ending charade of post-hoc defenses concocted by the Government should come to an end, the Court should rule in favor of Bancorp and proceed to a trial on damages.

## CONCLUSION

Wherefore, Plaintiff respectfully requests that the Court rule that there has been no prior material breach of contract by First Annapolis Bancorp, Inc.

Respectfully submitted,

Dated: September 18, 2006

COOTER, MANGOLD, TOMPERT
& KARAS, L.L.P.

s/Dale A. Cooter

Dale A. Cooter
5301 Wisconsin Avenue, NW
Suite 500
Washington, DC 20015
Tel: (202)537-0700
Facsimile: (202)364-3664

*Attorney for Plaintiff*
*First Annapolis Bancorp, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 18th day of September 2006, a copy of the foregoing Brief was filed electronically pursuant to the Electronic Case Filing procedures of the United States Court of Federal Claims, with service by Notice of Electronic Filing to the designated attorneys and parties of record.

s/Dale A. Cooter
Dale A. Cooter