**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 94-522C**
**(Judge Williams)**

---

**FIRST ANNAPOLIS BANCORP, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S POST-TRIAL BRIEF

---

**STUART E. SCHIFFER**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Deputy Director**

**WILLIAM F. RYAN**
**Assistant Director**

**RICHARD B. EVANS**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 353-7760**
**Fax: (202) 305-7643**

**Attorneys for Defendant**

**Of Counsel:**

**TIMOTHY ABRAHAM**
**MELINDA HART**
**MARK PITTMAN**
**DELISA M. SANCHEZ**

**Trial Attorneys**

**September 18, 2006**

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . iii

SUMMARY OF ARGUMENT . . . . . 1

I. BANCORP IS NOT A PARTY TO A CONTRACT FOR GOODWILL OR SERVICE CORPORATION FORBEARANCES AND ANY OTHER CONTRACT TO WHICH BANCORP MAY BE A PARTY IS IRRELEVANT . . . . . 2

II. THE EVIDENCE AT TRIAL PROVED THAT BANCORP COMMITTED A PRIOR MATERIAL BREACH OF ITS ALLEGED CONTRACT WITH THE GOVERNMENT . . . . . 7

A. The Law Of Prior Material Breach . . . . . 9

B. Bancorp's Alleged Contract Includes, Among Other Documents, The Applications Submitted By First Federal And Bancorp To The FHLBB . . . . . 12

C. Under The Terms Of Its Alleged Contract, Bancorp Had A Duty To Ensure Shareholder Loans Were Not Used To Fund First Federal's Supervisory Conversion . . . . . 17

D. The Shareholder Loans Represent A Prior Breach By Bancorp Of Its Alleged Contract With The Government . . . . . 21

1. First Annapolis' 1990 Bank Examination . . . . . 21

2. Continental Financial Holdings, Inc. . . . . . 23

3. The Impermissible Shareholder Loans . . . . . 24

4. The Impermissible Shareholder Loans Went Into Default . . . . . 28

5. The Bancorp Shareholders Contemplated Legal Action . . . . . 30

6. Bancorp Had Knowledge Of First Federal's Violation Of The Terms Of Its Conversion Application And Applicable Regulations . . . . . 30

E. Bancorp's Prior Breach Is Material . . . . . 32

III. SHOULD THE COURT FIND THAT THE IMPROPER SHAREHOLDER LOANS PRECEDED THE FORMATION OF THE CONTRACT, THE GOVERNMENT WOULD STILL NOT BE LIABLE BECAUSE IT WOULD CONSTITUTE THE FAILURE OF A CONDITION PRECEDENT . . . . . . . 40

A. The Date Of Contract Formation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

B. The Existence Of The Failure Of A Condition Precedent . . . . . . . . . . . . . . . . . . 42

C. The Effect Of The Failure Of A Condition Precedent . . . . . . . . . . . . . . . . . . . . . 44

D. The Court Can Conform Its Findings To The Evidence Admitted At Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

IV. THE GOVERNMENT HAS NEVER WAIVED ITS PRIOR MATERIAL BREACH DEFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

A. The Government Did Not Procedurally Waive Its Prior Material Breach Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

B. The Government Did Not Substantively Waive Its Prior Material Breach Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

1. The Government Did Not Voluntarily And Intentionally Relinquish Its Right To Terminate The Alleged Contract . . . . . . . . . . . . 50

2. The Government Did Not Have Knowledge Of The Shareholder Loans Prior to The 1990 Examination . . . . . . . . . . . . . . . . . 53

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

# TABLE OF AUTHORITIES

## FEDERAL CASES

6247 Atlas Corp. v. Marine Ins. Co., Ltd.,
923 F. Supp. 523 (S.D. N.Y. 1996),
aff'd, 104 F.3d 352 (2d Cir. 1996) . . . . . 43

Admiral Fin. Corp. v. United States,
57 Fed. Cl. 418 (2003),
aff'd, 378 F.3d 1336 (Fed. Cir. 2004) . . . . . 10

Alliant Techsystems, Inc. v. United States,
178 F.3d 1260 (Fed. Cir. 1999) . . . . . 9

Ashcraft & Gerel v. Coady,
244 F.3d 948 (D.C. Cir. 2001) . . . . . 51

Bradford Audio Corp. v. Pious,
392 F.2d 67 (2d Cir. 1968) . . . . . 45

Brazos Electric Power Co-op., Inc. v. United States,
49 Fed. Cl. 398 (2001) . . . . . 42

Browning Debenture Holders' Committee v. DASA Corp.,
560 F.2d 1078 (2d Cir. 1977) . . . . . 47

Caroline Hunt Trust Estate v. United States,
65 Fed. Cl. 271 (2005),
appeals argued, Nos. 05-5141, -5179 (Fed. Cir. June 9, 2006) . . . . . 50

Cherokee Nation v. United States,
355 F.2d 945 (Ct. Cl. 1966) . . . . . 50, 54

Christopher Village, L.P. v. United States,
360 F.3d 1319 (Fed. Cir. 2004) ,
cert. denied, 543 U.S. 1146,
reh'g denied, 544 U.S. 992 (2005) . . . . . *passim*

College Point Boat Corp. v. United States,
267 U.S. 12 (1925) . . . . . 10, 51

Dow Chemical Co. v. United States,
226 F.3d 1334 (Fed. Cir. 2000) . . . . . 52, 53

Farmers Grain Co. of Esmond v. United States,
33 Fed. Cl. 298 (1995) . . . . . . . . . . 10

Favell v. United States,
16 Cl. Ct. 700 (1989) . . . . . . . . . . 45

Fifth Third Bank of Western Ohio v. United States,
55 Fed. Cl. 372 (2003) . . . . . . . . . . 49

First Interstate Bank of Idaho v. Small Business Admin.,
868 F.2d 340 (9th Cir. 1989) . . . . . . . . . . 52

Foman v. Davis,
371 U.S. 178 (1962) . . . . . . . . . . 45, 47

General Eng'g & Mach. Works v. O'Keefe,
991 F.2d 775 (Fed. Cir. 1993) . . . . . . . . . . 50

George A. Fuller Co. v. Alexander & Reed, Esqs.,
760 F.Supp. 381 (S.D.N.Y. 1991) . . . . . . . . . . 46

Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.,
962 F.2d 628 (7th Cir. 1992) . . . . . . . . . . 43

Hoffman v. General Motors Acceptance Corp.,
814 F.2d 1385 (9th Cir. 1987) . . . . . . . . . . 51

Hometown Fin., Inc. v. United States,
409 F.3d 1360 (Fed. Cir. 2005) . . . . . . . . . . 9, 10, 32

Lincoln National Life Ins. Co. v. United States,
582 F.2d 579 (Ct. Cl. 1978) . . . . . . . . . . 50

Malone v. United States,
849 F.2d 1441 (Fed. Cir. 1988) . . . . . . . . . . 10, 11

McDonnell Douglas Corp. v. United States,
182 F.3d 1319 (Fed. Cir. 1999) . . . . . . . . . . 52

Mobil Oil Exploration & Producing Southeast, Inc. v. United States,
530 U.S. 604 (2000) . . . . . . . . . . 11, 39, 40

Moratzka v. United States (In re Matthieson),
63 B.R. 56 (D.Minn. 1986) . . . . . . . . . . 44

Nicholls v. Tufenkian Import/Export Ventures, Inc.,
367 F.Supp.2d 514 (S.D.N.Y. 2005) . . . . . . . . . . 46

Pacific Gas & Elec. Co. v. United States,
70 Fed. Cl. 766 (Apr. 25, 2006) . . . . . . . . . . 52

Pacific States Corp. v. Hall,
166 F.2d 668 (9th Cir. 1948) . . . . . . . . . . 50

Reliance Ins. Co. v. United States,
20 Cl. Ct. 715 (1990) . . . . . . . . . . 50, 54

Reservation Ranch v. United States,
39 Fed. Cl. 696 (1997) . . . . . . . . . . 52

Royall Nat. Bank of Palestine, Tex. v. United States,
566 F.2d 1151 (Ct. Cl. 1977) . . . . . . . . . . 42

Scott Timber Co. v. United States,
64 Fed. Cl. 130 (2005) . . . . . . . . . . 52

Southern California Fed. Sav. & Loan Ass'n v. United States,
422 F.3d 1319 (Fed. Cir. 2005) . . . . . . . . . . *passim*

Stone Forest Indus., Inc. v. United States,
973 F.2d 1548 (Fed. Cir. 1992) . . . . . . . . . . 9, 10, 11

Thomas v. Dep't of Housing & Urban Development,
124 F.3d 1439 (Fed. Cir. 1997) . . . . . . . . . . 10

Wells Fargo Bank, N.A. v. United States,
88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . 44

Wetsel-Oviatt Lumber Co. v. United States,
43 Fed. Cl. 748 (1999) . . . . . . . . . . 52

Williams v. Ashland Eng'g Co.,
45 F.3d 588 (1st Cir. 1995) . . . . . . . . . . 49

Zenith Radio Corp. v. Hazeltine Research, Inc.,
401 U.S. 321 (1971) . . . . . . . . . . 46

## STATE CASES

Parkview General Hospital, Inc. v. Eppes,
447 S.W.2d 487 (Tex. Civ. App. – Corpus Christi 1969, writ ref. n.r.e.) . . . . . . . . . . . . . . . . . . 44

Ross v. Harding,
391 P.2d 526 (Wash. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## RULES & STATUTES

12 C.F.R. § 563b.3(a) (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

12 C.F.R. § 563b.3(c)(22) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

12 C.F.R. § 563b.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 18

12 C.F.R. § 563b.20(c) (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

12 C.F.R. § 563b.24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

12 C.F.R.§ 563b.26(b)(2)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 32

12 C.F.R. §563b.29(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 32

RCFC 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46, 47

RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## MISCELLANEOUS

American Jurisprudence, Contracts § 38 (2d ed. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

American Jurisprudence, Contracts § 458 (2d ed. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

American Jurisprudence, Contracts § 601 (2d ed. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

American Jurisprudence, Contracts § 687 (2d ed. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

American Jurisprudence, Contracts § 688 (2d ed. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

American Jurisprudence, Contracts § 689 (2d ed. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

5 Arthur Linton Corbin, Corbin on Contracts § 1104 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . 10

E. Allan Farnsworth, Contracts § 8.15 (2d ed. 1990) . . . . . . . . . . 10

3 Moore's Federal Practice P 15.13(2) (2d ed. 1966) . . . . . . . . . . 46

Restatement (Second) of Contracts § 224 (1981) . . . . . . . . . . 42

Restatement (Second) of Contracts § 237 (1981) . . . . . . . . . . 10, 51

Restatement (Second) of Contracts § 241 (1981) . . . . . . . . . . 11

Restatement (Second) of Contracts § 243 (1981) . . . . . . . . . . 11

Restatement (Second) of Contracts § 381(3) (1981) . . . . . . . . . . 53

Restatement (First) of Contracts § 275, cmt. a (1932) . . . . . . . . . . 11

13 Williston on Contracts § 38:7 (4th ed. 2000) . . . . . . . . . . 44

5 Williston on Contracts § 666A (3d ed. 1961) . . . . . . . . . . 43

5 Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure § 1278 (3d ed. 2004) . . . . . . . . . . 45

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 94-522C** |
| **v.** | ) | **(Judge Williams)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S POST-TRIAL BRIEF

Pursuant to the Court's order dated August 8, 2006, defendant, the United States, respectfully submits its post-trial brief. At trial, we established that any breach of the contract alleged by plaintiff, First Annapolis Bancorp, Inc. ("Bancorp") by the Government was preceded by Bancorp's prior material breach of that very contract. Accordingly, the Court should enter judgment for the Government.

## SUMMARY OF ARGUMENT

Bancorp claims that a contract was created with the Government in conjunction with its acquisition and conversion of First Federal Savings and Loan Association of Annapolis ("First Federal") on August 13, 1988, and that certain provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") breached that contract. The principal issue before the Court during the June 2006 trial was whether Bancorp materially breached the alleged contract (to the extent one existed) before the passage of FIRREA. At trial, we demonstrated that Bancorp materially failed to comply with important requirements of the alleged contract, thus committing a prior material breach, thereby precluding a finding of liability against the Government for any subsequent breach.

The evidence at trial established that First Federal made loans to numerous individuals seeking to borrow money to finance their purchase of Bancorp stock – this fact cannot be disputed. As we demonstrated at trial, most, if not all, of these borrowers had no previous banking relationship with First Federal prior to seeking financing for their purchases of Bancorp stock. We also established that, at the time of their loan settlements, these investors received checks which they immediately endorsed over to Bancorp. Indeed, both the testimony and documentary evidence established that no money changed hands during these transactions. First Federal simply moved the money from one account to another while funding the purchases of Bancorp stock by various investors identified by Edward Wayson.

