**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 94-522C**
**(Judge Williams)**

---

**FIRST ANNAPOLIS BANCORP, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFF'S REPLY BRIEF TO DEFENDANT'S POST-TRIAL BRIEF

---

**Dale A. Cooter**
**COOTER, MANGOLD, TOMPERT & KARAS, L.L.P**
**5301 Wisconsin Avenue, N.W.**
**Suite 500**
**Washington, D.C. 20015**
**(202) 537-0700**

**Attorney for Plaintiff**
**First Annapolis Bancorp, Inc.**

**Of Counsel:**
**James E. Tompert**
**COOTER, MANGOLD, TOMPERT & KARAS, L.L.P.**
**5301 Wisconsin Avenue, N.W.**
**Suite 500**
**Washington, D.C. 20015**
**(202)537-0700**

**Dated: October 4, 2006**

**TABLE OF CONTENTS**

TABLE OF CONTENTS . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . 2

I. Section I Of Defendant's Post-Trial Brief Should Not Even Be Considered . . . . . . . 2

II. The Government Did Not Prove That Bancorp Committed A Prior Material Breach Of Contract . . . . . . . . . . 3

A. The Government Did Not Prove A Breach Of Any Term Of The Contract . . . . . . . . . . 3

B. The Government Did Not Prove A Breach Of Contract By Bancorp . . . . . . . . . . 8

C. The Government Did Not Prove A Material Breach Of Contract . . . . . . . . . . 9

III. The Government's Defense Of A Failure Of Condition Precedent Should Be Rejected. . . . . . . . . . . 11

IV. The Government Has Waived Its Defense Of A Prior Material Breach Of Contract . . . . . . . . . . 14

A. Shareholder Loans . . . . . . . . . . 14

1. Substantive Waiver . . . . . . . . . . 14

2. Procedural Waiver . . . . . . . . . . 17

B. Investments In Service Corporations. . . . . . . . . . . 21

1. Substantive Waiver . . . . . . . . . . 21

2. Procedural Waiver . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . 30

## TABLE OF AUTHORITIES

### FEDERAL CASES

Acme Process Equip. Co. v. United States, 171 Ct. Cl. 324 (1965), rev'd on other grounds, 385 U.S. 138 (1966) . . . . . . . . . . 15, 27

Burton v. Northern Dutchess Hospital, 106 F.R.D. 477 . . . . . . . . . . 21, 29

California Federal Bank v. United States, 39 Fed. Cl. 753 (1997) . . . . . . . . . . 19

Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271 (2005) . . . . . . . . . . 15

Cherokee Nation v. U.S., 355 F.2d 945 (Ct. Cl. 1966) . . . . . . . . . . 16

Cities Service Helix, Inc., v. United States, 543 F.2d 1306 (Ct. Cl. 1976) . . . . . . . . . . 14, 27

Eddy v. Virgin Islands Water and Power Auth., 256 F.3d 204 (3d Cir. 2001) . . . . . . . . . . 20, 29

Effects Associates, Inc. v. Cohen, 980 F.2d 555 (10th Cir. 1990) . . . . . . . . . . 13

Fifth Third Bank of Western Ohio v. United States, 55 Fed. Cl. 372 (2003) . . . . . . . . . . 20, 29

Filmline Productions. Inc. v. United Artists Corp., 865 F.2d 513 (2d Cir.1989) . . . . . . . . . . 6

First Interstate Bank of Idaho v. Small Business Administration, 868 F.2d 340 (9th Cir. 1989) . . . . . . . . . . 15, 27

General Eng'g & Mach. Works v. O'Keefe, 991 F.2d 775 (Fed. Cir. 1993) . . . . . . . . . . 16

Hometown Financial, Inc. v. United States, 409 F.3d 1360 (Fed. Cir. 2005) . . . . . . . . . . 9

Jacob Maxwell, Inc. v. Veeck, 110 F.2d 749 (11th Cir. 1997) . . . . . . . . . . 13

Lauder v. First UNUM Life Ins. Co., 284 F.3d 375 (2d Cir. 2002) . . . . . . . . . . 16

Lincoln Nat. Life Ins. Co. v. U.S., 582 F.2d 579 (Ct. Cl. 1978) . . . . . . . . . . 16

Melrose Associates, L.P. v. U.S., 43 Fed. Cl. 124 (1999) . . . . . . . . . . 16

Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604 (2000) . . . . . . . . . . 10, 11

Point Productions v. Sony Music Entertainment, 2000 WL 1006236 (S.D.N.Y 2000). . . . . . . . . . . . 6

Reliance Ins. Co. v. U.S., 20 Cl.Ct. 715 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Southern California Fed. Sav. & Loan Ass'n v. United States,
422 F.3d 1319 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Sun Cal, Inc. v. United States, 21 Cl. Ct. 31 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Thomas v. Dep't of Housing & Urban Development,
124 F.3d 1439 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**TREATISES**

17 Am. Jur.2d Contracts §§ 446-47, 489, 503, 510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 27

Restatement of Contracts §§ 309-10, 317 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 27

Williston, Contracts §§ 683-88 (3d ed. W. Jaeger 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 27

**FEDERAL REGULATIONS**

12 C.F.R. § 545.74(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

12 C.F.R. § 563b.3(c)(22) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

RCFC 9(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

RCFC 15(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 94-522C** |
| | ) | **(Judge Williams)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFF'S REPLY BRIEF TO DEFENDANT'S POST-TRIAL BRIEF**

Plaintiff, First Annapolis Bancorp, Inc. ("Bancorp"), by and through counsel, hereby submits this Reply Brief to Defendant's Post-Trial Brief, and states as follows:

**INTRODUCTION**

The Post-Trial Brief filed by the Government ("Defendant's Brief") is just another example of the *modus operandi* of the Government during the course of these proceedings and the trial in June 2006. Rather than any sincere effort to address the real issues at hand, the Government has attempted to overwhelm Bancorp, and the Court, with extraneous evidence to obscure its failure to prove that there was a prior material breach of contract by Bancorp. During the trial, the Government was assisted by five attorneys, along with four paralegals, who wasted huge portions of time presenting cumulative evidence of the shareholder loans and irrelevant commentary by the regulators, none of whom were directly involved in the conversion of First Federal Savings & Loan ("First Federal") into First Annapolis Savings Bank, F.S.B. ("First Annapolis"). Defendant's Brief just regurgitates what the Government presented at trial and further obscures the issues the Court asked the parties to brief in its August 8, 2006 Order.

As set forth below, Section I of Defendant's Brief on contract formation violates the August 8, 2006 Order of this Court and should not even be considered. In the remainder of Defendant's Brief, the Government did not sustain its burden to prove a prior material breach by Bancorp of any term of the contract by and between Bancorp and the Government. Also, its last minute defense of a failure of condition precedent should be rejected by the Court. Furthermore, the Government has waived its defense of a prior material breach on grounds of both shareholder loans and investments in service corporations during the course of its dealings with Bancorp and as a matter of procedure in this case.

