# EXHIBIT D

**No. 94-522C**
**(Judge Williams)**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**FIRST ANNAPOLIS BANCORP, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

**AFFIDAVIT OF DOUGLAS A. PARRAN, JR.**

DOUGLAS A. PARRAN, JR., having been duly sworn, says the following:

1. I am over 18 years of age and am competent to testify to the matters set forth herein, and testify that the following statements are true and correct and are based upon matters within my personal knowledge.

2. On behalf of First Annapolis Bancorp, Inc. ("Bancorp"), I negotiated the contract by and between Bancorp and the Government which is the subject of this dispute. I am familiar with the terms of that contract, and have averred to those terms in other Affidavits that I have executed in this case. I negotiated the terms of that contract with Betsy Brown Trump ("Ms. Trump"), the Principal Supervisory Agent from the Federal Home Loan Bank Board ("FHLBB"). I am familiar with the three forbearance letters dated July 21, 1988, August 11, 1988 and August 12, 1988, that are part of the contract by and between Bancorp

and the Government. The terms of the forbearance letters reflect promises made by Ms. Trump, on behalf of the Government, to me, on behalf of Bancorp, during the course of our negotiations. On behalf of Bancorp, I made it clear to Ms. Trump that the capital contribution by Bancorp was conditioned on assurances from the Government that First Annapolis would receive the regulatory forbearances.

3. To my knowledge, neither Ms. Trump nor anyone else on behalf of the Government ever gave Bancorp any oral or written notice that the contract by and between the Government and Bancorp would be or had been terminated on the basis of alleged excessive investments by First Annapolis Savings Bank, F.S.B. ("First Annapolis") in its service corporations, one being the Delta Financial Corporation ("Delta"). In the normal course of business at our offices such notice, if it was not delivered to me personally, would have been brought to my attention. Also, to my knowledge, neither Ms. Trump, as the Principal Supervisory Agent, nor anyone else on behalf of the Government never took any supervisory action against First Annapolis during the period of time from the effective date of the conversion, which I understand to be August 13, 1988 until December 7, 1989, which I understand is the date when the OTS regulations issued by the Government pursuant to FIRREA became effective. To the contrary, on a continuous basis after the execution of the Supervisory Agreement I informed Ms. Trump about the nature of the service corporation investments, and Ms. Trump expressed no objection thereto.

4. I have reviewed the Supervisory Agreement, dated July 8, 1987, and am familiar with its terms. First Annapolis developed and adopted a business plan in accordance with paragraph 4 of that agreement, and it was accepted by the Government.

5. First Annapolis submitted quarterly variance reports and monthly reports as required by paragraphs 5 and 6 of the Supervisory Agreement. The monthly reports included the six spreadsheets or charts which I understand were submitted by the Government with its recent filing in this case, which I have reviewed. The information on these documents confirms that, during the period of time from August 13, 1988 until December 7, 1989, there was no large increase in the total amount of investments in service corporations other than loans in process and accrued interest, which was an allowable method.

6. Moreover, in addition to the submission of these reports, after the conversion, I continued to speak with Ms. Trump, both in person and on the telephone, on at least a monthly basis, and reported on the status of the Bank's investments in the service corporations. Ms. Trump and I discussed the investments in a joint effort to accomplish the divestiture of service corporation investments as set forth in paragraph 4.b of the Supervisory Agreement. At no time during these conversations did Ms. Trump voice any objection to the level of the investments in the service corporations or suggest in any way that First Annapolis had exceeded the level of investments in Delta allowed by the forbearance. A significant part of the business plan was the generation of profits from the service corporations, back to the parent company, if it was to be a viable entity, a fact Ms. Trump was made well aware of and acknowledged. As of December 7, 1989, the service corporations of the Bank were in fact generating profits.

