**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 94-522C**
**(Judge Williams)**

---

**FIRST ANNAPOLIS BANCORP, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF

---

**STUART E. SCHIFFER**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Deputy Director**

**WILLIAM F. RYAN**
**Assistant Director**

**RICHARD B. EVANS**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 353-7760**
**Fax: (202) 305-7643**

**Attorneys for Defendant**

**Of Counsel:**

**TIMOTHY ABRAHAM**
**MELINDA HART**
**MARK PITTMAN**
**DELISA M. SANCHEZ**

**Trial Attorneys**

**October 4, 2006**

# TABLE OF CONTENTS


PAGE

TABLE OF AUTHORITIES . . . . . iii

ARGUMENT . . . . . 1

I. BANCORP'S POST-TRIAL BRIEF FURTHER DEMONSTRATES THAT THERE IS NO CONTRACT BETWEEN BANCORP AND THE GOVERNMENT . . . . . 1

II. BANCORP CANNOT DENY KNOWLEDGE OF THE IMPROPER SHAREHOLDER LOANS . . . . . 8

III. BANCORP ERRONEOUSLY CONTENDS THAT THERE IS NO EVIDENCE THAT FSLIC RELIED UPON BANCORP'S REPRESENTATION THAT IT WOULD NOT ISSUE LOANS TO FUND ITS CONVERSION . . . . . 14

IV. BANCORP ERRS WHEN IT CLAIMS THAT THE REGULATIONS FORBIDDING AN INSTITUTION FROM FUNDING ITS OWN CONVERSION DO NOT APPLY TO HOLDING COMPANIES . . . . . 15

V. BANCORP'S BREACH WAS MATERIAL . . . . . 19

VI. THE GOVERNMENT HAS NOT WAIVED ITS DEFENSE OF PRIOR MATERIAL BREACH OF CONTRACT . . . . . 23

A. Bancorp Has Not Established Substantive Waiver . . . . . 23

B. Bancorp Has Not Established Procedural Waiver . . . . . 30

C. Bancorp Has Failed To Establish Substantive Waiver As To Our Affirmative Defense Regarding Excess Investments In Service Corporations . . . . . 33

VII. THE DEFENSE OF FAILURE OF A CONDITION PRECEDENT . . . . . 37

A. Bancorp Has Failed To Demonstrate That The Government Waived This Defense . . . . . 37

B. The Evidence Has Established Failure Of A Condition Precedent . . . . . 40

VIII. THE GOVERNMENT HAS NOT ALLEGED FRAUD . . . . . 42

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

# TABLE OF AUTHORITIES

## FEDERAL CASES


Akin v. OTS,
950 F.2d 1180 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

American Heritage Bancorp v. United States,
56 Fed. Cl. 596 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 39

Barren Island Marina, Inc. v. United States,
44 Fed. Cl. 252 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Barron Bankshares, Inc. v. United States,
366 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Browning Debenture Holders' Comm. v. DASA Corp.,
560 F.2d 1078 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Burton v. Northern Dutchess Hospital,
106 F.R.D. 477 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Caroline Hunt Trust Estate v. United States,
65 Fed. Cl. 271 (2005),
appeals argued, Nos. 05-5141, -5179 (Fed. Cir. June 9, 2006) . . . . . . . . . . . . . . . . . . 14, 25, 30

Castle v. United States,
301 F.3d 1328 (Fed. Cir. 2002),
cert. denied, 539 U.S. 925 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Cherokee Nation v. United States,
355 F.2d 945 (Ct. Cl. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Christopher Village, L.P. v. United States,
360 F.3d 1319 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

Cities Service Helex, Inc. v. United States,
543 F.2d 1306 (Ct. Cl. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

In re Conner Corp.,
127 B. R. 775 (E.D. N.C. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

D&N Bank v. United States,
331 F.3d 1374 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Dow Chemical Co. v. United States,
226 F.3d 1334 (Fed. Cir. 2000) . . . . . . . . . . 24, 26, 27

Eddy v. Virgin Islands Water and Power Auth.,
256 F.3d 204 (3d Cir. 2001) . . . . . . . . . . 33

Exxon Corp. v. United States,
931 F.2d 874 (Fed. Cir. 1991) . . . . . . . . . . 30

FDIC ex. rel. Karnes County Savs. & Loan Ass'n v. United States,
342 F.3d 1313 (Fed. Cir. 2003) . . . . . . . . . . 5

Fifth Third Bank of Western Ohio v. United States,
55 Fed. Cl. 372 (2003) . . . . . . . . . . 33

First Hartford Corp. Pension Plan & Trust v. United States,
194 F.3d 1279 (Fed. Cir. 1999) . . . . . . . . . . 5

First Interstate Bank of Idaho v. Small Business Admin.,
868 F.2d 340 (9th Cir. 1989) . . . . . . . . . . 28

Matter of Garfinkle,
672 F.2d 1340 (11th Cir. 1982) . . . . . . . . . . 29

General Eng'g & Mach. Works v. O'Keefe,
991 F.2d 775 (Fed. Cir. 1993) . . . . . . . . . . 28

Glass v. United States,
44 Fed. Cl. 73 (1999),
rev'd in part, 258 F.3d 1349 (Fed. Cir.),
amended on reh'g, 273 F.3d 1072 (Fed. Cir. 2001) . . . . . . . . . . 6

Glass v. United States,
258 F.3d 1349 (Fed. Cir. 2001),
amended on reh'g, 273 F.3d 1072 (Fed. Cir. 2001) . . . . . . . . . . 6, 14

Groos Nat'l Bank v. Comptroller of the Currency,
573 F.2d 889 (5th Cir. 1978) . . . . . . . . . . 4

H.N. Bailey & Assocs. v. United States,
196 Ct. Cl. 156 (1971) . . . . . . . . . . 26

Hometown Fin. Inc. v. United States,
409 F.3d 1360 (Fed. Cir. 2005) . . . . . . . . . . 19, 20

Jamesbury Corp. v. Litton Indus. Products, Inc.,
839 F.2d 1544 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Lewis v. United States,
70 F.3d 597 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Lincoln National Life Ins. Co. v. United States,
582 F.2d 579 (Ct. Cl. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

McDonnell Douglas Corp. v. United States,
182 F.3d 1319 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 26

Mobil Oil Exploration and Producing Southeast, Inc. v. United States,
530 U.S. 604 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Pacific Gas & Elec. Co. v. United States,
70 Fed. Cl. 766 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

RTC v. Tetco, Inc.,
758 F. Supp. 1159 (W.D. Tex. 1990),
vacated as moot, 1992 WL 437650 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Reliance Ins. Co. v. United States,
20 Cl. Ct. 715 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Reservation Ranch v. United States,
39 Fed. Cl. 696 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Scott Timber Co. v. United States,
64 Fed. Cl. 130 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Southern California Fed. Sav. & Loan Ass'n v. United States,
422 F.3d 1319 (Fed. Cir. 2005),
cert. denied, 126 S. Ct. 2967 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 7

Stone Forest Indus., Inc. v. United States,
973 F.2d 1548 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Suel v. Sec.'y of Health & Human Servs.,
192 F.3d 981 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

Sun Cal, Inc. v. United States,
21 Cl. Ct. 31 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Tenneco Resins Inc. v. Reeves Bros., Inc.,
752 F.2d 630 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

United Liberty Life Ins. Co. v. Ryan,
985 F.2d 1320 (6th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

United States v. Winstar Corp.,
518 U.S. 839 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 27, 34

Wagner Iron Works v. United States,
146 Ct. Cl. 334, 174 F. Supp. 956 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Wells Fargo Bank, N.A. v. United States,
33 Fed. Cl. 233 (1995),
rev'd in part on other grounds, 88 F.3d 1012 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 36

Wetsel-Oviatt Lumber Co. v. United States,
43 Fed. Cl. 748 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Williams v. Ashland Eng'g Co.,
45 F.3d 588 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Zenith Radio Corp. v. Hazeltine Research Inc.,
401 U.S. 321 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**STATUTES AND RULES**

12 C.F.R. § 563b (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

12 C.F.R. § 563b.3 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

12 C.F.R. § 563b.3(a) (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

12 C.F.R. § 563b.3(c)(22) (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 18

12 C.F.R. § 563b.9 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

12 C.F.R. § 563b.20(c) (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

RCFC 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

RCFC 15(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## MISCELLANEOUS

3 Moore's Federal Practice P 15.13(2) (2d ed. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Restatement (First) of Contracts § 275, cmt. a (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Restatement (Second) of Contracts § 241, cmt. a (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Restatement (Second) of Contracts § 381(3) (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

5 Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure § 1278 (3d ed. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 94-522C** |
| **v.** | ) | **(Judge Williams)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF**

Pursuant to the Court's orders dated August 8, 2006, and September 29, 2006, defendant, the United States, respectfully submits this response to the post-trial brief filed by plaintiff, First Annapolis Bancorp, Inc. ("Bancorp"). For the reasons stated in our opening brief and those stated below, the Court should enter judgment for the Government.

## ARGUMENT

### I. BANCORP'S POST-TRIAL BRIEF FURTHER DEMONSTRATES THAT THERE IS NO CONTRACT BETWEEN BANCORP AND THE GOVERNMENT

As detailed in our previous filings and post-trial brief, Bancorp's breach of contract claim fails because there is no contract between Bancorp and the Government for goodwill and service corporation investment forbearances. See Parran Aff. (Jan. 22, 2003); Parran Dep. (May 14, 2003) at 73 (admitting that there was no agreement between the parties to count goodwill toward regulatory capital). The Court of Appeals for the Federal Circuit has repeatedly held that the elements necessary to determine that a contract exists are: (1) mutuality of intent to contract; (2) consideration; (3) lack of ambiguity in offer and acceptance; and (4) the Government representative whose conduct is relied upon had actual authority to bind the Government. D&N Bank v. United States, 331 F.3d 1374, 1378 (Fed. Cir. 2003) (citing Lewis v. United States, 70

F.3d 597, 600 (Fed. Cir. 1995)). It is now clear that Bancorp cannot demonstrate these necessary elements.

