**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 94-522C** |
| **v.** | ) | **(Judge Williams)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S SUPPLEMENTAL EXPERT WITNESS IDENTIFICATION**

Pursuant to Rules 1 and 7 of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court strike the supplemental expert witness identification filed by plaintiff, First Annapolis Bancorp, Inc. ("Bancorp") on November 17, 2007. Our motion is based upon the following.

**BACKGROUND**

Expert discovery commenced in this case in August 1999. In accordance with the Court's procedural order governing discovery in the Winstar-related cases, on August 25, 1999, Bancorp filed its identification of expert witnesses naming Edward Heiden as its sole expert. Ex. A ("Plaintiff identifies Edward Heiden . . . as its expert regarding damages suffered herein"). Similarly, on August 31, 1999, plaintiff-intervenor FDIC, then a party to the litigation, filed its identification of expert witnesses naming Robert E. Litan, Ph.D. as its sole expert. Ex. B. In the months that followed, Mr. Heiden prepared a report regarding Bancorp's alleged damages and Dr. Litan prepared a report regarding the alleged damages sustained by the thrift, First Annapolis Savings Bank, F.S.B. ("First Annapolis"). As indicated in his report, Dr. Litan was retained by

the FDIC to determine the damages First Annapolis allegedly suffered as the result of the Government's breach of the agreements between the FHLBB and First Annapolis. Ex. C at 1.

At no time during the expert discovery period did Bancorp identify Dr. Litan as one of its experts. Indeed, during expert discovery, we deposed each of the two experts regarding the damages opinions contained in their respective reports. At no time did Dr. Litan ever express any opinions regarding the damages allegedly sustained by Bancorp. His opinions were limited to those damages allegedly suffered by the thrift, First Annapolis. Bancorp's counsel attended the deposition of Dr. Litan by telephone and did not ask any questions; however, Bancorp's counsel specifically reserved the right to depose Dr. Litan at a later date. Ex. D (Litan Dep. at 121-22). To date, Bancorp has not deposed Dr. Litan.

## I. Bancorp Failed To Comply With The Court's Orders Regarding The Designation Of Dr. Litan As An Expert

This Court should not consider the opinions of the FDIC's expert, Dr. Litan, because Bancorp failed to identify Dr. Litan as one of its experts in accordance with the Court's procedural orders for the Winstar-related cases. Moreover, Dr. Litan has not prepared an expert report regarding the alleged damages suffered by Bancorp, nor did he opine on such damages in the report that he prepared for the FDIC.

As indicated above, Bancorp identified a single damages expert, Mr. Heiden, during the expert discovery period in 1999. Now, after a delay of more than seven years, Bancorp has identified Dr. Litan as one of its experts in this case; however, Bancorp failed to submit an expert report for Dr. Litan. Indeed, Bancorp has provided us with only one expert report in this case – that of Dr. Heiden – and it was produced during the expert discovery period in 1999-2000. Bancorp has failed to provide us with any expert report from Dr. Litan. As such, Bancorp has

effectively denied us the right to prepare a defense on an issue that is critical to the outcome of this case by failing to abide by the Court's discovery orders. While Bancorp did identify Dr. Litan as one of its experts on November 17, 2006, more than seven years after it was required to disclose him, Bancorp did not provide a report prepared by him explaining what opinions, if any, he has regarding Bancorp's alleged damages.

Bancorp can not deny that it failed to comply with the Court's procedural orders regarding expert discovery in this case. Specifically, part V, paragraph A.2. of Procedural Order No. 2 for Winstar-related cases provides:

> 2. Absent agreement of the parties, **each plaintiff shall deliver to defendant a final written report prepared and signed by each witness** identified pursuant to Paragraph V.A.I. within 60 days after identification. The written report shall contain: (a) a complete statement of all opinions to be expressed by the witness and basis and reasons for all opinions; (b) the data or other information considered by the witness in forming the opinions; and (c) all exhibits to be used as a summary of or in support for the opinions of the witness.

Ex. E (emphasis added). The Court's order further provides that: "If a plaintiff fails to comply with the provisions of this section with regard to any expert witness it proposes to call, **no opinion testimony will be received from that witness on behalf of that plaintiff**." Id. at 9 (emphasis added).

The Court's order is plain and succinct. Equally plain is Bancorp's knowing failure to comply with that order. Bancorp's belated attempt to piggy-back upon the efforts of the FDIC does not satisfy its obligations under the rules of this Court or Procedural Order No. 2 for Winstar-related cases. Additionally, the impropriety of Bancorp's reliance upon Dr. Litan's opinions is demonstrated by his own deposition testimony:

Q: Who does the FDIC represent in this case, the shareholders or the creditors?

* * *

A: **My understanding is that the FDIC is in the shoes or is standing in the shoes of the institution, and it took over these institutions as a result of the demise of the RTC, and the RTC took over the institution when they shut it down.**

Q: Okay.

A: **So it's acting as the representative of the institution and it's the institution that lost the goodwill and the forbearances and so forth that I value.**

Q: Okay. And did the shareholders also use [sic] the value or the – lose the goodwill and the forbearances over those – the institutions?

A: **Well, to my knowledge, the FDIC represents the institution. The split between the – if there is any – between the FDIC and the shareholders is none of my business.**

Ex. D (Litan Dep. at 95).

It is readily apparent from Dr. Litan's expert report and his deposition testimony that (1) he was retained only by the FDIC, (2) that his damages opinions relate only to the thrift, not the holding company, and (3) he has articulated no opinions concerning the damages suffered by Bancorp as a result of the alleged breach. Moreover, counsel for the FDIC has informed us that the FDIC was not aware of Bancorp's belated designation of Dr. Litan as one of its purported expert witnesses.

Aside from the inappropriateness of Bancorp's designation of another party's expert, the prejudice flowing from Bancorp's conduct is obvious. Although Dr. Litan was deposed at length concerning the basis of his opinions as to the alleged damages suffered by First Annapolis, and therefore, the FDIC, we were unable to question him concerning how and to what extent Bancorp suffered any damages because he expressly stated it was "none of his business." Thus,

it would be fundamentally unfair to allow Bancorp to identify Dr. Litan at this stage of the litigation and call him to testify at trial when he has yet to opine on the damages allegedly suffered by Bancorp.

The Federal Circuit has concluded that it is appropriate to exclude expert testimony when a party has failed to comply with orders of the court concerning discovery, or failed to make timely disclosure of experts and their opinions. Trilogy Communications, Inc., v. Times Fiber Communications, Inc., 109 F.3d 739, 744 (Fed. Cir. 1997). Accordingly, because Bancorp failed to comply with the Court's procedural orders regarding expert discovery, it is appropriate for the Court to exclude the opinion testimony of Dr. Litan in relation to Bancorp's claim for damages. Any opinions expressed by Dr. Litan concerning any damages suffered as a result of the alleged breach is relevant, if at all, to the FDIC, and should not be considered as evidence of any damages allegedly suffered by Bancorp. To the extent that Dr. Litan had any opinions regarding Bancorp's alleged damages, he should have issued a written report containing those opinions and we should have had the opportunity to depose him regarding those opinions. The time for the production of expert reports and depositions of the expert witnesses has long since passed.

As indicated above, the Court's Procedural Order No. 2 for Winstar-related cases specifically provides that: "If a plaintiff fails to comply with the provisions of this section with regard to any expert witness it proposes to call [i.e., providing a final written report prepared and signed by each witness], **no opinion testimony will be received from that witness on behalf of that plaintiff."** Ex. E at 9 (emphasis added). Accordingly, Dr. Litan may not offer any expert testimony at trial.

## II. Permitting Dr. Litan To Testify At Trial Would Be Futile As The Federal Circuit Has Repeatedly Denied Recovery Based Upon Similar Damage Models

The Court should also grant our motion to strike because the opinions articulated by Dr. Litan in the expert report he prepared for the FDIC have been repeatedly rejected by the Federal Circuit. Granite Mgt. Corp. v. United States, 416 F.3d 1373, 1381-82 (Fed. Cir. 2005); Fifth Third of Western Ohio v. United States, 402 F.3d 1221, 1236-37 (Fed. Cir. 2005). The model espoused by Dr. Litan is a hypothetical cost of replacement model and is similar to those that have been proffered, and rejected, in numerous other Winstar cases.

In both Granite and Fifth Third the Federal Circuit upheld decisions of this Court granting our summary judgment motions as to the respective plaintiffs' damages claims. In both cases, an expert proffered a model where he attempted to calculate the hypothetical cost of replacing the goodwill capital with tangible capital in the form of preferred stock. The Federal Circuit found that neither thrift had actually raised capital and thus, the damages models were purely hypothetical. Additionally, the Federal Circuit found that such models were "speculative" and therefore upheld this Court's decisions granting our motions for summary judgment as to those damages claims. Granite, 416 F.3d at 1382; Fifth Third, 402 F.3d at 1237.

