ENTERED DEC 2 0 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

IN THE U.S. COURT OF FEDERAL CLAIMS
NO (S) ____
Pltf's. Deft's. Ex. No. \ (No. of Sheets ____)
Joint Ct's. For ID. ✓ In Evid. ☐

FIRST ANNAPOLIS BANCORP, INC.,
Plaintiff

and

FEDERAL DEPOSIT INSURANCE CORPORATION, as Successor to the Rights of First Annapolis Savings Bank, F.S.B.,
Plaintiff-Intervenor

v.

UNITED STATES OF AMERICA,
Defendant

Civil Action No. 94-522-C

# EXPERT REPORT OF ROBERT E. LITAN

## I. INTRODUCTION AND SUMMARY OF OPINIONS

### A. Assignment

1. I have been asked by the Federal Deposit Insurance Corporation (FDIC) to provide an expert opinion on the damages recoverable by First Annapolis Savings Bank (First Annapolis or plaintiff) due to the Federal Government's (Government's or defendant's) breach of an August 1988 contract between First Annapolis and the Federal Home Loan Bank Board (FHLBB or Bank Board). This contract was formed as part of the recapitalization and conversion of the former First Federal Savings & Loan Association of Annapolis (First Federal) from a mutual- to a stock-financed thrift. Furthermore, I was asked to quantify damages at both the time of conversion and as of August 1989, when First Annapolis's contract was breached by the government, and

when the Financial Institutions Reform and Recovery Act (FIRREA) was signed into law.

**B. Compensation**

2. I am being compensated by the FDIC for my time at the rate of $325 per hour.

**C. Background and Qualifications**

3. I am the Vice President and Director of the Economic Studies Program at the Brookings Institution, Washington, D.C, where I also hold the Cabot Family Chair in Economics. Brookings is the nation's oldest independent public policy research organization. As Director, I supervise the economic research activities of approximately 20 senior scholars. I also continue to pursue my own research, which has covered a wide range of areas, including the economics of the financial services industry, the general performance of the economy, international economics, and various legal and economic issues. During the course of my career, I have authored, edited, and co-authored or co-edited, 20 books and over 100 articles in professional and popular journals, magazines and newspapers on these subjects. My background, as well as a list of my publications and testimony over the last four years, are included in my curriculum vitae, which is attached as Exhibit 1.

4. Several parts of my background may be of special relevance to the issues in this litigation. During 1990-91, I served as a member of a Congressionally authorized Commission on the Causes of the Savings and Loan Crisis. During 1996-97, I served as a consultant to the Department of Treasury on issues relating to financial modernization, and was the main author of the report issued by the Department on the subject, *American Finance in the 21st Century* (which was also subsequently published by the Brookings

Institution). I am currently a co-editor of the Brookings-Wharton Papers on Financial Services and an annual volume on finance in emerging markets (co-published with the World Bank and the International Monetary Fund).

5. As shown in Exhibit 1, I have training as both an economist and an attorney. I earned my B.S. in Economics from the Wharton School at the University of Pennsylvania, my M. Phil. and Ph.D. in Economics from Yale University and my J.D. from the Yale Law School. In addition to my research activities at Brookings, I have also served during the course of my career as an attorney, as a lecturer in banking law at the Yale Law School, and in several government positions, most recently as an Associate Director of the Office of Management and Budget (1995-96) and as Deputy Assistant Attorney General in the Antitrust Division of the Department of Justice (1993-95).

### D. Information Considered

6. In carrying out this assignment, I reviewed certain documents relating to this litigation, expert reports in related cases, and certain articles in professional journals and other sources, which are listed in Exhibit 2. In addition, I have been assisted in preparing this report and the analyses discussed herein by others working at my direction.

### E. Summary of Opinions

7. First Annapolis suffered economic harm due to the passage and promulgation of FIRREA, which curtailed several regulatory forbearances that the FHLBB had agreed to in its August 1988 contract with First Annapolis. These forbearances included the rights to (a) include the intangible assets created in the transaction, such as goodwill, in First Annapolis's regulatory capital calculations, and to amortize such intangible assets over 25 years, (b) meet a scheduled set of minimum regulatory capital requirements that were

below those generally applicable to thrift institutions and (c) invest in its "service corporations as approved by the Supervisory Agent up to the level permitted by Federal Regulation 545.74(d) for institutions meeting their minimum capital requirements."[1] As of the date of contract, the goodwill and capital ratio forbearances described in (a) and (b) above[2] allowed First Annapolis to avoid raising additional tangible capital in a total amount of $75.2 million ($62.9 million due to goodwill plus $12.3 million due to capital ratio forbearance). As of the date of breach, this amount was $69.5 million ($60.4 million due to goodwill and $9.1 million due to capital ratio forbearance). As described more fully below, these forbearances were valuable to the thrift because, among other things, for little or no cost they cushioned the institution against regulatory takeover and/or allowed the thrift to profit from a larger asset base than it otherwise would have been allowed to maintain.

8. At a minimum, the damages sustained by First Annapolis from the loss of these forbearances due to the breaching provisions of FIRREA were $25.8 million, as measured by the value of the regulatory promises at the time of its conversion in August 1988, and $27.9 million at the time the plaintiff's contract was breached in August 1989.

9. These calculations are based in part on several conservative assumptions about valuation and ignore any benefit First Annapolis gained from the third forbearance which allowed it to exceed the limitations on a thrift's direct investment in service corporations. To that extent, the above damages are understated. I also have reviewed the reports of

---

[1] July 14, 1988 FHLBB Voluntary Supervisory Conversion Memorandum, WOQ299 0041-0042; FHLBB Exam of July 11, 1988, p. 25, WOQ280 0197; and Revised Business Plan of October 21, 1987, pp. 4-5, WOT415 0520.

[2] From time-to-time, these two contractual agreements will be referred to below as the FHLB's "regulatory promises."

experts in other *Winstar* goodwill cases who have used a methodology similar to the one that I use here. Applying the valuation assumptions of several of those experts in this case would produce significantly higher damages than those I present here.[3] This underscores the conservatism of the methodology and assumptions that I have used to generate my estimates.

10. The damages amounts stated above reflect the present value of the goodwill and capital ratio forbearances as of either August 1988 or 1989. I calculate the value of these regulatory promises by determining the present value of the net cash flows to First Annapolis from issuing a hypothetical security to the FSLIC, such as preferred stock, in place of the goodwill and capital ratio forbearances, which were taken away by the FHLBB due to the breach. The terms of this hypothetical security, and hence its expected net cash flows, are set to exactly replicate the economically relevant aspects of the FHLBB's goodwill and capital ratio forbearance to the thrift. The present value of these net cash flows is the amount of cash that would make the plaintiff indifferent between accepting the regulatory promises or cash.

11. Issuing this hypothetical security would have put the institution in the same regulatory capital position that it would have occupied but-for the breach,[4] and restored to First Annapolis the profit opportunities it would have had in the absence of the breach. This would have made the thrift whole in an economic sense.[5] However, if FSLIC had

---

[3] See, e.g., September 22, 1998 *Expert Report of Christopher M. James, Ph.D.*, in the case of LaSalle Talman Bank, FSB v. United States; and December 16, 1998 *Supplemental Report of Stewart C. Myers* in the case of Bank United v. United States.

[4] At least one Government economic expert has agreed with this characterization. See December 9, 1996, *Affidavit of Richard S. Ruback in Support of Defendant's Motion in Limine Concerning Damages* in the case of Glendale Federal Bank, FSB v. United States of America, p. 7. It is my understanding that Dr. Ruback did not testify at trial.

[5] Dr. Ruback agreed that a cost of replacement capital approach to calculating damages would be appropriate. Ibid., p. 3. I calculated the cost of replacing the goodwill and capital ratio forbearance using

simply given First Annapolis roughly $75 million in cash in exchange for a security – equivalent to the face amount of the goodwill and initial capital ratio forbearance – that would have over-compensated the institution.[6] That is because the hypothetical security itself would have had a market value of only $53 million,[7] or the net present value of the principal and dividends that First Annapolis would have paid to it over the lifetime of the goodwill. The savings to the FSLIC from netting out the $53 million in payments from First Annapolis against the initial $75 million in cash paid to the thrift for the security (plus transactions cost) – or $22 million – is the value of the regulatory promises provided by the Bank Board.[8]

12. It is also my opinion that other Government witnesses have erred by claiming in cases similar to this one that the value of the goodwill and capital ratio forbearances consists only of the transaction costs of issuing securities that the thrift institution otherwise would have had to issue in order to comply with the relevant capital standards.[9] As described more fully below, these witnesses raise points about leverage that are irrelevant to the valuation of the regulatory promises in this case (and in other *Winstar* cases, for that matter). In any event, the government's witnesses make claims about leverage – specifically that it is of no value to a depository institution – that are incorrect. Specifically, they err in assuming that the marginal cost of capital to thrift institutions rises with leverage in an unconstrained fashion. This is largely true in unregulated

---

the methodology discussed by Dr. Ruback. The only significant difference in results between my method and his, other than differences due to certain case-specific issues, is that I have included transactions costs and he did not.

[6] For simplicity, this illustration ignores transactions costs.

[7] Sum of Present Value of 1989-2013 Cash Flows from Exhibit 4 plus Sum of Present Value of 1989-2013 Cash Flows from Exhibit 5.

[8] With avoided transactions costs, the FSLIC savings and, therefore, damages amount to $26 million.

[9] See, e.g., February 8, 1999, *Direct Testimony of Merton Miller* in California Federal Bank v. The United States, Washington, D.C., p. 3458.

markets but not in the case of thrifts, which have access to low-cost federally insured deposits. As a result, the added ability to leverage was of real value to First Annapolis, as it was to other institutions that benefited from similar contractual rights.

## II. RELEVANT FACTUAL BACKGROUND

### A. August 1988 Conversion Transaction

13. In July 1988, the FHLBB approved the conversion of the former First Federal from a mutual thrift to a stock chartered savings institution, which was then merged with a de novo institution, thereby forming First Annapolis Savings Bank.[10] As of June 30, 1988, just prior to the conversion, the thrift reported approximately $824.1 million in assets, and had a $25.5 million regulatory capital deficiency as of that date.[11] At the time of conversion, the institution's negative net worth was $62.9 million on a mark-to-market basis, which resulted in the thrift booking goodwill in that amount as a result of the transaction.[12] This supervisory goodwill was to be amortized on a straight line basis over a period of 25 years, as an asset on the First Annapolis balance sheet. The institution was also allowed to benefit from forbearance in meeting its regulatory capital requirements for a period of five years.[13] At the time of this contract, this capital ratio forbearance meant that First Annapolis was not required to raise over $12.3 million in additional capital.[14] In addition, as noted previously, First Annapolis was excused from the standard regulatory limits on its direct investment in its service corporation subsidiaries.[15]

[10] July 14, 1988 FHLBB Voluntary Supervisory Conversion Memorandum, WOQ299 0029-0043.
[11] June 30, 1988 Thrift Financial Report (TFR), Section A; July 11, 1988 FHLB Report of Examination, p. WOT315 0029.
[12] September, 30, 1988 TFR, Sections A and E; letter from Deloitte Haskins & Sells, WOQ280 1677-1680.
[13] July 14, 1988 FHLBB Voluntary Supervisory Conversion Memorandum, WOQ299 0032-0033.
[14] See, e.g., Exhibit 6. The capital ratio forbearances and the goodwill promise are often, collectively referred to below as the "regulatory promises."
[15] July 14, 1988 FHLBB Voluntary Supervisory Conversion Memorandum, WOQ299 0042.

14. As part of the supervisory conversion, a group of investors contributed $14.2 million in cash to the institution in return for common stock. This contribution was expected to result in net proceeds of $13.1 million.[16]

### B. Breach

15. On August 9, 1989, when FIRREA was enacted, it was clear that First Annapolis would be precluded – by virtue of the law – from counting most or all of approximately $60.4 million in remaining goodwill toward meeting its regulatory capital requirement, as the FHLBB originally had promised.[17] In addition, FIRREA abrogated the Bank Board's promise of capital ratio forbearance which, if FIRREA were fully operational in August 1989, meant that First Annapolis was short of meeting both its core and tangible regulatory capital requirements under FIRREA by approximately $60 million.[18]

## III. VALUE OF SUPERVISORY GOODWILL AND CAPITAL RATIO FORBEARANCE IN GENERAL

16. Prior to FIRREA, supervisory goodwill typically arose when the "purchase" method of accounting was applied to business combinations in which the market value of the tangible assets of an acquired thrift fell short of the market value of its liabilities. In contracts with the relevant entities, the regulatory authorities often allowed the resulting institution to treat the shortfall as "goodwill" or other "intangible assets", which could be counted in computing regulatory capital, but which had to be amortized (or gradually written down) over an agreed upon time period. In the present case, the Bank Board allowed First Annapolis to record goodwill and other intangible assets in connection with

---

[16] July 11, 1988 FHLBB Exam Report, WOT315 0030.
[17] See Exhibit 7.
[18] See Exhibit 11.

the supervised transaction and set the amortization period at 25 years, which was in excess of the period allowed by Generally Accepted Accounting Principles (GAAP).[19] The FHLBB also allowed some troubled thrifts, such as First Annapolis, a period of time following the transaction to meet otherwise applicable minimum capital requirements. These modified requirements typically were expressed as a minimum amount of shareholders' equity as a percentage of an institution's assets or liabilities.

