# In the United States Court of Federal Claims

**No. 94-522C**

**(Filed January 31, 2007)**

* * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** | * | **Winstar Liability; Standing; Summary Judgment; Contract Formation; Contract Interpretation; Risk of Regulatory Change.** |
| **Plaintiff,** | * | |
| **v.** | * | |
| **THE UNITED STATES,** | * | |
| **Defendant.** | * | |

* * * * * * * * * * * * * * * * * * * * * * *

Dale A. Cooter, Cooter, Mangold, Tompert & Karas, LLP, 5301 Wisconsin Avenue, N.W., Suite 500, Washington, D.C., for Plaintiff.

Richard B. Evans, Commercial Litigation Branch, Civil Division, Department of Justice, 1100 L Street, N.W., Washington, D.C., for Defendant; Timothy Abraham, Melinda Hart, Mark Pittman, James R. Whitman, Department of Justice, Civil Division, Washington, D.C., Of Counsel.

---

**OPINION AND ORDER GRANTING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON LIABILITY IN PART**

---

**WILLIAMS**, Judge

Currently before the Court in this Winstar litigation are the parties' cross-motions for summary judgment on liability. At issue is whether a contract was formed and, if so, whether the risk of regulatory change was shifted to Plaintiff.[1]

---

[1] Defendant also argued that two discrete prior material breaches barred Plaintiff's recovery -- 1) loans to shareholders to raise capital and 2) excess investments in service corporations. Plaintiff argued that Defendant waived both these defenses. As explained in a companion decision issued this

For the reasons explained below, the Court finds that a contract was formed permitting First Annapolis to count supervisory goodwill toward reduced capital requirements for a period of five years and that the risk of regulatory change did not shift to the institution.[2] The Government breached the contract by passing legislation prohibiting such goodwill accounting.

## Background[3]

The circumstances surrounding the thrift crisis of the early 1980s and the ensuing enactment of the Financial Institutions Recovery, Reform and Enforcement Act of 1989 (FIRREA), Pub. L. No. 101-73, 103 State 183, have been extensively set forth in United States v. Winstar Corp., 518 U.S. 839 (1996) and its progeny. In brief, these circumstances can be summarized as follows.

Rising interest rates during the 1980s led to the insolvency of many savings and loan institutions (thrifts). This threatened to exhaust the insurance fund of the Federal Savings and Loan Insurance Corporation (FSLIC), the agency charged with regulating the federally insured thrift industry and insuring consumer deposits in thrifts. Winstar, 518 U.S. at 846-47. To deal with this crisis, the Federal Home Loan Bank Board (FHLBB or Bank Board), the agency authorized to charter and regulate federal savings and loan associations, encouraged healthy thrifts to purchase insolvent thrifts in supervisory mergers and permitted the acquiring institution to allocate any shortfall between liabilities and assets to an intangible asset known as "supervisory goodwill."[4] Barron Bancshares Inc. v. United States, 366 F.3d 1360, 1364 (Fed. Cir. 2004). The FHLBB would then allow the new thrift to count supervisory goodwill toward its reserve capital requirements and to amortize the goodwill over a long period of time, which frequently exceeded the life of the underlying asset.

---

date, the Court determined that Defendant substantively waived its defense based upon excess investments in service corporations. In addition, Defendant did not prevail on its prior material breach defense based on shareholder loans because although loans which contravened regulation were made, they did not materially affect the transaction.

[2] As part of this contract the Government permitted First Annapolis to meet the reduced levels of capital set forth in its Business Plan instead of the levels required by regulation. The contract provided that after the initial five-year period, First Annapolis would be subject to any changes in the regulations.

[3] This background is derived from the pleadings and the exhibits accompanying the parties' motion papers.

[4] In 1981 and 1982, Generally Accepted Accounting Principles (GAAP) allowed two methods of accounting for mergers and acquisitions, either "purchase of assets" or "pooling of interest." At the time of these transactions, the purchase method of accounting permitted the acquiring institution to record on its books the excess of the acquired entity's liabilities over its assets on a marked-to-market basis as an intangible asset known as goodwill, or in a supervisory merger, supervisory goodwill.

Winstar, 518 U.S. at 849-51.

Nonetheless, the crisis in the savings and loan industry continued, prompting Congress to enact FIRREA in order to prevent the collapse of the industry, attack the causes of the crisis, and restore public confidence. Winstar, 518 U.S. at 856. FIRREA abolished the FHLBB and the FSLIC, transferred thrift insurance activities to the FDIC, established the Office of Thrift Supervision (OTS) as the new thrift regulatory agency, mandated a minimum capital requirement for thrifts, and prohibited counting supervisory goodwill as capital. Id. at 856-58. In its wake, many thrifts were unable to comply with regulatory capital requirements. Id.

**The 1987 Supervisory Agreement**

First Federal Savings & Loan Association of Annapolis (First Federal) was a federal mutual savings and loan association conducting business from its corporate headquarters in Annapolis, Maryland and twenty-five branch offices in Maryland. Originally organized in 1903, First Federal joined the Federal Home Loan Bank System in 1933 and was chartered in 1941 by the FHLBB.

Just over a year prior to the merger, on July 8, 1987, First Federal entered into a Supervisory Agreement with the Government, in part to avoid enforcement proceedings relating to investments in service corporations which purportedly exceeded regulatory limitations in violation of 12 C.F.R. § 545.74(d). Appendix to Defendant's Supplemental Memorandum in Support of Motion to Dismiss (Def. App.) at 326-33. According to the Supervisory Agreement, First Federal was obligated to present to the regulators a detailed business plan which would increase First Federal's level of capital and maintain the minimum regulatory capital, divest First Federal's investments in service corporations that exceeded regulatory limitations, and develop policies and procedures to ensure that First Federal "would remain in compliance with the investment limitations of Section 545.74(c) of the Federal Regulations."[5] Id. at 329-31. The divestitures were to "result in no loss to First Federal or its service corporations." Id. at 330. Upon written notice that the Supervisory Agent had no objection to the business plan, First Federal was required to adopt and implement the business plan. Id. According to the Supervisory Agreement, First Federal was required to submit a monthly report to the Supervisory Agent with regard to the actions First Federal had taken in the prior month to meet its obligations. Id. at 331. The agreement stated that the Bank Board was willing to forbear from the initiation of formal enforcement proceedings so long as First Federal complied with this agreement. Further, the agreement was made in "consideration of the FHLBB's . . . forbearance from the initiation of enforcement proceedings against First Federal." Id. at 327.

[5] 12 C.F.R. § 545.74(c) at the time of the Supervisory Agreement set forth the "Permitted Activities", i.e., investments in service corporations that Federal associations were permitted to make. That section of the regulations did not set forth the limitations on investments, which were found in Section 545.74(d).

