# In the United States Court of Federal Claims

**No. 94-522C**

**(Filed January 31, 2007)**

| | |
|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** Plaintiff, v. **THE UNITED STATES,** Defendant. | **Winstar; Breach of Contract; Prior Material Breach; Procedural Waiver; RCFC 8(c); Substantive Waiver; Investments in Service Corporations; Shareholder Loans; 12 C.F.R. § 563b(3)(c)(22); 12 C.F.R. § 563b.9; Summary Judgment.** |

Dale A. Cooter, Cooter, Mangold, Tompert & Karas, LLP, 5301 Wisconsin Avenue, N.W., Suite 500, Washington, D.C., for Plaintiff.

Richard B. Evans, Commercial Litigation Branch, Civil Division, Department of Justice, 1100 L Street, N.W., Washington, D.C., for Defendant; Timothy Abraham, Melinda Hart, Mark Pittman, James R. Whitman, Department of Justice, Civil Division, Washington, D.C., Of Counsel.

## OPINION ON PRIOR MATERIAL BREACH

**WILLIAMS**, Judge

In this Winstar litigation Defendant contends that Plaintiff's prior material breach excused any subsequent breach by Defendant.[1] Specifically, Defendant claims that Plaintiff breached the contract by improperly making loans to individuals to purchase stock in the holding company and by exceeding allowable investments in service corporations. Plaintiff claims that Defendant waived

[1] In a companion decision issued this date, the Court granted Plaintiff's motion for summary judgment in part and held that Defendant is liable for the breach of contract resulting from the passage of Financial Institutions Recovery, Reform and Enforcement Act of 1989 (FIRREA), Pub. L. No. 101-73, 103 State 183, but that Plaintiff is limited to damages for a five-year period.

these defenses procedurally by failing to raise them in timely fashion. Plaintiff also contends that Defendant substantively waived the defenses by continuing to perform the contract with knowledge of the improper loans to shareholders and excess investments in service corporations.

The Court dismisses the prior material breach defense based on investments in service corporations as substantively waived and concludes that Defendant failed to prove that the shareholder loans effected a prior material breach.[2] Although loans were made to shareholders in violation of regulation, the funding from the stock purchased with the loans was not necessary for the capitalization and the merger could have proceeded without it. Further, the loans were ultimately repaid or sold to other institutions, and Defendant did not demonstrate to what extent it suffered losses resulting from these loans. As such, Plaintiff did not commit a prior material breach of the contract by making loans to shareholders.

## Findings of Fact[3]

First Federal Savings & Loan Association of Annapolis (First Federal) was a savings and loan institution in Annapolis, Maryland. In order to recapitalize, First Federal converted from a federal mutual savings and loan association to a stock savings bank and then merged into the newly formed federal stock savings bank, First Annapolis Savings Bank, F.S.B. (First Annapolis). Plaintiff, First Annapolis Bancorp, Inc. (Bancorp), was formed for the purpose of acquiring the stock of the merged institutions, thereby infusing capital into the converted thrift.

Defendant, in approving the merger, agreed to allow the thrift to meet relaxed regulatory capital requirements and to count goodwill toward these modified regulatory capital requirements. The Government breached this agreement by enacting and enforcing FIRREA.

---

[2] Although Defendant did not timely raise these defenses, the Court finds no procedural waiver because there was no prejudice or surprise to Plaintiff as Plaintiff admittedly had full discovery on both the shareholder loans and investments. However, the Government substantively waived its defense based upon investments in service corporations because it had prior knowledge of such investments and acquiesced to them, without claiming that the investments breached the contract or violated regulation until after Defendant's breach. The Government did not substantively waive its defense of prior material breach based on shareholder loans because it did not have actual or constructive knowledge prior to FIRREA that the loans were used to purchase stock.

[3] The Court conducted a trial from June 19-22, 2006, on prior material breach based on shareholder loans. The findings of fact regarding shareholder loans are based upon the record of the trial and the parties' Joint Stipulation of Facts (Stip.). The Court does not make findings of fact on the investments in service corporations, instead concluding on summary judgment that this defense was waived. The Government had the opportunity to question Mr. Parran and any other witnesses on this waiver issue during the June 2006 trial, but chose not to do so. Tr. (May 30, 2006) at 73-74.

**The Conversion**

First Federal filed an application for supervisory conversion on November 5, 1987. Joint Exhibit (JX) 87. Appended to First Federal's Application was its Plan of Conversion which stated: "[t]he Association shall not loan funds or otherwise extend credit to any person to purchase shares of Holding Company Stock offered in the Conversion." JX 87 at WOT4150499. Bancorp was incorporated on November 19, 1987, as a savings and loan holding company. Stip. ¶ 1. Bancorp was formed for the purpose of acquiring First Federal after it had converted from a mutual savings and loan into a capital stock savings bank and merged with First Annapolis. Id. Bancorp planned to sell at least 12 million shares of its common stock at $1 per share in order to capitalize First Annapolis, thus ensuring that First Annapolis achieved a one-percent capital-to-liabilities ratio. Id.

On July 21, 1988, the FHLBB issued Resolution 88-603 which stated in part:

> On the date of consummation of the acquisition, merger and conversion, [Bancorp] shall make a capital contribution to [First Annapolis] through the purchase of common stock in a minimum amount equal to the greater of $11,000,000 or an amount sufficient to raise the net worth of [First Annapolis] to 1% of total liabilities on a GAAP basis as specified in 12 C.F.R. Part 563b.26(b)(2).

JX 93 at PFA0100103.

Bancorp was capitalized through the sale of 14,165,874 shares of its common stock at the price of one dollar per share. Defendant's Exhibit (DX) 118 at WOT3150007; DX 397 at WOT3150156. Bancorp then purchased 100 percent of the stock of First Annapolis, for a capital investment of $13,665,907. DX 397 at WOT3150156; Tr. at 626.[4] First Federal converted from a mutual savings and loan association and merged into First Annapolis as a federal stock savings bank. JX 93.

