**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 94-522C**
**(Judge Williams)**

---

**FIRST ANNAPOLIS BANCORP, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFF'S AMENDED CONTENTIONS OF FACT AND LAW

---

**Dale A. Cooter**
**James E. Tompert**
**COOTER, MANGOLD, TOMPERT & KARAS, L.L.P**
**5301 Wisconsin Avenue, N.W.**
**Suite 500**
**Washington, D.C. 20015**
**(202) 537-0700**

**Attorneys for Plaintiff**
**First Annapolis Bancorp, Inc.**

**Dated: February 14, 2007**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 94-522C** |
| | ) | **(Judge Williams)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFF'S CONTENTIONS OF FACT AND LAW**

Plaintiff, First Annapolis Bancorp, Inc. ("Bancorp"), by and through counsel, pursuant to the Scheduling Order entered herein February 7, 2007 and Appendix A of the Rules of this Court, hereby submits its Amended Contentions of Fact and Law for the trial on damages scheduled to commence on March 19, 2006, and states as follows:

**INTRODUCTION**

As set forth below, Bancorp submits that the evidence at trial will show that Bancorp is entitled to damages in the amount of $14,165,874 as costs incurred by Bancorp as a result of its performance under its contract with the Government, including the $13,665,907 that Bancorp invested in First Annapolis Savings Bank, F.S.B. ("First Annapolis"), plus a tax gross-up to compensate Bancorp for its total loss.

## CONTENTIONS OF FACT

### I. The Formation Of Bancorp.

1. On November 19, 1987, Bancorp was incorporated under the laws of the state of Delaware "to act as a savings and loan holding company." PX 11.

2. Bancorp was authorized to issue 30,000,000 shares of common stock. Id.

3. The evidence at trial will show, if necessary, that Bancorp was formed for the purpose of acquiring First Federal Savings and Loan Association of Annapolis ("First Federal") pursuant to its voluntary supervisory conversion into a stock savings bank. It was contemplated that First Federal would convert from a federal mutual savings and loan association into a federal capital stock savings bank by way of merger into a new entity, First Annapolis Savings Bank, F.S.B. ("First Annapolis"). Bancorp intended to sell at least 12,000,000 shares of its common stock at $1.00 per share through a private placement to accredited investors, and then use the net proceeds from the stock sale to purchase all of the stock in First Annapolis, in a minimum amount of $11,000,000, immediately prior to the conversion.

### II. The Contract Between Bancorp And The Government.

4. The contract by and between Bancorp and the Government is memorialized in the following documents:[1]

A. FHLBB Resolution 88-602, dated July 21, 1988. PX 1.

B. FHLBB Resolution 88-603, dated July 21, 1988. PX 2.

---

[1] The documents listed above were also all attached to Bancorp's Short Form Motion for Summary Judgment as tabs A through I.

C. July 21, 1988 forbearance letter. PX 3.

D. August 5, 1988 forbearance letter. PX 4.

E. August 11, 1988 forbearance letter. PX 5.

F. August 12, 1988 forbearance letter
(revising July 21, 1988 forbearance letter). PX 6.

G. Regulatory Capital Maintenance/Dividend Agreement ("RCMA"),
dated August 12, 1988. PX 7.

H. First Annapolis Business Plan, dated 10/21/87. PX 8.

I. October 28, 1998 letter from Deloitte Haskins & Sells
(independent public accountants). PX 9.

J. February 9, 1988 letter from Federal Home Loan Bank Board
("FHLBB"). PX 10.

5. In Resolution No. 88-603 the Federal Home Loan Bank Board ("FHLBB") made the express findings that (1) "the Old Association's [First Federal Savings and Loan Association of Annapolis'] liabilities exceed its assets, as calculated under generally accepted accounting principles on a going concern basis," (2) "there would be no value realizable by the mutual accountholders of the Old Association upon liquidation," (3) "severe financial conditions exist which threaten the stability of the Old Association and conversion from mutual to stock form of organization is likely to improve the financial condition of the Old Association," (4) **"New Institution [First Annapolis] would be a viable entity following conversion, as determined under 12 C.F.R. §563b.26,**" and (5) the conversion is a "supervisory conversion within the meaning of Subpart C of 12 C.F.R. Part 563b." PX 2 at 2 (emphasis supplied). The Resolution further provides that:

> On the date of consummation of the acquisition, merger and conversion, [Bancorp] shall make a capital contribution to the New Institution [First Annapolis] through the purchase of common stock **in a minimum amount equal to the greater of $11,000,000 or an amount sufficient to raise the net worth of the New Institution [First Annapolis] to 1% of the total liabilities on a GAAP basis** as specified in 12 C.F.R. Part 563b.26(b)(2).

