**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No.94-522C**
**(Judge Williams)**

---

**FIRST ANNAPOLIS BANCORP, INC.**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

---

# DEFENDANT'S CONTENTIONS OF FACT AND LAW

---

**STUART E. SCHIFFER**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Acting Director**

**KENNETH M. DINTZER**
**Assistant Director**

**RICHARD B. EVANS**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 353-7760**
**Fax: (202) 305-7643**

**Attorneys for Defendant**

**Of Counsel:**

**TIMOTHY ABRAHAM**
**MELINDA HART**
**MARK PITTMAN**
**DELISA M. SANCHEZ**

**Trial Attorneys**

**February 23, 2007**

## TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES . . . . . iv

INTRODUCTION . . . . . 1

CONTENTS OF FACT . . . . . 3

I. Pre Voluntary Supervisory Conversion Background . . . . . 3

II. First Federal's Voluntary Supervisory Conversion . . . . . 5

III. First Federal's July 1988 Report Of Examination . . . . . 8

IV. First Federal's Viability Depended Upon Projected Profits From Its Service Corporations . . . . . 10

V. The Service Corporation Profits Did Not Materialize As Projected And, As Expected, First Annapolis Lost Money On Its Core Operations . . . . . 12

VI. First Annapolis Continued To Lose Money After June 1989 . . . . . 14

VII. Despite First Annapolis' Asset Quality Deteriorating Rapidly In 1989, It Failed To Recognize Any Credit Losses Between June 1989 And December 1989 . . . . . 17

VIII. First Annapolis' Delinquent Loans And Their Impact On Profitability . . . . . 18

IX. First Annapolis' Criticized And Classified Assets Increased Substantially Between June 1989 And December 1989 . . . . . 20

X. First Annapolis' Failure To Properly Classify Its Problem Assets Caused Its Losses To Be Understated And Its Capital To Be Overstated During The Last Six Months Of 1989 . . . . . 21

XI. The Enactment Of FIRREA . . . . . 22

XII. First Annapolis' Performance Following The Enactment Of FIRREA . . . . . 23

XIII. First Annapolis' January 1990 Report Of Examination . . . . . 26

XIV. The Failure Of First Annapolis . . . . . 28

XV. The Specific Loan Losses Identified By The Examiners In Connection With The January 16, 1990 Report Of Examination Were Unrelated To The Breach . . . . . 30

A. Bayside Marina . . . . . 31

B. Dennis Blaeuer Entities . . . . . 33

C. Northhampton Office Park . . . . . 34

XVI. The General Loan Losses Identified By The Examiners In Connection With The January 16, 1990 Report Of Examination Were Unrelated To The Breach . . . . . 35

A. “Various Commercial Loans” . . . . . 36

B. “Real Estate Owned” . . . . . 36

C. “Various Mortgage Loans” . . . . . 36

CONTENTIONS OF LAW . . . . . 36

I. The Date Of The Breach Is December 7, 1989 . . . . . 37

II. Bancorp Is Not Entitled To An Award Of Restitution . . . . . 40

A. Restitution Is Not Proper Because The Contract Cannot Be Unwound . . . . . 41

B. The Government’s “Breach” Was Not A Total Breach Of Bancorp’s Contract . . . . . 44

C. Allowing Bancorp Full Restitution Would Be An Unfair Windfall . . . . . 49

III. Bancorp Is Not Entitled To An Award Of Reliance Damages . . . . . 50

IV. Bancorp Is Not Entitled To A Jury Verdict . . . . . 53

V. Bancorp’s Tax Gross-Up Claim Is Untenable . . . . . 54

A. Non-Taxable Damage Awards Are Ineligible For Tax Gross-Up Treatment . . . . . 54

B. This Court Lacks Subject Matter Jurisdiction Over Bancorp’s Tax Gross-Up Claim . . . . . 57

C. A Tax Gross-Up Award Would Constitute An Impermissible Windfall To Bancorp . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

OBJECTIONS TO PLAINTIFF'S EXHIBIT & WITNESS LISTS . . . . . . . . . . . . . . . . . . . . . . . 59

A. Exhibit List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

B. Witness List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

# TABLE OF AUTHORITIES

## FEDERAL CASES

Admiral Fin. Corp. v. United States,
57 Fed. Cl. 418 (2003) . . . . . 46

Admiral Fin. Corp. v. United States,
378 F.3d 1336 (Fed. Cir. 2004) . . . . . 44, 46, 50

Alaska Pulp Corp., Inc. v. United States,
48 Fed. Cl. 655 (2001) . . . . . 46

American Capital Corp. v. United States,
63 Fed. Cl. 637 (2005) . . . . . 40

American Capital Corp. v. United States,
472 F.3d 859 (Fed. Cir. 2006) . . . . . 51, 52

American Federal Bank, FSB v. United States,
68 Fed. Cl. 346 (2005) . . . . . 40

Ariadne Financial Services Pty. Ltd. v. United States,
133 F.3d 874 (Fed. Cir. 1998) . . . . . 38

Assurance Co. v. United States,
813 F.2d 1202 (Fed. Cir. 1987) . . . . . 37

Aurigemma v. Arco Petroleum Prods.,
734 F. Supp. 1025 (D. Conn. 1990) . . . . . 41

Bank of America, FSB v. United States,
51 Fed. Cl. 500 (2002) . . . . . 38, 39

Bank of America, F.S.B. v. United States,
67 Fed. Cl. 577 (2005) . . . . . 56

Bluebonnet Sav. Bank, F.S.B. v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . 49, 53

Bluebonnet Sav. Bank v. United States,
266 F.3d 1348 (Fed. Cir. 2001) . . . . . 53, 54

Boyajian v. United States,
423 F.2d 1231 (Ct. Cl. 1970) . . . . . 37

Canfield v. Reynolds,
631 F.2d 169 (2d Cir.1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Centex Corp. v. United States,
55 Fed. Cl. 381 (2003),
aff'd, 395 F.3d 1283 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Citizens Fed. Bank, F.S.B. v. United States,
59 Fed. Cl. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Clark v. Commissioner,
40 B.T.A. 333 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

Columbia First Bank, F.S.B. v. United States,
60 Fed. Cl. 97 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Commercial Fed. Bank, F.S.B. v. United States,
59 Fed. Cl. 338 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Dawco Construction, Inc. v. United States,
930 F.2d 872 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54

Electronic and Missile Facilities, Inc. v. United States,
416 F.2d 1345 (Ct. Cl. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

First Annapolis Bancorp, Inc. v. United States,
– Fed. Cl. –, 2007 WL 314885 (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

First Heights Bank, F.S.B. v. United States,
57 Fed. Cl. 162 (2003),
aff'd, 422 F.3d 1311 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

First Nationwide Bank v. United States,
51 Fed. Cl. 762 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43

Flora v. United States,
357 U.S. 63 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Freeman v. Commissioner,
33 T.C. 323 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

Glendale Federal Bank, F.S.B. v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 52

Glendale Fed. Bank, F.S.B. v. United States,
378 F.3d 1308 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Hansen Bancorp, Inc. v. United States,
53 Fed. Cl. 92 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Hansen Bancorp, Inc. v. United States,
67 Fed. Cl. 411 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 44

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Home Sav. of Am., F.S.B. v. United States,
399 F.3d 1341 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Hort v. Comm'r of Internal Revenue,
313 U.S. 28 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Hughes Comm. Galaxy, Inc. v. United States,
271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

LaSalle Talman Bank, F.S.B. v. United States,
45 Fed. Cl. 64 (1999)
rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 41

LaSalle Talman Bank, F.S.B. v. United States,
317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 49

LaSalle Talman Bank, F.S.B. v. United States,
462 F.3d 1331 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Landmark Land Co., Inc. v. United States,
256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Local Oklahoma Bank, N.A. v. United States,
59 Fed. Cl. 713 (2005),
aff'd, 452 F.3d 1371 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Mobil Oil Exploration and Producing Southeast, Inc. v. United States,
530 U.S. 604 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

Mola Development Corp. v. United States,
74 Fed. Cl. 528 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 40

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . 57

Nat'l Controls Corp. v. Nat'l Semiconductor Corp.,
833 F.2d 491 (3d Cir. 1987) . . . . . . . . . . 52

Old Stone Corp. v. United States,
450 F.3d 1360 (Fed. Cir. 2006) . . . . . . . . . . 51, 52, 53

Petrofsky v. United States,
488 F.2d 1394 (Ct. Cl. 1973) . . . . . . . . . . 51

Plaintiffs in Winstar-Related Cases v. United States,
37 Fed. Cl. 174 (1997) . . . . . . . . . . 37, 38, 39

Raytheon Prod. Corp. v. Comm'r,
144 F.2d 110 (1st Cir. 1944) . . . . . . . . . . 54

Reflectone, Inc. v. Dalton,
60 F.3d 1572 (Fed. Cir. 1995) . . . . . . . . . . 53

Shore v. United States,
9 F.3d 1524 (Fed. Cir. 1993) . . . . . . . . . . 58

Southern Pac. Co. v. Darnell-Taenzer Lumber Co.,
245 U.S. 531 (1918) . . . . . . . . . . 57

Southwest Investment Co. v. United States,
63 Fed. Cl. 182 (2004) . . . . . . . . . . 45, 46

Stone Forest Indus., Inc. v. United States,
973 F.2d 1548 (Fed. Cir. 1992) . . . . . . . . . . 45

United States v. Gotcher,
401 F.2d 118 (5th Cir. 1968) . . . . . . . . . . 55, 56

United States v. Winstar Corp.,
518 U.S. 839 (1996) . . . . . . . . . . 58

Westfed Holdings, Inc. v. United States,
407 F.3d 1352 (Fed. Cir. 2005) . . . . . . . . . . 51

Yankee Atomic Elec. Co. v. United States,
112 F.3d 1569 (Fed. Cir. 1997) . . . . . . . . . . 58

**STATE CASES**

Bernstein v. Nemeyer,
570 A.2d 164 (Conn. 1990) . . . . . . . . . . 50

**FEDERAL STATUTES**

12 U.S.C. §§ 1463-1464 (1989)
Financial Institutions Recovery, Reform and Enforcement Act of 1989,
Pub.L. No. 101-73, 103 Stat. 183 ("FIRREA") . . . . . . . . . . *passim*

12 U.S.C. § 1464(t)(2)(A) . . . . . . . . . . 23

12 U.S.C. § 1464(t)(2)(B) . . . . . . . . . . 22

12 U.S.C. § 1464(t)(2)(C) . . . . . . . . . . 23

12 U.S.C. § 1464(t)(3)(A) . . . . . . . . . . 23

12 U.S.C. § 1464(t)(9)(A) . . . . . . . . . . 23

12 U.S.C. § 1464(t)(9)(C) . . . . . . . . . . 22

12 U.S.C.A. § 1818(e)(7)(A) (FDIA § 8(e)(7)(A)) . . . . . . . . . . 30

26 U.S.C. § 61 . . . . . . . . . . 55

26 U.S.C. § 118(a) . . . . . . . . . . 55

26 U.S.C. § 6103 . . . . . . . . . . 59

28 U.S.C. § 1491 . . . . . . . . . . 58

**FEDERAL RULES AND REGULATIONS**

12 C.F.R. § 561.13 . . . . . . . . . . 7

12 C.F.R. § 561.16c(d)(3) . . . . . . . . . . 8

12 C.F.R. § 563.13 . . . . . . . . . . 4

12 C.F.R. § 563b.24(b) . . . . . . . . . . 11

12 C.F.R. § 563b.26(b)(2) . . . . . . . . . . 6, 11

12 C.F.R. § 567.2(a)(1)-(b) . . . . . . . . . . 23

12 C.F.R. § 567.5(a)(1),(2) . . . . . . . . . . 23

12 C.F.R. § 567.6 . . . . . . . . . . 23

12 C.F.R. § 567.8 . . . . . . . . . . 23

12 C.F.R. § 567.9(a) . . . . . . . . . . 22

54 Fed. Reg. 46,845 (11/8/89) . . . . . . . . . . 40

RCFC App. A . . . . . . . . . . 1

Rev. Rul. 81-277, 1981 WL 165965 (IRS RRU) (1981) . . . . . . . . . . 56

**MISCELLANEOUS**

John D. Calamari & Joseph M. Perillo, The Law of Contracts, § 15.4 (4th ed. 1998) . . . . . . . . 41

5 Arthur Linton Corbin, Corbin on Contracts §1102, at 548 (1964) . . . . . . . . . . 41

3 Dan B. Dobbs, Law of Remedies §12.7(5) (2d ed. 1993) . . . . . . . . . . 50

3 E. Allan Farnsworth, Farnsworth On Contracts, §12.1 at 151 (2d ed. 1998) . . . . . . . . . . 52

3 E. Allan Farnsworth, Farnsworth On Contracts, 193 (2d ed. 1998) . . . . . . . . . . 49

Restatement (Second) of Contracts §241, cmt. a (1981) . . . . . . . . . . 45

Restatement (Second) of Contracts §241, cmt. d (1981) . . . . . . . . . . 45

Restatement (Second) of Contracts §243(4) (1981) . . . . . . . . . . 45

Restatement (Second) of Contracts §344(b) (1981) . . . . . . . . . . 51, 52

Restatement (Second) of Contracts §351 (1981) . . . . . . . . . . 52

Restatement (Second) of Contracts §373 (1981) . . . . . . . . . . 43, 44

Restatement (Second) of Contracts §384 (1981) . . . . . . . . . . 43

Restatement (Second) of Contracts §384, cmt. a (1981) . . . . . . . . . . 41, 43

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | **No. 94-522C** |
| **v.** | **)** | **(Judge Williams)** |
| | **)** | |
| **THE UNITED STATES,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

**DEFENDANT'S CONTENTIONS OF FACT AND LAW**

Pursuant to Appendix A of the Rules of the United States Court of Federal Claims ("RCFC") and the Court's February 7, 2007 order, defendant, the United States, respectfully submits its memorandum of contentions of fact and law.

