**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No.94-522C**
**(Judge Williams)**

---

**FIRST ANNAPOLIS BANCORP, INC.**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

---

# DEFENDANT'S MOTION FOR JUDGMENT BASED UPON PARTIAL FINDINGS

---

**MICHAEL HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Assistant Director**

**RICHARD B. EVANS**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 353-7760**
**Fax: (202) 305-7643**

**Attorneys for Defendant**

**Of Counsel:**

**TIMOTHY ABRAHAM**
**MELINDA HART**
**MARK PITTMAN**
**DELISA M. SANCHEZ**

**Trial Attorneys**

**May 22, 2007**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . ii

INTRODUCTION . . . . . 1

ARGUMENT . . . . . 2

I. Standard Of Review . . . . . 2

II. Bancorp Has Failed To Prove Its Entitled To An Award Of Restitution . . . . . 2

A. Restitution Is Not Proper Because This Contract Cannot Be Unwound . . . . . 2

B. Bancorp Has Failed To Prove Total Breach . . . . . 5

C. Allowing Bancorp Full Restitution Would Be An Unfair Windfall . . . . . 17

III. Bancorp's Tax Gross-up Claim Is Based Upon Its Erroneous Restitution Claim and Cannot Be Supported . . . . . 20

CONCLUSION . . . . . 22

## TABLE OF AUTHORITIES

Page(s)

### FEDERAL CASES

Admiral Fin. Corp. v. United States,
378 F.3d 1336 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Admiral Fin. Corp. v. United States,
57 Fed. Cl. 418 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Alaska Pulp Corp., Inc. v. United States,
48 Fed. Cl. 655 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

American Capital Corp. v. United States,
63 Fed. Cl. 637 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

American Fed. Bank, FSB v. United States,
68 Fed. Cl. 346 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Ariadne Fin. Services Pty, Ltd. v. United States,
133 F.3d 874 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Aurigemma v. Arco Petroleum Prods.,
734 F. Supp. 1025 (D. Conn. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Canfield v. Reynolds,
631 F.2d 169 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Centex Corp. v. United States,
55 Fed. Cl. 381 (2003), aff'd, 395 F.3d 1283 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 21

Citizens Fed. Bank, F.S.B. v. United States,
59 Fed. Cl. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Clark v. Comm'r,
40 B.T.A. 333 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Columbia First Bank, F.S.B. v. United States,
60 Fed. Cl. 97 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Commercial Fed. Bank, F.S.B. v. United States,
59 Fed. Cl. 338 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Cooper v. United States,
37 Fed. Cl. 28 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Exxon Corp v. United States,
45 Fed. Cl. 581 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

First Annapolis Bancorp, Inc. v. United States,
__ Fed. Cl. __ , 2007 WL 314885 (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 9

First Heights Bank, F.S.B. v. United States,
57 Fed. Cl. 162 (2003), aff'd, 422 F.3d 1311 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 21

First Nationwide Bank v. United States,
51 Fed. Cl. 762 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Freeman v. Comm'r,
33 T.C. 323 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Glendale Fed. Bank, F.S.B. v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17

Hansen Bancorp, Inc. v. United States,
67 Fed. Cl. 411 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Hansen Bancorp, Inc. v. United States,
53 Fed. Cl. 92 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Help At Home, Inc. v. Medical Capital, L.L.C.,
260 F.3d 748 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Howard Indus. v. United States,
126 Ct. Cl. 283, 115 F. Supp. 481 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

LaSalle Talman Bank, F.S.B. v. United States,
45 Fed. Cl. 64 (1999), rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . 3

Local Oklahoma Bank, N.A. v. United States,
59 Fed. Cl. 713 (2005), aff'd, 452 F.3d 1371 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 21

Mobil Oil Exploration and Producing Southeast, Inc. v. United States,
530 U.S. 604 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Mola Development Corp. v. United States,
74 Fed. Cl. 528 (2006) . . . . . . . . . . 9, 11

Murrey v. United States,
73 F.3d 1448 (7th Cir. 2001) . . . . . . . . . . 11

Plaintiffs in Winstar-Related Cases v. United States,
37 Fed. Cl. 174 (1997) . . . . . . . . . . 9, 10

Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.,
272 F.3d 1335 (Fed. Cir. 2001) . . . . . . . . . . 11

Southwest Investment Co. v. United States,
63 Fed. Cl. 182 (2004) . . . . . . . . . . 5, 12, 14

Stone Forest Indus., Inc. v. United States,
973 F.2d 1548 (Fed. Cir. 1992) . . . . . . . . . . *passim*

United States v. Gotcher,
401 F.2d 118 (5th Cir. 1968) . . . . . . . . . . 21

**STATE CASES**

Bernstein v. Nemeyer,
570 A.2d 164 (Conn. 1990) . . . . . . . . . . 3, 19

**STATUTES**

26 U.S.C. § 61 (2006) . . . . . . . . . . 21

26 U.S.C. § 118(a) (2006) . . . . . . . . . . 21

Rev. Rul. 81-277, 1981-2 C.B. 14 (1981) . . . . . . . . . . 21

**MISCELLANEOUS**

Restatement (Second) of Contracts § 241 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 6

Restatement (Second) of Contracts § 243(4) (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

Restatement (Second) of Contracts § 373 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Restatement (Second) of Contracts § 384 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 17

3 Dan B. Dobbs, Law of Remedies § 12.7(5) (2d ed. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Henry Mather, Restitution as a Remedy for Breach of Contract:
The Case of the Partially Performing Seller, 92 Yale L.J. 14 (1982) . . . . . . . . . . . . . . . . . . . . . . 3

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 94-522C** |
| **v.** | ) | **(Judge Williams)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION**
**FOR JUDGMENT BASED UPON PARTIAL FINDINGS**

Defendant, the United States, respectfully requests the Court to enter judgment pursuant to Rule 52(c) of the Rules of the United States Court of Federal Claims against plaintiff, First Annapolis Bancorp, Inc. ("Bancorp"). Plaintiff cannot prevail on the record it presented in support of its claims for restitution or tax gross-up. Thus, we are entitled to judgment as a matter of law with respect to Bancorp's claims. In support of this motion, we rely upon the record established at trial, as well as the following brief.