As explained more fully below, the evidence adduced at trial also demonstrated that First Federal's actions – making loans to finance its own conversion – were prohibited by the applicable thrift regulations, by which Bancorp pledged to abide in the very documents it contends constitute the contract in this case. Officers of both First Federal and Bancorp certified to the regulators that they had complied with all applicable laws and regulations in effectuating the conversion; however, the loans to shareholders proved otherwise. These false representations were material to any contract that may have arisen between the parties concerning the conversion and, as we explain more fully below, they relieve the Government from liability for any subsequent breach.

## I. BANCORP IS NOT A PARTY TO A CONTRACT FOR GOODWILL OR SERVICE CORPORATION FORBEARANCES AND ANY OTHER CONTRACT TO WHICH BANCORP MAY BE A PARTY IS IRRELEVANT

Before turning to Bancorp's prior material breach, we reiterate that Bancorp's breach of contract claim should be rejected for the more fundamental reason that the contract it alleges in

this case for goodwill and service corporation investment forbearances never existed and, even if it did, Bancorp was never a party to it. Tellingly, none other than Mr. Parran himself, who at all applicable times was either the Executive Vice President or President of First Federal, First Annapolis Savings Bank ("First Annapolis"), and Bancorp, as well as an authorized agent and Director of Bancorp, and, by his own description, the individual who was "primarily responsible, on behalf of Bancorp," for interacting with the Federal Home Loan Bank Board ("FHLBB") in connection with First Federal's supervisory conversion, admitted unequivocally in his deposition that there was no agreement to count goodwill toward regulatory capital. Parran Aff. (Jan. 22, 2003); Parran Dep. (May 14, 2003) at 73. Because we have discussed this issue extensively in prior pleadings, we will not duplicate that discussion here. A few points, however, should be mentioned.

Although the parties have filed cross-motions for summary judgment as to liability regarding Bancorp's breach of contract claim (among others), the Court has yet to rule on these motions. At times, this made the contours of the recent trial somewhat nebulous, as it was (and remains) unclear, for example, exactly which documents constitute Bancorp's alleged contract (more on this below) and what the effective date of the contract was for purposes of analyzing this case under the rubric of a prior material breach or the failure of a condition precedent (more on this below as well). Tr. 835-41, 851-53. Nevertheless, we proceeded to trial only by assuming for purposes of argument that Bancorp is a party to an alleged contract with the Government. This assumption was then, and continues to be, ill-founded, as any contract Bancorp may have with the Government, if it has one at all, would not entitle it to the relief it seeks.

Indeed, recent case law from the United States Court of Appeals for the Federal Circuit, issued after the parties completed their liability briefing, further confirms this conclusion. In Southern California Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319 (Fed. Cir. 2005) ("SoCal"), several individual shareholders were among the plaintiffs who sued the Government for the breach of a Winstar-type contract. Of the three primary documents constitutes the alleged contract in that case, the individual plaintiffs were parties only to the regulatory capital maintenance agreement ("RCMA"), not the assistance agreement or a forbearance letter incorporated by reference into the assistance agreement. SoCal, 422 F.3d at 1325-26. As in this case, it was the forbearance letter in SoCal, not the RCMA, that contained the relevant language allowing the thrift to depart from generally accepted accounting principles when accounting for its goodwill and capital credits. Id. at 1326.

By applying "an expansive reading" to the agreements at issue, the trial court in SoCal determined that the above three documents were "components of one overall contract to which the Individual Plaintiffs were a party." Id. at 1329. It then held that the "government's promises regarding the treatment of supervisory goodwill and capital credits [ran] to all parties to the overall contract and determined that the Individual Plaintiffs had standing to recover." Id.

In reversing the trial court on this issue, the Federal Circuit rejected the theoretical underpinnings of the individual plaintiffs' standing argument. Specifically, it held that a party to one contract cannot "be deemed a party to a related contract simply because the separate contracts constitute components of one transaction." Id. at 1330. This is so even though execution of the RCMA was an "express condition to FSLIC's obligations under the Assistance Agreement." Id. at 1326. Nor was it relevant to the court of appeals that the individual plaintiffs

"initiated the conversion and acquisition," that "at least some of them negotiated directly with the government in arranging the transaction," or that the Government was aware that the individual plaintiffs "would be supplying the money to rehabilitate [the thrift]" and would be the primary shareholders of the thrift's holding company. Id. at 1331. As the Federal Circuit concluded, "these roles of negotiator and shareholder do not bring the Individual Plaintiffs into privity of contract with the government in regards to the Assistance Agreement entered into with [the holding company] and [the thrift]." Id.

Although the Court found that the individual plaintiffs were, in fact, in contractual privity with the Government under the RCMA, the problem was that they were not entitled to the particular damages they sought – the dilution and extinguishment of their ownership interest in the holding company – based upon the breach of that contact. Id. at 1333. The Court rejected the individual plaintiffs' argument that the incorporation of the capital credit promise into the terms of the RCMA was sufficient to uphold the damages award. Id. at 1334. This theory, the Court explained, failed to recognize that the damages the individual plaintiffs sought to recover "were not caused by the obligations they incurred under the RCMA" because the RCMA "did not require [them to] invest in [the holding company]." Id. "At the most," the RCMA obligated the individual plaintiffs to contribute a certain minimum amount of cash only in the event that the thrift did not maintain its regulatory capital at the required level. Id. Because there was "no indication that the government ever enforced this guarantee or that the Individual Plaintiffs ever complied with its terms," the individual plaintiffs could not recover their claimed damages under the RCMA. Id.

The analysis in SoCal is directly applicable here. As in SoCal, the only document to which Bancorp was a party (other than its own holding company application) was the RCMA. Yet, just as in SoCal, that document contains none of the contractual promises that Bancorp claims the Government breached when Congress passed FIRREA. At most, as the court of appeals put it in SoCal, the RCMA in this case obligated Bancorp to maintain First Annapolis' regulatory capital at a specified level.

Although the RCMA defines "regulatory capital" by referring to First Annapolis' business plan, which was submitted with the plan of conversion, JX 99 at WOQ280 1446, this is insufficient to sustain any award of damages in favor of Bancorp because, as in SoCal, the damages that Bancorp seeks – restitution for the capital it downstreamed to First Annapolis as part of the supervisory conversion and lost profits – were not caused by the obligations that Bancorp incurred under the RCMA. Again, as in SoCal, the RCMA in this case did not contractually require Bancorp to make the initial capital contribution to First Federal and at no time did the Government ever force Bancorp to make a subsequent capital contribution pursuant to the terms of the RCMA. JX 99.

Finally, even though Bancorp was the sole shareholder of First Annapolis and may view itself as a "negotiator" with the Government regarding First Federal's supervisory conversion, these facts alone do not bring Bancorp into privity with the Government regarding some other contract between the Government and First Annapolis (the existence of which we dispute) that actually contains the relevant goodwill and service corporation forbearances. SoCal, 422 F.3d at 1331. To the extent that a contract exists between the Government and First Annapolis based upon the forbearance letters and resolutions, and to the extent that a separate contract exists

between the Government and Bancorp based upon the RCMA, Bancorp cannot be deemed a party to the former simply because the two contracts "constitute components of one transaction." Id. at 1330.

In short, Bancorp is not a party to any contract with the Government regarding goodwill or service corporation forbearances, which are the only contractual "promises" relevant to this case. Instead, the only contract to which Bancorp conceivably is a party (i.e., the RCMA) was not breached by the Government and, even if it was, would not entitle Bancorp to the damages it now seeks. Accordingly, the Court should dismiss Bancorp's breach of contract claims in their entirety for these reasons alone.

## II. THE EVIDENCE AT TRIAL PROVED THAT BANCORP COMMITTED A PRIOR MATERIAL BREACH OF ITS ALLEGED CONTRACT WITH THE GOVERNMENT

Should, however, the Court find that Bancorp is in privity with the Government to some "overall" contract containing the supervisory goodwill and service corporation forbearances (as well as the FHLBB resolutions, RCMA, and other documents), we still would not be liable to Bancorp for the breach of that contract because, as we proved during the recent trial in this case, Bancorp committed a prior material breach of that contract. At trial, we solicited uncontradicted testimony that, despite Bancorp's previous and repeated denials, several Bancorp shareholders obtained loans from First Federal for the express purpose of funding their purchase of Bancorp stock as part of First Federal's supervisory conversion. These loans, of course, were in addition to the numerous other shareholder loans discovered by William Crompton during his 1990 examination of First Annapolis. DX 397 at WOT315 0147-48. All told, more than 25 percent of Bancorp's total stock offering was financed by loans from First Federal. Id. at WOT315 0147.

Regardless of the individual or cumulative amount, though, any loan issued by a converting thrift to be used for buying stock in the thrift's holding company constituted, as explained by our regulator witnesses, an extremely serious – and fatal – violation of then-existing regulations, by both the thrift and the holding company. Tr. 55 (Zimmerman). This is because a loan of this type struck at the very heart of a supervisory conversion, which was to bring in new, unfettered capital into the institution. Tr. 43-44, 49-50, 62, 123-24 (Zimmerman). By issuing loans to finance the conversion, the thrift and its holding company were doing nothing more than "just changing bank drawers." Tr. 62 (Zimmerman). Consequently, had the regulators known First Federal was making loans to individuals for the purpose of buying stock in Bancorp, they immediately would have taken action to stop the conversion. Tr. 55, 94, 121-22 (Zimmerman); 578, 603, 606-07 (G. Jones).

That Bancorp had a duty – under the terms of the contract it has alleged – to ensure that First Federal did not issue shareholder loans cannot be seriously disputed.[1] Not only do the

---

[1] At various times throughout this case, Bancorp has argued that this duty ran, and therefore any breach of that duty is attributable, only to First Federal, not Bancorp. This argument is flawed on several levels. First and foremost, this duty is, as we explain below, an explicit term of Bancorp's alleged contract. As discussed at length above, the Court should find either that the facts in this case do not give rise to a contract regarding goodwill and service corporation forbearances or, at the very least, that Bancorp is not a party to any such contract. But if the Court does find Bancorp is a party to such a contract, then Bancorp must be bound by all the terms of that contract, not just those that are most convenient to Bancorp's cause. Bancorp cannot have it both ways. If the goodwill and service corporation forbearances apply to Bancorp (which, as a matter of logic and accounting, they should not), then the prohibition against using shareholder loans to fund the conversion applies to Bancorp too, as it is part and parcel of Bancorp's alleged contract that contains those forbearances.

In addition, as we also explain below, the then-existing regulations plainly held holding companies being formed in connection with a supervisory conversion, such as Bancorp, accountable for transgressions of the FHLBB's supervisory conversion requirements – as when, for example, improper shareholder loans were used to fund a conversion. See 12 C.F.R.

alleged contractual documents expressly require Bancorp to comply with all applicable regulations pertaining to a supervisory conversion in general, including the regulation forbidding shareholder loans, see 12 C.F.R. § 563b.3(c)(22), but, even more particularly, Bancorp specifically represented to the Government, in one of the documents that Bancorp itself previously has claimed to be part of the contract in this case, that First Federal would not "loan funds or otherwise extend credit to any person to purchase shares of [Bancorp]" stock offered as part of First Federal's conversion. JX 87 at WOT415 0499.

Just as importantly, there can be no dispute that Bancorp's breaches of these provisions of its alleged contract with the Government are material. Indeed, because the regulators never would have allowed the supervisory conversion to go forward if they had known about the shareholder loans, it is hard to imagine a breach that could go any more directly to the essence of the contract. See Hometown Fin., Inc. v. United States, 409 F.3d 1360, 1370 (Fed. Cir. 2005) ("A breach is material when it relates to a matter of vital importance or goes to the essence of the contract."). For all of these reasons, discussed more fully below, the Court should find that the Government is not liable to Bancorp due to Bancorp's prior material breach.

**A. The Law Of Prior Material Breach**

In general, a material breach by one party to a contract permits the non-breaching party to discontinue performance under the contract. Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1276 (Fed. Cir. 1999); Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1550 (Fed. Cir. 1992). Therefore, where a plaintiff materially breaches a contract to which it is a party, the defendant is excused from liability for any subsequent breach it may have committed.

---

§§ 563b.3(c)(22), 563b.9.

College Point Boat Corp. v. United States, 267 U.S. 12, 15 (1925); Hometown, 409 F.3d at 1370; Christopher Vill., L.P. & Wilshire Inv. Corp. v. United States, 360 F.3d 1319, 1334 (Fed. Cir. 2004) (citing Restatement (Second) of Contracts § 237, cmt. b (1981); E. Allan Farnsworth, Contracts § 8.15 at 439 (2d ed. 1990)), cert. denied, 543 U.S. 1146, reh'g denied, 544 U.S. 992 (2005); Admiral Fin. Corp. v. United States, 57 Fed. Cl. 418, 432 (2003), aff'd on other grounds, 378 F.3d 1336, 1345 (Fed. Cir. 2004).

Whether a party to a contract committed a prior material breach is a mixed question of law and fact. Hometown, 409 F.3d at 1369. "The legal aspect of the question flows from the proper interpretation of the contract, while the factual aspects of the question flow from the parties' conduct – what they did, or did not, do." Id.