## ARGUMENT

### I. Section I Of Defendant's Brief Should Not Even Be Considered.

Section I of Defendant's Brief violates the express terms of the Order entered by this Court on August 8, 2006, which provides that "the parties shall file post-trial briefs on **prior material breach and waiver**." August 8, 2006 Order (emphasis supplied). In the first section of its Brief, Defendant argues that Bancorp is not a party to a contract for goodwill or service corporation forbearances and any other contract to which Bancorp may be a party is irrelevant. See Defendant's Brief at 2-7. This argument goes to contract formation, and has nothing to do with the issues of prior material breach or waiver. It is fundamentally unfair for the Government to violate the express terms of the August 8, 2006 Order and to argue, once again, the issue of contract formation, when this is an issue that is not presently before the Court.[1]

---

[1] Even if it is considered, in his deposition, Parran did not disavow the contract by and between Bancorp and the Government, and was not even designated as a corporate designee. Also, Southern California Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319 (Fed. Cir. 2005), is clearly inapplicable. In that case the issue was whether individual shareholders, not a holding company,

## II. The Government Did Not Prove That Bancorp Committed A Prior Material Breach Of Contract.

### A. The Government Did Not Prove A Breach Of Any Term Of The Contract.

In its Brief, the Government did not identify any term of the contract by and between Bancorp and the Government which prohibited loans to shareholders to purchase stock in Bancorp. Instead, the Government contends that the Application H-(e)1 submitted by Bancorp, dated November 5, 1987, is part of the contract. JX 87. The Government therefore argues that Bancorp is bound by the language in paragraph X of the Plan of Conversion attached to the application, which provides that "the association [First Federal] shall not loan funds or otherwise extend credit to any person to purchase shares of holding company stock offered in the conversion." Id. at WOT4150499. The Government, though, did not present any evidence at trial that the application was part of the contract.[2]

The best case for the Government is that the language in paragraph X of the plan of conversion, attached to the application, may be relevant because of the warranty provision in Section III.A of the Regulatory Capital Maintenance Agreement ("RCMA"), which provides that Bancorp "represents, covenants and warrants that the information given to the FSLIC by the Acquiror [Bancorp] and **relied upon thereby in connection with the acquisition of control of the New Institution** [First Annapolis] is true, accurate, complete and current in all **material respects**." JX 99 at 3 (emphasis supplied). Under this scenario, Bancorp could only be liable for a breach of Section III.A of the RCMA if the information in paragraph X of the Plan of Conversion was "relied upon" by the FSLIC in

---

had standing, and there was an assistance agreement that was not executed by the shareholders.

[2] The references by the Government in its Brief to the summary judgment briefs filed in the case do not constitute evidence.

"connection with the acquisition of control of" First Annapolis, was not "true, accurate, complete and current in all material respects." Id.

A review of the Government's Brief demonstrates that the Government failed to prove that there was a breach of the language in Section III.A of the RCMA in two significant respects. First, the Government presented no evidence that the FSLIC actually "relied upon" the statement in paragraph X in the Plan of Conversion in "connection with the acquisition of control of" First Annapolis in any way whatsoever. Instead of presenting any evidence that the FSLIC actually "relied upon" the statement in paragraph X in the Plan of Conversion in "connection with the acquisition of control of" First Annapolis, the Government relies upon the testimony of Park T. Zimmerman ("Zimmerman") and Gregory B. Jones ("Jones") that if they had known about the shareholder loans they would not have approved the conversion. This testimony was hypothetical and does not constitute proof of actual reliance. Moreover, neither Zimmerman nor Jones was directly involved with the conversion of First Federal into First Annapolis. 6/19/06 Tr. at 99/24-100/14 (Zimmerman); 6/21/06 Tr. at 622/10-6622/21. As stated in the Post-Trial Brief filed by First Annapolis ("Plaintiff's Brief"), the absence of any proof of reliance is fatal to the Government's case, and there is nothing in Defendant's Brief to change this result.

Even if the foregoing failure of proof is ignored, the Government did not otherwise prove a breach of the language of in Section III.A of the RCMA. In Section III.A, Bancorp did not give an absolute guarantee or unconditional warranty that **all** of the information it provided in "connection with the acquisition of control of" First Annapolis, was "true, accurate, complete and current." JX 99 at 3 (emphasis supplied). Instead, under the precise language in Section III.A it only did so "in all **material respects**." Id. (emphasis supplied). The Government conveniently ignored this qualifying phrase

during the trial and in its Brief. Within the context of this case, though, the foregoing qualification is significant. It is significant because it means that Bancorp did not warrant that all of the information it provided in the conversion process, assuming *arguendo* that it was relied upon by the FSLIC, was "true, accurate, complete and current," but, rather, it only warranted that the information it provided was "true, accurate, complete and current in all material respects." Id. As such, the argument by the Government in its Brief that the Government would not have approved the conversion if it had known that there were any shareholder loans, regardless of the total amount of the loans, is irrelevant. Since, as discussed at length in Plaintiff's Brief and further recited below, the amount of relevant shareholder loans is not material, there has been no breach of the RCMA by Bancorp.

Moreover, if all of the foregoing is ignored, there still has not been a breach of the RCMA because the Government did not comply with the default provision in the agreement. In its Brief, the Government virtually concedes that it did not send a notice of default to Bancorp, except for a vague reference to the April 18, 1990 letter from Jones to First Annapolis. Defendant's Brief at 56; DX 439. That letter, however, by its very terms does not comply with Sections V.A and VI.A. of the RCMA. Compare DX 439 with JX 99 at 4. The letter is addressed to First Annapolis, not Bancorp, does not give notice of any default, does not even refer to the RCMA, and does not give any opportunity to cure. Id. The additional contention by the Government that it was not required to provide a 90-day cure period because it would have been futile, is not supported by the case law. See Point Productions v. Sony Music Entertainment, 2000 WL 1006236 *4 (S.D.N.Y.)[3] ("The caselaw seems to hold that,

---

[3] In Point Productions, the United States District Court for the Southern District of New York noted that "the exception of the general rule favoring enforcement of notice and cure provisions is

standing alone, a party's mere inability to cure in a timely manner is an insufficient basis on which to deny a contractually-required opportunity to cure"); Filmline Productions. Inc. v. United Artists Corp., 865 F.2d 513, 518-519 (2d Cir.1989) (the failure by United Artists to give Filmline an opportunity to cure, even though futile, "was a fatal defect under New York law").