7. There were two reasons why the amount of the investments in Delta increased after the conversion. First, pursuant to the August 11, 1988 forbearance letter, First Annapolis was authorized to complete the presently existing projects. It was necessary to complete these projects because if the funding had ceased the projects would have been cut-

off in mid-stream, and huge losses would have resulted. Such losses would have been in conflict with the requirement in paragraph 4.b of the Supervisory Agreement that the Bank's plan of divestiture shall result in no loss to the Bank or the service corporations. Full disclosure of these projects to FHLBB was made both before and after the conversion. The second reason why there was an increase in the amount of the investments in service corporations was because of accrued interest in Delta, which Delta retained as cash, and was added to the outstanding investment balance, so that it may have appeared as if the amount of the investment by First Annapolis in Delta was increasing when it really was not. In fact, the major portion of the apparent increase of the amount of the investments was because of accrued interest.

8. Concerning the projects known as Duke Street, Townsquare and Omni Professional Center, these were partnership arrangements that the service corporations entered into prior to the conversion. The basis for these transactions was that pursuant to the existing regulations the 1% and 2% categories for investments in community, inter-city and community development had not been utilized by First Annapolis and the Bank was allowed to make additional investments in these categories. I discussed this situation with Ms. Trump at the time and Ms. Trump told me that First Annapolis could continue to make investments in these categories, even though First Annapolis was at a maximum level in other investment categories. Also, outside funding was used to complete all three of these projects. Two of the partnerships, Duke Street and Omni Professional, were in fact sold, and, as such, there was no further risk to First Annapolis. The third partnership, Townsquare, continued on schedule with an outside funding source, and the land was sold at a profit. Concerning the project known as Lake Anna Properties of Virginia, there was no investment in the service corporations by First

Annapolis in order to make this loan. The loan was made as an allowable loan under existing lending regulations by First Annapolis. Similarly, concerning the project known as Pelican Pouch, there was no investment in service corporations by First Annapolis. Instead, First Annapolis made an acquisition and development loan to the Pelican Perch Limited Partnership, and Delta made a working capital loan to the project's developer, which was made from existing capital in Delta.

9. The practice of accruing interest in Delta, which was due the parent company, was an acceptable accounting practice that allowed Delta to provide funds to build-out and complete its projects, without further increasing investments in the service corporations. First Annapolis had daily control over the cash by virtue of the fact that Delta was a wholly owned subsidiary of First Annapolis, and could draw on the cash on an as needed basis.

10. Concerning the other projects identified as Annapolis Overlook, Helmsley Court, Disney Severn and 424 Limited Partnership, these projects were funded as loans permitted under existing regulations from either First Annapolis or Delta, without new investments in the service corporations by First Annapolis. The loans for Annapolis Overlook, Hemsley Court and Disney projects were all paid off, while the loan for 424 Limited Partnership was a land acquisition and development loan in progress.

11. During the period of time after the conversion and prior to December 7, 1989, all of the foregoing transactions and projects mentioned above were fully disclosed to Ms. Trump and the Government's examination staff, who voiced no objection thereto. I disclosed them in my ongoing conversations with Ms. Trump and they were disclosed in the monthly and the quarterly reports that were sent to FHLBB. These reports were accepted by the Government without objection.

12. During the period of time, from July 1987 until December 7, 1989, consistent with its plan of divestiture, First Annapolis had made significant progress in reducing the number of projects that Delta was involved with. At the time of the July 1987 Supervisory Agreement, the service corporations were involved with approximately 44 different projects, and then by December 7, 1989, the service corporations were involved with approximately 11 projects. Of greater significance, many of the larger projects to which the service corporations faced their greatest risk exposure were disposed of or were already under contract of sale.

I swear and affirm, under the penalties of perjury, that the foregoing is true and correct.

Executed this 15th day of March 2004.

Douglas A. Parran

CALVERT COUNTY, MD

Sworn to and subscribed before me
on this 15 day of March 2004.

Sharon L. Lucas
Notary Public

My Commission Expires: 11/1/05