Although the parties proceeded to trial upon the Government's defense of prior material breach by assuming that Bancorp is a party to an enforceable contract, as evidenced at trial, there is **no** contract between Bancorp and the Government that would entitle it to the relief it seeks. Instead, Bancorp's post-trial brief and its ever-evolving definition of the alleged contract now demonstrate that Bancorp's breach of contract claim is based upon nothing but surmise and conjecture. See D&N, 331 F.3d at 1377 (rejecting alleged contract based upon a mere "cloud of evidence").

Throughout these proceedings, Bancorp alleged that the "contract" between it and the Government for regulatory forebearances for investments in service corporations and the amortization of goodwill consisted of the following: (1) the applications that Bancorp and First Federal Savings and Loan Association ("First Federal") concurrently filed with the Federal Home Loan Bank Board ("FHLBB") to approve First Federal's supervisory conversion and Bancorp's related acquisition of First Annapolis Savings Bank, FSB ("First Annapolis"); (2) a business plan submitted along with the application; (3) the Regulatory Maintenance/Dividend Agreement ("RCMA"); (4) various "forbearance" letters; (5) FHLBB resolutions 88-602 and 88-603; (6) various accountants' letters; and (7) a FHLBB letter dated February 9, 1989. See, e.g., Pl. Supp. Br. in Response to the Oct. 9, 2003 Order of This Court (Oct. 31, 2003) at 13 ("two FHLBB Resolutions and four forbearance letters, along with the Application, Business Plan, RCMA, letters from the accountants and the February 9, 1989 approval letter by the FHLBB . . . set forth the terms of the contract."); see also e.g., Pl. Supp. Br. in Support of Its Mot. for Entry of J. on

Liability (May 14, 2001) at 16-17; Pl. Reply to Def. Supp. Memo. & Opp. to Def. Cross-Mot. for Sum. J. on Liability (June 28, 2001) at 13; Pl. Supp. Memo. in Opp. to Def. Mot. to Dismiss & Reply Br. in Support of Pl. Mot. for Sum. J. on Liability (Mar. 15, 2004) at 4-5. Now, in a less than subtle effort to obviate Bancorp's explicit representation in its application for supervisory conversion that it would ensure that First Federal did not "loan funds or otherwise extend credit to any person to purchase shares of [Bancorp] Stock offered in the Conversion" (JX 87 at WOT415 0499), Bancorp's post-trial brief contends that "the relevant terms of Bancorp's contract with the Government" can be found in: (1) the RCMA; (2) FHLBB Resolutions 88-602 and 88-603; and (3) a FHLBB letter dated February 9, 1989. Pl. Br. at 3-5; see also Tr. 852-54 (Pl. closing).

If we take Bancorp at its word – **ten** years into this litigation – and assume that it has finally identified the components of its alleged contract, Bancorp's lawsuit must be dismissed. Of the documents identified by Bancorp to comprise the alleged contract, none contain the relevant goodwill and service corporation investments forbearances that are the subject of the lawsuit. Further, the RCMA, the only contract to which Bancorp conceivably is a party, was not breached by the Government, and certainly does not confer upon Bancorp standing to sue regarding the relevant forbearances.

The United States Court of Appeals for the Federal Circuit makes clear that the RCMA, by itself, does not confer standing upon Bancorp to bring a breach of contract claim against the Government regarding the goodwill or service corporation forbearances.[1] For example, in

---

[1] In fact, although it bears the title "agreement," the courts that have considered the issue of whether the RCMA, standing alone, could be enforced as a contract by the Government, have uniformly held that they were mere regulatory documents. See, e.g., FDIC v. Butler (In re

Southern California Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 2967 (2006) ("SoCal"), discussed at length in our post-trial brief (p. 4-7), shareholders sought to recover for injuries they allegedly suffered when FIRREA limited their thrift's ability to use supervisory goodwill and capital credits. 422 F.3d at 1331. In the underlying transaction, a shareholders' holding company acquired a failed thrift, and the shareholder plaintiffs signed a RCMA by which they agreed to provide up to $5 million of additional capital should the need ever occur.

The trial court in SoCal concluded that the shareholders were parties to an "overall" contract. Id. at 1332. It based this decision on several factors: (1) the shareholders were central to the transaction because without them the acquisition would never have occurred; (2) the shareholders initiated the acquisition process and negotiated directly with the Government; and (3) the Government knew that the shareholders would provide most of the money for the acquisition and would be the primary shareholders of the holding company making the acquisition. Id. at 1331-33.

The Federal Circuit rejected the trial court's conclusion, holding:

> Contrary to the conclusion of the Court of Federal Claims, however, these roles of negotiator and shareholder do not bring the Individual Plaintiffs into privity of contract with the government in

---

Conner Corp.), 127 B. R. 775, 778-81 (E.D. N.C. 1991); RTC v. Tetco, Inc., 758 F. Supp. 1159, 1162-64 (W.D. Tex. 1990), vacated as moot, 1992 WL 437650 (5th Cir. Apr. 22, 1992); see also United Liberty Life Ins. Co. v. Ryan, 985 F.2d 1320, 1331-33 (6th Cir. 1993) (Contie, J., concurring). Rather, RCMAs are administrative documents which Government agencies employ to achieve compliance with regulatory requirements. See Akin v. OTS, 950 F.2d 1180, 1183-84 (5th Cir. 1992) (citing Groos Nat'l Bank v. Comptroller of the Currency, 573 F.2d 889, 896 (5th Cir. 1978)).

> regards to the Assistance Agreement entered into with SCH and SoCal.

Id. at 1331 ("The [trial] court's emphasis on the [shareholders'] involvement in the conversion and acquisition processes fails to acknowledge that a corporation is generally considered to be a separate legal entity from its shareholder . . . .").

Likewise, in FDIC ex. rel. Karnes County Savs. & Loan Ass'n v. United States, 342 F.3d 1313 (Fed. Cir. 2003), shareholders appealed dismissal of their claim that they contracted with the FHLBB when they used a newly chartered thrift to acquire a financially troubled institution. The failing thrift's chief executive officer negotiated the transaction. The Court noted that the shareholders "did not sign or draft any of the documents that reflected these arrangements." Id. at 1315. Indeed, the Court emphasized that the thrift's president wrote all the letters requesting permission to use "supervisory goodwill." Id.

Rejecting the shareholder claims, the Federal Circuit stated:

> To be sure, the regulators undoubtedly were aware that the [shareholders] were supplying the money that would be used to rehabilitate [the thrift]. Neither that knowledge, the supplying of the new capital, or the [shareholders'] position as stockholders in [the thrift], made them parties to those arrangements. A shareholder generally does not have standing to assert a breach of contract claim on behalf of the corporation.

Id. at 1319 (emphasis added) (citations omitted); see also First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999) ("Only Dollar entered into the Amended Agreement with the FDIC – not Dollar's shareholders. Thus, First Hartford and other similarly situated shareholders lacked privity of contract with the government.")

Similarly in Glass v. United States, 44 Fed. Cl. 73, 79 (1999), rev'd in part, 258 F.3d 1349 (Fed. Cir.), amended, 273 F.3d 1072 (Fed. Cir. 2001), private shareholders initially owned Sentry Mortgage Corporation, which acquired a failing thrift called Security Savings Bank. The trial court determined that the shareholders were not direct parties to any contract, but were third-party beneficiaries. Id. at 79. In rejecting the shareholder's claims, the Court explained:

> Private plaintiffs, who are the four principal shareholders of Sentry, and who became the principal shareholders of Security, argue variously that they are parties to an express or implied-in-fact contract, or are third party beneficiaries. The documentary evidence shows, however, that individually the four private plaintiffs did not contract for the treatment of goodwill resulting from the acquisition; Sentry did. Sentry, of course, was subsumed as a result of the acquisition and the shareholders became controlling shareholders of Security. They are not parties to the contract.

Id.

On appeal, the Federal Circuit found that only Sentry and Security entered into an implied-in-fact contract with the FHLBB for certain regulatory treatment. Glass, 258 F.3d at 1355. The Federal Circuit stated "because the shareholders did not stand to directly benefit under the contract, they are at most incidental beneficiaries of the contract with no rights to enforce the contract against the United States." Id.; accord Castle v. United States, 301 F.3d 1328, 1339 (Fed. Cir. 2002), cert. denied, 539 U.S. 925 (2003) (“because the plaintiffs . . . neither negotiated with, nor promised any performance to, the government. Nor did the government make any alleged promises to these shareholders . . . these plaintiffs are at most incidental beneficiaries. As such, they lack standing to sue for breach of the alleged contract. Id.

These authorities demonstrate that Bancorp, the sole shareholder of First Annapolis, does not have privity with First Annapolis and cannot recover for the Government's alleged breach of a goodwill contract merely by virtue of its participation in the RCMA. The RCMA, the only document to which Bancorp was a party (other than its own holding company application) contains none of the contractual promises that Bancorp claims the Government breached when Congress passed the Financial Institutions Reform Recovery, and Enforcement Act of 1989 ("FIRREA"). At most, the RCMA obligated Bancorp to maintain First Annapolis' regulatory capital at a specified level. Further, the RCMA did not contractually require Bancorp to make the initial capital contribution to First Annapolis and the Government did not require Bancorp to make any capital contribution pursuant to the terms of the RCMA. JX 99. Finally, even though Bancorp may consider itself as a "negotiator" with the Government regarding First Federal's supervisory conversion, this does not bring it into privity with the Government regarding some other contract between the Government and First Annapolis (the existence of which we dispute) containing the relevant goodwill and service corporation forbearances. SoCal, 422 F.3d at 1331.

In attempting to retool the components of its alleged contract to avoid the prohibitions against shareholder loans, Bancorp has likewise precluded itself from any recovery in this case. Either the goodwill and service corporation forbearances and prohibition against using shareholder loans to fund the conversion apply to Bancorp or they do not. Despite Bancorp's attempt to dissect these concepts, they cannot be so easily separated. It is now clear that Bancorp is not a party to any contract with the Government regarding goodwill or service corporation forbearances. The only contract to which Bancorp arguably could be a party, the RCMA, was not breached by the Government.