This is exactly what Dr. Litan did in his report for the FDIC. In his report Dr. Litan explains that he attempted to value the goodwill and capital ratio forbearances by "determining the present value of the net cash flows to First Annapolis from issuing a hypothetical security to the FSLIC, such as preferred stock . . . ." Ex. C at 5. His model then produced damages of either $25.8 million or $27.9 million depending on the date of the calculation. Id. at 4. However, his model is no less hypothetical or less speculative than those models rejected by the Federal Circuit in both Granite and Fifth Third. Accordingly, this Court should not permit

Bancorp to call the FDIC's expert, Dr. Litan, at trial to opine upon a damages model that has been squarely rejected by the Federal Circuit.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant our motion to strike and bar Bancorp from calling Dr. Litan as a damages expert at trial.

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Deputy Director

s/William F. Ryan

WILLIAM F. RYAN
Assistant Director

s/Richard B. Evans

RICHARD B. EVANS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-7760
Facsimile: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:
TIMOTHY ABRAHAM
MELINDA HART
MARK PITTMAN
DELISA M. SANCHEZ
Trial Attorneys

December 6, 2006

**EXHIBIT A**

54

Cohen, D
Anderson, J

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| FIRST ANNAPOLIS BANCORP, INC., Plaintiff, and FEDERAL DEPOSIT INSURANCE CORPORATION, as Successor to the Rights of First Annapolis Savings Bank, F.S.B., a federally chartered stock savings association, Plaintiff-Intervenor, v. UNITED STATES OF AMERICA, Defendant. | Civil Action No. 94-522-C<br>Chief Judge Loren A. Smith |

**PLAINTIFF'S EXPERT WITNESS IDENTIFICATION**

COMES NOW, Plaintiff First Annapolis Bancorp, Inc., by and through its undersigned counsel, to identify its expert witness, pursuant to the provisions of this Court's August 11, 1997 Procedural Order No 2: Discovery Plan, and states as follows:

Plaintiff identifies Edward Heiden; of Heiden Associates, Inc., 2101 L Street, NW, Suite 200, Washington, DC 20037; (202)463-8171; as its expert regarding damages suffered by Plaintiff herein. Mr. Heiden's current curriculum vitae, including a list of Mr. Heiden's publications in the last ten years, is attached hereto as Exhibit A. A list of Mr. Heiden's

S:\WPDOCS\FIRSTANN\PLEADING\Expert.Identification.wpd



154-94-522
CB

testimony in the preceding four years is attached hereto as Exhibit B. Mr. Heiden is compensated at the rate of $275.00 for his preparation and at the rate of $2,000.00 per day for his testimony.

Respectfully submitted,

Dated: August 25, 1999

COOTER, MANGOLD, TOMPERT
& WAYSON, P.L.L.C.

Dale A. Cooter /eam

Dale A. Cooter
5301 Wisconsin Avenue, NW
Suite 500
Washington, DC 20015
Tel: (202)537-0700

Attorney for Plaintiff
First Annapolis Bancorp, Inc.

Of Counsel:
Donna S. Mangold
Elizabeth A. McFarland
COOTER, MANGOLD, TOMPERT
& WAYSON, P.L.L.C.
5301 Wisconsin Avenue, NW
Suite 500
Washington, DC 20015
Tel: (202)537-0700
FAX: (202)364-3664

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 25, 1999, a copy of the foregoing Plaintiff's Expert Witness Identification was mailed by first-class mail, postage prepaid to:

John Wright Carlisle
Senior Attorney
FDIC Legal Division
Receivership Goodwill Section
1910 Pacific Place, Room 5056
Dallas, TX 75201

**Attorney for Plaintiff-Intervenor FDIC**

James Anderson
U.S. Department of Justice
Civil Division -- Commercial
Litigation Branch
1100 L Street, NW
8th Floor
Washington, DC 20530

**Attorney for Defendant United States**

Elizabeth McFarland
Elizabeth A. McFarland

S:\WPDOCS\FIRSTANN\PLEADING\Expert.Identification.wpd

# EXHIBIT B

54

Cohen, T
Anderson, J

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FIRST ANNAPOLIS BANCORP., INC., *Plaintiff* | ) | |
| and | ) | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Successor to the Rights of FIRST ANNAPOLIS SAVINGS BANK, F.S.B., a federally chartered stock savings association, *Plaintiff-Intervenor* | ) | Civil Action No. 94-522-C |
| v. | ) | Chief Judge Loren A. Smith |
| UNITED STATES OF AMERICA, *Defendant* | ) | |

**PLAINTIFF FEDERAL DEPOSIT INSURANCE CORPORATION'S**
**EXPERT WITNESS IDENTIFICATION**

Plaintiff-Intervenor, Federal Deposit Insurance Corporation ("FDIC"), pursuant to the provisions of this Court's August 11, 1997 Procedural Order No. 2 regarding discovery of expert witnesses, hereby identifies its expert witness as follows:

FDIC identifies Robert E. Litan, Ph.D., of The Brookings Institution, 1775 Massachusetts Ave, N.W., Washington, D.C. 20036, (202) 797-6120, as its expert regarding the damages suffered by First Annapolis Savings Bank, F.S.B. Dr. Litan's current *curriculum vitae*, including a list of Dr. Litan's publications in the last ten years and Dr. Litan's testimony in the preceding four years is attached hereto as Exhibit A. Dr. Litan is compensated at the rate of $325 per hour for both his preparation and testimony.



154-94-522
CB

Respectfully submitted,

Dated: August 31, 1999

John Wright Carlisle
Attorney of Record for Plaintiff
Federal Deposit Insurance Corporation
1910 Pacific Ave., Room 5056
Dallas, Texas 75201
(972) 761-2264
(972) 761-2163 Fax

Of Counsel:
John V. Thomas
Thelma Diaz
Federal Deposit Insurance Corporation

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on the 31st day of August, 1999, I caused to be faxed and placed in the United States mail (first class, postage prepaid) copies of the foregoing FDIC's Response to First Annapolis Bancorp, Inc.'s Motion for Partial Summary Judgment on Damages, addressed as follows:

James L. Anderson, Esq.
Commercial Litigation Branch
Civil Division, Department of Justice
Attn.: Classification Unit, 8th Floor
1100 L Street N.W.
Washington, DC 20530 **FAX: 514-8640**

Attorneys for Defendant United States

Dale A. Cooter, Esq. **FAX: 364-3664**
Donna S. Mangold, Esq.
Elizabeth A. McFarland, Esq.
COOTER, MANGOLD, TOMPERT & WAYSON, P.L.L.C.
5301 Wisconsin Avenue, NW
Suite 500
Washington, DC 20015

Attorneys for First Annapolis Bancorp, Inc.

Executed this 31st day of August, 1999.

Martina Carpenter Woods

**EXHIBIT C**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FIRST ANNAPOLIS BANCORP, INC., Plaintiff | ) | |
| and | ) | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, as Successor to the Rights of First Annapolis Savings Bank, F.S.B., Plaintiff-Intervenor | ) | Civil Action No. 94-522-C |
| v. | ) | |
| UNITED STATES OF AMERICA, Defendant | ) | |

**EXPERT REPORT OF ROBERT E. LITAN**

# I. INTRODUCTION AND SUMMARY OF OPINIONS

## A. Assignment

1. I have been asked by the Federal Deposit Insurance Corporation (FDIC) to provide an expert opinion on the damages recoverable by First Annapolis Savings Bank (First Annapolis or plaintiff) due to the Federal Government's (Government's or defendant's) breach of an August 1988 contract between First Annapolis and the Federal Home Loan Bank Board (FHLBB or Bank Board). This contract was formed as part of the recapitalization and conversion of the former First Federal Savings & Loan Association o Annapolis (First Federal) from a mutual- to a stock-financed thrift. Furthermore, was asked to quantify damages at both the time of conversion and as of August 1989, when First Annapolis's contract was breached by the government, and

when the Financial Institutions Reform and Recovery Act (FIRREA) was signed into law.

**B. Compensation**

2. I am being compensated by the FDIC for my time at the rate of $325 per hour.

**C. Background and Qualifications**

3. I am the Vice President and Director of the Economic Studies Program at the Brookings Institution, Washington, D.C, where I also hold the Cabot Family Chair in Economics. Brookings is the nation's oldest independent public policy research organization. As Director, I supervise the economic research activities of approximately 20 senior scholars. I also continue to pursue my own research, which has covered a wide range of areas, including the economics of the financial services industry, the general performance of the economy, international economics, and various legal and economic issues. During the course of my career, I have authored, edited, and co-authored or co-edited, 20 books and over 100 articles in professional and popular journals, magazines and newspapers on these subjects. My background, as well as a list of my publications and testimony over the last four years, are included in my curriculum vitae, which is attached as Exhibit 1.

4. Several parts of my background may be of special relevance to the issues in this litigation. During 1990-91, I served as a member of a Congressionally authorized Commission on the Causes of the Savings and Loan Crisis. During 1996-97, I served as a consultant to the Department of Treasury on issues relating to financial modernization, and was the main author of the report issued by the Department on the subject, *American Finance in the 21st Century* (which was also subsequently published by the Brookings

Institution). I am currently a co-editor of the Brookings-Wharton Papers on Financial Services and an annual volume on finance in emerging markets (co-published with the World Bank and the International Monetary Fund).