17. The Bank Board allowed goodwill and granted regulatory forbearances during the 1980s because the insurance fund for thrift deposits, the Federal Savings and Loan Insurance Corporation or FSLIC, had insufficient funds to "resolve" the hundreds of insolvent thrifts that were still in business. This resolution process could have resulted either in the liquidation of insolvent institutions (with payoffs to depositors and sales of assets) or supervised/assisted mergers of the insolvent thrifts with healthier partners (by providing cash, notes or other valuable consideration to the acquiring institutions equivalent to the negative net worth of the insolvent thrifts). Instead, as noted previously, the Bank Board attempted to deal with the problems posed by insolvent institutions by allowing acquiring institutions to apply push-down accounting and thereby count the negative mark-to-market net worth in regulatory capital as goodwill and/or by granting weakly capitalized institutions forbearance from meeting minimum capital requirements for certain time periods.

18. The goodwill treatment and capital ratio forbearance policies were controversial at the time. Indeed, I and other financial policy analysts criticized the Congress and the

[19] GAAP is the generally recognized set of accounting guidelines established for businesses, including financial institutions. GAAP requires amortization of intangible assets over the period estimated to be benefited, but not to exceed 40 years (2000 Miller GAAP Guide, p. 23.05). In this case, the period benefited would likely have been less than the 25 years allowed in the contract.

Administration for not providing FSLIC with sufficient funds – and the Bank Board for not requesting such financing – so that the Board could have addressed the thrift problem without having to resort to forbearance. In my view, and in the view of many other financial scholars, forbearance for weakly capitalized or insolvent depository institutions can encourage them to take excessive risks when, at the same time, all (or virtually all) deposits are guaranteed by the insurance fund.

19. Goodwill treatment and capital ratio forbearance were, nonetheless, of real value to each of the individual institutions that benefited from it. Just as if the institutions were given cash, both regulatory promises provided an added cushion against regulatory takeover (because the larger the regulatory capital, the more losses an institution could bear without having its regulatory capital depleted and thus becoming subject to takeover). Likewise, both regulatory promises enabled the institutions that received them to maintain a larger asset base from which to derive earnings, or in other words, to profit from additional leverage.[20] The FHLBB could have provided the same benefit to institutions by giving cash rather than the regulatory promises. The key economic difference between cash and goodwill is that the institutions could directly realize earnings on the former (cash), but not the latter (goodwill).

20. A central question in this case – and in the other *Winstar* cases – is what is the *value* of the goodwill and any forbearances that the Bank Board provided? To answer that question it is useful to ask and answer another question: what is the amount of cash

[20] Leverage benefits a firm's equity investors because more borrowing leads to a higher rate of return on assets. For example, compare two hypothetical insured depository institutions that each earn a positive 1 percent on assets, but differ in the amount of shareholders' capital that has been supplied. In addition, assume that the institution that has a capital-to-asset ratio of 10 percent will also earn 10 percent on equity (1 percent divided by 0.10). The other institution with a capital-to-asset ratio of just 5 percent will, for the same return on assets (1 percent), earn 20 percent on equity (1 percent divided by 0.05). In short, with half the capital, the return on equity doubles – illustrating the value of leverage.

that the institution would have insisted upon at the time of its contract with the Bank Board that would have made it indifferent between taking the cash and accepting the regulatory promises? We cannot simply look up the answer in a list of market prices as we could if we wanted to know the price of a share of stock or a bushel of wheat, because goodwill was not purchased or sold in a conventional market. Thus , we must find another method for determining the value of goodwill and other capital forbearances.

21. There are a handful of facts that are useful in determining how much the regulatory promises given to First Annapolis were worth. First, goodwill has real economic value. I have already noted this point and will discuss it further in the report, but at this point, it is easy to illustrate. Suppose the investors in First Annapolis had been given two choices: they could (for the same price) have all the assets and liabilities of First Annapolis plus over $60 million in goodwill, <u>or</u> they could have the same assets and liabilities, but no goodwill. Which would they always choose? The transaction that included goodwill. Why? Because (a) utilizing goodwill allowed the thrift to be larger than what would otherwise be possible (i.e., it could leverage more) and (b) goodwill reduced regulatory risks, including the risk of closure. Accordingly, goodwill clearly is worth more than 0 cents on the dollar. Conversely in the same scenario, if the investors were offered a choice between $60 million in goodwill and $60 million in cash, any rational investor would take the cash -- because cash can be invested in earning assets.. Accordingly, goodwill must also be worth less than 100 cents on the dollar. The question addressed here is where between $0 and $1 does that value fall? The answer, as discussed below, is roughly 30 to 40 cents on the dollar.

22. Second, as noted above, goodwill and tangible capital (cash) share the attributes of allowing a thrift to leverage and reducing its risk of regulatory sanctions, including closure. They are different in that cash capital can be invested in earning assets, while goodwill cannot. As discussed below, we can determine how much First Annapolis could have earned by having cash capital to invest (about 9%), and we can determine how much it would have to pay in the market place to attract cash capital (about 16%). Using that information, we can "back out" the value that cash capital has, but goodwill lacks, leaving the value goodwill does have -- roughly 30 to 40 cents on the dollar. As discussed in more detail below, I have actually computed the value of goodwill by valuing a hypothetical security First Annapolis could have issued to the FSLIC in return for cash as of either August 1988 or December 1989.[21]

23. Certain of the Government's experts in the *Winstar* goodwill cases, including Professor Merton Miller, have argued that goodwill and other forbearances have only one benefit – the saving in transactions costs that institutions need not incur by issuing equity to replace them. As part of that argument, Professor Miller has asserted that thrifts gain no additional benefit from being allowed to operate with greater leverage.

24. This line of argument is irrelevant to the valuation issue before the court in this case (and in the other *Winstar* cases). As shown above, the regulatory promises made by the Bank Board provided, in two respects, the same benefits as cash: they added a cushion against regulatory takeover and permitted the institution to realize greater earnings from a larger asset base. To the extent that Professor Miller is denying that the

---

[21] This hypothetical security issuance is an illustration that is useful for determining the relevant cash flows. Other illustrations may also be appropriate.

regulatory promises had any benefits, he is implicitly contending that had the thrift been provided cash and then had it taken away, it would have suffered no harm. This is clearly erroneous on its face.

25. At the same time, the regulatory promises were not as valuable as cash because the institution could have earned money by investing cash, but could not do so with an "intangible asset" such as goodwill. That is the reason why the court must determine the cash-equivalent value of the regulatory promises rather than simply awarding the face amount of the goodwill and similar forbearances.

26. With all due respect to Professor Miller, his contentions about leverage in this particular case (and in the other *Winstar* cases) are misplaced. It is true, as Professor Miller demonstrated in a famous article in 1958, co-authored with Professor Franco Modigliani, that under certain restrictive assumptions, the benefit of added leverage will be precisely offset by the additional cost of capital as leverage is increased.[22] Professor Miller and other Government witnesses have used this result – which has come to be known as one of the "M&M Propositions" – to conclude that the added leverage afforded by goodwill (and presumably by any capital ratio forbearance) was of little or no value to the thrifts involved. This conclusion errs in several respects, however.

27. Unlike other firms, the main liabilities of thrift institutions – deposits – are insured by an agency of the federal government up to $100,000 per account. Indeed, as of June 30, 1989, deposits in amounts less than $100,000 per account – or fully insured

[22] This is because as a firm borrows more relative to its assets, it increases its chances of bankruptcy if it becomes unprofitable for any period of time. Suppliers of capital understand this and thus, all other factors being equal, ordinarily require higher rates of return to compensate for the added financial risk. See Modigliani and Miller, "The Cost of Capital, Corporation Finance and the Theory of Investment," *The American Economic Review*, June 1958.

deposits – accounted for 80 percent of the liabilities of First Annapolis (Exhibit 10). Because of deposit insurance, thrift deposit interest rates are, at best, only imperfectly sensitive to the riskiness of thrift investments, business strategies or even capital positions. This means that, unlike other firms in the private sector whose liabilities are not insured by the federal government, thrift institutions (and banks) have a strong incentive to utilize leverage, and insured deposit liabilities in particular. As Alan Greenspan, the current Chairman of the Federal Reserve Board, has noted, because of the "safety net" guarantee provided by deposit insurance,

> "...bank creditors are willing to accept a lower risk premium on bank liabilities and capital than otherwise would be the case. *For fully insured deposits this risk premium is reduced essentially to zero.*" (emphasis added).[23]

As a result, "banks enjoy a lower total and marginal cost of funding, *including lower capital ratios*, than would otherwise be required by the market" (emphasis added).

28. The fact that the assumptions underlying the M&M propositions do not apply to thrifts has been pointed out by Professor Modigliani, the other author of the proposition. As he stated in an expert report filed in the California Federal Bank case,

> "[T]he M&M theorem assumes that debt and equity are perfect substitutes . . . . But that is not true in the present case, since regulation dictates that debt cannot be used to satisfy the tangible and core capital requirements and therefore could not be used to avoid the loss of assets."[24]

He continues that:

> "...even aside from regulation, the M&M Propositions are based on the critical assumption that individual investors can borrow at roughly the same interest rate as the firm, which is obviously

---

[23] Testimony of Chairman Alan Greenspan Before the Subcommittee on Finance and Hazardous Materials of the Committee of Commerce, U.S. House of Representatives, July 17, 1997.

[24] August 24, 1998 Expert Report of Professor Franco Modigliani, in the case of California Federal Bank, FSB v. United States, p. 4. Professor Modigliani did not testify at trial.

> untrue for thrift institutions . . . . The kind of low-cost debt that banks and thrifts borrow is most definitely not the kind of debt that the M&M propositions were designed to, or in fact do, address."[25]

Professor Modigliani filed his report because he believed, as a co-author of the M&M propositions, that they were "being misused by the government in a way that [he] regard[s] as damaging to the credibility of the theorem."[26]

29. Yet another reason why the M&M propositions are not relevant in the thrift goodwill cases is that the propositions only apply without qualification to a world free of market imperfections, which is not the world in which banks or thrifts operate. As two leading banking scholars explain:

> "It should be obvious that in a *perfect* market, a market with no frictions such as transactions costs, information costs, or indivisibilities, financial intermediaries would not exist [because] the rationale for the existence of financial intermediaries [is] market imperfections."[27] (emphasis in the original).

30. Professor Miller also disputes the claim that his propositions imply that capital structures should vary randomly across firms and industries.[28] Yet that is exactly what the authors of one of the leading corporate finance textbooks say the M&M propositions do indeed imply.[29] These textbook authors point out that, in the real world, capital structures do not vary randomly across industries, but instead that the combination of tax considerations, the costs of bankruptcy, and other complications – all assumed away in the M&M propositions – leads to distinct patterns of corporate financing: capital-intensive firms tend to be more highly levered than firms that rely more heavily on

---

[25] Ibid.
[26] Ibid, p. 1.
[27] Benston and Smith, "A Transactions Cost Approach to the Theory of Financial Intermediation," *The Journal of Finance*, May 1976, p. 217.
[28] Miller testimony, p. 3531.
[29] Brealey and Myers, Principles of Corporate Finance, Fifth Edition, p. 474.

intellectual capital (such as drug companies or high-tech firms).[30] As stated elsewhere in the text:

> "M[&]M's propositions depend on perfect capital markets . . . . We believe capital markets are generally well-functioning, but they are not 100 percent perfect 100 percent of the time. *Therefore, M[&]M must be wrong some times in some places.*"[31] (emphasis added).

Furthermore, as Berger, Herring and Szego point out,

> "banks [and by analogy, thrifts] systematically have the highest leverage of firms in any industry, *in sharp contrast to the implications of the M&M [leverage] proposition, which predicts that capital structures should vary randomly across firms and industries.*"[32] (emphasis added).

31. It is not just academic scholars who have maintained that, in the presence of deposit insurance, there is value to leverage. U.S. depository institutions – banks in particular – strongly urged U.S. policy makers during the 1980s not to raise U.S. bank capital standards unilaterally, but to set such standards only in conjunction with bank regulators from other countries. Otherwise, the banks believed they would be put at a competitive disadvantage relative to banks from other countries, because lower capital requirements would allow the foreign banks to take on more leverage. As one banker put it in Congressional testimony at the time:

> "While capital is important, it should be emphasized that American banks must compete with banks around the world. Some of these banks have no or low capital requirements. It is essential that the U.S. banking system is competitive in the world marketplace in order to finance U.S. exports and U.S. industry in general."[33]

---

[30] Ibid.
[31] Ibid, p. 462.
[32] Berger, Herring and Szego, "The Role of Capital in Financial Institutions," *Journal of Banking and Finance*, June 1995, p. 394.
[33] Haswell, Carleton R., Senior Vice President, Chemical Bank, Testimony before the Subcommittee on International Finance and Monetary Policy of the Senate Committee on Banking, Housing and Urban Affairs, 99th Congress, 2d Session (GPO, June 25, 1986), pp. 38-39.

Indeed, no less an authority than then Federal Reserve Board Chairman Paul Volcker earlier confirmed the existence of banks' concern about competitive parity on capital:

> "I would also note that – not as any kind of excuse, but as a fact – banks undoubtedly have felt under very heavy pressure internationally, *and carrying more capital is a cost.* From the viewpoint of an individual institution, if it feels its competitors, particularly in this business which is literally worldwide, have a competitive advantage, this is not an atmosphere in which it is easy to get capital."[34] (emphasis added).