## The Decision to Merge First Federal Into First Annapolis

On March 18, 1987, First Federal's board of directors decided to infuse outside capital through a modified conversion or a modified supervisory conversion, thereby increasing the thrift's net worth by more than $5 million through 1991. To this end, First Federal submitted, on November 5, 1987, a package of documents to the FHLBB and FSLIC, including an Application for Voluntary Supervisory Stock Conversion (Form AC) and a Holding Company Application (Application H-(e)1 or Application) by Plaintiff First Annapolis Bancorp, Inc. (Bancorp) as a separate volume accompanying Form AC. Def. App. at 204-06, 211-12. The Application contained, as an exhibit, a Regulatory Business Plan (Business Plan), approved by the board of directors of First Federal on October 21, 1987.[6] Id. at 53-193, 204-69, 334-68. The Application and the Business Plan both proposed that First Federal be converted from a federal mutual savings and loan association to a stock savings bank. Once converted to a stock savings bank, First Federal would merge with a newly formed federal stock savings bank, First Annapolis Savings Bank, F.S.B. (First Annapolis). Bancorp was formed for the purpose of acquiring the stock of the merged institutions, thereby infusing capital into the converted and merged thrift. Bancorp was incorporated on November 19, 1987, as a savings and loan holding company.

Ultimately, the financial and organizational requirements for the conversion were set forth in several documents, including the Application, a Business Plan, resolutions passed by the FHLBB, forbearance letters, and the Regulatory Capital Maintenance/Dividend Agreement (RCMDA) between Bancorp and the FSLIC.

## The Application for Conversion and the Business Plan

Federal regulations in force at the time of the conversion afforded the FHLBB discretion to authorize a supervisory conversion when "the institution would be a viable entity under [12 C.F.R.] § 563b.26." 12 C.F.R. § 563b.24 (1988). Under this regulation, a converting institution would be considered a viable entity if:

> As part of the plan of conversion, the prospective acquirer shall (i) infuse sufficient capital at the conversion to enable the institution to

[6] Both Form AC and Application H-(e)1 were submitted prior to the date of incorporation of Bancorp. However, the original Application H-(e)1 stated that Bancorp would be incorporated under the laws of the State of Delaware for the purpose of acquiring First Federal pursuant to its voluntary supervisory conversion into a stock savings bank. Def. App. at 249. Bancorp was incorporated on November 20, 1987. First Federal amended its Form AC and Bancorp amended its Application H-(e)1 on May 13, 1988, to account for the incorporation and to set forth the manner in which Bancorp would acquire First Annapolis. Id. at 224-43. The May 13, 1988 amendment -- styled Amendment No. 3 to Form AC and Amendment No. 2 to Application H-(e)1 -- was signed by Douglas A. Parran, in his capacity as Executive Vice President of Bancorp, and in his capacity as Executive Vice President and "Duly Authorized Representative" of First Federal. Id. at 242.

> achieve a ratio of net worth to total liabilities, computed on the basis of generally accepted accounting principles, of at least one percent (1%) of total liabilities and (ii) agree in writing with the Corporation that the acquirer will infuse additional capital as necessary to enable the institution to increase its regulatory capital on a scheduled basis in order to comply with the [FHLBB]'s regulatory capital requirements in effect from time to time within five years of the date of conversion . . . .

12 C.F.R § 563b.26(b)(2).

With respect to these minimum capital requirements, Bancorp's Application stated that First Federal anticipated that First Annapolis would meet certain regulatory capital benchmarks set out in a schedule in the Business Plan. Def. App. at 337. Bancorp's Application further stated that Bancorp would raise funds to acquire the capital stock of First Annapolis through the sale of 12-15 million shares of its common stock. Id. According to Bancorp's Application, as amended on May 13, 1988, Bancorp planned to infuse at least $11 million into First Annapolis from the proceeds of this sale. The Application stated:

> As a result of the foregoing, it is anticipated that the infusion of not less than $11 million in capital into [First Annapolis] will result in a post-Conversion Savings Bank with net worth of not less than $11,000,000 and an estimated ratio of net worth to total liabilities of approximately 1.50% (in each case computed on the basis of generally accepted accounting principles ('GAAP') applied on a consistent basis). Such a ratio of net worth to total liabilities will be sufficient for the Savings Bank to be classified as a 'viable entity' within the meaning of 12 C.F.R. § 563b.26(b)(2) (1987). As set forth more fully in the [Business Plan], a copy of which has previously been filed as Exhibit B to the Application, [First Federal] projects that the Savings Bank [First Annapolis] will meet the benchmarks for regulatory capital described on page 5 of the Business Plan through results of operations.

Def. App. at 337.

As set out in its Business Plan, First Federal contemplated that its Projected Regulatory Capital would be below that of the estimated normal regulatory capital requirements, but would exceed the capital benchmarks scheduled in the Business Plan.[7] The Business Plan and its addendum included the following projections:

---

[7] In the context of the conversion, the Business Plan's reference to "Estimated (normal) Regulatory Capital Requirement" referred to the capital regulation found at 12 C.F.R. § 563.13.

| | End of Year 1 | % of Lia-bility | End of Year 2 | % of Lia-bility | End of Year 3 | % of Lia-bility | End of Year 4 | % of Lia-bility | End of Year 5 | % of Lia-bility |
|---|---|---|---|---|---|---|---|---|---|---|
| Estimated (normal) Regulatory Capital Req. | $25,929 | 3.259 % | $32,207 | 3.641 % | $40,405 | 4.089 % | $43,633 | 4.00% | $48,162 | 4.00% |
| Estimated Sch. Capital Benchmarks * | $14,304 | 1.798 % | $18,574 | 2.100 % | $23,717 | 2.400 % | $29,452 | 2.70% | $36,121 | 3.00% |
| Projected Regulatory Capital** | $15,563 | 1.956 % | $21,519 | 2.433 % | $25,524 | 2.583 % | $31,024 | 2.84% | $36,524 | 3.03% |

* First Federal will initially infuse capital of approximately 1.50% of liabilities computed according to GAAP [Generally Accepted Accounting Principles] and agree to bring regulatory capital up to required levels on a scheduled (prorata) basis within five (5) years.
** The projected regulatory capital exceeds the projected shareholders equity . . . in the amounts described below due to the requested regulatory forbearance . . . to amortize goodwill on a straight-line basis over 25 years . . . .

Def. App. at 60 and 221.[8]

Thus, the capital benchmarks in the Business Plan effectively functioned as a five-year forbearance with regard to the regulatory capital requirements, whereby First Annapolis would be in compliance with the regulatory capital requirements as long as it maintained capital sufficient to meet the relaxed capital benchmarks in the Business Plan. Def. App. at 7 and 221.