At the time of the conversion, one percent of the liabilities of the bank on a GAAP basis was $7,300,000. Tr. at 765-66. Pursuant to the terms of Resolution No. 88-603, the minimum amount of capital Bancorp had to raise for the conversion was $11,000,000. JX 93 at PFA0100103. Bancorp raised $3,165,874 more in capital than it was required to invest in First Annapolis (14,165,874 - 11,000,000 = 3,165,874). DX 171. Bancorp also exceeded the minimum amount it was required to invest in First Annapolis by $2,665,907 (13,665,907 - 11,000,000 = 2,665,907). Id; see also Tr. at 632-33, 826-27.

On August 12, 1988, Douglas Parran, President of Bancorp, signed the Regulatory Capital Maintenance/Dividend Agreement (RCMDA). JX 99. The disclosure provision of the RCMDA,

---

[4] "Tr." refers to the transcript of the trial occurring between June 19-22, 2006, unless otherwise indicated.

"Representations, Covenants and Warranties of the Acquiror" stated in relevant part:

> The information given to the FSLIC by the Acquiror [Bancorp] and relied on thereby in connection with the acquisition of control of the New Institution [First Annapolis] is true, accurate, complete and current in all material respects;

Id. at WOQ2801447. The effective date of the conversion was August 13, 1988. Appendix to Defendant's Supplemental Memorandum in Support of Motion to Dismiss (Def. App.) at 369.

**The Loans**

During August 1988, prior to the conversion, First Federal made the following loans to individuals and a partnership totaling $1.6 million for the purpose of purchasing stock in Bancorp:

- a $125,000 loan to Paul Jones. Tr. at 239-41; JX 116.
- a $150,000 loan to Paul Jones for David Thompson, James Earnest, and Bo Earnest. Tr. at 247-48.
- a $50,000 loan to Roy Cowdrey. Tr. at 157; JX 111.
- a $125,000 loan to William Jones. Tr. at 420-21; JX 115.
- a $1 million loan to Rental Management Associates, a partnership of Roger Howard, Marvin Taylor, Peter Horrigan and Pat Cole. Tr. at 408-09; JX 106.
- a $150,000 loan to Dr. Arthur Schwartz. Tr. at 364; DX 171.

Stip. ¶¶ 11-39.

The loan to Rental Management Associates (RMA) in the amount of $1,000,000 was documented with a Promissory Note and secured by a Deed of Trust, which were executed by Patrick Cole, Peter Horrigan, Roger Howard and Marvin Taylor. JX 106, 108; Stip. ¶¶ 12, 14. The loan to Paul Jones, in the aggregate amount of $275,000, was documented by a Commercial Promissory Note and secured by a Deed of Trust. JX 122, 123; Stip. ¶¶ 23, 24. The loan to William Jones in the amount of $125,000 was documented by a Commercial Promissory Note and secured by a Deed of Trust. JX 115, 123; Stip. ¶¶ 24, 28. The loan to Roy Cowdrey in the amount of $50,000 was documented by a Commercial Promissory Note and secured by a Deed of Trust. JX 111, 123; Stip. ¶¶ 24, 35. Dr. Schwartz believed that he utilized a line of credit or second mortgage to finance his purchase of stock. Dr. Schwartz appears to have paid off his loan at or around the time that the loan was made, and there is no evidence that Dr. Schwartz's loan went into default, or that his loan remains outstanding. Tr. at 850, 875.

Together, Messrs. Paul Jones, William Jones, Cowdrey, Schwartz, Cole, Horrigan, Howard and Taylor using the proceeds of their loans, purchased 1,600,000 shares in Bancorp, representing 11.29% of the total number of shares sold by Bancorp (14,165,874 / 1,600,000 = 11.29%). See DX 171; Stip. ¶¶ 13, 22, 29, 39.

On August 19, 1988, Bancorp sent a list of the shareholders in Bancorp to an analyst at the FHLBB. DX 171. This two-page list indicated the name of each shareholder, the number of shares and the percentage of ownership, but did not indicate how or whether each purchase of the stock was financed. Id.

Loans totaling $2.225 million were made to other shareholders after the conversion as follows:

- An October 20, 1988 loan of $1.2 million to the Daugherty Family Trust -- owner of 1.175 million shares of Bancorp stock;
- A December 19, 1988 loan of $100,000 to Michael O'Brien -- owner of 100,000 shares of stock; and
- A January 5, 1989 loan of $925,000 to Daniel and Elizabeth Fitzgerald -- owners of 1 million shares of stock.

DX 397 at WOT3150147-48; Tr. at 677, 682. The loans made to the Daugherty Family Trust, Daniel and Elizabeth Fitzgerald and Michael O'Brien were all made after John T. Daugherty, the Fitzgeralds and Mr. O'Brien had purchased their stock in Bancorp. DX 171; DX 397 at WOT3150147-0148.

**The 1988 Examination**

From July 11 through August 19, 1988, the FHLBB conducted a regular examination of the bank. DX 118 at WOT3150002. The report covered the period through August 19, 1988, six days after the effective date of the conversion on August 13, 1988, and after the loans to RMA, Paul Jones, William Jones, Roy Cowdrey and Dr. Schwartz had been made. DX 118; Def. App. at 369; Stip ¶ ¶ 11-39. The report stated that "[o]n August 12, 1988, while this examination was in process, the institution consummated a supervisory stock conversion at the time its holding company, [Bancorp], was capitalized through the sale of 14,165,874 shares of common stock at one dollar per share." DX 118 at WOT3150007. However, this report did not include a list of all shareholders who had obtained loans to purchase stock in Bancorp. DX 118. The report made no mention of the shareholder loans, but was critical of a variety of other loans made by the bank, as well as of underwriting practices and construction loan disbursement deficiencies. Id. at WOT3150006, 0012, 0018, 0057-0059, 0062 and 0064.