Id. at 11 ¶13 (emphasis supplied).

6. As set forth in the foregoing documents, the terms of Bancorp's contract with the Government, which are relevant to the issue of damages, include three regulatory forbearances, namely: (1) a regulatory forbearance so that supervisory goodwill could be included as an intangible asset in the calculation of regulatory capital, to be amortized over a period of 25 years ("goodwill forbearance"); (2) a regulatory forbearance so that First Annapolis could meet its minimum capital requirements by complying with a series of annual capital benchmarks set forth in its business plan for a period of 5 years ("capital ratio forbearance"), and (3) a regulatory forbearance to exceed the limitation on investments in service corporations for existing projects as approved by the Supervisory Agent ("investment in service corporations forbearance").

7. In its letter dated February 9, 1988, the FHLBB confirmed "that all conditions precedent have been met and the Conversion has been completed in accordance with the foregoing Resolution [No. 88-602] and the effective date of the conversion was August 13, 1988." PX 10.

**III. The Conversion.**

8. To fulfill its obligation under the foregoing contract, Bancorp offered outstanding shares of its common stock to certain investors for $1.00 per share.

9 . In reliance upon the promises made by the Government in the foregoing contract, including the regulatory forbearances, Bancorp sold 14,165,874 shares of its common stock and thereby raised $14,165,874.00 in capital. PX 12.

10. In further reliance upon the promises made by the Government in the foregoing contract, including the regulatory forbearances, Bancorp then purchased 100% of the stock of First Annapolis, or 13,665,907 million shares, for $1.00 per share. PX 31. The balance of the capital raised by Bancorp, $499,967, was spent by Bancorp as costs incurred in the performance of its contract with the Government.

11. First Federal thereby converted from a mutual savings and loan association, and merged into First Annapolis, as a federal stock savings bank. PX 2.

12. The effective date of the conversion, as determined by the FHLBB, was August 13, 1988. PX 10.

13. As of August 13, 1988, the total liabilities of the bank were in the range of $750,000,000, and 1% of that amount would have been $7,500,000. See PX 9 at 4. Therefore, pursuant to Resolution No. 88-603, dated July 21, 1988, the minimum amount of the capital Bancorp had to raise was $11,000,000, which it had exceeded by $3,165,874 (14,165,874.00 - 11,000,000 = 3,165,874). PX 2. By the same token, the minimum amount that Bancorp was required to invest in First Annapolis was $11,000,00, which it had exceeded by $2,665,907 (13,665,907 - 11,000,000 = 2,665,907).

14. On February 9, 1989, the FHLBB confirmed "that all conditions precedent have been met and the Conversion has been completed in accordance with" Resolution No. 88-602. PX 10.

**IV. Contract Performance.**

15. The evidence at trial will show that during the course of performance of the contract, which was from the effective date of the conversion, August 13, 1988 until the breach of the contract by the Government, Bancorp communicated on a regular basis with various representatives of the Government, including, but not limited to, Betsy Brown Faulk, Gregory B. Jones, John Ryan and William B. Crompton, and informed them of the operations of the bank.

16. On June 30, 1989, First Annapolis had satisfied its first capital benchmark of 1.80% as set forth in the Business Plan. PX 8.

17. During the course of contract performance, at no time did Bancorp receive any dividends from the stock it had purchased from First Annapolis.

**V. Breach Of The Contract By The Government.**

18. The evidence at trial will show that in early 1989 it was anticipated that FIRREA would be enacted, which had an adverse effect on the operations of the bank.

19. On August 9, 1989, FIRREA was enacted. Pub. L. No. 101-73, 103 Stat. 188 (codified as amended at 12 U.S.C. §§ 1441a, 1811 et. seq.). FIRREA replaced the FHLBB with the Office of Thrift Supervision ("OTS") and established new capital requirements for savings and loan associations. 12 U.S.C. §1464(t)(2); 54 Fed. Reg. 46,845 (11/8/89).