**INTRODUCTION**

On January 31, 2007, the Court found that a contract was created between plaintiff, First Annapolis Bancorp, Inc. ("Bancorp"), and the Government in conjunction with Bancorp's acquisition and conversion of First Federal Savings and Loan Association of Annapolis ("First Federal") on August 13, 1988. First Annapolis Bancorp, Inc. v. United States, – Fed. Cl. – , 2007 WL 314885 (Fed. Cl.) at 2 ("Liability Opinion"). The Court further held that certain provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") breached that contract in December 1989. Id. at 23.[1] The principal issues to be

---

[1] Significantly, the breach was not the enactment or implementation of FIRREA, Pub. L. No. 101-73, 103 Stat. 183, codified, in relevant part, at 12 U.S.C. §§ 1463-1464 (1989), but only those provisions of FIRREA which contrasted with the terms of the contract.

Indeed, recognizing this distinction, the Court found that Bancorp failed to prove that the enactment of FIRREA breached the forbearance regarding investments in service corporations. First Annapolis, Slip Op. at 23 n.18. In fact, the terms of the contract shifted the risk of regulatory change regarding investments in service corporations to Bancorp. See PX 3 at 2 ("In the event any regulation or statute referred to herein is amended or succeeded by another statute,

decided by the Court during the March 2007 trial are whether Bancorp is entitled to either restitution or reliance damages, and, if a recovery is appropriate, whether it is entitled to a tax gross-up.[2] The evidence at trial will establish that Bancorp cannot sustain its burden of proving that it was damaged as a result of the breach.

Bancorp claims $13,665,907 in restitution. Bancorp is not entitled to restitution for three reasons: (1) it is impossible to unwind the contract and restore the parties to their pre-contract positions; (2) Bancorp cannot prove that the Government's "breach" (the alleged failure to honor the forbearances) was a total or material breach; and (3) awarding Bancorp $13,665,907 would result in an unfair windfall, making the Government bear the downside risk of Bancorp's investment.

On January 16, 2007, in its initial Appendix A filing, Bancorp, for the first time in this litigation, alleged an additional theory for reliance damages in the amount $14,165,874, and a tax-gross up of any recovery, which it has since quantified as "at least $5,470,000 in additional damages." Pl. Br. filed Feb. 1, 2007. Bancorp cannot prove that its alleged reliance damages were proximately caused by the breach or that they were foreseeable. In addition, Bancorp has provided no evidence to support its new claim for $499,967, the balance of the capital it raised in

---

regulation or rule, then any reference to any such regulation or statute shall be deemed to refer to such regulation or statute as amended or the statute, regulation or rule which succeeds any such regulation or statute.").

[2] Bancorp has abandoned its previous damage claims for lost profits, hypothetical cost of replacement, and Fifth Amendment takings by representations to the Court and to counsel. We respectfully request that the Court issue an order acknowledging the abandonment of these damages claims so we may narrow our trial preparation, and for completeness of the record. In addition, the Court should order Bancorp to amend its witness lists to conform to its revised contentions of fact and law so the scope of its witnesses' testimony is properly limited.

1988, which it alleges it spent performing the contract with the Government. Furthermore, Bancorp is not entitled to a tax gross-up of any kind because: (1) this Court lacks subject matter jurisdiction to entertain such a claim; (2) any award would not be taxable; and (3) any such award would be a windfall.

## CONTENTIONS OF FACT

### I. Pre Voluntary Supervisory Conversion Background

1. First Federal Savings and Loan Association of Annapolis ("First Federal") was originally organized in 1903, and joined the Federal Home Loan Bank ("FHLB") System in 1933. JX 89 at 0079.

2. By the 1980s, First Federal's primary business was "attracting deposits from the general public through its 25 full-service branch offices in Maryland and making adjustable-rate mortgage loans ('ARMs') secured by first mortgage liens on residential and commercial property, including construction loans." JX 89 at 0124.

3. In addition, through its five wholly-owned subsidiary service corporations and one affiliated company, First Federal offered mortgage banking and discount brokerage services; engaged in joint ventures with local developers, contractors, and investors involving the development of land for residential and commercial uses and construction of homes and commercial structures; operated an insurance agency; performed title and closing work for residential and commercial customers; and financed mobile homes. JX 89 at 0125.

4. Delta Financial Corporation, Inc. ("Delta") was First Federal's "principal subsidiary" and was "engaged in investing in the acquisition, development, and construction of residential and commercial real estate. As of March 31, 1988, Delta was a partner or co-venturer

in 26 acquisition and development projects with real estate developers, builders and contractors." Delta provided "a portion of the acquisition, development and construction funds to such projects as a lender, advancing monies to the partnership or joint venture to fund acquisition and development expenses as required." JX 89 at 0080.

5. As with most other thrifts, First Federal experienced losses beginning in the early 1980s. Indeed, First Federal reported net losses for each fiscal year beginning with the fiscal year ending September 30, 1981. By March 31, 1988, First Federal had a deficit in retained earnings of approximately $68.0 million. JX 89 at 0070.

6. Additionally, in 1986, First Federal suffered losses of more than $35 million from a failed hedging strategy. First Federal elected to defer recognition of most of these losses. By letter dated May 18, 1987, the FHLBB informed First Federal that it had concluded its review with respect to the 1986 hedge program and that losses of $16,865,702 were required to be recognized immediately. DX 2045 at 1142-1143.

7. The FHLBB further informed First Federal that, upon recognition of these losses, "First Federal's regulatory capital will fall significantly below the minimum level of regulatory capital required by Insurance Regulation 563.13 . . . It is therefore imperative that the board of directors develop a timely and viable plan for the infusion of new capital into the institution." DX 2045 at 1143.

8. Accordingly, on July 5, 1987, First Federal entered into a Supervisory Agreement with the FHLBB. This Supervisory Agreement was in response to significant losses First Federal had incurred in connection with its hedging program, First Federal's actions in improperly accounting for these losses, and First Federal's excessive investments in service

corporations. The Supervisory Agreement severely restricted First Federal's ability to (1) engage in interest rate futures or financial options, and (2) to invest in service corporations. DX 20, DX 100.

## II. First Federal's Voluntary Supervisory Conversion

9. In response to the FHLBB's direction to First Federal to produce a plan for the immediate infusion of new capital, the thrift's board of directors began considering a plan for First Federal's voluntary supervisory conversion. JX 5 at 1054.

10. By letter dated June 5, 1987, First Federal informed the FHLBB that it was "proceeding to effect a supervisory conversion as expeditiously as possible." DX 9 at 2603.

11. Shortly thereafter, Bancorp was formed for the purpose of becoming a savings and loan holding company and acquiring First Federal in connection with its voluntary supervisory conversion. JX 89 at 0064.

12. On November 5, 1987, Bancorp submitted its holding company application and debt application to the FHLBB, and First Federal submitted its application for voluntary supervisory conversion to the FHLBB. DX 50; JX 83.

13. After a series of amendments, the FHLBB deemed First Federal's conversion application complete on February 26, 1988. DX 95.

14. On July 21, 1988 the FHLBB issued resolutions 88-602 and 88-603 approving (1) the voluntary supervisory conversion of First Federal from a federally-chartered mutual savings and loan association to a federally-chartered stock savings bank, known as First Annapolis, and (2) Bancorp's acquisition of First Annapolis. JX 92; JX 93.

15. FHLBB resolution number 88-603 required that: "On the date of consummation of the acquisition, merger and conversion, [Bancorp] shall make a capital contribution to [First Annapolis] through the purchase of common stock in a minimum amount equal to the greater of $11 million or an amount sufficient to raise the net worth of [First Annapolis] to 1% of total liabilities on a GAAP basis as specified in 12 C.F.R. Part 563b.26(b)(2)." JX 93 at 0103.

16. According to 12 C.F.R. §563b.26(b)(2): "As part of the plan of conversion the prospective acquirer shall (i) infuse sufficient capital at the conversion to enable the institution to achieve a ratio of net worth to total liabilities, computed on the basis of generally accepted accounting principles of at least one percent (1%) of total liabilities and (ii) agree in writing with the Corporation that the acquirer will infuse additional capital as necessary to enable the institution to increase its regulatory capital on a scheduled basis in order to comply with the Board's regulatory capital requirements in effect from time to time within five years of the date of conversion, *and* agree that upon <u>failure to achieve scheduled regulatory capital levels on or before the due date</u> or to adhere in all material aspects to the business plan submitted as part of the supervisory conversion application, the acquirer shall be subject to such sanction as the Board, in connection with its approval of the supervisory conversion application, directs to be included in the written agreement . . ." (emphasis added).

17. On July 21, 1988, the FHLBB sent a letter ("Forbearance Letter") to First Annapolis outlining the regulatory forbearances granted in connection with First Federal's voluntary supervisory conversion into First Annapolis and Bancorp's simultaneous acquisition of First Annapolis. JX 91

18. By letter dated August 5, 1988, the FHLBB informed First Federal that "it [was] First Annapolis' obligation to increase its regulatory capital in order to achieve each annual benchmark and to achieve the regulatory capital amount specified (in the Business Plan) at the end of the fifth year." The FHLBB further informed First Federal that First Annapolis would be subject to any successor regulations that may be in effect after the initial five years following the conversion. JX 94 at 0984-5.

19. On August 12, 1988, Bancorp and the Federal Savings and Loan Insurance Corporation ("FSLIC") entered into the Regulatory Capital Maintenance/Dividend Agreement ("RCMDA"), which defined First Annapolis' Regulatory Capital Requirement as "capital increased on a scheduled basis for five years as set forth in the Business Plan of the Plan of Conversion, and, thereafter, at any given time, thereafter, computed in accordance with 12 C.F.R. § 561.13, or any successor regulation thereto." JX 99 at 1446.

20. First Federal's Revised Regulatory Business Plan set forth its capital benchmarks for the first 3 years after its conversion at 1.8%, 2.1%, and 2.4% percent of liabilities, respectively. JX 134 at 0521.

21. Pursuant to section II.A of the RCMDA: "As long as [Bancorp] controls the New Institution, [Bancorp] will cause the Regulatory Capital of the New Institution to be maintained at a level at or above the Regulatory Capital Requirement and as necessary, will infuse sufficient additional capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement and cure a Regulatory Capital Deficiency during the first quarter after which the New Institution fails to meet its Regulatory Capital Requirement." JX 99 at 1447.

22. On August 13, 1988, the conversion became effective and First Annapolis opened for business. The purchase method of accounting was used to record the voluntary supervision conversion. Under the purchase method of accounting, all assets and liabilities acquired were adjusted to fair value as of the acquisition date. "The cost in excess of net assets acquired (goodwill) resulting from the valuation [of assets and liabilities] amounted to approximately $65 million and [in accordance with generally accepted accounting principles] is being amortized over 15 years using the straight-line method." JX 3 at 0834.

## III. First Federal's July 1988 Report Of Examination

23. At the time of First Federal's stock conversion, the FHLB of Atlanta was conducting a regular examination of First Federal. The examination had commenced on July 11, 1988, and concluded on August 19, 1988 ("July 1988 ROE"). DX 118 at 0002.

24. According to the July 1988 ROE, the examiners' review of 18 major loans totaling $49.7 million disclosed consistent underwriting and construction loan disbursement deficiencies which contributed to criticized assets totaling $43.8 million as of April 30, 1988. DX 118 at 0023. The examiners' also noted that First Federal's underwriting and disbursement deficiencies indicated "imprudent lending practices." DX 118 at 0025.

25. The examination revealed that, between March 31, 1988 and April 30, 1988, First Federal's level of classified assets increased by more than $12 million; however, its level of general valuation allowances remained the same. DX 118 at 0031. Consequently, the July 1988 ROE explained that: "Given the level of substandard and doubtful assets, the present level of general valuation allowances is inadequate and, thus, the association is in violation of section 561.16c(d)(3) of the insurance regulations." DX 118 at 0031.

26. The July 1988 ROE noted that First Federal's recent poor operating performance was a "result of a severely mismatched asset/liability structure, large losses from hedging activities, and losses from service corporations." DX 118 at 0034.

27. According to the July 1988 ROE, the five service corporations (or subsidiaries) of First Federal had combined losses of $1.0 million and $599,179 for the year ending December 31, 1987, and the six months ending June 30, 1988, respectively. The total subsidiary losses for these periods were attributable to Delta. DX 118 at 0034-35.

28. The July 1988 ROE also noted that First Federal "is substantially dependent upon service corporation, fee, and other sources of income to overcome the earnings deficit inherent in the balance sheet." DX 118 at 0036.