**INTRODUCTION**

Rule 52(c) allows for the entry of judgment upon partial findings at the close of a party's case if that party has been fully heard and the Court finds that the party is not entitled to judgment as a matter of law. Here, Bancorp has made a detailed presentation of their claims and has been fully heard.

Regarding Bancorp's restitution claim, first, it is impossible unwind the contract and restore the parties to their pre-contract positions. Second, Bancorp has not demonstrated that it is entitled to restitution because they have failed to establish that the Government's breach amounted to a "total breach." Third, awarding Bancorp $13,665,907 would result in an unfair windfall, making the Government bear the downside risk of Bancorp's investment in First

Annapolis Savings Bank, FSB ("First Annapolis"). Regarding Bancorp's tax gross-up claim, this claim fails because Bancorp has failed to prove that it is entitled to damages, and, in any event, Bancorp has failed to prove that any award would be taxable.

## ARGUMENT

### I. Standard Of Review

Rule 52(c) provides that, during trial, the Court may enter judgment against a party when it determines that an issue must be decided against that party under controlling law. See Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 101-02 (2004). The applicable standard is not whether the plaintiff has made a prima facie case, as it would be for a directed verdict motion in a jury trial. Cooper v. United States, 37 Fed. Cl. 28, 35 (1996). Instead, because the Court serves "as both the trier of fact and the trier of law," Rule 52(c) "permits the judge to weigh evidence and does not require that the judge resolve all credibility determinations in favor of the plaintiff." Id. "A plaintiff who has had full opportunity to put on his own case and has failed to convince the judge, as trier of the facts, of a right to relief, has no legal right . . . to hear the defendant's case." Howard Indus. v. United States, 126 Ct. Cl. 283, 289-90, 115 F. Supp. 481, 484-85 (1953).

### II. Bancorp Has Failed To Prove Its Entitled To An Award Of Restitution

#### A. Restitution Is Not Proper Because This Contract Cannot Be Unwound

It is improper to unwind this contract because both parties cannot be returned to their status quo before the contract. See Glendale Federal Bank, F.S.B. v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) ("Glendale I") citing Restatement (Second) of Contracts § 384, cmt. a (1981) ("Restatement") ("The objective is to return the parties, as nearly as is practicable, to the situation in which they found themselves before they made the contract."); LaSalle Talman Bank,

F.S.B. v. United States, 45 Fed. Cl. 64, 77 (1999), rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003); see Aurigemma v. Arco Petroleum Prods., 734 F. Supp. 1025, 1032 (D. Conn. 1990).

Restitution, as a remedy for breach of contract, is most appropriate in the classic case in which the parties' performance can be easily unwound, as in Mobil Oil, 530 U.S. 604 (2000). See also First Nationwide, 51 Fed. Cl. at 765; see also Restatement (Second) of Contracts § 373 (1981). In such a case, the non-breaching party paid money for contract performance which, as a result of a breach, it never received. The simplest remedy in that situation consists of an award to the non-breaching party of an amount equal to the amount it paid to the breaching party. That result is appropriate because, in entering into the contract, the nonperforming party implicitly agreed not to keep the money if it failed to perform at all. Henry Mather, Restitution as a Remedy for Breach of Contract: The Case of the Partially Performing Seller, 92 Yale L.J. 14, 36-37 (1982). An award of restitution in that situation restores both parties to their pre-contract positions. Mobil Oil follows that approach, because this Court concluded that the plaintiffs in that case had not received any significant performance and that the government's breach had a material effect upon their contract rights by depriving them of a "gateway to the companies' enjoyment of all other rights" - a "gateway" that this Court concluded was the essence of their bargain. 530 U.S. at 621.

It does not follow from such simple "money-back" restitution cases, however, that a non-breaching party is always entitled to restitution, regardless of the circumstances. See, e.g., Bernstein v. Nemeyer, 570 A.2d 164, 169 (Conn. 1990). Courts have been disinclined to find a "total" breach where there has been partial performance by the breaching party as by the Government in this case. See Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1551 (Fed. Cir. 1992); Restatement § 241 cmt. d. This case differs from Mobil Oil because, as the