To determine whether a prior breach is "material," the Court must consider "the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." Stone Forest, 973 F.2d at 1551; see also Farmers Grain Co. of Esmond v. United States, 33 Fed. Cl. 298, 300 (1995). In other words, the Court determines whether a breach is material "in light of the totality of events and circumstances." Stone Forest, 973 F.2d at 1552 (citing Restatement (Second) of Contracts §241, cmt. a (1981)).

"A breach is material when it relates to a matter of vital importance or goes to the essence of the contract." Hometown, 409 F.3d at 1370; Thomas v. Dep't of Housing & Urban Development, 124 F.3d 1439, 1442 (Fed. Cir. 1997) (citing 5 Arthur Linton Corbin, Corbin on Contracts § 1104 (1964)). In addition, "the extent to which the behavior of a party failing to perform . . . comports with standards of good faith and fair dealing" is a meaningful factor in determining whether a breach is material. Malone v. United States, 849 F.2d 1441, 1445 (Fed.

Cir. 1988) (citing Restatement (Second) of Contracts § 241(e) (1981)); see generally Restatement (Second) of Contracts § 241 (1981) (listing as "materiality" factors: "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing").

Importantly, the "materiality" of a breach does not depend upon whether the breach results in a financial loss to the non-breaching party. Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 620-21 (2000). Rather, the question is whether the breach substantially deprived the non-breaching party of the benefit of the bargain it struck. Id. at 621 (citing Restatement (Second) of Contracts § 243 (1981)). For this same reason, materiality cannot simply be equated to the proportion of performance completed by a party. Stone Forest, 973 F.2d at 1552 (holding party materially breached contract by denying access to 15.89 percent of lumber originally bargained for after other party had completed 50 percent of its performance) (citing Restatement (First) of Contracts § 275, cmt. a (1932) (regarding materiality, it is "impossible to lay down a rule that can be applied with mathematical exactness")).

Although any degree of fraud is material as a matter of law, a prior material breach does not require proof that the breaching party had a fraudulent intent in making a misrepresentation related to a contractual obligation. Christopher Village, 360 F.3d at 1335. Indeed, a

misrepresentation is material so long as it has a natural tendency to influence or is capable of influencing an action by the Government. Id. at 1336.

### B. Bancorp's Alleged Contract Includes, Among Other Documents, The Applications Submitted By First Federal And Bancorp To The FHLBB

Because Bancorp's counsel raised the issue during the recent trial, and because it is directly relevant to Bancorp's prior material breach and misrepresentations, we review briefly the various documents that constitute Bancorp's alleged contract with the Government.[2] Specifically, despite Bancorp's sudden and opportunistic about-face at trial, the applications that Bancorp and First Federal concurrently filed with the FHLBB to approve First Federal's supervisory conversion and Bancorp's related acquisition of First Federal are, under Bancorp's theory of its case, necessarily part of its alleged contract with the Government.

During closing arguments immediately after the trial in this case, the Court and Bancorp's counsel had a colloquy about whether Bancorp's application should be considered one of the contract documents. Tr. 851-56. In response to one of the Court's questions during this discussion, Bancorp's counsel stated: "I have this curious notion that the litigants should take positions and stick with them." Tr. 855. We could not agree more.

Nonetheless, when the Court asked Bancorp's counsel point blank: "Wouldn't the application have constituted the offer?" tr. 851-52, Bancorp's counsel answered: "It would have – to put it in contract terms, it would have constituted a solicitation to offer. . . . It is a prelude to the ultimate offer." Tr. 852. Following up on this, the Court asked: "What was the ultimate

[2] To repeat, we do not believe that any of the documents in this case, collectively or individually, give rise to a contract, and certainly not one involving goodwill and service corporation forbearances to which Bancorp is a party. Nevertheless, we will assume the Court finds this to be the case for present purposes.

offer?" Inexplicably, and with no further elaboration, Bancorp's counsel replied that the "ultimate offer . . . is that which is established by the Bank Board resolutions plus the RCMA. And there are some other letters, Judge, I'd have to go back to the summary judgment papers, but it seemed to me there were five or six documents that we say comprise the contract." Id. Then, the following colloquy occurred:

> The Court: Right. And is the application in any part?
> Mr. Cooter: Is not one of them.
> The Court: In any part, is it incorporated by reference into anything?
> Mr. Cooter: Nope, nope.
> The Court: Relied upon in anything?
> Mr. Cooter: Nope, not in my – I haven't gone back and read these this afternoon, obviously, but having said that, I do not believe so.

Tr. 852-53. Bancorp's counsel stated, without any qualifications, that "the original application, November 5, '87, . . . is not – was never alleged to be part of the contract documents, we've never – you can read the summary judgment pleadings for yourself. It does not constitute part of the offer and acceptance for sure." Tr. 854.

As it turns out, this representation is diametrically opposed to what Bancorp argued in those very same summary judgment briefs: Indeed, in its summary judgment papers, Bancorp repeatedly referred to the application as being not just part of its alleged contract, but specifically being the offer to contract. For example, in a supplemental brief Bancorp filed regarding liability in this case, it stated, quite succinctly, that "Bancorp's Application was, in effect, the offer, which was accepted when the Government approved the transaction." Pl. Reply to Def. Supp. Memo. & Opp. to Def. Cross-Mot. for Sum. J. on Liability (June 28, 2001) ("Pl. June 28, 2001 Br.") at 13. A few sentences later in this same brief, Bancorp repeated that the "Business Plan (Bancorp's Exhibit 2) was part of in [sic] the Application, Bancorp's offer to the Government"

and that the "Business Plan (and the Application with which it was submitted) was part of the factual records of this case which shows [sic] the intent to contract with the government for specified treatment of goodwill." Id. (emphasis added); see also id. at 17 (citing application as one of numerous documents that allegedly "evidence an intent by the parties to" contract for specified treatment of supervisory goodwill).

As recently as 2003, Bancorp continued to insist that the application was part of its alleged contract, stating that the "two FHLBB Resolutions and four forbearance letters, along with the Application, Business Plan, RCMA, letters from the accountants and the February 9, 1989 approval letter by the FHLBB . . . set forth the terms of the contract." Pl. Supp. Br. in Response to the Oct. 9, 2003 Order of This Court (Oct. 31, 2003) ("Pl. Oct. 31, 2003 Br.") at 13 (emphasis added). Bancorp has made similar claims throughout the history of this case. See id. at 15; Pl. Supp. Br. in Support of Its Mot. for Entry of J. on Liability (May 14, 2001) ("Pl. May 14, 2001 Br.") at 16-17; Pl. Supp. Memo. in Opp. to Def. Mot. to Dismiss & Reply Br. in Support of Pl. Mot. for Sum. J. on Liability (Mar. 15, 2004) at 4-5 (relying on the fact that the FHLBB resolutions reference the application and that Bancorp submitted its own holding company application as evidence of a contract between Bancorp and the Government); Pl. Oct. 31, 2003 Br. at 22 (same).[3]

[3] Bancorp's other newly-minted theory, raised for the first time in this ten-year-old litigation at closing arguments – that the FHLBB resolutions and the RCMA somehow constituted the offer – also directly contradicts Bancorp's earlier allegations. Indeed, Bancorp previously professed that the resolutions constituted the acceptance, not the offer: "Upon passage of these Resolutions, the contract was formed. No further FHLBB approval was necessary and all the material terms had been agreed upon by the parties." Pl. May 14, 2001 Br. at 7; see id. at 16-17 (arguing that the business plan, which was submitted with the application, was the offer and that the resolutions, forbearance letters, and RCMA constituted the acceptance); Pl. June 28, 2001 Br. at 13 (same).

Of course, despite its recent change of positions, Bancorp's original position – that the application is one of the documents to its alleged contract – is the only one that makes any sense under the facts of this case (assuming its "overall contract" theory is accepted). First and foremost, the FHLBB resolutions, which Bancorp still believes are part of its contract, specifically refer to compliance with the application as a condition of approval. As we pointed out in our contentions of fact, Resolution Number 88-603 conditioned the FHLBB's approval of the supervisory conversion and Bancorp's acquisition of First Federal upon, among other things, an opinion of independent legal counsel that the conversion, merger, and acquisition would be completed:

> in compliance with the terms of this Resolution (and to the extent consistent therewith, the applications, the Plan of Voluntary Supervisory Conversion, the Agreement and Plan of Reorganization, the Plan of Merger and combination), applicable state and federal laws and regulations as administered by the [FHLBB] and FSLIC [i.e., the Federal Savings and Loan Insurance Corporation], and the charter and bylaws of [First Annapolis].

JX 93 at PFA010 0099-0100 (emphasis added). This condition (as well as the recitals of this resolution, see id. at PFA010 0093) not only required compliance with "the applications" in general, but it specifically required compliance with the plan of conversion. As we discuss below, it is in the plan of conversion that Bancorp represented that First Federal would not loan funds to anybody for the purpose of purchasing Bancorp stock. JX 87 at WOT415 0491, 0499.

---

Besides being a reversal of its previous position, Bancorp's notion that the resolutions and the RCMA constituted the offer is simply untenable. If that is correct, then what is the acceptance? Bancorp's counsel provided no answer to this question.

Furthermore, Bancorp itself previously has argued that the RCMA – the one and only document to which Bancorp is actually a signatory – "incorporates the terms of the Business Plan regarding the regulatory capital requirements for First Annapolis." Pl. June 28, 2001 Br. at 2; see id. at 13 (arguing that the business plan was incorporated into the RCMA and two of the forbearance letters). The relevant provision of the RCMA actually refers to the "Business Plan of the Plan of Conversion." JX 99 at WOQ280 1446. And the plan of conversion is, in turn, Exhibit A to Bancorp's holding company application.[4] JX 87 at WOT415 0468, 0491, 0492, 0514.

More generally, it must be remembered that this was a voluntary supervisory conversion. First Federal and Bancorp, not the Government, initiated this process when they submitted their respective applications. Thus, to the extent any contract was formed between Bancorp and the Government in connection with First Federal's supervisory conversion – and again, we stress that no contract was, in fact, formed with Bancorp relating to goodwill and forbearances – the only sensible way to view the alleged contract is, as Bancorp has argued all along (until its counsel's comments during closing arguments), to consider Bancorp's application as the offer, which the Government then accepted when it conditionally approved the application in the resolutions.

[4] If, for some reason, Bancorp should try to distinguish between its holding company application and First Federal's supervisory conversion application, such a distinction would be meaningless. By its own terms, Bancorp's holding company application was submitted in conjunction with, and "as part of," First Federal's supervisory conversion application. JX 83 at WOT520 0133-34.

### C. Under The Terms Of Its Alleged Contract, Bancorp Had A Duty To Ensure Shareholder Loans Were Not Used To Fund First Federal's Supervisory Conversion

It is little wonder that Bancorp seeks to distance itself from its own application – as that is where Bancorp explicitly acknowledged its responsibility to insure First Federal did not "loan funds or otherwise extend credit to any person to purchase shares of [Bancorp] Stock offered in the Conversion." JX 87 at WOT415 0499. Because, as we have demonstrated above, Bancorp's application is necessarily part of Bancorp's alleged contract with the Government, this provision of that application, by itself, establishes that Bancorp had a contractual duty not to allow its stock to be purchased with the proceeds of loans from First Federal.

Even so, this same duty is expressed in many of the other documents that, according to Bancorp, form its contract. For example, in the RCMA – which is, again, the only document styled as an agreement or contract to which Bancorp is a party – Bancorp warranted that the information it had given to the FSLIC, and upon which the FSLIC had relied, in connection with Bancorp's acquisition of First Federal was "true, accurate, complete and current in all material respects." JX 99 at WOQ280 1447. Included in that information, of course, was Bancorp's representation in its application that First Federal would not loan funds to any individual to purchase Bancorp stock. JX 87 at WOT415 0499.

As Mr. Zimmerman explained, this provision in the RCMA was "directly related" to Bancorp's compliance with the regulations prohibiting the use of shareholder loans to fund a conversion. Tr. 81-82 (Zimmerman). Yet, on the very same day that Douglas Parran signed the RCMA on behalf of Bancorp – August 12, 1988 – Mr. Parran personally was approving loans to

individuals such as Paul Jones on behalf of First Federal for the sole purpose of selling Bancorp stock offered in connection with First Federal's conversion. Tr. 347-50, 377-78 (Parran).

More generally, several of the alleged contractual documents obligated Bancorp to comply, or to represent that it had complied, with any applicable FHLBB and FSLIC rules and regulations regarding supervisory conversions. JX 83 at WOT520 0127 (supervisory conversion application); JX 93 at PFA010 0100 (Resolution No. 88-603); DX 224 at PFA010 1644 (letter dated Oct. 14, 1988 from Bancorp's and First Annapolis' special counsel). As we have discussed in our prior pleadings, these regulations, among other things, forbade an institution undergoing a supervisory conversion from loaning funds "to any person to purchase the capital stock of the institution." 12 C.F.R. §§ 563b.20(c), 563b.3(a), 563b.3(c)(22) (1988).