There is also nothing in the Government's Brief to support the conclusion that there was a material breach of contract by Bancorp because of a purported regulatory violation. First of all, nowhere in its Brief does the Government cite to any provision of the contract which provides that, if there is a violation of the regulations, then there has been a material breach of contract by Bancorp. Instead, the Government argues that "several of the alleged contractual documents obligated Bancorp to comply, or represent that it had complied, with any applicable FHLBB and FSLIC rules and regulations regarding supervisory conversions." Defendant's Brief at 18. The Government then cited to the application, JX 83 at WOT5200127, Resolution No. 88-602, JX 93 at PFA0100100 and the October 14, 1988 letter from Dickstein, Shapiro and Morin, DX 224 at PFA0101644. Id. As discussed above, the application did not expressly state that Bancorp would comply with any applicable regulations, but rather provided that "the association [First Federal] shall not loan funds or otherwise extend credit to any person to purchase shares of holding company stock offered in the conversion," which only has significance if, under the terms of the RCMA, it was "relied upon" by the

---

a narrow one." 2000 WL 1006236 *4. It then explained, under New York law, that a terminating party's failure to afford contractually-required notice and cure is excusable as futile, only in limited circumstances, where the non-performing party: (1) expressly repudiates the contract or (2) abandons performance thereunder. Id. Obviously, neither of these circumstances is present here.

FSLIC in "connection with the acquisition of control of" First Annapolis, and was not "true, accurate, complete and current in all material respects." Id. at WOT4150499.

The relevant portion of Resolution No. 88-603 provides:

> That within 90 days of the date of this Resolution, the organization of [First Annapolis], the conversion of [First Federal] by merger into [First Annapolis] and the acquisition by [Bancorp] have been completed in compliance with the terms of this Resolution . . . applicable state and federal law and regulations as administered by the Board and the FSLIC . . . and that within 30 days thereafter [First Annapolis] shall file . . . an opinion of independent legal counsel that the conversion, the organization of [First Annapolis], and the merger and acquisition have been so completed.

JX 93 at PFA0100100. By its very terms recited above, this Resolution does not obligate Bancorp to ensure compliance with any applicable FHLBB and FSLIC rules and regulations regarding supervisory conversions. Instead, it requires, in pertinent part, that the conversion and the acquisition be "completed in compliance with the terms of" the applicable regulations. In other words, under the terms of the Resolution, Bancorp did not have a duty to ensure compliance with the regulations, namely, in this case, to ensure that First Federal did not make any loans to shareholders to purchase stock, it only had to do what the terms of the regulations required it to do. As set forth in detail in Plaintiff's Brief, Bancorp complied with the terms of the regulations. Plaintiff's Brief at 15-17. As required under 12 C.F.R. § 563b.3(c)(22) (1989), Bancorp included a provision in its plan of conversion that "the association [First Federal] shall not loan funds or otherwise extend credit to any person to purchase shares of holding company stock offered in the conversion." JX 87 at WOT4150499. The regulations do not impose upon Bancorp, as the Government contends, a duty "to ensure that First Federal did not issue shareholder loans." Defendant's Brief at 8. The Government's interpretation of the regulations, and Zimmerman's personal belief about what he thinks the intent of the regulations is, are irrelevant.

Bancorp complied with the express terms of the regulations, which is all that was required to do under the precise language of Resolution No. 88-603 .

Furthermore, the letter dated October 14, 1988 is not one of the contractual contracts. DX 224. Instead, it is a letter from Dickstein, Shapiro & Morin, which was sent to the Federal Home Loan Bank Board ("FHLBB") after the effective date of the conversion on August 13, 1988, and does not create any independent duty for Bancorp to comply with the regulations. Id.

**B. The Government Did Not Prove A Breach Of Contract By Bancorp.**

In its Brief, the Government did not cite to any evidence to demonstrate that Bancorp was involved with any of the loans to shareholders to purchase stock in Bancorp. The Government does not dispute the facts that all of the relevant loans in question were made by First Federal, not Bancorp, and that Bancorp, as a duly organized holding company, is an entity separate and distinct from the bank. Nor did the Government dispute the testimony by Douglas A. Parran ("Parran") that he "was not aware of any loans made to those individuals to purchase stock." 6/20/06 Tr. at 403/20-403/21. Instead, the Government asserts that the letter dated August 26, 1988 from Paul Jones somehow attributes knowledge to Bancorp that there were shareholder loans to purchase stock in Bancorp. A close review of this letter though does not support this assertion. The letter makes no mention of shareholder loans, and in the "RE" line simply states "$275,000.00 shares of First Annapolis Bancorp Common Stock," which is ambiguous to say the least, and does not impute knowledge of shareholder loans to Bancorp. Moreover, there was no testimony that Parran even received the letter or ever saw it before. See 6/20/06 Tr. at 359/25-361/22. The letter, although it is addressed to Parran, underneath the address it is marked to the attention of, "ATTN," Cathy A. Hinckel, and, as such, in the normal

course of business would have gone to her. Id. As such, the letter does not constitute evidence that Bancorp knew, or had any involvement with the shareholder loans.

Moreover, in its Brief, the Government does not even address the issue that, to the extent there was any proof by the Government of a violation, the only proof was that there may have been a regulatory violation by First Annapolis, not Bancorp, as set forth in the April 18, 1990 letter from the FHLBB and the extensive testimony by Jones. DX 439; 6/21/06 Tr. at 665/13-665/14, 636/24-638/24.

**C. The Government Did Not Prove A Material Breach Of Contract.**

In its Brief, the Government seems to agree with the general legal proposition that a breach of contract "is material when it relates to a matter of vital importance or goes to the essence of the contract." Hometown Financial, Inc. v. United States, 409 F.3d 1360, 1370 (Fed. Cir. 2005); Thomas v. Dep't of Housing & Urban Development, 124 F.3d 1439,1442 (Fed. Cir. 1997) (citing 5 *Corbin on Contracts* §1104 (1964)); Defendant's Brief at 10. The Government also seems to agree with the general factual proposition that the matter of vital importance or the essence of the contract by and between Bancorp and the Government was for Bancorp to invest new capital into First Annapolis, as set forth in Resolution 88-603, "in a minimum amount equal to the greater of $11,000,000 or an amount sufficient to raise the net worth of First Annapolis to 1% of its total liabilities on a GAAP basis." JX 93 at 11; JS at ¶3; JX 87 at WOT4150497; 6/19/06 Tr. at 43/25-44/6; 6/19/06 Tr. at 139/8-140/5.

The Government attempts to argue, though, that each and every dollar of the amount of new capital invested in First Annapolis, must be unfettered capital, not originating from a shareholder loan.

This is an argument though that is separate and distinct from the matter of vital importance and essential purpose of the contract, which was for Bancorp to invest new capital into First Annapolis, in a minimum amount equal to the greater of $11,000,000 or an amount sufficient to raise the net worth of First Annapolis to 1% of its total liabilities. There is no language in any of the contract documents or other exhibits, which states that the matter of vital importance and essential purpose of the contract was not to invest even one dollar of capital in First Annapolis that came from shareholder loans. Just because Zimmerman and Jones testified that they would have stopped the conversion if any capital had been raised by shareholder loans does not mean that this was the matter of vital importance and essential purpose of this particular contract. Zimmerman's and Jones' personal opinion of what they would have preferred does not supplant that actual terms of the contract, which called for a capital infusion of the greater of $11,000,000 or an amount sufficient to raise the net worth of First Annapolis to 1% of its total liabilities.