## II. BANCORP CANNOT DENY KNOWLEDGE OF THE IMPROPER SHAREHOLDER LOANS

Bancorp's gamesmanship is also evident in its attempts to distance itself from the $3.975 million in loans to shareholders (DX 397 at WOT315 0147; Tr. 676-82 (Crompton)) by arguing that it had no knowledge of the impermissible loans because they were made by First Federal, not Bancorp. Pl. Br. at 17-18. In support of this argument, Bancorp cites the testimony of Douglas Parran, at all relevant times a director, executive vice-president, and president of Bancorp, First Annapolis, or First Federal, that he "was not aware of any loans made to those individuals to purchase stock." Tr. 403. Inexplicably, Bancorp even insinuates that because the Resolution Trust Corporation ("RTC") placed First Annapolis under receivership, the Government, not Bancorp, is somehow the actual party with knowledge of the impermissible loans. See, e.g, Pl. Br. at 7. These arguments are merely an attempt to cloud the real issues before the Court. Rather, the undisputed testimony and documentary evidence presented at trial demonstrate that Bancorp breached its alleged contract with the Government by permitting First Federal to fund its own conversion, made deliberate misrepresentations to the FHLBB, and knowingly accepted the proceeds of shareholder loans for the purchase Bancorp stock.

Bancorp's statement that it did not have knowledge of loans to shareholders defies common sense. First, outside of serving as the holding company for First Annapolis, Bancorp conducted no separate business operations. As Bancorp stated in its May 13, 1988 amendment to its application for voluntary supervisory conversion "Bancorp [was] formed for the purpose of serving as a holding company for the savings bank. . . . [Bancorp] has no present plans to engage

in any specific business operations or activities." JX 86 at WOT415 1119 (emphasis added).

Further, in its private placement memorandum to potential investors, Bancorp represented that it

> was formed for the purpose of becoming a savings and loan holding company and acquiring [First Federal], in connection with [First Federal's] voluntary conversion and merger with and into a federal stock savings bank. . . . [Bancorp] has not yet engaged in any business and, immediately upon completion of the Conversion, its business will consist only of the business of [First Annapolis].

JX 89 at FA2006 0064 (emphasis added).

Along these lines, Bancorp and First Federal (and later First Annapolis) shared common officers and directors. See, e.g., Tr. 315-16 (Parran); JX 89 at 109. For example, the amendment to Bancorp's and First Federal's applications for supervisory conversion states that both First Federal and Bancorp expected to confer upon Douglas Parran "substantially all of the responsibilities ordinarily associated with the office of President and Chief Executive Officer" after the conversion was complete. JX 86. This amendment was signed by Mr. Parran, both as Executive Vice President of Bancorp and as Executive Vice President of First Federal. Id. Further, in reviewing First Federal's and Bancorp's applications, the FHLBB noted that First Federal's current directors would continue to be members of the board of directors of both First Annapolis and Bancorp, and that Mr. Parran would become President of First Annapolis. DX 69 at WOQ273 0452 ("Mr. Parran will become president of First Federal when the conversion is consummated."). Finally, First Federal and Bancorp even conducted simultaneous board of directors meetings to discuss funding for "First Federal's voluntary conversion application." JX 25; see also JX 22 (First Federal board of director minutes discussing the conversion).

Bancorp relies solely upon the testimony of Douglas Parran – testimony that begs credulity – to deny knowledge of the impermissible shareholder loans. It is well established that "a corporation can act only through its officers and agents, and when they are clothed with the authority to act for it, the corporation is responsible for their acts." Wagner Iron Works v. United States, 146 Ct. Cl. 334, 337-38, 174 F. Supp. 956, 958 (1959). This Court has recognized that an officer of a thrift is "clothed with the authority to act for it" when that officer is a high ranking official. Barren Island Marina, Inc. v. United States, 44 Fed. Cl. 252, 257 (1999).

At trial, it was demonstrated through the testimony of the shareholders that Bancorp and Mr. Parran had knowledge of the impermissible loans. For example, despite the fact that they had no prior banking relationship with First Federal, Paul Jones' **August 11, 1988** loan application for $125,000 and William Jones' **August 12, 1988** loan application for $125,000 contain virtually no information regarding their assets or net worth. JX 110; JX 113. In fact, both applications vaguely list the purpose of the loans as "investment." JX 110; JX 113. Despite the absence of any information regarding their creditworthiness, the loan applications sailed through process and were approved, and the settlements occurred, on **August 12, 1988**, the day after Paul Jones submitted his application and the very same day that William Jones submitted his application. Moreover, at trial Paul Jones testified that he believed Mr. Parran was present when he signed his loan documentation. Tr. 229-30 ("Mr. Parran – Mr. Wayson brought in aides and agents in that thing and Mr. Parran may have been one of them, but I didn't know who he was at the time.") (emphasis added). Importantly, **August 12, 1988** was the final day before the Bancorp conversion became effective on **August 13, 1988.** JX 119; JX 114.

During this truncated loan process, both Paul Jones and William Jones failed to produce their tax returns at settlement as required by their loan commitment letters. Id.; Tr. 242-44 (P. Jones). As a result, after the conversion First Annapolis, though loan officer Catherine Hinkle, sent a letter to Paul Jones referencing the loans he received and requesting that he provide his tax returns for 1986 and 1987 for inclusion in the loan file. DX 180. Paul Jones responded to this request by providing the requested tax returns, not to the loan officer who had sent him the letter, but to Douglas Parran. DX 183 (addressed to "Dear Doug"). Additionally, the subject line of the letter from Paul Jones to Douglas Parran specifically referenced the purchase of "$275,000.00 shares of First Annapolis Bancorp common stock" rather than the loans totaling $275,000. Further, the body of the letter stated: "I am enclosing tax returns for 1986 and 1987 regarding the above-captioned purchase." Id. Given Paul Jones' re-direction of the letter to Douglas Parran, the first-name salutation, and the subject line referencing the Bancorp stock purchase, the only reasonable inference that can be drawn is that Paul Jones and Douglas Parran were aware of the loan/stock purchase arrangement. The logical conclusion from these documents and the rushed manner in which these loans were approved – only hours before the Bancorp conversion – is that Douglas Parran knew that the purpose of the loans was to purchase Bancorp stock.

Paul Jones and William Jones were not the only shareholders that applied for loans from First Federal on the eve of the conversion on August 13, 1988. In August 1988, First Federal's Management Committee approved a $1 million commercial loan to Rental Management Associates ("RMA") made subject to the personal guarantee of each RMA partner. JX 76; Joint Fact. Stip. 11. On **August 10, 1988**, the RMA partners signed a $1 million commercial promissory note payable to First Federal which resulted in each RMA partner owning 250,000

shares of Bancorp stock as of **August 12, 1988** (the day before the Bancorp conversion), which was funded by RMA's $1 million dollar loan. Tr. 228 (P. Jones); Tr. 409-10, 413-14 (Howard); Tr. 490-91 (Horrigan); Tr. 535, 539-40 (Taylor); DX 171; JX 131; JX 133; Joint Fact. Stip. 13. Like Paul Jones and William Jones, despite their $1 million loan, RMA and its four partners had no prior banking relationship with First Federal and provided little, if any, documentation of the creditworthiness to First Federal when applying for their loan. Tr. 486 (Horrigan).

On **August 12, 1988**, Paul Jones also obtained second loan from First Federal in the amount of $150,000 for the purchase of an additional 150,00 shares of Bancorp stock. JX 121; Joint Fact Stip. 21. This second loan was the result of Paul Jones's business associates – Broughton Earnest, James Earnest, and David Thompson – purchasing shares of Bancorp stock through investment partnerships with Paul Jones. Tr. 286 (Earnest); Tr. 424 (W. Jones); Tr. 227-28 (P. Jones). Another business associate of Paul Jones, Roy Cowdrey, also received a $50,000 loan from First Federal for the purchase of 50,000 shares of Bancorp stock on or about **August 12, 1988**. Tr. 156-57, 162-64 (Cowdrey) (recalling that the loan paperwork was approved and signed in "kind of a hurry-up fashion" on August 12, 1988); JX 76; JX 112; JX 114; JX 115.

Further, on **August 12, 1988**, First Federal approved a $150,000 loan to Dr. Arthur Schwartz and issued a check in the amount of $150,000 to him that same day. JX 103; Schwartz Dep. at 10; DX 171. Despite Dr. Schwartz's failing memory, Paul Jones testified that Dr. Schwartz's purchase of 150,000 shares of Bancorp stock was funded by the $150,000 loan he received from First Federal on **August 12, 1988.** Tr. 227-28 (P. Jones).

The evidence at trial established that no cash was exchanged in conjunction with these hastily arranged shareholder loans that were applied for, approved, and settled within one or two

days of the deadline for First Federal's conversion. Tr. 156, 160 (Cowdrey); Tr. 246-47 (P. Jones); Tr. 286-87 (Earnest); Tr. 441-42 (W. Jones). Rather, the loan proceeds from each First Federal loan were directly credited to the purchase of each shareholder's Bancorp stock in a non-cash transaction. Thompson Dep. at 16; Tr. 156-57 (Cowdrey); Tr. 247-48 (P. Jones); Tr. 442-43 (W. Jones). As Mr. Zimmerman succinctly put it, Bancorp was "using its own money to fund its own conversion" by "just changing bank drawers that it's kept in." Tr. 49, 62 (Zimmerman).

Given these circumstances, it is inconceivable that Douglas Parran, and therefore Bancorp, did not know that loans were being made by First Federal to shareholders to fund the conversion. Indeed, on **August 12, 1988**, when Mr. Parran personally approved hundreds of thousands of dollars in loans on behalf of First Federal to shareholders like the partners of RMA, Paul Jones, and William Jones, and others, he also signed the RCMA on behalf of Bancorp. Tr. 347-50, 377-78 (Parran). To borrow an analogy from Bancorp's counsel, Bancorp's denials of knowledge of the shareholder loans are reminiscent of "the French police captain in *Casablanca* who said, [']Rick, I'm shocked, shocked to hear that gambling was going on in there, and puts money in his pocket.[']" Tr. 684. Unlike the fictional police captain, Bancorp should not be permitted to benefit from the admittedly improper shareholder loans by relying upon such absurd doublespeak in an obvious effort to circumvent the regulations. See Tr. 43-44, 62 (Zimmerman) (explaining that the entire purpose of a conversions to bring in "new, unfettered capital"); Tr. 572-73 (G. Jones).