5. As shown in Exhibit 1, I have training as both an economist and an attorney. I earned my B.S. in Economics from the Wharton School at the University of Pennsylvania my M. Phil. and Ph.D. in Economics from Yale University and my J.D. from the Yale Law School. In addition to my research activities at Brookings, I have also served during the course of my career as an attorney, as a lecturer in banking law at the Yale Law School, and in several government positions, most recently as an Associate Director of the Office of Management and Budget (1995-96) and as Deputy Assistant Attorney General in the Antitrust Division of the Department of Justice (1993-95).

**D. Information Considered**

6. In carrying out this assignment, I reviewed certain documents relating to this litigation, expert reports in related cases, and certain articles in professional journals and other sources which are listed in Exhibit 2. In addition, I have been assisted in preparing this report and the analyses discussed herein by others working at my direction.

**E. Summary of Opinions**

7. First Annapolis suffered economic harm due to the passage and promulgation of FIRREA, which curtailed several regulatory forbearances that the FHLBB had agreed to in its August 1988 contract with First Annapolis. These forbearances included the rights to (a) include the intangible assets created in the transaction, such as goodwill, in First Annapolis's regulatory capital calculations, and to amortize such intangible assets over 25 years, (b) meet a scheduled set of minimum regulatory capital requirements that were

below those generally applicable to thrift institutions and (c) invest in its "service corporations as approved by the Supervisory Agent up to the level permitted by Federal Regulation 545.74(d) for institutions meeting their minimum capital requirements."[1] As of the date of contract, the goodwill and capital ratio forbearances described in (a) and (b) above[2] allowed First Annapolis to avoid raising additional tangible capital in a total amount of $75.2 million ($62.9 million due to goodwill plus $12.3 million due to capital ratio forbearance). As of the date of breach, this amount was $69.5 million ($60.4 million due to goodwill and $9.1 million due to capital ratio forbearance). As described more fully below, these forbearances were valuable to the thrift because, among other things, for little or no cost they cushioned the institution against regulatory takeover and/or allowed the thrift to profit from a larger asset base than it otherwise would have been allowed to maintain.

8. At a minimum, the damages sustained by First Annapolis from the loss of these forbearances due to the breaching provisions of FIRREA were $25.8 million, as measured by the value of the regulatory promises at the time of its conversion in August 1988, and $27.9 million at the time the plaintiff's contract was breached in August 1989.

9. These calculations are based in part on several conservative assumptions about valuation and ignore any benefit First Annapolis gained from the third forbearance which allowed it to exceed the limitations on a thrift's direct investment in service corporations. To that extent, the above damages are understated. I also have reviewed the reports of

---

[1] July 14, 1988 FHLBB Voluntary Supervisory Conversion Memorandum, WOQ299 0041-0042; FHLBB Exam of July 11, 1988, p. 25, WOQ280 0197; and Revised Business Plan of October 21, 1987, pp. 4-5, WOT415 052(.

[2] From time-to-time, these two contractual agreements will be referred to below as the FHLB's "regulatory promises."

experts in other *Winstar* goodwill cases who have used a methodology similar to the one that I use here. Applying the valuation assumptions of several of those experts in this case would produce significantly higher damages than those I present here.[3] This underscores the conservatism of the methodology and assumptions that I have used to generate my estimates.

10. The damages amounts stated above reflect the present value of the goodwill and capital ratio forbearances as of either August 1988 or 1989. I calculate the value of these regulatory promises by determining the present value of the net cash flows to First Annapolis from issuing a hypothetical security to the FSLIC, such as preferred stock, in place of the goodwill and capital ratio forbearances, which were taken away by the FHLBB due to the breach. The terms of this hypothetical security, and hence its expected net cash flows, are set to exactly replicate the economically relevant aspects of the FHLBB's goodwill and capital ratio forbearance to the thrift. The present value of these net cash flows is the amount of cash that would make the plaintiff indifferent between accepting the regulatory promises or cash.

11. Issuing this hypothetical security would have put the institution in the same regulatory capital position that it would have occupied but-for the breach,[4] and restored to First Annapolis the profit opportunities it would have had in the absence of the breach. This would have made the thrift whole in an economic sense.[5] However, if FSLIC had

---

[3] See, e.g., September 22, 1998 *Expert Report of Christopher M. James, Ph.D.*, in the case of LaSalle Talman Bank, FSB v. United States; and December 16, 1998 *Supplemental Report of Stewart C. Myers* in the case of Bank United v. United States.

[4] At least one Government economic expert has agreed with this characterization. See December 9, 1996, *Affidavit of Richard S. Ruback in Support of Defendant's Motion in Limine Concerning Damages* in the case of Glendale Federal Bank, FSB v. United States of America, p. 7. It is my understanding that Dr. Ruback did not testify at trial.

[5] Dr. Ruback agreed that a cost of replacement capital approach to calculating damages would be appropriate. Ibid., p. 3. I calculated the cost of replacing the goodwill and capital ratio forbearance using

simply given First Annapolis roughly $75 million in cash in exchange for a security – equivalent to the face amount of the goodwill and initial capital ratio forbearance – that would have over-compensated the institution.[6] That is because the hypothetical security itself would have had a market value of only $53 million,[7] or the net present value of the principal and dividends that First Annapolis would have paid to it over the lifetime of the goodwill. The savings to the FSLIC from netting out the $53 million in payments from First Annapolis against the initial $75 million in cash paid to the thrift for the security (plus transactions cost) – or $22 million – is the value of the regulatory promises provided by the Bank Board.[8]

12. It is also my opinion that other Government witnesses have erred by claiming in cases similar to this one that the value of the goodwill and capital ratio forbearances consists only of the transaction costs of issuing securities that the thrift institution otherwise would have had to issue in order to comply with the relevant capital standards.[9] As described more fully below, these witnesses raise points about leverage that are irrelevant to the valuation of the regulatory promises in this case (and in other *Winstar* cases, for that matter). In any event, the government's witnesses make claims about leverage – specifically that it is of no value to a depository institution – that are incorrect. Specifically, they err in assuming that the marginal cost of capital to thrift institutions rises with leverage in an unconstrained fashion. This is largely true in unregulated

---

the methodology discussed by Dr. Ruback. The only significant difference in results between my method and his, other than differences due to certain case-specific issues, is that I have included transactions costs and he did not.

[6] For simplicity, this illustration ignores transactions costs.

[7] Sum of Present Value of 1989-2013 Cash Flows from Exhibit 4 plus Sum of Present Value of 1989-2013 Cash Flows from Exhibit 5.

[8] With avoided transactions costs, the FSLIC savings and, therefore, damages amount to $26 million.

[9] See, e.g., February 8, 1999, *Direct Testimony of Merton Miller* in California Federal Bank v. The United States, Washington, D.C., p. 3458.

markets but not in the case of thrifts, which have access to low-cost federally insured deposits. As a result, the added ability to leverage was of real value to First Annapolis, as it was to other institutions that benefited from similar contractual rights.

## II. RELEVANT FACTUAL BACKGROUND

### A. August 1988 Conversion Transaction

13. In July 1988, the FHLBB approved the conversion of the former First Federal from a mutual thrift to a stock chartered savings institution, which was then merged with a de novo institution, thereby forming First Annapolis Savings Bank.[10] As of June 30, 1988, just prior to the conversion, the thrift reported approximately $824.1 million in assets, and had a $25.5 million regulatory capital deficiency as of that date.[11] At the time of conversion, the institution's negative net worth was $62.9 million on a mark-to-market basis, which resulted in the thrift booking goodwill in that amount as a result of the transaction.[12] This supervisory goodwill was to be amortized on a straight line basis over a period of 25 years, as an asset on the First Annapolis balance sheet. The institution was also allowed to benefit from forbearance in meeting its regulatory capital requirements for a period of five years.[13] At the time of this contract, this capital ratio forbearance meant that First Annapolis was not required to raise over $12.3 million in additional capital.[14] In addition, as noted previously, First Annapolis was excused from the standard regulatory limits on its direct investment in its service corporation subsidiaries.[15]

---

[10] July 14, 1988 FHLBB Voluntary Supervisory Conversion Memorandum, WOQ299 0029-0043.
[11] June 30, 1988 Thrift Financial Report (TFR), Section A; July 11, 1988 FHLB Report of Examination, p. WOT315 0029.
[12] September, 30, 1988 TFR, Sections A and E; letter from Deloitte Haskins & Sells, WOQ280 1677-1680.
[13] July 14, 1988 FHLBB Voluntary Supervisory Conversion Memorandum, WOQ299 0032-0033.
[14] See, e.g., Exhibit 6. The capital ratio forbearances and the goodwill promise are often, collectively referred to below as the "regulatory promises."
[15] July 14, 1988 FHLBB Voluntary Supervisory Conversion Memorandum, WOQ299 0042.