Government witnesses may argue that the banks shouldn't have believed that capital ratios – and thus the amount of permissible leverage -- matters. However, the people who run banks (and by logical extension, thrift institutions, which have bank-like powers) certainly believe that leverage has value in their industry. Otherwise, they would not argue that competitors who are allowed by regulatory authorities to compete with more leverage are thereby given a competitive advantage.

32. In sum, the added leverage that the FHLBB allowed First Annapolis to take on without additional cost – in the form of goodwill and capital ratio forbearance – was of real value to the institution. Claims to the contrary ignore the evidence that insured depository institutions, like First Annapolis, operate with more leverage than other non-insured financial institutions, as well as other inconsistencies between the theoretical M&M propositions and the real world in which thrifts like First Annapolis operated.

[34] As cited in Reinicke, Wolfgang H., Global Public Policy: Governing without Government? (Brookings Institution, 1998), p. 107.

## IV. VALUE OF SUPERVISORY GOODWILL AND CAPITAL RATIO FORBEARANCE IN THIS CASE

33. A fundamental approach to financial valuation is "net present value" (NPV) or "discounted cash flow" (DCF) analysis. Under this approach, the net cash flows (i.e., the cash inflows minus the cash outflows) from a "project" are projected into the future, then discounted to a certain point in time (often the present, but in this case, August 1988 and August 1989) using an appropriate discount rate or "cost of capital." Discounting is a standard procedure analysts use to take into account the "time value of money" – the fact that $1 received in the future is not worth as much as $1 received today. Amounts to be received in the future are discounted to reflect the fact that the recipient could invest the smaller (discounted) amount today at an appropriate rate of return and realize the full dollar on the relevant future date. The resulting NPV represents the dollar value of a particular project, or set of cash flows, as of a particular point in time.

34. The NPV method can be applied to valuing the supervisory goodwill and capital ratio forbearance in this case by calculating the present value of the net cash flows required to replicate the economic effects on First Annapolis of the FHLB's agreement in August 1988. This is a measure of the value taken away by the breach and, therefore, is an appropriate measure of damages in this case. Alternatively, if damages are measured at the time of breach, the same calculation can be made as of August 1989. In either case, the NPV analysis includes three standard steps: project the net cash flows to be valued, determine an appropriate discount rate and discount the projected cash flows to present value. Each of these steps is described separately below.

### A. Calculation of Net Cash Flows Required to Replicate the FHLB's Goodwill and Capital Ratio Promises

35. The net cash flows required to replicate the FHLB's regulatory promises can be illustrated by assuming that the thrift issues a hypothetical security to the FSLIC in return for cash as of either August 1988 or 1989. The amount of cash provided exactly equals the face amount of intangible capital represented by the goodwill and capital ratio forbearance, thereby restoring the thrift to its non-breach capital position. However, this hypothetical cash infusion would not be equivalent to the damages in this case because, in order to replicate the salient aspects of the goodwill and capital ratio forbearance, it would have come with "strings attached." These strings would be the requirement that the principal amount be repaid gradually over time (consistent with the amortization schedules of the goodwill and capital ratio forbearances) and that the thrift pay dividends to the FSLIC on the outstanding balance, with these dividends equal to the amount First Annapolis could have expected to earn by investing the cash received from FSLIC.

36. The challenge in this case is to factor out of the value of tangible capital – the value of having cash to invest – thus leaving the value of having intangible capital, or goodwill and other forbearances. To summarize then: I first estimate the cash that First Annapolis initially would have received to replace the goodwill and capital ratio forbearance; I then calculate the schedule of principal and interest/dividends that would be paid to the FSLIC; and I conclude by subtracting the present value of those payments from the face amount of the security (or initial cash) supplied, to determine the minimum damages that First Annapolis suffered from losing the advantages of goodwill and the capital ratio forbearance.

1. Initial Cash Received

37. The amount of capital to be raised from the FSLIC to replace the goodwill would equal the unamortized balance of the goodwill as of either August 1988 or August 1989. As shown in Exhibits 4 and 7, this would have been $62.9 and $60.4 million, respectively.

38. First Annapolis also had a capital ratio forbearance agreement that allowed it to have a capital ratio of 1.5 percent of liabilities in mid-1988 and 1.8 percent in mid-1989, when the requirement for thrifts generally was approximately 3 percent. I have calculated the amount of capital that would have been needed to make up for the loss of the capital ratio forbearance as the difference between the true regulatory requirement (3.0% of liabilities) and First Annapolis's lower contractual requirements. As shown in Exhibits 5 and 8, this would have amounted to $12.3 million in August 1988 and $9.1 million in August 1989.

39. Although the FHLBB provided the intangible capital represented by the goodwill and capital ratio forbearance without the thrift incurring any transactions costs, objectively such costs are a normal part of raising tangible capital. Therefore, in order to calculate the cash flows necessary to compensate the thrift for taking away the goodwill and capital ratio forbearance, it is necessary to include the transactions costs that were avoided by receiving intangible capital rather than raising tangible capital. I have estimated this cost as equal to 5 percent of the total amount of replacement capital, which equates to $3.8 million as of August 1988, the date of contract (Exhibits 4 and 5) and $3.5 million as of August 1989, the date of breach (Exhibits 7 and 8). The percentage

used for transactions costs is based on the usual costs of issuing new equity capital, such as legal, accounting and underwriter fees.[35]

2. Cash outflows

40. One reason that permanent cash equity infusions by the FSLIC would have been more valuable to First Annapolis than the intangible assets they replaced is that they would have been permanent capital whereas, according to the agreement, the thrift had to amortize or reduce the goodwill and capital ratio forbearance over time. This wasting aspect of the intangible assets is easily replicated in cash flow terms by assuming that the hypothetical security issued to the FSLIC would require First Annapolis to make regular principal repayments over time in the exact amounts of the goodwill amortization and the phasing out of the capital ratio forbearance.[36] These are modeled in the exhibits as negative cash flows to First Annapolis, the present value of which offsets (to some extent) the amount of cash received in return for the security.

41. The hypothetical security would also require an additional term requiring First Annapolis to pay the FSLIC the thrift's expected earnings on the balance of the FSLIC cash it had not repaid as of each dividend date. For the purposes of my damages calculations, I assumed that this annual payment would equal the yield on 30-year U.S.

---

[35] July 24, 1996 "Report of the Advisory Committee on the Capital Formation and Regulatory Process," U.S. Securities and Exchange Commission, Appendix A; and Lee, Lochhead, Ritter and Zhao, "The Costs of Raising Capital," *The Journal of Financial Research*, Spring 1996 (see especially p. 62, which provides a cost estimate of 5 percent for seasoned public offerings in the range of $40-100 million, based on 1990-94 data).

[36] For example, as shown in Exhibits 4 and 7, First Annapolis would be required to make annual principal payments to the FSLIC of $2.5 million per year to replicate the amortization of the goodwill. As shown in Exhibits 5 and 8, the corresponding figures for the capital ratio forbearance are $2.5 million per year as of August 1988 and $2.3 million per year as of August 1989, based on the increasing contractual capital to liability ratios (decreasing amount of the forbearance).

Treasury securities.[37] The 30-year Treasury interest rate was 9.32 percent in August 1988 and 8.12 percent in August 1989.[38]

3. Summary: Net Cash Flows or Damages

42. Total damages equal the initial cash provided by the security minus the present value of the principal and dividend payments that the hypothetical security would need to carry in order to mimic the economic characteristics of the goodwill and capital ratio forbearances, plus the costs avoided in having to raise the capital.

**B. Appropriate discount rate or cost of capital to value the hypothetical cash flows.**

43. The next step in a net present value analysis after estimating the net cash flows is to determine the appropriate discount rate, or cost of capital, for valuing these cash flows as of a single point in time. The appropriate discount rate is called the "cost" of capital because it is the rate of return that must be offered to investors to entice them to invest their capital in the project at hand. They will only do so if the project offers the same or a better return than alternative investments with the same risk. If investors could earn the same return elsewhere with less risk, they would obviously take their capital elsewhere. Thus, the appropriate discount rate for valuing a project, or stream of projected cash flows, is the appropriate opportunity cost of capital, or the expected rate of return on an investment of equivalent risk.

---

[37] Other rates, which are only slightly different, also might be appropriate – e.g., the marginal cost of deposits or other thrift debt (because they could be replaced with the issuance proceeds) or the marginal return on assets that a thrift may choose to invest in. For example, it is important to note that because Treasury securities are low risk and low yield, and they are a common thrift investment, they are often the marginal investment for thrifts.
[38] Source: Federal Reserve Form H.15.

44. In this case, the expected future cash flows from the issuance of the hypothetical security would be the principal and interest payments already discussed. These are not certain payments, however. Whether the FSLIC would receive them would depend on the risk of the thrift's operations from an equity-holder's perspective.

45. I have made this conclusion operational by using as a discount rate the expected rate of return on a preferred stock investment in the thrift. Like preferred stock dividends, the hypothetical security would require regular repayments to the investor, under most conditions. However, also like preferred stock, whether or not the payments are made depends on the overall fortunes of the thrift.[39]

46. To estimate the appropriate discount rate, I calculate the dividend rate on B-rated preferred stock. Typically, any S&P rating below BB+ is referred to as "non-investment grade" or "junk bond" debt. I use a B rating, which is at the lower end of this scale (but not as low as the C and D ratings) because First Annapolis was weakly capitalized both at the time of contract and the time of breach.

47. I estimate this rate by adding an estimated yield spread between perpetual preferred stock dividend yields and the interest rates on B-rated corporate bonds. The average yield on B-rated industrial bonds as of August 1988 was 12.37 percent. Adding to this a spread of 3.80 percent produces an estimated B-rated preferred dividend rate of 16.17 percent as of August 1988.[40] Using the same approach, I calculated a B-rated

---

[39] For example, if the thrift has a bad year, it may delay payment until the following year. If the thrift has several bad years, then payments may not be paid at all as the invested proceeds are liquidated to pay the thrift's creditors.

[40] The calculated spreads between B-rated preferred stock and B-rated debt range from 3.8 to 11.2 percent, depending on the assumptions used. This credit spread is the lowest such spread calculated in the table that serves as the source for the number. Source: Crabbe, L.E., "Estimating the Credit-Risk Yield Premium for Preferred Stock," *Financial Analysts Journal*, Sep./Oct. 1996, Table 7, p. 54.

preferred dividend rate for August 1989 of 16.56 percent. These two rates are used as the discount rate in Exhibits 4, 5, 7 and 8, which depict calculations for the cost at the time of contract (August 1988) and time of breach (August 1989), respectively.

48. The preferred dividend rates that I have used are conservative, in that a much higher rate – which would produce higher damages -- could easily be justified. For example, if I had used the median credit spread on B-rated preferred from the article that I have used as a source, I would have calculated rates of 19.6 and 20.0 percent in August 1988 and 1989, respectively. Additional evidence that my 1989 rate is conservative is the fact that, at the time FIRREA was signed into law, thrift stocks were highly unpopular. This would have led investors in any preferred stock that First Annapolis would have issued to demand a higher rate than the one I use. For example, the court in the recently decided case involving LaSalle Talman Bank, F.S.B. noted that the dividend rate LaSalle Talman would have had to pay in December 1989 on preferred stock – had it decided to issue it – might well have been 25-30 percent, well above the rates I have used.[41]

### C. Discounting to present value

49. The final step in the analysis is to use the discount rate to calculate the present value of the expected future principal and interest payments and subtract them from the cash inflows represented by the issuance of the hypothetical security and the avoided transactions cost. This procedure is shown in Exhibits 4, 5, 7 and 8 (col. [H]). The net result is the value of the goodwill and capital ratio forbearance taken away by the breach, which is an appropriate measure of damages in this case.

---

[41] Lasalle Tallman decision, p. 15.

50. Looking at the same numbers from a different perspective, if FSLIC had tried to sell the hypothetical security in the market at the time FSLIC received it, the agency could not have realized $75 million for it. This is because a third-party investor would have demanded a 16% rate of return – reflecting the risk of the cash flows – but only would have been paid a steadily amortizing sum at an annual dividend rate of 9 percent, but discounted at the 16% rate. The net present value of the payments would be $53 million (Exhibits). The difference between the $75 million and the $53 million fair market value, or $22 million, is, at once, the value of the regulatory promises, FSLIC's savings from giving those regulatory promises rather than the same economic value in cash or notes, and First Annapolis's cost or loss in taking (later abrogated) goodwill rather than cash having the same economic value.[42]

## V. CONCLUSIONS

51. As calculated in Exhibits 4 and 5, the value of First Annapolis's goodwill and capital ratio forbearance at the time of the conversion or contract, totals $25.8 million ($23.4 million for the supervisory goodwill plus $2.4 million for the capital ratio forbearance). Exhibits 7 and 8 report the results of a similar calculation for the value at the time of breach, and show a total discounted value of $27.9 million ($26.2 million for the supervisory goodwill plus $1.7 million for the capital ratio forbearance).

[42] For simplicity, this discussion ignored transactions costs. With transactions costs, the $22 million value cited above becomes $26 million.