The Business Plan discussed the planned supervisory conversion of First Federal and the acquisition of First Federal by Bancorp as well as the $11 million cash infusion into First Annapolis in "EXHIBIT III: STRUCTURE OF A PROPOSED VOLUNTARY SUPERVISORY CONVERSION," as follows:

> Applicant [Bancorp] will be incorporated for the purpose of acquiring First Federal in connection with the voluntary supervisory conversion into a stock savings bank. In connection with the plan of conversion, it is contemplated that First Federal will convert from a mutual to a stock federal savings bank by way of merger. As part of the conversion process, [Bancorp] will cause to be established an interim stock savings bank ('Interim') [First Annapolis]. [Bancorp] will purchase from [First Annapolis] approximately $11,000,000 of [First Annapolis'] common stock. Upon such purchase, First Federal will be merged into [First Annapolis] with the effect that First Federal

[8] The referenced footnotes are quoted from the Business Plan. The addendum to the Business Plan was submitted in an amendment to the Application dated December 22, 1987.

> after such conversion and merger will be a wholly-owned subsidiary of [Bancorp].

Id. at 191.

According to the Business Plan, the conversion would be accounted for under the purchase method accounting and would create goodwill of $61,830,000. Id. at 177. Exhibit III of the Business Plan based its financial reporting projections on the ability to amortize supervisory goodwill over a period of 25 years on a straight-line basis. Id. The Business Plan further provided that First Federal would submit to the FHLBB's Supervisory Agent an opinion of an independent certified public accountant that First Federal had accounted for the transaction in this manner. Id. at 192.

In addition, the Business Plan referenced the limitations in investments in subsidiary corporations agreed to by First Federal and the FHLBB in the July 8, 1987 Supervisory Agreement.[9] The Business Plan stated:

> The Supervisory Agreement entered into on July 8, 1987 between First Federal Savings & Loan Association of Annapolis and the Federal Home Loan Bank of Atlanta limits [First Federal's] activities in financial futures and options transactions and investments in subsidiary corporations. These limitations, however, have been made part of this Business Plan and therefore will have no material effect on the information presented herewith.

Def. App. at 193. The Business Plan described the ongoing level of investments in subsidiaries and affiliated companies, including "a detailed description of Delta Financial Corporation, Inc. and Diversified Financial Services, Inc., which compose[d] a substantial portion of service corporation activities." Id. at 96-106.

## Bank Board Resolutions

On July 21, 1988, the FHLBB, which had authority to act on behalf of the FSLIC, issued two resolutions, Resolution No. 88-602 and Resolution No. 88-603. These resolutions approved the voluntary conversion of First Federal from a mutual to a federal stock savings bank, the formation of First Annapolis Savings Bank, F.S.B. (the interim entity) and its merger with First Federal, and the acquisition of First Annapolis stock by Bancorp. Resolution 88-603 set forth the following findings in connection with the conversion and acquisition of First Federal by Bancorp:

---

[9] "Subsidiary corporations" referred to the service corporations in which First Federal agreed to limit its investments.

> (1) [First Federal's] liabilities exceed its assets, as calculated under generally accepted accounting principles on a going concern basis, (2) there would be no value realizable by the mutual accountholders [sic] of [First Federal] upon liquidation, (3) severe financial conditions exist which threaten the stability of [First Federal] and conversion from mutual to stock form of organization is likely to improve the financial condition of [First Federal], as it survives in the form of Savings Bank, (4) [First Annapolis] would be a viable entity following the conversion, as determined under 12 C.F.R. § 563b.26, and (5) the conversion of [First Federal] to a federal stock charter is a supervisory conversion within the meaning of Subpart C of 12 C.F.R. Part 563b.

Def. App. at 26. The FHLBB made a further finding that "all of the transactions approved herein are instituted for supervisory reasons and are necessary to prevent the probable failure of [First Federal]." Id.

Resolution 88-603 approved the conversion subject to a number of conditions, requiring:

> That in accordance [with] the terms of the applications, [First Annapolis'] stock is issued and sold to [Bancorp] for cash consideration in an amount calculated as the amount of capital infusion that, upon consummation of the merger, conversion and acquisition, would result in [First Annapolis] achieving a ratio of net worth to total liabilities equal to at least one percent of liabilities computed on the basis of [GAAP] provided further that such consideration is transferred to [First Annapolis] through its account at the Federal Home Loan Bank of Atlanta on or before the date of the merger in a manner acceptable to the Supervisory Agent.

Id. at 27. Resolution 88-603 also provided that Bancorp infuse capital in the amount of $11 million through the purchase of First Annapolis' common stock. Id. at 35. Once the conversion, merger, and acquisition took place, Resolution 88-603 required that Bancorp stipulate that First Annapolis would operate in accordance with the Business Plan for a period of five years. Id. at 34-35.[10]

Resolution 88-603 required that Bancorp and First Annapolis execute a Regulatory Capital and Dividend Agreement with the FSLIC as another condition of approval, stating:

> prior to the consummation of the acquisition, [Bancorp and First Annapolis] shall execute a regulatory capital and dividend limitation

[10] First Annapolis was directed to make a virtually identical stipulation. Id. at 35-36.

> agreement . . . agreeing (a) that unless written approval has been obtained from the Supervisory Agent, in addition to causing [First Annapolis] to comply with 12 C.F.R. Part 563b.3(g)(3), [First Annapolis] shall not pay dividends that exceed 50% of its net income . . . and (2) [sic] Bancorp shall infuse additional capital into [First Annapolis], as necessary and as requested by the Supervisory Agent, to enable [First Annapolis] to increase its regulatory capital on a scheduled basis to comply with the Bank Board's minimum capital requirements within five years from the date of acquisition and, thereafter, that as long as Bancorp controls [First Annapolis], Bancorp will cause the regulatory capital of [First Annapolis] to be maintained at a level consistent with that required by 12 C.F.R. Part 563.13(b) as now or thereafter in effect, and as necessary, will infuse sufficient additional capital, in a form satisfactory t[o] the Supervisory Agent, to effect compliance with such requirement during the first quarter after which [First Annapolis] fails to meet its regulatory capital requirement.

Def. App. at 36.

Resolution 88-603 also conditioned approval of the conversion upon First Annapolis submitting an opinion from an independent certified public accountant (CPA) describing any intangible assets, including goodwill, arising from the transaction and the method of amortization of the intangible assets. Id. at 33-34. Finally, Resolution 88-603 directed the Board to issue a letter to First Annapolis concerning supervisory forbearances. Id. at 38.

**Forbearance Letters**

The FHLBB issued a letter dated July 21, 1988, which granted First Annapolis a series of regulatory forbearances. The first forbearance concerned First Annapolis' investments in, and loans to, a service corporation:

> For a period not to exceed five years, First Annapolis may make investments in, and conforming loans to, its service corporation, subject to the prior written approval of the Supervisory Agent, up to the level permitted by Section 545.74(d) of the Rules and Regulations for Federal Associations ('Federal Associations') for institutions which meet the minimum regulatory capital requirements.