**The Government's Reaction to the Loans**

The Government first learned of these loans during a 1990 examination of the institution after FIRREA was passed. DX 397; Tr. at 674. This examination commenced on January 16, 1990 and concluded on February 16, 1990. Tr. at 667; DX 397. In the examination report, there were comments that loans were made to shareholders to purchase stock in Bancorp. DX 397 at WOT3150147-48. Subsequent to the examination, in a letter dated April 18, 1990, the Office of Thrift Supervision (OTS) notified First Annapolis of "specific issues of supervisory concern" in the examination report, including the loans to shareholders. DX 439. In this letter, OTS did not inform Bancorp that it had breached its contract with the Government due to the shareholder loans. Id. Nor did the Government give notice to Bancorp that it had defaulted under the RCMDA.[5] Id. Rather, the FHLBB directed First Annapolis to "remove all loans to stockholders, the purposes of which were to purchase stock in the Institution, from the Institution's books without material loss and without reciprocal lending arrangements with other financial institutions." Id. at WOQ3921301

The OTS Supervisory Agent who authored the April 18 letter confirmed that the Government did not require any other curative actions besides "getting the loans off their books." Tr. at 636-38. Supervisory Agent Jones testified:

> Q. . . . And the corrective action that the government required as a result of this violation is as set forth in paragraph number 6 of your cover letter, is it not? "The institution shall remove all loans to stockholders, the purposes of which were to purchase stock in the institution, from the institution's books, without material loss and without reciprocal lending arrangements with other financial institutions." Right?
>
> . . .
>
> A. Yes.
>
> Q. Now, other than that, did the government require any curative action as a result of this regulatory violation called shareholder loans?

---

[5] The RCMDA required that the FSLIC provide written notice to Bancorp in the event that it defaulted on the agreement. JX 99 at WOQ2801448. The RCMDA defined "Default" as "the failure of [Bancorp] to comply with Section II [Bancorp's obligation to maintain the regulatory capital of First Annapolis and its restriction on dividends] or Section III [Representations, Covenants, and Warranties] of this Agreement or the breach of any representation or warranty set forth in Section III of this Agreement." Id. at WOQ2801446.

A. No.

Q. Now, you can confirm for me, will you, that the government never took action to revoke the effect of the conversion?

A. At the time that was not the most pressing issue to the solvency of the institution, and resolution of that was not as critical as some of these other matters.

Q. And I understand what you say. I'm simply trying to get on this record that the government never took any steps to revoke the effectiveness of this conversion.

A. No.

Q. And it never took any action at the time to, I don't know, impair the bargained-for forbearances that the holding corporation had gotten in exchange for new money, right?

A. Correct.

Q. In fact, it's true, is it not, that the government in its deliberations never even considered such a thing at the time. Isn't that so?

Witness: No, there was no other measure.

Tr. 637-38.[6]

As of April 18, 1990, First Annapolis had already sold two of the offending loans to Second National Bank -- the $275,000 loan to Paul Jones and the $1,000,000 loan to RMA.[7] JX 140. On

---

[6] Agent Jones also testified that had he known that a thrift was making loans to fund its own conversion, he "would have certainly raised concerns about it to [his] supervisor and sought to stop the conversion until [he] had a chance to resolve the issue." Tr. at 578.

[7] In April 1989, First Annapolis entered into an agreement with Second National Bank (Second National) to purchase the loans made to RMA and Paul Jones. Stip. ¶ 40; JX 140. By letter dated April 11, 1989, Second National informed First Annapolis that Second National had approved the purchase of the $275,000 loan to Paul Jones and the $1,000,000 loan to RMA at par. Stip. ¶ 42; JX 140. The loan to RMA was sold to Second National without recourse. JX 106 at FFA0770029; Tr. at 373. In return, First Annapolis agreed to purchase two of Second National's loans at par. Stip. ¶ 43; JX 140. The loan to RMA was repaid in full. Tr. at 542-43.

March 5, 1990, Mr. Parran wrote to William Jones requesting that he seek refinancing of his loan at another institution. JX 126. In 1992, the loan to William Jones, on behalf of the RTC as Receiver for First Federal, was ultimately transferred to the Key Federal Savings Bank (Key Federal). See JX 115 at FA 2006 0036. In 1997, the loan went into default, and William Jones paid Key Federal $75,000 for the outstanding balance of the loan. Tr. at 478. Mr. Cowdrey's loan was sold to Key Federal Savings Bank on October 16, 1992. See JX 111 at FA 2001 0081. On October 16, 1992, Key Federal informed Roy Cowdrey that it had purchased his loan from the RTC. JX 111 at FA 2001 0081. In November 1994, Mr. Cowdrey executed a Mutual Release with Key Federal, as successor-in-interest to the RTC as receiver for First Federal, pursuant to which he made a payment of $28,000 to Key Federal to settle the claim by the bank for the outstanding balance of the loan. JX 119 at FA 2001 0123.

Park Zimmerman, a former employee of OTS and the FHLBB, now retired, who had served as the Executive Vice President of the Federal Home Loan Bank of Atlanta in 1988, testified that if the Bank Board had known at the time that an institution was loaning funds for the purpose of purchasing stock, the Board "would have taken action to stop the conversion at that point. . . . [and] considered [it] a fatal violation that would cause the approval to be withdrawn . . . [because] [i]t was an act of . . . dishonesty." Tr. at 55-56.[8] Mr. Zimmerman further testified that, at the time of the conversion, had he known that funds were being loaned to shareholders, he would have stopped the conversion regardless of the amount of money that was loaned or the status of the loans at the time they were discovered.[9] Tr. at 55.

The Court discounts this testimony as being speculative and inconsistent with other evidence. This witness himself testified that there was only one prior instance of which he was aware involving loans made to shareholders to purchase stock, but he could not recall what action the regulators had taken with respect to these loans. He testified:

> Q. Were you familiar or do you have any experience with institutions where they were issuing loans as part of a supervisory conversion?