20. Pursuant to FIRREA, supervisory goodwill could not be included in satisfying the tangible capital requirement. Id. In addition, supervisory goodwill had to be phased out by December 1994 when calculating core capital, and had to be amortized over a maximum of twenty years when calculating both risk-based and core capital. Id.; 12 U.S.C. §1464(t)(3)(A), (9)(B) and (C).

21. For purposes of determining the damages sustained by Bancorp, the date of the breach of the contract by the Government should be August 9, 1989, the date of the enactment of FIRREA, as agreed to by the Government. See Southwest Investment Co. v. United States, 63 Fed. Cl. 182, 194 (2004), aff'd, 158 Fed.Appx. (2005) ("The Defendant's position is that, assuming arguendo it breached the contract, the date of the breach would be August 9, 1989, the date of FIRREA's enactment"); see also Admiral Fin. Corp v. United States, 57 Fed.Cl. 418, 423-24 (2003) (the Court discussed the issue of whether in date of the breach was the enactment of FIRREA on August 9, 1989 or when regulations under FIRREA became effective on December 7, 1989, and concluded "in the course of this case we have treated the critical date [of the breach] as the enactment [August 9, 1989], and the Government 'agrees'"), aff'd, Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1339 (Fed. Cir. 2004) (acknowledging the ruling by the trial court in Admiral Fin. Corp v. United States, 54 Fed.Cl. 247 (2002), that the Government breached the contract with the enactment of FIRREA).

22. Following the enactment of FIRREA, the evidence at trial will show that the Government did not allow First Annapolis to include supervisory goodwill as regulatory capital, imposed regulatory capital requirements greater than those contained in the Business Plan, did not permit First Annapolis to invest in its service corporation at the agreed upon levels and did not otherwise honor the regulatory forbearances that it had granted as part of the contract.

23. On December 7, 1989, the regulations issued by the OTS under FIRREA became effective. 54 Fed. Reg. 46,845 (11/8/89).

24. Because First Annapolis could not meet FIRREA's new capital requirements, on January 5, 1990, it submitted a capital plan to OTS for review. PX 32.

25. On February 27, 1990, the FHLBB informed First Annapolis that it was rejecting the proposed capital plan. DX 406.

26. First Annapolis failed to meet the new capital requirements, and on May 31, 1990, OTS placed First Annapolis into receivership.

27. On June 1, 1990, or thereabouts, the Resolution Trust Corporation took possession of First Annapolis.

**VI. Damages Sustained By Bancorp.**

28. As a consequence of the breach of contract by the Government, Bancorp sustained damages in the amount of $14,165,874, including its cost of performance and its $13,665,907 investment in First Annapolis, plus a tax gross-up to compensate Bancorp for its total loss. PX 12; PX 44 at 2 (Report of Edward J. Heiden, August 3, 1999); PX 45 at 2 (Report of Edward J. Heiden, October 29, 1999).

29. An award of restitution or reliance damages in this case would be taxable as gross income to Bancorp, which would compensate Bancorp for lost monies that would not have been taxable. Testimony of G. Thomas Daughtery, Jr. The appropriate rate of a tax gross-up to compensate Bancorp for restitution or reliance damages would be in the minimum amount of 38.62%. Id.

30. The evidence at trial will show that an award of restitution or reliance damages in this case would not constitute a windfall to Bancorp. The Government will not be able to sustain its burden to show that there was a windfall. See Contentions of Law ¶¶ 24 and 25. If the Government had honored the terms of the contract, including the regulatory forbearances, First Annapolis would have

been a viable entity following the conversion, as the Government had previously determined under 12 C.F.R. §563b.26, set forth in Resolution No. 88-603. PX 2 at 2.

**VII. <u>Procedural Background</u>**

31. On August 10, 1994, Bancorp filed its Complaint herein, alleging claims for breach of contract, violation of law, breach of implied-in-fact contract, promissory estoppel, failure of consideration and Fifth Amendment taking.