29. At the conclusion of the July 11, 1988 ROE, regulators assigned First Federal a composite rating of 4, which would normally have subjected First Federal to RD 3a. DX 392 at 0537. However, according to the December 31, 1989 regulatory plan, the regulators agreed to waive RB 3a because First Annapolis was operating under a capital forbearance agreement.

30. By letter dated December 28, 1988, the FHLBB forwarded a copy of the July 11, 1988, report of examination to the board of directors at First Annapolis. DX 267 at 0111.

31. The July 11, 1988 ROE highlighted "First Annapolis' present weak overall financial condition, which continues to be aggravated by regulatory violations and operating deficiencies. The volume and nature of supervisory concerns reflect unfavorably upon the overall administration of the institution and pose a risk to First Annapolis' long-term viability." DX 267 at 0112.

32. Additionally, the FHLBB "strongly suggest[ed] that the board perform an internal assessment of itself, the institution's management team and the current organizational structure, and determine the capability of existing resources to successfully implement the recapitalization plan and restore the institution to a satisfactory condition." DX 267 at 0112.

## IV. First Federal's Viability Depended Upon Projected Profits From Its Service Corporations

33. In connection with the conversion, First Annapolis prepared a business plan, which Bancorp included with its holding company application. JX 87 at 0514-0653; JX 134. First Federal's Board of Directors approved this business plan on October 21, 1987, and titled the document the "Revised Regulatory Business Plan." JX 134 at 0515.

34. The Revised Regulatory Business Plan projected total net income of $12.6 million over the three years ending December 1990. JX 134 at I-5 and 0516. However, over this same three-year period, income from service corporations was projected to total $16.7 million or 133 percent of projected net income.[3] JX 134 at I-5; DX 118 at 0030.

35. In other words, while First Annapolis projected that it would lose approximately $4.1 million on its core operations, those losses would be offset by the anticipated profits from the service corporations. DX 69 at 0403. Thus, the "viability of [First Annapolis] would only be possible with the income generated from the service corporations." DX 634 at ¶10; DX 2074 at 0758.

[3] Profits from Delta were expected to account for nearly $14 million of the $16.7 million in service corporation profits. JX 134 at 48. Between fiscal year ending September 30, 1982 and fiscal year ending June 30, 1988, Delta's cumulative net income totaled $1,896,481. DX 2007 at 2005, DX 2012 at 0013, DX 2027 at 0449, DX 2050 at 0026, DX 2136 at 2099.

36. While the regulators' February 1988 "analysis demonstrate[d] that the $11 million capital infusion combined with the successful implementation of the proposed business plan satisfie[d] the viability criteria of Sections 563b.24(b) and 563b.26(b)(2)" (DX 69 at 0403), the regulators also recognized that the "income generated through service corporation activity [was] crucial to the viability of the converted institution." DX 69 at 0405.

37. In a July 15, 1988 letter from the FHLBB to First Federal, the regulators again recognized that "the profitability of First Federal, as indicated in the institution's business plan, is dependent upon income generated by the service corporation . . . ." By then, however, the regulators had become "concerned that the institution's investment in such projects continues to increase while projected profit decreases." DX 2457 at 0152.

38. By letter dated July 25, 1988, First Federal responded to the concerns expressed by the FHLBB in its July 15, 1988 letter. DX 2458. First Federal "wish[ed] to assure [the FHLB-Atlanta] that the projected profits [from service corporation investments] as shown on Exhibit A will be accomplished. A majority of the projects have existing contracts of sale, which justify the conservative projections. As you are aware, these projects have been reviewed by Deloitte, Haskins & Sells, Akin Gump, Dickstein, Shapiro & Morin, The National Bank of Washington and are presently being reviewed by your examiners. The viability or value assigned to any project has not been questioned by any of these groups." DX 2458 at 0334.

39. In connection with the July 1988 ROE, the examiners reviewed 10 of First Federal's service corporations' 38 joint ventures. The examiners' "review did not reveal material weaknesses with management's assumptions upon which the total profit projections were based. However, this review disclosed that some projected profits may be realized later

than originally estimated." DX 118 at 0035. The examiners also, prophetically, noted that "considering the speculative nature of these real estate ventures, any change in market conditions can have a substantial negative impact on profits booked." DX 118 at 0035 (emphasis added).

40. After the voluntary supervisory conversion was completed, First Annapolis prepared a revised business plan dated January 5, 1989 ("January 1989 Business Plan"), which was approved at the October 26, 1988 meeting of First Annapolis' Board of Directors. JX 135 at 0868 and 0870.

41. The January 1989 Business Plan projected total net income for the three-year period ending September 1991 of $8.51 million. JX 135 at 0882 and 0872.

42. The ability to generate the $8.51 million in total net income, however, was - once again - dependent upon the service corporations realizing profits of $15 million. JX 135 at 0875, 0882. Thus, just like the October 1987 Revised Regulatory Business Plan, the January 1989 Business Plan projected losses from core operations that would be offset by profits from service corporation investments.

43. Therefore, the plan concluded "continued forbearance for the savings bank on overinvestment in subsidiaries [was] crucial for maintaining a viable institution." JX 135 at 0875.

## V. The Service Corporation Profits Did Not Materialize As Projected And, As Expected, First Annapolis Lost Money On Its Core Operations

44. As projected, First Annapolis lost money on its core operations – albeit substantially more than expected. The service corporation profits, moreover, did not materialize in the amounts hoped for and they were not sufficient to offset the higher-than-projected losses that First Annapolis realized from its core operations.

45. During the nine-month period ending June 1989, while First Annapolis projected losses (before goodwill amortization and extraordinary items) of nearly $1.5 million on its core operations, its actual losses totaled approximately $4.2 million. DX 2120 at 1550, 0704, and 0486.

46. Furthermore, while First Annapolis projected income from its service corporations of $3.3 million during this same nine-month period, its actual income was less than $1.9 million. DX 2120 at 1550, 0704, and 0486.

47. The combination of higher than expected losses from operations and lower than expected profits from service corporation investments resulted in First Annapolis realizing an actual loss (before goodwill amortization and extraordinary items) of nearly $2.4 million versus a projected profit of nearly $1.9 million – a difference of approximately $4.3 million in just nine months. DX 2120 at 1550, 0704, and 0486.

48. According to the January 1989 Business Plan, as of September 1988, First Annapolis' regulatory capital to total liabilities ratio was 2.31 percent. JX 135 at 0879. The January 1989 Business Plan also projected that by June 1989 First Annapolis' regulatory capital to total liabilities ratio would be 2.42 percent. JX 135 at 0889 and 0879.

49. In addition, First Annapolis' January 1989 Business Plan projected that, as of June 1989, not only would First Annapolis exceed its June 1989 benchmark requirement, but it would also exceed its June 1990 and June 1991 requirements. JX 135 at 0889.

50. First Annapolis' actual regulatory capital to total liabilities ratio as of June 1989 was 1.99 percent, which was substantially less than the 2.42 percent ratio that First Annapolis

projected just six months earlier.[4] Furthermore, First Annapolis' actual June 1989 regulatory capital ratio did not exceed the June 1990 and June 1991 benchmarks, as projected in the January 1989 Business Plan.

51. Since First Annapolis did not meet its June 1990 and June 1991 regulatory capital benchmarks as of June 1989, as projected, First Annapolis would either have to shrink, raise capital or become profitable – something it had not done since prior to fiscal year 1981 – in order to meet its future benchmarks. JX 89 at 0070.

52. Further, unless First Annapolis was able to stop generating losses – again, a feat it had not accomplished since prior to fiscal year 1981 – it would soon fail to meet its 1.80 percent regulatory capital benchmark requirement.

53. In fact, the only thing that could save First Annapolis from failure would be if it were somehow able to generate profits <u>and</u> avoid having to recognize substantial credit losses due to a deterioration in asset quality. First Annapolis was unable to do either.

## VI. <u>First Annapolis Continued To Lose Money After June 1989</u>

54. First Annapolis continued to lose money after June 1989, just as it had done in each fiscal year since 1981. JX 89 at 0070. For example, during the quarter ended September 1989, while First Annapolis <u>projected total net income</u> of over $1.2 million, it <u>actually lost</u> approximately $84,415. DX 2120 at 0129.

---

[4] This ratio was calculated by dividing the regulatory capital of $15.1 million by the total liabilities of $760.4 million. JX 3 at 0824, 0846.

55. Due to its losses, by September 30, 1989, First Annapolis' regulatory capital (including all of the goodwill) to total liabilities ratio had fallen to 1.88 percent and only exceeded its 1.80 percent regulatory capital requirement by $582,494.[5] DX 365 at 1422.

56. During the month of October 1989, First Annapolis reported a loss on core operations of $1.2 million, a loss on service corporations of $43,896, and a total loss of $1.3 million. Much of the loss on core operations can be traced to a significant shortfall between projected and actual net interest income and a significant overage between projected and actual non-interest expense. JX 58 at 1543-44.

57. As discussed in more detail below, despite rapidly deteriorating asset quality, the $1.2 million loss from core operations was not the result of First Annapolis recognizing credit losses. In fact, during October 1989, First Annapolis actually recorded "negative" loan loss provisions, which increased earnings and decreased loan loss reserves.[6] JX 58 at 1543.

58. As a result of the loss it experienced in October 1989, First Annapolis' regulatory capital (including all the goodwill) to total liabilities ratio had fallen to 1.77 percent as of October 31, 1989. Thus, as of the end of October 1989, First Annapolis failed to meet its 1.80 percent regulatory capital requirement. JX 58 at 1545.

59. This negative trend in financial results continued in November and December 1989. More specifically, First Annapolis lost nearly $1.2 million in November 1989, and nearly

---

[5] As discussed in more detail in Section VII, First Annapolis only met its regulatory capital benchmark as of September 1989 because it failed to recognize credit losses despite the significant decline in asset quality that had occurred since June 1989.

[6] In fact, during the four-month period ending October 1989, First Annapolis recorded "negative" loan loss provisions of $599,685. JX 58 at 1543.

$1.1 million in December 1989. These losses were due to a combination of continued losses on core operations and minimal profits from service corporations. JX 61 at 1643.

60. Once again, the losses realized in November and December 1989, were not due to First Annapolis recording significant credit losses. JX 61 at 1642. Instead, these results were exactly what First Annapolis had projected, losses from core operations – and what the regulators were concerned about – service corporation profits not meeting expectations. DX 118 at 0035; DX 2457 at 0152.

61. By November 1989 and December 1989, First Annapolis' regulatory capital (including all of the goodwill) to total liabilities ratio had fallen to 1.65 percent and 1.55 percent, respectively. Therefore, as of November 1989 and December 1989, First Annapolis failed to meet its 1.80 percent regulatory capital benchmark ratio by approximately $1.1 million and $1.9 million, respectively. DX 2294 at 1612; JX 61 at 1645.

62. First Annapolis faired no better during the first four months of calendar 1990. More specifically, in January 1990, it reported a net loss of nearly $1.1 million, which – as expected – was due to significant net losses from core operations. JX 65 at 1730.

63. Due to this latest loss, First Annapolis' regulatory capital (including all goodwill) to total liabilities ratio equaled 1.38 percent, which resulted in a regulatory capital shortfall of over $3 million versus the 1.80 percent benchmark requirement. JX 62 at 1672.

64. In February 1990, First Annapolis recorded a net loss of $13.3 million. JX 65 at 1730. This loss was due in large part to the nearly $8 million in credit losses and the $4.9

million in service corporations losses that First Annapolis recorded during the month.[7] JX 65 at 1729-30.

65. In March 1990, and April 1990, First Annapolis reported additional losses of approximately $1.3 million during each month. Again, as expected, the March and April losses were primarily due to the negative earnings that First Annapolis was experiencing on its core operations, which could not be offset by profits from its service corporation. JX 68 at 0013.

66. As of April 1990, First Annapolis' regulatory capital (including all goodwill) to total liabilities ratio was a negative 0.25 percent. JX 68 at 0016.[8]

67. In total, between August 12, 1988, and April 30, 1990, First Annapolis realized losses of $23.7 million (after the amortization of goodwill) and nearly $16.4 million (before the amortization of goodwill). JX 68 at 0016. That is, the losses experienced by First Annapolis after the conversion exceeded the $13.7 million in capital Bancorp infused into First Annapolis.

## VII. Despite First Annapolis' Asset Quality Deteriorating Rapidly In 1989, It Failed To Recognize Any Credit Losses Between June 1989 and December 1989

68. First Annapolis' October 1987 Revised Regulatory Business Plan projected total loan loss provisions of less than $1.7 million over the three-year period ending December 31, 1990. JX 134 at 0516 and I-5.

---

[7] Incredibly, in January 1990, which was only one month before recording an $8 million loan loss provision, First Annapolis recorded a "negative" loan loss provision of $288,249. JX 65 at 1729. In other words, First Annapolis actually reduced its provision for loan losses.

[8] In the "Background" section of its Liability Opinion, the Court stated that: "As of May 31, 1990, First Annapolis would have met the 1.8% capital benchmark . . . ." Slip Op. at 13. The Court's statement was attributed to an unsupported affidavit executed by Douglas Parran in support of this litigation; however, we will demonstrate at trial that this assertion is false.

69. First Annapolis' January 1989 business plan projected loan loss provisions totaling just $612,000 for the three years ending September 1991. JX 135 at 0872 and 0882.