undisputed facts establish, there was partial performance on the part of the government here so as to make it impossible for the Court to unwind the contract. For one, Bancorp never paid $13.6 million to the Government but instead infused it into its own thrift. After Bancorp infused its initial investment into the thrift, in exchange, it was able to control and manage the newly-converted thrift, First Annapolis, with the benefit of its forbearances provided that, among other things, it maintained compliance with the Business Plan. See JX 134. However, unwinding the contract now would seek to undo the effects of the supervisory conversion and Bancorp's operation of the thrift for over 18 months. See Hansen, 367 F.3d at 1318-19 (acknowledging the inherent difficulty in unwinding the thrift's merger, conversion, and subsequent activities). "The goal of restitution, to return the parties to their precise state before the contract, is incompatible with the situation of partial breach, where the non-breaching party has, to some extent, benefitted from the transaction." Hansen, 367 F.3d at 1309 n.10. Bancorp was to benefit by being able to keep the resulting profits it was forecasting in its business plan from its investments in real estate. However, because of the combination of poor lending practices and the downturn in the economy, Bancorp never realized these profits. Tr. 1004-1005 (Cook). Just because the profits from these additional contracts with third parties did not materialize, it is not now appropriate to only unwind the contract with the Government. An award of restitution in this case therefore would be contrary to the well-established principles that restitution should only be awarded when "it is just in the circumstances." Restatement § 243(4); see Mobil Oil, 530 U.S. at 608.

In any event, a non-breaching party seeking restitution must account for the benefits it received pursuant to the contract and must return any property it received as a result of the breaching party's partial performance. Restitution is precluded when the non-breaching party cannot return "any interest in property that he has received in exchange in substantially as good

condition as when it was received by him." Hansen, 367 F.3d at 1315 (quoting 3 Restatement § 384 (1)(a)). Restitution is generally unavailable if the property obtained by the non-breaching party has "been used, destroyed or substantially altered in character while in his possession." Restatement § 384, cmt. a. Bancorp acquired the thrift First Annapolis as part of the contract, but it failed to return the thrift in substantially as good condition. Therefore, it is impossible to the Government to its position before the contract.[1] First Annapolis changed markedly during Bancorp's tenure and the contract's performance, making it impossible to return the thrift to the Government in its original condition. First Annapolis' deteriorating financial condition clearly illustrates this point. As of August 13, 1988, First Annapolis' liabilities exceeded its assets by $65 million. JX 3 at 0834. After the thrift failed, the Government was forced to pay $187.6 million. DX 635 at 0003.

**B. Bancorp Has Failed To Prove Total Breach**

Bancorp has failed to prove that the Government's breach "so substantially impair[ed] the value of the contract to [plaintiff] at the time of the breach that it is just in the circumstances to allow [them] to recover damages based on all [their] remaining rights to performance." Hansen, 367 F.3d at 1309; Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1345 (Fed. Cir. 2004); Restatement §243(4); accord Southwest Investment Co. v. United States, 63 Fed. Cl. 182, 195 (2004).[2]

---

[1] Even assuming it were permissible for the Court to attempt to return only Bancorp to its position before the contract, the award of $13.6 million in restitution is still not appropriate because, as explained below, it would give Bancorp an unfair windfall.

[2] Courts have been disinclined to find a "total" breach where there has been partial performance by the breaching party as by the Government in this case. See Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1551 (Fed. Cir. 1992); Restatement (Second) of Contracts § 241 cmt. d.

The materiality of the Government's breach "depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." Stone Forest, 973 F.2d at 1551. The materiality of breach is determined by the totality of circumstances. Id.; Restatement § 241, cmt. a.[3] This analysis necessarily entails an examination of (1) what were plaintiffs' contract rights, (2) what amounted to a "breach" of those rights, (3) the degree to which the Government performed its contractual obligations, and (4) the effect of the breach, at the time of the breach.

Plaintiff's contract rights are based on the terms of the contract. The Court has found in its liability decision that "the RCMDA here was 'part of' the agreement along with the Application, Business Plan, Resolutions, and Forbearance Letters." First Annapolis Bancorp, Inc. v. United States, __ Fed. Cl. __ , 2007 WL 314885, *14-15 (Fed. Cl.) (Slip Op. At 20-21) ("Liability Opinion"). Therefore, Bancorp's contract rights included three "forbearances:" the ability to meet relaxed capital standards in its own business plan for a five-year period, and the ability to include supervisory goodwill in regulatory capital and amortize the goodwill for 25 years, and the ability to exceed the limitations upon investments in service corporation investments for a five-year period. First Annapolis, Slip Op. at 18-19.

The Government, however, expressly reserved its statutory and regulatory enforcement powers within the text of the July 21, 1988 forbearance letter as follows:

> This letter does not and shall not be construed to constitute forbearance or waiver by the Bank Board or the Federal Savings and Loan Insurance Corporation with respect to any regulatory or other requirements other than those encompassed within the

---

[3] Whether it would be "just in the circumstances" to allow recovery requires us to look not only to the circumstances of the breach itself, but to the equities of the situation as a whole. Mobil Oil Exploration and Producing Southeast, Inc. v. United States, 530 U.S. 604, 630 (2000) (Stevens, J., dissenting) (internal citations omitted).

> preceding paragraphs 1 through 3. Other than the actions to enforce the regulatory requirements waived in accordance with paragraphs 1 through 3 and the statutory provisions authorizing imposition of the waived requirements, insofar as such requirements are waived, <u>the [FHLBB] and [FSLIC] expressly reserve all of their statutory rights and powers with respect to First Annapolis, including, without limitation, those under Section 5 of the Home Owners' Loan Act of 1933 and Sections 406 and 407 of the National Housing Act.</u>

JX 91 (emphasis added). Notably, as Mr. Parran admitted, the Government did not promise that the regulators would forbear from its other regulatory duties, including requiring the thrift to: operate in a safe and sound manner, recognize losses it incurred, properly classify assets, or limit its loans to a single borrower. Tr. 1093-94 (Parran).