This same prohibition applied equally to a holding company being formed in connection with a thrift's supervisory conversion. See id. § 563b.9. As was any other holding company being formed as part of a supervisory conversion, Bancorp thus was bound by these regulations not to use improper shareholder loans to finance that conversion. More importantly, though, under Bancorp's theory, this regulatory requirement is also a contractual duty because, even under the strictest interpretation, the plain terms of the documents that Bancorp says form its contract with the Government expressly required Bancorp to comply with all applicable regulatory requirements, including, by definition, the one prohibiting financing the purchase of Bancorp stock with loans from First Federal.

Despite the clarity of these documents and regulations, however, Bancorp at times has argued that the regulations required only that the plan of conversion contain a representation that improper shareholder loans would not be made. According to Bancorp, whether the

representation was true is irrelevant. Alternatively, Bancorp has argued that any duty not to finance the conversion with shareholder loans ran only to First Federal, not Bancorp. These arguments are meritless.

Bancorp's suggestion that it could use all of the improper shareholder loans it wanted to finance First Federal's supervisory conversion, so long as it said it would not do so in the plan of conversion, is obviously wrong. If this position were accepted, it would reduce one of the, if not the, most important regulations governing a supervisory conversion to empty formalism. Even Bancorp's own former president could not subscribe to this notion and testified that he understood – at the time of First Federal's conversion – that it was a violation of regulations to issue loans to individuals to purchase stock in the conversion. Tr. 346-47 (Parran). And certainly the regulators at the time understood this to be the case as well. Tr. 49-50 (Zimmerman); Tr. 606 (G. Jones).

Apart from the regulations themselves and the understanding of the parties at the time, the very documents that Bancorp claims to constitute its contract with the Government, as set forth above, required Bancorp to comply with the actual terms of its application and the attached plan of conversion. Bancorp could not just submit a plan of conversion with empty promises and be done with it.

For all of these same reasons, Bancorp's argument that any duty regarding shareholder loans ran only to First Federal, and not Bancorp, is equally unavailing. The regulations specifically applied to holding companies formed in connection with a supervisory conversion, unless clearly inapplicable. Again, Bancorp's position, if accepted, would render those regulations meaningless, as it would allow thrifts to avoid complying with virtually all of them

through the simple expedient of creating a holding company. As noted above, the regulators at the time understood that the prohibition against shareholder loans applied to holding companies. Tr. 57-58 (Zimmerman); Tr. 605-06 (G. Jones). And, once again, Bancorp itself understood this to be the case at the time, which is why its representation in its application – that First Federal will not loan funds to individuals to buy Bancorp stock – mimics the language of the regulations, except, importantly, it refers to the holding company's stock, rather than the thrift's stock. Compare JX 87 at WOT415 0499 with 12 C.F.R. § 563b.3(c)(22).

As an additional measure to ensure compliance, the FHLBB required that First Federal's officers and directors, including Mr. Parran, certify that they had "made such examination and investigation as is necessary to enable [them] to express an informed opinion that [First Federal's] Application complies to the best of [their] knowledge and belief with the applicable requirements of Part 563b of the Rules and Regulations for Insurance of Accounts and forms thereunder . . . ." JX 83. This certification that was executed by First Federal was confirmed by First Federal's legal counsel who signed a separate certificate certifying that the transaction was consummated in accordance with all applicable laws, the conversion application, and the FHLBB resolutions approving the transaction. DX 224; see also Tr. 83-85 (Zimmerman). Both certifications were required to secure FHLBB approval of First Federal's conversion application.

If the Court accepts Bancorp's theory and finds that the Government owed a duty to Bancorp regarding goodwill and service corporation forbearances, then Bancorp must be bound by any reciprocal duties contained in the same documents that form Bancorp's "overall" contract with the Government. At a minimum, the terms of those documents unmistakably imposed upon

Bancorp (and First Federal) a duty to ensure that Bancorp's stock was not purchased with the proceeds of loans obtained from First Federal.

### D. The Shareholder Loans Represent A Prior Breach By Bancorp Of Its Alleged Contract With The Government

Even more clear than Bancorp's duty to avoid using improper shareholder loans to finance its stock offering is the fact – now undisputed by Bancorp itself – that Bancorp deliberately and repeatedly breached that duty at the time of the conversion when several individuals applied for, and received, loans from First Federal for the specific purpose of buying Bancorp's stock as part of First Federal's conversion. The undisputed testimony and evidence presented at trial, described more fully below, not only demonstrates that Bancorp breached its contract by doing exactly what it said it would not do, but also demonstrates that Bancorp made deliberate misrepresentations to the FHLBB, when it warranted that the information it had provided was truthful and accurate and certified that it would comply with all applicable rules and regulations – on the very same day, no less, that it was knowingly using the proceeds of shareholder loans to purchase its stock.

#### 1. First Annapolis' 1990 Bank Examination

Notwithstanding the above mandatory regulations and First Federal's certification that its conversion application complied with all applicable regulations, the evidence at trial demonstrated that OTS examiners uncovered material regulatory violations involving First Federal, First Annapolis, and Bancorp. William Crompton, examiner-in-charge of First Annapolis's 1990 bank examination, testified that:

> During the course of the review, we noted that the bank had made a series of loans to a group of individuals who we knew had also

> purchased stock in the bank. And during the course of our review, we noted that in some instances, the timing of their loans - of receiving loans from First Annapolis corresponded with the timing of the stock conversion.

Tr. 674 (Crompton). As discussed above, these were loans to Bancorp shareholders that were in direct violation of the FHLBB's regulatory prohibition against a converting institution loaning funds to finance its own conversion. Mr. Crompton wrote the following summary of the OTS' findings on this issue;

> Based upon the examiner's review, it became evident that the bank had either directly at the time, or subsequently funded a <u>significant</u> portion of the stock sale by granting loans to various stockholders in amounts generally equal to the amount of the stock purchased. In total, the examiner has identified such loans made between July 22, 1988 and January 5, 1989 to 12 stockholders who had collectively purchased $3, 975, 000, or 28.1 percent of the stock issued.

DX 397 at WOT315 0147 (emphasis added); Tr. 674-77 (Crompton).

These impermissible shareholder loans, which were discovered by the thrift examiners reviewing First Annapolis' commercial loan register, were not previously discovered because:

> [they] were made during the course of the [1988] examination, not prior to the examination. . . . When [the FHLBB does] an exam, it's as of the as-of date, which would be the financial period ending prior to [the] examination. So when we do an examination, we'll get a list of all the loans on the books as of the quarter-end period but . . . that list would not be carried forward to loans granted during the course of an exam.

Tr 674, 677-78 (Crompton). Although Mr. Crompton did not remember the specific "as-of" date for First Annapolis's 1988 exam, he testified that "[i]t would have been either June 30 or March 31, 1988," which preceded the July 22, 1988 through January 5, 1989 time frame when the impermissible shareholder loans occurred. Tr. 678 (Crompton).

### 2. Continental Financial Holdings, Inc.

Pursuant to the viability test under 12 C.F.R. § 563b.26(b)(2)(I), approval of First Federal's conversion application was conditioned upon an infusion of sufficient capital to achieve a one percent net worth to liabilities ratio after First Federal's conversion. To achieve this mandate, First Federal initially partnered with Continental Financial Holdings, Inc., a Maryland company that agreed to purchase 50 percent of the outstanding stock of Bancorp. Nevertheless, at a June 22, 1988 board of directors meeting, First Federal decided to forego this significant infusion of new capital by limiting the ownership percentage of any one shareholder to 9.9 percent of all outstanding Bancorp stock. Tr. 326-28 (Parran); JX 25 at PFA011 1857. Consequently, First Federal had just a few weeks to raise more than $6 million in new capital to fund its conversion. Id. Any failure to raise this capital would have prevented the FHLBB from lawfully approving First Federal's supervisory conversion application. See 12 C.F.R. § 563b.29(d); 12 C.F.R. § 563b.24.

At trial, Mr. Parran testified that, after the June 22, 1988 meeting he "asked [Mr. Wayson] to help raise [the] capital" needed for FHLBB approval of the conversion. Tr. 339 (Parran). Mr. Wayson promptly set about this task by informing two acquaintances, E. Patrick Cole and Paul Jones, about the opportunity to investment in Bancorp. Both Mr. Cole and Mr. Jones not only accepted Mr. Wayson's invitation, but each informed their business associates and friends about this investment opportunity. See, e.g., Tr. 156 (Cowdrey); Tr. 415 (Howard); Tr. 424 (W. Jones); Tr. 486 (Horrigan).

### 3. The Impermissible Shareholder Loans

E. Patrick Cole, who at the time was the managing partner of an investment partnership called Rental Management Associates ("RMA"), informed his RMA partners Peter Horrigan, Roger Howard and Marvin Taylor, Jr. about the investment opportunity with Bancorp. Tr. 407, 414-15 (Howard); Tr. 483, 486-87 (Horrigan); Tr. 537-38, 548-49 (Taylor). Each partner owned a 25 percent share of RMA. Tr. 407 (Howard); Tr. 483 (Horrigan); Tr. 538 (Taylor). Although RMA was primarily involved in real estate investments and had not previously invested in a banking institution, Messrs. Horrigan, Howard, and Taylor relied upon Mr. Cole's recommendation, and agreed to purchase Bancorp stock. Tr. 407, 414-15 (Howard); Tr. 486-87 (Horrigan).

In August 1988, First Federal's Management Committee approved a $1 million commercial loan to RMA made subject to the personal guarantee of each RMA partner. JX 76; Joint Fact. Stip. 11. The RMA partners also signed a $1 million commercial promissory note on August 10, 1988 that was payable to First Federal. JX 106; Joint Fact. Stip. 12. The result of these transactions was that each RMA partner owned 250,000 shares of Bancorp stock as of August 12, 1988, which was funded by RMA's $1 million dollar loan. Tr. 228 (P. Jones); Tr. 409-10, 413-14 (Howard); Tr. 490-91 (Horrigan); Tr. 535, 539-40 (Taylor); DX 171; JX 131; JX 133; Joint Fact. Stip. 13. By funding this purchase of Bancorp stock, First Federal knowingly violated applicable conversion regulations and the express terms of its own conversion application. Tr. 346-47 (Parran); 12 C.F.R. §563b.3(c)(22); JX 87 at WOT415 0491, 0499.

First Federal's $1 million loan to RMA was securitized by joint property interests of the RMA partners. Mr. Cole, as the managing partner of RMA, executed an indemnity deed of trust

on August 10, 1988. Tr. 412-13 (Howard); Tr. 550 (Taylor). The deed of trust specifically acknowledged that it was in consideration of the $1 million loan approved by First Federal for RMA partners Cole, Howard, Horrigan, and Taylor. JX 108.

Consistent with Mr. Cole's actions, Paul Jones made the decision to invest in Bancorp. With no previous banking relationship with First Federal, on or about August 11, 1988, Paul Jones submitted a $125,000 loan application for First Federal with the stated purpose being an "investment." Tr. 237-40, 242-44 (P. Jones); JX 110; JX 118; DX 180; DX 183. First Federal approved Paul Jones' loan application the following day on August 12, 1988, and on that same day, Mr. Jones executed a commercial promissory note for $125,000. JX 76; JX 116; JX 119; JX 120. At trial, Mr. Jones testified that his $125,000 loan was used to fund his purchase of 125,000 shares of Bancorp stock on August 12, 1988. Tr. 225 (P. Jones).

However, Paul Jones' investment was not limited to 125,000 Bancorp stock shares. After informing several business associates and acquaintances about Edward Wayson's invitation to invest in Bancorp, those individuals purchased shares of Bancorp stock either individually or through investment partnerships with Paul Jones. Tr. 286 (Earnest); Tr. 424 (W. Jones). As Paul Jones testified at trial, these business associates and acquaintances were William F. Jones, Arthur H. Schwartz, Broughton Earnest, James M. Earnest, David R. Thompson, and Roy Cowdrey. Tr. 227-28 (P. Jones). Through these investment partnerships, Paul Jones purchased a total of 275,000 shares of Bancorp stock, with the additional shares financed by an additional $150,000 loan from First Federal. Thus, Paul Jones' total indebtedness to First Federal increased to $275,000. Tr. 223, 225, 248, 250-51 (P. Jones).

David Thompson, Broughton Earnest, and James Earnest entered into a partnership arrangement with Paul Jones whereby each acquired an investment interest in 50,000 shares of Bancorp stock. James Earnest, the brother of Broughton Earnest, learned about the opportunity through his brother, Broughton. Tr. 280-82, 287-88 (Earnest). Broughton Earnest testified that the most attractive aspect of investing in Bancorp, was the ability to obtain 100 percent financing through loans from First Federal. Tr. 281 (Earnest).