Moreover, the contention by the Government that each and every dollar of new capital had to be unfettered capital is not supported by the case law. The issue, rather, is whether the breach substantially deprived the non-breaching party of the benefit of the bargain it struck. Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 620-21 (2000) (cited by the Government). In this regard, the Government ignores the dispositive fact that the net amount of the unfettered capital invested in First Annapolis exceeded the minimum amount of capital investment required by the contract, even if the shareholder loans prior to the conversion are considered. It is undisputed that the minimum amount of the capital investment was $11,000,000, that Bancorp invested $13,665,907 in capital and, therefore, Bancorp exceeded the minimum amount of the required

investment by $2,665,907. As such, even if the shareholder loans prior to the conversion are considered, the minimum amount of capital required to be invested was exceeded by $1,065,907 ($2,665,907 - 1,600,000[4] = 1,065,907), and the Government has not been substantially deprived of the benefit of the bargain it struck with Bancorp. Mobil Oil, 530 U.S. at 620-21.

Furthermore, the Government in its Brief does not refute the fact that any loss to the Government resulting from the shareholder loans to RMA, Paul Jones, William Jones, Cowdrey and Dr. Arthur Schwartz is, at best for the Government, *de minimus.* As set forth in detail in Plaintiff's Brief any actual loss to the Government, at most, should be no more than $100,000, which further confirms that the Government has not been substantially deprived of the benefit of the bargain it struck with Bancorp. Plaintiff's Brief at 21-22.

**III. The Government's Defense Of A Failure Of Condition Precedent Should Be Rejected.**

In its Brief, the Government asserts that if the Court concludes that the contract was formed on August 13, 1988, then it should be entitled to proceed with a new affirmative defense of a failure of condition precedent. Defendant's Brief at 40. In its Brief, the Government has also apparently abandoned any affirmative defense of fraud or fraudulent inducement, as alluded to by counsel for the

[4] The total amount of the loans to RMA, Paul Jones, William Jones, Cowdrey and Schwartz, was $1,600,000. The loans to the Daughtery Trust, the Fitzgeralds and O'Brien were not made "to purchase shares of Holding Company stock offered in the Conversion," as set forth in paragraph X of the Plan of Conversion. JX 87 at WOT4150499. Instead, they were made well after the effective date of the conversion on August 13, 1988. In its Brief, the Government did not even attempt to cure the failure by the Government to prove at trial that these loans were used, even after the conversion, to purchase shares of stock in Bancorp.

Government in his closing argument. The assertion by the Government of a defense of a failure of condition precedent should be rejected for six reasons.

First, the assertion of this new defense should not be dependent upon any ruling by the Court as to the date of contract formation. Rather, it is incumbent upon the Government to select the affirmative defense that it relies upon and then present evidence in support of that defense. It was the responsibility of the Government to prove all aspects of its defense, including proof of the date of contract formation. In this case, there cannot be both a failure of condition precedent and a prior material breach. Since the Government elected to proceed at trial with its defense of a prior material breach, it should not now be able to disavow that election because the Court had a question during closing argument about the date of contract formation.

Second, the Government's defense of a failure of condition precedent should not be considered for the additional reason that the Government has not complied with Rule 9(c) of the Rules of this Court or filed a motion under Rule 15(b) of the Rules of this Court. Rule 9(c) concerns pleading the special matter of a condition precedent, and is even entitled "**Conditions Precedent**." RCFC 9(c) (emphasis in original). It provides that "[a] denial of performance [of a condition precedent] or occurrence shall be made specifically and with particularity." Id. At no time has the Government ever complied with Rule 9(c). To make matters worse, the Government never filed a motion under Rule 15(b) to amend its disclosures to include the defense of a failure of condition precedent. If the Government is now sincere about this defense, then it should have complied with Rule 9(c) stating "specifically and with particularity" the manner in which it contends that there has been a failure of condition precedent by

Bancorp, and filed a motion under Rule 15(b) to amended its prior disclosures. Since it did neither, it should not now be allowed to argue that there has been a failure of condition precedent.

Third, the Government has never identified a condition precedent in the contract documents, which expressly states that the contract is void and Bancorp must forfeit its investment if First Annapolis made loans to shareholders to purchase stock in Bancorp. See Effects Associates, Inc. v. Cohen, 980 F.2d 555, 559 n.7 (10th Cir. 1990) ("[c]onditions precedent are disfavored and will not be read into a contract unless required by plain unambiguous language"); accord Jacob Maxwell, Inc. v. Veeck, 110 F.2d 749, 754 (11th Cir. 1997).

Fourth, for the same reasons that the Government has waived its defense of a prior material breach of contract discussed in detail in Plaintiff's Brief, the Government has also waived this new defense.

Fifth, there has been no failure of a condition precedent because on February 9, 1989, the Government expressly confirmed "**that all conditions precedent have been met and the Conversion has been completed in accordance with"** Resolution No. 88-602. JX 101 (emphasis supplied); JS at ¶6.

Sixth, there has been no failure of a condition precedent because the evidence shows that, even if the amount of the shareholder loans is deducted from the amount invested in First Annapolis, the minimum amount of capital required to be invested was exceeded by $1,065,907.

## IV. The Government Has Waived Its Defense Of A Prior Material Breach Of Contract.

### A. Shareholder Loans

#### 1. Substantive Waiver.

In its Brief, the Government attempts to skirt the issue of substantive waiver on grounds that "any waiver must be knowing," and that it did not know of the shareholder loans prior to January 1990. Defendant's Brief at 50, 53. Even if these parameters are accepted however, the Government still waived its defense of a prior material breach of contract because even after it learned of the shareholder loans in January 1990, it chose to continue with the contract. Cities Service Helix, Inc., v. United States, 543 F.2d 1306, 1313 (Ct. Cl. 1976) (if the injured party elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach) (citing 5 S. Williston, Contracts §§ 683-88 (3d ed. W. Jaeger 1961)); Restatement of Contracts §§ 317, 309-10 (1932); 17 Am. Jur.2d *Contracts* §§ 446-47, 489, 503, 510 (1964)); see also cases cited in Plaintiff's Brief at 23. The evidence at trial which shows that the Government chose to continue with the contract was overwhelming. The April 18, 1990 letter from Jones to First Annapolis and the testimony by Jones, Zimmerman and even William B. Crompton ("Crompton") all support the conclusion that the Government chose to continue with the contract. DX 439; 6/19/06 Tr. at 108/18-108/23, 110/8-110/17, 115/1-115/21 (Zimmerman); 6/21/06 Tr. at 605/13-605/14, 636/24-638/24, 640/9-640/12, 643/1-643/25, 649/15-649/25 (Jones); 6/22/06 Tr. at 750/18-750/25 (Crompton). Despite the garbled argument by the Government in its Brief on the issue of substantive waiver, there can be no legitimate dispute that, after the Government learned of the loans in January 1990, it still did not inform Bancorp that it had breached its contract with the

Government on grounds of shareholder loans, or give any notice to Bancorp under Section V of the RCMA that it had committed a "Default" of its obligations under the RCMA. As explained above, the April 18, 1990 letter from Jones to First Annapolis does not qualify as a notice of default under the terms of RCMA, and any failure to give a notice of default cannot be excused on grounds of futility.