## III. BANCORP ERRONEOUSLY CONTENDS THAT THERE IS NO EVIDENCE THAT FSLIC RELIED UPON BANCORP'S REPRESENTATION THAT IT WOULD NOT ISSUE LOANS TO FUND ITS CONVERSION

Equally absurd is Bancorp's contention that the Government failed to present evidence that the "FSLIC relied on the statement in paragraph X" of Bancorp's application for supervisory conversion that it would not "loan funds or otherwise extend credit to any person to purchase shares of [Bancorp] Stock offered in the Conversion" because "the Government did not call a witness from FSLIC." Pl. Br. at 13; see also JX 87 at WOT415 0499).

Bancorp's contention represents a flawed understanding of the federal regulation of the thrift industry. Prior to passage of FIRREA, the FHLBB **was** the operating head of FSLIC and accordingly approved acquisitions, mergers, and other transactions between thrifts. United States v. Winstar Corp., 518 U.S. 839, 844 (1996); see also Glass v. United States, 258 F.3d 1349, 1351 n. 1 (Fed. Cir. 2001) ("The FSLIC was an agency under the FHLBB that formerly insured thrift deposits and acted to regulate all federally insured thrifts."); Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271, 273 (2005) (FHLBB "served as the operating head of the FSLIC, and the FSLIC conducted its operations as a division or office within the FHLBB").

Here, the Government offered the testimony of Park Zimmerman, the Executive Vice President of the Federal Home Loan Bank of Atlanta ("FHLBB-Atlanta"), the "operating head" of FSLIC in Atlanta in August 1988. Tr. 38-39, 41. Mr. Zimmerman was in charge of the entire examination and supervisory side of the FHLBB-Atlanta. Tr. 39-40, 42. He explained that when reviewing a supervisory conversion applications, part of his responsibilities was to make sure the applicant complied with the FHLBB's and FSLIC's rules and regulations governing supervisory conversions, including those prohibiting the use of shareholder loans to fund the conversion. Tr.

46-48. Additionally, Mr. Zimmerman testified to the importance of an applicant's representation that it would not fund its own conversion through shareholder loans when he stated, without qualification, that, if an applicant was loaning funds to purchase stock as part of its supervisory conversion, and he was aware of that fact at the time the loans were being made, the FHLBB-Atlanta "would have taken action to stop the conversion at that point." Tr. 55. According to Mr. Zimmerman, this would have been considered a "fatal violation that would cause the approval to be withdrawn . . . if it had already been granted at that point." Id.

In short, the Government provided a representative of FSLIC who testified not only that the Government relied upon the thrift's representation that it would not fund its own conversion, but that this went to the very heart of the Government's approval. See Tr. 43-44 (Zimmerman); see also Tr. 572-73 (G. Jones). Therefore, Bancorp's assertion that the Government failed to show that FSLIC relied upon Bancorp's representation that it would not issue loans to fund its own conversion is erroneous.

## IV. BANCORP ERRS WHEN IT CLAIMS THAT THE REGULATIONS FORBIDDING AN INSTITUTION FROM FUNDING ITS OWN CONVERSION DO NOT APPLY TO HOLDING COMPANIES

As we argued at trial and in our post-trial brief, the regulations, as well as the understanding of the parties at the time, and the documents that Bancorp claims to constitute its contract, require Bancorp to do more than simply make an empty promise that it would not fund its own conversion through shareholder loans. Indeed, it required Bancorp to actually ensure that no such self-funding would take place. Now, in an effort to avoid these requirements, Bancorp first argues that the relevant regulations do not apply to it because it is a "holding company." Pl. Br. at 16-17; see 12 C.F.R. §§ 563b.20(c), 563b.3(a), 563b.3(c)(22) (1988). Bancorp then argues

that even if these regulations apply to holding companies, it complied with the regulations merely by including a provision in the plan of conversion that First Federal would not loan funds "to anyone to purchase stock in the converting institution." Pl. Br. at 16. If Bancorp's paradoxical arguments are correct, one must ask why the regulations governing supervisory conversions were adopted in the first place, since they could be so easily avoided by the expedient of a holding company. But see Tr. 43-44 (Zimmerman).

As we demonstrated at trial, at the time of the conversion, the FHLBB's regulations governing the conversions of thrifts from mutual to stock form were found at 12 C.F.R. § 563b. Subpart C to Part 563b, which governed voluntary supervisory stock conversions, provided that "[a]ll of the provisions of Subpart A of this part shall apply to a supervisory conversion undertaken pursuant to this subpart unless clearly inapplicable." 12 C.F.R. § 563b.20(c). Further, subpart A of Part 563b – and, in particular, 12 C.F.R. § 563b.3 – provided general principles for conversions, and confirmed that the "provisions of this subpart shall govern conversions undertaken pursuant to any other subpart of this part unless clearly inapplicable." 12 C.F.R. § 563b.3(a). Section 563b.3 details the numerous requirements for a plan of conversion, including the condition that "the converting institution shall not loan funds or otherwise extend credit to any person to purchase the capital stock of the institution." 12 C.F. R. § 563b.3(c)(22). Likewise, subpart A encompasses 12 C.F.R. § 563b.9, which applies to the conversion of an insured institution in connection with the formation of a holding company and states, among other things, that, "[u]nless clearly inapplicable, all of the requirements of this Subpart A shall apply to a conversion under this section." Id. (emphasis added).

Bancorp's argument that these regulations to do not apply to it belies both the plain language of the regulations and the evidence in this case. For example, throughout its internal deliberations regarding First Federal's supervisory conversion and Bancorp's acquisition of First Federal, the FHLBB analyzed First Federal's and Bancorp's applications under the rules and regulations governing supervisory conversions contained in subpart C (and, by necessary implication, subpart A) of 12 C.F.R. § 563b. See Tr. 46-62 (Zimmerman). This is specifically recognized in the FHLBB resolutions, numbers 88-602 and 88-603, which were issued in connection with the FHLBB's approval of First Federal's and Bancorp's applications on July 21, 1988. DX 69; JX 92; JX 93. Indeed, on February 18, 1988, the Supervisory Agent in charge of First Federal at the FHLBB-Atlanta recommended the approval of First Federal's and Bancorp's applications, subject to Bancorp filing, within thirty days from the date of the acquisition, a certification by legal counsel that, among other things, the acquisition had been consummated in accordance with all applicable laws and regulations, the application, and the FHLBB resolutions issued in connection with the approval. DX 69 at WOQ273 0454-55. Another condition of approval was that Bancorp and First Annapolis satisfy "all requirements and conditions imposed by the [FHLBB], and comply with all applicable laws, rules and regulations." Id. at WOQ273 0455.

Moreover, Bancorp and First Annapolis' special counsel represented that the "Conversion of [First Federal], the merger of the Association with and into [First Annapolis] and the acquisition by [Bancorp] of all of the issued and outstanding shares of Capital Stock will have each been completed in compliance with the Approval, all applicable laws regulations administered by the [FHLBB] and [FSLIC] . . . ." DX 224 at PFA010 1644 (letter to the FHLBB

dated Oct. 14, 1988 from Bancorp's and First Annapolis' special counsel); see also Tr. 82-83 (Zimmerman). Likewise, Bancorp's supervisory conversion application obligated it to comply, with any applicable FHLBB and FSLIC rules and regulations regarding supervisory conversions. JX 83 at WOT520 0127 (supervisory conversion application). In turn, relying upon the representations of Bancorp, the FHLBB "confirm[ed] that all the conditions precedent [had] been met" and the effective date of the conversion was August 13, 1988." JX 101; Tr. 600-02 (G. Jones); see also DX 287.

The plain terms of the documents that Bancorp says form its alleged contract expressly required Bancorp to comply with all applicable regulatory requirements, including, by definition, the one prohibiting financing the purchase of Bancorp stock with loans from First Federal. Thus, Bancorp's argument that the regulations do not apply to it as a "holding company" is without merit. The regulations specifically applied to holding companies formed in connection with a supervisory conversion, unless clearly inapplicable. 12 C.F. R. §§ 563b.3(c)(22) & 563b.9. The regulators at the time understood that the prohibition against shareholder loans applied to holding companies. Tr. 57-58 (Zimmerman); Tr. 605-06 (G. Jones). Bancorp also understood this to be the case at the time of the conversion, otherwise, why did it specifically represent in its application for the supervisory conversion that First Federal will not loan funds to individuals to buy Bancorp stock. Compare JX 87 at WOT415 0499 with 12 C.F.R. § 563b.3(c)(22).

Further, Bancorp's argument that, even if the regulations apply to holding companies, it complied by stating in its plan of conversion that improper shareholder loans would not be made, is nonsensical. Or, to borrow a phrase from Bancorp's counsel – "that dog still won't hunt." Tr. 17. Obviously, if Bancorp could comply with the regulations merely by representing that it

would not use loans to shareholders to fund its own conversion, but in turn used the shareholder loans to finance First Federal's supervisory conversion, one of the most important regulations governing a supervisory conversion would be rendered meaningless. But see Tr. 346-47 (Parran) (recognizing that it was a violation of the regulations to issue loans to individuals to purchase stock in the conversion). Moreover, if Bancorp's position is accepted, it would not only reduce the regulations to empty words, but thrifts could avoid complying with the regulations simply by creating a holding company.