14. As part of the supervisory conversion, a group of investors contributed $14.2 million in cash to the institution in return for common stock. This contribution was expected to result in net proceeds of $13.1 million.[16]

**B. Breach**

15. On August 9, 1989, when FIRREA was enacted, it was clear that First Annapolis would be precluded – by virtue of the law – from counting most or all of approximately $60.4 million in remaining goodwill toward meeting its regulatory capital requirement, as the FHLBB originally had promised.[17] In addition, FIRREA abrogated the Bank Board's promise of capital ratio forbearance which, if FIRREA were fully operational in August 1989, meant that First Annapolis was short of meeting both its core and tangible regulatory capital requirements under FIRREA by approximately $60 million.[18]

## III. VALUE OF SUPERVISORY GOODWILL AND CAPITAL RATIO FORBEARANCE IN GENERAL

16. Prior to FIRREA, supervisory goodwill typically arose when the "purchase" method of accounting was applied to business combinations in which the market value of the tangible assets of an acquired thrift fell short of the market value of its liabilities. In contracts with the relevant entities, the regulatory authorities often allowed the resulting institution to treat the shortfall as "goodwill" or other "intangible assets", which could be counted in computing regulatory capital, but which had to be amortized (or gradually written down) over an agreed upon time period. In the present case, the Bank Board allowed First Annapolis to record goodwill and other intangible assets in connection with

[16] July 11, 1988 FHLBB Exam Report, WOT315 0030.
[17] See Exhibit 7
[18] See Exhibit 1 .

the supervised transaction and set the amortization period at 25 years, which was in excess of the period allowed by Generally Accepted Accounting Principles (GAAP).[19] The FHLBB also allowed some troubled thrifts, such as First Annapolis, a period of time following the transaction to meet otherwise applicable minimum capital requirements. These modified requirements typically were expressed as a minimum amount of shareholders' equity as a percentage of an institution's assets or liabilities.

17. The Bank Board allowed goodwill and granted regulatory forbearances during the 1980s because the insurance fund for thrift deposits, the Federal Savings and Loan Insurance Corporation or FSLIC, had insufficient funds to "resolve" the hundreds of insolvent thrifts that were still in business. This resolution process could have resulted either in the liquidation of insolvent institutions (with payoffs to depositors and sales of assets) or supervised/assisted mergers of the insolvent thrifts with healthier partners (by providing cash, notes or other valuable consideration to the acquiring institutions equivalent to the negative net worth of the insolvent thrifts). Instead, as noted previously, the Bank Board attempted to deal with the problems posed by insolvent institutions by allowing acquiring institutions to apply push-down accounting and thereby count the negative mark-to-market net worth in regulatory capital as goodwill and/or by granting weakly capitalized institutions forbearance from meeting minimum capital requirements for certain time periods.

18. The goodwill treatment and capital ratio forbearance policies were controversial at the time. Indeed, I and other financial policy analysts criticized the Congress and the

---

[19] GAAP is the generally recognized set of accounting guidelines established for businesses, including financial institutions. GAAP requires amortization of intangible assets over the period estimated to be benefited, but not to exceed 40 years (2000 Miller GAAP Guide, p. 23.05). In this case, the period benefited would likely have been less than the 25 years allowed in the contract.

Administration for not providing FSLIC with sufficient funds – and the Bank Board for not requesting such financing – so that the Board could have addressed the thrift problem without having to resort to forbearance. In my view, and in the view of many other financial scholars, forbearance for weakly capitalized or insolvent depository institutions can encourage them to take excessive risks when, at the same time, all (or virtually all) deposits are guaranteed by the insurance fund.

19. Goodwill treatment and capital ratio forbearance were, nonetheless, of real value to each of the individual institutions that benefited from it. Just as if the institutions were given cash, both regulatory promises provided an added cushion against regulatory takeover (because the larger the regulatory capital, the more losses an institution could bear without having its regulatory capital depleted and thus becoming subject to takeover). Likewise, both regulatory promises enabled the institutions that received them to maintain a larger asset base from which to derive earnings, or in other words, to profit from additional leverage.[20] The FHLBB could have provided the same benefit to institutions by giving cash rather than the regulatory promises. The key economic difference between cash and goodwill is that the institutions could directly realize earnings on the former (cash), but not the latter (goodwill).

20. A central question in this case – and in the other *Winstar* cases – is what is the *value* of the goodwill and any forbearances that the Bank Board provided? To answer that question it is useful to ask and answer another question: what is the amount of cash

---

[20] Leverage benefits a firm's equity investors because more borrowing leads to a higher rate of return on assets. For example, compare two hypothetical insured depository institutions that each earn a positive 1 percent on assets, but differ in the amount of shareholders' capital that has been supplied. In addition, assume that the institution that has a capital-to-asset ratio of 10 percent will also earn 10 percent on equity (1 percent divided by 0.10). The other institution with a capital-to-asset ratio of just 5 percent will, for the same return on assets (1 percent), earn 20 percent on equity (1 percent divided by 0.05). In short, with half the capital, the return on equity doubles – illustrating the value of leverage.

that the institution would have insisted upon at the time of its contract with the Bank Board that would have made it indifferent between taking the cash and accepting the regulatory promises? We cannot simply look up the answer in a list of market prices as we could if we wanted to know the price of a share of stock or a bushel of wheat, because goodwill was not purchased or sold in a conventional market. Thus , we must find another method for determining the value of goodwill and other capital forbearances.

21. There are a handful of facts that are useful in determining how much the regulatory promises given to First Annapolis were worth. First, goodwill has real economic value. I have already noted this point and will discuss it further in the report, but at this point, it is easy to illustrate. Suppose the investors in First Annapolis had been given two choices: they could (for the same price) have all the assets and liabilities of First Annapolis plus over $60 million in goodwill, <u>or</u> they could have the same assets and liabilities, but no goodwill. Which would they always choose? The transaction that included goodwill. Why? Because (a) utilizing goodwill allowed the thrift to be larger than what would otherwise be possible (i.e., it could leverage more) and (b) goodwill reduced regulatory risks, including the risk of closure. Accordingly, goodwill clearly is worth more than 0 cents on the dollar. Conversely in the same scenario, if the investors were offered a choice between $60 million in goodwill and $60 million in cash, any rational investor would take the cash -- because cash can be invested in earning assets.. Accordingly, goodwill must also be worth less than 100 cents on the dollar. The question addressed here is where between $0 and $1 does that value fall? The answer, as discussed below, is roughly 30 to 40 cents on the dollar.

22. Second, as noted above, goodwill and tangible capital (cash) share the attributes of allowing a thrift to leverage and reducing its risk of regulatory sanctions, including closure. They are different in that cash capital can be invested in earning assets, while goodwill cannot. As discussed below, we can determine how much First Annapolis could have earned by having cash capital to invest (about 9%), and we can determine how much it would have to pay in the market place to attract cash capital (about 16%). Using that information, we can "back out" the value that cash capital has, but goodwill lacks, leaving the value goodwill does have -- roughly 30 to 40 cents on the dollar. As discussed in more detail below, I have actually computed the value of goodwill by valuing a hypothetical security First Annapolis could have issued to the FSLIC in return for cash as of either August 1988 or December 1989.[21]

23. Certain of the Government's experts in the *Winstar* goodwill cases, including Professor Merton Miller, have argued that goodwill and other forbearances have only one benefit – the saving in transactions costs that institutions need not incur by issuing equity to replace them. As part of that argument, Professor Miller has asserted that thrifts gain no additional benefit from being allowed to operate with greater leverage.

24. This line of argument is irrelevant to the valuation issue before the court in this case (and in the other *Winstar* cases). As shown above, the regulatory promises made by the Bank Board provided, in two respects, the same benefits as cash: they added a cushion against regulatory takeover and permitted the institution to realize greater earnings from a larger asset base. To the extent that Professor Miller is denying that the

---

[21] This hypothetical security issuance is an illustration that is useful for determining the relevant cash flows. Other illustrations may also be appropriate.

regulatory promises had any benefits, he is implicitly contending that had the thrift been provided cash and then had it taken away, it would have suffered no harm. This is clearly erroneous on its face.

25. At the same time, the regulatory promises were not as valuable as cash because the institution could have earned money by investing cash, but could not do so with an "intangible asset" such as goodwill. That is the reason why the court must determine the cash-equivalent value of the regulatory promises rather than simply awarding the face amount of the goodwill and similar forbearances.

26. With all due respect to Professor Miller, his contentions about leverage in this particular case (and in the other *Winstar* cases) are misplaced. It is true, as Professor Miller demonstrated in a famous article in 1958, co-authored with Professor Franco Modigliani, that under certain restrictive assumptions, the benefit of added leverage will be precisely offset by the additional cost of capital as leverage is increased.[22] Professor Miller and other Government witnesses have used this result -- which has come to be known as one of the "M&M Propositions" – to conclude that the added leverage afforded by goodwill (and presumably by any capital ratio forbearance) was of little or no value to the thrifts involved. This conclusion errs in several respects, however.