52. I intend to update the opinions expressed in this report as new material information becomes available.

Date: October 29, 1999

Robert E. Litan

**EXHIBIT 1**

CURRICULUM VITAE

Robert E. Litan

Home Address

3 Golden Crest Court
Rockville, Maryland 20854
301/424-3722

Office Address

The Brookings Institution
1775 Massachusetts Ave, N.W.
Washington, D.C. 20036
Tel: 202/797-6120
Fax: 202/797-6181 or 4362
E-mail: rlitan@brook.edu

Employment

1996- Vice President and Director, Economic Studies Program and Cabot Family Chair in Economics, The Brookings Institution

Responsible for supervising the Institution=s economic research program, its 22 scholars and support staff, and for administering and raising funds for a $5.5 million annual research program; continuing research on financial institutions, trade, and legal and economic issues relating to the information revolution

Co-Editor, The Brookings-Wharton Papers on Financial Services (1997 -)

Co-Editor, The World Bank-Brookings Papers on Emerging Markets Finance (1998 - )

Co-Director, AEI-Brookings Joint Center on Regulatory Studies (1998 - )

1996- Special Consultant, Economists, Inc. (Economic consulting firm)

1995-96 Associate Director, U.S. Office of Management Budget -- Responsible for budgets and clearance of policy for five cabinet agencies (Commerce, HUD, Justice, Treasury and Transportation) and most of the independent agencies of the U.S. Government (requiring supervision of approximately 70 professional staff)

| | |
|---|---|
| 1993-95 | Deputy Assistant Attorney General, Antitrust Division, Department of Justice -- Supervision of approximately 150 attorneys and paralegals in non -merger civil antitrust investigations; Developing DOJ policy on regulatory issues; Active participation in the development of the Administration's policies on telecommunications, trade and various regulatory issues |
| 1984-1993 | Senior Fellow, Economic Studies Program; Director (1987-92), Center for Economic Progress and Employment; and Director (1992-93), Center for Law, Economics, and Politics, The Brookings Institution, Washington, D.C., -- Specialist in financial institutions; international trade; and regulatory policy. |
| 1982-90 | Powell, Goldstein, Frazer & Murphy, law firm, Washington, D.C.: Senior Associate (1982-84); Partner (1984); Of Counsel (1984-90) -- Attorney specializing in administrative law, antitrust, banking, energy, international trade, and legal issues generally involving law and economics. |
| 1979-1982 | Arnold & Porter, law firm, Washington, D.C., Associate. |
| 1977-1979 | President's Council of Economic Advisers, Executive Office of the President, Washington, D.C. Regulatory and Energy Specialist; principal staff for the Regulatory Analysis Review Group; handled selected legal issues for the Council. |
| 1974-1976 | Peabody, Rivlin, Lambert & Meyers - summer legal associate. |
| 1972-1973 | The Brookings Institution, Washington, D.C. - research assistant to Dr. Arthur M. Okun. |
| 1970-1971 | Peat, Marwick, Mitchell & Co., Wichita, Kansas - two summers as an intern tax accountant. |

Teaching

| | |
|---|---|
| 1993 | Taught principles of Western banking to Russian bankers (under a Treasury Department grant administered by KPMG Peat Marwick) |
| 1989-90<br>1986-87 | Yale Law School - Visiting Lecturer in Law (Banking). |
| 1976-1977 | Yale University - Lecturer in Economics (taught Economics and Law; and Elementary Macroeconomics; both large lecture courses). |

| | |
|---|---|
| 1975-1976 | Yale University - Instructor in Economics (taught two sections of Elementary Micro and Macroeconomics). |

Consultancies

| | |
|---|---|
| 1998 | Main Writer for the Report of the President=s Commission to Study Capital Budgeting |
| 1996-97 | U.S. Department of the Treasury (prepared Congressionally mandated report on the future of the financial services industry and its regulation) |
| 1993 | Federal Home Loan Bank of San Francisco (prepared report on the future role of the Federal Home Loan Bank System) |
| 1990 | Financial Institutions Subcommittee of the House Banking Committee (prepared report on the condition of the Federal Deposit Insurance Corporation with James R. Barth and R. Dan Brumbaugh, Jr.). |
| 1987-92 | Oxford Analytica (British News Service) -- regular contributor of reports on the U.S. banking and thrift industries. |
| 1987 | Senate Judiciary Committee -- organized hearings for the Chairman on antitrust and competitiveness issues, authored report on antitrust policy for the Committee. |
| 1985-89 | Institute for Liberty and Democracy, Lima Peru - legal and economic consulting on deregulation matters generally, including financial institutions issues. |
| 1976-77 | National Academy of Sciences - consultant to the Modeling Resources Group of the Committee on Nuclear and Alternative Energy Systems (CONAES). |

Testimony in the Past Four Years

*Snider v. State Farm Mutual Automobile Insurance Co.*, Case No. 97-1-114, First Judicial Circuit, Illinois State Court.

Advisory Boards or Boards of Directors

| | |
|---|---|
| 1997-98 | Chairman, National Research Council Committee on Disaster Loss Estimation (And co-author of The Impacts of Natural Disasters: A Framework for Loss Estimation). |

| | |
|---|---|
| 1996- | Member, Shadow Financial Regulatory Committee; Co-Chairman as of May 1998 |
| 1996 | Department of Defense, Defense Sciences Board, Member of Task Force on Vertical Integration in the Defense Industry |
| 1993-94 | Department of Defense, Defense Sciences Board, Member of Task Force on Mergers within the Defense Industry |
| 1991-93 | Chairman, Editorial Advisory Board, Public Policy Studies Series for the Insurance Information Institute. |
| 1991-92 | Presidential-Congressional Commission on the Causes of the Savings and Loan Crisis (Member). |
| 1988-90 | Conference Board of Canada Financial Institutions Group (Advisory Board). |
| 1988-90 | Foundation for Change (Board of Directors). |
| 1988-89 | Member of Advisory Board to Office of Technology Assessment Study on Technological Change in Banking and Securities Markets. |

Education

| | |
|---|---|
| 1987 | Yale University: Ph.D. in Economics. Dissertation: An Economic Inquiry Into the Expansion of Bank Powers. (Dissertation Committee: Professors Richard Levin, Merton Peck and James Tobin). |
| 1977 | Yale University: J.D. (1977), Felix S. Cohen Prize for best essay in legal philosophy; Extra-curricular Activities: Yale Legislative Services, Barrister's Union; Employment, Consulting and Teaching 1973-1977 (see above). |
| 1976 | Yale University: M. Phil. in Economics, Distinction in Ph.D. oral examinations (international trade and finance, industrial organization). |
| 1968-72 | Wharton School of Finance and Commerce, University of Pennsylvania: B.S. Economics, summa cum laude (Valedictorian); Major - Finance; Minors - Accounting, Statistics and Mathematics. |

Honors and Awards: Thouron Fellowship for Graduate Study in Great Britain (which was not used); Royal Society of Arts Silver Medal (National award given to selected outstanding graduating seniors in the U.S.); Class of 1946 Award (given by the

University to an outstanding graduating senior); William D. Gordon Award (given by the Wharton School to the graduating senior with the highest scholastic average); Beta Gamma Sigma Award (given by the Wharton School to the graduating senior with the highest scholastic average); Albert A. Berg Scholarship Award, 1971, 1972, (given each year by the Wharton Faculty to an outstanding upperclassman in the Wharton School).

Extra-curricular Activities: Chairman, Activities Council (major student government body); Executive Editor of Wharton Account (major undergraduate business magazine); Vice-President of Debate Council; 2 years in intercollegiate debate; President, Beta Gamma Sigma; Friars Senior Honor Society; Beta Alpha Psi; Employment in Electrical Engineering Library (4 years).

Publications

Books

None of Your Business: World Data Flows, Electronic Commerce, and The European Privacy Directive (with Peter Swire), Brookings (1998)

Globaphobia: Confronting Fears About Open Trade (with Gary Burtless, Robert Lawrence and Robert Shapiro), Brookings, Progressive Policy Institute, and the Twentieth Century Fund, 1998

American Finance for the 21st Century (with the assistance of Jonathan Rauch), U.S. Department of the Treasury (1997) and Brookings (1998)

Going Digital! (with William Niskanen), Brookings Institution Press and the Cato Institute (1998)

Footing The Bill For Superfund Cleanups (with Don Fullerton, Paul Portney and Kate Probst), Brookings Institution and Resources for the Future, 1995

Financial Regulation in the Global Economy (with Richard Herring), Brookings Institution, 1994

Growth With Equity: Economic Policymaking For The Next Century (with Martin Baily and Gary Burtless), Brookings Institution, 1993.

Physical Damage and Human Loss: The Economic Impact of Earthquake Mitigation Measures (with Frederick Krimgold, Karen Clark, and Jayant Khadilkar), Insurance Information Institute, 1992).

The Future of American Banking (with James Barth and R. Dan Brumbaugh, Jr.), W. E. Sharpe, 1991.

The Revolution in U.S. Finance, Brookings Institution, 1991.

What Should Banks Do?, Brookings Institution, 1987.

Saving Free Trade: A Pragmatic Approach (with Robert Z. Lawrence), Brookings Institution, 1986.

Reforming Federal Regulation (with William D. Nordhaus), Yale University Press, 1983.

Books Edited

Finance in Emerging Markets: The Crisis in Emerging Markets (with Michael Pomerleano and Alison Harwood), Brookings Institution, 1999.

Assessing Bank Reform: FDICIA One Year Later (with George G. Kaufman), Brookings Institution, 1993.

Verdict: Assessing The Civil Jury System, Brookings Institution, 1993.

Down in the Dumps: Administration of the Unfair Trade Laws (with Richard Boltuck), Brookings Institution, 1991.

The Liability Maze: The Impact of Liability Law on Safety and Innovation, co-editor (with Peter Huber), Brookings Institution, 1991.

American Living Standards: Threats and Challenges,(co-editor with Robert Z. Lawrence and Charles L. Schultze and author of two chapters), Brookings Institution, 1988.

Liability: Perspectives and Policy, (co-editor and co-author of two chapters, with Clifford M. Winston), Brookings Institution, 1988.

Reports

Report of the President=s Commission to Study Capital Budgeting (Main Writer)

Improving Regulatory Accountability (with Robert Hahn), AEI and Brookings, 1997

An Agenda for Federal Regulatory Reform (with Robert Crandall, Christopher DeMuth, Robert Hahn, Pietro Nivola, Paul Portney), AEI and Brookings, 1997

Options for Reinforcing and Expanding the Role of the Federal Home Loan Bank System, Financing Affordable Housing in America Conference (sponsored by Affordable Housing Advisory Council, Federal Home Loan Bank of San Francisco), Washington, D.C., April 20, 1993.

The Economics of Credit Cards, 1993 (sponsored by MasterCard and Visa).

Charting A Future For The Civil Jury System, Brookings Institution, 1992 (with G. Marc Whitehead)

Consumers, Competition and Choice: The Impact of Price Controls on the Credit Card Industry, March 1992 (prepared for MasterCard International).

Back To Basics: Solvency As the Primary Objective Of Insurance Industry Regulation, for State Farm Insurance Companies, October 1991.

Protecting Taxpayers From Deposit Insurance: Bank Capital, Consumers Union, May 1991.

A National Earthquake Mitigation and Insurance Plan: Response to Market Failures, The Earthquake Project, April 1991.

The Banking Industry In Turmoil: A Report to the Financial Institutions Subcommittee on the Condition of the U.S. Banking Industry and the Federal Deposit Insurance Corporation, U.S. Government Printing Office, December 1990 (with James Barth and R. Dan Brumbaugh, Jr., revised later into a book; see The Future of American Banking, above).

Justice For All: Reducing Costs and Delay In Civil Litigation, Brookings Institution, 1989 (with Mark Gitenstein).

A Blueprint for Restructuring America's Financial Institutions, Brookings Institution, 1989 (with George Benston, R. Dan Brumbaugh, Jack Guttentag, Richard Herring, George Kaufman, and Kenneth Scott).

Energy Modeling for an Uncertain Future, National Academy of Sciences, 1978 (with Tjalling C. Koopmans).

Articles

"Does The IMF Have A Future? What Should It Be?", in William C. Hunter, et al, eds., The Asian Financial Crisis: Origins, Implications, And Solutions (Federal Reserve Bank of Chicago and the International Monetary Fund, 1999)

"The Crisis in Emerging Markets," Brookings Conference Report, May 1999 (with Alison Harwood and Michael Pomerleano)

"Expanding The Winner's Circle," Blueprint, Winter 1999.