Def. App. at 39.

The second forbearance permitted First Annapolis to amortize goodwill resulting from the merger of First Federal with First Annapolis over a 25-year period on a straight-line basis. Id. This

letter also required First Annapolis to submit an opinion from a certified public accountant within 60 days of the conversion to demonstrate that the transaction was effected in accordance with GAAP except that the value of goodwill could be amortized over 25 years by the straight-line method. Id. All of these regulatory forbearances were granted in connection with the approval of the supervisory conversion of First Federal and its ultimate acquisition by Bancorp. Id. at 39-40.

In a subsequent letter from the FHLBB to the law firm of Dickstein, Shapiro & Morin,[11] dated August 5, 1998, the FHLBB clarified that First Annapolis could comply with the minimum capital regulatory requirements on the five-year schedule it had proposed in the Business Plan stating: "it is First Annapolis' obligation to increase its regulatory capital in order to achieve each annual benchmark and to achieve the regulatory capital amount specified (in the Business Plan) at the end of the fifth year." Def. App. at 41. The letter further stated that First Annapolis was expected to be compliant with minimum regulatory capital requirements as of the first day of the sixth year following the date of conversion, and that this requirement "may or may not coincide with the 3% regulatory capital level" expected by the Business Plan. Id. at 41-42. This August 5, 1988 letter made explicit reference to the "Regulatory Capital Maintenance/Dividend Agreement" (RCMDA), stating: "[t]his letter and the [RCMDA] are intended to be consistent with each other with respect to the regulatory capital requirement and for any potential actions by the Supervisory Agent for failure by First Annapolis to meet the conditions of the conversion and/or Agreement." Id. at 43.

On August 11, 1988, the FHLBB sent another letter to Douglas A. Parran, President of First Annapolis, regarding the forbearance on service corporation investment limitations:

> In response to your request, and in accordance with the service corporation investment limitation forbearance granted by the [FHLBB], please be advised that the Supervisory Agent will neither take, nor recommend that the FHLBB or Federal Savings and Loan Insurance Corporation take, any supervisory action against First Annapolis Savings Bank, FSB, for failure to comply with the limitations of 12 C.F.R. Section 545.74(d) with respect to presently existing service corporation investments which have been identified in the schedule prepared by the institution as of July 31, 1988, and submitted to the Supervisory Agent on August 10, 1988, so long as First Annapolis complies with the requirements of FHLBB Resolution 88-602 pertaining to compliance with its Business Plan and, so long as it shall remain in effect, the requirements of the Supervisory Agreement dated July 8, 1987, between First Federal

---

[11] Dickstein, Shapiro & Morin was listed as "Special Counsel" in the May 13, 1988 Amendment No. 2 to Bancorp's Application H-(e)1 and Amendment No. 3 to First Federal's Form AC. Def. App. at 342.

> Savings and Loan Association of Annapolis and the Federal Home Loan Bank of Atlanta.

Def. App. at 44.

On August 12, 1988, the FHLBB issued what it termed "a technical amendment" to the July 21 forbearance letter with respect to the forbearance on investments in service corporations. Id. at 45. The August 12, 1988 letter substituted new language with regard to the investment in service corporations forbearance as follows:

> For a five year period from the date of conversion, First Annapolis shall, solely for purposes of complying with service corporation investment limitations set forth in Federal Regulation 545.74(d), be deemed to be in compliance with its minimum regulatory capital requirement.

Id.

**Regulatory Capital Maintenance/Dividend Agreement**

On August 12, 1988, as required by FHLBB Resolution 88-603**,** Bancorp and the FSLIC, under the operating direction of the FHLBB, entered into a Regulatory Capital Maintenance/Dividend Agreement (RCMDA). Id. at 46-52. The RCMDA defined "Regulatory Capital" as "capital increased on a scheduled basis for five years as set forth in the Business Plan of the Plan of Conversion, and, thereafter, regulatory capital as defined in accordance with 12 C.F.R. § 561.13 or any successor regulation thereto." Def. App. at 47 (emphasis added). It further defined "Regulatory Capital Requirement" as "[First Annapolis'] capital increased on a scheduled basis for five years as set forth in the Business Plan of the Plan of Conversion, and thereafter, at any time . . . computed in accordance with 12 C.F.R. § 561.13 or any successor regulation thereto." Id. (emphasis added). The RCMDA further defined "Regulatory Capital Deficiency" as:

> the amount by which the regulatory capital of [First Annapolis], computed in accordance with the scheduled capital amounts as set forth in the Business Plan for five years and thereafter, in accordance with 12 C.F.R. § 561.13, is less than [First Annapolis'] Regulatory Capital Requirement.

Id. (emphasis added).

In the RCMDA, Bancorp undertook two pertinent obligations "to maintain [First Annapolis'] Regulatory Capital in compliance with the Regulatory Capital Requirement and the limitations imposed by Section IV [regarding receipt of dividends]." Id. Bancorp promised that it would cause the regulatory capital of First Annapolis to be maintained above the regulatory capital level set forth

in the Business Plan, and would infuse such capital so as to cure any deficiency in the regulatory capital level set forth in the Business Plan, stating:

> As long as [Bancorp] controls [First Annapolis], [Bancorp] will cause the Regulatory Capital of [First Annapolis] to be maintained at a level at or above the Regulatory Capital Requirement and as necessary, will infuse sufficient additional capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement and cure a Regulatory Capital Deficiency during the first quarter after which [First Annapolis] fails to meet its Regulatory Capital Requirement.

Id. at 48. In addition, Bancorp agreed not to accept dividends from First Annapolis that exceeded 50 percent of First Annapolis' net income for the fiscal year, unless written approval from the Supervisory Agent was obtained. Id. The RCMDA stated, in relevant part, that "the Acquiror [Bancorp] is willing to make such commitment in order that the FSLIC will approve the acquisition." Id. at 46. The RCMDA also stated that Bancorp's agreement was "in consideration of the FSLIC approving the acquisition of control of [First Annapolis] by [Bancorp]." Id.

The RCMDA also contained the following Clause VI. D, "Miscellaneous Provisions," which provided:

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease [Bancorp's] obligation under this Agreement.

Id. at 50. The RCMDA described itself as "a contract made under and governed by Federal law." Id. at 50.

**Certified Public Acountant's Letter**

As required by the July 21, 1988 forbearance letter and Resolution 88-603, Bancorp provided a letter from a CPA setting forth the push-down accounting adjustment recorded "in connection with the voluntary supervisory conversion of [First Federal] with all capital stock to be owned by [Bancorp]. Def. App. at 270. On October 28, 1988, Deloitte Haskins & Sells submitted the letter stating that, with respect to the conversion, "[g]oodwill will be amortized over 15.2 years in accordance with Financial Accounting Standards Board Opinion #72." Id.