---

[8] Mr. Zimmerman has been an attorney since 1965. Tr. at 38. He worked for the FHLBB/OTS for approximately 22 years. Id. at 36. As Executive Vice President of the Atlanta FHLB, Mr. Zimmerman supervised between 450-500 people and oversaw approximately 650 banks or savings and loans. Id. at 40. He further testified that "the whole point" of a supervisory conversion was to inject unfettered, new capital. Tr. at 43-44. He explained that the Bank Board did not want "money that has prior claims on it, such that it's collateral for a loan or something of that sort." Id. at 44-45.

[9] The Court granted a motion to strike this witness' testimony that the shareholder loans were not a good faith mistake, but "an intentional act which is fairly clearly prohibited." Tr. at 50-51. The court strikes the testimony at lines 1-6 on page 51 as nonresponsive to counsel's question and speculative.

A. Not too many. I -- there was at least one other one that I recall where we had a similar problem.

. . .

A. I heard of it happening in other bank districts, though.

Q. You are familiar with it happening in other banks? Is that what you said?

A. Other bank districts. In other words, my equivalents in a different region.

Q. And I think you said that you did have experience, personal experience, with at least one?

A. There was at least one other. I can't recall the name of the institution now, but it was a similar problem.

. . . .

Q. Now, you've told us . . . you apparently were involved in some other bank that made some shareholder loans to purchase stock, right?

A. I think what I said was I remembered that there was one other case during the time I was here, it would have been earlier in the '80s when I wasn't as senior as I was at the end, and someone else was handling it. But I knew that they had a problem come up about that.

Q. And in that case isn't is so that the government said you have a problem, fix it, get the loans out of the bank?

A I don't know - I don't remember . . . that.

Q. You don't know either way?

A. No.

Tr. at 52-53; Tr. at 110-11. However, the witness who did recall this single prior instance of a shareholder loan violation, William Crompton, a current OTS field manager, testified that in that instance the regulators "require[d] the institution to exclude any of those funds from their capital

base until such time as those loans were paid off." Tr. at 750.[10] Moreover, in his tenure as a supervisor, Mr. Zimmerman never suggested undoing a conversion for any regulatory violation. Tr. at 110.[11]

**Excess Investments In Service Corporations**

In 1987, First Federal entered into a Supervisory Agreement with the Government, in part to avoid enforcement proceedings relating to investments in service corporations which exceeded regulatory limitations. See Def. App. at 326-33. The Supervisory Agreement, signed on July 8, 1987, required First Federal to prepare a business plan regarding how First Federal would divest investments in the service corporations to the extent the investments exceeded regulatory limitations. Id. at 329-30. The divestitures were to "result in no loss to First Federal or its service corporations." Id. at 330. According to the Supervisory Agreement, First Federal was to submit a monthly report to the Supervisory Agent with regard to the actions First Federal had taken in the prior month to meet its obligations. Id. at 331.

In addition, the Business Plan took into account the limitations in investments in subsidiary corporations agreed to by First Federal and the FHLBB in the July 8, 1987 Supervisory Agreement between First Federal and the Bank Board. The Business Plan stated:

> The Supervisory Agreement entered into on July 8, 1987 between First Federal Savings & Loan Association of Annapolis and the Federal Home Loan Bank of Atlanta limits the Association's activities in financial futures and options transactions and investments in subsidiary corporations. These limitations, however, have been made part of this Business Plan and therefore will have no material effect on the information presented herewith.

Def. App at 193. The subsidiary service corporations and other affiliated companies of First Federal were described in the Business Plan. Id. at 96-106.

---

[10] William Crompton has worked with OTS or its predecessor, the FHLBB, for 25 years. Tr. at 662. As a field manager Mr. Crompton is responsible for overseeing examinations by his team, and he had regular examination responsibility for First Annapolis. Id. at 664. In the 1988 examination of First Annapolis, Mr. Crompton was a field manager overseeing the examiners and processing the final examination report. Id. at 665. Mr. Crompton was the examiner in charge of the 1990 special limited examination "focusing on [First Annapolis'] deteriorating earnings position and weakening asset quality. Id. at 666. Mr. Crompton drafted the 1990 examination report. Id.

[11] Mr. Gregory Jones, the OTS Supervisory Agent overseeing First Annapolis testified that in the continuum of potential regulatory violations, loans to shareholders were not among the most significant that First Annapolis faced. Tr. at 612-13, 634-35.

First Annapolis submitted quarterly variance reports and monthly reports as required by the Supervisory Agreement. Pl. Post-Trial Reply Br., Ex. D ¶ 15. The first of these reports was a schedule entitled "Investment Limitations in Service Corporations" dated July 31, 1988. Pl. Supp. Mem., Ex. C. Similar schedules were submitted in August 1988 and March, May, November, and December of 1989, and March of 1990. Def. App. at 390-95. These schedules listed the service corporations and projects in which First Federal or Bancorp had invested and the amounts of those investments. Id.

By letter dated August 11, 1988, the FHLBB advised First Annapolis' President, Mr. Parran:

> [T]he Supervisory Agent will neither take, nor recommend that the FHLBB or Federal Savings and Loan Insurance Corporation take, any supervisory action against First Annapolis Savings Bank, FSB, for failure to comply with the limitations of 12 C.F.R. Section 545.74(d) with respect to presently existing service corporation investments which have been identified in the schedule prepared by the institution as of July 31, 1988, and submitted to the Supervisory Agent on August 10, 1988, so long as First Annapolis complies with the requirements of FHLBB Resolution 88-602 pertaining to compliance with its Business Plan [12] and, so long as it shall remain in effect, the requirements of the Supervisory Agreement dated July 8, 1987, between First Federal Savings and Loan Association of Annapolis and the Federal Home Loan Bank of Atlanta.

Def. App. at 44.