32. To date, the Government has not filed an answer to the Complaint.

33. To date, the Government has never alleged any affirmative defenses to the claim for compensatory damages by Bancorp, including any affirmative defense for a set-off.

34. To date, the Government has not filed any Counterclaim against Bancorp in this case.

35. On the same day that the discovery deadline expired, August 5, 1999, Plaintiff filed its Motion for Entry of Partial Summary Judgment on Damages. Plaintiff sought a ruling by the Court that it was entitled as a matter of law to recover the amount of its investment in First Annapolis in the amount of $13,665,907.

36. The Government did not file an opposition to Plaintiff's Motion. Instead, on August 31, 1999, the Government filed a Motion to Stay Briefing on Plaintiff's Motion for Entry of Partial Summary Judgment on Damages. In that Motion, the Government requested that "this Court stay Defendant's briefing requirements until both a decision on liability is rendered and after the Defendant has the opportunity to depose Mr. Heiden regarding his final expert report." Defendant's Motion to Stay Briefing on Plaintiff's Motion for Entry of Partial Summary Judgment on Damages, filed August

31, 1999, at 3. To date, the Government has never filed an opposition to Plaintiff's Motion for Entry of Partial Summary Judgment on Damages.

37. On December 27, 2006, at the joint meeting of counsel pursuant to paragraph 13 of Appendix A of the Rules of this Court, the Government disclosed, for the first time, that its defense to the claim by Bancorp for restitution or reliance damages is that an award of such damages would constitute a "windfall" to Bancorp.

**CONTENTIONS OF LAW**

**General Rule of Contract Damages**

1. "[T]he general rule [is] that 'when there has been a breach of contract, the non-breaching party is entitled to an award of damages that will place it 'in as good a position as [it] would have been had the breaching party fully performed.'" Hi-Shear Technology Corp. v. United States, 356 F.3d 1372, 1378 (Fed. Cir. 2004); (quoting Rumsfield v.Applied Companies, Inc., 325 F.3d 1328, 1336 (Fed Cir. 2003)) (quoting Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021 (Fed. Cir. 1996)).

2. "Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been had the breaching party fully performed,' Wells Fargo Bank, 88 F.3d at 1021, the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract." Rumsfield, 356 F.3d at 1336; accord Hi Shear 356 F.3d at 11379. As set forth above, the relevant obligations of the Government under its contract with Bancorp were to honor the regulatory forbearances.

**Restitution**

3. "The idea behind restitution is to restore - that is to restore the non-breaching party to the position he would have been in had there never been a contract to breach." Glendale Federal Bank, F.S.B. v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001); accord Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1306 (Fed. Cir. 2004). "The objective is to return the parties, as nearly as practicable, to the situation in which they found themselves before they made the contract." Restatement (Second) of Contracts §384 cmt. A (1981); accord Glendale, 239 F.3d at 1380; Hansen, 367 F.3d at 1309.

4. Restitution is available if the breach of contract gives rise to a claim of damages for total breach and not merely to a claim for damages for partial breach. Restatement (Second) of Contracts §373; accord Hansen, 367 F.3d at 1309. A total breach of contract is defined in the Restatement as one "that so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to recover damages based on all his remaining rights to performance." Restatement (Second) of Contracts §243(4); accord Hansen, 367 F.3d at 1311; accord Southwest Investment Co. v. United States, 63 Fed. Cl. 182, 195 (2004). Bancorp submits that under the facts and circumstances of this case, the breach of contract of the Government constitutes a total breach of contract.

5. Restitution can be measured by either "the value of the benefits received by the defendant due to the plaintiff's performance" or "the cost of the plaintiff's performance, which includes both the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its

performance under the contract." Landmark Land Co., Inc. v. FDIC, 256 F.3d 1365, 1372 (Fed. Cir. 2001); accord Hansen, 367 F.3d at 1314.

6. Under either measurement, Bancorp is entitled to the costs of its capital contribution to First Annapolis, in the amount of $13,665,907, as restitution damages, plus a tax gross-up to compensate Bancorp for its total loss. LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1376 (Fed. Cir. 2003) ("The principle of restitution damages is to return the costs incurred in performing the contract, costs sometimes conveniently measured by the benefits conferred on the breaching party"); Restatement (Second) of Contracts §371 cmt. A ("If the benefit consists simply of a sum of money received by the party from whom restitution is sought, there is no difficulty in determining this amount"); accord Hansen, 367 F.3d at 1316. Bancorp is also entitled to the additional costs of its performance under the contract, in the amount of $499,967, for a total of $14,165,874, plus a tax gross-up to compensate Bancorp for its total loss. Landmark, 256 F.3d at 1372.