70. First Annapolis' June 1989 Revised Business Plan projected loan loss provisions totaling just $124,000 during the five years ending March 1994. JX 136 at 0556.

71. In other words, First Annapolis' profitability was dependant upon it incurring only minimal loan losses. First Annapolis' projected loan losses, like its projected profitability, turned out to be wildly optimistic.

72. As described in more detail below, despite the substantial increase in delinquent loans and criticized assets after June 1989, First Annapolis recorded "negative" credit losses of $299,810 during the six-month period ending December 1989. DX 2294 at 1610; JX 61 at 1642. Thus, rather than recording additional credit losses to account for the deterioration in asset quality that it was experiencing, First Annapolis – remarkably – did the exact opposite and reduced its loan loss allowances, which served to artificially inflate its capital.

## VIII. First Annapolis' Delinquent Loans And Their Impact On Profitability

73. During its April 19, 1989 Board of Directors meeting, First Annapolis approved a policy governing when interest income should stop being accrued (i.e., recorded as income) on delinquent loans. JX 46 at 1012-13. When this policy was adopted, First Annapolis' delinquent loans totaled approximately $13.1 million. JX 46 at 1012.

74. By July 1989, however, the amount of First Annapolis loans that were more than 30-days past due had increased by $45.2 million to nearly $58.3 million. DX 2210 at 0517.

75. By September 1989, loans more than 30 days past due had increased another $24 million to $82.3 million. DX 365 at 1410.

76. Despite this tremendous increase in delinquent loans, First Annapolis recorded "negative" loan loss provisions of $401,350 during the quarter ending September 1989. DX 2120 at 0128.

77. According to the OTS' January 16, 1990 report of examination ("January 1990 ROE"), "during the 12 months ended December 31, 1989 the level of real estate owned and loans on non-accrual has increased from 1.2% of assets to 7.1% of assets, which is cause for significant concern and is indicative of an extremely serious asset quality problem." DX 397 at 0139 and 0149.

78. The examiners further observed that the majority of the increase (61.9 percent) in real estate owned and loans on non-accrual status "has occurred since June 30, 1989." DX 397 at 0161.

79. The impact of this substantial increase in delinquent loans, combined with First Annapolis' policy to stop accruing interest once a loan became delinquent for a specific period of time, contributed to First Annapolis' interest income declining from $5.8 million in September 1989, to $5.1 million in October 1989, and to First Annapolis missing its projected interest income target of $5.9 million by $800,000. DX 365 at 1420; JX 58 at 1543.

80. Furthermore, it was the decline in interest income - not loan losses - that played a key role in First Annapolis realizing a $1.2 million loss on its core operations during October 1989. JX 58 at 1544.

81. The January 16, 1990 ROE also commented on the impact of delinquent and non-accrual loans on the profitability of First Annapolis. According to the examiners: "During the year ended December 31, 1989, the reserve for uncollected interest increased from $464,971 to

$3,367,634, indicating $2,902,662 of lost interest income for just the non-REO assets. The impact of this lost [interest] income has been most felt in the more recent months such as December 1989 during which the bank reserved $586,224 of uncollected interest, an amount which represents 53.3% of the $1.1 million net loss for the month." DX 397 at 0162.

**IX. First Annapolis' Criticized And Classified Assets Increased Substantially Between June 1989 And December 1989**

82. During its June 15, 1988 Board of Directors meeting, First Federal's Board approved an "Asset Classification Policy." JX 23 at 0461. This policy required that: "Once a problem asset has been identified, it will be classified 'special mention', 'substandard', 'doubtful', or 'loss'." JX 23 at 0466.

83. The decision on whether or not to classify an asset would be based upon many factors including, but not limited to, the default and/or bankruptcy of the debtor, payment delinquency, and updated or new appraisals. JX 23 at 0466.

84. Classified assets are equal to the sum of assets categorized substandard, doubtful, and loss. Criticized assets are equal to classified assets plus special mention assets. DX 397 at 0170.

85. As of June 1989, First Annapolis' special mention assets totaled $4.5 million and its classified assets totaled $27.4 million, resulting in total criticized assets of $31.9 million. DX 2200 at 1239.

86. By September 1989, First Annapolis' special mention assets had increased to nearly $32.3 million while its classified assets declined to $23.4 million, resulting in total criticized assets of over $55.6 million. JX 58 at 1549.

87. By October 1989, First Annapolis' special mention assets had increased to over $44.9 million while its classified assets had declined to $11.8 million, resulting in total criticized assets of nearly $56.8 million. JX 58 at 1549.

88. By December 1989, First Annapolis' special mention assets had increased to over $48 million while its classified assets had declined to $10.9 million, resulting in total criticized assets of nearly $58.9 million.[9] DX 397 at 0150.

## X. First Annapolis' Failure To Properly Classify Its Problem Assets Caused Its Losses To Be Understated And Its Capital To Be Overstated During The Last Six Months Of 1989

89. Under First Federal's Asset Classification Policy, assets that were classified special mention did not require valuation allowances, while assets classified substandard and doubtful required valuation allowances of 10 percent and 30 percent, respectively. JX 23 at 0461; DX 397 at 0150-51.

90. Therefore, by internally categorizing assets as special mention rather than substandard, First Annapolis was not required to record a loan loss provision, despite total criticized assets increasing from $31.9 million in June 1989 to $56.8 million by December 1989 - a 78 percent increase in just six months.

91. The evidence will show that management did not adequately classify its assets, and in fact, management established just special mention designations for the vast majority of the thrift's non-performing assets. DX 397 at 0150.

[9] According to First Annapolis' January 4, 1990 Capital Plan and its March 8, 1990 Amended and Restated Capital Plan, the "[r]esolution of all classified assets [was] of highest priority." DX 2311 at 0100; DX 2341 at 1102.

92. Had management utilized reasonable classification criteria in assessing its non-performing assets by applying at least substandard asset classifications to the special mention assets, First Annapolis would have had to increase general reserves by $4,264,634. DX 397 at 0151; DX 397 at 0162.

93. In fact, if First Annapolis had classified as substandard the $32.3 million in assets it had classified special mention as of September 1989, the thrift would have recorded loan loss provisions of approximately $3.3 million. The recognition of this loan loss would have caused First Annapolis to fail its regulatory capital ratio benchmark as of September 1989. JX 58 at 1549.

**XI. The Enactment Of FIRREA**

94. On August 9, 1989, Congress enacted FIRREA. FIRREA of 1989, Pub. L. No. 101-73, 103 Stat. 183.

95. FIRREA required the Director of the OTS to promulgate regulations establishing a "tangible" capital requirement, a "leverage" or "core" capital requirement, and a "risk-based" capital requirement for thrifts. Id.

96. FIRREA and its implementing regulations (which were promulgated on November 8, 1989 and became effective on December 7, 1989) required a savings institution to maintain tangible capital in an amount not less than 1.5 percent of the institution's adjusted total assets. 12 U.S.C. § 1464(t)(2)(B); 12 C.F.R. § 567.9(a).

97. Pursuant to the regulatory requirements put in place as of December 7, 1989, tangible capital did not include any intangible assets, such as goodwill. 12 U.S.C. § 1464(t)(9)(C).

98. FIRREA and its implementing regulations also required an institution to maintain core capital of three percent of its adjusted total assets. 12 U.S.C. § 1464(t)(2)(A); 12 C.F.R. § 567.8.

99. Pursuant to the regulatory requirements put in place as of December 7, 1989, core capital was defined to exclude any unidentifiable intangible assets, including goodwill. 12 U.S.C. § 1464(t)(9)(A); 12 C.F.R. § 567.5(a)(1), (2).

100. Nevertheless, FIRREA and the accompanying regulations permitted a thrift to include certain amounts of "qualifying supervisory goodwill" in the calculation of core capital. This limit was initially 1.5 percent of total assets. The limit declined gradually each year and was phased out entirely by December 31, 1994. 12 U.S.C. § 1464(t)(3)(A); 12 C.F.R. § 567.5(a)(1), (2).

101. Savings institutions were also required to maintain risk-based capital in an amount greater than or equal to 6.4 percent of risk-weighted assets at December 31, 1989, 7.2 percent of risk-weighted assets as of December 31, 1990, and 8.0 percent of risk-weighted assets as of December 31, 1992. 12 U.S.C. § 1464(t)(2)(C); 12 C.F.R. §§ 567.2(a)(1)-(b), 567.6.

102. As with the core capital requirement and the regulatory requirements put in place as of December 7, 1989, qualifying supervisory goodwill could be counted towards the risk-based capital requirement, and would be phased out over five years. 12 U.S.C. § 1464(t)(2)(C).

**XII. <u>First Annapolis' Performance Following The Enactment Of FIRREA</u>**

103. By letter dated August 9, 1989, the FHLBB informed First Annapolis that: "As noted in the June 1989 Thrift Financial Report, First Annapolis is reporting a gradual decline in its net interest margin, a significantly large increase in its non-interest operating expense, and a

decline in income from its service corporations. These changes in income and expense have resulted in a significant loss for First Annapolis, significantly impacting the institution's regulatory capital level. Accordingly, in comparing such financial figures with First Annapolis' business plan, it appears that the institution's operating expenses are understated and the institution's net interest margin, net income, and regulatory capital projections are overstated. Based on such variations, it appears that First Annapolis will be unable to meet its business plan projections." DX 2214 at 0498.

104. By letter to the FHLBB dated September 13, 1989, First Annapolis "acknowldge[d] that actual income and expenses, and resultant net income (loss) are at variance with our previously submitted business plan." DX 2239 at 0242.

105. According to attachments to the minutes of First Annapolis' October 12, 1989 Special Board of Directors Meeting, "[t]he Board is deeply concerned that the present actions of Delta have the potential of further draining the capital of the corporation. Therefore, the Board of Directors of the holding company, and in its new capacity as the Board of Directors of Delta Corp., announces the following actions:

> (1) A Review Committee is established and is instructed to review the present status of all activity, past and present, of the corporation. The committee shall make a report to the Executive Committee by October 30, 1989 detailing the status of all projects and proposing a plan that will release the Institution from all liability on or before June 30, 1990." JX 56 at 0424.

106. As of December 31, 1989, First Annapolis reported annual net operating losses for 1989, of $11.3 million and annual net losses of $8.2 million. "Such losses have continually

depleted capital and contributed to the institution's already tenuous financial condition." DX 438 at 0011.

107. "As of December 31, 1989, the institution's interest earning assets to interest bearing liabilities ratio equaled 77.8 percent, resulting in a net interest position of negative $162.5 million. This compares with peer group ratios which total 91.2 percent for institutions with assets between $500 million and $1 billion, 90.1 percent for institutions in Maryland, and 90.7 percent for institutions in the fourth district." DX 438 at 0011.

108. First Annapolis' "net interest margin has been historically below the peer group average while its operating expenses have slightly exceeded the peer group average. Notwithstanding the amortization of goodwill, the institution's operating expenses equal approximately 2.00 percent. The loss of income associated with non-accrual loans and the institution's cost of funds, have contributed significantly to its low net interest margin." DX 438 at 0012.

109. On January 5, 1990, First Annapolis submitted its capital plan to the OTS and requested a "capital exemption from the capital requirements and the sanctions and penalties attendant to a failure to comply with the minimum capital standards." DX 2311 at 0077.

110. First Annapolis' January 4, 1990 Capital Plan provided: "The enactment of [FIRREA] has cast some doubt upon the continued validity of these 1988 forbearances. It is the Bank's position that regardless of past forbearance agreements or the current FIRREA legislation, prudent business sense dictates that the issues of capital compliance and service corporation investments be effectively addressed. The Bank is in concurrence with the goals and

objectives of FIRREA. Management and the board of directors will adhere to its goals as it implements this Capital Plan." DX 2311 at 0089 and 0090.

111. The Capital Plan further stated: "Regulatory limitations on loans to one borrower (LTOB) have changed markedly under FIRREA; the Bank's management interprets its presently applicable LTOB limitation as amounting to the sum of $500,000 per borrower. During the term of this Capital Plan, the Bank shall strictly comply with the applicable LTOB limit in relation to new loans." DX 2311 at 0104.

112. Additionally, the Capital Plan stated: "Investments in service corporations will be brought into compliance with applicable regulatory limitations by December 31, 1992. The profits inherent in existing projects will serve a meaningful business purpose during this Plan term while the Bank undergoes the transition from being a savings bank relying on the earnings of investments with inherently higher risk to a savings bank built on the foundation of home ownership and traditional thrift lending." DX 2311 at 103.

113. By letter dated February 27, 1990, the OTS informed First Annapolis that it was not able to approve the capital plan First Annapolis submitted on January 5, 1990. DX 406 at 1039.

**XIII. <u>First Annapolis' January 1990 Report Of Examination</u>**

114. The OTS conducted a special limited examination of First Annapolis, which commenced on January 16, 1990. The purpose of the examination was "to review and analyze the bank's rapidly deteriorating operating results and the resulting deficient capital position, along with a review of the status of the continued excess level of service corporation investment." DX 397 at 0139.

115. During the examination, the examiners noted that: "Once on site, it became evident that the true level of classified assets was much higher than what was being reported on the Thrift Financial Reports, and thus, the scope of the examination was expanded to include a review of the larger classifiable assets." DX 397 at 0139.