As the Court pointed out, the Government's acceptance required Bancorp to do more than infuse $11 million into First Annapolis. JX 93 at 0103 (Admitted as PX 2). It also required that Bancorp stipulate that First Annapolis would operate in accordance with the Business Plan for a period of five years, obtain regulatory approval for material deviations, and submit variance reports. JX 93 at 0104 (PX 2). The Government's acceptance also required Bancorp to execute the RCMDA. In the RCMDA, Bancorp also accepted the obligation to infuse capital into First Annapolis as necessary to maintain compliance and also accepted certain obligations regarding the payment of dividends. JX 99 (Admitted as PX 7).

In addition, the terms of the July 21, 1988 forbearance letter also shifted the risk of regulatory change regarding any statute referenced therein:

> In the event any regulation or statute referred to herein is amended or succeeded by another statute, regulation or rule, then any reference to any such regulation or statute shall be deemed to refer to such regulation or statute as amended or the statute, regulation or rule which succeeds any such regulation or statute.

JX 91. The letter specifically mentioned Section 545.74(d) of the Rules and Regulations for Federal Associations which governed investments in service corporations.

The August 11, 1988 forbearance letter allowed First Annapolis to make certain investments in service corporations "so long as First Annapolis complies with the requirements of FHLBB Resolution 88-602 pertaining to compliance with its Business Plan and, so long as it shall remain in effect, the requirements of the Supervisory Agreement dated July 8, 1987." JX 95 (Admitted as PX 5). Again, the Government acknowledged that compliance with the Business Plan would be a fundamental part of the contract.

The next issue is what amounted to a breach of those rights by the Government. The Court has found that FIRREA breached the goodwill and capital benchmark forbearances. Only those provisions of FIRREA which abrogated the contract as defined by the Court can be viewed as the "breach." Indeed, Bancorp has failed to prove that implementation of FIRREA breached its service corporation forbearance. In addition, the non-breaching provisions of FIRREA, which placed other regulatory requirements on the thrift, are not to be considered part of the breach. This includes the limitations on loans to one borrower.

Bancorp contends that there is still an issue as to the date of the breach. In its amended contentions of fact and law, Bancorp, alleged that "the date of the breach of contract by the Government should be August 9, 1989, the date of the enactment of FIRREA." Pl. Am. App. A at 7, ¶ 21. During his opening statement, Bancorp's attorney argued that the Government somehow "stripped" Bancorp of the contract "by the enactment of FIRREA" and "still kept our money." Tr. 912.[4] At trial, Mr. Parran went so far as to opine that the taint of FIRREA might

[4]Of course, as even Mr. Parran admits, the Government never had possession or control of the "money," Bancorp downstreamed to First Annapolis. Tr. 1081-82 (Parran).

have effected First Annapolis as early as the “ the last quarter of ‘88.” Tr. 1047 (Parran). However, Bancorp’s admonitions to the contrary, this Court has determined that the breach occurred in December 1989, when the Government began to **enforce** FIRREA’s new minimum capital requirements against First Annapolis. First Annapolis, Slip Op. at 23 (Liability Opinion); see also Mola Development Corp. v. United States, 74 Fed. Cl. 528, 542 (2006) (holding that the “alleged breach claim did not accrue until **December 7, 1989**, when FIRREA was first applied to” the thrift and the thrift “could no longer count goodwill toward regulatory capital”) (emphasis added); Hansen Bancorp, Inc. v. United States, 67 Fed. Cl. 411, 423 (2005) (analyzing whether the Government’s breach was total based on the thrift’s capital position at year-end 1989, when new capital requirements were to be implemented); see also Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 184 (1997) (holding that “FIRREA did not legally require plaintiffs to act in any certain way before the effective date of the regulations” and finding that the breach occurred on the effective date of the regulations, December 7, 1989, not upon the passage of FIRREA, August 9, 1989)

Further, in Mola Development Corp. v. United States, 74 Fed. Cl. 528, 542 (2006) this Court held that a Winstar plaintiff’s claim for breach of contract accrued on December 7, 1989, the effective date of FIRREA, rather than July 31, 1989, when the OTS sent a letter to the thrift designating it as troubled thrift and “plac[ing] restrictions on [the thrift’s] ability to increase assets or liabilities.” 74 Fed. Cl. At 542-43. According to this Court:

> As the Federal Circuit recognized in Ariadne, the Government’s liability was fixed when it “refused to allow use of the asset as it had promised.” Ariadne Financial Services Pty. Ltd. v. United States, 133 F.3d 874, 879 (Fed. Cir. 1998). It is clear that the RB3a restrictions as well as the July 31, 1989 letter designating Charter as troubled and imposing restrictions flowing from that designation did not operate to fix Defendant’s alleged liability for “deliberately

> repudiating its promise to allow MDC and Charter to include supervisory goodwill as regulatory capital." Compl. ¶ 38. **Rather, the alleged breach claim did not accrue until December 7, 1989, when FIRREA was first applied to Charter and Charter could no longer count goodwill toward regulatory capital.**

Id. at 14 (emphasis added).