Mr. Thompson had initially tried to obtain direct financing from First Federal. Mr Thompson explained that, after executing a $50,000 promissory note to First Federal for the purchase of 50,000 Bancorp shares, Edward Wayson informed him and Paul Jones that his net worth was insufficient for a loan directly from First Federal. Mr. Thompson and Roy Cowdrey both testified that First Federal required a personal net worth of at least $1 million to obtain a loan directly for the purchase Bancorp stock. Tr. 162-64 (Cowdrey); Thompson Dep. at 16. Consequently, David Thompson became a Bancorp investor when Paul Jones increased his First Federal loan by $150,000 to purchase an additional 150,000 shares on behalf of the investment partnership. Tr. 281-82, 286-88 (Earnest).

Roy Cowdrey, another business associate of Paul Jones, and William Jones, Paul Jones' brother, also became shareholders of Bancorp after obtaining loans individually from First Federal to finance their investment in Bancorp. Tr. 156 (Cowdrey). After completing a net worth financial statement that he delivered to Paul Jones, Roy Cowdrey applied and was approved for a $50,000 loan from First Federal for the purchase of 50,000 shares of Bancorp stock on or about August 12, 1988. Tr. 156, 162-64 (Cowdrey); JX 76; JX 112; JX 114; JX 115. At the same time, Mr. Cowdrey executed a $50,000 promissory note to First Federal on or about

August 12, 1988. Tr. 161-62 (Cowdrey); JX 111. First Federal, in turn, issued a $50,000 check to Roy Cowdrey and his wife, which he endorsed over to Bancorp for the stock purchase. Tr. 159-61 (Cowdrey); JX 102.

The evidence at trial also demonstrated that, on or about August 12, 1988, William Jones applied and was approved for a $125,000 "investment" loan from First Federal to fund his purchase of 125,000 shares of Bancorp stock. Tr. 419-21, 434-38 (W. Jones); JX 112; JX 113; JX 114; JX 130.

Dr. Arthur Schwartz, an acquaintance of both Paul and William Jones, also became a shareholder of Bancorp after Paul Jones informed him about this investment opportunity. Schwartz Dep. at 10; DX 171. On August 12, 1988, First Federal approved a $150,000 loan for Dr. Schwartz and issued to him a $150,000 check that same day. JX 103. Dr. Schwartz endorsed this First Federal check directly over to Bancorp. Id. Schwartz Dep. at 25-27, 66-67, 70-71. While Dr. Schwartz was unable to recall the specifics of this transaction, Paul Jones and David Thompson both testified that Dr. Schwartz's purchase of 150,000 shares of Bancorp stock was indeed funded by the $150,000 loan he received from First Federal on August 12, 1988. Tr. 227-28 (P. Jones).

No cash was ever exchanged in conjunction with these impermissible shareholder loans. Tr. 156, 160 (Cowdrey); Tr. 246-47 (P. Jones); Tr. 286-87 (Earnest); Tr. 441-42 (W. Jones); Thompson Dep. at 20-21. Rather, the loan proceeds from each First Federal loan were directly credited to the purchase of each shareholder's Bancorp stock in a non-cash transaction. Id.; Thompson Dep. at 16. In fact, Messrs. Paul Jones, William Jones, Cowdrey, Schwartz, Cole, Taylor, Horrigan, and Howard testified that, at the loan settlement, when they received their loan

proceeds, they immediately endorsed the checks from First Federal over to Bancorp for the purchase of stock. Tr. 156-57 (Cowdrey); Tr. 247-48 (P. Jones); Tr. 442-43 (W. Jones). Mr. Cowdrey testified that this transaction was completed with some sense of urgency. Tr. 156 (Cowdrey). As a result, he was forced to execute his loan documents while suffering from conjunctivitis. Id. at 156-57. Because this condition made him unable to see or drive, he was driven that day by Paul Jones to execute the loan documents. Id. at 157.

As with the $1 million loan provided to the RMA partners, the loans provided to Paul Jones and his business associates were securitized by the property interests of the investors. Paul Jones, William Jones, and Roy Cowdrey jointly executed a $450,000 deed of trust to pledge a specific asset, called the Patrick Plains property, as security for their individual First Federal loans totaling $450,000. Tr. 251-52 (P. Jones); Tr. 165-66 (Cowdrey); Tr. 440-41; 444-45 (W. Jones); JX 112; JX 115; JX 123.

**4. The Impermissible Shareholder Loans Went Into Default**

The importance of the FHLBB's regulatory prohibition against these impermissible shareholder loans became apparent through the experiences of the Bancorp shareholders. As demonstrated at trial, the Bancorp shareholders defaulted on their loan obligations related to the purchase of their Bancorp stock. Thus, not only did these impermissible loans prevent an immediate infusion of sufficient new capital into First Annapolis as required by First Federal's conversion application and applicable regulations, but the shareholders' inability to pay their loan obligations in full meant that the anticipated protection for the insurance fund was never fully realized.

Messrs. Horrigan, Howard, and Taylor all testified that they and Mr. Cole defaulted on their $1 million RMA loan obligation after the loan was transferred to Second National Federal Savings Bank ("Second National"). Tr. 490-92, 498-99 (Horrigan). Although Mr. Taylor testified that this $1 million RMA loan was fully paid after going into default, Tr. 552-53 (Taylor), Mr. Taylor admitted that he had no independent recollection of paying off this loan. Tr. 542-43 (Taylor). Moreover, Messrs. Howard and Horrigan testified that they had no recollection of any payments being made on the $1 million RMA loan. Tr. 416 (Howard); Tr. 492, 499, 500 (Horrigan). Significantly, neither Mr. Taylor nor the plaintiff has ever produced any evidence demonstrating that a single payment was made on RMA's $1 million loan obligation. Rather, each RMA partner declared bankruptcy after defaulting on this obligation. Tr. 416 (Howard); Tr. 498-99 (Horrigan); 552-55 (Taylor).

Similar to the loan to RMA partners, Paul Jones' $275,000 loan for the purchase of Bancorp stock went into default after it was transferred to Second National, as Paul Jones and David Thompson testified. Tr. 261 (P. Jones); Thompson Dep. at 26-28. In addition, Roy Cowdrey's $50,000 loan for the purchase of Bancorp stock went into default after it was transferred to Key Federal Savings Bank, and he stopped making payments on the loan. Tr. 166-67 (Cowdrey). William Jones' $150,000 loan that funded his Bancorp investment was also transferred to Key Federal Savings Bank and went into default shortly thereafter. Tr. 458 (W. Jones).

Although each shareholder eventually settled his outstanding loan obligations with his respective institution, all paid less than the face value of the loan obligation. Tr. 266-67, 269-70 (P. Jones); Tr. 170-76, 177 (Cowdrey); Tr. 478 (W. Jones); DX 536; DX 613; DX 614; DX 619,

DX622. Moreover, for institutions that went into receivership like First Annapolis and Second National, these losses were borne by the FDIC, as both receiver and successor-in-interest to these failed institutions.

### 5. The Bancorp Shareholders Contemplated Legal Action

When the shareholders who received loans from First Federal to fund their purchase of Bancorp stock learned that such a transaction was impermissible under applicable regulations, they contemplated legal action against those persons or entities they believed were responsible for their investments. Tr. 170 (Cowdrey); Tr. 470-71 (W. Jones). To this end, William Jones wrote a memorandum of understanding specifying how such contemplated litigation would be funded, and the shareholders proceeded to engage a law firm to prepare a draft complaint. Tr. 446-47, 454-55 (William Jones); DX 473. Among the defendants named in this draft complaint was Edward Wayson. DX 481. However, after Mr. Wayson filed a declaratory judgment action against the shareholders, the matter was settled. Id.; Tr: 305-06 (Earnest).

### 6. Bancorp Had Knowledge Of First Federal's Violation Of The Terms Of Its Conversion Application And Applicable Regulations

As we established at trial, by funding more than $3 million in shareholder loans, which were discovered by federal regulators during First Annapolis' 1990 examination, First Federal violated the conversion regulations and conditions of its own conversion application. Although Douglas Parran, president of both First Federal and Bancorp, testified that he was not aware of any loans that were made to purchase stock, or that anyone else at the bank had such knowledge (Tr. 403-04), his testimony is belied by the documentary evidence admitted at trial.

To begin, the loan applications of both Paul Jones and William Jones, neither of which had a previous banking relationship with First Federal, are nearly bereft of information despite the fact that they were each attempting to borrow $125,000. JX 110; JX 113. Both applications list the purpose of the loan merely as "investment" and contain little more than their names and addresses. Additionally, their loan applications were approved the day after the applications were made, and the loan settlements occurred that same day, which, not coincidentally, was the final day before the conversion. JX 119; JX 114.

Moreover, neither individual produced his tax returns at settlement as required by the loan commitments. Id.; Tr. 242-44 (P. Jones). It is in the follow-up paperwork from First Annapolis that the truth about the purpose of Paul Jones' loan was documented – that it was intended for the purchase of Bancorp stock. Shortly after the conversion, First Annapolis sent a letter to Paul Jones referencing the loans he recently received and requesting that he provide his tax returns for 1986 and 1987, which he failed to produce at settlement. DX 180. By letter dated August 26, 1988, Paul Jones responded to this request by providing the requested tax returns, not to the loan officer who had sent him the letter, but to Douglas Parran himself. DX 183.

Of greater significance is the fact that the subject line of his letter did not reference his loans but instead, the purchase of "$275,000.00 shares of First Annapolis Bancorp common stock." Id. Moreover, in the body of the letter, Paul Jones stated: "I am enclosing tax returns for 1986 and 1987 regarding the above-captioned purchase. Id. Only one logical conclusion can be drawn from these documents and the manner in which these loans were approved on the eve of the conversion with little or no documentation – Douglas Parran had knowledge of the intended purpose of these loans – the purchase of Bancorp stock.

As previously discussed, if the regulators had known about the impermissible shareholder loans, they would not have recommended approval of First Federal's conversion application. Indeed, FHLBB regulations specifically prohibited approval of any conversion application if regulatory violations were present. See 12 C.F.R. § 563b.29(d). In this case, First Federal's loans to Bancorp shareholders for the purpose of purchasing Bancorp stock, which financed its own conversion, was a clear violation of 12 C.F.R. §563b.3(c)(22), and prevented an "infus[ion of] sufficient capital [for First Annapolis] . . . to achieve a ratio of net worth to total liabilities . . . of at least one percent (1%) of total liabilities," as required by12 C.F.R. § 563b.26(b)(2)(I). Furthermore, as we discuss below, these regulatory violations were material.

### E. Bancorp's Prior Breach Is Material

In addition to conclusively proving that Bancorp committed a prior breach of, and made a misrepresentation to the Government in, its alleged contract by using the proceeds of improper shareholder loans from First Federal to finance a significant portion of its stock offering, the testimony at trial also demonstrated that this breach was, by any definition, material. Indeed, the evidence is undisputed that, had the regulators known about the shareholder loans at the time they were being made, they would have acted immediately to stop the conversion. Tr. 55 (Zimmerman); Tr. 578, 603 (G. Jones). And because the very purpose of the alleged contract was to permit First Federal to convert to stock form, and to permit Bancorp to acquire the thrift post-conversion, the fact that the shareholder loans would have led to the withdrawal of regulatory approval for the conversion means that Bancorp's breach obviously "relates to a matter of vital importance" and "goes to the essence of the contract." Hometown, 409 F.3d at 1370.

No one made this any clearer than Park Zimmerman, who, at the time of First Federal's supervisory conversion in August 1988, was the Executive Vice President of the Federal Home Loan Bank of Atlanta ("FHLB-Atlanta"). Tr. 38-39, 41 (Zimmerman). This meant that Mr. Zimmerman was in charge of the entire examination and supervisory side of the FHLB-Atlanta, and reported directly to the FHLB-Atlanta President. Tr. 39-40, 42. In that capacity, he and his staff of examiners and supervisory agents were ultimately responsible for making a recommendation to approve or disapprove a supervisory conversion. Tr. 42-43. When reviewing a supervisory conversion application, part of Mr. Zimmerman's responsibilities was, naturally, to make sure the applicant(s) complied with the FHLBB's and FSLIC's rules and regulations governing supervisory conversions, including those prohibiting the use of shareholder loans to fund the conversion. Tr. 46-48 (Zimmerman).

In this regard, Mr. Zimmerman testified, without hesitation or qualification, that, if an institution was loaning funds to purchase stock as part of its supervisory conversion, and he was aware of that fact at the time the loans were being made, the FHLB-Atlanta "would have taken action to stop the conversion at that point." Tr. 55. According to Mr. Zimmerman, this would have been considered a "fatal violation that would cause the approval to be withdrawn . . . if it had already been granted at that point." Id. Even more specifically, Mr. Zimmerman explained that the FHLB-Atlanta would have responded in exactly this manner if they had known, at the time, that First Federal was making loans to individuals to buy Bancorp stock in connection with First Federal's conversion: "We would have stopped the conversion and withdrawn our

approval."[5] Tr. 93-94.