In regards to the failure by the Government to raise its defense of a prior material breach on grounds of shareholder loans until September 14, 1999, the Government does not give any explanation as to why it waited over nine years to raise the defense, and merely states in its Brief that the [t]he question is whether any delay is reasonable, given all the facts and circumstances." Defendant's Brief at 52. Under the facts and circumstances of this case, the delay of over nine years is inherently unreasonable as a matter of law. Acme Process Equip. Co. v. United States, 171 Ct. Cl. 324, 337 (1965), rev'd on other grounds, 385 U.S. 138 (1966); First Interstate Bank of Idaho v. Small Business Administration, 868 F.2d 340, 346 (9th Cir. 1989) ("A party rescinding a contract must do so within a reasonable period of time after discovery of a breach justifying rescission") (cited by the Government).

In regards to the contention by Bancorp that the Government should have had constructive knowledge of the shareholder loans prior to January 1990, the Government contends that under the case law, "it must have actual, not constructive, knowledge of the breach." Defendant's Brief at 50. The Government, however, ignores the pervasive case law which holds that constructive knowledge may be sufficient. See Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271, 309-310 (2005) ("After hearing testimony in this regard, the court finds that the regulators' extensive reviews, audits, and particularly their interest in establishing additional loan loss reserves, both pre- and post-merger, as well as their comments about SSA's loan process and portfolios, that **they knew or should have**

**known** of the financial conditions of which the government now complains) (emphasis supplied); Melrose Associates, L.P. v. U.S., 43 Fed. Cl. 124, 149 (1999) ("Waiver requires (1) the existence at the time of the waiver a right, privilege, advantage or benefit that may be waived; (2) **the actual *or constructive* knowledge thereof**; and (3) an intention to relinquish such right, privilege, advantage or benefit.") (emphasis supplied) (quoting Youngdale & Sons Constr. Co. v. United States, 22 Cl. Ct. 345, 346 (1991)); Lauder v. First UNUM Life Ins. Co., 284 F.3d 375, 381-382 (2d Cir. 2002) (actual or constructive knowledge satisfied the knowledge requirement for waiver).[5] The Government ignores the abundant evidence at trial that it had a full and fair opportunity during the 1988 examination and thereafter up until the time of the January 1990 examination to discover the shareholder loans. DX 118 at WOT3150007, WOT3150008, WOT3150030, WOT3150012, WOT3150018, WOT3150057-0059,WOT3150062 and WOT3150064 (1988 Examination Report); 6/22/06 Tr. at 666/2-666/7, 675 13/676/2 (Crompton testimony); 6/21/06 Tr. at 623/2-623/14 (Jones testimony); DX 287 (January 24, 1989 letter from Jones to counsel for First Annapolis). This evidence, especially

---

[5] The cases relied upon by the Government are inapposite. None of the cases holds that constructive knowledge is insufficient, and in none of the cases could constructive knowledge have even existed. General Eng'g & Mach. Works v. O'Keefe, 991 F.2d 775, 781 (Fed. Cir. 1993) (finding no "evidence of knowledge" of certain improper charges because the Navy never audited the part of the contract containing the expense pools providing for the charges at issue); Lincoln Nat. Life Ins. Co. v. U.S., 582 F.2d 579, 582 (Ct. Cl. 1978) (finding that the plaintiff did not waive any rights by the legal positions it took because the "various positions taken by the courts on the subject" prevented the plaintiff from knowing its rights, and plaintiff took a "reasonable legal position under the then existing legal climate of opinion"); Reliance Ins. Co. v. U.S., 20 Cl.Ct. 715, 722-723 (1990) (finding no waiver from inconsistent application of contract clause because: (1) the clause was inapplicable; and (2) the clause was not waiveable except by a person with proper authority); Cherokee Nation v. U.S., 355 F.2d 945, 950 (Ct. Cl. 1966) (finding that no waiver occurred when attorneys accepted a reduced fee award based on "compulsion and financial duress").

coupled with the February 9, 1989 letter from Jones, confirming that "all conditions precedent have been met," is sufficient proof that the Government should have had constructive knowledge of the shareholder loans prior to January 1990. JX 101.

The assertion by the Government in its Brief that "First Annapolis took actions to conceal the impermissible loans from the regulators," is pure conjecture. Defendant's Brief at 53. There was no competent evidence of concealment by First Annapolis. The sale by First Annapolis to Second National of the loans to RMA and Paul Jones was documented in the April 12, 1989 letter agreement and noted by Crompton in the 1990 Examination Report. JX 140; DX 397 at WOT3150148. Zimmerman even admitted in cross examination that it was commonplace for banks to buy and sell loans to other banks, and there is nothing illegal or improper about that practice. 6/104/1-104/7. Also, regardless of how the loan sale to Second National is viewed, there is no evidence of any concealment of anything by Bancorp. This attempt by the Government to concoct an issue of concealment is nothing more than another smokescreen by the Government designed to conceal the relevant evidence that the Government should have had constructive knowledge of the shareholder loans, and thereby waived its defense of a prior material breach.

**2. <u>Procedural Waiver.</u>**

In its scant response to the issue of procedural waiver, the Government asserts that it was "never obligated to file an answer setting forth our defenses." Defendant's Brief at 48. Incredibly the Government fails to mention that the very reason it was not required to file an answer was because it was obligated to comply with the terms of the Case Management Order ("CMO") negotiated by the Coordinating Committees for the <u>Winstar</u> Plaintiffs and the Government. The Government then states

that "[t]he CMO did not require us, however, to assert defenses related to issues other than whether a contract existed and whether we acted inconsistent with that contract." Id. at 49. This statement is belied by the terms of the CMO which provide that "[t]his Order applies to all Winstar-related cases ("Winstar cases" or "cases"), including any claims, special pleas in fraud, **defenses**, **affirmative defenses**, setoffs, counterclaims, or other issues raised in those cases . . . " CMO at 1 (emphasis supplied). The CMO further provides that within 120 days of the filing of a motion for partial summary judgment, the Government was ordered to "set forth, in accordance with the requirements of the rules of this Court, any defenses of which it knows or has reason to know that relate to the two issues asserted in the motion." Id. at 7. As such, the defense of a prior material breach of contract is clearly an "affirmative defense" that relates to the issues asserted in Bancorp's Short Form Motion for Partial Summary Judgment. Indeed, when the Government first raised the defense in its Motion to Dismiss Counts II, V, VI and VII of Plaintiff's Complaint and Motion for Summary Judgment as to Counts I, III, IV, filed September 14, 1999, it argued, on pages 26-28 of that Motion, that Plaintiff is not entitled to summary judgment on grounds that there is a material fact in dispute regarding loans to shareholders. Thereafter, the Government on multiple occasions has continued to argue that Bancorp is not entitled to summary judgment on grounds of its defense of a prior material breach of contract on grounds of shareholder loans. The Government cannot now say with a straight face that it was not required by the terms of the CMO to raise this defense.