## V. BANCORP'S BREACH WAS MATERIAL

The evidence introduced at trial demonstrated that Bancorp's breach was material. To begin, Bancorp concedes, as it must, that the evidence showed that it was a "matter of vital importance or the essence of the conversion [] to get new capital." Pl.'s Br. at 19. (emphasis added); see Hometown Fin., Inc. v. United State, 409 F.3d 1360, 1370 (Fed. Cir. 2005) (a material breach "relates to a matter of vital importance" and "goes to the essence of the contract."). However, Bancorp argues that its violation of the regulation prohibiting loans to shareholders was not a material breach because it complied with another term of the FHLBB Resolution 88-603, which required it to invest at least $11 million in new capital into the thrift. Id. Bancorp invested $13,665,907 into First Annapolis, or $2,665,907 more than the FHLBB Resolution 88-603 required. Id. at 19-21. Because this "surplus" of $2,665,907 exceeded the $1,600,000 in shareholder loans to RMA, Paul Jones, William Jones, Cowdrey and Schwarz by $1,065,907, Bancorp claims that there can be no material breach of the contract. Id. at 20-21.

Bancorp is wrong for several reasons. First, there was not an "over investment" of $1,065,907 because the Government proved through a preponderance of the evidence that there

were $3,975,000 in shareholder loans violating the regulations, so Bancorp did not meet the FHLBB Resolution requirement to invest at least $11 million. DX 397 at WOT315 0147; Tr. 676-82 (Crompton).

Second, whether this "over investment" was $1,065,907 or $1, the breach is still material. Even if the Court found that, after deducting the amount of shareholder loans, Bancorp invested the required $11 million in real capital, the breach would still be material based upon the evidence introduced at trial "in light of the totality of events and circumstances." See Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1552 (Fed. Cir. 1992) (citing Restatement (Second) of Contracts §241, cmt. a (1981)).[2] The regulators provided testimony regarding "the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." Stone Forest Industries, Inc., 973 F.2d at 1551. More specifically, they testified that had they known about the shareholder loans at the time they were being made, they would have acted immediately to stop the conversion. Tr. 55 (Zimmerman); Tr. 578, 603 (G. Jones). The breach is clearly "material" because the very purpose of the alleged contract was to gain regulatory approval for the supervisory conversion and acquisition of First Federal by Bancorp. The testimony indicated that the regulatory approval would have been withdrawn because of the shareholder loans. Hometown, 409 F.3d at 1370.

[2] Bancorp's argument has improperly oversimplified the issue of material breach to a matter of compliance with this $11 million minimum capital requirement in the FHLBB Resolution. In Bancorp's view, they must have breached this requirement in order for their violation of the regulation to be material. This is not correct. Even if Bancorp met this requirement, the Government has proved that the shareholder loans represented a "material" breach.

Mr. Zimmerman testified that "it didn't really matter how much was involved" because it was still a regulatory violation. Tr. 122.

Nevertheless, should the Court consider the dollar amount of shareholder loans, the breach is still material. The Government has proven $3.975 million in shareholder loans, which represented 28.1 percent of the stock issued. DX 397 at WOT315 0147; Tr. 676-82 (Crompton). Even if the Court were to consider only the $1.6 million in shareholder loans, conceded by Bancorp, those loans still represent a 11.29 percent of the total shares sold by Bancorp, which by its own admission, is a "relatively significant number." Tr. 338 (Parran); see Stone Forest Indus., Inc., 973 F.2d 1548 at 1552 (holding party materially breached contract by denying access to 15.89 percent of lumber originally bargained for after other party had completed 50 percent of its performance) (citing Restatement (First) of Contracts § 275, cmt. a (1932) (regarding materiality it is "impossible to lay down a rule that can be applied with mathematical exactness").

Bancorp further argues that the breach is not material because the evidence indicates that the Government did not view the shareholder loans as a significant matter in January 1990. Pl. Br. at 21. However, Bancorp's only evidence to support its contention, the cross-examination testimony of Greg Jones (Tr. 635), does not support Bancorp's contention. Greg Jones did not testify that shareholder loans were not a significant supervisory issue. Rather, Mr. Jones testified that, although the loans to shareholders were indeed significant, Bancorp's other supervisory issues were more significant at that time. Tr. 635 ("We were addressing a number of other problems at the institution at that time that had direct bearing on the instituion's solvency, and this issue was at that point in time not as significant . . . . This issue at that time was not as relevant as these solvency issues that were present.") (emphasis added); see also DX 438.

In any event, the evidence admitted at trial established that the regulators considered the shareholder loans to be a significant supervisory concern that the thrift had to address. DX 397; DX 439. Mr. Crompton documented this supervisory issue in his January 1990 examination. DX 397 at WOT315 0147; Tr. 674-77 (Crompton). Furthermore, by letter dated April 18, 1990, the OTS formally notified First Annapolis of the major supervisory concerns that were revealed during the examination, including the impermissible loans to shareholders. DX 439. The OTS directed First Annapolis to "remove all loans to stockholders, the purpose of which were to purchase stock in the Institution, from the Institution's books without material loss and without reciprocal lending arrangements with other financial institutions." DX 439; Tr. 605 (G. Jones).

Despite the well-settled law on prior material breach, Bancorp continues to press the argument that any actual loss to the Government from the shareholder loans was "de minimis." Pl. Br. at 21-22. Indeed, the actual losses associated with these loans is not determinative of the issue of materiality. See Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 620-21 (2000) (materiality does not depend upon whether the breach results in a financial loss to the non-breaching party).

In any event, Bancorp has again misconstrued the testimony presented at trial regarding the actual loss to the Government. For example, the evidence at trial did not establish that the loan to RMA was paid back in full. Mr. Taylor's testimony that, over fifteen years later, he was sure that the loan was paid back simply because the liens were released by Second National does not prove that there was no loss. Tr. 543. In fact, he did not remember RMA making any payments on the loan and was not involved with that aspect of the business. Id. Moreover, his partners in RMA, Messrs. Howard and Horrigan testified that they had no recollection of any

payments being made on the $1 million RMA loan. Tr. 416 (Howard); Tr. 492, 499, 500 (Horrigan). Furthermore, each RMA partner, including Mr. Taylor, declared bankruptcy after defaulting on this obligation. Tr. 416 (Howard); Tr. 498-99 (Horrigan); Tr. 552-55 (Taylor). The evidence established that most of the shareholder loans resulted in some loss. Tr. 266-67, 269-70 (P. Jones); Tr. 170-76, 177 (Cowdrey); Tr. 478 (W. Jones); DX 536; DX 613; DX 614; DX 619, DX622. However, regardless of the exact amount of loss demonstrated at trial, these shareholder loans were still a material breach.

## VI. THE GOVERNMENT HAS NOT WAIVED ITS DEFENSE OF PRIOR MATERIAL BREACH OF CONTRACT

Despite Bancorp's arguments to the contrary, the Government never waived its prior material breach defense, either as a matter of substance or procedure.

### A. Bancorp Has Not Established Substantive Waiver

Bancorp argues that the Government substantively waived its prior material breach defense during the course of its dealings. Pl. Br. 22-30. First, Bancorp's statement of the law concerning the election doctrine is incomplete. Bancorp implies that if after discovering a material breach, the non-breaching party continues to perform the contract, that continuing performance always constitutes a waiver of its defense. Id. at 23 (citing Cities Service Helix, Inc. v. United States, 543 F.2d 1306, 1313 (Ct. Cl. 1976)). To the contrary, the Federal Circuit has held on numerous occasions that a party's continued performance did not waive this defense. McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1326 (Fed. Cir. 1999) (citation omitted) ("A party that chooses to proceed with the contract – even if it is the government, and even if it manifests a strong desire to procure the item that is the subject of the contract – does

not thereby waive its right to terminate for default."); Dow Chemical Co. v. United States, 226 F.3d 1334, 1346 (Fed. Cir. 2000) (finding no waiver of termination right where there was no evidence that the breaching party was prejudiced by the non-breaching party's delay in terminating); see also Pacific Gas & Elec. Co. v. United States, 70 Fed. Cl. 766, 771-72 (2006) (relying upon Dow in rejecting the argument that plaintiff waived claim for material breach under "election doctrine").[3]

Even assuming for the sake of argument that continued performance always waives the breach, the Government's conduct did not meet this standard because it seized the thrift on May 31, 1990 – less than 50 days after informing the thrift of the breach on April 18, 1990. Therefore, this case is clearly distinguishable from Barron Banchshares, Inc. v. United States, where the Court found the defendant waived the prior material breach, because it acted inconsistently with the "perceived material breach," by continuing to perform for years. 366 F.3d 1360, 1383 (Fed. Cir. 2004) ("On the one hand, the government claims that investor plaintiffs almost immediately implemented a practice of reckless lending, yet on the other, it nevertheless continued to make its assistance payments for the full five years.") (citations omitted). In this

---

[3] Indeed, in Cities Service Helix, the very case cited by Bancorp, the trial court acknowledged that there are four approaches to determining whether a party's continuing performance waives their defense. 543 F.2d at 1313-14. The least strict view was Professor Corbin's "that an election to continue performance should not be conclusive unless facts giving rise to an estoppel exist; either the breaching party must have changed his position in reliance on the injured party's failure to cancel or the injured party's conduct must be such that it would be unjust to allow him to change his position." Id. The trial court found that the party had waived its defense under all of these four theories. Id. at 1314.

Bancorp has failed to provide any evidence that it relied on the Government's purported failure to cancel or that the Government should be estopped from raising this defense.

case, the Government did not act inconsistently with the breach, and therefore, has not waived it as a defense.[4]

Bancorp also argues that the Government waived the breach because it did not comply with Section V of the RCMA, in that we did not send a formal "notice of default" under the contract but instead treated the matter as a regulatory violation. Pl. Br. at 24-25. This argument fails for several reasons.

First, Bancorp's argument fails to give effect to the entire language of Section V. Section V. B. of the RCMA states that "[n]o failure or delay on the part of the FSLIC in the exercise of any right or remedy shall operate as a waiver thereof, nor shall any partial exercise of any right or remedy preclude other or further exercise of any other right or remedy." JX 99. In other words, the parties agreed that the Government's conduct alone could not serve to waive any default under the RCMA. Moreover, Section V. C. of the RCMA requires that any waiver by the Government be in writing. JX 99. Because the Government never waived any default based upon the shareholder loans in writing, Bancorp has failed carry its burden of proving a voluntary and intentional waiver on the part of the Government. See Reliance Ins. Co. v. United States, 20 Cl. Ct. 715, 723 (1990); Cherokee Nation v. United States, 355 F.2d 945, 950 (Ct. Cl. 1966).