27. Unlike other firms, the main liabilities of thrift institutions – deposits – are insured by an agency of the federal government up to $100,000 per account. Indeed, as of June 30, 1989, deposits in amounts less than $100,000 per account – or fully insured

[22] This is because as a firm borrows more relative to its assets, it increases its chances of bankruptcy if it becomes unprofitable for any period of time. Suppliers of capital understand this and thus, all other factors being equal, ordinarily require higher rates of return to compensate for the added financial risk. See Modigliani and Miller, "The Cost of Capital, Corporation Finance and the Theory of Investment," *The American Economic Review*, June 1958.

deposits – accounted for 80 percent of the liabilities of First Annapolis (Exhibit 10). Because of deposit insurance, thrift deposit interest rates are, at best, only imperfectly sensitive to the riskiness of thrift investments, business strategies or even capital positions. This means that, unlike other firms in the private sector whose liabilities are not insured by the federal government, thrift institutions (and banks) have a strong incentive to utilize leverage, and insured deposit liabilities in particular. As Alan Greenspan, the current Chairman of the Federal Reserve Board, has noted, because of the "safety net" guarantee provided by deposit insurance,

> "...bank creditors are willing to accept a lower risk premium on bank liabilities and capital than otherwise would be the case. *For fully insured deposits this risk premium is reduced essentially to zero.*" (emphasis added).[23]

As a result, "banks enjoy a lower total and marginal cost of funding, *including lower capital ratios*, than would otherwise be required by the market" (emphasis added).

28. The fact that the assumptions underlying the M&M propositions do not apply to thrifts has been pointed out by Professor Modigliani, the other author of the proposition. As he stated in an expert report filed in the California Federal Bank case,

> "[T]he M&M theorem assumes that debt and equity are perfect substitutes . . . . But that is not true in the present case, since regulation dictates that debt cannot be used to satisfy the tangible and core capital requirements and therefore could not be used to avoid the loss of assets."[24]

He continues that:

> "...even aside from regulation, the M&M Propositions are based on the critical assumption that individual investors can borrow at roughly the same interest rate as the firm, which is obviously

[23] Testimony of Chairman Alan Greenspan Before the Subcommittee on Finance and Hazardous Materials of the Committee of Commerce, U.S. House of Representatives, July 17, 1997.

[24] August 24, 1998 Expert Report of Professor Franco Modigliani, in the case of California Federal Bank, FSB v. United States, p. 4. Professor Modigliani did not testify at trial.

> untrue for thrift institutions . . . . The kind of low-cost debt that banks and thrifts borrow is most definitely not the kind of debt that the M&M propositions were designed to, or in fact do, address."[25]

Professor Modigliani filed his report because he believed, as a co-author of the M&M propositions, that they were "being misused by the government in a way that [he] regard[s] as damaging to the credibility of the theorem."[26]

29. Yet another reason why the M&M propositions are not relevant in the thrift goodwill cases is that the propositions only apply without qualification to a world free of market imperfections, which is not the world in which banks or thrifts operate. As two leading banking scholars explain:

> "It should be obvious that in a *perfect* market, a market with no frictions such as transactions costs, information costs, or indivisibilities, financial intermediaries would not exist [because] the rationale for the existence of financial intermediaries [is] market imperfections."[27] (emphasis in the original).

30. Professor Miller also disputes the claim that his propositions imply that capital structures should vary randomly across firms and industries.[28] Yet that is exactly what the authors of one of the leading corporate finance textbooks say the M&M propositions do indeed imply.[29] These textbook authors point out that, in the real world, capital structures do not vary randomly across industries, but instead that the combination of tax considerations, the costs of bankruptcy, and other complications – all assumed away in the M&M propositions – leads to distinct patterns of corporate financing: capital-intensive firms tend to be more highly levered than firms that rely more heavily on

---

[25] Ibid.

[26] Ibid, p. 1.

[27] Benston and Smith, "A Transactions Cost Approach to the Theory of Financial Intermediation," *The Journal of Finance*, May 1976, p. 217.

[28] Miller testimony, p. 3531.

[29] Brealey and Myers, Principles of Corporate Finance, Fifth Edition, p. 474.

intellectual capital (such as drug companies or high-tech firms).[30] As stated elsewhere in the text:

> "M[&]M's propositions depend on perfect capital markets . . . . We believe capital markets are generally well-functioning, but they are not 100 percent perfect 100 percent of the time. *Therefore, M[&]M must be wrong some times in some places.*"[31] (emphasis added).

Furthermore, as Berger, Herring and Szego point out,

> "banks [and by analogy, thrifts] systematically have the highest leverage of firms in any industry, *in sharp contrast to the implications of the M&M [leverage] proposition, which predicts that capital structures should vary randomly across firms and industries.*"[32] (emphasis added).

31. It is no just academic scholars who have maintained that, in the presence of deposit insurance, there is value to leverage. U.S. depository institutions – banks in particular – strongly urged U.S. policy makers during the 1980s not to raise U.S. bank capital standards unilaterally, but to set such standards only in conjunction with bank regulators from other countries. Otherwise, the banks believed they would be put at a competitive disadvantage relative to banks from other countries, because lower capital requirements would allow the foreign banks to take on more leverage. As one banker put it in Congressional testimony at the time:

> "While capital is important, it should be emphasized that American banks must compete with banks around the world. Some of these banks have no or low capital requirements. It is essential that the U.S. banking system is competitive in the world marketplace in order to finance U.S. exports and U.S. industry in general."[33]

---

[30] Ibid.
[31] Ibid, p. 462.
[32] Berger, Herring and Szego, "The Role of Capital in Financial Institutions," *Journal of Banking and Finance*, June 1995, p. 394.
[33] Haswell, Carleton R., Senior Vice President, Chemical Bank, Testimony before the Subcommittee on International Finance and Monetary Policy of the Senate Committee on Banking, Housing and Urban Affairs, 99th Congress, 2d Session (GPO, June 25, 1986), pp. 38-39.

Indeed, no less an authority than then Federal Reserve Board Chairman Paul Volcker earlier confirmed the existence of banks' concern about competitive parity on capital:

> "I would also note that – not as any kind of excuse, but as a fact – banks undoubtedly have felt under very heavy pressure internationally, *and carrying more capital is a cost.* From the viewpoint of an individual institution, if it feels its competitors, particularly in this business which is literally worldwide, have a competitive advantage, this is not an atmosphere in which it is easy to get capital."[34] (emphasis added).

Government witnesses may argue that the banks shouldn't have believed that capital ratios – and thus the amount of permissible leverage -- matters. However, the people who run banks (and by logical extension, thrift institutions, which have bank-like powers) certainly believe that leverage has value in their industry. Otherwise, they would not argue that competitors who are allowed by regulatory authorities to compete with more leverage are thereby given a competitive advantage.

32. In sum, the added leverage that the FHLBB allowed First Annapolis to take on without additional cost – in the form of goodwill and capital ratio forbearance – was of real value to the institution. Claims to the contrary ignore the evidence that insured depository institutions, like First Annapolis, operate with more leverage than other non-insured financial institutions, as well as other inconsistencies between the theoretical M&M propositions and the real world in which thrifts like First Annapolis operated.

---

[34] As cited in Reinicke, Wolfgang H., Global Public Policy: Governing without Government? (Brookings Institution, 1998), p. 107.

## IV. VALUE OF SUPERVISORY GOODWILL AND CAPITAL RATIO FORBEARANCE IN THIS CASE

33. A fundamental approach to financial valuation is "net present value" (NPV) or "discounted cash flow" (DCF) analysis. Under this approach, the net cash flows (i.e., the cash inflows minus the cash outflows) from a "project" are projected into the future, then discounted to a certain point in time (often the present, but in this case, August 1988 and August 1989) using an appropriate discount rate or "cost of capital." Discounting is a standard procedure analysts use to take into account the "time value of money" – the fact that $1 received in the future is not worth as much as $1 received today. Amounts to be received in the future are discounted to reflect the fact that the recipient could invest the smaller (discounted) amount today at an appropriate rate of return and realize the full dollar on the relevant future date. The resulting NPV represents the dollar value of a particular project, or set of cash flows, as of a particular point in time.

34. The NPV method can be applied to valuing the supervisory goodwill and capital ratio forbearance in this case by calculating the present value of the net cash flows required to replicate the economic effects on First Annapolis of the FHLB's agreement in August 1988. This is a measure of the value taken away by the breach and, therefore, is an appropriate measure of damages in this case. Alternatively, if damages are measured at the time of breach, the same calculation can be made as of August 1989. In either case, the NPV analysis includes three standard steps: project the net cash flows to be valued, determine an appropriate discount rate and discount the projected cash flows to present value Each of these steps is described separately below.

**A. Calculation of Net Cash Flows Required to Replicate the FHLB's Goodwill and Capital Ratio Promises**

35. The net cash flows required to replicate the FHLB's regulatory promises can be illustrated by assuming that the thrift issues a hypothetical security to the FSLIC in return for cash as of either August 1988 or 1989. The amount of cash provided exactly equals the face amount of intangible capital represented by the goodwill and capital ratio forbearance, thereby restoring the thrift to its non-breach capital position. However, this hypothetical cash infusion would not be equivalent to the damages in this case because, in order to replicate the salient aspects of the goodwill and capital ratio forbearance, it would have come with "strings attached." These strings would be the requirement that the principal amount be repaid gradually over time (consistent with the amortization schedules of the goodwill and capital ratio forbearances) and that the thrift pay dividends to the FSLIC on the outstanding balance, with these dividends equal to the amount First Annapolis could have expected to earn by investing the cash received from FSLIC.