"Unleashing Telecommunications: The Case for True Competition," Brookings Policy Brief, November 1998, No. 39 (with Roger G. Noll)

"Preventing Bank Crises: Lessons from Bank Failures in the United States," (With James R. Barth), forthcoming in a volume to be edited by George Kaufman)

"The Asian Financial Crisis," Looking Ahead (National Planning Association), Vol. XX, No. 2, 1998

"Treading Carefully: A Prudent Agenda for Democrats in an Age of Budget Surpluses," The New Democrat, May/June 1998

"Globalization and Its Discontents," Foreign Affairs, May/June 1998 (With Richard Haass)

"Reducing Anxiety About Trade Agreements," in Jeffrey J. Schott, ed., Restarting Fast Track (Institute for International Economics, April 1998)

"Institutions and Policies for Maintaining Financial Stability," in Maintaining Financial Stability in a Global Economy, Federal Reserve Bank of Kansas City (Jackson Hole Symposium Conference)

"A Three-Step Remedy for Asia's Financial Flu," Brookings Policy Brief, February 1998, No. 30 (reprinted in ASLI Review, Vol. 5, 1998)

"Avoiding a Showdown Over EU Privacy Laws," Brookings Policy Brief, February 1998, No. 29 (with Peter P. Swire)

"The Big Bang: An Ambivalent Japan Deregulates Its Financial Markets" (with Edward J. Lincoln), The Brookings Review, Winter 1998

"What's Next After FDICIA?," in George G. Kaufman, ed., Research In Financial Services: Private and Public Policy, 1997, Vol. 9 (JAI Press, 1997)

"Globaphobia: The Wrong Debate Over Trade Policy," Brookings Policy Brief, No.24, September, 1997 (with Robert Z. Lawrence)

"Disciplining Large Banks After FDICIA," Journal of Retail Banking Services (Summer 1997)

"Uncle Sam in the Housing Market: The Section 8 Rental Subsidy Disaster," The Brookings Review, Fall 1996 (with James Barth); and AThe Housing Disaster That Hasn't Been Fixed, Brookings Policy Briefs, 1996, No. 1 (with James Barth)

"Antitrust Enforcement and the Telecommunications Revolution: Friends, Not Enemies", in Revolution in the U.S. Information Infrastructure (National Academy of Engineering, 1995)

"The Relative Decline of Banking: Should We Care?", in proceedings of the 1994 Conference on Bank Structure, Federal Reserve Bank of Chicago (forthcoming, 1995)

"More Value for the Legal Dollar", Judicature, January-February 1994 (with Steven C. Salop)

"Saving Our Way out of the Deficit Dilemma", Brookings Review, Fall 1993 (with William Gale)

"Superfund: Assessing The Program And Options For Reform", in Enhancing Environmental Quality through Economic Growth (American Council for Capital Formation, 1993).

"Nightmare in Basle," International Economy, November/December 1992.

"Banks and Real Estate: Regulating the Unholy Alliance," in Real Estate and the Credit Crunch, Proceedings of a Federal Reserve Bank of Boston Conference, September 1992.

"The Impact of EC 1992 on Financial Services--A Different Perspective: A Comment on "Europe 1992," Research in International Business and Finance, 1992.

"Interstate Banking and Product-Line Freedom: Would Broader Powers Have Helped The Banks?", Yale Journal on Regulation, Summer 1992.

"Down in the Dumps: Administering America's "Unfair" Trade Laws," The Brookings Review, Spring 1992.

"A Critique of the Financial Institutions Recovery, Reform and Enforcement Act of 1989 and the Financial Strength of the Commercial Banks," in James R. Barth and R. Dan Brumbaugh, Jr., eds., The Reform of

Federal Deposit Insurance (Harper, 1992) (with R. Dan Brumbaugh, Jr.).

"Speeding Up Civil Justice," in Elliot E. Slotnick, ed., Judicial Politics: Readings from Judicature, American Judicature Society, 1992.

"Nick Brady, Call Your Office," International Economy, March/April 1992

"Short and Long Run Snapshots of the U.S. Banking Industry," Bank Structure and Competition, Federal Reserve Bank of Chicago, 1991.

"U.S. Financial Markets and Institutions in the 1980s: A Decade of Turbulence," in Martin Feldstein, ed., American Economic Policy in the 1980s, University of Chicago Press and NBER, 1991.

"Bank Failures Are Sinking The FDIC," Challenge, March/April 1991 (with James R. Barth and R. Dan Brumbaugh, Jr).

"The Safety and Innovation Effects of U.S. Liability Law: The Evidence," American Economic Review: Papers and Proceedings, May 1991.

"Who Needs American Banks?," International Economy, January/February 1991.

"Facing The Future: The End of the Savings and Loan Industry," Domestic Affairs, February 1991.

"Ignoring Economics In Dealing With The Savings And Loan And Commercial Banking Crisis," Contemporary Policy Issues, January 1991 (with R. Dan Brumbaugh, Jr.).

"The Liability Explosion and American Trade Performance: Myths and Realities," in Peter Schuck, ed., Tort Law and the Public Interest: Competition, Innovation and Consumer Welfare (American Assembly, 1991.

"Getting Out of the Thrift Crisis, Now!," The Brookings Review, Winter 1990.

"Let's Try Operation "Clean Sweep," Challenge, November-December 1990.

"The World Trading System after the Uruguay Round," Boston University International Law Journal, May 1991.

"Avoiding Insurer Insolvencies: Lessons from the Thrift Crisis," John Liner Review, Fall 1990.

"Earthquake! Planning and Paying for the "Big One," The Brookings Review (Fall 1990).

"Explaining Corporate Leverage and LBO Activity in the Eighties," in John B. Shoven, ed., Corporate Leverage and Tax Policy (Brookings Institution, 1990) (with Margaret Blair).

"The Banks Are Worse Off Than You Think," Challenge Jan.-Feb. 1990 (with R. Dan Brumbaugh, Jr.).

"U.S. Trade Policy at a Crossroad," Science, January 5, 1990 (with Peter O. Suchman), reprinted in William Dudley, ed., Trade: Opposing Viewpoints, (Greenhaven Press, 1991).

"Speeding Up Civil Justice," Judicature, October-November, 1989.

"Cleaning Up the Depository Institutions Mess," Brookings Papers on

Economic Activity (BPEA), 1989:1 (with R. Dan Brumbaugh and Andrew Carron).

"The S&L Crisis: How to Get Out and Stay Out," Brookings Review, Spring 1989 (with R. Dan Brumbaugh, Jr.).

"The American Banking System: Dangers and Tasks Ahead," in S. Irving, ed., Economic Vulnerabilities, Challenges for Policymakers (Curry Foundation, 1988).

"The Future of Banking: Are `Narrow Banks' the Answer?," in The Financial Services Industry in the Year 2000, Proceedings of a Conference on Bank Structure and Competition (May 11-13, 1988).

"Facing Up to the Crisis in American Banking," in Critical Choices, Brookings Institution, 1988, (with R. Dan Brumbaugh, Jr.) and in Brookings Review, Winter 1988/89.

"Improving American Living Standards," in Critical Choices, Brookings Institution, 1988 (with Robert Z. Lawrence and Charles L. Schultze) and in Brookings Review, Winter 1988/89.

"A Guide to the U.S. Trade Laws" in Jan Egert and John Gornall, eds., Doing Business in the United States (Gabler Publishing, 1988).

"What Reforming Glass-Steagall Will Bring," International Economy, March/April, 1988.

"Causes of the Liability Insurance Crisis," Science, February 12, 1988 (With Scott Harrington).

"Financial Restructuring: Which Way for Congress?" Challenge, November/ December, 1987.

"Is The U.S. Turning Protectionist?," JAMA Forum, October 1987.

"Reuniting Investment and Commercial Banking," in Catherine England and Thomas Huertas, eds., The Financial Services Revolution (Kluwer Academic Press, October 1987).

"The Protectionist Prescription: Errors in Diagnosis and Cure," BPEA, 1987:1 (with Robert Z. Lawrence).

"Why Protectionism Doesn't Pay," Harvard Business Review, May/June 1987 (with Robert Z. Lawrence).

"Dealing with Dislocation," Harvard International Review, January, 1987 (with Robert Z. Lawrence).

"Regulatory Reform in Peru," Regulation 1987, No. 1 (with Peter Schuck).

"Deregulation in the Third World: The Case of Peru," Yale Journal on Regulation, 1986, Vol. 4, No. 1 (with Peter Schuck).

"Taking the Dangers Out of Bank Deregulation," The Brookings Review, Fall 1986 (reprinted in the American Banker, January 20, 1987).

"Internal Structural Reforms in Peru: A Promising Road Out of the Debt Crisis," Journal of Economic Growth, Second Quarter 1986 (with Jorge Fernandez and Luis Morales).

"Evaluating and Controlling the Risks of Financial Product Deregulation," Yale Journal on Regulation, 1985, Vol. 3, No. 1.

"Living with the Trade Deficit: Adjustment Strategies to Preserve Free Trade, The Brookings Review, Winter 1985 (with Robert Z. Lawrence).

"Regulatory Policy in the Second Reagan Administration," The Brookings Review, Spring 1985.

"Deregulation in a Second Reagan Term" HealthScan, January, 1985.

"The Democrats' Coming Civil War Over Industrial Policy," The Atlantic Monthly, September, 1984 (with Simon Lazarus).

"Maintaining Confidentiality of an Environmental Audit," in Lee Harrison (ed.), The McGraw Hill Environmental Auditing Handbook, McGraw Hill, 1983 (with Stuart Eizenstat).

"The Role of Economic Analysis in the Regulatory Process," Issues in Bank Regulation, Winter 1982 and Regulatory Impact Analysis, Law & Business, Inc., 1982, (with Michael Sohn).

"Sierra Club vs. Costle: Regulatory Oversight Wins in Court," Regulation, July/August 1981 (with Michael Sohn).

"On Rectification in Nozick's Minimal State," Political Theory, May 1977.

Appendix to Joseph A. Pechman, "Responsiveness of the Federal Income Tax to Changes in Income," BPEA, 1973:3.

Comments and Book Reviews

"Curing The Asian Flu," Interview in Reason, May 1998

Book Review of Daniel Yergin and Joseph Stanislaw, The Commanding Heights, in the Washington Post, February 8, 1998

Comments on "Lessons of the 1980s: What Does the Evidence Show?," History of the Eighties: Lessons for the Future, FDIC Symposium Proceedings, Vol. II, January 16, 1997

Comments on "Adversial Legalism: An International Perspective, In Pietro Nivola, ed., Comparative Disadvantages?," Social Regulations and the Global Economy (Brookings Institution Press, 1997)

Comments on Fischel's Political Economy of Just Compensation, Harvard Journal of Law and Public Policy, Fall 1996

Comments On: "Rewriting History and Riding The Wave (papers By Robert Wilson/Frederick R. Warren-Boulton and William Comanor and F.M. Scherer)," in International Journal of the Economics of Business, Vol. 2, No. 2, July 1995

"Discussant's Comments", in Safeguarding the Banking System in an Environment of Financial Cycles, Federal Reserve Bank of Boston (Proceedings of a 1993 Symposium)

"Comments on Staiger and Wolak" (Antidumping article), Brookings Papers on Economic Activity, Microeconomics, 1993

"Fertile Money and Banks in Russia: A Comment", in Bruce L.R. Smith and Gennady M. Danilenko, eds., Law and Democracy in the New Russia, Brookings Institution, 1993

"Commentary on Universal Banking," in Brooklyn Journal of International Law, 1993, Vol. XIX, No. 1.

"The Impact of EC 1992 on Financial Services--A Different Perspective: A Comment on "Europe 1992," in Emerging Challenges for the International Financial Services Industry, Research in International Business and Finance, 1992, Vol. 9 (JAI Press Inc., 1992).

"Comment" on Gary Gorton's and George Pennacchi's "Money Market Funds and Finance Companies: Are They the Banks of the Future?" in Michael Klausner and Lawrence J. White, eds., Structural Change in Banking, (New York University Press, 1993).

"Comments" on Scott Harrington's "Public Policy and Property-Liability Insurance," in The Financial Condition and Regulation of Insurance Companies, Proceedings of a Federal Reserve Bank of Boston Conference, June 1991.

"Probing Banking's Black Hole," review of Lawrence White's The S&L Debacle: Public Policy Lessons for Bank and Thrift Regulation, in Cato Regulation Magazine, Winter 1990/91.

Commentary on "U.S. Banking in an Increasingly Integrated and Competitive World Economy," Journal of Financial Services Research, December 1990.

Comments on Thomas Romer and Barry Weingast, "Political Foundations of the Thrift Debacle," in Geoffrey Carliner and Alberto Alessina, eds., Politics and Economics in the Eighties (NBER and Univ. of Chicago Press, 1991).

Book Review of Kenneth Meier's "The Political Economy of Regulation: The Case of Insurance," in Journal of Economic Literature, December 1989.

Comments on Ed Kane's "Changing Incentives Facing Regulators," Journal of Financial Services Research, September 1989.

Commentary on "Payment Risk, Network Risk and the Role of the Fed," in David B. Humphrey, ed., The U.S. Payment System: Efficiency, Risk And The Role Of The Federal Reserve (Kluwer Academic Press, 1989).

"Just How Fast Can a Bank Run?," Manhattan, Inc., January 1988.

"Comments on Financial Restructuring Proposals," Financial Restructuring, A Symposium Sponsored by the Federal Reserve Bank of Kansas City (November 1987).

Book Review of Bruce Guile and Harvey Brooks, eds., "Technology and Global Industry," in Science October, 1987.

Book Review of Stephen Cohen and John Zysman, "Manufacturing Matters" in Across the Board, Fall 1987.

Remarks at a "World Policy Forum: Workers in Transition," World Policy Journal, Summer, 1986.

"Comments on Mendeloff's `Regulatory Reform and OSHA Policy,'" Journal

of Public Policy, Management, 1986, Vol. 5, No. 3, (with William D. Nordhaus).

"Comments on Papers on Electronic Funds Transfer," in Robert Rogowsky, ed., Regulation and Competitive Strategy (1986).