**FHLBB Confirmation Letter**

On February 9, 1989, Gregory Jones, the FHLBB's Supervisory Agent overseeing the conversion, submitted a letter to First Annapolis, care of Dickstein, Shapiro & Morin, stating that all conditions precedent had been met and that the conversion was completed, with an effective date of August 13, 1988. Id. at 369.

**FIRREA**

On August 9, 1989, FIRREA became effective. The legislation abolished the FHLBB, created the OTS and instructed it to promulgate regulations creating strict capital standards which did not allow intangibles such as goodwill to be counted as capital for regulatory purposes. Specifically, Congress created three new regulatory capital standards: core capital, tangible capital, and risk-based capital. 12 U.S.C. § 1464(t). Under these new standards, supervisory goodwill could not be counted towards tangible capital. The OTS promulgated regulations on December 7, 1989, implementing FIRREA that prohibited First Annapolis from treating the supervisory goodwill as an asset for the purpose of meeting its tangible capital requirement.

As of May 31, 1990, First Annapolis would have met the 1.80% capital benchmark as provided in the Business Plan had more stringent regulatory capital requirements not been imposed. Plaintiff's Appendix of Exhibits in Support of Supplemental Brief in Support of Motion for Judgment on Liability ("Pl. App.") Exh. 12 ¶ 6. According to a January 1990 Report of Examination, as of December 31, 1989, First Annapolis was failing both the tangible and core capital requirements by $69.7 million, partially as a result of the deduction of goodwill. Def. App. at 195, 203.

On May 31, 1990, following failed negotiations with Bancorp, the OTS appointed the Resolution Trust Corporation (RTC) as receiver. First Annapolis Bancorp, Inc. v. United States, 54 Fed. Cl. 529, 533-34 (2002) ("First Annapolis I"). On June 1, 1990, the RTC took possession of First Annapolis and succeeded to all rights, titles, powers, and privileges of the institution.[12] Id.

---

[12] The Court in First Annapolis I further described the transfer into receivership as follows:

> On May 31, 1990, the OTS issued a federal charter for First Federal Savings Bank of Annapolis (First Federal II) allowing the RTC, as a conservator, to operate First Federal II as a new thrift to manage and control the assets and liabilities of the failed First Annapolis. Also on June 1, 1990, the RTC, entered into a purchase and assumption agreement with First Federal II. The purchase and assumption agreement provided for First Federal II to purchase the assets of First Annapolis in consideration of its assumption of certain liabilities, including the insured deposits of First Annapolis.

54 Fed. Cl. at 534.

## Discussion

### Standing

Defendant argues that Bancorp lacks standing because it was not a party to a contract for goodwill or service corporation forbearances. The Government alleges that, if any contract existed, it was between First Annapolis and the Government, not between Bancorp and the Government. In order to have standing to enforce a contract, a plaintiff must establish that it is in privity of contract with the Government. Anderson v. United States, 344 F.3d 1343, 1351 (Fed. Cir. 2003)(citing Erickson Air Crane Co. of Wash. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984) ("the government consents to be sued only by those with whom it has privity of contract")). Privity is necessary to show that the Government has waived its sovereign immunity; without such a waiver, the Government may not be sued. Chancellor Manor v. United States, 331 F.3d 891, 899 (Fed. Cir. 2003). To establish privity of contract, Bancorp must establish that it has a direct claim against the Government, separate and apart from its status as a shareholder. FDIC ex rel. Karnes County Sav. and Loan Ass'n v. United States, 342 F.3d 1313, 1319 (Fed. Cir. 2003) (citing First Hartford Corp. v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999)).[13]

In Home Savings of America, FSB v. United States, 399 F.3d 1341, 1349 (Fed. Cir. 2005), the Federal Circuit found that a holding company, which was not a signatory to certain assistance agreements, was nonetheless in privity with the Government because the transactions there evidenced reciprocal promises between the holding company and the Government. In distinguishing cases concluding that generally shareholders lacked standing, the Federal Circuit found that the holding company "was not only a shareholder, but an essential participant as a contracting party," noting that the holding company had negotiated for approval of the acquisitions and the Government had recognized the holding company as obligating itself to maintain the institution's net worth. Id. at 1349-50. Because the Government's promise ran directly to the holding company, the holding company was in privity of contract and had standing to sue. Id. at 1349.

Home Savings is strikingly similar to the instant case. Here, Bancorp, like the plaintiff in Home Savings, was not only the sole shareholder of First Annapolis, it was actually the acquiror of

---

[13] In this action, Judge Horn previously recognized that:

> the plaintiff Bancorp has brought separately identified claims based upon the alleged contract entered into by Bancorp and the government. The plaintiff Bancorp's complaint does not allege claims on behalf of the failed thrift. Bancorp has brought its claims as direct claims against the United States for breach of Bancorp's contract and property rights, not those of any other party, including First Annapolis or its successor . . . .

First Annapolis Bancorp., Inc. v. United States, 56 Fed. Cl. 206, 210 (Fed. Cl. 2003).

the thrift. It was Bancorp which purchased all of the outstanding shares of First Annapolis, and contributed sufficient capital to First Annapolis for the merger and acquisition to go forward. Further, Bancorp's crucial obligations in this transaction were prominently featured in the resolutions. Resolution 88-603 approved the conversion subject to an express condition that Bancorp execute the RCMDA, thereby agreeing to infuse additional capital into First Annapolis as necessary to maintain First Annapolis' regulatory capital and to effect compliance if First Annapolis failed to meet such requirement. The RCMDA defined Bancorp to be the acquiror and imposed obligations for maintaining capital benchmarks and complying with regulations solely on Bancorp. As such, Bancorp, like the plaintiff in Home Savings, was "an essential participant as a contracting party" obligated to maintain the thrift's capital. 399 F.3d at 1350; see also, La Van v. United States, 382 F.3d 1340, 1347-49 (Fed. Cir. 2004), (finding that acquirors were "an integral part of the conversion" and had standing); Franklin Fed. Sav. Bank v. United States, 53 Fed. Cl. 690, 696-97 (2002), aff'd on other grounds, 431 F.3d. 1360 (Fed. Cir. 2005) (concluding that a contract existed between a holding company and the Government because the holding company was a signatory to the core document obligating the holding company to maintain regulatory capital).

The Court recognizes that Bancorp was only a signatory to the RCMDA and the Holding Company Application and its amendments. Nonetheless, the role of Bancorp as the holding company of First Annapolis and as the "acquiror" under the express terms of the RCMDA was referenced in FHLBB Resolution 88-603 and the Forbearance Letter dated July 21, 1988:

- [Resolution 88-603] WHEREAS [First Federal] . . . filed . . . an application . . . for permission to convert from a federally-chartered mutual association to a federally-chartered stock savings bank to be known as [First Annapolis] through a merger into a federal stock interim institution [First Annapolis], 100% of which is to be acquired by [Bancorp]. Def. App. at 25.