On August 12, 1988, the FHLBB sent another letter to Mr. Parran granting a regulatory forbearance with respect to excess investments in service corporations. This letter stated in part:

> For a period of five years from the date of conversion, First Annapolis shall, solely for purposes of complying with the service corporation investment limitations set forth in Federal Regulation

---

[12] FHLBB Resolution 88-602, dated July 21, 1988, made no mention of First Federal's Business Plan. Def. App. at 24. The Resolution did state that the conversion/merger process was approved "subject to any conditions, that may be imposed by Federal Home Loan Bank Board in any concurrent resolution or action issued as of the date of this resolution." Id. On the same day, the Bank Board also passed Resolution 88-603 which included the condition that the "Acquiror shall stipulate that for a period of five years following the date of the acquisition of the New Institution (i) New Institution will operate within the scope of the business plan provided in this application, as amended, and/or obtain prior written approval form the Supervisory Agent of any changes which would cause New Institution to materially deviate from the business plan . . . ." Def. App. at 34-35.

> 545.74(d), be deemed to be in compliance with its minimum regulatory capital requirement.

Id. at 45.

The 1990 Report of Examination (ROE) which concluded on February 16, 1990, addressed investments in service corporations as follows:

> Another item of significant concern indicative of unsafe and unsound banking practices is the bank's overinvestment in its service corporations which results, in part, from several transactions which the examiner has determined represent violations of the July 1987 Supervisory Agreement. As discussed in management comment A, since the previous examination Delta Financial Corporation (a real estate development subsidiary) has entered into three new partnership agreements and granted loans to an additional project being funded by the bank. In total, the bank's investments in its service corporations represents 8.4% of assets, which exceeds the regulatory limitation (including all forbearances granted) by 123.6% and has increased 44% since the previous examination.

Def. App. at 196. According to the ROE, First Annapolis had invested in its service corporations in an amount "more than twice the allowable level, even taking into account all forbearances granted," despite the original purpose in entering the Supervisory Agreement, which was to " 'divest [the institution's] investment in service corporations which exceeds the limitations of Section 545.74(d) of the Federal Regulations.' " Id. at 197. The 1990 ROE was the first notification to Bancorp of any problem the regulators had with First Annapolis' compliance with the limitations on investments in service corporations.

## Discussion

### Waiver

### Procedural Waiver

Plaintiff contends Defendant procedurally waived its defense of prior material breach because it did not assert this defense in a timely fashion. Plaintiff argues that Defendant was required to raise any affirmative defenses within 120 days of a motion for partial summary judgment pursuant to the September 18, 1996 Omnibus Case Management Order (CMO), but instead waited years to first raise

the issue of prior material breach with regard to the shareholder loans and investments in service corporations. Pl. Post-Trial Br. at 34.[13]

Defendant first raised the issue of shareholder loans two weeks after discovery had closed. Defendant did not raise the issue of investment in service corporations as an affirmative defense until it filed a supplemental memorandum in support of its motion to dismiss, over six years after the deadline established by the CMO.

Rule 8(c) of the Rules of the Court of Federal Claims (RCFC) states: "In pleading to a preceding pleading, a party shall set forth affirmatively . . . any other matter constituting an avoidance or affirmative defense." Here, Rule 8(c) was supplanted by the CMO, which required affirmative defenses to be raised in the Government's response to a motion for summary judgment. An affirmative defense may be waived if not pled as prescribed, but the waiver is not effective absent unfair surprise or prejudice. See Caldera v. Northrop Worldwide Aircraft Servs., Inc., 192 F.3d 962, 970 (Fed. Cir. 1999) (citing Fed. R. Civ. P. 8(c) which is identical to RCFC 8(c)); see also Cities Serv. Helex, Inc. v. United States, 211 Ct.Cl. 222, 234 n. 14, 543 F.2d 1306, 1313 n. 14 (1976) (holding that affirmative defense was not waived without evidence that plaintiffs were prejudiced by introduction of defense in briefs rather than in answer); S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins. Co., 353 F.3d 367, 373 (4th Cir. 2003) (holding that waiver would not be effective unless "failure to plead resulted in unfair surprise or prejudice"); Stockton East Water Dist. v. United States, 70 Fed. Cl. 515, 528-29 (2006) (holding that "plaintiffs' able and detailed response to the arguments of defendant and amicus in the instant case shows that plaintiffs were not prejudiced by defendant's late invocation of the defense of sovereign acts."); Int'l Fid. Ins. Co. v. United States, 27 Fed. Cl. 107, 110 (1992) (affirmative defense was not waived when defendant articulated defense so that plaintiff is not victim of unfair surprise).

In this case, it is clear that Defendant did not assert either defense until after the deadline established in the CMO. Plaintiff, however, has not demonstrated that it was prejudiced or that the delay resulted in unfair surprise. Rather, Bancorp had adequate opportunity to take discovery on both issues.[14] As such, Defendant did not waive its prior material breach defenses procedurally.

---

[13] The CMO states: "This Order applies to all Winstar-related cases . . . including any claims, special pleas in fraud, defenses, affirmative defenses, setoffs, counterclaims, or other issues raised in those cases . . ." CMO at 1. According to the CMO, plaintiffs in the Winstar cases were permitted to file motions for summary judgment on two issues: "(1) whether a contract(s) existed in each case; and (2) whether the Government acted inconsistently with that contract(s)." Id. at 6. The Government was given 60 days to respond to those issues and 120 days to "set forth, in accordance with the requirements of the rules of this Court, any defenses of which it [knew or had reason to know] that relate to the two issues asserted in the motion." Id. at 6-7.

[14] On January 19, 2006, the Court granted Defendant's renewed motion to take depositions of the shareholders out of time. At the same time, the Court granted Plaintiff "leave to move for further discovery on any relevant issues that arise from the further depositions." Order Granting

**Substantive Waiver**

Plaintiff argues that Defendant substantively waived its prior material breach defense based on investments in service corporations and shareholder loans by continuing to perform under the contract after learning of these matters.