7. A party that is injured by a breach of contract is entitled to restitution even if the party would have sustained a loss on the contract, instead of having made a profit. Restatement (Second) Contracts §373 cmt. d, *Losing contracts* . ("The right of the injured party under a losing contract to a greater amount in restitution that he could have recovered in damages has engendered much controversy. The rules stated in this Section give him that right."); accord Bausch & Lomb v. Bressler, 977 F.2d 720, 730 (2d Cir. 1992) ("Because the doctrine of restitution looks to the reasonable value of any benefit conferred upon the defendant by the plaintiff, and is not governed by the terms of the parties' agreement, restitution is available even if the plaintiff would have lost money on the contract had it fully been performed.")

**Reliance Damages**

8. "When restitution damages are based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages, wherein the non-breaching party is restored to its pre-contract position by returning as damages the costs incurred in reliance on the contract." LaSalle, 317 F.3d at 1376; accord Acme Process Equipment Co. v. United States, 171 Ct.Cl. 324, 347 F.2d 509, 530 (1965), rev'd on other grounds, 385 U.S. 138 (1966); see also Hansen, 367 F.3d at 1308 ("Reliance damages provide another way for a non-breaching party to recover losses suffered as the result of a breach of contract"); Restatement (Second) of Contracts §344(b).

9. "The underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise." Glendale, 239 F.3d at 1382. As such, Bancorp is entitled to damages for the expenditures it made in reliance on the promises for regulatory forbearances made by the Government in its contract with Bancorp. Id. at 1382-1383; accord Hi-Shear, 356 F.3d at 1382. These expenditures include both the amount of its investment in First Annapolis, $13,665,907, and the additional costs of its performance under the contract, in the amount of $499,967, for a total of $14,165,874, plus a tax gross-up to compensate Bancorp for its total loss.

10. In order to recover reliance damages the "loss must have been foreseeable to the party in breach at the time of contract formation." Old Stone Corp. v. United States, 450 F.3d 1360, 1375 (Fed. Cir. 2006) (quoting Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1365 (Fed. Cir.

2005) (quoting Landmark, 256 F.3d at 1378). The losses must also have been "proximately caused by the breach." Old Stone, 450 F.3d at 1375.

11. The evidence at trial will show that the loss by Bancorp of its cost of performance and investment in First Annapolis was foreseeable to the Government at the time of contract formation in August 1988. See PX 2 at 11 ¶13; see Westfed, 407 F.3d at 1368, 1371 (the expenditures made by the holding company to purchase stock of the thrift can be recovered as reliance damages). The evidence will also show that the loss was proximately caused by the breach of contract by the Government. See Westfed, 407 F.3d at 1361-1364 (Government's breach of contract by withdrawal of modified capital requirement through enactment of FIRREA caused thrift's failure); see also Edward J. Heiden Report, August 3, 1999 at 2.

**Proof Of Exact Amount Of Damages Is Not Required**

12. In order for Bancorp to prove damages, Bancorp is it not required to do so with mathematical certainty. LaSalle, 317 F.3d 1363, 1374 (Fed. Cir. 2003). "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." Locke v. United States, 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960) (citing Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931)).

13. Bancorp "can meet its burden of proving damages if it 'furnishes the court with a reasonable basis for computation, even though the result is only approximate.'" Hi-Shear Technology Corp v. United States, 53 Fed.Cl. 420, 437 (2002) (quoting Wunderlich Contracting Co. v. United States, 173 Ct.Cl. 180, 351 F.2d 956, 968 (1965)), aff'd, Hi-Shear, 356 F.3d 1372, 1381, 1383

(Fed. Cir. 2004)); see also LaSalle, 317 F.3d at 1374 ("when damages are hard to estimate, the burden of imprecision does not fall on the innocent party").