116. The January 1990 ROE noted that First Annapolis "is faced with significant problems with regards to earnings, capital, and asset quality." DX 397 at 0139.

117. During the quarter ended December 31, 1989, First Annapolis was losing in excess of $1.1 million per month. This trend continued into January 1990. DX 397 at 0139 and 0160. Examiners noted that: "The level of [First Annapolis'] losses has been accelerating as a result of the significant increase in the level of non-performing assets along with the lack of new sources of non-operating income." DX 397 at 0139.

118. With respect to First Annapolis' operating results, the examiners explained that: "The single most significant item impacting operating results is the bank's fundamentally poor asset structure. As of December 31, 1989, interest earning assets totaled $564.7 million, which is only 75.3% of total assets ($750.1 million) and 77.0% of interest bearing liabilities ($733.0 million). Also, these ratios have worsened throughout 1989 as the level of non-performing assets has increased. Consequently, the bank's decreasing net interest margin has been materially inadequate to fund ongoing operations and the level of losses has accelerated." DX 397 at 0160.

119. As of December 31, 1989, First Annapolis' reported GAAP capital was $6.9 million. This amount represented less than one percent of the bank's total assets. DX 397 at 0139.

120. Furthermore, examiners explained that: "Had management properly classified its non-performing assets, reported earnings during 1989 would have been substantially worse due to the increased charges to the loan loss provisions resulting from the establishment of general valuation allowances." DX 397 at 0162.

121. Examiners concluded that First Annapolis' failure to maintain adequate general valuation allowances was considered an "unsafe and unsound banking practice." DX 397 at 0140.

122. The examiners' review, in accordance with First Annapolis' internal asset classification policy, "identified $6.2 million of loss classifications and a $5.8 million increase to the general valuation allowance mandated by bank policy for classified assets." DX 397 at 0139. When booked, these additional loss classifications and general valuation allowances "will leave [First Annapolis] insolvent on a GAAP basis." DX 397 at 0139, 0150, 0156.

123. By letter dated April 18, 1990, the OTS forwarded a copy of the January 1990 ROE, which assigned First Annapolis a MACRO rating of 5, to First Annapolis' Board of Directors. DX 439 at 1300, DX 397 at 0140.

**XIV. <u>The Failure Of First Annapolis</u>**

124. On March 8, 1990, First Annapolis filed an amended capital plan with the OTS (DX 2341), which the OTS rejected as "materially deficient" on March 12, 1990. DX 438 at 0017.

125. On March 23, 1990, Douglas A. Parran "tendered [his] resignation as a Director and President of [First Annapolis] effective Monday, March 26, 1990." DX 422.

126. At a special meeting of First Annapolis' Board of Directors, held on March 23, 1990, the board appointed David F. Vorel as the acting Chief Executive Officer and Chief Financial Officer and Director of First Annapolis. DX 429.

127. By April 16, 1990, the OTS was of the opinion that adequate grounds existed for the appointment of a conservator or receiver for First Annapolis. DX 438 at 0005.

128. The OTS found that First Annapolis suffered "from a high level of non-earning and non-performing assets, insufficient net interest margin, an unfavorable operating structure, as well as an extremely high level of goodwill." The OTS further believed that this structure had a negative impact on First Annapolis' efforts to recapitalize. DX 438 at 0011.

129. By letter dated May 1, 1990, the OTS informed First Annapolis that it was unable to approve its "Amended Capital Plan Filed on March 9, 1990." DX 2362 at 0899; DX 448 at 1959.

130. By Order number 90-1019 dated May 31, 1990, the OTS appointed the Resolution Trust Corporation as receiver for First Annapolis. DX 2370

131. On March 19, 1993, Douglas A. Parran and the OTS entered into a "Stipulation and Consent to the Entry of a Prohibition Order and A Restitution Order" ("Stipulation"). DX 691.

132. According to the Stipulation: "[Mr.] Parran was responsible for the origination or approval of at least three limited partnership arrangements, created to fund new projects through Delta, and at least three direct loans, that resulted in a substantial increase in the Institution's investment in service corporations, in violation of the" July 1987 Supervisory Agreement. DX 691 at 1771.

133. According to the Stipulation: "[Mr.] Parran also was responsible for the origination or approval of two major projects that were structured as loans, rather than as partnerships, in an apparent attempt to circumvent the investment limitations for service corporations and the requirements of the [July 1987 Supervisory Agreement]." DX 691 at 1771.

134. According to the Stipulation: "The investments in the service corporation that were made in violation of the [July 1987 Supervisory Agreement] resulted in estimated losses to the Institution, as of January 25, 1991, in excess of $3.3 million." DX 691 at 1771-72.

135. On March 19, 1993, Douglas A. Parran and the OTS also entered into an "Order of Prohibition and Order of Restitution" ("Prohibition Order"), which provided that: "Without the prior written approval of the Regional Director for the Southeast Region and, if appropriate, any other Federal financial institutions regulatory agency, [Mr.] Parran may not hold any office in, or participate in any manner in the conduct of the affairs of any institution(s) or other entity as set forth in Section 8(e)(7)(A) of the FDIA, 12 U.S.C.A § 1818(e)(7)(A)." DX 692 at 1777.

136. According to the March 31, 2006 "Goodwill Financial Reporting Package," the FDIC had incurred a loss of $103.3 million on the liquidation of First Annapolis as of June 30, 2004 (DX 635 at 0008), and the First Annapolis receivership had a net deficit of $187.6 million as of December 31, 2005. DX 635 at 0005.

## XV. The Specific Loan Losses Identified By The Examiners In Connection With The January 16, 1990 Report of Examination Were Unrelated To The Breach

137. Based upon the results of the January 16, 1990 examination, the OTS directed First Annapolis to "immediately charge-off those assets, or portions thereof, classified as loss by the OTS examiners at the January 16, 1990 examination and aggregating $6,186,116." DX 439 at 1300.

138. The specific assets and dollar amounts of the charge-offs included the following: (a) Bayside Marina, $3,234,056; (b) Dennis Blaeuer entities, $947,822; and (c) Northampton Business Park, $1,479,051. DX 439 at 1300.

139. As discussed below, there is no evidence that the losses First Annapolis recorded on the Bayside Marina, Dennis Blaeuer entities, and Northampton loans were in any way due to the breach.

**A. <u>Bayside Marina</u>**

140. On August 5, 1987, First Federal granted three loans totaling $16.9 million to Bayside Marina Associates Joint Venture and Sterling Properties Associates III, Inc. ("Bayside").

141. Within one year of being granted, the Bayside loans were classified as special mention by the examiners in the July 1988 ROE due to the lack of sewer allocations and the poor operating results of the existing marina. DX 118 at 0064.

142. The Bayside loans were placed on non-accrual status by First Annapolis in January 1989, (DX 2145 at 1505) and they remained in default throughout 1989. DX 397 at 0171.

143. A loss reserve in the amount of $2.5 million was recognized during 1989 on one of the Bayside loans; however, in accordance with SFAS #38, this reserve was added to goodwill rather than being recorded as an expense. JX 3 at 0834.

144. On August 9, 1989, First Annapolis sent separate letters to Mr. Sterling Leppo and Bayside Marina Associates Joint Venture demanding full payment of the outstanding

balances of the three Bayside loans within 15 days, after which, First Annapolis would proceed with suit and/or foreclosure proceedings. DX 2212; DX 2213.

145. First Annapolis eventually reached an agreement with Mr. Leppo in December 1989, whereby the Bank took control of the remaining condominiums and undeveloped land through a deed-in-lieu of foreclosure and refinanced the marina with a $5 million loan. DX 397 at 0171-2.

146. Prior to the January 1990 ROE, First Annapolis had designated $10.2 million of the Bayside loans as special mention and had established specific reserves totaling $4.1 million (including $1.6 million of uncollected interest). DX 397 at 0171.

147. According to the January 1990 ROE, examiners classified $7.0 million of the Bayside loans as substandard and $7.3 million as loss as of December 31, 1989. DX 397 at 0171-72.

148. The substandard classification of $7 million was equal to the projected value of the properties as determined by the District Appraiser, who cited “significant deficiencies” in a July 1989 appraisal report that estimated the combined value of the Bayside property at $10.3 million. DX 397 at 0171-72.

149. The loss classification of $7.3 million was equal to the difference between the total loan balance of $14.3 million less the District Appraiser’s projected value of $7.0 million. DX 397 at 0171-72.

150. Based upon the above classifications, an increase of $3.2 million was required to the loss reserve. DX 397 at 0171-72.

**B. <u>Dennis Blaeuer Entities</u>**

151. Dennis Blaeuer entities had 10 loans with First Annapolis, two of which were held by Delta. The loans were secured by five separate marinas or boatyards in Maryland. As of December 31, 1989, these 10 loans were seriously delinquent (from three to six months). DX 397 at 0174.

152. On October 31, 1989, David Cook, Executive Vice President at First Annapolis, wrote a memo to the Board of Directors that stated: "The major issue for our company is the substantial loss in the Spa Creek Marina ([First Annapolis'] first - $2,160,000; Delta's second - $2,232,752 plus $368,446 in additional notes, for a company exposure of $4,761,198). The marina value is in the 3,000,000 to 4,000,000 range; we hope to achieve a minimum of $3,500,000 through a well-publicized owner's auction, and we could bid it in above that amount to protect our interest." DX 2265 at 0776.

153. According to a December 1, 1989 memo from David Cook to file: "The bank has agreed to release its $4.7MM principal liens on White Rocks/Spa Creek for the sum of $3.500MM in a sale of subject marina to the Annapolis Yacht Club. That transaction will result in a loss of up to $1.2MM to [First Annapolis]." DX 2289 at 0760.

154. In connection with the January 1990 ROE, the examiners classified $947,882 of the Spa Creek related loans as a loss. The loss was equal to difference between the future sale amount of Spa Creek ($3.50 million) and First Annapolis' net exposure on Spa Creek ($4.45 million as of December 31, 1989). DX 397 at 0174.

**C. Northampton Office Park**

155. On October 1, 1986, First Federal granted a $6.1 million dollar first trust loan to the Northampton partnership, and Delta subsequently granted various unsecured loans to finance development costs. DX 397 at 0173. The loan, as amended, was due July 20, 1989. DX 2461 at 0171.

156. On July 20, 1989, a letter was sent to Northampton stating that the $6.1 loan matured that day and that "[n]o further modification or extension is contemplated." DX 2461 at 0171.

157. On August 2, 1989, First Annapolis' Board of Directors declined further funding for the Northampton loan. DX 2210 at 0496; DX 2462 at 1623.

158. On August 11, 1989, First Annapolis classified all loans to Maisel-Hollins, including Northampton, as special mention. DX 2215 at 0004. As of December 1989, the Northampton loan was still classified special mention by First Annapolis.[10]

159. As of August 20, 1989, appraisers valued the Northampton Business Park Subdivision at $6.7 million. DX 2218 at 1659. First Annapolis' Classified Loan Report as of August 31, 1989, noted that the net current balance for Northampton totaled $9.1 million, all of which was classified as special mention. DX 2242 at 1341. Therefore, Northampton was worth $2.4 million less than the current balance of the loans outstanding.

---

[10] A listing of how each loan was classified as of December 31, 1989 is not available. Given that First Annapolis classified Northampton as special mention as of October 1989, DX 2274 at 0149, and the fact that assets classified substandard by First Annapolis declined from $5.9 million in October 1989, JX 58 at 1549, to $5.2 million as of December 31, 1989, DX 397 at 0150, the Northampton loan was clearly still classified special mention by First Annapolis as of December 31, 1989.

160. According to the January 1990 ROE, examiners classified $6.7 million of the Northampton loan as substandard and $2.7 million as loss. DX 397 at 0173.

161. The $6.7 million substandard amount was equal to the August 20, 1989 appraised value.

162. The loss value of $2.7 million was equal to the difference between the total loan balance of $9.4 million less the $6.7 million appraised value. Based upon the above classifications, an increase of nearly $1.5 million was required to the loss reserve. DX 397 at 0173.

## XVI. The General Loan Losses Identified By The Examiners In Connection With The January 16, 1990 Report Of Examination Were Unrelated To The Breach

163. In connection with the January 1990 ROE, the examiners identified classified assets of $87.6 million and criticized assets of $126.5 million. The criticized assets equaled 16.9 percent of total assets and 1,821.6 percent of GAAP capital. Furthermore, substandard assets accounted for nearly $69.9 million of total classified assets. DX 397 at 0170.

164. Based upon the results of the January 1990 ROE, First Annapolis was directed to "immediately increase its general loan loss reserve by $5,800,000, consistent with the institution's loan loss reserve policy and with the level of criticized and classified assets identified by the OTS examiners at the January 16, 1990 examination." DX 439 at 1301.

165. In addition to the Bayside Marina, Dennis Blaeuer entities, and the Northampton loans discussed above, the following discusses other loans that were classified substandard by the examiners and the reasons for the classification.

**A. "<u>Various Commercial Loans</u>"**

166. "A review of 35 commercial loans which were 90 or more days delinquent as of December 31, 1989, resulted in" the examiners classifying over $3.9 million of the loans substandard. First Annapolis "agreed with the examiner's comments." DX 397 at 0176.