In fact, prior to this trial and the filing of its contentions of fact and law on January 16, 2007, Bancorp consistently claimed that the date of the breach was December 7, 1989, not August, 9, 1989, when FIRREA was passed, or some other vague day in "third quarter of 1988." For example, in its November 21, 1997 reply memorandum in support of its "short form" motion for partial summary judgment and in opposition to defendant's cross-motion for summary judgment, Bancorp stated:

> The government's final argument is that Bancorp was specifically advised that, at the end of five years, First Annapolis Savings Bank would have to meet all applicable regulatory requirements that might be in effect at the time. The government fails to explain how this fact has any relevance to the case, in which the conversion occurred on August 13, 1988, and **the government breached its contract less than a year and a half later, when FIRREA's regulations went into effect on December 7, 1989**. Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 184 (1997).

Pl. Reply Mem. in Supp. of "Short Form" Mot. for Partial Summ. J. and in Opp'n to Def. Cross-Mot. for Summ. J. (Nov. 11, 1997) at 16 (emphasis added); see also Pl. "Short Form" Mot. for Partial Sum. J. (May 23, 1997) at short form liability sheet page 9, § G ("On **December 7, 1989**, the OTS Regulations issued by the Government pursuant to FIRREA became effective, thereby placing the Government in breach of contract.") (emphasis added). As recently as June 6, 2006, in its contentions of fact and law filed before the June 2006 trial on our prior material breach defense, Bancorp alleged: "On December 7, 1989, the regulations issued by the OTS

under FIRREA became effective. 54 Fed. Reg. 46,845 (11/8/89). **As such, as a consequence of FIRREA and the OTS regulations, on or about, December 7, 1989, the Government breached its contract with Bancorp.**" Pl. Contentions of Fact and Law (Jun. 6, 2006) at 10 (emphasis added). Thus, for the past ten years, Bancorp has judicially admitted that the date of the breach was December 7, 1989. See Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp., 272 F.3d 1335, 1353 (Fed. Cir. 2001) (citing Help At Home Inc. v. Medical Capital, L.L.C., 260 F.3d 748 (7th Cir. 2001) ("Pleadings are judicial admissions and a party may use them to render facts indisputable."); see also Murrey v. United States, 73 F.3d 1448, 1455 (7th Cir. 2001) ("A judicial admission trumps evidence."); Exxon Corp v. United States, 45 Fed. Cl. 581, 656 (1999) (assertions in briefs may act as judicial admissions).

Pursuant to this Court's decision on liability, the authorities discussed herein, and Bancorp's repeated judicial admissions, it is undisputed that the breach is December 7, 1989, when FIRREA's restrictions were first applied to First Annapolis and it could no longer count goodwill toward regulatory capital. see Mola Development Corp., 74 Fed. Cl. at 542-43; American Capital Corp. v. United States, 63 Fed. Cl. 637. 694 (2005) ("AmCap I") ("On December 7, 1989, the statutory provisions of FIRREA became effective. Neither party proffered evidence as to Transohio Savings' exact financial condition as of December 7, 1989, the date of the breach."); American Federal Bank, FSB v. United States, 68 Fed. Cl. 346, 351 (2005) ("The passage of FIRREA breached the government's two existing contracts with American Federal as of the effective date of FIRREA's implementing regulations").

The final issue is whether the breach was total or partial. In ascertaining whether a total breach has occurred, the Court's analysis must focus upon the breach. Hansen, 367 F.3d at 1311 (citing Restatement §243(4)). In addition, the Court must take into account the totality of events

and circumstances surrounding the breach. See Stone Forest, 973 F.2d at 1550-52 ("[N]ot every departure from the literal terms of a contract is sufficient to be deemed a material breach . . . . The determination depends upon the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties."). Even events occurring before and after the breach, if relevant, must be factored into the total breach analysis. See Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1343-45 (Fed. Cir. 2004) (relevant events occurring in 1989 and 1990 factored into a total breach analysis when the time of breach was FIRREA's enactment and enforcement).

This assessment "is not made based on the actual, ultimate impact of the breach and supervening events, but, rather, on the impact on a plaintiff's contractual rights at the time of the breach." Hansen Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 103 (2002) (citing Mobil, 530 U.S. at 609); see also Alaska Pulp Corp., Inc. v. United States, 48 Fed. Cl. 655, 661 (2001). As this Court has explained, "[d]epending on the nature of the breach, it may be possible to quantify or estimate the impact on contractual rights as of the time of the injury." Alaska Pulp, 48 Fed. Cl. at 661.

Determining the viability of the thrift at the time of the breach helps the Court determine the impact, and hence, the materiality, of the breach. Bancorp has claimed that viability is irrelevant under Mobil Oil. The Federal Circuit and this Court have soundly rejected this argument. Admiral, 378 F.3d at 1344 (Fed. Cir. 2004) (rejecting Admiral's argument that "because it sought restitution rather than damages, it is irrelevant whether the enactment of FIRREA was the cause of Admiral's loss."); Southwest, 63 Fed. Cl. at 195 ("The Plaintiff in this present matter appears to argue that under Mobil Oil a court may not examine the value of

contract to the non breaching party at the time of the breach. This position misreads the Court's opinion and runs counter to that of the Restatement and case law precedent.")

In fact, nothing in Mobil Oil overrules Admiral's finding that the viability of the thrift absent the breach is relevant to whether the breach was total, or substantially impaired value of contract at time of the breach:

> In this case, as noted above, the trial court found that at the time of the breach Admiral was in such dire straits that it would not have been able to recover, even absent a breach. Thus, the court found that even under the pre FIRREA requirements Admiral would not have been able to infuse enough capital in the thrift to avoid receivership. Given Haven's condition in 1989 and 1990, the trial court found that the enactment of FIRREA had no practical effect on Admiral's ability to find the necessary additional funding for the thrift. Therefore, the government's action did not 'substantially impair the value of the contract to the injured party at the time of the breach' so as to make rescission an appropriate remedy.