Other regulators echoed these same concerns. For example, Gregory Jones, who was one of the Supervisory Agents at the FHLB-Atlanta for First Annapolis, and, as such, had "significant input" into supervisory conversion applications, was asked what effect it would have had on a thrift's supervisory conversion application if he knew, before the application was approved, that the thrift was to make loans to fund its own conversion. Tr. 560, 564, 572, 578 (G. Jones). As did Mr. Zimmerman, Mr. Jones testified, "I would have certainly raised concerns about it to my supervisor and sought to stop the conversion until we had a chance to resolve the issue." Id. at 578. Similarly, Mr. Jones testified that, if Bancorp did not comply with all of the appropriate conditions and regulations in connection with First Federal's supervisory conversion, he "would

---

[5] At trial, plaintiff's counsel and the Court seemed to question whether Mr. Zimmerman was competent to offer this testimony, or at least suggested his testimony should be given less weight, because he had only one prior experience with an institution using shareholder loans to finance a supervisory conversion. Tr. 51-53, 55, 124 (Zimmerman). Respectfully, Mr. Zimmerman's testimony that he would have sought to stop the conversion if he had known, at the time, that First Federal was loaning money to individuals to buy Bancorp stock does not depend at all upon Mr. Zimmerman having encountered this situation before. As Mr. Zimmerman himself explained, his understanding of the seriousness of using shareholder loans to fund a supervisory conversion is not "necessarily related to it having happened before." Tr. 124. Rather, it is based upon his familiarity with the regulatory process and his decades of experience as a thrift regulator and attorney for the OTS. "So without actually having that happen, [Mr. Zimmerman] certainly understood what was at stake and the importance of it." Id.

A simple hypothetical helps illustrate this point. Suppose a police officer with fifteen years of experience has never arrested some one for drunk driving. Nevertheless, the officer is obviously familiar with the law prohibiting driving while intoxicated. So, if he is asked what he would do if he saw someone driving drunk, he can certainly testify that he would arrest that person, based upon his years of experience and training. He need not actually have arrested someone previously for driving while intoxicated to say that is what he would do if he saw someone driving drunk.

In short, Bancorp cannot benefit from the fact that few other institutions and holding companies have violated the regulations Bancorp did.

have recommended that [Bancorp] not be allowed to proceed with it until [Bancorp] was able to resolve whatever the issues might have been." Tr. 603.

The reason the regulators were so unforgiving when it came to using shareholder loans to fund a supervisory conversion, as Mr. Zimmerman explained, was because it defeated the very purpose of the conversion, which was to bring in "new, unfettered capital" – i.e., capital that had no prior claims on it, as opposed to loans which disperse funds that the bank already has. Tr. 43-44, 62 (Zimmerman). Indeed, bringing in new capital, "fully available to the institution," was the "whole point of the . . . the exercise [of a supervisory conversion]," was "one of the key elements of the conversion," and "went to the very heart of the purpose of the transaction." Tr. 43, 50, 62 (Zimmerman).

William Crompton, an OTS field manager who was responsible for overseeing the regulatory examination process for all of the institutions in his caseload, including First Federal (and then First Annapolis) beginning in 1986, and who also was the examiner-in-charge of First Annapolis' January 1990 examination, similarly testified that "the purpose of the stock conversion is to bring in fresh capital into the institution. So it would be unencumbered funds, fresh resources for the bank to invest. When you're loaning the individual the money, in effect, you're not getting fresh capital, but you're just getting an IOU." Tr. 662-64, 680 (Crompton). Or, as Mr. Zimmerman pithily put it, by lending the money to invest in the conversion, the thrift is doing nothing more than "using its own money to fund its own conversion" and "just changing bank drawers that it's kept in." Tr. 49, 62 (Zimmerman).

The fact that this was a supervisory conversion, as opposed to a standard conversion, only magnified these concerns. This is because, as Mr. Zimmerman testified, a supervisory

conversion was strictly for a thrift that was "close to failing." Tr. 45. And because the key problem with First Federal, as with any thrift undergoing a supervisory conversion, was the lack of capital, using shareholder loans to fund the conversion "went really to the core of [its] financial problem." Tr. 123. A supervisory conversion therefore "wouldn't have been allowed were it not for the fact that it held a promise of bringing in new capital." Tr. 44.

For all of these reasons, it simply did not matter, contrary to Bancorp's contention otherwise, whether Bancorp raised enough capital to complete the conversion without the shareholder loans or, more generally, whether the shareholder loans represented a small percentage of the total stock sold. As an initial matter, however, the factual premise to these arguments – specifically, the notion that the shareholder loans were immaterial because they represented "only" 11.29 percent of the total number of shares sold by Bancorp and were not necessary to complete the conversion – is incorrect. As we demonstrated at trial, First Federal, in fact, issued $3.975 million in shareholder loans, which represented <u>28.1 percent</u> of the stock issued. DX 397 at WOT315 0147; Tr. 676-82 (Crompton). By any definition, 28 percent is a significant – and material – amount, and one that proves that Bancorp could <u>not</u> have completed the conversion without the shareholder loans.

But even if the Court were to consider only the shareholder loans made to Paul Jones, William Jones, Patrick Cole, Roger Howard, Peter Horrigan, Marvin Taylor, Arthur Schwartz, and Roy Cowdrey, which, according to Bancorp's calculations, amount to 11.29 percent of the total shares sold by Bancorp, even Bancorp's own former President considered this a significant amount. In discussing Bancorp's decision to limit the amount of stock that any one individual could purchase to 9.9 percent, Mr. Parran agreed that 9.9 percent of the stock is a "relatively

significant number." Tr. 338 (Parran). So even by Bancorp's own standards, 11.29 percent is material.

More importantly, however, the total amount of shareholder loans that were issued simply does not matter. Rather, what matters is the fact that some amount of shareholder loans were used in the conversion, in direct violation of the regulations and contrary to Bancorp's representations to the FHLBB and Federal Savings and Loan Insurance Corporation. The Court, in fact, asked Mr. Zimmerman about this very topic, when it asked him to confirm that his testimony – that he would have taken action to stop the conversion if he had known about the shareholder loans at the time – "did not entail any understanding of the amounts of the loans." Tr. 121-22. Mr. Zimmerman responded: "That's correct, although it's kind of hard to take that out of the equation. But that's right. What I was saying was it didn't really matter how much was involved." Tr. 122. Mr. Zimmerman explained further: "The amount of money involved, you know, as long as it wasn't de minimis, it didn't matter that it was, you know, it was the whole capital of the company involved." Tr. 123-24.

This testimony remains undisputed by Bancorp. Nor could it, because its logic is unassailable. If, as the regulators testified, using shareholder loans defeats the very purpose of undergoing a supervisory conversion (bringing in new, unencumbered capital), violates the clear mandate of the regulations governing a supervisory conversion, and amounts to Bancorp and First Federal reneging on the promises and representations they made to the FHLBB to obtain approval for the conversion, then it makes perfect sense that the regulators would be concerned only about the fact, not the amount, of shareholder loans being used to fund the conversion. The only conclusion to be drawn from this irrefutable testimony is that the shareholder loans

represented a prior material breach of Bancorp's alleged contract because, if the regulators had known about those loans at the time they were being made, they would have taken immediate action to stop the conversion, regardless of the amount of those loans.

At the same time, Bancorp's related argument that the shareholder loans were not material because the ultimate loss suffered on those loans was "de minimis" is equally baseless. Again, Mr. Zimmerman addressed this point in his testimony:

> The purpose of it [i.e., a supervisory conversion], as I understood it, was to ensure that the money coming into the institution, as a part of its conversion to stock, was capital that was – had no other claims on it, that was not subject to a failure to provide those funds in a meaningful way, and also the idea that an institution is using its own money to fund its own conversion is not what the regulations had in mind when they said you shall not loan money to the people to buy stock in your institution. In other words, they have borrowed that money from the institution itself, so the institution still has a huge risk on their hands. And my experience in the business is that even people that look good on paper later, for whatever reason, default on loans. Doesn't happen every time, but what it means is there's a risk of that happening. There's always a risk when you loan money to someone that they may not pay it back. These regulations contemplate we don't want you accepting that risk against the capital that you're supposed to be raising in this conversion. It should be coming into the institution without any risk of default.

Tr. 49-50 (Zimmerman) (emphasis added).

As Mr. Zimmerman's testimony makes clear, the regulations were not concerned with what might happen in the future. Regulators are not clairvoyant and cannot tell if a particular borrower will default or pay back a loan in full. The purpose of the prohibition against shareholder loans, therefore, was simply to eliminate any risk of default associated with lending money to finance the conversion. The only way to avoid that risk completely is to prohibit the

institution from making shareholder loans in the first place. So, if a thrift and its holding company were using shareholder loans to finance a conversion, the only logical reaction by the regulators would be to stop the conversion itself. This explanation also dovetails with the discussion above: just as the regulators did not care how much of the conversion was being financed with shareholder loans, they also did not care whether the loans ultimately were paid back.

Because the regulators' primary concern was to avoid using shareholder loans altogether to fund a supervisory conversion, any post-hoc response by the FHLBB or Office of Thrift Supervision to an institution with shareholder loans on its books is simply irrelevant in determining whether Bancorp committed a prior material breach of its alleged contract. The testimony at trial established that the purpose of the conversion was to bring new, unfettered capital into the thrift in order to increase its level of capital and protect the insurance fund. Tr. 44 (Zimmerman). Additionally, the regulations prohibiting a thrift from funding its own conversion were designed to eliminate any risk of future default. Id. at 50. Thus, the materiality of Bancorp's breach in this case must be viewed from the time of the breach, not twenty years after the fact.

Bancorp claims that most of the loans which went into default were no longer on First Annapolis' books at the time but had been sold either to Second National or to some other thrift. Again, these facts are irrelevant given the testimony by the regulators that they would have stopped the conversion from going forward if they had know about the impermissible loans to shareholders. The actual losses associated with these loans, regardless of whose books they were on at the time they went into default, should be irrelevant to the Court's inquiry. See Mobil Oil,

530 U.S. at 620-21 (materiality does not depend upon whether the breach results in a financial loss to the non-breaching party).

## III. SHOULD THE COURT FIND THAT THE IMPROPER SHAREHOLDER LOANS PRECEDED THE FORMATION OF THE CONTRACT, THE GOVERNMENT WOULD STILL NOT BE LIABLE BECAUSE IT WOULD CONSTITUTE THE FAILURE OF A CONDITION PRECEDENT

During the recent trial, the parties, prompted by the Court's queries, discussed whether Bancorp's prior material breach should indeed be considered the failure of a condition precedent – assuming Bancorp's violation of the conversion regulations (and the plan of conversion) occurred before the contract was formed. Tr. 835-41; 886-93. As we explained during our closing arguments, and discuss more fully below, the short answer to this question is, "Yes." Two related points, however, also must be stressed. First, as alluded to above, Bancorp has been inconsistent on the question as to when its alleged contract took effect. Second, and more importantly, regardless of which legal construct the Court uses to analyze the facts in this case, the result is the same: the Government is not liable to Bancorp because the shareholder loans used to purchase Bancorp's stock represent either a prior material breach by Bancorp of its alleged contract, or Bancorp's failure to satisfy a condition precedent to that contract.

Bancorp's first violation and breach took place on August 12, 1988 when several individuals that received loans from the thrift actually purchased shares of Bancorp. DX 171.[6]

[6] To the extent that some persons purchased stock with loans after August 12, 1988, their purchases and loans also represent regulatory violations and a breach by Bancorp of the alleged contract. More specifically, the Daugherty Family Trust, Daniel and Elizabeth Fitzgerald, and Michael O'Brien all received loans after August 12, 1988 that funded their respective purchases of stock in Bancorp. DX 397. Assuming the contract was effective on August 13, 1988, Bancorp's failure to comply with the requirement that the conversion not be funded by these sorts of loans would constitute a prior material breach.

Should the Court find that the alleged contract was formed after this date, then Bancorp's violation and breach would constitute a failure of an express condition precedent excusing the Government's alleged breach, rather than a prior material breach.

**A. <u>The Date Of Contract Formation</u>**

In order to determine the effective date of the alleged contract, namely when it became binding upon both parties, the Court should determine what documents are included in the alleged contract. If the alleged contract includes just the RCMA, executed by Bancorp on August 12, 1988, it would seem that the effective date of the contract was August 13, 1988. The RCMA explicitly states that: "This Agreement shall be effective as of the Date of the Acquisition," which is defined as "the effective date on which the Acquiror acquired control of the Old Association." JX 99, paragraph VI(H), which refers to paragraph I(B). According to Bancorp's legal representative, the effective date of the acquisition was August 13, 1988, DX 224, which also was the effective date of the supervisory conversion. JX 101, JX 93 at PFA010 0105. In this case, the violation of the conversion regulations would be a failure of a condition precedent.

If the "contract" includes all the documents Bancorp now contends: RCMA, forbearance letters, FHLBB resolutions and other documents, then the effective date of the overall "agreement" could be viewed differently, despite the plain language of the RCMA. In that instance, the July 21, 1988 FHLBB resolutions, JX 92 and JX 93, would be the key documents. If the Court accepts Bancorp's current litigation position that the resolutions and the RCMA were the "ultimate offer," (Tr. 852) then it would seem that Bancorp's supervisory conversion was their "acceptance," which formed the contract on August 13, 1988. In this situation, the regulatory violations would still constitute a failure of a condition precedent.