Indeed, the failure by the Government to articulate its defenses in the 120-day responses it filed pursuant to the CMO was even previously addressed by this Court. In response to complaints by the Plaintiffs' Coordinating Committee of the adequacy of the Government 120-day responses, on August

21, 1997, Judge Smith entered an Order in all Winstar cases, including this case, which clarified the requirements for the Government's 120-day responses. Judge Smith prefaced the order with the explanation that "[p]ursuant to the remarks made by the Court on July 23, 1997 regarding the adequacy of the Government's 120-day response generally, and regarding the motion of the Coast plaintiff's Proposal for Entry of Judgment in particular the following is ORDERED." Id. at 1. The Order then provides:

> 1) It has always been the court's understanding that, under the procedures established in the Omnibus Case Management Order, the 120-day response to a motion for partial summary judgment must contain more than a mere listing of possible or theoretical defenses that could conceivably exist. Such a filing is of no use, either to the parties or to the court, in advancing these cases towards resolution. It is the court's understanding that the 120-day response is intended to require more than mere assertions, and should be consistent with RCFC 56(d), which requires a respondent to "state the precise nature of its disagreement and give its version of the events, supported by record citations."

Id. at 1-2. In response to this Order, on October 1, 1997, the Government filed a pleading entitled "Supplemental Filing Pursuant to Paragraph 5.d of the Omnibus Case Management Order," in which it merely referred to the defenses it previously raised, and once again, did not raise any defense of a prior material breach on grounds of shareholder loans or otherwise.

In its Brief, the Government also ignores the December 22, 1997 Show Cause Order and the March 23, 1998 Order of this Court. On December 22, 1997, Judge Smith issued his decision in California Federal in which he found for the plaintiffs in four consolidated cases, and also ordered the Government in all Winstar cases, including this one, to show cause why the Court should not grant the pending short form motions for summary judgment. California Federal Bank v. United States, 39 Fed. Cl. 753 (1997) ("Cal Fed. I"). After discovery commenced, on February 20, 1998, the Government

filed its response to the Show Cause Order, and, once again merely reiterated its prior defenses and, for the third time, did not raise any defense of a prior material breach on grounds of shareholder loans or otherwise.

On March 23, 1998, this Court ordered Bancorp to submit a proposed order entering summary judgment on the issue of liability and ordered the Government to identify specific facts in this case which distinguish it from the holding in the Court's December 22, 1997 decision in Cal Fed I. On March 31, 1998, Bancorp submitted its proposed order and memorandum in support thereof. In its response, filed on April 30, 1998, the Government failed to set forth any facts to distinguish this case from Cal Fed I, and, for the fourth time, did not raise any defense of a prior material breach on grounds of shareholder loans or otherwise.

On July 30, 1998, the Government filed another pleading entitled "Supplemental Filing Pursuant to Paragraph 5.d of the Omnibus Case Management Order," in which it merely referred to the defenses raised in its prior pleadings. For the fifth time, the Government did not raise any defense of a prior material breach on grounds of shareholder loans or otherwise.

As such, the Government has clearly violated four different Orders of this Court and has made a mockery out the Winstar Case Management Procedures in this case. The Government had five different opportunities to raise its defense of a prior material breach, but failed to do so. It failed to do so until approximately **eleven years** after the loans to shareholders were made, **nine years** after its discovery of the loans, and **five years** after this case was filed. Considering all of the foregoing, the Government has waived its defense of a prior material breach of contract on grounds of shareholder loans. Fifth Third Bank of Western Ohio v. United States, 55 Fed. Cl. 372, 377 (2003); Eddy v.

Virgin Islands Water and Power Auth., 256 F.3d 204, 210 (3d Cir. 2001); Burton v. Northern Dutchess Hospital, 106 F.R.D. 477, 481-82 (S.D.N.Y.1985).

**B. Investments In Service Corporations.**

In its September 9, 2006 Order, the Court instructed the parties to brief the issue of waiver of the Government's defense of a prior material breach of contract based on investments in service corporations. As set forth below, the Government has waived this defense during the course of its dealings with Bancorp and also as a matter of procedure in this case.

**1. Substantive Waiver**

To properly address this defense, it is necessary to understand the terms of the forbearance concerning investments in service corporations. The forbearance is initially set forth in three letters dated July 21, 1988, August 11, 1988 and August 12, 1988.

The July 21, 1988 letter provides, in pertinent part:

> 1. For a period not to exceed five years, First Annapolis may make investments in, and conforming loans to, its service corporation, subject to the prior written approval of the Supervisory Agent, up to the level permitted by Section 545.74(d) of the Rules and Regulations for Federal Associations ("Federal Regulations") for institutions which meet the minimum regulatory capital requirements.

JX 91 at 1 (also attached as Exhibit 4 to Defendant's October 31, 2003 Appendix).

The August 11, 1988 letter provides, in pertinent part:

> Supervisory Agent will neither take, nor recommend that the FHLBB or Federal Savings and Loan Insurance Corporation take, any supervisory action against First Annapolis Savings Bank, FSB, for failure to comply with the limitations of 12 C.F.R. Section 545.74(d) with respect to **presently existing service corporation investments which have been identified in the schedule prepared by the institution as of July 31, 1988**, and submitted to the Supervisory Agent on August 10, 1989, so long as First Annapolis complies with the requirements of FHLBB Resolution 88-602 pertaining to compliance with its Business Plan and so long as it

> shall remain in effect, the requirements of the Supervisory Agreement dated July 8, 1987, between First Federal Savings and Loan Association of Annapolis and the Federal Home Loan Bank of Atlanta.

Exhibit A, attached hereto[6] (also attached as Exhibit 6 to Defendant's October 31, 2003 Appendix) (emphasis supplied). The schedule referenced above, prepared by First Annapolis as of July 31, 1988, is attached hereto as Exhibit B.