Second, the Government's April 18, 1990 letter was sufficient "notice of default" under Section V. In its April 18, 1990 letter, the Government informed Bancorp in writing that these shareholder loans were improper and instructed it to remove them from the institution's books.

---

[4] Caroline Hunt can be distinguished on the same basis. In that case, the Court, relying upon Barron Bancshares as "determinative," found waiver because the Government continued to make payments under the assistance agreement while the breaching activity was taking place. 65 Fed. Cl. 271, 309-10 (2005). This ruling was mere dicta because the Court found, in any event, that the defendant had not established a prior material breach.

DX 439. Nothing more was required by Section V of the RCMA than formal written notice. The RCMA did not explicitly require the regulators to use the terms "notice" or "default." Therefore, this conduct cannot represent waiver of the breach.[5]

Third, Bancorp asks the Court to ignore the reality of the situation and the full context provided by the evidence at trial. The Government's treatment of the matter as a "regulatory violation" in no way precludes its assertion of a prior material breach defense. Furthermore, the witnesses' characterization of the problem as "regulatory" or of "supervisory concern" is irrelevant for purposes of the legal determination of the issue of waiver. At the time, the Government viewed the supervisory conversion from a regulatory standpoint rather than a contractual one.

In most instances Government regulators are not attorneys and certainly did not view the regulations as terms of a "contract" with the thrifts they regulated. Indeed, Greg Jones testified that, like the regulatory prohibition against a thrift funding its own conversion through loans to

---

[5] Bancorp interprets the Government's April 18, 1990 letter to the thrift instructing it to remove the loans to shareholders from its books as "sufficient evidence of waiver" based upon two cases from this Court regarding notice of termination to the breaching party. Pl. Br. at 27 (citing H.N. Bailey & Assocs. v. United States, 196 Ct. Cl. 156, 163 (1971); Sun Cal, Inc. v. United States, 21 Cl. Ct. 31, 41 (1990)). However, both cases are contrary to controlling precedent. See McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1326 (Fed. Cir. 1999); Dow Chemical Co. v. United States, 226 F.3d 1334, 1346 (Fed. Cir. 2000); see also Pacific Gas & Elec. Co. v. United States, 70 Fed. Cl. 766, 771-72 (2006).

Further, H.N. Bailey is also factually distinguishable. In that case, the trial court found that the Government waived its right to terminate the contract by only specifying defects in the performance because the Court interpreted that specific contract to require a specific notice of termination by a certain date. 196 Ct. Cl. at 163. Here, the Government has acted consistently with the terms of the RCMA. Moreover, because the Government seized the thrift soon after the discovery of the breach, any notice of termination would have been futile in this case.

shareholders, the failure of a thrift to meet the capital requirements under FIRREA was also considered to be a "regulatory violation." Tr. 652. Obviously, it was not until 1996, with the Supreme Court's decision in United States v. Winstar Corp., 518 U.S. 839, 910 (1996), that the regulatory capital provisions of FIRREA were found to be breaches of "contracts" between the Government with certain thrifts.

Bancorp also argues that because the Government did not revoke the supervisory conversion its conduct waived the breach. Pl. Br. at 24-26. However, the testimony made clear that by the time the regulators discovered the loans to shareholders, the supervisory conversion was complete and would have been difficult, if not impossible, to reverse. Tr. 650 (G. Jones).[6] Moreover, the regulators testified that even "without the conversion" the institution's condition in early 1990 was "very tenuous, at best" because of a number of other problems. Tr. 635, 651 (G. Jones). Indeed, because of a myriad of supervisory concerns, including shareholder loans, the institution was seized on May 31, 1990. DX 438. Even if the conversion could have been voided, as Bancorp suggests, the Government's decision to seize the thrift without voiding the conversion did not waive its defense of prior material breach. See Dow Chemical Co., 226 F.3d at 1346; see also Tr. 109 (Zimmerman).[7]

---

[6] The testimony also made clear that, had the regulators discovered these loans before the conversion, they would not have allowed the conversion to go forward. Tr. 55, 94, 121-22 (Zimmerman); 578, 603, 606-07 (G. Jones).

[7] Even if the Government's seizure was viewed as a cancellation of the contract on other grounds besides shareholder loans, such a cancellation may be sustained if the shareholder loans provide an adequate basis. Scott Timber Co. v. United States, 64 Fed. Cl. 130, 142 (2005); Wetsel-Oviatt Lumber Co. v. United States, 43 Fed. Cl. 748, 755 (1999); Reservation Ranch v. United States, 39 Fed. Cl. 696, 719 (1997).

Bancorp alleges that the Government waived the defense because it did not "choose to cancel the contract" until nine years after the breach on September 14, 1999 when Government counsel asserted this defense in its moving papers. Pl. Br. at 27. Here, Bancorp improperly conflates the issues of substantive waiver, or actions by the contracting parties, with those of procedural waiver through the course of the litigation. Regardless, there was no one-year delay, let alone a nine-year delay, because the Government effectively cancelled the alleged contract on May 31, 1990 when it seized the thrift. Further, as explained above, any delay by the Government that did occur cannot serve to waive the breach pursuant to Section V. B. of the RCMA. JX 99. Even assuming this provision did not apply, Bancorp has failed to demonstrate that any delay was unreasonable given the facts and circumstances. See Restatement (Second) of Contracts § 381(3) (1981); see also First Interstate Bank of Idaho v. Small Business Admin., 868 F.2d 340, 346 (9th Cir. 1989).

Regarding substantive waiver, Bancorp lastly argues that because the Government should have known of the shareholder loans prior to February 9, 1989, it has waived the breach. Pl. Br. 28-30. First, the Government could not waive the breach by conduct alone but had to do so in writing under Section V of the RCMA. JX 99. Second, even assuming the RCMA's terms did not apply, the law requires actual knowledge rather than constructive knowledge. General Eng'g & Mach. Works v. O'Keefe, 991 F.2d 775, 781 (Fed. Cir. 1993) (holding that the Government did now waive contract requirement pursuant to a federal regulation because it did not have actual knowledge that the requirement was not met); Lincoln National Life Ins. Co. v. United States, 582 F.2d 579, 582 (Ct. Cl. 1978).

Even if the Court chose to ignore the requirement of actual knowledge, Bancorp has failed to establish that the Government had constructive knowledge, or should have known of the shareholder loans prior to its 1990 examination of the thrift. "When waiver is implied from conduct, the acts, conduct, or circumstances relied upon to show waiver must make out a clear case." Matter of Garfinkle, 672 F.2d 1340, 1347 (11th Cir. 1982). Here, the evidence presented at trial did not make a clear case for implied waiver of the breach through constructive knowledge.

First, implied waiver is inappropriate in these circumstances because First Annapolis attempted to conceal the impermissible loans from the regulators. First Annapolis entered into an agreement in April 1989 with Second National to swap the loans made to Messrs. Cole, Howard, Horrigan, Taylor and Paul Jones, for other loans. DX 481; DX 524; DX 548. By letter dated April 11, 1989, Second National informed Douglas Parran, that it had approved the purchase of the $275,000 loan to Paul Jones as well as the $1,000,000 loan to Messrs. Cole, Howard, Horrigan, and Taylor, known as RMA. JX 140. In return, First Annapolis agreed to purchase two of Second National's loans. Id. Douglas Parran agreed to these terms by signing Second National's letter on April 12, 1989. JX 140; DX 481; DX 498; DX 524.

Second, the regulators could not have discovered the shareholder loans during the 1988 exam, because they only reviewed loans that were made up to the end of the prior quarter and would not have reviewed any loans made during the course of the 1988 examination. Tr. 678-79 (Crompton). Therefore, prior to the 1990 exam, the Government had no reason to question

Bancorp's certification that it had complied with all applicable rules and regulations. JX 99 at WOQ280 1447.[8]

Moreover, this case is easily distinguishable from Caroline Hunt, a case cited by Bancorp, where the trial court found that the Government waived the breach through conduct. Pl. Br. at 28. In that case, the alleged prior material breach was far more subjective because it involved the failure to maintain a conservative lending portfolio. 65 Fed. Cl. at 309-10. The Caroline Hunt Court found that the Government's extensive examination of that particular lending portfolio before seizure of the thrift led to either actual or constructive knowledge. Id. Here, it is clear that the Government had neither actual nor constructive knowledge of the shareholder loans until the January 1990 examination. For these reasons, Bancorp has failed to established substantive waiver.

**B. Bancorp Has Not Established Procedural Waiver**

Bancorp continues to argue that we procedurally waived our defense of prior material breach. Pl. Br. at 30-35. First, the Court has already rejected Bancorp's procedural waiver argument so it need not be reconsidered. Although a trial court certainly "has the power to reconsider its decisions until a judgment is entered," "[o]rderly and efficient case administration suggests that questions once decided not be subject to continued argument . . . ." Exxon Corp. v. United States, 931 F.2d 874, 877 (Fed. Cir. 1994) (emphasis added) (quoting Jamesbury Corp. v. Litton Indus. Products, Inc., 839 F.2d 1544, 1550 (Fed. Cir. 1998)); see also Suel v. Sec.'y of

[8] Bancorp also cites correspondence from the regulators acknowledging receipt of materials regarding the supervisory conversion as evidence of constructive knowledge. Pl. Br. at 29-30 (citing DX 287; JX 101). These are routine correspondence which do not prove that the Government should have known of Bancorp's regulatory violation. Tr. 117-18 (Zimmerman).

Health & Human Servs., 192 F.3d 981, 985 (Fed. Cir. 1999) (noting that the law of the case doctrine "protect[s] the settled expectations of the parties and promote[s] orderly development of the case.").