36. The challenge in this case is to factor out of the value of tangible capital – the value of having cash to invest – thus leaving the value of having intangible capital, or goodwill and other forbearances. To summarize then: I first estimate the cash that First Annapolis initially would have received to replace the goodwill and capital ratio forbearance; I then calculate the schedule of principal and interest/dividends that would be paid to the FSLIC; and I conclude by subtracting the present value of those payments from the face amount of the security (or initial cash) supplied, to determine the minimum damages that First Annapolis suffered from losing the advantages of goodwill and the capital ratio forbearance.

1. Initial Cash Received

37. The amount of capital to be raised from the FSLIC to replace the goodwill would equal the unamortized balance of the goodwill as of either August 1988 or August 1989. As shown in Exhibits 4 and 7, this would have been \$62.9 and \$60.4 million, respectively.

38. First Annapolis also had a capital ratio forbearance agreement that allowed it to have a capital ratio of 1.5 percent of liabilities in mid-1988 and 1.8 percent in mid-1989, when the requirement for thrifts generally was approximately 3 percent. I have calculated the amount of capital that would have been needed to make up for the loss of the capital ratio forbearance as the difference between the true regulatory requirement (3.0% of liabilities) and First Annapolis's lower contractual requirements. As shown in Exhibits 5 and 8, this would have amounted to \$12.3 million in August 1988 and \$9.1 million in August 1989.

39. Although the FHLBB provided the intangible capital represented by the goodwill and capital ratio forbearance without the thrift incurring any transactions costs, objectively such costs are a normal part of raising tangible capital. Therefore, in order to calculate the cash flows necessary to compensate the thrift for taking away the goodwill and capital ratio forbearance, it is necessary to include the transactions costs that were avoided by receiving intangible capital rather than raising tangible capital. I have estimated this cost as equal to 5 percent of the total amount of replacement capital, which equates to \$3.8 million as of August 1988, the date of contract (Exhibits 4 and 5) and \$3.5 million as of August 1989, the date of breach (Exhibits 7 and 8). The percentage

used for transactions costs is based on the usual costs of issuing new equity capital, such as legal, accounting and underwriter fees.[35]

2. Cash outflows

40. One reason that permanent cash equity infusions by the FSLIC would have been more valuable to First Annapolis than the intangible assets they replaced is that they would have been permanent capital whereas, according to the agreement, the thrift had to amortize or reduce the goodwill and capital ratio forbearance over time. This wasting aspect of the intangible assets is easily replicated in cash flow terms by assuming that the hypothetical security issued to the FSLIC would require First Annapolis to make regular principal repayments over time in the exact amounts of the goodwill amortization and the phasing out of the capital ratio forbearance.[36] These are modeled in the exhibits as negative cash flows to First Annapolis, the present value of which offsets (to some extent) the amount of cash received in return for the security.

41. The hypothetical security would also require an additional term requiring First Annapolis to pay the FSLIC the thrift's expected earnings on the balance of the FSLIC cash it had not repaid as of each dividend date. For the purposes of my damages calculations, I assumed that this annual payment would equal the yield on 30-year U.S.

---

[35] July 24, 1996 "Report of the Advisory Committee on the Capital Formation and Regulatory Process," U.S. Securities and Exchange Commission, Appendix A; and Lee, Lochhead, Ritter and Zhao, "The Costs of Raising Capital," *The Journal of Financial Research*, Spring 1996 (see especially p. 62, which provides a cost estimate of 5 percent for seasoned public offerings in the range of $40-100 million, based on 1990-94 data).

[36] For example, as shown in Exhibits 4 and 7, First Annapolis would be required to make annual principal payments to the FSLIC of $2.5 million per year to replicate the amortization of the goodwill. As shown in Exhibits 5 and 8, the corresponding figures for the capital ratio forbearance are $2.5 million per year as of August 1988 and $2.3 million per year as of August 1989, based on the increasing contractual capital to liability ratios (decreasing amount of the forbearance).

Treasury securities.[37] The 30-year Treasury interest rate was 9.32 percent in August 1988 and 8.12 percent in August 1989.[38]

3. Summary: Net Cash Flows or Damages

42. Total damages equal the initial cash provided by the security minus the present value of the principal and dividend payments that the hypothetical security would need to carry in order to mimic the economic characteristics of the goodwill and capital ratio forbearances, plus the costs avoided in having to raise the capital.

### B. Appropriate discount rate or cost of capital to value the hypothetical cash flows.

43. The next step in a net present value analysis after estimating the net cash flows is to determine the appropriate discount rate, or cost of capital, for valuing these cash flows as of a single point in time. The appropriate discount rate is called the "cost" of capital because it is the rate of return that must be offered to investors to entice them to invest their capital in the project at hand. They will only do so if the project offers the same or a better return than alternative investments with the same risk. If investors could earn the same return elsewhere with less risk, they would obviously take their capital elsewhere. Thus, the appropriate discount rate for valuing a project, or stream of projected cash flows, is the appropriate opportunity cost of capital, or the expected rate of return on an investment of equivalent risk.

---

[37] Other rates, which are only slightly different, also might be appropriate – e.g., the marginal cost of deposits or other thrift debt (because they could be replaced with the issuance proceeds) or the marginal return on assets that a thrift may choose to invest in. For example, it is important to note that because Treasury securities are low risk and low yield, and they are a common thrift investment, they are often the marginal investment for thrifts.
[38] Source: Federal Reserve Form H.15.

44. In this case, the expected future cash flows from the issuance of the hypothetical security would be the principal and interest payments already discussed. These are not certain payments, however. Whether the FSLIC would receive them would depend on the risk of the thrift's operations from an equity-holder's perspective.

45. I have made this conclusion operational by using as a discount rate the expected rate of return on a preferred stock investment in the thrift. Like preferred stock dividends, the hypothetical security would require regular repayments to the investor, under most conditions. However, also like preferred stock, whether or not the payments are made depends on the overall fortunes of the thrift.[39]

46. To estimate the appropriate discount rate, I calculate the dividend rate on B-rated preferred stock. Typically, any S&P rating below BB+ is referred to as "non-investment grade" or "junk bond" debt. I use a B rating, which is at the lower end of this scale (but not as low as the C and D ratings) because First Annapolis was weakly capitalized both at the time of contract and the time of breach.

47. I estimate this rate by adding an estimated yield spread between perpetual preferred stock dividend yields and the interest rates on B-rated corporate bonds. The average yield on B-rated industrial bonds as of August 1988 was 12.37 percent. Adding to this a spread of 3.80 percent produces an estimated B-rated preferred dividend rate of 16.17 percent as of August 1988.[40] Using the same approach, I calculated a B-rated

---

[39] For example, if the thrift has a bad year, it may delay payment until the following year. If the thrift has several bad years, then payments may not be paid at all as the invested proceeds are liquidated to pay the thrift's creditors

[40] The calculated spreads between B-rated preferred stock and B-rated debt range from 3.8 to 11.2 percent, depending on the assumptions used. This credit spread is the lowest such spread calculated in the table that serves as the source for the number. Source: Crabbe, L.E., "Estimating the Credit-Risk Yield Premium for Preferred Stock " *Financial Analysts Journal*, Sep./Oct. 1996, Table 7, p. 54.

preferred dividend rate for August 1989 of 16.56 percent. These two rates are used as the discount rate in Exhibits 4, 5, 7 and 8, which depict calculations for the cost at the time of contract (August 1988) and time of breach (August 1989), respectively.

48. The preferred dividend rates that I have used are conservative, in that a much higher rate – which would produce higher damages -- could easily be justified. For example, if I had used the median credit spread on B-rated preferred from the article that I have used as a source, I would have calculated rates of 19.6 and 20.0 percent in August 1988 and 1989, respectively. Additional evidence that my 1989 rate is conservative is the fact that, at the time FIRREA was signed into law, thrift stocks were highly unpopular. This would have led investors in any preferred stock that First Annapolis would have issued to demand a higher rate than the one I use. For example, the court in the recently decided case involving LaSalle Talman Bank, F.S.B. noted that the dividend rate LaSalle Talman would have had to pay in December 1989 on preferred stock – had it decided to issue it – might well have been 25-30 percent, well above the rates I have used.[41]

**C. Discounting to present value**

49. The final step in the analysis is to use the discount rate to calculate the present value of the expected future principal and interest payments and subtract them from the cash inflows represented by the issuance of the hypothetical security and the avoided transactions cost. This procedure is shown in Exhibits 4, 5, 7 and 8 (col. [H]). The net result is the value of the goodwill and capital ratio forbearance taken away by the breach, which is an appropriate measure of damages in this case.

---

[41] Lasalle Tallman decision, p. 15.