Book Review in the New York Times, October 16, 1983 of Susan J. and Martin Tolchin, Dismantling America.

Book Review of Joseph Gold, The Fund Agreement in Courts, in the American Journal of International Law, October 1983.

Book Review of Kenneth Dam, The Rules of the Game: Reform and Evolution in the International Monetary System, in the American Journal of International Law, January 1983.

Newspaper Articles

"The Clogged Arteries of a Troubled Economy (Japan)," The Los Angeles Times, October 4, 1998

"Why a Market Correction Won't Replay 1987," Wall Street Journal, July 28, 1998 (with Anthony M. Santomero)

"Bankruptcy Bailout Could Fix Asia's Woes," Newsday, March 4, 1998

"Honoring US Obligations to the IMF," Journal of Commerce, February 25, 1998

"A Tough Regime for Rescuing Japan's Banks," The Los Angeles Times, December 22, 1997

"Putting Regulation To A Test, Washington Post," July 30, 1997 and Houston Chronicle, August 1, 997, (with Robert W. Hahn)

"A Time Long Ignored: The Impending Section 8 Disaster," Baltimore Sun, August 18, 1996 (with James Barth)

"Deposit Insurance, Gas on S&L Fire," The Wall Street Journal, July 29, 1993.

"Force-Feeding Our Piggy Banks," The Washington Post, May 30, 1993.

"To Russia, With Advisers," The Washington Post, March 2, 1993, (with Lex Rieffel).

"Perot Medicine for Clinton," The New York Times, October 7, 1992.

"Too Good To Be True," The Atlanta Journal/The Atlanta Constitution, July 26, 1992.

"No Quick Fix for Nation's Economy," The Atlanta Journal/The Atlanta Constitution, February 2, 1992.

"Choosing Insurance Regulators," The Journal of Commerce, January 30, 1992.

"The Banking Bill Passed At End of Session Isn't Really As 'Narrow' As It First Seems," Roll Call, December 9, 1991.

"The Dangers of Letting Banks Own Everything," Wall Street Journal, February 5, 1991.

"Some Hidden Nuggets in the Thrift Bill" American Banker, September 29, 1989 (with Ernest Fleischer).

"Solving the FSLIC Crisis," American Banker, October 31, 1988 (with R. Dan Brumbaugh, Jr.).

"Should S&Ls Become Banks?," Washington Times, October 26, 1988 (syndicated nationally in other newspapers).

"The Banks Are in Big Trouble, Too," The New York Times, August 21, 1988 (with R. Dan Brumbaugh, Jr.).

Interview on "Microenterprise and the Need for Policy Reform," in Economic Impact, 1988:2.

"Bank Revolution Won't Wait for Congress," Wall Street Journal, November 10, 1987.

"World Bank Should Consolidate Third World Debt," American Banker, June 18, 1987 (with Tamar Frankel).

"Moving Beyond the Stalemate Over Expanded Bank Powers," American Banker, July 11, 1986.

"Ending the 'Lunacy' of Trade Protection," The New York Times, April 27, 1986 (with Robert Z. Lawrence).

"Regulators Should Use Carrot in Lieu of Stick," American Banker, January 23, 1986 (with Tamar Frankel).

"Carrots and Sticks in Bank Supervision," Legal Times, January 13, 1986 (with Tamar Frankel).

"What Will Tax Reform Do to the Trade Balance?" Journal of Commerce, March 6, 1985 (with Robert Herzstein).

"Will Reg Analysis be a Tool for Managers or Litigators?," Legal Times, April 27, 1981 (with Michael Sohn).

Testimony

Testimony on Privacy and Financial Services before the Subocmmittee on Financial Institutions and Consumer Issues of the House Banking Committee, July 20, 1999

Testimony on Proposed Regulatory Reform Legislation before the Senate Committee on Government Affairs, April 22, 1999

Testimony on the European Privacy Directive before the House Committee On International Affairs, May 7, 1998

Testimony on a proposed Congressional Office of Regulatory Affairs, Before the Subcommittee on National Economic Growth of the House Committee on Government Reform and Oversight, March 11,1998

Testimony on Regulatory Reform Legislation before Senate Committee on Government Affairs, February 24, 1998

Testimony on IRS Restructuring before the National Commission on Restructuring the IRS, March 13, 1997

Testimony on the Impact of Liability Law Trends on Innovation by Small Business before the Subcommittee on Competitiveness and Economic Opportunity of the Senate Commerce Committee, November 7, 1991.

Testimony on Budgetary Risks of Problems in Banks, Thrifts and GSEs before the

House Ways and Means Committee, March 13, 1991.

Testimony on Deposit Insurance Reform before the Senate Banking Committee, March 12, 1991.

Testimony on Condition of the U.S. Banking Industry and the Bank Insurance Fund, Financial Institutions Subcommittee of the House Banking Committee, December 17, 1990.

Testimony on the Causes of the S&L Crisis before the Senate Judiciary Committee, August 14, 1990 (reprinted in Challenge, Nov-Dec 1990).

Testimony on Financial Restructuring before the Subcommittee on Telecommunications and Finance of the House Energy and Commerce Committee, July 11, 1990.

Testimony on the Condition of the U.S. Commercial Banking Industry before the Senate Committee on Banking, Housing and Urban Affairs, October 5, 1989.

Testimony on the Condition of the FDIC before the Financial Institutions Subcommittee of the House Banking Committee, September 19, 1989 (reprinted in the American Banker, October 11, 1989).

Testimony on the Long-Term Economic Outlook for the U.S. before the Joint Economic Committee of the U.S. Congress, February 23, 1989.

Testimony on Proposed Thrift Capital Standards before the Federal Home Loan Bank Board, February 9, 1989.

Testimony on Competitiveness and Concentration Issues Raised by Proposed Financial Restructuring Legislation before the Subcommittee on Monopoly of the House Judiciary Committee, September 14, 1988.

Testimony on Repeal of New York's "Mini Glass-Steagall Act" before the Banking Committee of the New York State Legislature, January 26, 1988.

Testimony on Proposed Financial Restructuring Legislation before the Senate Banking Committee, December 2, 1987.

"Frameworks for Financial Product Deregulation," paper presented to the annual meetings of the Eastern Economic Association, March 1987.

Testimony on "Financial Product Deregulation" before the Subcommittee on Commerce, Consumer and Monetary Affairs of the House Government Operations Committee, December 18, 1986.

Testimony on "Reforming the U.S. Escape Clause" before the Trade Subcommittee of the House Ways and Means Committee, April 15, 1986.

Testimony on "Legislative Veto and the Chadha Decision" before the Senate Subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee, July 1983.

Regular speeches, seminars on banking, international trade and regulatory issues before academic, government and other professional audiences.

* * * * * *

Who's Who in America
Who's Who in the East

Who's Who Among American Lawyers
Member, Council on Foreign Relations

Date of Birth: May 16, 1950

Married (Avivah); Son (Ariel Daniel); Daughter (Alisa Michelle)

**Exhibit 2**

**First Annapolis Savings Bank and FDIC v. United States**
**Documents Relied upon by Robert E. Litan**

| Bates | Description | Date |
|---|---|---|
| WOQ280 0936 | First Annapolis Savings Bank, F.S.B. Mark–To–Market Evaluation, Kallop & Company | October 10, 1988 |
| WOT 415 0515 | Revised Business Plan of First Federal Savings and Loan Association of Annapolis | October 21, 1987 |
| WOQ396 1082 | First Annapolis Savings Bank, F.S.B. Business Plan | November 1988 |
| | Scott, James H., "Bankruptcy, Secured Debt, and Optimal Capital Structure", *The Journal of Finance*, March 1977, pp.1-19. | |
| | Lee, Inmoo, Scott Lochhead, and Jay Ritter, "The Costs of Raising Capital", *The Journal of Financial Research*, Spring 1996, pp. 59-74. | |
| | Peltzman, Sam, "Capital Investment in Commercial Banking and Its Relationship to Portfolio Regulation", *Journal of Political Economy*, Vol. 78, 1970, pp.1-26 | |
| | Miller, Merton H. and Richard A. Posner, "An Approach to the Regulation of Bank Holding Companies", *Journal of Business*, 1971, Vol. 51, no 3, pp. 379-413. | |
| | Berger, Allen N., Richard J. Herring, and Giorgio P. Szego, "The Role of Capital in Financial Institutions", *Journal of Banking & Finance*, June 1995, pp. 393-430. | |
| | Benston, George J. and Clifford W. Smith, Jr., "A Transaction Cost Approach to the Theory of Financial Intermediation", *The Journal of Finance*, May 1976, pp. 215-232. | |
| | Modigliani, Franco, and Merton H. Miller, "The Cost of Capital, Corporation Finance and the Theory of Investment", *The American Economic Review*, June 1958, pp. 263-297. | |
| | Smith, Clifford W., "Alternative Methods for Raising Capital", *Journal of Financial Economics*, 1977, pp. 273-307. | |
| | Kryzanowski, Lawrence, and Gordon S. Roberts, "Capital Forbearance: Depression-era Experience of Life Insurance Companies, *Canadian Journal of Administrative Sciences*, March 1998 pp. 1-16. | |

**Exhibit 2**

**First Annapolis Savings Bank and FDIC v. United States**
**Documents Relied upon by Robert E. Litan**

| | | |
|---|---|---|
| | Barth, James R., The Great S&L Debacle, AEI Press, 1991. | |
| | Crabbe, Leland E., "Estimating the Credit-Risk Yield for Preferred Stock", *Financial Analysts Journal,* September/October 1996, pp. 45-56. | |
| | Dimson, Elroy, and Paul Marsh, "Stress Tests of Capital Requirements, *Journal of Banking & Finance,* 1997, pp. 1515-1546. | |
| | Saunders, Anthony, and Berry Wilson, "The Impact of Consolidation and Safety-net Support on Canadian, US and UK Banks: 1893-1992 *Journal of Banking & Finance,* February 1999 pp. 537-571. | |
| | Miller, Merton H. and Franco Modigliani, "Dividend Policy, Growth, and the Valuation of Shares", *The Journal of Business,* October 1961, pp. 411-433. | |
| | Direct Testimony of Merton H. Miller in the matter of California Federal Bank v. United States, pp. 3387-3621 | February 8, 1999 |
| | Supplemental Report of Stewart C. Myers, Bank United v. United States | December 15, 1998 |
| | Amended Expert Report and Declaration of Arnold A. Heggestad, Ph.D. in the matter of Carolyn Hunt Trust Estate and FDIC a successor to the Rights of Southwest Savings Association v. The United States of America | January 28, 1999 |
| | Expert Report and Declaration of Arnold A. Heggestad, Ph.D. in the matter of Anderson et al. and FDIC as Successor to the Rights of CenTrust Bank, a State Savings Bank v. The United States of America | January 2, 1999 |
| | Expert Report of Professor Bradford Cornell in the matter of Landmark Land Company and FDIC and Successor to the Rights of Oak Tree Savings Bank, S.S.B. v. United States | December 7, 1998 |
| | Expert Report of Professor Bradford Cornell in the matter of FDIC and Successor to the Rights of Security Savings and Loan Association et al. v. United States | |
| | Expert Report of Christopher M. James, Ph.D. in the matter of LaSalle Talman Bank, F.S.B. v. United States | September 22, 1998 |

**Exhibit 2**

**First Annapolis Savings Bank and FDIC v. United States**
**Documents Relied upon by Robert E. Litan**

| | | |
|---|---|---|
| | Joint Affidavit of Daniel R. Fischel and Merton H. Miller in the matter of Statesman Savings Holding Corp., et al. v. United States of America | December 6, 1996 |
| | Expert Report of Franco Modigliani in the matter of Glendale Federal Bank, F.S.B. v. United States | August 24, 1998 |
| | Affidavit of Richard S. Ruback in Support of Defendant" Motion in Limine Concerning Damages in the matter of Glendale Federal Bank F.S.B. v. United States | December 9, 1996 |
| | Affidavit of Richard S. Ruback in Support of Defendant's Motion in Limine Concerning Damages in the matter of Statesman Savings Holding Corp., et al. v. United States of America | December 9, 1996 |
| | LaSalle Talman Bank F.S.B. v. The United States, Opinion of Judge Bruggink, No. 92-652C | September 30, 1999 |
| | Statesman Savings Holding Corporation, et al. v. The United States, Opinion of Judge Miller, No 90-773C | April 22, 1998 |
| | Glendale Federal Bank, F.S.B. v. The United States, Opinion of Judge Smith, No. 92-138C | April 9, 1999 |
| | California Federal Bank, F.S.B. v. United States of America, Opinion of Judge Hodges, No. 92-138C | April 16, 1999 |
| | United States, Petitioner v. Winstar Corporation et al., Opinion of Justice Souter, No 95-865 | July 2, 1996 |
| | First Annapolis Bancorp, Inc. v. United States of America, Complaint | August 10, 1994 |
| WOQ280 0083 | Office of Thrift Supervision, First Annapolis Savings Bank, F.S.B., Annapolis, Maryland, "S" Memorandum | April 16, 1990 |
| WOT315 0134 | First Annapolis Savings Bank, Report of Examination, Office of Thrift Supervision | January 16, 1990 |
| | First Annapolis Savings Bank, Report of Examination, Office of Thrift Supervision | April 13, 1987 |
| C-FA-A-0052543 | First Federal Savings Bank of Annapolis #8204, Conservatorship Operating Plan | July 27, 1990 |
| WOT315 0002 | First Annapolis Savings Bank, Report of Examination, Office of Thrift Supervision | July 11, 1988 |
| | Federal Reserve Form H.15 | 1988-1989 |
| | Monthly Thrift Financial Reports | January 1988-December 1988 |
| | Monthly Thrift Financial Reports | January 1989 – December 1989 |