- [Resolution 88-603] WHEREAS, organizers have filed an application, on behalf of [Bancorp], for permission to organize [First Annapolis], an interim federal stock savings bank. Id.

- [Resolution 88-603] WHEREAS [Bancorp] has filed with the FSLIC for review . . . an application for prior FSLIC approval of its acquisition of control of [First Annapolis]. Id.

- [Resolution 88-603] IT IS FURTHER RESOLVED, that . . . [Bancorp] is hereby authorized to acquire control of [First Annapolis], and of [First Federal] as a result of [the] merger . . . provided that the following conditions are complied with to the satisfaction of the Supervisory Agent. Id. at 31-32.

- [July 21, 1988 Forbearance Letter] In connection with . . . the acquisition of First Annapolis by [Bancorp], the following regulatory forbearances are hereby granted. Def. App. at 39.

Bancorp's role in acquiring the stock of First Annapolis was described in these documents as part and parcel of the transaction. More importantly, the sine qua non of this transaction was Bancorp's promise to infuse $11 million of capital into First Annapolis and to undertake a significant continuing obligation, i.e., ensuring that First Annapolis would meet its capital requirements during contract performance. The Government insisted that Bancorp sign up to this obligation in the RCMDA, and Bancorp did. As such, Bancorp was obligated both to ensure First Annapolis' compliance with its capital requirements and to infuse additional capital as needed so that First Annapolis could meet ensuing regulatory capital requirements. The RCMDA stated that Bancorp was "willing to make such commitment in order that the FSLIC would approve the acquisition" and that Bancorp's agreement to maintain First Annapolis' regulatory capital was "in consideration of the FSLIC approving the acquisition of control" of First Annapolis by Bancorp. Def. App. at 46. In return, the Government promised Bancorp that it would approve the acquisition of control of First Annapolis by Bancorp. Id. As such, here as in Home Savings, Plaintiff has standing because the Government's promise ran directly to Bancorp and Bancorp was "an essential participant as a contracting party," obligated to maintain the thrift's capital. 399 F.3d at 1349.

**Summary Judgment Standard**

The Court may grant a motion for summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." RCFC 56(c). A genuine issue is one that "may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit." Id. at 248. The movant has the burden of establishing the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once this burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. Liberty Lobby, 477 U.S. at 256. It is not necessary that such evidence be admissible, but mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative will not defeat summary judgment. Celotex, 477 U.S. at 324; Liberty Lobby, 477 U.S. at 249-50; Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). A court does not "weigh" each side's evidence when considering a motion for summary judgment. Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002). Rather, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

When considering cross-motions for summary judgment, the court evaluates each motion under the same standard. Cubic Def. Sys., Inc. v. United States, 45 Fed. Cl. 450, 457 (1999). If

genuine disputes exist over material facts, both motions must be denied. Mingus Constructors, 812 F.2d at 1390-91.

Courts must act with caution in granting summary judgment, because though it is a useful procedural tool to speed the determination of disputes in which no questions of material fact exist, an erroneous grant of summary judgment may deny a party its chance to prove its case at trial. D.L. Auld Co. v. Chroma Graphics Corp., 714 F.2d 1144, 1146-47 (Fed. Cir. 1983); Northeast Sav. v. United States, 63 Fed. Cl. 507, 514 (2005). Likewise, an "improvident denial" of summary judgment may force the parties and the court to bear the expense of an unnecessary trial. D.L. Auld, 714 F.2d at 1147; Northeast Sav., 63 Fed. Cl. at 514.

**Was There A Contract?**

In cases in which the Government contracts as a commercial party, courts are to apply "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties." Winstar, 518 U.S. at 871. When contracting with the Federal Government, those elements of contract formation are: "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." Anderson, 344 F.3d at 1353; Total Medical Management, Inc. v. United States, 104 F.3d 1314 (Fed. Cir. 1997).

**Mutuality of Intent to Contract**

Unambiguous mutuality of intent to contract is a precondition for contract formation. Anderson, 344 F.3d at 1353. In order to show that mutual intent existed, a plaintiff must provide objective evidence of an offer and a reciprocal acceptance. Id. at 1353.

**Offer**

An offer is "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Anderson, 344 F.3d at 1353; Linear Tech. Corp. v. Micrel, Inc., 275 F.3d 1040, 1050 (Fed. Cir. 2001) (quoting Restatement (Second) of Contracts § 24). In this case, Bancorp made an offer to the Government, reflected in its Application to convert First Federal to a federal stock savings bank and merge it into First Annapolis, and have Bancorp acquire First Annapolis, immediately infusing the merged institution with the capital. The offer embodied in the Application was premised on approval of the relaxed capital benchmarks in the Business Plan, attached as an exhibit to the Application, in lieu of the benchmarks required by the applicable regulations for the first five years after conversion. The Application and Business Plan proposed that First Annapolis account for the acquisition and merger using pushdown accounting and that goodwill be counted as regulatory capital and amortized over 25 years. While Bancorp's Application accompanied First Federal's Form AC, the Business Plan and the proposed forbearances were specifically incorporated into

Application H-(e)1 which was submitted by Bancorp. As such, Bancorp made the offer to acquire the thrift and infuse capital in exchange for the requested forbearances.

**Acceptance**

"For a contract to be formed once an offer is made, there must be an acceptance, i.e., a 'manifestation of assent' to the terms thereof made by the offeree in a manner invited or required by the terms of the offer." Anderson, 344 F.3d at 1355 ( quoting Restatement § 50(1)). In D & N Bank v. United States, 331 F.3d 1374, 1379 (Fed. Cir. 2003), the Federal Circuit held that in the Winstar context, "something more" than mere regulatory approval of the merger is necessary to support a finding that the Government accepted an offer and entered into a contractually binding agreement. In Anderson, the Federal Circuit illuminated what that "something more" might be, stating that it "must be, according to our precedent, a 'manifest assent to the same bargain proposed by the offer.'" 344 F.3d at 1356 (quoting Restatement (Second) of Contracts § 50 cmt. a.); Northeast Sav. v. United States, 63 Fed. Cl. 507, 516 (2005).

The Bank Board Resolutions and the August 5, 1988 letter from the FHLBB contain express language that for a five-year period First Annapolis would be permitted to meet the relaxed capital benchmarks in the Business Plan, in lieu of the more stringent requirements in the governing regulations. The August 5, 1988 letter expressly recognized First Annapolis's obligation to meet the minimum capital regulatory requirements of 12 C.F.R. § 563.13 after the five-year period provided in the Business Plan had ended. Def. App. at 41-42. The letter required that on the first day of the sixth year, First Annapolis would be required to come into compliance with then current regulatory requirements rather than the benchmarks in the Business Plan, even if those requirements were higher.[14] Def. App. at 41-42.