A prior material breach may be waived if the injured party chooses to continue acting under the contract and the obligations of both parties remain in force. Cities Serv., 543 F.2d at 1313; see Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1383 (Fed. Cir. 2004) ("through its continued performance of the contract, the government waived any claim for prior material breach or material misrepresentation giving rise to the right to terminate the contract"). However, waiver cannot be found "without evidence of knowledge on the part of the [Government]." Gen. Eng'g & Mach. Works v. O'Keefe, 991 F.2d 775, 781 (Fed. Cir. 1993); Lincoln Nat'l Life Ins. Co. v. United States, 582 F.2d 579, 582 ("For there to be a waiver of a right, a party must have known what rights it had.") (Ct. Cl. 1978). This court has found that the knowledge giving rise to a waiver may be actual or constructive. Caroline Hunt Trust Est. v. United States, 65 Fed. Cl. 271, 309-10, rev'd in part on other grounds, 470 F.3d 1044 (Fed. Cir. 2006); see generally Melrose Assoc., L.P. v. United States, 43 Fed. Cl. 124, 129 (1999) (" 'Waiver requires (1) the existence at the time of the waiver of a right, privilege, advantage or benefit that may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit.' ") (internal citation omitted).

**Investments In Service Corporations**

On the record before the Court, there is undisputed evidence in the form of the monthly and quarterly reports sent to the regulators demonstrating that Defendant knew of the excess investments in service corporations, yet continued to perform under the contract. First Annapolis submitted quarterly variance reports and monthly reports on its investments in service corporations to the Government as required by the 1987 Supervisory Agreement following the conversion. These reports showed the level of the institution's investments in its service corporations.[15]

---

Defendant's Renewed Motion for Leave to Take Depositions Out of Time at 5, Jan. 20, 2006. Plaintiff secured supplemental discovery on this issue via interrogatories. See e.g., Plaintiff's Exhibit (PX) 28, PX 29, PX 33.

Plaintiff's counsel informed the Court in a November 17, 2005 status conference that "there was full discovery on [the issue of investments in service corporations] during the discovery period. It's all been discovered." Tr. (Nov. 17, 2005) at 22.

[15] These documents formed part of the basis of the Government's claim of prior material breach. Compare Def. Supp. Mem. at 26-27 with Def. App. at 390-395 and Pl. Post-Trial Reply Br., Ex. E.

Importantly, the Government not only knew of these excess investments in service corporations, but also granted the Bank a forbearance from complying with the limitation on investments in service corporations in its letters of August 11 and August 12, 1988. The Government did not treat these investments as a breach or as a violation of the Supervisory Agreement. Instead, the Government continued to perform its obligations under the contract by allowing First Annapolis to meet the regulatory capital requirements in its Business Plan and count goodwill as capital until FIRREA's regulations became effective. The Government did not advise First Annapolis that its investments in service corporations violated the 1987 Supervisory Agreement or require corrective action until the 1990 ROE -- after FIRREA was passed.

Plaintiff has demonstrated that the Government knew of the excess investments in service corporations, granted the bank a forbearance from complying with the limitations on investments in service corporations, and acquiesced in those investments until the 1990 ROE. As such, the Government waived its defense of prior material breach with regard to investments in service corporations. See Barron Bancshares, 366 F.3d at 1383 ("through its continued performance of the contract, the government waived any claim for prior material breach or material misrepresentation giving rise to the right to terminate the contract").

**Shareholder Loans**

Plaintiff contends that Defendant substantively waived its defense of prior material breach with regard to shareholder loans because it had access to information regarding the loans prior to the February 9, 1989 letter from the FHLBB confirming that "all conditions precedent [for the conversion] have been met." JX 101. Plaintiff argues that Defendant had constructive knowledge of the loans between August 13, 1988 and February 9, 1989, because it had access to all the loan documents and records pertaining to the loans and had a full opportunity to discover the loans. As the Court recognized in Melrose Associates, L.P. v. United States, 43 Fed. Cl. 124, 129 (1999), "[w]aiver requires (1) the existence at the time of the waiver of a right, privilege, advantage or benefit that may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage or benefit."

Plaintiff argues that the Government should be charged with constructive knowledge of these loans because at the very time the loans were being made, the 1988 examination was being conducted. Plaintiff points to the 1988 examination report which states: "[o]n August 12, 1988, while this examination was in process, the institution consummated a supervisory stock conversion at which time its holding company, First Annapolis Bancorp, was capitalized through the sale of 14,165,874 shares of common stock at one dollar per share." DX 118 at WOT3150007. However, there is no information in this report that reveals either that loans to shareholders were made to purchase stock or that there was any regulatory violation or impropriety associated with such loans. Nonetheless, Plaintiff attempts to link this statement about the conversion and stock sale with "the schedule of stockholders provided to the examiners" in conjunction with the 1988 ROE. However, the schedule of stockholders was not appended to the ROE, and the only stockholders discussed in the report were those of concern to the regulators due to control issues, i.e., Maryland Bankcorp Inc. which together with its directors acquired a 21 percent interest in Bancorp and the law firm of

Blumenthal, Wayson, Downs and Offutt, whose three members collectively acquired 10.6 percent of Bancorp's total shares. DX 118 WOT3150008-09; Tr. at 714.

"When waiver is implied from conduct, the acts, conduct, or circumstances relied upon to show waiver must make out a clear case." Matter of Garfinkle, 672 F.2d 1340, 1347 (11th Cir. 1982). Here, the evidence does not "make out a clear case" for implied waiver of the prior material breach defense through constructive knowledge. The regulators could not have discovered the shareholder loans during the 1988 examination because the Government had no reason to question shareholder loans at this juncture. The 1988 examination focused on First Federal's loans as of the prior quarter and would not have reviewed any loans made during the examination period. Tr. 678-79. The fact that the Government had access to the loan files and to the names of the shareholders does not mean that it should have known that loans to shareholders were used to finance the conversion. There has been no showing that at that point in time the regulators had reason to connect the dots and discern that First Federal had made the loans to individuals and entities for the purpose of investing in First Annapolis. Cf. Caroline Hunt Trust Est., 65 Fed. Cl. at 309, rev'd in part on other grounds, 470 F.3d 1044 (Fed. Cir. 2006), (the Government "should have known of the financial conditions of which the government now complains" based on "the regulators' extensive reviews, audits, and particularly their interest in establishing additional loan loss reserves, both pre- and post-merger, as well as their comments about [the institution's] loan process and portfolios").