**Discretion Of The Court**

14. "Determining the amount of damages to award 'is not an exact science, and the methodology of assessing and computing damages is committed to the sound discretion of the district court.'" Ferguson Beauregard v. Mega Sys., 350 F.3d 1327, 1345 (Fed.Cir. 2003) (quoting State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1576-77 (Fed. Cir. 1989)); accord HiShear, 356 F.3d at 1382.

15. In using its discretion, if necessary, the Court can use the "jury verdict approach." Hi-Shear, 356 F.3d at 1381 (the "jury verdict approach" is "an approved method of approximately contract damages"); accord Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1357 (Fed. Cir. 2001) ("We have allowed so-called 'jury verdicts,' if there was clear proof of injury and there was no more reliable method for computing damages - but only where the evidence adduced was sufficient to enable the court or jury to make a fair and reasonable estimation"). The "jury verdict method" is "most often employed when damages cannot be ascertained by any reasonable computation from actual figures." Dawco Construction, Inc. v. United States, 930 F.2d 872, 880 (Fed. Cir. 1991), overruled on other grounds, Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995). "Before adopting the 'jury verdict method,' the court must first determine three things: (1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to made a fair and reasonable approximation of damages." Id.

**The Burden To Prove A Windfall Is On The Government**

16. The sole response by the Government to the claim by Bancorp for restitution or reliance damages is that Bancorp would receive a "windfall" if it was awarded $14,165,874 in damages. Assuming *arguendo* there is such a defense in the case, the burden to prove any such windfall is on the Government. Old Stone Corp. v. United States, 63 Fed. Cl. 65, 96 (2004) ("The breaching party has the burden of proving windfall"); aff'd in part, rev'd in part on other grounds, Old Stone Corp. v. United States, 450 F.3d 1360 (Fed. Cir. 2006).

17. Moreover, the Government cannot sustain its burden by relying on operations of First Annapolis which are unrelated to the contract. LaSalle, 239 F.3d at 1373 ("The general rule is as articulated by Justice Holmes, that unrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong") (citing Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531 (1918)); 1 *Dobbs Law of Remedies* , § 3.8 (2) (2d ed. 1993) ("One effect of a market damages measurement then is to ignore later events, whether they are favorable to the plaintiff or unfavorable").

**Tax Gross-up**

18. An award of damages for restitution or reliance damages to Bancorp in this case should be adjusted to reflect the tax consequences of the award. Home Savings, 399 F.3d at 1356 ("The Court of Federal Claims properly adjusted the damages award to reflect tax consequences . . . We adopt the rule of other courts that a tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable"). An award of the foregoing damages in this case would

be taxed as gross income of Bancorp, and in order to make Bancorp whole, the award should be adjusted by a "tax gross-up." Id.

**PLAINTIFF'S EXHIBIT AND WITNESS LISTS**

Plaintiff previously filed its list of witnesses and exhibits in accordance with the December 7, 2006 Scheduling Order entered herein. Pursuant to paragraph 18 of Appendix A of the Rules of this Court, the parties will endeavor to submit a list of Joint Exhibits prior to the Pre-Trial Conference scheduled for March 5, 2007.

**DEFENDANT'S EXHIBIT AND WITNESS LISTS**

**A. Exhibits**.

Pursuant to the Scheduling Order entered on December 7, 2006, Plaintiff's objections to Defendant's exhibits are not due until February 16, 2007.

**B. Witnesses.**

Plaintiff's objections to Defendant's Witnesses were previously filed herein. Plaintiff also objects to Defendant's Witness List to the extent that it fails to comply with the Court's Procedural Order No. 2; Discovery Plan.

Respectfully submitted,

Dated: February 14, 2007

COOTER, MANGOLD, TOMPERT
& KARAS, P.L.L.C.

s/Dale A. Cooter
Dale A. Cooter
James E. Tompert
5301 Wisconsin Avenue, NW
Suite 500
Washington, DC 20015
Tel: (202)537-0700
Facsimile: (202)364-3664

*Attorneys for Plaintiff*
*First Annapolis Bancorp, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 14th day of February 2007, a copy of the foregoing Contentions was filed electronically pursuant to the Electronic Case Filing procedures of the United States Court of Federal Claims, with service by Notice of Electronic Filing to the designated attorneys and parties of record.

s/Dale A. Cooter
Dale A. Cooter