**B. "<u>Real Estate Owned</u>"**

167. The examiners classified $3.2 million of real estate owned by First Annapolis as substandard. "The majority of these [real estate owned] properties are single family townhouses and condominiums located in Texas." First Annapolis failed to classify the entire $3.2 million in REO as substandard. First Annapolis "agreed with the examiners comments." DX 397 at 0177.

**C. "<u>Various Mortgage Loans</u>"**

168. The examiners classified 70 mortgage loans with aggregate outstanding balances totaling over $8.9 million as substandard. These loans were classified substandard because the loans were delinquent by 90 days or more as of December 31, 1989. First Annapolis "had classified the majority of these loans as special mention." First Annapolis "acknowledged that the classification of these loans as special mention rather than substandard was inconsistent with bank policy." DX 397 at 0177-78.

**<u>CONTENTIONS OF LAW</u>**

1. In its contentions of fact and law, Bancorp contends that it is entitled to damages from the breach under either restitution or reliance theories. Bancorp also claims that an "award for damages for restitution or reliance damages should be adjusted to reflect the tax consequences of the award." Pl. Am. App. A at 16.

2. Bancorp bears the burden of establishing that it was injured as a direct result of the breach. Boyajian v. United States, 423 F.2d 1231, 1235 (Ct. Cl. 1970); Electronic and Missile Facilities, Inc. v. United States, 416 F.2d 1345, 1356 (Ct. Cl. 1969). Bancorp is not entitled to damages absent proof that FIRREA's acceleration of the amortization of goodwill and new capital requirements caused it direct monetary injury. Assurance Co. v. United States, 813 F.2d 1202, 1205 (Fed. Cir. 1987).

## I. The Date Of The Breach Is December 7, 1989

3. In its amended contentions of fact and law, Bancorp, in an apparent attempt to establish a total breach, contends that "the date of the breach of contract by the Government should be August 9, 1989, the date of the enactment of FIRREA." Pl. Am. App. A at 7, ¶ 21. This Court, however, has determined that the breach occurred in December 1989, when the Government began to enforce new minimum capital requirements. First Annapolis, Slip Op. at 23 (Liability Opinion); see also Mola Development Corp. v. United States, 74 Fed. Cl. 528, 542 (2006) (holding that the "alleged breach claim did not accrue until **December 7, 1989**, when FIRREA was first applied to" the thrift and the thrift "could no longer count goodwill toward regulatory capital") (emphasis added); Hansen Bancorp, Inc. v. United States, 67 Fed. Cl. 411, 423 (2005) (analyzing whether the Government's breach was total based on the thrift's capital position at year-end 1989, when new capital requirements were to be implemented).

4. In Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 184 (1997), this Court held that "FIRREA did not legally require plaintiffs to act in any certain way before the effective date of the regulations" and found that the breach occurred on the effective date of the regulations, December 7, 1989, not upon the passage of FIRREA, August 9, 1989.

5. In Bank of America, FSB v. United States, 51 Fed. Cl. 500 (2002), the Court held that Plaintiffs in Winstar-Related Cases did not establish a bright-line rule that FIRREA's implementing regulations triggered a Winstar action, but that:

> the regulations were legally significant because '[o]nce [they] took effect, thrifts were legally subject to new capital standards that were in direct contradiction to the terms of their forbearance agreements.... At this point, the Government's breach of contract was actual and harm to plaintiffs was inherent and obvious. It follows, therefore, that a government action which contradicted plaintiffs' forbearance agreements--for instance, one that interfered with their right to treat supervisory goodwill as capital--could likewise mark the claim's accrual. At the heart of our ... inquiry, then, is a single question: when did [the thrift] first become subject to the restrictions imposed by FIRREA?

Id. at 506 (citations omitted). The Bank of America court then found that the plaintiff’s claim for the breach of the goodwill contract accrued no later than October 6, 1989, the date of an OTS approval letter conditioning a merger on meeting FIRREA’s capital requirements because “the approval letter effectively accelerated the application of FIRREA.” Id. at 510.

6. Applying the standards set forth in Plaintiffs in Winstar-Related Cases and Bank of America, this Court, in Mola Development Corp., held that a Winstar plaintiff’s claim for breach of contract accrued on December 7, 1989, the effective date of FIRREA, rather than July 31, 1989, when the OTS sent a letter to the thrift designating it as troubled thrift and “plac[ing] restrictions on [the thrift’s] ability to increase assets or liabilities.” 74 Fed. Cl. At 542-43. According to this Court:

> As the Federal Circuit recognized in Ariadne, the Government's liability was fixed when it “refused to allow use of the asset as it had promised.” Ariadne Financial Services Pty. Ltd. v. United States, 133 F.3d 874, 879 (Fed. Cir. 1998). It is clear that the RB3a restrictions as well as the July 31, 1989 letter designating Charter as troubled and imposing restrictions flowing from that

> designation did not operate to fix Defendant's alleged liability for "deliberately repudiating its promise to allow MDC and Charter to include supervisory goodwill as regulatory capital." Compl. ¶ 38. **Rather, the alleged breach claim did not accrue until December 7, 1989, when FIRREA was first applied to Charter and Charter could no longer count goodwill toward regulatory capital.**

Id. at 14 (emphasis added). Indeed, unlike Bank of America, in this case, Bancorp continued to assume the Government would honor its forbearances in the capital plan it filed on January 5, 1990. DX 406 at 1039.

7. Bancorp has never alleged, nor is there any evidence indicating, that the mere enactment of FIRREA on August 9, 1989, somehow accelerated the application of FIRREA to First Annapolis or otherwise caused Bancorp immediate harm. Prior to the filing of its current contentions of fact and law on January 16, 2007, Bancorp consistently claimed that the date of the breach was December 7, 1989, not August, 9, 1989. For example, in its November 21, 1997 reply memorandum in support of its "short form" motion for partial summary judgment and in opposition to defendant's cross-motion for summary judgment, Bancorp stated:

> The government's final argument is that Bancorp was specifically advised that, at the end of five years, First Annapolis Savings Bank would have to meet all applicable regulatory requirements that might be in effect at the time. The government fails to explain how this fact has any relevance to the case, in which the conversion occurred on August 13, 1988, and **the government breached its contract less than a year and a half later, when FIRREA's regulations went into effect on December 7, 1989**. Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 184 (1997).

Pl. Reply Mem. in Supp. of "Short Form" Mot. for Partial Summ. J. and in Opp'n to Def. Cross-Mot. for Summ. J. (Nov. 11, 1997) at 16 (emphasis added); see also Pl. "Short Form" Mot.

for Partial Sum. J. (May 23, 1997) at short form liability sheet page 9, § G ("On **December 7, 1989**, the OTS Regulations issued by the Government pursuant to FIRREA became effective, thereby placing the Government in breach of contract.") (emphasis added). Indeed, as recently as June 6, 2006, in its contentions of fact and law filed before the June 2006 trial on our prior material breach defense, Bancorp alleged: "On December 7, 1989, the regulations issued by the OTS under FIRREA became effective. 54 Fed. Reg. 46,845 (11/8/89). **As such, as a consequence of FIRREA and the OTS regulations, on or about, December 7, 1989, the Government breached its contract with Bancorp.**" Pl. Contentions of Fact and Law (Jun. 6, 2006) at 10 (emphasis added).

8. Pursuant to the authorities discussed herein and Bancorp's own pleadings, the only possible date for the breach is December 7, 1989, when FIRREA's restrictions were first applied to First Annapolis and it could no longer count goodwill toward regulatory capital. see Mola Development Corp., 74 Fed. Cl. at 542-43; American Capital Corp. v. United States, 63 Fed. Cl. 637. 694 (2005) ("AmCap I") ("On December 7, 1989, the statutory provisions of FIRREA became effective. Neither party proffered evidence as to Transohio Savings' exact financial condition as of December 7, 1989, the date of the breach."); American Federal Bank, FSB v. United States, 68 Fed. Cl. 346, 351 (2005) ("The passage of FIRREA breached the government's two existing contracts with American Federal as of the effective date of FIRREA's implementing regulations").

## II. Bancorp Is Not Entitled To An Award Of Restitution

Bancorp is not entitled to restitution for three reasons: (1) it is impossible to restore the parties to their pre-contract positions; (2) Bancorp has not shown that the Government's

"breach" was total; and (3) awarding Bancorp its initial investment would result in an unfair windfall.

**A. Restitution Is Not Proper Because The Contract Cannot Be Unwound**

9. "When proof of expectancy damages fails, the law provides a fall-back position for the injured party – he can sue for restitution. The idea behind restitution is to restore – that is to restore the non-breaching party to the position he would have been in had there never been a contract to breach." Glendale Federal Bank, F.S.B. v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) ("Glendale I"); accord Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1306 (Fed. Cir. 2004); 5 Arthur Linton Corbin, Corbin on Contracts § 1102, at 548 (1964); John D. Calamari & Joseph M. Perillo, The Law of Contracts, § 15.4 (4th ed. 1998) ("The basic aim of restitution is to place the plaintiff in the same economic position as the plaintiff enjoyed prior to contracting."); cf. Restatement (Second) of Contracts § 384, cmt. a (1981) ("Restatement") ("A party who seeks restitution of a benefit that he has conferred on the other party is expected to return what he has received from the other party.").

10. In this case, it is impossible to "unscramble the egg" and return the parties to their pre-contract positions. As this Court has stated, "the obvious problem with restitution, however, is that . . . it typically requires unwinding the entire transaction." First Nationwide Bank v. United States, 51 Fed. Cl. 762, 765 (2002). In other words, the Court must be able to "'unscramble the egg' and return both parties to the position they would have been in absent the contract." LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 77 (1999), rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003); see Aurigemma v. Arco Petroleum Prods., 734 F. Supp. 1025, 1032 (D. Conn. 1990); Restatement (Second) of Contracts § 384, cmt. a ("The

objective is to return the parties, as nearly as is practicable, to the situation in which they found themselves before they made the contract.") (emphasis added).

11. Here, Bancorp infused its initial investment, and in exchange, was able to control and manage the newly-converted thrift, First Annapolis, provided that, among other things, it maintained compliance with the Business Plan. See PX 5. However, unwinding the contract now would seek to undo the effects of the supervisory conversion and Bancorp's operation of the thrift for over 20 months. See Hansen, 367 F.3d at 1318-19 (acknowledging the inherent difficulty in unwinding the thrift's merger, conversion, and subsequent activities).[11]

12. Moreover, it is impossible to return the Government to its position before the contract. First Annapolis changed markedly during Bancorp's tenure and the contract's performance, making it impossible to return the thrift to the Government in its original condition. First Annapolis' financial condition clearly illustrates this point. As of Aug. 13, 1988, First Annapolis' liabilities exceeded its assets by $65 million. JX 3 at 0834. As of May 24, 1990, however, after Bancorp's stewardship, Bancorp's Board of Directors estimated the cost to liquidate the thrift would be $136 million. The actual cost of liquidation was ultimately $103.3 million. DX 635 at 0008. As of 2005, the net deficit of the First Annapolis receivership was $187.6 million (excluding taxes and post insolvency interest) – a debt paid by the United States' taxpayers. DX 635 at 0003.

[11] In any event, a non-breaching party seeking restitution must account for the benefits it received pursuant to the contract and must return any property it received as a result of the breaching party's partial performance. "[I]f the value of the benefit conferred upon the breaching party is not ascertainable through some usable measure of damages, restitution may not be possible." Hansen, 367 F.3d at 1315 (citing LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1376-77 (Fed. Cir. 2003)).

13. Furthermore, restitution "fits best when the breaching party wholly fails to perform and when the injured party has paid up front for that non-performance." First Nationwide, 51 Fed. Cl. at 765 (emphasis added); see also Restatement (Second) of Contracts § 373 (1981). Here, the Government partially performed the contract by allowing Bancorp to obtain control of the thrift and operate it for over 20 months.

14. The contract also cannot be properly unwound because Bancorp substantially altered the character of First Annapolis while Bancorp controlled the thrift. "The goal of restitution, to return the parties to their precise state before the contract, is incompatible with the situation of partial breach, where the non-breaching party has, to some extent, benefitted from the transaction." Hansen, 367 F.3d at 1309 n.10 (emphasis supplied). It is for this reason that section 384 of the Restatement makes recovery in restitution conditional on the return of any property that the parties have received pursuant to the agreement." Id. Restitution is generally unavailable if the property obtained by the non-breaching party has "been used, destroyed or substantially altered in character while in his possession." Restatement (Second) of Contracts § 384, cmt. a (1981).

15. Here, Bancorp's mismanagement of the thrift substantially altered its condition before it went into receivership. In Hansen, the Federal Circuit found that a plaintiff's restitution claim could proceed but that under section 384, "[i]f mismanagement on their part is established, the [plaintiff] may be accountable for any diminishment of the character or value of [thrift] that can be directly traced to their mismanagement." Id. at 1319. Here, Bancorp's mismanagement did diminish the value of the thrift. The thrift's management refused to recognize significant credit losses, improperly classified problem assets, and ignored its own internal checks and

controls. DX 397; DX 439.[12] Bancorp's mismanagement also included various regulatory violations, such as loaning money to shareholders to purchase stock in Bancorp. DX 397; DX 439.