Admiral, 378 F.3d at 1345 (citing Mobil Oil, 530 U.S. at 608). First Annapolis' viability is relevant because if First Annapolis would have failed and been seized with the forbearances the breach of Bancorp's contract was not total. Indeed, the record has shown that First Annapolis would have failed with the forbearances because of its financial condition, systemic problems, and business decisions unrelated to breach. See Admiral ("In this case, the trial court found that Haven's problems began long before FIRREA was proposed, enacted, or implemented, and Haven's financial situation continued to deteriorate both before and after FIRREA's enactment . . . The trial court concluded that the government's breach did not significantly affect Admiral's prospects of profiting from the contract or its opportunity to find a merger partner or acquirer.")

First Annapolis was in such poor financial condition and had such poor economic prospects at the time of the Government's breach that the breach was not total or material. In other words, First Annapolis was "in such dire straits that it would not have been able to recover,

even absent a breach." See Admiral, 378 F.3d at 1345 (i.e., the thrift would have failed absent the breach); Admiral Financial Corp. v. United States, 57 Fed. Cl. 418, 434-35 (2003) (the trial court found that the thrift was in such poor financial condition due to operating losses at the time of the breach, that the enactment of FIRREA did not materially harm the thrift).

First Annapolis failed its capital requirements before the Government's breach. See Admiral, 378 F.3d at 1343 (no total breach because "even if [the holding company] had been able to replace all of Haven's goodwill with cash on September 30, 1989, [the thrift] would still have been formally below its minimum capital requirement"); Southwest, 63 Fed. Cl. at 196 (no total breach because the thrift was out of capital compliance with goodwill restored at the time of the breach: "By that time, the promises were worth nothing because First Louisiana was already insolvent.")

First Annapolis was out of capital compliance by Oct. 31, 1989, even taking into account all of its regulatory forbearances. JX 58 at 1545. By December 31, 1989, First Annapolis, by its own accounting, failed to meet its 1.80 percent regulatory capital benchmark ratio by approximately $1.9 million. DX 2294 at 1612; JX 61 at 1645. As of April 1990, First Annapolis' regulatory capital (including all the goodwill) to total liabilities ratio was negative 0.25 percent. JX 68 at 0016.

First Annapolis, by its own accounting, was already $2 million out of capital compliance in December 1989, even with the benefit of the forbearances. First Annapolis' actual operations did not generate the profits that it projected in its business plans. For one, First Annapolis' core operations were losing money and had not been profitable for over 10 years. After the supervisory conversion, this did not change. During the nine-month period ending June 1989, while First Annapolis projected losses (before goodwill amortization and extraordinary items) of

nearly $1.5 million on its core operations, its actual losses totaled approximately $4.2 million. DX 2120 at 1550 and 0704 and 0486.

First Annapolis never became profitable. In February 1990, First Annapolis recorded a net loss of $13.3 million. JX 65 at 1730. This loss was due, in large part, to the nearly $8 million in credit losses and the $4.9 million in service corporations losses that First Annapolis recorded during the month. JX 65 at 1729-30. First Annapolis' economic environment also deteriorated in 1989, before the breach. The downturn in the real estate market was a major factor in Bancorp's failure because of its huge investments in several large real estate projects.

Moreover, First Annapolis' asset quality was a serious part of its problems. As their head of lending, Executive Vice President Mr. Cook, acknowledged that when he arrived in December 1988, First Annapolis had poor underwriting practices, no loan review function and huge problem loans which preceded FIRREA. Tr. 982, 983 (Cook). Mr. Cook also admitted that when he arrived First Annapolis had no actual procedure for ceasing recognition of income on loans that became impaired. Tr. 984-85 (Cook). As a result, First Annapolis' net income and therefore its capital was overstated. Mr. Cook stopped the thrift's recognition of income on the Bayside Marina loan of $13 million as of December 31, 1988. DX 2145; Tr. 989 (Cook). Mr. Cook identified other problem loans including loans to the Dennis Blauer entities. Regarding one of these loans, the bank was forced to sell the collateral, a marina, for a loss of $1.2 million. DX 2289. Mr. Cook agreed that the bank and its subsidiary had disbursed more money into the loan than it was worth and that it turned out to be a "giant pyramid scheme" that didn't work out. Tr. 1005 (Cook). Although First Annapolis had several large problem assets that had declined in value over the previous months, the thrift recognized almost no credit losses during the last six

months of 1989. In fact, First Annapolis did the opposite and recorded "negative" credit losses of $299,810 during the six month period ended December 1989. DX 2294 at 1610; JX 61 at 1642.

Once the regulators discovered this failure to adequately account for the credit losses during the January 1990 examination, they directed First Annapolis to recognize the $6,186,116 in losses it had already incurred. DX 439 at 1300 (including among others: Bayside Marina, $3,234,056; (b) Dennis Blaeuer entities, $947,822; and (c) Northampton Business Park, $1,479,051). This reduced the overstated capital by $6,186,116. During the January 1990 examination, the regulators also discovered that First Annapolis failed to adequately classify its non-performing assets. These errors resulted in the thrift's capital being overstated. DX 397 at 0150. In other words, by categorizing assets as special mention rather than substandard, First Annapolis was not required to record a loan loss provision that would reduce capital. Based upon the results of the January 1990 examination, First Annapolis was directed to "immediately increase its general loan loss reserve by $5,800,000, consistent with the institution's loan loss reserve policy and with the level of criticized and classified assets identified by the OTS examiners at the January 16, 1990 examination." DX 439 at 1301. This reduced the overstated capital by $5,800,000. Therefore, First Annapolis' December 1989 capital was overstated by approximately $12 million. In total, between August 12, 1988, and April 30, 1990, First Annapolis realized losses of $23.7 million (after the amortization of goodwill) and nearly $16.4 million (before the amortization of goodwill). JX 68 at 0016. In other words, during Bancorp's stewardship of First Annapolis, the thrift's losses, unrelated to the breach, exceeded the $13.7 million in capital Bancorp infused into First Annapolis.