If, however, the Court holds Bancorp to its original position (discussed above) that "Bancorp's Application was, in effect, the offer, which was accepted when the Government approved the transaction," then the date of the contract would be the date of that acceptance. More specifically, the Government's conditional approval through the resolutions on July 21, 1988, would be viewed as the date the contract was formed. Pl. June 28, 2001 Br. at 13. Bancorp stated this position more explicitly in its May 14, 2001 Supplemental Memorandum at page 7: "Upon passage of these Resolutions, the contract was formed. No further FHLBB approval was necessary and all the material terms had been agreed upon by the parties." Under this construction, the regulatory violations would represent a prior material breach.

Still a third option would be for the Court to construe the alleged contract as being formed on August 12, 1988. Indeed, August 12, 1988, is also supported by several factors. First, this is the day when Bancorp executed the RCMA and agreed to be bound by its terms, even though the agreement was to become "effective" the next day. Under this view, the Court could find the regulatory violations to be a prior material breach that occurred the same day as contract formation.

**B. The Existence Of The Failure Of A Condition Precedent**

Even if the Court were to find that Bancorp's regulatory violations occurred before the date the contract was formed, the Court should find that Bancorp failed to satisfy a condition precedent. A condition precedent is an event, not certain to occur, which must occur "before performance under a contract becomes due." Restatement (Second) of Contracts § 224 (1981).[7]

---

[7] This Court has applied this definition in interpreting the terms of a contract. Brazos Electric Power Co-op., Inc. v. United States, 49 Fed. Cl. 398, 405 (2001); see also Royall Nat. Bank of Palestine, Tex. v. United States, 215 Ct. Cl. 349, 566 F.2d 1151, 1153 (Ct. Cl. 1977)

The condition precedent in this instance required Bancorp to comply with all applicable rules and regulations before the Government would perform. This condition was expressly set out in First Annapolis' supervisory conversion application, Bancorp's holding company application and plan of conversion, the October 14, 1988 letter of Bancorp's special counsel, and FHLB Resolution No. 88-603. See supra section II. C. This condition was incorporated into the RCMA because it required Bancorp to warrant that the information it gave FSLIC was "true, accurate, complete and current in all material respects." JX 99 at WOQ280 1447. Regardless of what documents are included in the contract, at a minimum, there existed an implied condition that Bancorp comply with all applicable rules and regulations. The evidence admitted at trial established that Bancorp failed to meet this condition by violating the conversion regulations prohibiting loans to shareholders.[8]

The Court also asked if the concept of materiality was present in a failure of a condition precedent. Tr. 892. Despite Bancorp's response that it was a factor, materiality is irrelevant. 6247 Atlas Corp. v. Marine Ins. Co., Ltd., 923 F. Supp. 523 (S.D. N.Y. 1996), aff'd, 104 F.3d 352 (2d Cir. 1996); see also Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co., 962 F.2d 628 (7th Cir. 1992) (substantial performance of condition insufficient); American Jurisprudence, Contracts § 601 (2d ed. 2006). Therefore, the Government can satisfy this standard even if the Court finds the failed condition was not material.

---

(quoting 5 Williston on Contracts, § 666A (3d ed. 1961), which states in part that "A precedent condition in a contract . . . must be performed or happen before a duty of immediate performance arises on the promise which the condition qualifies.").

[8] Additionally, should the Court find that the contract includes the plan of conversion, then the express condition prohibiting the thrift from funding the purchase of Bancorp's stock itself would not have been met. See JX 87 at WOT415 0499.

**C. The Effect Of The Failure Of A Condition Precedent**

The Court also asked the parties how Bancorp's failure of a condition precedent would affect the contract. Tr. 835-41; 886-93. Bancorp's counsel responded that "[t]he failure of a condition precedent voids the contract ab initio. It is a condition of contract existence." Tr. 886. However, the Federal Circuit has held that the opposite is true:

> [A] condition precedent is a condition precedent to performance under the contract, not formation of the contract. When a condition precedent is not satisfied, it relieves a party to the contract of the obligation to perform. It does not negate the existence of the contract or the binding contractual relationship of the parties.

Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1019 (Fed. Cir. 1996) (quoting Moratzka v. United States (In re Matthieson), 63 B.R. 56, 60 (D.Minn.1986)) (emphasis added). Pursuant to the Federal Circuit's holding in Wells Fargo, Bancorp's failed condition does not void the contract.[9]

"Before liability arises on a promise qualified by conditions, express or implied in fact, the conditions must be fulfilled, in the absence of waiver, prevention, or repudiation." American Jurisprudence, Contracts § 601 (2d ed. 2006). The evidence admitted at trial established that

[9] Notwithstanding the Federal Circuit's statement in Wells Fargo, other courts have found that a failure of a condition precedent could prevent the formation of a contract. "A condition may be precedent either to the existence of a contract or to an obligation immediately to perform the contract." American Jurisprudence, Contracts § 458 (2nd ed. 2006) (emphasis added) (collecting cases). "Thus, if the parties to a proposed contract have agreed that the contract is not to be effective or binding until certain conditions are performed or occur, no binding contract will arise until the conditions specified have occurred or been performed." American Jurisprudence, Contracts § 38 (2nd ed. 2006); 13 Williston on Contracts § 38:7 (4th ed. 2000) (citing Parkview General Hospital, Inc. v. Eppes, 447 S.W.2d 487 (Tex. Civ. App. Corpus Christi 1969, writ refused n.r.e.). However, under either scenario the result is the same: Bancorp's breach of contract claim fails.

Bancorp never fulfilled the condition of complying with the regulation prohibiting loans to shareholders. The Government never voluntarily and intentionally relinquished this condition so there can be no waiver. See Ross v. Harding, 391 P.2d 526 (Wash. 1964). Moreover, the Government did not repudiate the contract before the failed condition or prevent Bancorp from fulfilling this condition. American Jurisprudence, Contracts §§ 687-89 (2d ed. 2006). According, the Government is not liable because Bancorp is not able to enforce the contract. See Favell v. United States, 16 Cl. Ct. 700, 721 (1989).

Regardless of which legal construct the Court uses to analyze the facts in this case, the result is the same: the Government is not liable to Bancorp because the shareholder loans used to purchase Bancorp's stock represent either a prior material breach by Bancorp of its alleged contract, or Bancorp's failure to satisfy a condition precedent to that contract.

**D. The Court Can Conform Its Findings To The Evidence Admitted At Trial**

The Court also asked the parties if it had the authority under RCFC 15 to amend the pleadings to conform to the evidence should it find a failure of a condition precedent. Tr. 890-91. Indeed, the Court has broad authority under Rule 15(b) and, if necessary, it should exercise it in this case. See Foman v. Davis, 371 U.S. 178, 182 (1962).

Although Bancorp argues that it is too late to conform the evidence to a different affirmative defense, there is no time limit upon the application of Rule 15(b):

> Even as late as trial, if evidence relating to an unpleaded affirmative defense is introduced without objection, Rule 15(b) requires the pleadings to be treated as if they actually had raised the defensive issue." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1278 (3d ed. 2004) at 679 (footnote omitted); see also Bradford Audio Corp. v. Pious, 392 F.2d 67, 73-74 (2d Cir. 1968) (defense of official immunity not

> pled but tried with implied consent of the parties); George A. Fuller Co. v. Alexander & Reed Esqs., 760 F.Supp. 381, 385 (S.D.N.Y. 1991).

Nicholls v. Tufenkian Import/Export Ventures, Inc., 367 F.Supp.2d 514, 524 (S.D.N.Y. 2005).

Rule 15(b) provides that the Court can conform the pleadings to the evidence "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties." Here, Bancorp expressly consented to a trial by which the Government asserted improper shareholder loans as an affirmative defense. It does not matter that the pre-trial orders and filings characterized this as a "prior material breach" as opposed to a "failure of a condition precedent" because the underlying evidence is the same. Even though the Government did not specifically plead "failure of a condition precedent," Bancorp gave its implied consent to any possible characterization of the improper shareholder loans.[10]

Along with the issue of express or implied consent, courts also examine whether the opposing party "would be prejudiced by the implied amendment, i.e., whether he had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory." 3 Moore's Federal Practice P 15.13(2), at 993 (2d ed. 1966); see Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330-31 (1971).

In this case, Bancorp had the opportunity to defend against the issue and would not be prejudiced should the Court determine that it is necessary to conform the pleadings to the

---

[10] This is especially true in these circumstances. Bancorp originally alleged the contract was formed on July 21, 1988. Only at the closing argument did Bancorp subscribe to the theory that the July 21, 1988 resolutions were an "offer" which it accepted on August 13, 1988. The newly alleged date of contract formation necessitated the failure of a condition precedent defense.

evidence admitted at trial. Because the underlying evidence is the same for both affirmative defenses, Bancorp will not be harmed by an amendment under Rule 15(b). It has had ample opportunity to defend against the improper shareholder loan issue. Bancorp also need not offer any new factual evidence because the appropriate affirmative defense will be determined by the Court's legal interpretation of the same key documents – those it ultimately determines make up the alleged contract.

Moreover, no other relevant factors militate against such an amendment. The Government has not acted in bad faith or with a dilatory motive, but is merely responding to a possible interpretation of the alleged contract. See Foman v. Davis, 371 U.S. 178, 182 (1962) (the trial judge's discretion is broad and its sound exercise of Rule 15(b) usually depends upon the presence or absence of such factors as "undue delay, bad faith or dilatory motive on the part of the movant"). The main purpose of Rule 15(b) is to allow the pleadings to conform to issues actually tried. See Browning Debenture Holders' Committee v. DASA Corp., 560 F.2d 1078 (2d Cir. 1977). That purpose is served here. The requirements of Rule 15(b) are satisfied and the Court should use its authority to conform its judgement to the evidence should it determine that the appropriate defense in this instance is failure of a condition precedent rather than prior material breach. As explained above, both defenses result in the same outcome – the Government is relieved from any subsequent breach.

## IV. THE GOVERNMENT HAS NEVER WAIVED ITS PRIOR MATERIAL BREACH DEFENSE

Bancorp argues that we have waived our defense of prior material breach in two ways, first as a matter of procedure, and second, as a matter of substance. Both arguments fail for the reasons stated below.

### A. The Government Did Not Procedurally Waive Its Prior Material Breach Defense

Bancorp argues that we procedurally waived its defense of prior material breach because we allegedly did not "comply" with the Case Management Order ("CMO") for Winstar-related cases, the August 21, 1997 Order, the December 22, 1997 Show Cause Order, the March 23, 1998 Order, and/or RCFC 56. See Pl.'s App. A at ¶¶ 15-17; Tr. 790-91, 884-85.[11] However, the Government never procedurally waived the defense of prior material breach.

First, we were never obligated to file an answer setting forth our defenses. Indeed, we were prohibited from doing so by design of the parties and the Court in the Winstar-related cases. Under the CMO, which was the result of extensive negotiation by all parties, and governed all Winstar-related cases, we were required to "set forth - - - any defenses of which [we] know [] or had reason to know that relate to" the issues raised by plaintiff in its short-form summary judgment motion, within 120 days of when the plaintiff filed its motion.

---

[11] Bancorp first raised this procedural waiver argument in its November 7, 2003 Motion to Strike when it argued that: (1) it was too late for us to assert either a prior material breach defense regarding investments in subsidiaries or our argument concerning Bancorp's lack of standing, and (2) that seven of our exhibits should be stricken from the record. On February 13, 2004, this Court held that "because the issues of standing and prior material breach have been squarely presented to this Court at least as early as the last status conference and because it can discern no surprise or prejudice to Plaintiff caused by the submission of the seven exhibits, the Court denies Plaintiff's Motion to Strike." February 13, 2004 Order at 3.

The CMO did not require us, however, to assert defenses related to issues other than whether a contract existed and whether we acted inconsistent with that contract. In other words, we were not required to assert our defense of prior material breach at that time, which involves the issue of whether Bancorp acted inconsistently with any alleged contract.

In any event, in our "120-day response" we "reserve[d] our right to assert such defenses in the future, including all defenses to any damages that may be owed to plaintiff, in a manner consistent with the Rules and procedures of the Court of Federal Claims." Def. Supp. Filing Pursuant to Paragraph 5.d of the CMO ("120-day response") at 2 (Oct. 1, 1997). Indeed, even if raised for the first time at trial, our prior material breach defense would not be untimely pursuant to the CMO.[12]

Even if Bancorp could establish that our prior material breach defense is untimely, it cannot be waived unless Bancorp can also show resulting prejudice. See Williams v. Ashland Eng'g Co., 45 F.3d 588 (1st Cir. 1995). Bancorp has failed to show any such prejudice. To the contrary, any possible prejudice was cured when both parties undertook discovery on our defense of prior material breach. For these reasons, Bancorp's procedural waiver arguments fail.