Since the foregoing forbearance letter obligates First Annapolis to comply with the requirements of the Supervisory Agreement dated July 8, 1987, a review of its relevant terms is appropriate. That Agreement is by and between First Federal and FHLBB (Bancorp is not a party to the contract). Exhibit C, attached hereto (also attached as Exhibit 17 to Defendant's October 31, 2003 Appendix). The relevant terms of the agreement concerning investments in service corporations are set forth in paragraphs 4, 5 and 6. Pursuant to paragraph 4, First Federal was obligated to develop and adopt a business plan, which incorporates:

> b. A plan to divest First Federal's investment in service corporations which exceeds the limitations of Section 545.74 (c) of the Federal Regulations. Said divestiture shall result in no loss to First Federal or its service corporations. The plan shall also include policies, procedures and internal controls to ensure that First Federal and its service corporations shall at all times remain in compliance with the investment limitations of Section 545.74(c) of the Federal Regulations.

---

[6] The Exhibits to this Reply Brief are attached for the convenience of the Court. They were all previously submitted in conjunction with Defendant's Supplemental Memorandum in Support of its Motion to Dismiss and in Opposition to Bancorp's Motion for Summary Judgment, and Appendix, filed on October 31, 2003, and Bancorp's Supplemental Memorandum in Opposition to Defendant's Motion to Dismiss and Reply Brief in Support of First Annapolis Bancorp, Inc's Motion for Summary Judgment on Liability, filed on March 15, 2004.

Id. at 5. Paragraph 5 requires First Federal to submit quarterly variance reports and paragraph 6 requires First Federal to submit monthly reports to the Supervisory Agent, Betsy Brown Trump ("Ms. Trump").[7] Id. at 6.

The August 12, 1988 forbearance letter states that "the following language should be substituted for paragraph number 1 of the July 21, 1988, forbearance letter:"

> 1. For a period of five years from the date of the conversion, First Annapolis shall, solely for purposes of complying with the service corporation investment limitations set forth in Federal Regulation 545.74(d), be deemed to be in compliance with its minimum regulatory capital requirement.

JX 98 (also attached as Exhibit 7 to Defendant's October 31, 2003 Appendix).

Accordingly, the relevant terms of the forbearance with which First Annapolis was obligated to comply are set forth in August 11, 1988 forbearance letter and, by reference, in the Supervisory Agreement. The first numbered paragraph in the July 21, 1988 letter is not applicable because that paragraph was substituted with the language in the August 12, 1988 letter, which does not impose any requirements on the Bank. The language in paragraphs 4.b, 5 and 6 of the Supervisory Agreement, set forth above, is relevant to the issue of waiver. See Exhibit C at 0319-23.

As required by the terms of the Supervisory Agreement, First Federal developed and adopted a business plan in accordance with paragraph 4.b, which it tendered to and was accepted by the Government. See Affidavit of Douglas A. Parran ("Parran Affidavit") at ¶4, Exhibit D, attached hereto (previously submitted as Exhibit A to Plaintiff's March 15, 2004 Supplemental Memorandum). After

---

[7] Zimmerman testified that Ms. Trump was in charge of the conversion, that she negotiated the terms of the conversion, and was the Supervisory Agent for the conversion, until she was replaced by Jones. 6/9/06 Tr. at 99/24-100/21.

the conversion, First Annapolis submitted its quarterly variance reports and monthly reports to the Government as required by paragraphs 5 and 6. Parran Affidavit at ¶5, Exhibit D. Copies of those monthly reports are attached hereto as Exhibit E (also attached as Exhibit 23 to Defendant's October 31, 2003 Appendix of Exhibits).

Moreover, in addition to the submission of these reports, after the conversion, Parran continued to speak with Ms. Trump on a regular basis, and reported on the status of the Bank's investments in the service corporations. Parran Affidavit at ¶6, Exhibit D. Parran and Ms. Trump discussed the investments in a joint effort to accomplish the divestiture of service corporation investments as set forth in paragraph 4.b of the Supervisory Agreement. Id. At no time during these conversations did Ms. Trump voice any objection to the investments in the service corporation or suggest in any way that the Bank had exceeded the level of investments in the service corporations allowed by the forbearance. Id.

The investments in service corporations was also commented on in both the 1988 Examination Report and the 1990 Special Limited Examination Report. The 1988 Examination Report noted the forbearance granted in the August 11, 1988 letter and commented on the level of service corporation investments. DX 118 at WOT3150011 and WOT3150023. The examiner even noted that:

> As a result of the recently completed stock conversion, the Supervisory Agent notified the institution that, so long as the association remains in compliance with the Supervisory Agreement and business plan, they will not take or recommend supervisory action against the institution for failure to comply with the limitations of service corporations, solely with respect to existing projects.

Id. at WOT3150023. On December 28, 1988, the FHLBB sent a copy of the 1988 Examination Report to First Annapolis, noted that First Annapolis is currently reporting service corporation

investments in excess of the regulatory limit and requested additional information. DX 267 at WOT3150111 and WOT3150114.

In the 1990 Examination Report there is considerable discussion of the investments in service corporations. DX 397 at WOT3150141-0144. The examiner noted that the "level of service corporation investment is well in excess of the regulatory limitation," but did not address the forbearance that was given in the August 11, 1988 letter. Id. at WOT3150141. The report also includes the written response provided by Parran, in which Parran explains why the level of investment increased, states that full disclosure of the transactions was made prior to the conversion and notes the forbearance agreement. Id at WOT3151043.[8] On April 18, 1990, Jones sent a copy of the 1990 examination report to First Annapolis with a cover letter. DX 439. In the letter, Jones stated that First Annapolis "shall develop a detailed plan which demonstrates the elimination of investment in service corporations by no later than December 31, 1991," and required First Annapolis to send a copy of the

---

[8] There were two reasons why the amount of the investments in the service corporations increased after the conversion. First, pursuant to the August 11, 1988 forbearance letter, First Annapolis was authorized to complete the presently existing projects. Parran Affidavit at ¶7, Exhibit D. It was necessary to complete these projects because if the funding ceased they would have been cut-off in mid-stream, and huge losses would have resulted, which would have been in conflict with the requirement in paragraph 4.b that the Bank's plan of divestiture "shall result in no loss to First Federal or its service corporations." Id. Full disclosure of these projects to FHLBB was made both before and after the conversion. Id. The second reason why there was an increase in the amount of the investments in service corporations was because of accrued interest, which was retained as cash by the service corporation Delta Financial Corporation ("Delta"), and added to the outstanding investment balance, so that it appeared as if the amount of the investment by First Annapolis was increasing when it really was not. Id. In fact, the major portion of the apparent increase was because of accrued interest. Id.

plan to the Government, along with monthly reports on the status and implementation of the plan. Id. at WOQ3921301.

During the period of time after the conversion and prior to December 7, 1989, all of the transactions that were criticized in the 1990 Examination Report were fully disclosed to Ms. Trump and the Government's examination staff, who voiced no objection thereto. Parran Affidavit at ¶11, Exhibit D. They were disclosed by Parran in his on-going conversations with Ms. Trump and they were disclosed in the monthly and the quarterly reports that were sent to FHLBB. Id. These reports were accepted by the Government without objection. Id.