Bancorp first raised this procedural waiver argument in its November 7, 2003 Motion to Strike our October 31, 2003 supplemental memorandum. It argued, inter alia, that our prior material breach defense regarding investments in subsidiaries was untimely and had been procedurally waived because our prior pleadings had not raised this defense. In our November 21, 2003 opposition we responded that: (1) we were never obligated to file an answer setting forth our defenses; (2) the CMO did not require us to set forth the prior material breach defense; (3) even if we raised the defense for the first time at trial it would not be untimely; (4) Bancorp's contract claim had evolved; and (5) summary judgment on liability would not necessarily preclude a trial on this affirmative defense. On February 13, 2004, this Court ruled in our favor holding that "because the issues of standing and prior material breach have been squarely presented to this Court at least as early as the last status conference and because it can discern no surprise or prejudice to Plaintiff caused by the submission of the seven exhibits, the Court denies Plaintiff's Motion to Strike." February 13, 2004 Order at 3. Therefore, our defense of prior material breach has not been procedurally waived.[9]

Should the Court decide to reconsider this ruling, our arguments still prevail. First, pursuant to the CMO, we have not filed an answer in this case, and therefore, cannot be said to have waived our affirmative defenses. Indeed, this Court has rejected plaintiff's argument of

[9] While that ruling specifically involved the prior material breach of investments in subsidiaries, it applies equally to the defense regarding shareholder loans because it is the same legal principle, and it was raised even earlier in the proceedings.

procedural waiver in another case on the same grounds. See American Heritage Bancorp v. United States, 56 Fed. Cl. 596, 605 (2003) ("It is clear from reading the entire CMO and subsequent orders that the government was not required to file an answer until after a liability ruling in the case, and that the government's counterclaims and defenses could not be waived until an answer was filed.").

Although the CMO required us to "set forth - - - any defenses of which [we] know [] or had reason to know that relate to" the issues raised by plaintiff in its short-form summary judgment motion, within 120 days of when the plaintiff filed its motion, it did not require us, however, to assert defenses related to issues other than whether a contract existed and whether we acted inconsistent with that contract. Nevertheless, we still specifically reserved our right in our "120-day response" to raise defenses in the future. Def. Supp. Filing Pursuant to Paragraph 5.d of the CMO ("120-day response") at 2 (Filed Oct. 24, 1997). Therefore, even if we raised our prior material breach defense for the first time at trial, it would not be untimely pursuant to the CMO. See also American Heritage, 56 Fed. Cl. at 605 ("While it is no doubt true that to the extent the defendant knew or had reason to know of a defense, the CMO contemplated that the defense should have been raised within 120 days of the filing of the short form motion for partial summary judgment, the CMO does not provide that the government's failure to do so results in a waiver of the government's counterclaims and defenses.")

Even if Bancorp could establish that our prior material breach defense is untimely, it cannot be waived unless Bancorp can also show resulting prejudice. See American Heritage, 56 Fed. Cl. at 605 (finding that there was no prejudice to the plaintiff because it knew of underlying bases for claim for several years); Williams v. Ashland Eng'g Co., 45 F.3d 588 (1st Cir. 1995).

Bancorp has known about the shareholder loans since at least 1990 and it has failed to show any such prejudice. The Court has also addressed any possible prejudice by allowing both parties further discovery on the factual issues.[10] Therefore, Bancorp has failed to establish procedural waiver.

**C. Bancorp Has Failed To Establish Substantive Waiver As To Our Affirmative Defense Regarding Excess Investments In Service Corporations**

Bancorp has failed to carry its burden that the Government substantively waived is defense of prior material breach as to First Annapolis' excess investments in service corporations. As we established at trial, First Federal and its successor, First Annapolis, were subject to a Supervisory Agreement that specifically limited its investments in service corporations due to past abuses. DX 20. We also established that, during the 1990 examination of First Annapolis, the regulators identified numerous transactions that were in violation of the 1987 Supervisory Agreement. According to the examination report, this was "another item of significant concern indicative of unsafe and unsound banking practices." DX 397 at WOT315 0140.

In its most recent brief concerning this subject, Bancorp's sole claim of substantive waiver regarding excess investment in service corporation investments was that, since the Government "did not reject the contract with Bancorp," we are "barred from invoking the

[10] Bancorp also cites examples of other courts finding that a party had waived a defense. Pl. Br. at 34-35 (citing Eddy v. Virgin Islands Water and Power Auth., 256 F.3d 204, 210 (3d Cir. 2001); Fifth Third Bank of Western Ohio v. United States, 55 Fed. Cl. 372, 377 (2003); Burton v. Northern Dutchess Hospital, 106 F.R.D. 477, 481-82 (S.D.N.Y. 1985)). These cases are distinguishable because they involve different defenses and because those courts found that the litigant's dilatory conduct caused prejudice. Because the Government has not been dilatory in raising this defense and because Bancorp has failed to show any resulting prejudice, the cited case law is inapplicable.

defense of prior material breach." Pl. Opp. to Def. Mot. for Leave to Amend its Cont. of Fact and Law (May 24, 2006) at 6. Bancorp also states: "It is significant that in this case the Government never gave Bancorp any notice whatsoever that its contract could be terminated on the basis of alleged excessive investments in the service corporations." Id. at 7. Both of these arguments are without merit.

First, as previously indicated, the regulators did not view the approval of First Federal's conversion as a contract. They were simply fulfilling their responsibilities as thrift regulators when they considered and ultimately approved the conversion applications of both First Federal and Bancorp. Indeed, it was not until the Supreme Court's decision in Winstar in 1996, eight years after the conversion in this case, that any of these regulatory approvals were deemed to be contractual. Moreover, the Court has yet to make such a determination in this case. Thus, it is nonsensical for Bancorp to claim that since we "did not reject the contract with Bancorp" we somehow waived our claim of prior material breach. For the same reason, Bancorp's argument regarding the alleged lack of notice that "its contract could be terminated on the basis of excessive investments in service corporations" also fails.

As indicated above, First Federal, and it successor, First Annapolis, were subject to the 1987 Supervisory Agreement that was necessitated, in part, by First Federal's excess investments in service corporations. Indeed, the Agreement stated: "First Federal's investment in service corporations exceeds the limitations imposed by Section 545.74(c) . . . and that such violations provide grounds for the initiation of cease and desist proceedings against the Association [First Federal] by the FHLBB." DX 20 at WOQ396 0828. Further, the Supervisory Agreement was entered into by the parties in order to "avoid the initiation of formal enforcement proceedings

against First Federal." Id. at WOQ396 0829. Significantly, the Supervisory Agreement also required First Federal to reduce its investments in service corporations and report its compliance with that requirement to the regulators on a regular basis. Id. at WOQ396 0831-33.

Notwithstanding this requirement, the January 1990 examination revealed that First Annapolis' "investment in its service corporations . . . exceeds the regulatory limitation (including all forbearances granted) by 123.6% and **has increased 44% since the previous examination**." DX 397 at WOT315 0140 (emphasis added). The examination report further states:

> While most of the increased investment can be attributed to additional disbursements on existing projects, **the corporation has continued to fund new projects.** Since the date of the previous examination, Delta has entered into at least three new partnership agreements and granted loans for two additional projects being funded by the bank. . . . In addition to entering into the above partnership agreements, two other major projects were structured as loans rather than as partnerships in an effort to circumvent investment restrictions. . . . Based on the five transactions described in this comment and the practice of accruing and not paying interest, **it is evident that the bank directly violated, or intentionally circumvented the Supervisory Agreement. Considering the magnitude of the ongoing excessive service corporation investment, these transactions and violations represent unsafe and unsound management practices**.

DX 397 at WOT315 0141-43 (emphasis added).

First Annapolis provided a written response to these findings that was incorporated into the examination report, stating, in part, that it had informed regulators, specifically Betsy Brown Trump, about these additional investments and that it had received her approval. Id. at WOT315 0143-44. However, the examiner noted that First Annapolis failed to produce any documentation "to support the contention that supervisory approval was ever received for projects that would

violate the Supervisory Agreement." Id. at WOT315 0144. Bancorp has also failed to produce any such documentation.

Nevertheless, Bancorp claims, through Douglas Parran, that First Annapolis' supervisory agent, Betsy Brown Trump, was aware of these investments and verbally approved First Annapolis' continued service corporation investments, which violated the Supervisory Agreement. See Affidavit of Douglas Parran, attached as Exhibit A to Pl. March 15, 2004 Supp. Mem. Again, Bancorp fails to identify any confirming correspondence or any other documentation to support this assertion. As the Court is no doubt aware, the banking industry is highly regulated. See Wells Fargo Bank, N.A. v. United States, 33 Fed. Cl. 233, 236 (1995) rev'd in part on other grounds, 88 F.3d 1012 (Fed. Cir. 1996). Accordingly, to suggest that the thrift's principal supervisory agent at the time verbally agreed to permit First Annapolis to violate the Supervisory Agreement does not make sense.

Additionally, Ms. Trump left the FHLBB in May 1989 (Tr. 563 (G. Jones)), and there is no indication that First Annapolis informed her successor, Greg Jones, of this alleged verbal agreement. Moreover, the Supervisory Agreement itself provided that it would remain in effect until terminated by the FHLBB acting through its Supervisory Agent in Atlanta, and that: "The Supervisory Agent will consider written requests for termination of this agreement following the completion of two examination cycles or at the end of three years, whichever is greater, if First Annapolis has demonstrated satisfactory compliance with the terms of this agreement." DX 20 at WOQ396 0834.[11] There is no evidence of any written request from First Annapolis to be

[11] The Supervisory Agreement was entered into on July 8, 1987. Id. at WOQ396 0828. Thus, it was to remain in effect until at least July, 1990. By that time, First Annapolis had already been replaced into receivership.

relieved from the requirements of the Supervisory Agreement nor has Bancorp alleged that such a request was ever made.

Given the above, Bancorp has failed to carry its burden that the Government substantively waived its defense of prior material breach regarding investments in service corporations.[12] Bancorp has produced no documentary evidence that either the FHLBB or the OTS ever released First Annapolis from the Supervisory Agreement of agreed to permit the thrift to violate the Supervisory Agreement's provisions regarding investments in service corporations. The only evidence Bancorp offers is Douglas Parran's word; however, that is insufficient given that the Agreement itself requires that such requests be in writing.