50. Looking at the same numbers from a different perspective, if FSLIC had tried to sell the hypothetical security in the market at the time FSLIC received it, the agency could not have realized $75 million for it. This is because a third-party investor would have demanded a 16% rate of return – reflecting the risk of the cash flows – but only would have been paid a steadily amortizing sum at an annual dividend rate of 9 percent, but discounted at the 16% rate. The net present value of the payments would be $53 million (Exhibits). The difference between the $75 million and the $53 million fair market value, or $22 million, is, at once, the value of the regulatory promises, FSLIC's savings from giving those regulatory promises rather than the same economic value in cash or notes, and First Annapolis's cost or loss in taking (later abrogated) goodwill rather than cash having the same economic value.[42]

## V. CONCLUSIONS

51. As calculated in Exhibits 4 and 5, the value of First Annapolis's goodwill and capital ratio forbearance at the time of the conversion or contract, totals $25.8 million ($23.4 million for the supervisory goodwill plus $2.4 million for the capital ratio forbearance). Exhibits 7 and 8 report the results of a similar calculation for the value at the time of breach, and show a total discounted value of $27.9 million ($26.2 million for the supervisory goodwill plus $1.7 million for the capital ratio forbearance).

[42] For simplicity, this discussion ignored transactions costs. With transactions costs, the $22 million value cited above becomes $26 million.

52. I intend to update the opinions expressed in this report as new material information becomes available.

Date: October 29, 1999

Robert E. Litan

# EXHIBIT D

# TRANSCRIPT OF PROCEEDINGS

| | | |
|---|---|---|
| FIRST ANNAPOLIS BANCORP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Docket No.: 94-522C |
| and | ) | |
| | ) | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, | ) | |
| | ) | |
| Plaintiff/Intervenor, | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Deposition of: ROBERT E. LITAN

Pages: 1 through 126

Place: Washington, D.C.

Date: March 23, 2000

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

A On that day, yes.
Q Who does the FDIC represent in this case, the shareholders or the creditors?
MR. CARLISLE: I'll objection. It's asking for a legal conclusion.
BY MR. ANDERSON:
Q You can answer.
A You want my understanding?
Q Sure.
A My understanding is that the FDIC is in the shoes or is standing in the shoes of the institution, and it took over these institutions as a result of the demise of the RTC, and the RTC took over the institution when they shut it down.
Q Okay.
A So it's acting as the representative of the institution and it's the institution that lost the goodwill and the forbearances and so forth that I value.
Q Okay. And did the shareholders also use the value or the -- lose the goodwill and the forbearances over those -- the institutions?
A Well, to my knowledge, the FDIC represents the institution. The split between the -- if there is any -- between the FDIC and the shareholders is none of my business.

A The B rating.

Q Right. And the change in the discount rate is because of the change in the market of the B rating, correct?

A That is correct.

Q Not because of any change in First Annapolis's profitability or viability or anything of that nature?

A Right. And to the extent that First Annapolis looks worse at the time of breach than at the date of contract, in principle, the discount rate should go up rather than down. I didn't correct for that. I have a lower discount rate because I followed interest rates going down. So to that extent my numbers are conservative. They are probably understating what the goodwill is really worth.

MR. ANDERSON: I don't have any further questions.

MR. CARLISLE: Karen, did you get a chance to talk with Jim Tompert?

MS. KARAS: What did you ask? With Jim?

MR. CARLISLE: Yes.

MS. KARAS: I did. I talked to him briefly and he basically -- he wants to preserve his opportunity to do an oral deposition but he said, you know, the idea is that if we finished early today he wasn't going to, you know, hold anyone to coming back tomorrow even though -- I mean, basically, his understanding was that it would go for two

days.

He also did say that he might consider doing a deposition by written questions. Basically what he suggested is that he just get in touch with you tomorrow when he gets back into town and you guys can resolve the scheduling of it.

MR. CARLISLE: If you would, I would be out of town tomorrow, have him call me Monday.

MS. KARAS: Okay, that's fine. That's fine as long as we can, you know, preserve our right to do a oral deposition at this point .

MR. CARLISLE: Okay.

MS. KARAS: All right?

MR. ANDERSON: Thank you very much.

MR. KARAS: Okay, thanks.

MR. CARLISLE: Thank you, Karen.

MS. KARAS: Thanks. Bye-bye.

MR. CARLISLE: And of course we will not take any questions.

You want to read?

THE WITNESS: Oh, yes, I want to read this. Yes, because I found mistakes in the last one.

People have done depositions by telephone before, haven't they?

MR. CARLISLE: Oh, yes.

# EXHIBIT E

# In the United States Court of Federal Claims

(Filed: August 7, 1997)

| | |
|---|---|
| PLAINTIFFS IN ALL WINSTAR-RELATED CASES AT THE COURT, Plaintiffs, v. THE UNITED STATES, Defendant. | No. 90-8 C, et al. |

## PROCEDURAL ORDER NO. 2: DISCOVERY PLAN

Pursuant to Rules 1, 16, 77 and 77.1 of the Rules of the United States Court of Federal Claims, and to the Omnibus Case Management Order entered by the Court on September 18, 1996, ("Case Management Order" or "CMO"), the Court ORDERS as follows:

I. SCOPE OF THIS ORDER AND GENERAL PROVISIONS

A. This Discovery Plan governs discovery in all *Winstar*-related cases before the court except for (a) the *Glendale* and *Statesman* cases, and (b) the Priority Cases identified in Appendix D to the CMO. In the event that a case is removed from the list of Priority Cases it shall thereafter be subject to the terms of this Order.

B. The Discovery Plan is subject to the CMO, Procedural Order Number One ("Procedural Order No. 1"), the Master Order Concerning De Bene Esse Depositions, the Master Protective Order ("MPO"), and other procedural orders of the Managing Judge. The Rules of the Court of Federal

Claims ("RCFC") govern discovery, except where in conflict with the CMO, Procedural Order No. 1, the MPO, or this Discovery Plan.

C. No provision of the Discovery Plan shall be construed to permit any party any discovery not otherwise permitted by the CMO, Procedural Order No. 1, the MPO, other Orders of this Court, or the RCFC.

D. Except insofar as this plan expressly states that the parties may agree to modification of time limits, the parties may not stipulate to an extension or increase of any Discovery Plan deadline or limitation without approval of the Court.

II. DISCOVERY CONVENTIONS

The following conventions apply to all discovery, including the common discovery procedures set forth in Section III. Production of "Common Documents" shall be governed by the provisions of Paragraph II.B.2. of Procedural Order No. 1.

A. Conventions for Production of Documents

1. Document production shall take place in Washington, D.C. or where the documents are maintained in the ordinary course of business, at the option of the producing party. The parties shall confer prior to a document production to establish dates and procedures for selection, review, and duplication of documents. Where the documents subject to a production are indexed, the producing party may require the requesting party to select groups or boxes of documents for production and review using the most current available indices prior to the commencement of the production.

2. Document production pursuant to a document request shall commence within 30 days of receipt of such document request and be completed within 60 days of receipt of such

document request, absent agreement of the parties to extend the deadline for such production, with such agreement to extend not to be unreasonably withheld.

3. Within thirty days of the deadline for production of documents, the producing party shall provide the requesting party with a privilege log specifically identifying any documents that the producing party did not produce pursuant to an assertion of privilege, and the nature of the privilege claimed. Identification of privileged documents that were produced in accordance with the CMO, shall continue to be subject to the provisions of the MPO. A party need not produce or identify in the privilege log (a) any document prepared pursuant to the attorney-client or work-product privileges prepared in connection with the present litigation, excluding expert reports, which shall be produced in accordance with the provisions of Section V, or (b) any document prepared pursuant to the attorney-client or work-product privileges developed or generated in the context of an enforcement proceeding or investigation, including criminal investigations.

B. Conventions for Depositions

1. Absent agreement between the parties participating in a deposition and the deponent, a deposition shall take place within 75 miles of the deponent's residence or place of employment and ordinarily shall be conducted between 9:00 am. and 5:30 p.m. on successive weekdays, excluding holidays. Depositions may be attended only by a court reporter and persons authorized under the MPO to have access to confidential information absent agreement between the parties.

2. The deponent may be questioned by no more than one attorney for the defendant and one attorney for each plaintiff at a time. An objection by one counsel for a plaintiff shall be deemed an objection by all plaintiffs' counsel who are present at a deposition.

3. Where a deposition is recorded by videotape, the appearance or demeanor of attorneys and the deponent shall not be distorted through camera or sound-recording techniques. To the extent practicable, a videotaped deposition will be conducted in a neutral setting against a solid background, with only such lighting as is required for accurate video recording. Camera angle, lens setting, and field of view will be changed only as necessary to record the natural body movements of the deponent or to portray exhibits and materials used during the deposition. No part of a videotaped deposition shall be released or made available to any member of the press or general public unless authorized by the Court.

4. Where a party intends to examine a non-party witness pursuant to a subpoena duces tecum, the parties shall use their best efforts to arrange for inspection and/or copying of the documents at least one week before the scheduled deposition.