**Exhibit 2**

**First Annapolis Savings Bank and FDIC v. United States**
**Documents Relied upon by Robert E. Litan**

| | | |
|---|---|---|
| | Monthly Thrift Financial Reports | January 1990 – July 1990 |
| | Testimony of Alan Greenspan Before the Subcommittee on Finance and Hazardous Materials of the Committee on Commerce, U.S. House of Representatives | July 17, 1997 |
| WOQ299 0044 | Application H-(e)1, First Annapolis Bancorp, Inc. | November 5, 1987 |
| WOQ299 0013 | From Betsy Brown Trump to Julie L. Williams re: H-(e)1 application from FASB | February 18, 1988 |
| WOQ299 0029 | From Jordan Luke to FHLBB | May 26, 1988 |
| WOQ 397 0107 | FHLBB letter approving Voluntary Supervisory Conversion | July 21, 1988 |
| WOQ395 1489 | Minutes of Staff Meeting | February 3, 1989 |
| WOQ395 1534 | From Allen W. Bach to Franklin Coburn | May 19, 1989 |
| WOQ395 1532 | From Franklin Coburn to Allen W. Bach | June 12, 1989 |
| OFA001 0833 | From OTS to Board of Directors of First Annapolis re: capital requirements shortfall | December 28, 1989 |
| WOQ280 1677 | Letter From Deloitte Haskins & Sells to Board of Directors re: audit of "Push-down accounting | August 1988 |
| | Cross Examination of Merton Miller in trial of California Federal Bank v. United States | |
| | Brealey, Richard and Stewart Myers, <u>Principles of Corporate Finance</u>, 5th Edition. (McGraw-Hill, 1996.) | |
| | Haswell, Carleton R., Senior Vice President, Chemical Bank, Testimony before the Subcommittee on International Finance and Monetary Policy of the Senate Committee on Banking, Housing and Urban Affairs, 99th Cong., 2d Sess. (GPO, June 25, 1986) | June 25, 1986 |
| | Reinicke, Wolfgang H., <u>Global Public Policy: Governing without Government?</u> (Brookings Institution, 1998) | |
| | Standard & Poors Bond Guide, 1989-1990 | |
| WOQ 299 0029-0042 | FHLBB Voluntary Supervisory Conversion Memorandum | July 14, 1988 |
| WOQ 280 0197 | FHLBB Examination Report | July 11, 1988 |
| | U.S. Securities and Exchange Commission. "Report of the Advisory Committee on the Capital Formation and Regulatory Process," Appendix A. | July 24, 1996 |
| | Williams, Jan. <u>2000 Miller GAAP Guide</u>. p. 23.05. | |

**Exhibit 2**

**First Annapolis Savings Bank and FDIC v. United States**
**Documents Relied upon by Robert E. Litan**

| | | |
|---|---|---|
| WOQ 392 1742-44 | Memorandum re: First Annapolis Savings Bank, FSB | January 23, 1990 |
| WOQ 395 0181-84 | Letter to Douglas Parran from Gregory Jones | November 17, 1989 |
| WOQ 395 0124-26 | Letter to Gregory Jones from Douglas Parran | November 1, 1989 |
| WOQ 395 0262-0291 | Consolidated Financial Statements of First Annapolis Bank from June 30, 1989 | |
| WOQ 392 1522-1556 | Shareholder Information Package and Notice of Special Meeting of Stockholders of First Annapolis Bancorp, Inc. | March, 1990 |
| WOQ 402 0729-0798 | Capital Plan of First Annapolis Savings Bank, FSB and First Annapolis Bancorp, Inc. | January, 1990 |
| | 44904 Fed. Reg. Sections 565.2-567.1 (1992). Federal Register, Sept. 29, 1992. Vol. 57, No. 189. | |

# EXHIBIT 3

## First Annapolis and FDIC vs. U.S.A.
## Summary of Damages

| Source of Damages | [A] August 1988 | [B] August 1989 |
|---|---|---|
| Goodwill | $ 23.35 | $26.24 |
| Capital Ratio Forbearance | 2.43 | 1.68 |
| Total | $ 25.78 | $ 27.93 |

Notes and Sources:

[A]: Exhibits 4 and 7.
[B]: Exhibits 5 and 8.

# EXHIBIT 4

## Supervisory Goodwill Damages as of Date of Contract (August 1988)
(in millions)

| [A] Year | [B] Beginning Balance of Goodwill | [C] Ending Balance of Goodwill | [D] Transaction Costs | [E] Annual Principal Payments Equal to Amortization of Goodwill | [F] Annual Dividends Equal to Earnings on Balance of Goodwill | [G] Net Cash Flows Required to Replace Goodwill | [H] PV of Net Cash Flows |
|---|---|---|---|---|---|---|---|
| 1988 | | $62.88 | $3.14 | | | $66.02 | $66.02 |
| 1989 | $62.88 | 60.36 | | ($2.52) | ($5.86) | (8.38) | (7.21) |
| 1990 | 60.36 | 57.85 | | (2.52) | (5.63) | (8.14) | (6.03) |
| 1991 | 57.85 | 55.33 | | (2.52) | (5.39) | (7.91) | (5.04) |
| 1992 | 55.33 | 52.82 | | (2.52) | (5.16) | (7.67) | (4.21) |
| 1993 | 52.82 | 50.30 | | (2.52) | (4.92) | (7.44) | (3.52) |
| 1994 | 50.30 | 47.79 | | (2.52) | (4.69) | (7.20) | (2.93) |
| 1995 | 47.79 | 45.27 | | (2.52) | (4.45) | (6.97) | (2.44) |
| 1996 | 45.27 | 42.76 | | (2.52) | (4.22) | (6.73) | (2.03) |
| 1997 | 42.76 | 40.24 | | (2.52) | (3.99) | (6.50) | (1.69) |
| 1998 | 40.24 | 37.73 | | (2.52) | (3.75) | (6.27) | (1.40) |
| 1999 | 37.73 | 35.21 | | (2.52) | (3.52) | (6.03) | (1.16) |
| 2000 | 35.21 | 32.70 | | (2.52) | (3.28) | (5.80) | (0.96) |
| 2001 | 32.70 | 30.18 | | (2.52) | (3.05) | (5.56) | (0.79) |
| 2002 | 30.18 | 27.67 | | (2.52) | (2.81) | (5.33) | (0.65) |
| 2003 | 27.67 | 25.15 | | (2.52) | (2.58) | (5.09) | (0.54) |
| 2004 | 25.15 | 22.64 | | (2.52) | (2.34) | (4.86) | (0.44) |
| 2005 | 22.64 | 20.12 | | (2.52) | (2.11) | (4.62) | (0.36) |
| 2006 | 20.12 | 17.61 | | (2.52) | (1.88) | (4.39) | (0.30) |
| 2007 | 17.61 | 15.09 | | (2.52) | (1.64) | (4.16) | (0.24) |
| 2008 | 15.09 | 12.58 | | (2.52) | (1.41) | (3.92) | (0.20) |
| 2009 | 12.58 | 10.06 | | (2.52) | (1.17) | (3.69) | (0.16) |
| 2010 | 10.06 | 7.55 | | (2.52) | (0.94) | (3.45) | (0.13) |
| 2011 | 7.55 | 5.03 | | (2.52) | (0.70) | (3.22) | (0.10) |
| 2012 | 5.03 | 2.52 | | (2.52) | (0.47) | (2.98) | (0.08) |
| 2013 | 2.52 | 0.00 | | (2.52) | (0.23) | (2.75) | (0.06) |
| TOTAL DAMAGES AT DATE OF CONTRACT | | | | | | | $23.35 |
| PRESENT VALUE OF 1989-2013 CASH FLOWS | | | | | | | ($42.67) |

# EXHIBIT 4

## Supervisory Goodwill Damages as of Date of Contract (August 1988)
(in millions)

Notes and Sources:

[A]: Through 2013 because the Goodwill was to be amortized over a 25-year period.

[B]: [C] at previous year.

[C]: 1988: 9/30/88 TFR, "Goodwill and Other" from Section A + "Amortization of Goodwill" from Section E.
1989-2013: [B] + [E].

[D]: [C] x 5.00%.
See, e.g., "Report of the Advisory Committee on the Capital Formation and Regulatory Processes," Appendix A; and
Lee, Lochhead, Ritter and Zhao, "The Costs of Raising Capital," *The Journal of Financial Research*, Spring 1996, especially at p. 62.

[E]: 9/30/88 TFR, 4 x "Amortization of Goodwill" from Section E.

[F]: -[B] x 9.32%.
9.32% represents the 30-year Treasury bill rate as of August 1988. See Federal Reserve Form H.15.

[G]: 1988: [C] + [D].
1989-2013: [E] + [F].

[H]: [G] discounted at the B-Rated Preferred Divident Rate of 16.17%, derived as follows:

| | |
|---|---|
| 12.37% | Average August 1988 yield on B-rated industrial bonds from the June 1989 Standard & Poor's Bond Guide, p. 3. |
| 3.80% | Spread between B-Rated corporate bonds and B-Rated preferred stock from Crabbe, L.E., "Estimating the Credit-Risk Yield Premium for Preferred Stock," *Financial Analysts Journal*, Sep./Oct. 1996, Table 7, p. 54. |
| 16.17% | B-Rated Preferred Dividend Rate |

# EXHIBIT 5

## Capital Ratio Forbearance Damages as of Date of Contract (August 1988)
(in millions)

| [A] Year | [B] Beginning Balance of Forbearance | [C] Ending Balance of Forbearance | [D] Transaction Costs | [E] Annual Principal Payments Equal to Amortization of Forbearance | [F] Annual Dividends Equal to Earnings on Balance of Forbearance | [G] Net Cash Flows Required to Replace Forbearance | [H] PV of Net Cash Flows |
|---|---|---|---|---|---|---|---|
| 1988 | | $12.30 | $0.62 | | | $12.92 | $12.92 |
| 1989 | $12.30 | 9.84 | | ($2.46) | ($1.15) | (3.61) | (3.11) |
| 1990 | 9.84 | 7.38 | | (2.46) | (0.92) | (3.38) | (2.50) |
| 1991 | 7.38 | 4.92 | | (2.46) | (0.69) | (3.15) | (2.01) |
| 1992 | 4.92 | 2.46 | | (2.46) | (0.46) | (2.92) | (1.60) |
| 1993 | 2.46 | 0.00 | | (2.46) | (0.23) | (2.69) | (1.27) |
| TOTAL DAMAGES AT DATE OF CONTRACT | | | | | | | $2.43 |
| PRESENT VALUE OF 1989-1993 CASH FLOWS | | | | | | | ($10.49) |

Notes and Sources:

[A]: Through 1993 because the Capital Ratio Forbearance was to last 5 years.

[B]: [C] at previous year.

[C]: Exhibit 6, column [D].

[D]: [C] x 5.00%.
See, e.g., "Report of the Advisory Committee on the Capital Formation and Regulatory Processes," Appendix A; and Lee, Lochhead, Ritter and Zhao, "The Costs of Raising Capital," *The Journal of Financial Research*, Spring 1996, especially at p. 62.

[E]: Exhibit 6, column [E].

[F]: -[B] x 9.32%.
9.32% represents the 30-year Treasury bill rate as of August 1988. See Federal Reserve Form H.15.

[G]: 1988: [C]+[D].
1989-1993: [E] + [F].

[H]: [G] discounted at the B-Rated Preferred Divident Rate of 16.17%, derived as follows:

| | |
|---|---|
| 12.37% | Average August 1988 yield on B-rated industrial bonds from the June 1989 Standard & Poor's Bond Guide, p. 3. |
| <u>3.80%</u> | Spread between B-Rated corporate bonds and B-Rated preferred stock from Crabbe, L.E., "Estimating the Credit-Risk Yield Premium for Preferred Stock," *Financial Analysts Journal*, Sep./Oct. 1996, Table 7, p. 54. |
| 16.17% | B-Rated Preferred Dividend Rate |

# EXHIBIT 6

## Calculation of Forbearance Amortization as of August 1988
(in millions)

| [A]<br>Year | [B]<br>Total Liabilities as of July 31, 1988 | [C]<br>Difference in Capital Ratios | [D]<br>Capital Ratio Forbearance | [E]<br>Annual Difference |
|---|---|---|---|---|
| 1988 | $820.21 | 1.50% | $12.30 | |
| 1989 | | 1.20% | 9.84 | ($2.46) |
| 1990 | | 0.90% | 7.38 | (2.46) |
| 1991 | | 0.60% | 4.92 | (2.46) |
| 1992 | | 0.30% | 2.46 | (2.46) |
| 1993 | | 0.00% | 0.00 | (2.46) |

Notes and Sources:

[A]: Through 1993 because the Capital Ratio Forbearance was to last 5 years.