The Bank Board Resolutions contained similar language to the effect that First Annapolis would operate within the parameters of the Business Plan for purposes of complying with capital requirements for the first five years after conversion. Again in the RCMDA, Bancorp and the FSLIC agreed that the resulting institution would follow the relaxed capital benchmarks in the Business Plan for the first five years after conversion in order to have the FSLIC approve the merger of First Annapolis and First Federal. Def. App. at 46-52, 60, 177. The Bank Board Resolutions and

[14] Counsel for Plaintiff acknowledged:

> All of the documents said that we were exempt for the first five years and to prevent potential failure, two paragraphs down of the regulatory capital requirement, on the first day of the sixth year. Well, what does that phrase mean if not that the regs kick in, as it says, on the first day of the sixth year; otherwise, there's no reason for the phrase.

Tr. (Mar. 24, 2005) at 51-52.

Forbearance Letters also contained express approval of the push-down method of accounting and the amortization of goodwill over a 25-year period. Def. App. at 33-36, 39.

**Consideration**

In the Winstar context, the consideration necessary for contract formation involves the Government providing economic inducements such as goodwill and capital credits to relatively healthy thrifts in exchange for their merging with troubled thrifts. The Government avoids the expense of bailing out the troubled thrifts temporarily and the acquiring thrift receives the goodwill to be counted toward capital requirements. Winstar, 518 U.S. at 853.

Such consideration was exchanged here. First Federal was a failing thrift in need of assistance. In exchange for the merger of First Federal with First Annapolis and the infusion of capital from Bancorp as well as Bancorp's promise in the RCMDA to ensure that First Annapolis met its ensuing capital requirements, the Government allowed First Annapolis to meet relaxed capital benchmarks as set out in the Business Plan for the first five years after the conversion, instead of the benchmarks set by regulation, to utilize goodwill as regulatory capital, and to amortize the goodwill over an extended period using the straight-line method of accounting. Def. App. at 39. See Hometown Financial Inc. v. United States, 409 F.3d 1360 (Fed. Cir. 2005); Glendale Fed. Bank, FSB v. United States, 229 F.3d 1374, 1382 (Fed. Cir. 2001); Northeast Sav., 63 Fed. Cl. at 518.

**Authority**

To prove that the Government is contractually bound, a plaintiff must show that the parties who purported to bind the Government had actual authority to do so. Hometown, 409 F.3d at 1364-65; Northeast Sav., 63 Fed. Cl. at 518. In the Winstar context, it has long been settled that the FHLBB had authority to bind the Government. As the Federal Circuit stated in Hometown:

> We have already answered the question of whether the FHLBB and the FSLIC have the authority to enter into contracts like these in the affirmative. Winstar Corp. v. United States, 64 F.3d 1531, 1548 (Fed. Cir.1995) (Winstar II ). Since its inception, the FSLIC has had the authority under 12 U.S.C. § 1725(c)(3) to make contracts. Id. Further, both the FSLIC and its supervisory agency, the FHLBB, have had the authority both to extend assistance to acquirers of insolvent FSLIC-insured thrifts, 12 U.S.C. § 1729(f)(2)(A) (repealed), and to set minimum capital limits on a case-by-case basis, 12 U.S.C. § 1730(t)(2) (repealed).

409 F.3d at 1364 (quoting Cal. Fed. Bank, F.S.B. v. United States, 245 F.3d 1342, 1347 (Fed. Cir. 2001) (internal quotes omitted)). Accordingly, the FSLIC and the FHLBB had the authority to bind the United States in contract.

**The Contract Was Not Limited to the RCMDA**

Defendant contends that the RCMDA is the only document that comprises a contract and that the forbearances in the resolutions and forbearance letters -- allowing compliance with relaxed capital benchmarks in the Business Plan, the use of goodwill as regulatory capital and its long-term amortization -- were not part of the contract.

This Court construes all the documents in the transaction to assess what constitutes the contract. See Home Savings of America v. United States, 399 F.3d 1341, 1349 (2005). Cal. Fed., 245 F.3d at 1347 ("'[I]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and (FHLBB) resolutions confirm that intent, the absence of an (assistance agreement) or (supervisory action agreement) should be irrelevant to the finding that a contract existed.'")(quoting California Fed. Bank v. United States, 39 Fed. Cl. 753, 773 (1997)). Here, several documents comprise the contract.

Bancorp submitted a holding company application that contained a Business Plan. This Business Plan proposed regulatory capital benchmarks which relaxed the minimum regulatory capital requirements then in effect and the ability to count goodwill towards regulatory capital until it was fully amortized. The FHLBB agreed to the terms in the Business Plan by issuing Resolutions, forbearances letters, and entering into a RCMDA with Bancorp. The RCMDA expressly referenced the capital benchmarks in the Business Plan.

In Home Savings, 399 F.3d at 1349, the court found that the Assistance Agreements were not the entire contract when they were part of a larger transaction which included FHLBB resolutions demonstrating the Government's exchange of promises with the acquiring entity. Similarly, in the instant case, the Application, the Business Plan, the Forbearance Letters, the Bank Board Resolutions, and the RCMDA are components of the overall transaction. The FHLBB Resolutions specifically incorporate the Forbearance Letters. The August 5, 1988 letter specifically references the RCMDA and indicates that the letters and the RCMDA work in concert. "Reference is made to the Regulatory Capital Maintenance/Dividend Agreement ("Agreement") that is to be signed as a part of the conversion. This letter and the Agreement are intended to be consistent with each other with respect to the regulatory capital requirement . . . . This letter is not intended, in any manner, to limit the Agreement . . . ." (emphasis added). Def. App. at 43.

The manifest interaction of these documents distinguishes this case from Franklin, 431 F.3d at 1366-67. There, the Federal Circuit found the Dividend Agreement to be the sole contract for the regulatory treatment of goodwill, where it was clear that the parties contemplated that there would not be any agreement absent the Dividend Agreement and that the Approval Letter of the Board was conditioned on execution of the Dividend Agreement. Id. at 1366. Importantly, the Dividend Agreement in Franklin did not incorporate the Approval and Forbearance letters and superceded all prior agreements save "any understanding in writing by the parties." Franklin, 431 F.3d at 1366. While the Dividend Agreement in Franklin by its terms constituted the entire contract, the RCMDA

here was "part of" the agreement along with the Application, Business Plan, Resolutions, and Forbearance Letters.

**The Risk of Regulatory Change was Not Shifted to the Thrift Until Five Years After the Conversion**

Defendant argues that even if a contract was formed which allowed First Annapolis to count goodwill as capital and decreased the capital benchmarks, the RCMDA shifted the risk of regulatory change to the thrift. Defendant focuses on Clause VI.D of the RCMDA -- the Miscellaneous Provisions clause -- which states:

> All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquirors' obligation under this Agreement.