Here, the 1988 examination did not purport to scrutinize these shareholder loans, but was focused on prior concerns -- a capital deficiency attributed to over $20 million in losses stemming from hedging activities and the acquisition of controlling shares by Maryland Bankcorp and the Blumenthal Wayson law firm. The 1988 report reflected supervisory issues which had surfaced between July 11 and August 19, 1988, and was not a generalized audit report. Plaintiff does not point to any other circumstance which triggered constructive knowledge that the loans were used to purchase shares in Bancorp. As such, Plaintiff has not made out a "clear case" for imputing constructive knowledge of the shareholder loans to the regulators, and the Government did not substantively waive this defense.[16]

**Did the Loans to Shareholders Constitute a Prior Material Breach?**

Defendant contends that First Federal's loans to individuals to purchase Bancorp stock and its failure to disclose these loans violated regulations and that First Federal and Bancorp misrepresented the accuracy of their representations in the Application and the RCMDA. The two

---

[16] Plaintiff further contends that even if the Government only learned of the loans as a result of the January 1990 examination, it waived its right to assert this defense because the Government never moved to terminate the contract until September 14, 1999, when the Government raised its defense of prior material breach. Pl. Br. at 30-33. The Court rejects this argument. By the time the Government learned of the shareholder loans, FIRREA's regulations had taken effect. The enactment and enforcement of FIRREA, and the seizure of the thrift on June 1, 1990, effectively terminated the contract between Plaintiff and the Government.

regulations at issue are 12 C.F.R. § 563b.3(c)(22) (1989) and 12 C.F.R. § 563b.9 (1989).[17] Section 563b.3(c)(22) required a converting insured institution, such as First Federal, to include a representation in its plan of conversion that the "converting insured institution shall not loan funds or otherwise extend credit to any person to purchase the capital stock of the institution." Section 563b.9, entitled "Conversion of an Insured Institution in Connection with the Formation of a Holding Company," stated, in relevant part, that "[u]nless clearly applicable, all of the requirements of this Subpart A shall apply to conversion under this section." 12 C.F.R. § 563b.9 (1989). Section 563b.3(c)(22) was a part of "Subpart A." In its plan of conversion appended to its Application, First Federal stated: "[t]he Association shall not loan funds or otherwise extend credit to any person to purchase shares of Holding Company Stock offered in the Conversion." JX 87 at WOT4150499. The RCMDA disclosure provision, "Representations, Covenants and Warranties of the Acquiror" provided, in relevant part:

> A. The information given to the FSLIC [Federal Savings and Loan Insurance Corporation] by the Acquiror [Bancorp] and relied on thereby in connection with the acquisition of control of the New Institution [First Annapolis] is true, accurate, complete and current in all material respects;

Def. App. at 48. Defendant contends that because Bancorp did not disclose the existence of these shareholder loans to the FSLIC, Bancorp committed a prior material breach of its obligations under its Application and the RCMDA.

"Under general contract principles, a party sued for breach of contract may defend on a theory that its nonperformance is excused because the other contracting party committed the first material breach." Hometown Fin., Inc. v. United States, 409 F.3d 1360, 1370 (Fed. Cir. 2005); see also Barron Bancshares, 366 F.3d 1360 at 1380-81; Christopher Village, L.P. v. United States, 360 F.3d 1319, 1334 (Fed. Cir. 2004) (holding that a party to a contract may defend against an alleged breach of contract by asserting that the other party first breached the contract, thereby excusing nonperformance) (internal citations omitted); Kennedy Heights Apartments Ltd. I v. United States, 63 Fed. Cl. 731, 737 (2005). This doctrine of prior material breach is based upon the principle that " 'where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties . . . if there has already been an uncured material failure of performance by the other party.' " Christopher Village, 360 F.3d at 1334 (quoting Restatement (Second) of Contracts § 237b, cmt. b (1981)).

At the outset, the Court finds that Plaintiff did commit a prior breach of its contract with the Government by loaning $1.6 million to shareholders for the purpose of purchasing stock in Bancorp, in contravention of 12 C.F.R. § 563b.3(c)(22) (1989) and 12 C.F.R. § 563b.9 (1989), as well as its representations in the Application and RCMDA.

[17] These provisions were in effect in 1989, but are no longer in effect.

As the Federal Circuit has recognized, however, only a sufficiently material breach can justify the Government's subsequent breach. Christopher Village, 360 F.3d at 1335. The materiality of a breach is a mixed question of law and fact. Hometown, 409 F.3d at 1369. "In determining materiality courts often look to whether the breached obligation is an important part of the contract." Lary v. United States Postal Serv., ___ F.3d ___ , 2006 WL 3742104 *3 (Fed. Cir. Dec. 21, 2006) (citing Thomas v. Dep't of Hous. and Urban Dev., 124 F.3d 1439, 1442 (Fed. Cir. 1997)). A breach should be considered material when it goes to a matter of vital importance or to the essence of the contract. Id.; Hometown at 1370. In determining the materiality of a breach, the Court must review the totality of events and circumstances. Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1552 (Fed. Cir.1992) (citing Restatement (Second) of Contracts § 241 cmt. a). This flexible approach examines "the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." Id. at 1557; see also Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988) (citing Restatement (Second) of Contracts § 241(e) (1981).

The Restatement of Contracts § 241 states:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981) at 237. The comments to the Restatement underscore that these "circumstances" are not rules and are to be applied "in such a way as to further

the purpose of securing for each party [its] expectation of an exchange of performances.[18]

The benefit the Government expected by Plaintiff abiding by regulations prohibiting loans to shareholders was the infusion of new unfettered capital into the institution. That benefit was substantially achieved here. Casting aside the capital raised by the improper loans, Plaintiff still raised more capital than required to complete the conversion. Although Defendant argues that First Federal made loans totaling $3.975 million to shareholders, representing over 25 percent of the total stock offering, that argument is not supported by the record. In order to reach its $3.975 million figure, Defendant includes loans to the Daugherty Trust, Michael O'Brien and the Fitzgeralds, which were made months after the conversion. There is no evidence that these loans were made for the purchase of stock to infuse capital at the time of the conversion. Tr. at 725-30, 735-37. As such, the amount of shareholder loans made prior to the conversion and used to capitalize Bancorp was $1.6 million, and the Government has not established the shareholder loans deprived it of a reasonably expected benefit.