16. Moreover, as mentioned above, under Bancorp's stewardship, the thrift's financial condition significantly deteriorated. Bancorp made bad management decisions prior to the breach, and it cannot avoid the consequences of its mismanagement by obtaining a full return of its entire investment (which it actually dissipated due to its own mismanagement of the thrift). DX 267 at 0112 ("The volume and nature of supervisory concerns reflect unfavorably upon the overall administration of the institution and pose a risk to First Annapolis' long-term viability.").

### B. The Government's "Breach" Was Not A Total Breach Of Bancorp's Contract

17. Bancorp acknowledges that it is only entitled to restitution if the breach of contract was a total breach. Pl.'s Am. App. A at 11. Restatement §373; accord Hansen, 367 F.3d at 1309. Bancorp has the burden to establish that any alleged breach by the Government was a total breach. Hansen, 67 Fed. Cl. at 434.

18. Bancorp must prove that the Government's breach "so substantially impair[ed] the value of the contract to [plaintiff] at the time of the breach that it is just in the circumstances to allow [them] to recover damages based on all [their] remaining rights to performance." Hansen, 367 F.3d at 1309; Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1345 (Fed. Cir.

[12] For instance, Bancorp's agent, Douglas Parran, mismanaged the thrift regarding a loan to Vincent Ambrosetti which led to the thrift being sued. DX 397; see also DX 213 at 0224-25 ("Mr. Parran indicated that he knew this was not a good business decision and he was not sure why he signed the letter of intent.").

2004); Restatement (Second) of Contracts §243(4); accord Southwest Investment Co. v. United States, 63 Fed. Cl. 182, 195 (2004).[13]

19. The materiality of the Government's breach "depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." Stone Forest, 973 F.2d at 1551. The materiality of breach is determined by totality of circumstances. Id.; Restatement (Second) of Contracts § 241 cmt. a.[14] This analysis necessarily entails an examination of (1) what were plaintiffs' contract rights, (2) what amounted to a "breach" of those rights, (3) the degree to which the Government performed its contractual obligations, and (4) the effect of the breach, at the time of the breach.

20. Pursuant to the Court's January 31, 2007, opinion, Bancorp's contract rights included relaxed capital standards for a five-year period ending in 1993, and the ability to include supervisory goodwill in regulatory capital and amortize the goodwill for an extended time, and the ability to exceed the limitations upon investments in service corporation investments.[15] First Annapolis, Slip Op. at 18-19. At trial, the evidence will demonstrate that

---

[13] Courts have been disinclined to find a "total" breach where there has been partial performance by the breaching party as by the Government in this case. See Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1551 (Fed. Cir. 1992); Restatement (Second) of Contracts § 241 cmt. d.

[14] Whether it would be "just in the circumstances" to allow recovery requires us to look not only to the circumstances of the breach itself, but to the equities of the situation as a whole. Mobil Oil Exploration and Producing Southeast, Inc. v. United States, 530 U.S. 604, 630 (2000) (Stevens, J., dissenting) (internal citations omitted).

[15] Only those provisions of FIRREA which abrogated the contract as defined by the Court can be viewed as the "breach." Indeed, Bancorp has failed to prove that implementation of FIRREA breached its service corporation forbearance. In addition, the non-breaching provisions of FIRREA, which placed other regulatory requirements on the thrift, are not to be considered.

the breach in this case – the abrogation of those contract rights – was not a "total breach" because of the effect of the breach, at the time of the breach.

21. This assessment "is not made based on the actual, ultimate impact of the breach and supervening events, but, rather, on the impact on a plaintiff's contractual rights at the time of the breach." Hansen Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 103 (2002) (citing Mobil, 530 U.S. at 609); see also Alaska Pulp Corp., Inc. v. United States, 48 Fed. Cl. 655, 661 (2001). As this Court has explained, "[d]epending on the nature of the breach, it may be possible to quantify or estimate the impact on contractual rights as of the time of the injury." Alaska Pulp, 48 Fed. Cl. at 661.

22. First Annapolis was in such poor financial condition and had such poor economic prospects at the time of the Government's breach that the breach was not total or material. In other words, First Annapolis was "in such dire straits that it would not have been able to recover, even absent a breach." See Admiral, 378 F.3d at 1345 (i.e., the thrift would have failed absent the breach); Admiral Financial Corp. v United States, 57 Fed. Cl. 418, 434-35 (2003) (the trial court found that the thrift was in such poor financial condition due to operating losses at the time of the breach, that the enactment of FIRREA did not materially harm the thrift).

23. First Annapolis failed its capital requirements before the Government's breach. See Admiral, 378 F.3d at 1343 (no total breach because "even if [the holding company] had been able to replace all of Haven's goodwill with cash on September 30, 1989, [the thrift] would still have been formally below its minimum capital requirement"); Southwest Investment Co. v. United States, 63 Fed. Cl. 182, 196 (2004) (no total breach because the thrift was out of capital

compliance with goodwill restored). Bancorp was out of capital compliance by Oct. 31, 1989, even taking into account the regulatory forbearances. DX 2251 at WOQ061 0366; JX 58 at 1545. Moreover, this included the shareholder loans that were still on First Annapolis' books at the time. By November 30, 1989, First Annapolis failed to meet its 1.80 percent regulatory capital benchmark ratio by approximately $1.9 million. DX 2294 at 1612; JX 61 at 1645. As of April 1990, First Annapolis' regulatory capital (including all the goodwill) to total liabilities ratio was negative 0.25 percent. JX 68 at 0016.

24. First Annapolis, by its own accounting, was already $2 million out of capital compliance in December 1989, even with the benefit of the forbearances. The regulators discovered, however, that the thrift had overstated its capital levels by recording only a $2 million shortfall. First, although First Annapolis had several large problem assets that had declined in value over the previous months, the thrift recognized almost no credit losses during the last six months of 1989. In fact, First Annapolis did the opposite and recorded "negative" credit losses of $299,810 during the six month period ended December 1989. DX 2294 at 1610; JX 61 at 1642.

25. Once the regulators discovered this failure to adequately account for the credit losses during the January 1990 examination, they directed First Annapolis to "immediately charge-off those assets, or portions thereof, classified as loss by the OTS examiners at the January 16, 1990 examination and aggregating $6,186,116." DX 439 at 1300 (including among others: Bayside Marina, $3,234,056; (b) Dennis Blaeuer entities, $947,822; and (c) Northampton Business Park, $1,479,051). This reduced the overstated capital by $6,186,116.

26. During the January 1990 examination, the regulators also discovered that First Annapolis failed to adequately classify its non-performing assets. These errors resulted in the thrift's capital being overstated. DX 397 at 0150. In other words, by categorizing assets as special mention rather than substandard, First Annapolis was not required to record a loan loss provision that would reduce capital. Based upon the results of the January 1990 examination, First Annapolis was directed to "immediately increase its general loan loss reserve by $5,800,000, consistent with the institution's loan loss reserve policy and with the level of criticized and classified assets identified by the OTS examiners at the January 16, 1990 examination." DX 439 at 1301. This reduced the overstated capital by $5,800,000. Therefore, First Annapolis' December 1989 capital was overstated by approximately $12 million.

27. Aside from the thrift's asset quality problems, First Annapolis' operations did not generate the profits that it projected in its business plans. For one, First Annapolis' core operations were losing money and had not been profitable for over 10 years. After the supervisory conversion, this did not change. During the nine-month period ending June 1989, while First Annapolis projected losses (before goodwill amortization and extraordinary items) of nearly $1.5 million on its core operations, its actual losses totaled approximately $4.2 million. DX 2120 at 1550 and 0704 and 0486.

28. First Annapolis never became profitable. In February 1990, First Annapolis recorded a net loss of $13.3 million. JX 65 at 1730. This loss was due, in large part, to the nearly $8 million in credit losses and the $4.9 million in service corporations losses that First Annapolis recorded during the month. JX 65 at 1729-30. First Annapolis' economic environment also

deteriorated in 1989, before the breach. The downturn in the real estate market was a major factor in Bancorp's failure. Kennedy Dep. at 113-14, 121-22; Heiden Dep. at 210.

29. In total, between August 12, 1988, and April 30, 1990, First Annapolis realized losses of $23.7 million (after the amortization of goodwill) and nearly $16.4 million (before the amortization of goodwill). JX 68 at 0016. In other words, during Bancorp's stewardship of First Annapolis, the thrift's losses, unrelated to the breach, exceeded the $13.7 million in capital Bancorp infused into First Annapolis.

30. The evidence at trial will show that as First Annapolis would have failed even absent the breach, the breach was not total, and, therefore, restitution is not appropriate.

**C. Allowing Bancorp Full Restitution Would Be An Unfair Windfall**

31. "While an award of restitution should seek to return the non-breaching party to as good of a position as it would have been in if the contract had never been entered into, 'the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach.'" Hansen, 367 F.3d at 1315 (citing Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003); see LaSalle, 317 F.3d at 1371(citing 3 E. Allen Farnsworth, Farnsworth on Contracts 193 (2d ed. 1998)). "Courts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement." Id.

32. Even assuming the Government's actions constituted a total breach, Bancorp is not entitled to restitution of its initial $13,665,907 investment, because any such award would place Bancorp in a better position than if there had been no breach. Allowing Bancorp to rescind the contract and obtain full restitution would afford it a windfall, contrary to the equitable principles

on which the remedy of restitution is based. See Canfield v. Reynolds, 631 F.2d 169, 178 (2d Cir. 1980) (declining to order rescission because it would give plaintiff a windfall in a setting in which there was "no reason to relieve [plaintiff] of his investment's downside risks").

33. By December 31, 1989, the regulators noted that even by the thrift's own accounting, Bancorp had already lost at least half of its initial investment. DX 397 at 0156. After properly accounting for the thrift's loan losses, Bancorp had actually lost its entire investment. DX 439. Therefore, returning Bancorp its initial investment would clearly be a windfall. In fact, by the time of the seizure, Bancorp had lost nearly $10 million more than it had invested in the thrift.

34. An award of Bancorp's investment in First Annapolis also would improperly reallocate the risks that the parties had allocated for themselves. See 3 Dan B. Dobbs, Law of Remedies § 12.7(5) (2d ed. 1993). The contract placed the risk of First Annapolis' profitability upon Bancorp. If First Annapolis became profitable, as Bancorp projected would happen once it had control of the thrift, Bancorp would reap all the benefits. If, however, Bancorp's projections were incorrect, Bancorp would have to absorb any losses. Bancorp should not be permitted to now use restitution as an excuse to shift to the Government the risk of loss, which it agreed to assume. See Admiral, 378 F.3d at 1345; Canfield, 631 F.2d at 178; see also Bernstein v. Nemeyer, 570 A.2d 164, 169 (Conn. 1990).

## III. Bancorp Is Not Entitled To An Award Of Reliance Damages

35. Remarkably, for the first time in thirteen years of litigation, Bancorp alleged in its January 16, 2007 contentions of fact and law that it is entitled to $14,165,874 in "reliance damages," based upon the Government's alleged breach of contract. Pl. App. A. at 13-38. As a

result of this last minute disclosure, no discovery has been conducted on this newly minted claim and our experts have not had the opportunity to address the merits of Bancorp's reliance claim.[16] Indeed, a review of Bancorp's reliance theory in its contentions of law and fact indicates that it is merely a recycling of its restitution claim. "However, restitution is not recoverable in addition to reliance damages for the same injury." American Capital Corp. v. United States, 472 F.3d 859, 870 (Fed. Cir. 2006) ("AmCap II"); see also Petrofsky v. United States, 488 F.2d 1394, 1405 (Ct. Cl. 1973) ( "[R]estitution and a suit for damages are alternative remedies.").[17]

36. The purpose of reliance damages is to compensate the plaintiff "for loss caused by reliance on the contract." Restatement § 344(b); see also Old Stone Corp. v. United States, 450 F.3d 1360, 1374 (Fed. Cir. 2006). Courts award reliance damages in an attempt to put the non-breaching party in as good a position as he would have been in had the contract not been made. Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1364 (Fed. Cir.

---

[16] The failure to disclose this new damages theory, only a month a half before trial, is prejudicial to the Government, and we intend to file a motion in limine to exclude this claim. Even if the Court allows Bancorp's eleventh-hour claim, it is uncertain how Bancorp intends to prove or calculate such damages as neither Bancorp's expert, Dr. Edward Heiden, nor the FDIC's expert, Dr. Robert Litan, has opined upon anything remotely resembling a reliance damages theory. See generally Heiden Report; Litan Report.

[17] Bancorp's belated reliance damages theory is an apparent attempt to enlarge its damages claim to also recover the remainder of the capital it raised when it issued 14,165,874 shares of common stock. Pl. Am. App. A at 5 (citing PX 12). Bancorp acknowledges that this excess capital was not infused into the thrift. Id. (citing PX 31). Without citing to any evidence, however, Bancorp avers that "[t]he balance of the capital raised by Bancorp, $499,967, was spent by Bancorp as costs incurred in the performance of its contract with the Government." Id. At a minimum, Bancorp should have at least disclosed what the "additional costs of performance under the contract" consist of before making a claim for these so-called damages upon the eve of trial.

2005) ("Westfed") (quoting Restatement § 344(b)); accord 3 E. Allan Farnsworth, Farnsworth On Contracts, § 12.1 at 151 (2d ed. 1998).