Bancorp attempts to resist the contemporaneous documents by asserting that FIRREA was the "elephant in the room" that affected all the thrift's activities throughout the last quarter of

1988 and the year 1989, but was never talked about by members of the thrift. Bancorp's witnesses Messrs. Parran and Cook contend that the breach was the entire FIRREA legislation and that its impact was felt long before August 1989. Bancorp's witnesses also allege that most of their financial problems, including problem loans and failed real estate investments, all can be tied solely to the FIRREA legislation. Further, the witnesses testify that First Annapolis would have survived absent FIRREA. However, the witnesses point to absolutely no contemporaneous documents to prove their case. Mr. Cook talked about FIRREA's impact on lending and the viability of the bank but acknowledged that there were no contemporaneous documents to support his assertions. Tr. 978-79 (Cook). Mr. Cook also acknowledged that the downturn in the economy affected these loans, and as a result, the thrift's faith in its real estate investments turned out to be unfounded. Tr. 1004-1005 (Cook). The contemporaneous documents tell the story: First Annapolis was a failing thrift well before the impact of FIRREA, and its serious asset quality problems only worsened with the downturn in the economy. Messrs. Cook and Parran's post-hoc testimony that everything was related to the FIRREA legislation cannot overcome the evidence in this case. Bancorp has clearly failed to meet its burden of proof that the breach was total.

**C. Allowing Bancorp Full Restitution Would Be An Unfair Windfall**

We have spent considerable time in this trial reviewing the status of First Annapolis's finances and business decisions. Such an analysis is mandated by the principles of restitution. The objective of restitution is "to return the parties, as nearly as practicable, to the situation in which they found themselves before they made the contract." Restatement § 384; see also Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001). For a period of over 18 months, Bancorp obtained a significant benefit by acquiring and operating First

Annapolis under the forbearances. Tr. 1101-1102 (Parran). Even assuming the Government's actions constituted a total breach, Bancorp is not entitled to restitution of its initial $13,665,907 investment, because any such award would be a "windfall," placing Bancorp in a better position than if there had been no breach. See Hansen, 367 F.3d at 1315 ("Courts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement.").

Awarding restitution to Bancorp would leave it in a superior position, and in effect, reward it for its consistently bad decisions. During Bancorp's watch, First Annapolis' problems were undisputedly exacerbated. At the time of the conversion, August 13, 1988, First Annapolis' liabilities exceeded its assets by $65 million, (JX 3 at 0834), but by the time the thrift failed, the Government was forced to pay $118.6 million. DX 635 at 0003. Indeed, by December 31, 1989, even by First Annapolis' own accounting, Bancorp had already lost at least half of its initial investment. DX 397 at 0156. After properly accounting for the thrift's loan losses, Bancorp had actually lost its entire investment. DX 439. In fact, by the time of the seizure, Bancorp had lost nearly $10 million more than it had invested in the thrift. JX 68 at 0016. Allowing Bancorp to rescind the contract and obtain full restitution would afford it a windfall, contrary to the equitable principles on which the remedy of restitution is based. See Canfield v. Reynolds, 631 F.2d 169, 178 (2d Cir. 1980) (declining to order rescission because it would give plaintiff a windfall in a setting in which there was "no reason to relieve [plaintiff] of his investment's downside risks").

An award of Bancorp's investment in First Annapolis also would improperly reallocate the risks that the parties had allocated for themselves. See 3 Dan B. Dobbs, Law of Remedies § 12.7(5) (2d ed. 1993). The contract placed the risk of First Annapolis' profitability upon Bancorp. If First Annapolis became profitable, as Bancorp projected would happen once it had control of

the thrift, Bancorp would reap all the benefits. If, however, Bancorp's projections were incorrect, Bancorp would have to absorb any losses. Bancorp should not be permitted to now use restitution as an excuse to shift to the Government the risk of loss, which it agreed to assume. See Admiral, 378 F.3d at 1345; Canfield, 631 F.2d at 178; see also Bernstein v. Nemeyer, 570 A.2d 164, 169 (Conn. 1990).

Pursuant to Bancorp's theory of the case, the fact that it would be better off with an award of damages than if the breach had not occurred at all is entirely irrelevant to a determination of its entitlement to restitution. Bancorp's suggests that the Supreme Court's decision in Mobil Oil bars consideration of any "windfall" resulting from an award of damages. See Mobil Oil, 530 U.S. at 608 (restitution is appropriate where "it is just in the circumstances to allow [the non-breaching party] to recover damages based on all his remaining rights to performance.") (emphasis added) (quoting Restatement § 243(4)). However, in Mobil Oil, the Supreme Court held that the oil company plaintiffs were not required to establish that the contract ultimately would have resulted in a financial gain, or that they would have succeeded in obtaining the right to explore for oil, in order to be entitled to restitution. 530 U.S. at 623- 624. The Court found, however, that the breach was "material" at the time of breach because the change in the law denied them the benefit for which they paid the government $156 million and which remained available at the time of breach - the "opportunity to try to obtain exploration and development rights in accordance with the procedures and under the standards specified in the cross-referenced statutes and regulations." Id. at 620. This was the harm suffered by the plaintiff in Mobil Oil on the date of the breach, and it was central to the Supreme Court's holding that the breach was material.