### B. The Government Did Not Substantively Waive Its Prior Material Breach Defense

Bancorp further argues that we substantively waived our prior material breach defense because we "should have known" of the impermissible loans to shareholders and should have

[12] Bancorp cites Fifth Third Bank of Western Ohio v. United States, 55 Fed. Cl. 372, 377 (2003) for the proposition that we waived our defense in this case. To begin, Fifth Third is not binding upon this Court. Moreover, it is distinguishable because it involved the real party in interest defense. In that case, the Court relied upon other cases involving that same defense, to find waiver by the Government. Id. at 375-77.

given Bancorp notice of the breach. Pl.'s App. A at 26. Thus, Bancorp alleges that we waived any right to allege a prior breach of contact by Bancorp in this action. Id. Bancorp is wrong.

### 1. The Government Did Not Voluntarily And Intentionally Relinquish Its Right To Terminate The Alleged Contract

As we have stressed repeatedly throughout these proceedings, central to the concept of a waiver of a material breach of contract is the principle that any waiver must be knowing: "There can be no waiver or estoppel without evidence of knowledge on the part of the [Government]." General Eng'g & Mach. Works v. O'Keefe, 991 F.2d 775, 781 (Fed. Cir. 1993); Lincoln National Life Ins. Co. v. United States, 582 F.2d 579, 582 (Ct. Cl. 1978) ("For there to be a waiver of a right, a party must have known what rights it had."). That is, before the Government can waive a breach of contract, it must have **actual**, not constructive, knowledge of the breach and must make a **voluntary** and **intentional** relinquishment of the right to terminate the contract because of that breach. See Reliance Ins. Co. v. United States, 20 Cl. Ct. 715, 723 (1990); Cherokee Nation v. United States, 355 F.2d 945, 950 (Ct. Cl. 1966) (citing Pacific States Corp. v. Hall, 166 F.2d 668, 671 (9th Cir. 1948)). But see Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271, 310 (2005), appeals argued, Nos. 05-5141, -5179 (Fed. Cir. June 9, 2006) (holding that Government failed to establish material breach but also stating, in dicta, that evidence at trial established Government had constructive notice sufficient to waive any such material breach). As the party invoking the doctrine of waiver, at trial, Bancorp had the burden to present evidence that a **knowing** and **voluntary** waiver occurred. Reliance Ins. Co., 20 Cl. Ct. at 723. Other than mere conjectural argument from its counsel, Bancorp failed to present any evidence at trial demonstrating a knowing and voluntary waiver of the prior material breach by the Government.

It is well-established that a party may defend its breach based upon a legal excuse for nonperformance that existed at the time, such as the material failure of another party to perform or the non-occurrence of a condition precedent, even if the defending party had no knowledge of the legal excuse. As the Supreme Court has stated: "A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was ignorant of the fact." College Point Boat Corp. v. United States, 267 U.S. 12, 15-16 (1925) (emphasis added) cited in Christopher Vill., L.P. and Wilshire Inv. Corp. v. United States, 360 F.3d 1319, 1334 (Fed. Cir. 2004); see also Ashcraft & Gerel v. Coady, 244 F.3d 948, 952 (D.C. Cir. 2001) (a prior material breach by one party justifies subsequent nonperformance by a second party, even if, at the time of the nonperformance, the second party is unaware of the prior breach); Hoffman v. General Motors Acceptance Corp., 814 F.2d 1385, 1387 (9th Cir. 1987) (citing Restatement (Second) of Contracts § 237 (1981) for proposition that, "if a condition precedent to the promisor's duty to perform has not occurred, he is under no duty to perform, whether or not he knows the condition has not occurred") (emphasis added).

Further, continued performance does not act as a bar to subsequent assertion of material breach as a basis to terminate a contract. "A party to a contract, faced with a breach by the opposing party, can choose either to terminate the contract or to continue the contract, perhaps extracting other concessions or consideration from the breaching party in return for its willingness to modify the contract. . . . A party that chooses to proceed with the contract – even if it is the government, and even if it manifests a strong desire to procure the item that is the

subject of the contract – does not thereby waive its right to terminate for default." McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1326 (Fed. Cir. 1999) (citation omitted).

Moreover, this Court has consistently cited the rule set forth in College Point Boat Corp. as a basis for holding that, where the Government has cancelled a contract based upon erroneous grounds, the cancellation may be sustained if there existed an adequate basis for cancellation at the time of the cancellation. Scott Timber Co. v. United States, 64 Fed. Cl. 130, 142 (2005); Wetsel-Oviatt Lumber Co. v. United States, 43 Fed. Cl. 748, 755 (1999); Reservation Ranch v. United States, 39 Fed. Cl. 696, 719 (1997). Indeed, a party to a contract has the ability to continue performance and still reserve its right to assert a claim of material breach. Dow Chemical Co. v. United States, 226 F.3d 1334, 1346 (Fed. Cir. 2000). For example, in Dow Chemical Co., the Court rejected the Government's argument that the plaintiff had waived its right to terminate the license by continuing to urge the Government to perform and by failing to terminate the license in a reasonable time after the repudiation by the Government. Id.; see also Pacific Gas & Elec. Co. v. United States, 70 Fed. Cl. 766, 771-72 (2006) (relying upon Dow in rejecting argument that plaintiff waived claim for material breach under "election doctrine").

In any case, mere delay in rescission after a material breach does not necessarily constitute waiver of the breach. The question is whether any delay is reasonable, given all of the facts and circumstances. See First Interstate Bank of Idaho v. Small Business Admin., 868 F.2d 340, 346 (9th Cir. 1989). The Restatement sets forth four factors to consider in determining the reasonableness of a delay: (1) the extent to which the delay permitted the party with the power of avoidance to speculate; (2) the extent to which the delay caused the breaching party to justifiably rely; (3) the extent to which the material breach was the fault of either party; and (4) the extent to

which the breaching party's conduct contributed to the delay. See Restatement (Second) of Contracts § 381(3) (1981); see also Dow Chemical Co., 226 F.3d at 1346 (finding party had not waived its right to terminate contract because there was no evidence the delay in termination prejudiced the other party).

**2. The Government Did Not Have Knowledge Of The Shareholder Loans Prior To The 1990 Examination**

Prior to the 1990 examination, the Government knew nothing of the impermissible shareholder loans. Tr. 612 (G. Jones); Tr. 677 (Crompton). First, First Annapolis took actions to conceal the impermissible loans from the regulators. First Annapolis entered into an agreement in April 1989 with Second National to swap the loans made to Messrs. Cole, Howard, Horrigan, Taylor and Paul Jones, for other loans. DX 481; DX 524; see also DX 548. By letter dated April 11, 1989, Second National informed Douglas Parran, that it had approved the purchase of the $275,000 loan to Paul Jones as well as the $1,000,000 loan to Messrs. Cole, Howard, Horrigan, and Taylor, known as RMA. JX 140. In return, First Annapolis agreed to purchase two of Second National's loans. Id. The loans were to be purchased at par. Id. First Annapolis further agreed that, if a default occurred on the two loans Second National was purchasing, First Annapolis would repurchase the loans at par. Id. Douglas Parran agreed to these terms by signing Second National's letter on April 12, 1989. JX 140; DX 481; DX 498; DX 524.

Second, despite First Annapolis' attempts to remove the loans from its books, the regulators learned of them during First Annapolis's 1990 examination which was commenced on January 16, 1990 and concluded on February 16, 1990. Tr. 674 (Crompton); DX 397 at WOT315 0134, 0147-48. According to William Crompton, the examiner-in-charge of the 1990

examination, the impermissible shareholder loans were only discovered because he reviewed First Annapolis' commercial loan register during the 1990 examination. Tr. 674-75.

The loans were not discovered prior to January 1990, because the OTS and FHLBB did not conduct an examination that would have discovered these loans prior to that time. Tr. 612 (G. Jones). The fact that Government may have had access to First Annapolis's records prior to the January 1990 exam does not mean that it had "constructive knowledge" of the loans. But see Reliance Ins. Co., 20 Cl. Ct. at 723; Cherokee Nation, 355 F.2d 945 at 950 (finding that before a party can waive a breach of contract, it must have **actual**, not constructive, knowledge of the breach). As explained by Greg Jones, without prior knowledge of the impermissible loans, there was simply no reason for the OTS or FHLBB to inquire about them. Tr. 612. In addition, an examination of First Annapolis was not conducted prior to January 1990 because the OTS and Bank Board "had other institutions to examine" as part of its regulatory functions. Id.

Any suggestion by Bancorp that the Government had "constructive knowledge" of the impermissible loans prior to January 1990 merely by virtue of its regulatory authority over the thrift industry is untenable and belies common sense. The OTS and FHLBB rely upon the thrift's they regulate to be open and honest about their operations; Government agencies are not clairvoyant. Here, Bancorp certified that it had complied with all applicable rules and regulations and warranted that the information it provided to FSLIC was "true, accurate, complete and current in all material respects." JX 99 at WOQ280 1447. Until the shareholder loans were discovered during the 1990 exam, the Government had no reason to doubt Bancorp's representations.

Further, despite Bancorp's allusions to the contrary, the shareholder loans could not have been discovered by the regulators during the 1988 exam which concluded on August 19, 1988 – a mere six days after the August 13, 1988 conversion – because the loans "were made during the course of the [1988] examination, not prior to the examination" and "when [the FHLBB does] an exam, it's as of the as-of date, which would be the financial period ending prior to [the 1988] examination." Tr. 677-78 (Crompton).

As soon as the impermissible loans were discovered, the Government notified Bancorp of its findings. Mr. Crompton testified that soon after the 1990 exam was concluded, First Annapolis was given copies of the regulators' preliminary findings that "were going to be in the examination report," and First Annapolis was given an opportunity to respond to the regulators findings. Tr. 684 (Crompton). Mr. Parran responded in writing to the regulators findings and acknowledged that loans were indeed made to numerous stockholders, and his response was incorporated into the final OTS report of examination that was forwarded to First Annapolis in April 1990. DX 397 at WOT315 0138; DX 439; Tr. 684 (Crompton); Tr. 611 (G. Jones).

By letter dated April 18, 1990, the OTS formally notified First Annapolis of the major supervisory concerns that were revealed during the examination, including the impermissible loans to shareholders. DX 439. According to Greg Jones, although the impermissible loans had occurred in August 1988, the 1990 examination was "the first [OTS] had learned about this," and the OTS was "asking the institution to take measures to correct the situation. . . . .[b]ecause it was in violation – the loans were in violation of the supervisory conversion regulation." Tr. 605 (G. Jones). The OTS therefore directed First Annapolis to "remove all loans to stockholders, the purpose of which were to purchase stock in the Institution, from the Institution's books without

material loss and without reciprocal lending arrangements with other financial institutions." DX 439; Tr. 605 (G. Jones). At the time this letter was sent, First Annapolis' capital plan was about to be denied and they had a number of other problems aside from shareholder loans. Tr. 613 (G. Jones); DX 438. In fact, on May 31, 1990, OTS placed First Annapolis into receivership. Tr. 618 (G. Jones); DX 548 at 5.

Bancorp further alleges that, under Section V of the RCMA, the Government failed to give proper notice of Bancorp's breach and also failed to give Bancorp 90 days to cure any such default. ¶ 6C of Pl.'s App. A; Tr. 865-72. However, the Government gave Bancorp the written notice required in the OTS's April 18, 1990 letter informing them of the shareholder loans and asking them to take corrective action. DX 439. Moreover, there was no way for Bancorp to properly "cure" its default of illegal shareholder loans under the contract because the conversion had been completed and could not be undone. Tr. 650 (G. Jones). Even if the Court finds that Bancorp could have cured the default by replacing "fake capital" with "real capital" after the conversion, the OTS was not required to provide a 90-day cure period because, as the Court recognized, the evidence showed that it was "futile" based upon the thrift's financial condition at the time. Tr. 867; Tr. 651 (G. Jones) ("At that point the institution's condition by itself, with or without the conversion, was very tenuous, at best.").[13]

---

[13] The RCMA cure provision makes clear that the Government must voluntarily and intentionally waive any default: "No failure or delay on the part of the FSLIC in the exercise of any right or remedy shall operate as a waiver thereof, nor shall any partial exercise of any right or remedy preclude other or further exercise of any other right or remedy." JX 99 at § VB.

In conclusion, Bancorp does not cite a single piece of evidence to support its claim that the Government had actual or constructive knowledge of Bancorp's prior material breach. Indeed, the earliest documentary evidence in the record of any knowledge on the part of the Government of improper shareholder loans is the 1990 examination which is dated after the Government's alleged breach. DX 397. Thus, we could not have known about Bancorp's breach before our own alleged breach occurred.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant judgment for the Defendant.

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Deputy Director

s/William F. Ryan

WILLIAM F. RYAN
Assistant Director

s/Richard B. Evans

RICHARD B. EVANS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-7760
Facsimile: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:
TIMOTHY ABRAHAM
MELINDA HART
MARK PITTMAN
DELISA M. SANCHEZ
Trial Attorneys

September 18, 2006

CERTIFICATE OF FILING

I hereby certify that on September 18, 2006, a copy of the foregoing "DEFENDANT'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard B. Evans