Moreover, neither Ms. Trump nor anyone else on behalf of the Government ever gave Bancorp any oral or written notice that the contract by and between the Government and Bancorp would be or had been terminated on the basis of alleged excessive investments by First Annapolis in its service corporations. Id. at ¶3. Neither Ms. Trump, as the Supervisory Agent, nor anyone else on behalf of the Government never even took any supervisory action against First Annapolis during the period of time from the effective date of the conversion, August 13, 1988 until December 7, 1989. Id. To the contrary, on a continuous basis after the execution of the Supervisory Agreement Parran informed Ms. Trump about the nature of the service corporation investments, and Ms. Trump expressed no objection thereto. Id.

Considering all of the above, there can be no legitimate dispute that the Government waived its defense of a prior material breach of contract on grounds of investments in service corporations. It had full disclosure before, during, and after the conversion of the investments in service corporations. Exhibits B, D and E, hereto. In the 1988 Examination Report, the December 28, 1988 letter, the 1990

Examination Report, and the April 18, 1990 letter, the Government acknowledged that it was aware of the issue, yet never took any action to rescind its contract with Bancorp. See DX 118, DX 267, DX 397 and DX 439. In none of the foregoing documents, or otherwise, did the Government inform Bancorp that there was a prior material breach of contract on grounds of investments in service corporations or give a notice of default as required by the RCMA. It even waited until **fifteen** years after it learned that the investments in service corporations had exceeded the regulatory limits to raise its defense of a prior material breach of contract on grounds of investments in service corporations in its October 31, 2003 Supplemental Memorandum. As such, the Government has waived its defenses of a prior material breach of contract on grounds of investments in service corporations. Cities Service Helix, 543 F.2d at 1313; 5 S. Williston, Contracts §§ 683-88 (3d ed. W. Jaeger 1961); Restatement of Contracts §§ 317, 309-10 (1932); 17 Am. Jur.2d *Contracts* §§ 446-47, 489, 503, 510 (1964)); Sun Cal, Inc. V. United States, 21 Cl. Ct. 31, 41 (1990); Acme Process, 171 Ct. Cl. at 337; First Interstate Bank of Idaho, 868 F.2d at 346.

**2. Procedural Waiver.**

For the same reasons that the Government waived its defense of a prior material breach on grounds of shareholder loans as a matter of procedure in this case as set forth above, it also waived its defense of a prior material breach on grounds of investments in service corporations.

In addition to the foregoing, there are other facts which further demonstrate that the defense has been waived during the course of these proceedings. First, this defense was not raised until October 31, 2003, when the Government filed its Supplemental Memorandum, which was approximately **four** years after the Government raised its defense of a prior material breach of contract on grounds of shareholder

loans, and **fifteen** years after it learned of that First Federal had exceeded the regulatory limit on investments in service corporations.

Moreover, the Government even failed to raise this defense as an issue to be tried during the June 2006 trial and failed to do so. In this regard, as the Court will recall, on January 20, 2006, the Court, over objection of Bancorp, granted the Government's Renewed Motion for Leave to Take Depositions out of Time, on the issue of shareholder loans. During the course of the depositions, and the on-going colloquy with the Court, both on and off the record, the Government made no mention whatsoever of the issue of investments in service corporations. On April 7, 2006, the parties filed a Joint Proposed Pre-trial Schedule, which set forth various dates leading up to the trial on the Government's defense of prior material breach. On April 20, 2006, as required by Rule 13 of Appendix A, counsel for both parties met at the offices of Plaintiff's counsel and discussed the matters required by Rule 13(c) of Appendix A, and the discussion was limited solely to the issue of shareholder loans. During the meeting there was no mention whatsoever by the Government of the issue of investments in service corporations. On April 27, 2006, the parties filed their Joint Certification of that meeting. On May 8, 2006, Defendant filed its Contentions of Fact and Law, in which there was no mention of the issue of investments in service corporations. On May 15, 2006 during a conference call with the Court, Defendant represented that it continued to rely on its defense of investments in service corporations, and sought leave to amend its Contentions of Fact and Law. On May 16, 2006, the Court entered an Order, in which it ruled that Defendant could file a Motion for Leave by May 17, 2006, in which it must set forth any proposed additional contentions, testimony and exhibits, "**as well as the cause for omitting this defense from its original contentions**." Emphasis supplied. On

May 17, 2006, Defendant filed its Motion for Leave and did not, as required by the May 16, 2006 Order of this Court, explain "the cause for omitting this defense from its original contentions." Instead, it merely stated that the "contentions were inadvertently omitted." Motion for Leave at 1. That Motion was denied by the Court.

Furthermore, since the defense was not raised until over four years after the discovery deadline and was not even mentioned by the Government until the eve of the June 2006 trial, Bancorp never had the opportunity to take any discovery from the Government concerning this defense. Bancorp, therefore, will be unfairly prejudiced if the Government is now allowed to proceed with its defense.

Since the Government: (1) did not comply with the CMO, did not comply with the August 21, 1997 Order, it did not comply with the Show Cause Order, did not comply with the March 23, 1998 Order, did not comply with Rule 56, did not comply with its own representation to the Court on February 26, 2001 that all issues related to summary judgment had been joined, did not comply with the dates it agreed to in the Joint Proposed Pre-trial Schedule filed on April 7, 2006, did not comply with Rule 13(c)(3), did not comply with the May 8, 2006 deadline and did not comply with the May 16, 2006 Order; (2) did not raise this defense until approximately **fifteen years** after it learned of the investments, **six years** after it was required to be disclosed by the terms of the CMO, the Show Cause Order and the March 23, 1998 Order, **over four years** after the close of discovery, and after all of the pre-trial dates it agreed to, and (3) because of prejudice to Bancorp, the Government has waived its defense of a prior material breach on grounds of investments in service corporations. Fifth Third Bank, 55 Fed. Cl. at 377 (2003); Eddy, 256 F.3d at 210; Burton, 106 F.R.D. at 481-82.

**CONCLUSION**

Wherefore, Plaintiff respectfully requests that the Court rule that there has been no prior material breach of contract by First Annapolis Bancorp, Inc. and that the Government has waived any defenses of a prior material breach of contract.

Respectfully submitted,

Dated: October 4, 2006

COOTER, MANGOLD, TOMPERT
& KARAS, L.L.P.

s/Dale A. Cooter

______________________________

Dale A. Cooter
5301 Wisconsin Avenue, NW
Suite 500
Washington, DC 20015
Tel: (202)537-0700
Facsimile: (202)364-3664

*Attorney for Plaintiff*
*First Annapolis Bancorp, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of October 2006, a copy of the foregoing Reply Brief and Exhibits was filed electronically pursuant to the Electronic Case Filing procedures of the United States Court of Federal Claims, with service by Notice of Electronic Filing to the designated attorneys and parties of record.

s/Dale A. Cooter
Dale A. Cooter