## VII. THE DEFENSE OF FAILURE OF A CONDITION PRECEDENT

### A. Bancorp Has Failed To Demonstrate That The Government Waived This Defense

Bancorp asserts that the Government has waived the defense of failure of a condition precedent for the same reasons it has waived the defense of a prior material breach. Pl. Br. at 35-37. However, Bancorp is again incorrect because the Court has the discretion under RCFC 15 to conform its findings to the evidence admitted at trial, and because Bancorp cannot demonstrate any prejudice.

Bancorp claims that the Government is attempting to interject an entirely new affirmative defense at the last minute. Id. However, the Government properly reserved this defense just as it properly reserved the defense of prior material breach. Def. Supp. Filing Pursuant to Paragraph

[12] The same facts regarding procedural waiver apply equally to this defense as they do to our defense regarding impermissible loans to shareholders. Thus, we did not repeat the arguments discussed in section B above.

5.d of the CMO ("120-day response") at 2 (Filed Oct. 24, 1997). Moreover, even though the pre-trial filings focused on the defense of prior material breach, Bancorp was put on notice that its breach could be viewed as a failure of a condition precedent by our prior pleadings. Even before discovery was allowed on the issue of shareholder loans, we argued in our June 14, 2001 supplemental memorandum that those loans "may have been a failure of a condition precedent or a prior material breach of any contract." Def. June 14, 2001 Supp. Mem. at 33. We stated that these loans were "a complete defense to contract formation, whether couched in terms of a failure of a condition precedent, prior material breach, or perhaps even misrepresentation in the inducement." Id. at 35-36; Def. July 12, 2001 Supp. Reply at 16 ("plaintiffs must show that it has satisfied all conditions precedent") (citation omitted). Therefore, the Government raised this defense in connection with the shareholder loans.

After the Court granted our renewed motion to conduct discovery regarding shareholder loans, it scheduled a trial on the issue of whether the loans constituted a prior material breach. The parties and the Court referred to the shareholder loan issue as a prior material breach defense, although the Court had not made a ruling as to the date of contract formation. At trial, the evidence presented prompted the Court to raise the issue of failure of a condition precedent because of the possibility that the contract was not yet formed when the breaching shareholder loans were made. Tr. 887-93.

Bancorp, in part, necessitated a discussion of this issue by its abrupt change in litigation position after the close of evidence. Bancorp originally argued that its conversion application was an "offer" and the FHLBB resolutions were the Government's "acceptance" which formed a contract on July 21, 1988. Pl. May 14, 2001 Br. at 7 ("Upon passage of these Resolutions, the

contract was formed. No further FHLBB approval was necessary and all the material terms had been agreed upon by the parties."); Pl. June 28, 2001 Br. at 13. However, during closing argument, Bancorp argued that the FHLBB resolutions were an "offer" by the Government meaning any alleged contract had to be formed after July 21, 1988. Tr. 852.

Bancorp further alleges that it would be unduly prejudiced by this defense because: (1) it is based on an entirely different legal theory, (2) it was denied any opportunity to take discovery of facts in support of these theories, and (3) that it based its presentation of evidence at trial solely on the prior material breach defense. These arguments fail to demonstrate prejudice to Bancorp.

First,"the court has broad discretion to allow new claims and defenses to be added to a case before the resolution of the litigation in any event." <u>See</u> <u>American Heritage</u>, 56 Fed. Cl. 596, 605 (2003) (citing <u>Zenith Radio Corp. v. Hazeltine Research Inc.</u>, 401 U.S. 321, 330 (1971); <u>Tenneco Resins Inc. v. Reeves</u>, 752 F.2d 630, 635 (Fed. Cir. 1985)). "Even as late as trial, if evidence relating to an unpleaded affirmative defense is introduced without objection, Rule 15(b) requires the pleadings to be treated as if they actually had raised the defensive issue." 5 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1278 (3d ed. 2004) at 679 (footnote omitted). Courts also examine whether the opposing party "would be prejudiced by the implied amendment, <u>i.e.</u>, whether he had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory." 3 Moore's Federal Practice P 15.13(2), at 993 (2d ed. 1966); <u>see</u> <u>Zenith Radio Corp.</u>, 401 U.S. at 330-31.

Although the failure of a condition precedent is a different legal theory, it is absurd to suggest that this affirmative defense entitled Bancorp to further discovery and another trial. The

defense is based upon the same underlying evidence – the improper loans to shareholders for the purpose of buying stock – and Bancorp has had a full and fair opportunity to litigate that issue. Indeed, Bancorp did not even specify what additional evidence it would present if this case were retried on the theory of failure of a condition precedent. Bancorp has already had an ample opportunity to take discovery during the initial discovery period and when discovery was specifically reopened regarding shareholder loans. In short, Bancorp alleges prejudice where there is none.

Moreover, this is not the usual case under Rule 15(b) of the RCFC, where a party is trying to introduce an entirely new and unrelated claim or defense into the proceedings based upon new evidence. Instead, the defense of failure of a condition precedent is closely intertwined with that of prior material breach in this case as evidenced by our prior pleadings. They both tie directly to our central allegation throughout these proceedings: that Bancorp's regulatory violation involving loans to shareholders serves as a complete defense to any breach by the Government. Therefore, it is clear that the defense of failure of a condition precedent was tried by the implied consent of the parties. RCFC Rule 15(b); Browning Debenture Holders' Comm. v. DASA Corp., 560 F.2d 1078 (2d Cir. 1977).

**B. The Evidence Has Established Failure Of A Condition Precedent**

If the Court finds that a contract between the parties was formed after Bancorp's improper shareholder loans, then the evidence has established that Bancorp failed to satisfy an express condition precedent, that it comply with all applicable rules and regulations before the Government would perform. This condition was expressly set out in First Annapolis' supervisory conversion application, Bancorp's holding company application and plan of

conversion, the October 14, 1988 letter of Bancorp's special counsel, and FHLBB Resolution No. 88-603, and it was also incorporated into the RCMA which required Bancorp to warrant that the information it gave FSLIC was "true, accurate, complete and current in all material respects." JX 99 at WOQ280 1447.

Bancorp raises only two arguments in the face of the insurmountable evidence: (1) that the Government's defense cannot be raised because of the February 9, 1989 letter from the regulators to the holding company, and (2) that the terms of the contract did not expressly state that the contract was void if the applicant made loans to shareholders. Pl. Br. at 36-37. Both arguments are without merit. First, the February 9, 1989 letter saying "that all conditions precedent have been met and the Conversion has been completed" was "standard procedure in the application process [sic]" confirming receipt of the required materials. JX 101; Tr. 117-18 (Zimmerman). It did not serve to waive the Government's contractual rights, but was merely intended to inform the thrift that the required materials were received. Tr. 600 (G. Jones) ("when the institution provided the last bit of information to fulfill the last conditions . . . they asked the [FHLBB] to include certain language in this letter, which we entertained and reviewed and included"); see also JX 101; DX 287. Indeed, those required materials included a certification that the thrift and holding company were complying with all applicable rules and regulations. As Mr. Zimmerman acknowledged, if that certification was not true and the thrift was actually violating the regulations, this letter would not affect the Government's rights in that regard. Tr. 118 (Zimmerman).

Second, Bancorp incorrectly claims that such a specific and narrow term regarding the condition precedent was required to be in the alleged contract. The plain and unambiguous

language of the alleged contract demonstrates that both parties agreed that, as a condition precedent to regulatory approval of First Federal's conversion and Bancorp's acquisition of First Federal, Bancorp was required to comply with all applicable rules and regulations including the one prohibiting loans to shareholders, which was specifically incorporated into the holding company application. Accordingly, Bancorp's citation to two cases from other circuits in support of the proposition that, "conditions precedent are disfavored and will not be read into a contract unless required by plain unambiguous language," (Pl. Br. at 37) is inapposite.

Bancorp has cited no case law to support its claim that there must be a statement "which expressly states that the contract is void . . . if First Annapolis made loans to shareholders to purchase stock in Bancorp." Id. Nor has Bancorp identified any tenet of contract law or construction mandating such a clause. Moreover, such a statement would be redundant given that the parties included express language to that effect, just stated in the affirmative rather than the negative.

Accordingly, whether the loans are viewed as a prior material breach or a failure of a condition precedent, the result is the same: the Government is excused from any breach.

## VIII. THE GOVERNMENT HAS NOT ALLEGED FRAUD

The Government has not alleged fraud as a counterclaim so Bancorp's arguments regarding our failure to specifically plead and prove fraud are irrelevant. Pl. Br. at 37-38. Nevertheless, this Court is entitled to take all the evidence from trial into account in determining the materiality of Bancorp's breach. Although any degree of fraud is material as a matter of law, a prior material breach does not require proof that the breaching party had a fraudulent intent in making a misrepresentation related to a contractual obligation. Christopher Village, L.P. v.

United States, 360 F.3d 1319, 1335 (Fed. Cir. 2004). Indeed, a misrepresentation is material so long as it has a natural tendency to influence or is capable of influencing an action by the Government. Id. at 1336.

The testimony of the regulators made clear that Bancorp's certifications influenced the approval of the conversion. If the Court determines that Bancorp's agents made material misrepresentations regarding the shareholder loans, this is further support for the Government's defense of prior material breach.

**CONCLUSION**

For the foregoing reasons as well as those stated in our post-trial brief, we respectfully request that the Court grant judgment for the defendant.

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Deputy Director

s/William F. Ryan

WILLIAM F. RYAN
Assistant Director

s/Richard B. Evans

RICHARD B. EVANS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-7760
Facsimile: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:
TIMOTHY J. ABRAHAM
MELINDA HART
MARK T. PITTMAN
DELISA SANCHEZ
Trial Attorneys

October 4, 2006

CERTIFICATE OF FILING

I hereby certify that on October 4, 2006, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard B. Evans