5. The deponent shall execute the original deposition transcript within 30 days after receiving it from the court reporter. The court reporter shall distribute an errata sheet to counsel for the noticing party and to all counsel who requested copies of the deposition transcript. If a deponent fails to execute the deposition transcript within thirty days of receipt, the parties may use the deposition transcript as if it had been executed. The parties may use a certified copy of a deposition transcript in lieu of the original for all purposes.

C. Other Conventions

When serving a discovery request or response, a party shall also provide a copy of the request or response, excluding any produced documents, in an electronic form suitable to the parties.

III. COMMON DISCOVERY

A. General Provisions

1. Common discovery from the Government is limited to the discovery of information and production of documents that are not solely specific to any case or institution. Defendant has no obligation to respond to common discovery requests which seek only case-specific information, and Defendant shall not withhold documents or information directly relevant to common discovery merely because such documents or information also reference specific institutions or specific transactions.

2. Case-specific discovery in individual *Winstar* cases may not duplicate discovery already provided by defendant to Plaintiffs Coordinating Committee ("Plaintiffs Committee") in connection with common discovery under Procedural Order No. 1 and this Discovery Plan.

3. The Plaintiffs Committee is responsible for preparing common discovery interrogatories and a list of individuals or organizations for common discovery depositions as provided in this Discovery Plan. The Plaintiffs Committee is responsible for serving defendant with common discovery requests and ensuring that all common discovery material produced by defendant is available to all *Winstar* plaintiffs.

4. Any disputes concerning discovery referenced in Section III.A., including disputes over whether a request calls for only case-specific information, shall be raised, in the first instance, with the Coordinating Committees and the FDIC. The Coordinating Committees and the FDIC will attempt to resolve any disputes. If they are unable to reach agreement, either Coordinating Committee or the FDIC may file a motion with the Discovery Judge.

B. <u>Common Discovery Interrogatories and Requests for Admissions</u>

The Plaintiffs Committee shall prepare common discovery interrogatories. The Plaintiffs Committee shall serve the common discovery interrogatories on or after September 8, 1997, and

defendant shall serve its responses on the Plaintiffs Committee and the FDIC within 45 days thereafter.

C. Common Discovery Depositions

1. The Plaintiffs Committee shall submit a list to identify individuals or organizations that it will depose for purposes of common discovery. The list may not include damages expert witnesses for the defendant except for, and only to the extent they are, fact witnesses. The Plaintiffs Committee shall serve defendant with its initial list of these individuals and organizations on or after September 8, 1997. For depositions of organizations pursuant to RCFC 30(b)(6), the Plaintiffs Committee also shall inform defendant of the topics on which examination is required.

2. Defendant shall submit a list to identify individuals that it will depose for purposes of common discovery. The list may not include damage witnesses for a plaintiff except for, and only to the extent they are, fact witnesses. Defendant shall serve the Plaintiffs Committee with its initial list of these individuals on or after September 8, 1997.

3. The Coordinating Committees shall attempt to agree on a schedule for all common discovery depositions, including an estimated length of time for each deposition. If the Coordinating Committees are unable to agree, notice of a common discovery deposition and an estimated length of time for that deposition must be served on the opposing party at least 14 days prior to the date of the deposition.

4. At least 7 days prior to the commencement of a common discovery deposition, the Plaintiffs Committee shall identify no more than three attorneys who shall conduct the initial questioning on behalf of all plaintiffs. Additional plaintiffs' counsel, including the FDIC, may question a deponent only after completion of the examination by counsel designated by the Plaintiffs

Committee and may not repeat any questions posed previously in that deposition except to the limited extent required to establish a predicate or framework for examination on a new topic or for more detailed examination of topics previously covered.

IV. <u>CASE-SPECIFIC DISCOVERY IN INDIVIDUAL WINSTAR CASES</u>

A. <u>Initial Disclosures</u>

1. Within 30 days after the commencement of Phase II case-specific discovery in a case, a party shall, without awaiting a discovery request, provide to the other parties, to the extent known, the name and title of any current or former employee, agent, or representative of a party likely to have discoverable information relevant to the allegations in the Complaint, and any Cross-Claim or Counterclaim, identifying the subject of the information.

2. The plaintiffs, including the FDIC, participating in each wave of discovery shall form a Plaintiffs Discovery Committee to attempt, to the extent practicable, to coordinate discovery from third parties and depositions of fact witnesses.

B. <u>Requests For Production of Documents</u>

1. Parties may submit case-specific requests for production of documents at any time after commencement of Phase II case-specific discovery in a case. Such document production requests shall be governed by the provisions of this Order, Procedural Order No. 1 and the MPO.

C. <u>Interrogatories, Requests for Admissions and Depositions</u>

1. In addition to the common discovery and case-specific document discovery discussed above, a party in an individual case may submit case-specific interrogatories and requests for admissions, and take case-specific depositions. Such interrogatories and requests for admission

may not be submitted, and such depositions may not be taken, until 90 days after commencement of Phase II case-specific discovery in a case.

2. A party shall respond to interrogatories and requests for admissions within 45 days of service.

3. Where a plaintiff seeks to depose an individual or organization already deposed during common discovery, the deposition will be focused on case-specific topics. The parties shall attempt to agree on a schedule for all case-specific depositions, including an estimated length of time for each deposition. If the parties are unable to agree, notice of a deposition and an estimated length of time for that deposition must be served on a party at least 14 days prior to the date of the deposition.

4. Disputes over scheduling the deposition of a witness for case-specific discovery shall be resolved by the Discovery Judge.

V. EXPERT WITNESSES

A. Discovery of Plaintiffs' Expert Witnesses

1. Thirty days after Phase II case-specific discovery is completed in a case under the provisions of Procedural Order No. 1, each plaintiff shall provide defendant with the identity of each witness that plaintiff intends to call at trial to offer opinion testimony pursuant to Rule 702 of the Federal Rules of Evidence. The identifying information shall include (a) the witnesses' qualifications, including a curriculum vitae; (b) a list of all publications authored by each witness within the last ten years; (c) the compensation to be paid for each witnesses' study and testimony; and (d) a listing of any other cases in which each witness has testified at trial or by deposition, declaration or affidavit within the preceding four years.

2. Absent agreement of the parties, each plaintiff shall deliver to defendant a final written report prepared and signed by each witness identified pursuant to Paragraph V.A.1. within 60 days after identification. The written report shall contain: (a) a complete statement of all opinions to be expressed by the witness and the basis and reasons for all opinions; (b) the data or other information considered by the witness in forming the opinions; and (c) all exhibits to be used as a summary of or in support for the opinions of the witness.

3. Absent agreement of the parties, defendant shall depose each of plaintiff's expert witnesses within 90 days after receiving the expert's final written report. Each plaintiff shall cooperate in scheduling such depositions and in making each expert witness available for deposition.

4. If a plaintiff fails to comply with the provisions of this section with regard to any expert witness it proposes to call, no opinion testimony will be received from that witness on behalf of that plaintiff.

B. Discovery of Defendant's Expert Witnesses

1. Thirty days after defendant receives a plaintiffs' expert reports pursuant to Paragraph V.A.2. defendant shall provide such plaintiff with the identity of each witness whom defendant intends to call at trial to offer opinion testimony pursuant to Rule 702 of the Federal Rules of Evidence. The identifying information shall include (a) the witnesses' qualifications, including a curriculum vitae; (b) a list of all publications authored by each witness within the last ten years; (c) the compensation to be paid for each witnesses' study and testimony; and (d) a listing of any other cases in which each witness has testified at trial or by deposition, declaration or affidavit within the preceding four years.

2. Absent agreement of the parties, defendant shall deliver to each plaintiff a final written report prepared and signed by each witness identified pursuant to Paragraph V.B.1. within

90 days after identification. The written report shall contain: (a) a complete statement of all opinions to be expressed by the witness and the basis and reasons for all opinions; (b) the data or other information considered by the witness in forming the opinions; and (c) all exhibits to be used as a summary of or in support for the opinions of the witness.

3. Absent agreement of the parties, a plaintiff shall depose defendant's expert witnesses within 60 days after receiving the experts' final report. The defendant shall cooperate in scheduling such depositions and in making each expert witness available for deposition.

4. If defendant fails to comply with the provisions of this section with regard to any expert witness it proposes to call, no opinion testimony will be received from that witness on behalf of defendant.

VI. DISCOVERY DISPUTES

A. All discovery motions shall hereafter be filed with and resolved by the Discovery Judge, unless otherwise directed by the Managing Judge, Issue Judge or the Motion Judge.

B. In the event that a discovery dispute (a) appears to raise generic issues that may be relevant to a significant number of *Winstar*-related cases, or (b) raises concerns regarding a risk of substantial and burdensome duplication of discovery among different cases, the parties shall bring (or the Discovery Judge may refer) the dispute to the attention of the Coordinating Committees and the FDIC to consider whether the dispute should be subject to "common issue" treatment.

LOREN A. SMITH
CHIEF JUDGE

CERTIFICATE OF FILING

I hereby certify that on December 6, 2006, a copy of the foregoing "DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S SUPPLEMENTAL EXPERT WITNESS IDENTIFICATION " was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard B. Evans