[B]: July 31, 1988 Thrift Financial Report

[C]: Capital ratios from 10/21/87 Revised Business Plan, p. 5 and 7/11/88 FHLBB Exam, p. 25.

| Year | Requirement | Contractual Minimum Ratios | Difference |
|---|---|---|---|
| 1988 | 3.00% | 1.50% | 1.50% |
| 1989 | 3.00% | 1.80% | 1.20% |
| 1990 | 3.00% | 2.10% | 0.90% |
| 1991 | 3.00% | 2.40% | 0.60% |
| 1992 | 3.00% | 2.70% | 0.30% |
| 1993 | 3.00% | 3.00% | 0.00% |

[D]: [B] x [C].

[E]: [D] at current period - [D] at previous period.

EXHIBIT 7

Supervisory Goodwill Damages as of Date of the Breach (August 1989)
(in millions)

| [A] Year | [B] Beginning Balance of Goodwill | [C] Ending Balance of Goodwill | [D] Transaction Costs | [E] Annual Principal Payments Equal to Amortization of Goodwill | [F] Annual Dividends Equal to Earnings on Balance of Goodwill | [G] Net Cash Flows Required to Replicate Goodwill | [H] PV of Net Cash Flows |
|---|---|---|---|---|---|---|---|
| 1989 | | $60.36 | $3.02 | | | $63.38 | $63.38 |
| 1990 | $60.36 | 57.85 | | ($2.52) | ($4.90) | (7.42) | (6.36) |
| 1991 | 57.85 | 55.33 | | (2.52) | (4.70) | (7.21) | (5.31) |
| 1992 | 55.33 | 52.82 | | (2.52) | (4.49) | (7.01) | (4.43) |
| 1993 | 52.82 | 50.30 | | (2.52) | (4.29) | (6.80) | (3.69) |
| 1994 | 50.30 | 47.79 | | (2.52) | (4.08) | (6.60) | (3.07) |
| 1995 | 47.79 | 45.27 | | (2.52) | (3.88) | (6.40) | (2.55) |
| 1996 | 45.27 | 42.76 | | (2.52) | (3.68) | (6.19) | (2.12) |
| 1997 | 42.76 | 40.24 | | (2.52) | (3.47) | (5.99) | (1.76) |
| 1998 | 40.24 | 37.73 | | (2.52) | (3.27) | (5.78) | (1.46) |
| 1999 | 37.73 | 35.21 | | (2.52) | (3.06) | (5.58) | (1.20) |
| 2000 | 35.21 | 32.70 | | (2.52) | (2.86) | (5.37) | (1.00) |
| 2001 | 32.70 | 30.18 | | (2.52) | (2.66) | (5.17) | (0.82) |
| 2002 | 30.18 | 27.67 | | (2.52) | (2.45) | (4.97) | (0.68) |
| 2003 | 27.67 | 25.15 | | (2.52) | (2.25) | (4.76) | (0.56) |
| 2004 | 25.15 | 22.64 | | (2.52) | (2.04) | (4.56) | (0.46) |
| 2005 | 22.64 | 20.12 | | (2.52) | (1.84) | (4.35) | (0.37) |
| 2006 | 20.12 | 17.61 | | (2.52) | (1.63) | (4.15) | (0.31) |
| 2007 | 17.61 | 15.09 | | (2.52) | (1.43) | (3.94) | (0.25) |
| 2008 | 15.09 | 12.58 | | (2.52) | (1.23) | (3.74) | (0.20) |
| 2009 | 12.58 | 10.06 | | (2.52) | (1.02) | (3.54) | (0.16) |
| 2010 | 10.06 | 7.55 | | (2.52) | (0.82) | (3.33) | (0.13) |
| 2011 | 7.55 | 5.03 | | (2.52) | (0.61) | (3.13) | (0.11) |
| 2012 | 5.03 | 2.52 | | (2.52) | (0.41) | (2.92) | (0.09) |
| 2013 | 2.52 | 0.00 | | (2.52) | (0.20) | (2.72) | (0.07) |

| | |
|---|---|
| TOTAL DAMAGES AT DATE OF CONTRACT | $26.24 |
| PRESENT VALUE OF 1990-2013 CASH FLOWS | ($37.14) |

# EXHIBIT 7

## Supervisory Goodwill Damages as of Date of the Breach (August 1989)
(in millions)

Notes and Sources:

| | |
|---|---|
| [A]: | Through 2013 because the Goodwill was to be amortized over a 25-year period. |
| [B]: | Exhibit 4, column [B]. |
| [C]: | Exhibit 4, column [C]. |
| [D] | [C] x 5.00%. |
| | See, e.g., "Report of the Advisory Committee on the Capital Formation and Regulatory Processes," Appendix A; and |
| | Lee, Lochhead, Ritter and Zhao, "The Costs of Raising Capital," *The Journal of Financial Research*, Spring 1996, especially at p. 62. |
| [E]: | Exhibit 4, column [E] |
| [F]: | -[B] x 8.12% |
| | 8.12% represents the 30-year Treasury bill rate as of August 1989. See Federal Reserve Form H.15. |
| [G]: | 1989: [C] + [D]. |
| | 1990-2013: [E] + [F]. |
| [H]: | [G] discounted at the B-Rated Preferred Divident Rate of 16.17%, derived as follows: |

| | |
|---|---|
| 12.76% | Average August 1989 yield on B-rated industrial bonds from the June 1990 Standard & Poor's Bond Guide, p. 3. |
| 3.80% | Spread between B-Rated corporate bonds and B-Rated preferred stock from Crabbe, L.E., "Estimating the Credit-Risk Yield Premium for Preferred Stock,"*Financial Analysts Journal*, Sep./Oct. 1996, Table 7, p. 54. |
| 16.56% | B-Rated Preferred Dividend Rate |

# EXHIBIT 8

## Capital Ratio Forbearance Damages as of Date of the Breach (August 1989)
(in millions)

| [A] Year | [B] Beginning Balance of Forbearance | [C] Ending Balance of Forbearance | [D] Transaction Costs | [E] Annual Principal Payments Equal to Amortization of Forbearance | [F] Annual Dividends Equal to Earnings on Balance of Forbearance | [G] Net Cash Flows Required to Replace Forbearance | [H] PV of Net Cash Flows |
|---|---|---|---|---|---|---|---|
| 1989 | | $9.11 | $0.46 | | $0.00 | $9.56 | $9.56 |
| 1990 | $9.11 | 6.83 | | ($2.28) | (0.85) | (3.12) | (2.68) |
| 1991 | 6.83 | 4.55 | | (2.28) | (0.64) | (2.91) | (2.14) |
| 1992 | 4.55 | 2.28 | | (2.28) | (0.42) | (2.70) | (1.71) |
| 1993 | 2.28 | 0.00 | | (2.28) | (0.21) | (2.49) | (1.35) |
| TOTAL DAMAGES AT DATE OF CONTRACT | | | | | | | **$1.68** |
| PRESENT VALUE OF 1990-1993 CASH FLOWS | | | | | | | ($7.88) |

Notes and Sources:

[A]: Through 1993 because the Capital Ratio Forbearance was to last 5 years, starting in 8/88.

[B]: [C] at previous year.

[C]: Exhibit 9, column [D].

[D]: [C] x 5.00%.
5.00% from "Report of the Advisory Committee on the Capital Formation and Regulatory Processes," Appendix A; and Lee, Lochhead, Ritter and Zhao, "The Costs of Raising Capital," *The Journal of Financial Research*, Spring 1996, especially at p. 62.

[E]: Exhibit 9, column [E].

[F]: -[B] x 9.32%.
9.32% represents the 30-year Treasury bill rate as of August 1988. See Federal Reserve Form H.15.

[G]: 1989: [C]+[D].
1990-1993: [E] + [F].

[H]: [G] discounted at the B-Rated Preferred Divident Rate of 16.17%, derived as follows:

| | |
|---|---|
| 12.76% | Average August 1989 yield on B-rated industrial bonds from the June 1990 Standard & Poor's Bond Guide, p. 3. |
| <u>3.80%</u> | Spread between B-Rated corporate bonds and B-Rated preferred stock from Crabbe, L.E., "Estimating the Credit-Risk Yield Premium for Preferred Stock," *Financial Analysts Journal*, Sep./Oct. 1996, Table 7, p. 54. |
| 16.56% | B-Rated Preferred Dividend Rate |

# EXHIBIT 9

## Calculation of Forbearance Amortization as of August 1989
(in millions)

| [A] Year | [B] Total Liabilities as of July 31, 1989 | [C] Capital Ratio Forbearance Schedule | [D] Capital Ratio Forbearance | [E] Annual Difference |
|---|---|---|---|---|
| 1989 | $758.75 | 1.20% | $9.11 | |
| 1990 | | 0.90% | 6.83 | ($2.28) |
| 1991 | | 0.60% | 4.55 | (2.28) |
| 1992 | | 0.30% | 2.28 | (2.28) |
| 1993 | | 0.00% | 0.00 | (2.28) |

Notes and Sources:

[A]: Through 1993 because the Capital Ratio Forbearance was to last 5 years, starting in 8/88.
[B]: July 31, 1989 Thrift Financial Report
[C]: Exhibit 6, column [C].
[D]: [B] x [C].
[E]: [D] at current period - [D] at previous period.

# EXHIBIT 10

## First Annapolis Liabilities
(in thousands)

| | Mar-88 | Jun-88 | Sep-88 | Dec-88 | Mar-89 | Jun-89 | Sep-89 | Dec-89 | Mar-90* | Jun-90 | Sep-90 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Liabilities** | $793,599 | $817,527 | $747,334 | $738,408 | $749,564 | $765,172 | $768,141 | $743,358 | $728,835 | $716,451 | $702,580 |
| Deposits with Balances less than $80,000 | $424,071 | $421,412 | $425,499 | $422,145 | $414,118 | $445,263 | $460,006 | $439,275 | $440,055 | $405,156 | $374,077 |
| Deposits with Balances $80,000 to $100,000 | 136,542 | 152,491 | 146,861 | 134,643 | 162,801 | 166,350 | 140,578 | 126,313 | 121,455 | 132,321 | 140,065 |
| **Total Insured Deposits (less than $100,000)** | $560,613 | $573,903 | $572,360 | $556,788 | $576,919 | $611,613 | $600,584 | $565,588 | $561,510 | $537,477 | $514,142 |
| *Percent of Liabilities* | *71%* | *70%* | *77%* | *75%* | *77%* | *80%* | *78%* | *76%* | *77%* | *75%* | *73%* |
| **FHLB advances** | $89,400 | $98,900 | $83,900 | $87,000 | $95,100 | $79,900 | $89,900 | $89,900 | $89,655 | $96,691 | $89,727 |
| *Percent of Liabilities* | *11%* | *12%* | *11%* | *12%* | *13%* | *10%* | *12%* | *12%* | *12%* | *13%* | *13%* |
| Other Deposits | $63,092 | $66,735 | $70,667 | $65,779 | $59,267 | $53,715 | $61,019 | $62,637 | $52,355 | $36,814 | $26,583 |
| Reverse Repurchase Agreements | 61,612 | 59,159 | | 11,356 | | | | 9,360 | | | |
| Other Borrowings | 4,884 | 4,922 | 4,961 | 5,001 | 5,043 | 5,087 | 5,131 | 5,178 | 5,225 | 32,877 | 62,929 |
| Other | 13,998 | 13,908 | 15,446 | 12,484 | 13,235 | 14,857 | 11,507 | 10,695 | 20,090 | 12,592 | 9,199 |
| **Total Other Liabilities** | $143,586 | $144,724 | $91,074 | $94,620 | $77,545 | $73,659 | $77,657 | $87,870 | $77,670 | $82,283 | $98,711 |
| *Percent of Liabilities* | *18%* | *18%* | *12%* | *13%* | *10%* | *10%* | *10%* | *12%* | *11%* | *11%* | *14%* |

Source: Quarterly Thrift Financial Reports.

* Right-most column of digits is cutoff on the March 1990 TFR. The last digit of each figure is assumed to be a "five."

# EXHIBIT 11

## Estimated Tangible and Core Capital Shortfalls (July 1989)
(in thousands)

| | | Tangible | Core |
|---|---|---|---|
| [1] | Total Assets | $770,028 | $770,028 |
| [2] | Goodwill | $60,757 | $60,757 |
| [3] | Adjusted Total Assets | $709,271 | $709,271 |
| [4] | Requirement Ratio | 1.5% | 3.0% |
| [5] | Regulatory Requirement | $10,639 | $21,278 |
| [6] | Modified Equity Capital | $11,274 | $11,274 |
| [7] | Goodwill | $60,757 | $60,757 |
| [8] | Regulatory Capital | ($49,483) | ($38,844) |
| [9] | Regulatory Surplus (Deficit) | ($60,122) | ($60,122) |

Notes and Sources:

[1]: July 1989 Thrift Financial Report.
[2]: July 1989 Thrift Financial Report.
[3]: [1] - [2].
[4]: Tangible: Federal Register, Paragraph 12029.
Core: Federal Register, Paragraph 12028.
[5]: [3] x [4].
[6]: July 1989 Thrift Financial Report.
[7]: Row [2].
[8]: Tangible: [6] - [7].
Core: [6] - [7] + ( 1.5% x [3] ). Allowable goodwill for core = 1.5% as per Federal Register, Paragraph 12025.
[9]: [5] - [8].