Def. App. at 50 (emphasis added).

At the outset, the Court notes that the Miscellaneous Provisions clause itself, when read in the context of the RCMDA here, does not warrant a conclusion that successor regulations would dictate capital requirements. This clause states that all references to regulations "used in this Agreement" shall include successor regulations and potentially increase the Acquiror's obligation. However, there were no regulations "used in this Agreement" which governed the capital requirements. Rather, under the clear definitions in the RCMDA, the relaxed benchmarks in the Business Plan, not any regulations, governed the capital requirements for the first five years. Def. App. at 50.

Moreover, even if this clause could somehow be read to incorporate successor regulations to the requirements set forth in the Business Plan, this general provision regarding successor regulations would be trumped by more specific provisions establishing that First Annapolis would meet the relaxed capital benchmarks in the Business Plan for five years. The RCMDA expressly integrated the Business Plan's relaxed capital benchmarks for the first five years by including the following definitions:

> 'Regulatory Capital' means capital increased on a scheduled basis *for five years* as set forth in the Business Plan of the Plan of Conversion, and, *thereafter*, regulatory capital as defined in accordance with 12 C.F.R. § 561.13 or any successor regulation thereto.
>
> 'Regulatory Capital Requirement' means the New Institution's capital increased on a scheduled basis *for five years* as set forth in the Business Plan of the Plan of Conversion, and, *thereafter*, at any given

> time, computed in accordance with 12 C.F.R. § 563.13, or any successor regulation thereto.
>
> 'Regulatory Capital Deficiency' means the amount by which the regulatory capital of the New Institution, computed in accordance with the scheduled capital amounts as set forth in the Business Plan *for five years* and, *thereafter*, in accordance with 12 C.F.R. § 561.13, is less than the New Institution's Regulatory Capital Requirement.

Def. App. at 47 (emphasis added).

In Hometown, 409 F.3d at1367-68, the Federal Circuit held that, notwithstanding language in a similar Miscellaneous Clause of a Regulatory Capital Maintenance Agreement (RCMA),[15] the RCMA had not shifted the risk of regulatory change to the plaintiff.[16] In Hometown, the Federal Circuit found that the contract specifically exempted the thrift from the regulation regarding the maintenance of minimum capital requirements for a five-year period. Id. at 1368. The RCMA in Hometown defined the Regulatory Capital Requirement as follows:

> 'Regulatory Capital Requirement' means the Institution's regulatory capital requirement at any given time computed in accordance with 12 C.F.R. § 563.13(b), or any successor regulation thereto, except that during the five-year period following consummation of the acquisition of the Institution, the Regulatory Capital Requirement of the Institution shall take into account forbearances granted by the FHLBB by letter dated December 22, 1987 and those granted by the Principal Supervisory Agent of the Federal Home Loan Bank of Indianapolis by letter dated April 1, 1988.

Id. at 1367 (emphasis added). The Federal Circuit held that this language excepting Hometown from the risk of regulatory change for a certain length of time was a specific contract provision which was controlling over the general contract provision shifting the risk of regulatory change. Hometown, 409 F.3d at 1369 (citing Hol-Gar Mfg. v. United States, 169 Ct. Cl. 384, 351 F.2d 972, 980 (1965).

In so ruling, the Hometown court distinguished two earlier cases that had similar Miscellaneous Provisions -- Guaranty Fin. Servs., Inc. v. Ryan, 928 F. 2d 994 (11th Cir. 1991), a

---

[15] An RCMA differs an RCMDA insofar as the former does not include restrictions on the payment of dividends.

[16] Hometown also involved the conversion of a federal mutual savings and loan association to a federal stock savings bank. Hometown, 409 F.3d at 1362. The conversion was approved by the FHLBB based on two business plans containing a list of regulatory forbearances and requiring the execution of an RCMA by the holding company's major shareholder. Id.

pre-Winstar case and Admiral Fin. Corp. v. United States, 378 F.3d 1336 (Fed. Cir. 2004). Neither Guaranty nor Admiral contain the specific language of Hometown and the instant case excepting the plaintiffs from regulations for a definitive time period.[17] As the Hometown Court explained, "[w]hat distinguishes the present case is that there is language addressing the length of time during which the promised exception would last." 409 F.3d at 1369. Such language, addressing the five-year period during which the Business Plan's relaxed capital requirements were to displace regulatory requirements, is present here in the RCMDA's definitions. Therefore, First Annapolis, like Hometown, was insulated from regulatory change for five years and the risk of regulatory change was not shifted to the thrift until five years after the conversion.

**The Breach**

When the law as to minimum capital requirements changed, "the Government was unable to perform its promise and, therefore, became liable for breach." Winstar, 518 U.S. at 870; Am. Fed. Bank, F.S.B. v. United States, 58 Fed. Cl. 429, 445-46 (2003). With the enactment of FIRREA, the OTS developed new minimum capital requirements, which were applied to First Annapolis in December 1989. Thus, First Annapolis was required to meet more stringent capital requirements than those established in its Business Plan. FIRREA also disallowed the use of goodwill in calculating the new tangible capital requirement, which had been necessary for First Annapolis to meet even the relaxed requirements, thus compounding First Annapolis' inability to meet the new requirements. As in Winstar, the Government breached its contract with Bancorp when it began to enforce new minimum capital requirements in accordance with FIRREA.[18] Without goodwill as regulatory capital, as of December 31, 1989, First Annapolis was failing both the tangible and core capital requirements of FIRREA.

---

[17] The Federal Circuit recently followed Admiral concluding that, absent the specific "excepting" language, the general risk-shifting language of the type found in the Miscellaneous Provisions would shift the risk of regulatory change to a plaintiff. Franklin Fed. Sav. v. United States, 431 F.3d 1360, 1371 (Fed. Cir. 2005) reh'g and reh'g en banc denied (March 21, 2006). However, here, as in Hometown, such additional language governing compliance with specified capital benchmarks for a prescribed duration supercedes the general risk-shifting language in the RCMDA's Miscellaneous Provisions.

[18] In its Supplemental Brief, Bancorp alleges that the regulatory changes wrought by FIRREA breached the Government's promise to recognize the favorable regulatory treatment of First Annapolis' investment levels in service corporations. While it is clear that forbearances regarding investments in service corporations were granted in connection with the regulators' approval of the supervisory conversion and acquisition, it is unclear on this record whether or how FIRREA impacted this aspect of the agreement.

## Conclusion

1. Plaintiff's Motion for Summary Judgment on Liability is **GRANTED IN PART**.

2. Defendant's Cross-Motion for Summary Judgment on Liability is **DENIED**.

3. Trial on damages will be conducted from **March 19 - 30, 2007, in Washington D.C.**

4. The Court will conduct a telephonic status call on **February 7, 2007, at 3:00 p.m. ET.**

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**