In contrast, in Admiral Financial Corp. v. United States, 57 Fed. Cl. 418 (2003), aff'd on other grounds, 378 F.3d 1336 (Fed. Cir. 2004), the Court of Federal Claims found that "Admiral's failure to infuse cash into Haven to bring it into regulatory capital compliance, its futile efforts to find outside sources, and its persistent denial of its ability to supply the needed capital, did indeed substantially impair the value of the contractual exchange to the Government" and therefore constituted a prior material breach. Admiral, 57 Fed. Cl. at 432. Here, the fact of the illegal shareholder loans did not "substantially impair" the value of the contractual exchange to the Government. Even if it had, applying the Second Restatement factor, the Government could have been compensated as it was in the prior instance where this occurred -- by removal of the offending loans and capitalization via other means.

The Restatement's factor concerning curative action must also be assessed in Plaintiff's favor here, since many of the offending loans were transferred or repaid, and the Government failed to prove whether or by how much it was harmed by these loans. See Hometown Financial, Inc. v. United States, 60 Fed. Cl. 513, 521 (2004), aff'd, 409 F.3d 1360 (2005) (failure to establish losses fatal to prior material breach claim). Ridding the institution of the illegal loans was ordered and effected, and there has been no showing at this stage of the proceedings that this circumstance had a significant impact on the institution.

With respect to the Restatement's final criterion, Plaintiff's conduct in violating regulations and contractual representations, while not epitomizing good faith and fair dealing, does not in and of itself warrant a finding of material breach here. Rather, the nature and extent of the violation in the context of the overall schema of this contract -- illegal loans which were not required for the capitalization and which did not deprive the Government of the expected benefit of its bargain -- do not amount to a material breach of the parties' agreement. See Restatement (Second) Contracts §

[18] The Restatement's reference to the breaching party's potential forfeiture in subparagraph (c) is not applicable in this context.

241 cmt. f (other circumstances may cause a failure not to be material in spite of a party's nonadherence to standards of good faith and fair dealing). The essence of this contract was the Government's grant of forbearances to Plaintiff in exchange for Plaintiff acquiring a failing thrift and infusing unfettered capital into the resulting institution. Bancorp met its critical obligations despite the illegal loans.

The Government argues that any amount loaned for the purpose of purchasing stock in Bancorp should result in a material breach. Defendant urges that new, unfettered capital was the "essence" of the conversion -- therefore, any breach that caused a failure of such capitalization had to be material. Defendant relies on the former FHLBB supervisor's testimony that if the Bank Board had known at the time that an institution was loaning funds for the purpose of purchasing stock, the Board "would have taken action to stop the conversion at that point. . . . [and] considered [it] a fatal violation that would cause the approval to be withdrawn . . . [because it was an act of . . . dishonesty." Tr. at 55-56. This witness would have recommended stopping the conversion regardless of the amount of money that was loaned or the status of the loans at the time they were found. Id. at 122-23. The Court, however, does not find this witness's testimony probative, as it was a speculative post hoc construct. This former regulator's testimony was not based on his personal experience and was inconsistent with the testimony of a current 25-year veteran of the FHLBB/OTS and the examiner in charge of First Annapolis' 1990 examination, -- William Crompton, and the FHLBB's Supervisory Agent, Greg Jones, who said that the actual curative action in both a prior case and this case was to "get the shareholder loans off the books." Tr. at 750-51, 576, and 605. Cf. J.C. Equipment Corp. v. England, 360 F.3d 1311, 1315 (Fed. Cir. 2004) (holding that the Armed Services Board of Contract Appeals had adequately explained why it did not credit testimony which was "contradicted by . . . former employees, frequently lacked specificity, was quite often uncorroborated by the record, and was often in response to leading questions asked by his attorney.") (ellipses in original) (internal quotations omitted).

In this case, if Bancorp had been required to exclude the $1.6 million from its capital for the conversion, Bancorp still would have met the required capital threshold to complete the conversion. Discounting the $1.6 million in shareholder loans, Bancorp raised over $12 million in capital, and it was only required to raise $11 million. Further, Bancorp removed $1.275 million of the $1.6 million in shareholder loans from its books in April 1989. JX 140. Thus, Plaintiff took action to cure adverse effects of these loans. Moreover, Defendant failed to prove what actual losses it suffered resulting from these loans. See Hometown, 60 Fed. Cl. at 521, aff'd 409 F.3d 1360 (2005) ("[t]he Government's failure to establish a single dollar of loss attributable to the Plaintiffs' underwriting, appraisal, and internal control practices or any imminent losses is fatal to its prior material breach claim."). Under these circumstances, Bancorp's prior breach of the contract due to shareholder loans was not material and does not excuse Defendant from any later breach.

**Conclusion**

1. Defendant waived its defense of prior material breach based upon investments in service corporations.

2. Plaintiff's shareholder loans constituted a breach of its contract with the Government. However, this breach was not a material breach and does not excuse any subsequent breach by Defendant.[19]

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

[19] Defendant argued in the alternative that Plaintiff's failure to comply with the regulations governing shareholder loans was a failure to satisfy a condition precedent. Def. Post-Trial Br. at 40-45. A condition precedent is an event which must occur "before performance under a contract becomes due." Restatement (Second) of Contracts § 224. The testimony of Mr. Crompton and Agent Jones confirm that compliance with the regulations prohibiting shareholder loans was not a condition precedent to the Government's performance. Rather, the lack of such compliance was a regulatory deficiency capable of being cured during performance. See Tr. at 750-51, 576 and 605.