37. A party seeking reliance damages must establish that they were "proximately caused by the breach." Old Stone, 450 F.3d at 1375 (citing Hughes Comm. Galaxy, Inc. v. United States, 271 F.3d 1060, 1066 (Fed. Cir. 2001)); see also Nat'l Controls Corp. v. Nat'l Semiconductor Corp., 833 F.2d 491, 496 (3d Cir. 1987). Here, Bancorp has not shown its alleged reliance damages were caused by the Government's breach.

38. For reliance damages, the "plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation." Old Stone, 450 F.3d at 1375; Landmark Land Co., Inc. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001). A loss may be foreseeable and therefore recoverable "as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." AmCap II, 472 F.3d at 867 (citations omitted). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement at § 351; see also Old Stone, 450 F.3rd at 1376 ("We hold that the loss of [the plaintiff's] initial contributions were not a foreseeable result of the enactment of FIRREA and cannot be recovered under a reliance theory."). Bancorp has not shown that its reliance damages were foreseeable.

39. Like restitution, in order to recover reliance damages, the Federal Circuit requires that the plaintiff in a Winstar-related case demonstrate "losses actually sustained" in order to recover any reliance damages. Glendale I, 239 F.3d at 1381; see also Glendale Fed.

Bank, F.S.B. v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004) ("Glendale II"). "However denominated, the focus of a recovery based on the reliance interest is the real costs incurred for capital and services that the thrift would not have incurred but for the contract and its subsequent" breach. Id. at 1381-83 (because reliance damages take into account actual loss, reliance analysis is "a more finely tuned calculation" than restitution).

40. Also like restitution, "reliance damages are inappropriate where relief would result in an 'unfair windfall' to the non-breaching party." Old Stone, 450 F.3d at 1378. As the Federal Circuit explained, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Bluebonnet, 339 F.3d. at 1345. For the same reasons stated above regarding restitution, it would be a windfall to award any reliance damages to Bancorp.

## IV. Bancorp Is Not Entitled To A Jury Verdict

41. This Circuit has sanctioned "jury verdicts" only when the trial court concludes that: (1) clear proof of injury exists; (2) there is no more reliable method for computing damages; and (3) the evidence is sufficient for a court to make a fair and reasonable approximation of damages. Dawco Construction, Inc. v. United States, 930 F.2d 872, 880 (Fed. Cir. 1991) ("Dawco") (overruled on other grounds in Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995)); accord Bluebonnet Sav. Bank v. United States, 266 F.3d 1348, 1357 (Fed. Cir. 2001).

42. "[I]t is . . . well settled that the amount of recovery can only be approximated in the format of a 'jury verdict' where the claimant can demonstrate a justifiable inability to substantiate the amount of his resultant injury by direct and specific proof." Dawco, 930 F.2d at

881. This Court has observed that, "a plaintiff . . . is in the best position to document its losses and bears the burden of proving that 'no more reliable method for computing damages' exists." Columbia First Bank F.S.B. v. United States, 60 Fed. Cl. 97, 109 (2004) (quoting Dawco, 930 F.2d at 881). Also, a jury verdict is only available for calculating damages, after a plaintiff has proven that it was actually harmed by the breach. See Bluebonnet, 266 F.3d at 1357. Bancorp has failed to make such a showing.

## V. Bancorp's Tax Gross-Up Claim Is Untenable

43. Bancorp erroneously asserts that a tax gross-up is appropriate for an award of restitution or reliance damages because such a recovery "would be taxable as gross income to Bancorp, which would compensate Bancorp for lost monies that would not have been taxable." Pl. App. A at 8. As the evidence will show, Bancorp's tax gross-up claim is both counterfactual and contrary to applicable authority. Because Bancorp's alleged restitution and reliance damages represent nothing more than the funds utilized to capitalize both Bancorp and First Annapolis, Pl. App. A at 4-5, any recovery of these capital contributions would be nontaxable and thus, ineligible for tax gross-up treatment. Bancorp's tax gross-up claim is also beyond the scope of this Court's subject matter jurisdiction, and an award of such damages would result in a windfall to Bancorp.

### A. Non-Taxable Damage Awards Are Ineligible For Tax Gross-Up Treatment

44. To determine whether a damage award would be taxable income or a non-taxable return of capital, courts look to the nature of the claim and underlying basis for the recovery. Hort v. Comm'r of Internal Revenue, 313 U.S. 28 (1941). This process has come to be known as the "origin of the claim test." Raytheon Prod. Corp. v. Comm'r, 144 F.2d 110, 113 (1st Cir.

1944) (in determining the origin of the claim, "the test is not whether the action was one in tort or contract but rather the question to be asked is 'in lieu of what were the damages awarded?'").

45. As a general rule, "[i]n the case of a corporation, gross income does not include any contribution to. . . capital . . ." 26 U.S.C. § 118(a). A related corollary is that for a corporation to have income under 26 U.S.C. § 61, there must be an economic gain benefitting that corporation. 26 U.S.C. § 61; United States v. Gotcher, 401 F.2d 118, 121 (5th Cir. 1968) ("The concept of economic gain to the taxpayer is the key to section 61."). Where a recovery replaces capital and provides no economic gain to the taxpayer, the resulting damage award is viewed as a return of capital, and is not taxable as income. Freeman v. Commissioner, 33 T.C. 323 (1959).

46. Accordingly, payments by a defendant that do not increase the economic position of a plaintiff prior to its loss, are not includible in income as there is no economic gain to the plaintiff. Clark v. Commissioner, 40 B.T.A. 333 (1939) ("[Damage award] was, in fact, compensation for a loss which impaired petitioner's capital . . . so long as petitioner neither could nor did take a deduction in a prior year of this loss in such a way as to offset income for the prior year, the amount received by him in the taxable year, by way of recompense, is not then includible in his gross income."). In addition, damages replacing non-deductible costs are not income under 26 U.S.C. §61 because they do not constitute an economic gain. Id.; United States v. Gotcher, 401 F.2d at 121.

47. Bancorp concedes that its alleged restitution damages equate to the "costs of its capital contribution to First Annapolis [] in the amount of $13,665,907." Pl. App. A at 4-5. Bancorp's further concedes that its alleged reliance damages of $14,165,874 represent nothing

more than the capital contributions made to Bancorp in exchange for its own stock. Pl. App. A at 12. In addition, Bancorp admits that its alleged restitution and reliance damages "would compensate Bancorp for . . . monies that would not have been taxable." Id. at 8.

48. The evidence will show that because Bancorp's restitution and reliance claims seek the recovery of nondeductible capital contributions, any judgment based upon these capital items would likely be excludible from Bancorp's gross income and nontaxable because their recovery would not represent an economic gain to Bancorp. See United States v. Gotcher, 401 F.2d at 121; Freeman v. Comm'r, 33 T.C. 323, 327 (1959); see also Rev. Rul. 81-277, 1981 WL 165965 (IRS RRU) (1981) (citing Clark v. Comm'r, 40 B.T.A. 333 (1939)). Rather, any such recovery would constitute a return of capital. Id.

49. Federal Circuit precedent holds that a tax "gross-up" may not be granted where a plaintiff has not proven with reasonable certainty that the damages would be treated as taxable upon receipt. Home Sav. of Am., F.S.B. v. United States, 399 F.3d 1341, 1355-56 (Fed. Cir. 2005) (finding "a tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable."); LaSalle Talman Bank, F.S.B. v. United States, 462 F.3d 1331, 1338 (Fed. Cir. 2006).

50. Where plaintiffs have failed to meet their burden of proving taxability with reasonable certainty, as well as an applicable marginal tax rate, this Court has denied tax "gross-up" requests. See, e.g., Bank of America, F.S.B. v. United States, 67 Fed. Cl. 577, 596-97 (2005) (relying upon Home Savings and holding that plaintiff Bank of America failed to prove with reasonable certainty whether the damage award would be taxable at all, having presented only testimony respecting the tax rate); see also Commercial Fed. Bank, F.S.B. v. United States,

59 Fed. Cl. 338, 355-56 (2004); Citizens Fed. Bank, F.S.B. v. United States, 59 Fed. Cl. 507, 521-23 (2004) (rejecting "gross-up" on summary judgment in part due to uncertainty regarding taxability); Local Oklahoma Bank, N.A. v. United States, 59 Fed. Cl. 713, 720-21 (2005), aff'd, 452 F.3d 1371 (Fed. Cir. 2006) (same); First Heights Bank, F.S.B. v. United States, 57 Fed. Cl. 162, 175 (2003), aff'd, 422 F.3d 1311 (Fed. Cir. 2005); Centex Corp. v. United States, 55 Fed. Cl. 381, 388-89 (2003), aff'd, 395 F.3d 1283 (Fed. Cir. 2005).

51. The evidence will show that Bancorp's claimed marginal tax rate of 38.62% is subject to numerous uncertainties. First, Bancorp fails to meet its burden of proof by citing unspecified testimony from a single lay witness as the sole basis for its claimed marginal tax rate. Pl. App. A at 9. Second, future tax law changes and tax benefits such as net operating loss carryforwards and other tax deductions could lower its future marginal tax rate.

**B. This Court Lacks Subject Matter Jurisdiction Over Bancorp's Tax Gross-Up Claim**

52. This Court lacks jurisdiction and the waiver of sovereign immunity necessary to award taxes above and beyond damages that flow directly – without intervening steps – from a contract breach. See, e.g., Southern Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533-34 (1918) (Holmes, J.) ("The general tendency of the law, in regard to damages at least, is not to go beyond the first step."). Taxation of a damages award is not a compensable injury that flows directly from a breach because "there is more than one step between cause and damage." Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). The evidence will show that Bancorp's tax gross-up claim stems from remote events and fails for lack of direct causation, and accordingly, fails for lack of jurisdiction.

53. If an "award of damages . . . would [be] . . . the equivalent of exemption from the terms of [a] . . . statute," it is barred absent unmistakable contract language to the contrary. United States v. Winstar Corp., 518 U.S. 839, 879-80 (1996) (plurality opinion). The evidence will show that Bancorp's request for a pre-emptive refund of potential, yet unlikely, future taxes "effectively block[s] the exercise of [the] sovereign power to tax," and is accordingly barred by the unmistakability doctrine. Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1579 (Fed. Cir. 1997) (" Although [plaintiff] seeks money damages, its argument would effectively block the exercise of [the] sovereign power to tax, for if [plaintiff] were to prevail, the Government would be required to refund the entire amount assessed. This is akin to a tax rebate, which even the plurality [of the Winstar court] seemed to recognize as a block to the exercise of sovereign power.").

54. Moreover, to the extent that the United States has waived sovereign immunity for some suits that compensate for taxes, it has done so only for those suits where the taxes have been fully paid. Flora v. United States, 357 U.S. 63, 72-76 (1958); Shore v. United States, 9 F.3d 1524, 1526 (Fed. Cir. 1993) (recognizing "full payment" as pre-requisite for jurisdiction under 28 U.S.C. § 1491). The evidence will show that the award of a tax gross-up in this case would effectively permit Bancorp to bring a tax refund suit in advance of paying a tax that is neither remotely nor reasonably certain to be imposed, thus making this claim contrary to the jurisdictional limits of this Court. Id.

### C. A Tax Gross-Up Award Would Constitute An Impermissible Windfall To Bancorp

55. A tax gross-up under the facts of this case would constitute a windfall by placing Bancorp in a better position than it would have otherwise occupied absent any alleged breach. A

gross-up <u>guarantees</u> Bancorp a rebate <u>now</u> for a tax that will likely never be paid. As previously discussed, taxation of Bancorp's alleged restitution and reliance damages would be contrary to established judicial, statutory and regulatory authority, as these claimed damages represent capital items. Moreover, neither the Court nor defendant possess the right to monitor whether Bancorp actually pays taxes upon the damages that it seeks. <u>See</u> 26 U.S.C. § 6103 (barring IRS disclosure of taxpayer return information). Accordingly, Bancorp's tax gross-up claim fails both as a matter of law and, as we shall prove, as a matter of fact.

## OBJECTIONS TO PLAINTIFF'S EXHIBIT & WITNESS LISTS

### A. Exhibit List

Pursuant to the Court's order dated February 7, 2007, our objections to Bancorp's exhibit list are due on February 28, 2007, and will be filed at that time.

### B. Witness List

Pursuant to the Court's order dated December 7, 2006, we object to Bancorp's witness list to the extent that it fails to comply with the Court's Procedural Order No. 2, Discovery Plan. Additionally, we object to the broad categories of witnesses listed on Bancorp's witness list and respectfully reserve the right to file further objections should plaintiff identify any additional witnesses.

Specifically, we object to Bancorp's failure to amend its witness lists when it filed its amended Appendix A materials on February 14, 2007, to acknowledge the abandonment of its claims for lost profits, hypothetical cost of replacement, and Fifth Amendment takings. Accordingly, the Court should not permit Bancorp to offer any testimony regarding these claims at trial.

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

s/Kenneth M. Dintzer

KENNETH M. DINTZER
Assistant Director

s/Richard B. Evans

RICHARD B. EVANS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-7760
Facsimile: (202) 305-7644

Attorneys for Defendant

OF COUNSEL:
TIMOTHY ABRAHAM
MELINDA HART
MARK PITTMAN
DELISA M. SANCHEZ
Trial Attorneys

February 23, 2007

CERTIFICATE OF FILING

I hereby certify that on February 23, 2007, a copy of the foregoing "DEFENDANT'S CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard B. Evans