Here, in contrast to the plaintiffs in Mobil Oil, Bancorp the received the benefit of its bargain with respect to the forbearances right up until the date First Annapolis seized. Unlike Mobil Oil, the $13,665,907 Bancorp infused into First Annapolis was not provided to the Government, it was used by First Annapolis to gamble on various investments and enter into contracts and business relationships with other third-parties. Tr. 1081-1082. First Annapolis became subject to seizure - and lost the opportunity to continue to operate - because of market conditions and its own serious deficiencies in management. Those reasons were entirely unrelated to and independent of any breach resulting from the enactment of FIRREA. As the Court observed in Hansen, restitution is inappropriate "where relief would result in an "unfair windfall' to the non-breaching party." Hansen, 367 F.3d at 1315. A return of the alleged value of Bancorp's contribution would put it in a superior position to the position Bancorp would have held if the contract had never been breached. The Court should therefore reject Bancorp's claim for restitution.

## III. Bancorp's Tax Gross-up Claim Is Based Upon Its Erroneous Restitution Claim and Cannot Be Supported

Bancorp erroneously asserts that a tax gross-up is appropriate for an award of restitution damages because such a recovery would be taxable as gross income to Bancorp. Pl.'s Am. App. A at 16-17. Bancorp's tax-gross up claim is therefore premised exclusively upon its erroneous restitution claim. The restitution claim fails because, as demonstrated at trial and above, the contract cannot be unwound, Bancorp has failed to establish that the Government's breach amounted to a "total breach," and awarding Bancorp $13,665,907 would result in an unfair windfall. As a result, the tax gross-up claim also fails.

Moreover, Bancorp has failed to show with "reasonable certainty" that the restitution damages it seeks would be treated as taxable upon receipt. See Commercial Fed. Bank, F.S.B. v.

United States, 59 Fed. Cl. 338, 355-56 (2004); Citizens Fed. Bank, F.S.B. v. United States, 59 Fed. Cl. 507, 521-23 (2004) (rejecting "gross-up" as a matter of law in part due to uncertainty regarding taxability); Local Oklahoma Bank, N.A. v. United States, 59 Fed. Cl. 713, 720-21 (2005), aff'd, 452 F.3d 1371 (Fed. Cir. 2006) (same); First Heights Bank, F.S.B. v. United States, 57 Fed. Cl. 162, 175 (2003), aff'd, 422 F.3d 1311 (Fed. Cir. 2005); Centex Corp. v. United States, 55 Fed. Cl. 381, 388-89 (2003), aff'd, 395 F.3d 1283 (Fed. Cir. 2005). By definition, Bancorp's tax gross-up claim is untenable because its restitution claims seeks the recovery of the $13,665,907 capital contribution Bancorp made to the thrift, making any judgment based upon the return of this capital excludible from Bancorp's gross income and nontaxable because it is not an economic gain or "income" to Bancorp. See United States v. Gotcher, 401 F.2d 118, 121 (5th Cir. 1968); Freeman v. Comm'r, 33 T.C. 323, 327 (1959); see also Rev. Rul. 81-277, 1981 WL 165965 (IRS RRU) (1981) (citing Clark v. Comm'r, 40 B.T.A. 333 (1939)).

"In the case of a corporation, gross income does not include any contribution to. . . capital . . ." 26 U.S.C. § 118(a). Further, a corporation to have income under 26 U.S.C. § 61, it must have benefitted from an economic gain. 26 U.S.C. § 61; United States v. Gotcher, 401 F.2d at 121 ("The concept of economic gain to the taxpayer is the key to section 61."). Where a recovery replaces capital and provides no economic gain to the taxpayer, the resulting damage award is viewed as a return of capital, and is not taxable as income. Freeman v. Commissioner, 33 T.C. 323 (1959). Here, there is no dispute that no income taxes were paid by Bancorp when it injected capital into the thrift, and the return of this capital would not be an economic gain for Bancorp. Therefore, the return of Bancorp's investment through an award of restitution damages would not be taxable and Bancorp's tax gross-up claim fails as a matter of law.

**CONCLUSION**

Now, after having had a full opportunity to be heard, it is amply evident that plaintiff has not met the burden of establishing its right to restitution. As such, the Court should discontinue further proceedings and enter judgment for the Government. For the above reasons, we respectfully request that the Court grant our motion for judgment upon partial findings.

Respectfully submitted,

MICHAEL HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Jeanne E. Davidson

KENNETH M. DINTZER
Assistant Director

s/ Richard B. Evans

RICHARD B. EVANS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 353-7760
Facsimile: (202) 305-7643

OF COUNSEL:
TIMOTHY ABRAHAM
MELINDA HART
MARK PITTMAN
DELISA M. SANCHEZ
Trial Attorneys

March 22, 2007

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on March 22, 2007, a copy of the foregoing "DEFENDANT'S MOTION FOR JUDGMENT BASED UPON PARTIAL FINDINGS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard B. Evans