**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 94-522C**
**(Judge Williams)**

---

**FIRST ANNAPOLIS BANCORP, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFF'S POST-TRIAL FINDINGS OF FACT AND LEGAL ARGUMENT REGARDING DAMAGES

---

**Dale A. Cooter**
**James E. Tompert**
**COOTER, MANGOLD, TOMPERT & KARAS, L.L.P**
**5301 Wisconsin Avenue, N.W.**
**Suite 500**
**Washington, D.C. 20015**
**(202) 537-0700**

**Attorneys for Plaintiff**
**First Annapolis Bancorp, Inc.**

**Dated: June 4, 2007**

**TABLE OF CONTENTS**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. The Formation Of Bancorp . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. The Contract Between Bancorp And The Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. The Conversion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV. Contract Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

V. Breach Of The Contract By The Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

VI. The Impact of the Passage of Firrea on the Bank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VII. The Viability of the Bank "But For" Fierrea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VIII. RAP versus GAAP Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IX. Damages Sustained By Bancorp . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

X. Procedural Status of the Defendant's Defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

SUMMARY OF LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

I. PLAINTIFF IS ENTITLED TO $22,606,959 IN RESTITUTION . . . . . . . . . . . . . . . . . . . . . . . 36

A. FIRREA Constituted a Total Breach of the Government's Agreement With Bancorp 36

B. The Government's Total Breach Cases- *Admiral* and *Southwest* - are Distinguishable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1. *Admiral* is factually distinguishable . . . . . 39

2. *Southwest* is factually distinguishable . . . . . 46

C. Bancorp Is Entitled to $22,606,959 in Restitution . . . . . 48

1. Bancorp is entitled to recover its $13, 665,907 investment . . . . . 49

2. The Plaintiff is entitled to a tax gross-up on the award . . . . . 51

3. The Government has failed to prove that there should be an offset to Plaintiff's award . . . . . 54

III. EVEN ASSUMING THAT THE BANK'S VIABILITY IS RELEVANT, THE GOVERNMENT HAS NOT SUSTAINED ITS BURDEN OF PROOF ON VIABILITY . . . . . 57

A. The Burden of Proof is the Defendant's And It Has Failed to Meet It . . . . . 58

B. Even If It Was the Plaintiff's Burden to Demonstrate Viability, It Did So . . . . . 63

CONCLUSION . . . . . 64

# TABLE OF AUTHORITIES

FEDERAL CASES

*Admiral Financial Corp v. United States*, 57 Fed.Cl. 418 (2003) . . . . . . . . . . . . . . . . . . . . *passim*

*Admiral Financial Corp. v. United States*, 378 F.3d 1336 (Fed. Cir. 2004) . . . . . . . . . . . . *passim*

*Admiral Financial Corp. v. United States*, 329 F.3d 1372 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . 40

*Admiral Financial Corp. v. United States*, 54 Fed. Cl. 247 (2002) . . . . . . . . . . . . . . . . . 14, 20, 41

*Amber Resources Co. v. U.S.*, 73 Fed.Cl. 738 (Fed.Cl.,2006) . . . . . . . . . . . . . . . . . . . . . . . 50, 51

*Amber Resources v. United States*, 68 Fed. Cl. 535 (2005) . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*American Capital Corp. v. U.S.*, 472 F.3d 859 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 59

*American Capital Corp. v. U.S.*, 65 Fed. Cl. 241 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 61

*Caroline Hunt Trust v. United States*, 470 F.3d 1044 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Caroline Hunt Trust Estate v. United States*, 65 Fed. Cl. 271 (2005) . . . . . . . . . . . . . . . . . *passim*

*First Annapolis v. United States*, 75 Fed. Cl. 280 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374 (Fed. Cir. 2001)) . . . . . . . . . . . . . . . 48

*Green v. C.I.R.*, T.C. Memo. 2003-244, 2003 WL 21940722 . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297 (Fed.Cir.2004) . . . . . . . . . . . . . . . . *passim*

*Home Savings of America v. US* 399 F.3d 1356 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

*Hughes v. United States*, 71 Fed. Cl. 284 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kilburg v. C. I. R.*, T.C. Summ. Op. 2004-36, 2004 WL 565952 (2004) . . . . . . . . . . . . . . . . . . . 53

*Landmark Land Co. v. FDIC*, 256 F.3d 1365 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 55

*LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . 62

*Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . 54

*Mobil Oil Exploration & Producing Southeast, Inc. v. United States*,
530 U.S. 604 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Southwest Investment Co. v. United States*, 63 Fed. Cl. 182 (2004)
aff'd, 158 Fed.Appx. (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Westfed Holdings , Inc. v. United States*, 407 F.3d 1352 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . 56

FEDERAL STATUTES

12 U.S.C. §§ 1441a, 1811 et. seq.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

12 U.S.C. §1464(t)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

12 U.S.C. §1464(t)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

28 U.S.C. §172(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .53

Pub. L. 105-34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

FEDERAL REGULATIONS

12 C.F.R. Part 563b.26(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59

12 C.F.R. §563b.26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 22

54 Fed. Reg. 46, 845 (11/8/89) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13, 15

Subpart C of 12 C.F.R. Part 563b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

TREATISES

Restatement (Second) of Contracts, §243 (1979)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 48

Restatement (Second) of Contracts, §349 (1979)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Restatement (Second) of Contracts, §373 (1979)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Restatement (Third) of Restitution and Unjust Enrichment,
§37 (Tentative Draft No. 3, 2004)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 55

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **No. 94-522C** |
| | **)** | **(Judge Williams)** |
| **THE UNITED STATES,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |
| | **)** | |

**PLAINTIFF'S POST-TRIAL**
**FINDINGS OF FACT AND LEGAL ARGUMENT**
**REGARDING DAMAGES**

Plaintiff, First Annapolis Bancorp, Inc. ("Bancorp"), by and through counsel, pursuant to the briefing schedule set by the Court at the conclusion of the trial on damages, hereby submits its Post-trial Findings of Fact and Legal Argument Regarding Damages, and states as follows:

## INTRODUCTION

As set forth below, Bancorp submits that applying the proper legal analysis to the evidence adduced at trial demonstrates that Bancorp is entitled to restitution damages in the amount of the $13,665,907 that Bancorp invested in First Annapolis Savings Bank, F.S.B. ("First Annapolis"), plus a tax gross-up to compensate Bancorp for its total loss, for a total award of $22,609,959.

## FINDINGS OF FACT

### I. The Formation Of Bancorp.

1. On November 19, 1987, Bancorp was incorporated under the laws of the state of Delaware "to act as a savings and loan holding company." Plaintiff's Trial Exhibit ("PX") 11.

2. Bancorp was authorized to issue 30,000,000 shares of common stock. Id.

3. Bancorp was formed for the purpose of acquiring First Federal Savings and Loan Association of Annapolis ("First Federal") pursuant to its voluntary supervisory conversion into a stock savings bank. PX 8 (10/21/87 revised business plan). It was contemplated that First Federal would convert from a federal mutual savings and loan association into a federal capital stock savings bank by way of merger into a new entity, First Annapolis Savings Bank, F.S.B. ("First Annapolis") PX 8. Bancorp intended to sell at least 12,000,000 shares of its common stock at $1.00 per share through a private placement to accredited investors, and then use the net proceeds from the stock sale to purchase all of the stock in First Annapolis, in a minimum amount of $11,000,000, immediately prior to the conversion. PX 8.

## II. The Contract Between Bancorp And The Government.

4. The contract by and between Bancorp and the Government is memorialized in the following documents:[1]

A. FHLBB Resolution 88-602, dated July 21, 1988. PX 1.

B. FHLBB Resolution 88-603, dated July 21, 1988. PX 2.

C. July 21, 1988 forbearance letter. PX 3.

D. August 5, 1988 forbearance letter. PX 4.

E. August 11, 1988 forbearance letter. PX 5.

F. August 12, 1988 forbearance letter

[1] The documents listed above were also all attached to Bancorp's Short Form Motion for Summary Judgment as tabs A through I.

(revising July 21, 1988 forbearance letter). PX 6.

G. Regulatory Capital Maintenance/Dividend Agreement ("RCMA"), dated August 12, 1988. PX 7.

H. First Annapolis Business Plan, dated 10/21/87. PX 8.

I. October 28, 1998 letter from Deloitte Haskins & Sells (independent public accountants). PX 9.

J. February 9, 1988 letter from Federal Home Loan Bank Board ("FHLBB"). PX 10.

5. In Resolution No. 88-603 the Federal Home Loan Bank Board ("FHLBB") made the express findings that (1) "the Old Association's [First Federal Savings and Loan Association of Annapolis'] liabilities exceed its assets, as calculated under generally accepted accounting principles on a going concern basis," (2) "there would be no value realizable by the mutual accountholders of the Old Association upon liquidation," (3) "severe financial conditions exist which threaten the stability of the Old Association and conversion from mutual to stock form of organization is likely to improve the financial condition of the Old Association," (4) **"New Institution [First Annapolis] would be a viable entity following conversion, as determined under 12 C.F.R. §563b.26,**" and (5) the conversion is a "supervisory conversion within the meaning of Subpart C of 12 C.F.R. Part 563b." PX 2 at 2 (emphasis supplied). The Resolution further provides that:

> On the date of consummation of the acquisition, merger and conversion, [Bancorp] shall make a capital contribution to the New Institution [First Annapolis] through the purchase of common stock **in a minimum amount equal to the greater of $11,000,000 or an amount sufficient to raise the net worth of the New Institution [First Annapolis] to 1% of the total liabilities on a GAAP basis** as specified in 12 C.F.R. Part 563b.26(b)(2).

Id. at 11 ¶13 (emphasis supplied).

6. As set forth in the foregoing documents, the terms of Bancorp's contract with the Government, which are relevant to the issue of damages, include three regulatory forbearances, namely: (1) a regulatory forbearance so that supervisory goodwill could be included as an intangible asset in the calculation of regulatory capital, to be amortized over a period of 25 years ("goodwill forbearance"); (2) a regulatory forbearance so that First Annapolis could meet its minimum capital requirements by complying with a series of annual capital benchmarks set forth in its business plan for a period of 5 years ("capital ratio forbearance"), and (3) a regulatory forbearance to exceed the limitation on investments in service corporations for existing projects as approved by the Supervisory Agent ("investment in service corporations forbearance"). The Government did not give any other consideration or any thing of value. Transcript of March 28, 2007 Trial Testimony of David Kennedy ("Kennedy 3/28/07 Tr."). at 2330; Parran 3/19/07 Tr. at 1044, 1045.

7. The foregoing forbearances were the "heart and soul" of the contract. Transcript of March 21, 2007 Trial Testimony of Edward J. Heiden ("Heiden 3/21/07 Tr.") at 1430, 1432, 1433. They were integral to the agreement. Heiden 3/21/07 Tr. at 1434. "[T]he agreement was completely grounded in the forbearances that FHLBB was giving under the agreement to Bancorp to basically create a viable firm that would have a context for operating in a way so as to be profitable." Heiden 3/21/07 Tr. at 1430. The forbearances "went to the three areas that were needed for Bancorp to be successful, eliminating the baggage of its past, giving it enough flexibility with a five-year chance to meet its benchmarks and giving – one of the key ways it was going to meet the, namely its loan – the obtaining of profitability from its loan portfolio, giving that more flexibility and the flexibility for [ ] Bancorp to pursue that." Heiden 3/21/07 Tr. at 1431-32.

8. Dr. Heiden concluded that no investor would have invested in Bancorp if the forbearances (or something similar) had not been part of the agreement. Heiden 3/21/07 Tr. at 1437. Even if the identical forbearances were not part of the agreement, there would have to be some comparable provisions allowing Bancorp to remove the burden of past regulatory deficits, that would allow the Bank to work with its major asset - the loan portfolio - in a way that could make it part of normal business operations; and that would afford "some latitude and space to get its act together with respect to meeting relevant regulatory benchmarks in a five-year period." Heiden 3/21/07 Tr. at 1437.

9. In its letter dated February 9, 1988, the FHLBB confirmed "that all conditions precedent have been met and the Conversion has been completed in accordance with the foregoing Resolution [No. 88-602] and the effective date of the conversion was August 13, 1988." PX 10.

**III. The Conversion.**

10. To fulfill its obligation under the foregoing contract, Bancorp offered outstanding shares of its common stock to certain investors for $1.00 per share. PX 8.

11. In reliance upon the promises made by the Government in the foregoing contract, including the regulatory forbearances, Bancorp sold 14,165,874 shares of its common stock and thereby raised $14,165,874.00 in capital. First Annapolis v. United States, 75 Fed. Cl. 280, 282 (2007).

12. In further reliance upon the promises made by the Government in the foregoing contract, including the regulatory forbearances, Bancorp then purchased 100% of the stock of First Annapolis, or 13,665,907 million shares, for $1.00 per share. First Annapolis, 75 Fed. Cl. at 282. Transcript of March 19, 2007 Trial Testimony of Douglas A. Parran ("Parran 3/19/07 Tr.") at 1045;Transcript of March 22, 2007 Trial Testimony of George Thomas Daugherty ("Daugherty 3/22/07 Tr.") at 1587.

13. First Federal thereby converted from a mutual savings and loan association, and merged into First Annapolis, as a federal stock savings bank. PX 2.

14. The effective date of the conversion, as determined by the FHLBB, was August 13, 1988. PX 10.

15. As of August 13, 1988, the total liabilities of the bank were in the range of $750,000,000, and 1% of that amount would have been $7,500,000. See PX 9 at 4. Therefore, pursuant to Resolution No. 88-603, dated July 21, 1988, the minimum amount of the capital Bancorp had to raise was $11,000,000, which it had exceeded by $3,165,874 (14,165,874.00 - 11,000,000 = 3,165,874). PX 2. By the same token, the minimum amount that Bancorp was required to invest in First Annapolis was $11,000,00, which it had exceeded by $2,665,907 (13,665,907 - 11,000,000 = 2,665,907).

16. On February 9, 1989, the FHLBB confirmed "that all conditions precedent have been met and the Conversion has been completed in accordance with" Resolution No. 88-602. PX 10.

**IV. Contract Performance.**

17. Gregory Jones was the supervisory agent for the Bank during the period from the August 1988 conversion through December 1989. Transcript of March 23, 2007 Trial Testimony of Gregory Jones ("Jones 3/23/07 Tr.") at 1802.

18. By the last quarter of 1988, the Bank was on track and had made a profit. Parran 3/19/07 Tr. at 1047; Transcript of March 20, 2007 Trial Testimony of Douglas A. Parran ("Parran 3/20/07 Tr.") at 1202.

19. It was the meeting of the capital benchmarks, though, not whether the Bank was profitable or unprofitable, that was important under the contract. Parran 3/20/07 Tr. at 1144. On June 30,

1989, First Annapolis had satisfied its first capital benchmark of 1.80% as set forth in the Business Plan. PX 8; Parran 3/19/07 Tr. at 1064; Parran 3/20/07 Tr. at 1144, 1225; Heiden 3/21/07 Tr. at 1478-79; Jones 3/23/07 Tr. at 1823-24, 1850; Kennedy 3/28/07 Tr. at 2307.

20. Through the Spring and Summer of 1989, the Bank was continuing to fund its service corporation investments as it had agreed in August 1988. Parran 3/20/07 Tr. at 1125. Regulatory capital continued to increase over the next six months. Jones 3/23/07 Tr. at 1850.

## V. **Breach Of The Contract By The Government**.

21. In early 1989, the news that FIRREA was coming was well publicized. Transcript of March 19, 2007 Trial Testimony of David F. Cook ("Cook 3/19/07 Tr.") at 960-61, 1048-1049; Jones 3/23/07 Tr. at 1812-13; Transcript of March 26, 2007 Trial Testimony of William Burl Crompton III ("Crompton 3/26/07 Tr.") at 2012. It was well known throughout th the banking industry that Congress was unhappy with what the FHLBB had done with the thrifts in the supervisory conversions. Jones 3/23/07 Tr. at 1813. Jones spoke about the proposed legislation with his colleagues in Atlanta, with the members of the management of the banks he was supervising, and, in particular, with the management of the banks he was supervising that would be impacted by the legislation. Jones 3/23/07 Tr. at 1813-14.

22. It would be reasonable for the management of a thrift that was expected to be impacted by FIRREA to adjust its practices to the upcoming legislation is that is what the management believed it needed to do. Jones 3/23/07 Tr. at 1815. Management of First Annapolis met with Jones and others in Atlanta in or about November to discuss FIRREA. Jones 3/23/07 Tr. at 1819.

23. When the proposed legislation was first announced, it was anticipated that the legislation would have a serious negative impact. Cook 3/19/07 Tr. at 962. Mr. Cook testified:

> [O]ne of the things that First Annapolis had to contemplate doing was building up its capital account, and [the proposed legislation] could have a chilling effect on potential investors in the thrift industry because there were a multitude of thrifts around that had obtained new, fresh capital, had converted from a thrift to a stock-owned, and some of these might not survive.
>
> * * * * *
>
> Over time, [the announcement of the proposed legislation] cast a negative cloud over the bank. It was something that no one quite understood what would happen, but there was a premonition that it would just scare away all potential good customers, additional sources of capital, the thrifts – possibly our thrift was not looked upon as a growth institution any longer, because we were cast in that definition of a bank that could be dealt severely with under the FIRREA proposal. . . . It affected core deposits.

Cook 3/19/07 Tr. at 962, 965.

24. In the Spring of 1989, the news of the coming of FIRREA as disseminated through the United States Savings and Loan League, the Maryland League and through conversations with the Federal Home Loan Bank was that the regulatory forbearances would not be honored. Cook 3/19/07 Tr. at 1047-48.

25. The specter of the FIRREA legislation also affected lending relationships. Cook 3/19/07 Tr. at 966. The strongest borrowers gravitated away from the thrifts towards the commercial banks which would not be affected by the legislation. Id. at 966, 971. Borrowers need to have a banking relationship which would allow them to go back to a bank, borrow again, pay down, and reborrow and that could not be done with a bank that might not be there a year or six months later. Id. at 966-67, 971-972. See also Jones 3/23/07 Tr. at 1821 (if developer/borrower heard that bank would not be able to fund a construction loan through buyout, the developer might have a disincentive to pay on the loan); Transcript of March 27,

2007 Trial Testimony of William Burl Crompton III ("Crompton 3/27/07 Tr.") at 2013-14 (Crompton would expect that developers would be aware of the proposed legislation and that they would react to it somehow).

26. The pendency of the FIRREA legislation also negatively effected the real estate loans at the service corporation level because it meant the real estate had to be turned to cash quickly and with real estate that means a deeper discount. Cook 3/19/07 Tr. at 969-70.

27. By April 1989, the Board of Directors was already discussing, and planning for, the coming of FIRREA. Joint Trial Exhibit ("JX") 46 (Minutes of 4/28/89 Board of Directors meeting) at p. 0053364. Again in September, 1989, the Board took up the issue of the impact of FIRREA ("[t]he purpose of the meeting was to discuss the impact of the loans to one borrower limitation imposed by [FIRREA]. . . .At the last Loan Review Committee meeting, it was decided to discuss this limitation with counsel and Deloitte, Haskins and Sells. The Committee request this advice to provide them with a sound path to follow during this confusing period"). JX 54 (Minutes of 9/25/89 Board of Directors meeting) at p. 0053736.

28. By late Spring/early Summer 1989, the specter of FIRREA effected the service corporation projects because Bancorp knew that if the regulations were passed as suggested, the bank would have to revert back to maximum loan amounts of $500,000 and then the bank would be unable to finish 90 percent of the projects it had in the subsidiary companies where it had been anticipated all of the income would come from. Cook 3/19/07 Tr. at 1049. Mr. Parran met with the majority of the joint venture partners in the service corporations to make them aware that FIRREA was coming and that it might prohibit the Bank from continuing to fund the projects. Parran 3/19/07 Tr. at 1061. Some of those joint venture partners were able to obtain financing elsewhere, but others were not able to do so because the projects

were in the beginning or middle stages of development. Parran 3/19/07 Tr. at 1062. See also Transcript of March 21, 2007 Trial Testimony of Douglas A. Parran ("Parran 3/21/07 Tr.") at 1328-30 (Solomon's Landing was one of the projects where the borrower stopped paying because of FIRREA because the loan was halfway through its development stage and the Bank could not continue to fund it because the loan amount exceeded $500,000 and the borrower had to go elsewhere to borrow funds); Jones 3/23/07 Tr. at 1819-20 (Mr. Jones had no knowledge of what as to what happened to any of the loans that became non-performing). Mr. Parran testified regarding the impact this had on the Bank:

> [I]t had a severe impact, because first off, we stopped the origination of larger loans. And one of the major sources of income is fee income, the points you charge on those loans. We didn't try to generate additional savings, and obviously, the less savings accounts you have or deposits you have, the less amount of money you have to leverage out and produce income on.
>
> And then I guess the major effect was really going back to what everybody counting on as the subsidiary income from these joint ventures. We basically went into a very slow, slow period. . . . But not that we predicted a tremendous amount of income in '89 from those subsidiary companies anyway, but when this happened, it just cut off the future. . . . [I]t wasn't possible for us to ever think about obtaining earnings from those subsidiary companies again. And that's what the financial future of the bank was based on.

Parran 3/19/07 Tr. at 1063.

29. Because of the anticipation of FIRREA, which choked off growth, the bank was not profitable in the spring and summer of 1989. Cook 3/19/07 Tr. at 972. Bancorp was not able to go out and obtain new capital. Id. at 1023.

30. Prior to and in anticipation of the passage of FIRREA in August 1989, Mr. Parran had six to eight conversations with Gregory Jones who had taken over the supervisory position from Mrs. Betsy Trump. Parran 3/19/07 Tr. at 1051. During those conversations, Mr. Jones told Mr. Parran that he

believed FIRREA would be passed; that it would be effective in August; that the forbearances would go away; and that Bancorp should submit a new business plan to the FHLBB early on. Parran 3/19/07 Tr. at 1053-54. The Bank did develop and submit a new business plan in June 1989. Parran 3/21/07 Tr. at 1380. Mr. Jones was aware of the pending legislation on the Bank and inquired of Parran as to whether the Bank could survive. Parran 3/19/07 Tr. at 1063. Mr. Parran told Mr. Jones that if FIRREA went into effect, the Bank would not survive. Parran 3/19/07 Tr. at 1064.

31. In preparation for the passage of FIRREA, the Bank sought advice from its counsel regarding what it could and could not do and it spoke with its supervisory agent in Atlanta and it then slowed down its loan program; slowed down its growth in savings; attempted to deal with (by way of refinancing, work out or sale) some of its loans which would become problems because of FIRREA. Cook 3/19/07 Tr. at 1054-55; Parran 3/21/07 Tr. at 1373; Defendant's Trial Exhibit ("DX") 2467. In anticipation of FIRREA, the Bank did not enter into any new projects in 1989. Parran 3/21/07 Tr. at 1375-76, 1377; JX 54 at 0053739 (9/25/89 Board minutes noting that "in anticipation of the new FIRREA regulation, no additional projects have been entered into in 1989").

32.There was no evidence to dispute Parran's testimony that in anticipation of FIRREA, he spoke with the bank's borrowers to tell them that bank not be able to finish funding the loans. See Kennedy 3/28/07 Tr. at 2312-13 ("I don't know whether he did or didn't talk to specific borrowers"); Crompton 3/27/07 Tr. at 2014-15. Mr. Kennedy testified that the most obvious way to determine what the impact of FIRREA was on the bank over the course of 1989 would be to speak with someone who was at the bank in 1989. Kennedy 3/28/07 Tr. at 2313-14. Mr. Kennedy also testified, however, that in preparing his Report, he did not speak with anyone who was at the bank at the time the news was being disseminated

that FIRREA was coming; he did not speak with Mr. Parran, with Mr. Cook, or with anyone else who had been at the bank at the time (early 1989). Kennedy 3/28/07 Tr. at 2314-15. Although Mr. Kennedy spoke with Mr. Crompton for about one hour, Mr. Crompton was not at the bank in 1989. Kennedy 3/28/07 Tr. at 2314-15. See Crompton 3/27/07 Tr. at 1999 (other than being perhaps being present at the Bank to attend one or two board meetings, Mr. Crompton was not at the Bank between the summer of 1988 and January 1990). Mr. Crompton was not a party to any conversations within that time period between the Bank's management and the supervisory staff in Atlanta. Crompton 3/27/07 Tr. at 2000-01.

33. FIRREA effected the Bank as early as the Spring of 1989 because the Bank's management realized it could not continue "with overinvestment in subsidiary companies, joint ventures, loans to one borrower" and it started to pull back on those investments. Parran 3/20/07 Tr. at 1295. By Spring 1989, the Bank had begun to implement a policy of a maximum loan to one borrower of $500,000. Parran 3/21/07 Tr. at 1373-74. In anticipation of FIRREA, the Bank did not enter into any additional projects in 1989. Parran 3/21/07 Tr. at 1376-77.

34. On August 9, 1989, FIRREA was enacted. Pub. L. No. 101-73, 103 Stat. 188 (codified as amended at 12 U.S.C. §§ 1441a, 1811 et. seq.). FIRREA replaced the FHLBB with the Office of Thrift Supervision ("OTS") and established new capital requirements for savings and loan associations. 12 U.S.C. §1464(t)(2); 54 Fed. Reg. 46,845 (11/8/89).

35. The passage of FIRREA had impact in August (prior to the passage of the implementing regulations) and people were reacting and trying to figure out what would happen once the implementing regulations were passed. Kennedy 3/28/07 Tr. at 2323-24. Mr. Kennedy testified, for example, that a

banker's behavior in August would have been impacted by knowledge that as a result of FIRREA his loan limit would be reduced to $500,000. Kennedy 3/28/07 Tr. at 2324-25.

36. Pursuant to FIRREA, supervisory goodwill could not be included in satisfying the tangible capital requirement. 12 U.S.C. §1464(t)(2); 54 Fed. Reg. 46,845 (11/8/89). In addition, supervisory goodwill had to be phased out by December 1994 when calculating core capital, and had to be amortized over a maximum of twenty years when calculating both risk-based and core capital. Id.; 12 U.S.C. §1464(t)(3)(A), (9)(B) and (c).

37. By the Fall of 1989, the Bank was no longer funding its service corporation investment projects because of FIRREA. Parran 3/20/07 Tr. at 1125. By November 1989, the Bank was already making other changes in anticipation of the implementing regulations. See DX 389 (Minutes of 11/7/89 at FHLBB in Atlanta and attended by representatives of Bank and FHLBB); DX 379 (11/14/89 Parran letter to Gregory Jones).

38. For purposes of determining the damages sustained by Bancorp, the date of the breach of the contract by the Government should at least be as early as August 9, 1989, the date of the enactment of FIRREA, as agreed to by the Government. See Southwest Investment Co. v. United States, 63 Fed. Cl. 182, 194 (2004), aff'd, 158 Fed.Appx. (2005) ("The Defendant's position is that, assuming arguendo it breached the contract, the date of the breach would be August 9, 1989, the date of FIRREA's enactment"); see also Admiral Fin. Corp v. United States, 57 Fed.Cl. 418, 423-24 (2003) (the Court discussed the issue of whether in date of the breach was the enactment of FIRREA on August 9, 1989 or when regulations under FIRREA became effective on December 7, 1989, and concluded "in the course of this case we have treated the critical date [of the breach] as the enactment [August 9, 1989], and the

Government 'agrees'"), aff'd, Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1339 (Fed. Cir. 2004) (acknowledging the ruling by the trial court in Admiral Fin. Corp v. United States, 54 Fed.Cl. 247 (2002), that the Government breached the contract with the enactment of FIRREA).

39. The effect of FIRREA took place long before the implementing regulations. Parran 3/19/07 Tr. at 1100. First Annapolis was not permitted to operate from the August 12, 1988 conversion through the December 7, 1989 enactment of the implementing regulations with the advantage of the forbearances. Parran 3/19/07 Tr. at 1101. Prior to the effective date of the implementing regulations, the Bank was advised by the Government, because of the pendency of those regulations, that it should not continue to exceed the level of service corporation investments. Parran 3/19/07 Tr. at 1102. Between the August 1989 enactment of FIRREA and the December 1989 effective date of the implementing regulations, the OTS took actions in its capacity as a regulator to bring the banks, including First Annapolis, into compliance with what it knew the regulations would ultimately look like. Jones 3/23/07 Tr. at 1840, 1843. In the fall of 1989, OTS required First Annapolis to propose a new capital plan and the Bank was being encouraged by the regulators to take actions to come into compliance. Jones 3/23/07 Tr. at 1840, 1843. The regulators expected First Annapolis to begin taking steps or develop a plan between August and December; i.e., the regulators expected First Annapolis to act before the December 1989 effective date of the implementing regulations. Jones 3/23/07 Tr. at 1843-44. The Bank did propose a new capital plan, as requested. Jones 3/23/07 Tr. at 1845.

40. Following the enactment of FIRREA, the Government did not allow First Annapolis to include supervisory goodwill as regulatory capital; imposed regulatory capital requirements greater than those contained in the Business Plan; did not permit First Annapolis to invest in its service corporation at the

agreed upon levels; and did not otherwise honor the regulatory forbearances that it had granted as part of the contract. Jones 3/23/07 Tr. at 1805-06 (FIRREA took away each and every forbearance); Parran 3/19/07 Tr. at 1046 (FIRREA took away all of the forbearances; the Bank did not "keep one item, not a hint of one item"); Kennedy 3/28/07 Tr. at 2330 (as a result of FIRREA, the government took away all of the forbearances). After taking away the forbearances, the Government did not return any of Bancorp's investment. Parran 3/19/07 Tr. at 1046. The passage of FIRREA "completely and totally broke the contract" the Bank had with the Government. Parran 3/19/07 Tr. at 1045-46; Parran 3/20/07 Tr. at 1118. Dr. Heiden testified that the "forbearances were the heart and soul of the operation of Bancorp." Heiden 3/21/07 Tr. at 1558; see Heiden 3/21/07 at 1430 (same).

41. On December 7, 1989, the regulations issued by the OTS under FIRREA became effective. 54 Fed. Reg. 46,845 (11/8/89).

42. FIRREA created "a situation of a complete imbalance in profit and loss and assets and liabilities for Bancorp, and the replacement of these benchmarks with new requirements that completely superseded and invalidated those benchmarks and prevented, in fact, prevented Bancorp from being profitable – from the opportunity to be [ ] profitable . . . ." Heiden 3/21/07 Tr. at 1432-33. FIRREA caused Bancorp to lose "the heart and soul of the contract." Heiden 3/21/07 Tr. at 1433.

43. Dr. Heiden concluded as follows:

> The bottom line of all that is that since these were so integral to the agreement, these three forbearances were so integral to it and all were breached, I think it is – the conclusion that is – could be reached, that but for these forbearances and knowing that they wouldn't be put into effect, there would have been no investment by this group of investors who were, for the most part, many of them, savvy, sophisticated investors who had other opportunities to invest their money.

Heiden 3/21/07 Tr. at 1434. Dr. Heiden concluded, within a reasonable degree of certainty, that the damage to Bancorp as a result of the government's breach, is $53.9 million. Heiden 3/21/07 Tr. at 1441-42.

44. By December 31, 1989, the OTS was probably measuring capital against FIRREA standards. Jones 3/23/07 Tr. at 1845. See also Jones 3/23/07 Tr. at 1846-47 (Mr. Crompton's January 1990 examination report probably evaluated the Bank on a post-FIRREA basis); Crompton 3/27/07 Tr. at 2004-05 (Mr. Crompton's January 1990 Examination was a snapshot of the Bank and its assets as of December 31, 1989 and no other date, with the possible addition of some events after December 31, 1989 that came to Crompton's attention) . The January 1990 Examination was limited in scope. Crompton 3/27/07 Tr. at 2006-07.

45. Because First Annapolis could not meet FIRREA's new capital requirements, on January 5, 1990, it submitted a capital plan to OTS for review. PX 32.

46. On February 27, 1990, the FHLBB informed First Annapolis that it was rejecting the proposed capital plan. DX 406.

47. Because First Annapolis failed to meet FIRREA's new capital requirements, the OTS placed First Annapolis into receivership. Kennedy 3/28/07 Tr. at 2305.

48. On June 1, 1990, or thereabouts, the Resolution Trust Corporation ("RTC") took possession of First Annapolis. The OTS recommended that the RTC take possession primarily because the Bank's tangible capital was negative $53 million when the mandatory FIRREA standards were applied. Jones 3/23/07 Tr. at 1793; Jones 3/23/07 Tr. at 1862.

49. Once the Bank went into receivership, Government workers were actually present in the Bank and running it. Jones 3/23/07 Tr. at 1862.

## VI. The Impact of the Passage of Firrea on the Bank

50. The Government's expert, David Kennedy, agrees that the passage of FIRREA significantly impacted the thrift industry, including First Annapolis. Kennedy 3/28/07 Tr. at 2304.

51.With FIRREA, the Bank's contractual arrangement with FHLBB was breached and the Bank was required "to accomplish virtually overnight what it otherwise had five years to accomplish." Cook 3/19/07 Tr. at 974-75. Mr. Cook testified:

> [The enactment of FIRREA in August 1989] only solidified everything that had preceded ***and was tending towards a perfect storm***. And the bill was enacted, and there was a perception and a recognition that the bank was likely to not be able to pull itself out
.

Cook 3/19/07 Tr. at 973 (emphasis added). Mr. Parran testified that the passage of FIRREA in August 1989 was "devastating" to the Bank. Parran 3/19/07 Tr. at 1045, 1065, 1080. FIRREA put the Bank out of business. Parran 3/19/07 Tr. at 1080.

52. As a result of FIRREA, investors who had capitalized at the Bank at minimum permitted standards lost their investments. Cook 3/19/07 Tr. at 975.

53. Although changes at the Bank beginning in August 1989 due to FIRREA did not abruptly happen all in one day and were gradual, the changes were meaningful. Cook 3/19/07 Tr. at 1026.

54. Although the Bank did not lose depositors as a result of FIRREA, the Bank was able to maintain its deposit number only by paying higher amounts of interest or converting them to noncore deposits. Cook 3/19/07 Tr. at 1026, 1028.

55. Once FIRREA passed, the Bank's management could not do anything and became "baby-sitters for a physical structure[.]" Parran 3/19/07 Tr. at 1065; see Parran 3/21/07 Tr. at 1384 (management was just babysitting; it could not perform any function other than make a single-family loan to a single homeowner); Jones 3/23/07 Tr. at 1858 (by no later than February 1990, the Government was in effective control of the Bank and the Bank's management had no power to control the bank); Jones 3/23/07 Tr. at 1863 (agreeing that by February, "babysitters" was an accurate description of the Bank's management); Kennedy 3/28/07 Tr. at 2329 (same); Kennedy 3/28/07 Tr. at 2364 (by February 1990 the government, not management, had effective control of the Bank) . See also DX 406 (2/27/90 letter from John E. Ryan to the First Annapolis Board of Directors and its attached Consent Agreement (subjecting Bank to restrictions on activities); Parran 3/19/07 Tr. at 1074-75 (under restrictions of letter, Bank would not sell, refinance, extend, modify, purchase, invest in, letters of credit; except for making single-family loans, the Bank's management had to now obtain permission for any growth activity); Jones 3/23/07 Tr. at 1855 ( Bank could not make large loan even if it would have been a profitable loan big enough to increase the asset base). The Government had effectively taken control of the Bank. Parran 3/19/07 Tr. at 1075-76.

56. One of the effects of the regulators imposing their control over the bank as a result of FIRREA was that it deprived management of the ability to ride out the real estate slump. Kennedy 3/28/07 Tr. at 2337. When the RTC took control of the Bank's assets, it liquidated them when the real estate market was a buyers' market. Kennedy 3/28/07 Tr. at 2338. Mr. Kennedy testified that in hindsight, the Bank, with enough capital, might have been able to ride out the real estate slump to the point where the loans turned around. Kennedy 3/28/07 Tr. at 2338. All of the real estate was sold. Kennedy 3/28/07 Tr. at 2342. Although Mr. Kennedy did not inquire as to the price at which the real estate sold, he assumed the land

values were low at the time they were sold. Kennedy 3/28/07 Tr. at 2343. It was the Government, not the Bank's management, that sold the assets. Transcript of March 29, 2007 Trial Testimony of Alan C. Shapiro ("Shapiro 3/29/07 Tr.") at 2486.

57. Mr. Parran perceived the consent agreement (DX 406) as a cease-and-desist order. Parran 3/21/07 Tr. at 1383-84. At an April 1990 Bank Board meeting attended by members of the OTS, Mr. Jones stated that not signing the Consent Agreement would not change the OTS' point of view as reflected therein. See JX 67 at Bates numbered page 1735. The terms of the consent agreement were in force as of February 1990 whether or not First Annapolis signed the consent because the Government simply directed the Bank to conform its behavior to the terms of the Consent Agreement.. Jones 3/23/07 Tr. at 1854-55.

58. Mr. Parran further explained FIRREA's impact:

> We were down to $500,000 loan limit. We couldn't increase our savings, couldn't add any branches, couldn't buy and sell loans.
>
> FIRREA said we're now going to expense you, you can't have goodwill at 25 years anymore, which came out to about 2.4 million expense a year, you have to do it over five years, so that's like 12 million a year. So you've got an additional almost $10 million hit because the contract was broken, just on that one item. ***Nobody can survive that. That's why we had a contract, that's why we had a business plan.*** The contract was based on that business plan.

Parran 3/19/07 Tr. at 1065 (emphasis added). See Parran 3/1907 Tr. at 1068 (without the 25-year straight line amortization, the Bank's annual expenses were increased by an additional $10 million creating an impossible situation).

59. FIRREA caused the Bank to be undercapitalized which triggered the imposition of the $500,000 loan limit which definitely effected the Bank because it limited the amount of large loans and their

concomitant fee and interest income. Parran 3/19/07 Tr. at 1076. See Parran 3/21/07 Tr. at 1321-25, 1359 (post-FIRREA, the Bank could loan no more than $500,000 to more than one borrower because the Bank no longer met the regulatory capital requirements); Jones 3/23/07 Tr. at 1806 (the loss of the regulatory capital forbearance caused the Bank to be out of capital compliance therefore subjecting the Bank to the $500,000 loan limit). See also Parran 3/21/07 Tr. at 1374-75 regarding DX 2467 (9/25/89 letter (at page 4) to Mr. Parran from the Bank's lawyers at advising that any loan issued after FIRREA's enactment would be limited to $500,000). The Bank instituted a policy of limiting loans to $500,000 sometime between midsummer 1989 and early September 1989. Parran 3/21/07 Tr. at 1374, 1375; JX 54 (9/25/89 Board Minutes reflecting adoption of policy to use a $500,000 loan limit).

60. Without the growth which had been predicted to come from the service corporations, First Annapolis would have to shrink its balance sheet to maintain its capital ratio. Jones 3/23/07 Tr. at 1738.

61. FIRREA prevented the Bank from managing the economic reality of its loan portfolio and from utilizing the normal process of dealing with defaulted loans (including loan work outs; placing loans in special asset categories for problem loans; attempting to collect loans that had been written off) even though First Annapolis could have done so under its forbearances. Heiden 3/21/07 Tr. at 1448; Transcript of March 22, 2007 Trial Testimony of Edward J. Heiden ("Heiden 3/22/07 Tr.") at 1533, 1534. Mr. Jones agreed that just because a loan is written of the books - even if it reflects a loss and diminution in capital - does not mean that the loan is worthless. Jones 3/23/07 Tr. at 1835-38. That a loan is written off does not mean that the Bank no longer had an interest in the real estate underlying the loan. Jones 3/23/07 Tr. at 1835-38. In his January 1990 Examination Report, however, Mr. Crompton did not value the real estate. Crompton 3/27/07 Tr. at 2005-06.

62. As summarized by Dr. Heiden, FIRREA breached the contract in the following ways: it implemented a new goodwill amortization schedule requiring a 5 year rather than a 25-year write-off life; it introduced new benchmarks replacing the interim and five-year regulatory capital requirement under which Bancorp had been operating; it imposed new ratios for tangible capital, core capital and risk-based capital which "upped the ante, were considerably more draconian than what Bancorp was operating under" pursuant to its contract with the FHLBB; and it caused the Bank to operate in an environment where the Bank could no longer manage any of its projects. Heiden 3/21/07 Tr. at 1556-57.

63. As reflected on DX 3001, "First Annapolis Regulatory Capital Ratio As of Month's End," after about six months (from September 1988 through March 1989) of increasing regulatory capital and compliance through the end of the third quarter of 1989 , there was significant drop in capital at the end of 1989. Jones 3/23/07 Tr. at 1849-51. See Kennedy 3/28/07 Tr. at 2318, 2319 (most of the losses which impacted Mr. Kennedy's report were in late 1989 or early 1990); Transcript of March 29, 2007 Trial Testimony of Alan C. Shapiro ("Shapiro 3/29/07 Tr.") at 2499 (agreeing that the magnitude of the Bank's losses increased substantially in the last quarter of 1989 and the first quarter of 1990). The most precipitous drop was in December 1989 after the FIRREA regulations became effective. Jones 3/23/07 Tr. at 1849-52.

64. Mr. Jones agreed that the most significant event for the Bank in December 1989 was the implementation of FIRREA. Jones 3/23/07 Tr. at 1852. If the Government had honored the terms of the contract, including the regulatory forbearances, First Annapolis would have been a viable entity following the conversion, as the Government had previously determined under 12 C.F.R. §563b.26, set forth in Resolution No. 88-603. PX 2 at 2.

65. The Bank's proposed post-FIRREA revised business plan (PX 36) was not approved by the Government. Parran 3/19/07 Tr. at 1067; Jones 3/23/07 Tr. at 1853. The OTS letter disapproving the plan (DX 406) stated, in part: "As mandated by FIRREA, these forbearances are no longer in effect." Mr. Jones agreed that among the reasons the OTS was unable to approve the proposed plan was that FIRREA made an approval of such a plan illegal. Jones 3/23/07 Tr. at 1854.

## VII. <u>The Viability of the Bank "But For" FIRREA</u>

66. Mr. David Cook had experience and success in turning troubled banks around prior to his tenure at First Annapolis. Mr. Cook believed First Annapolis could gain complete regulatory capital compliance within five years. Cook 3/19/07 Tr. at 960. Mr. Cook hired a new chief financial officer for the bank. Cook 3/19/07 Tr. at 964. Because Mr. Cook also wanted to establish an internal loan review function, he also hired a new banker who Mr. Cook believed was very effective in changing internal policies. Cook 3/19/07 Tr. at 964. Mr. Cook also hired a career commercial banker with whom Mr. Cook had worked for four years turning around a bank in New Jersey. Cook 3/19/07 Tr. at 964-65. That banker was retained to visit all the First Annapolis branches to put in place controls, procedures and training for the Bank's staff. Cook 3/19/07 Tr. at 964-65.

67. With Mr. Cook's prior banking experiences, the banks were on a quicker time schedule for improvement. Cook 3/19/07 Tr. at 973. First Annapolis, however, had five years due to the agreement with the Government. Cook 3/19/07 Tr. at 974. In Mr. Cook's experience:

> [F]ive years is a very long time to deal with the problems of a loan portfolio, the problems of a branch network, the problems of appropriate policies and procedures, the problems of the right mix of loan officers, the right mix of staff people. And once you put those things together in a meaningful way, then that interests investors, that interests people who invest in banks, and additional capital, in [his] view, could have been obtained.

Cook 3/19/07 Tr. at 974. See also Jones 3/23/07 Tr. at 1805 (the transaction contemplated that the Bank would have five years to bring its regulatory capital up to par). The infusion of the $13 million and the Government's commitment to give First Annapolis five years to meet its regulatory capital requirements provided a rescue plan to cure the problems First Annapolis had experienced prior to Mr. Cook's arrival. Cook 3/19/07 Tr. at 1024.

68. Mr. Cook testified that during his tenure, First Annapolis did not lose any customers, it did not lose deposits and the customers stood by the Bank. Cook 3/19/07 Tr. at 1029. Mr. Cook testified that the Bank could have survived. Cook 3/19/07 Tr. at 1029. The Bank knew that it might lose money during the first two or three years because the majority of the income was going to come in from the service corporations in the last 3, 4 or 5 years. Parran 3/20/07 Tr. at 1145; Parran 3/19/07 Tr. at 1056, 1057 (it would take about 3 to 5 years to develop the Northampton Park project). At least one of the projects, Solomons Landing, was expected to take about 7-8 years to develop. Parran 3/19/07 Tr. at 1058. In 1989, most of these projects were just getting started. Parran 3/19/07 Tr. at 1056, 1057, 1058. One of the projects, Bayside, encountered unexpected water and sewer problems that would cause a time delay of about 18 months. Parran 3/19/07 Tr. at 1059. The Bank and its regulators knew there would be peaks and valleys. Parran 3/20/07 Tr. at 1145; Jones 5/23/07 Tr. at 1815. Subsidiary income comes in only when a project is completed. Parran 3/20/07 Tr. at 1145; Jones 5/23/07 Tr. at 1815-16. A project might not result in any income for three years and then suddenly it results in millions of dollars in income. Parran 3/20/07 Tr. at 1145. See also Heiden Tr. 3/21/07 Tr. at 1507 (initially projects, by their very nature, would not earn very much and would not produce income until completion); Jones 3/23/07 Tr. at 1816 (acknowledging that it might take years before some of the service corporation projects resulted in

earnings). During the pre-FIRREA period when Bancorp was developing is business plan, the FHLBB was not concerned about the projections for the service corporation projects. Parran 3/20/07 Tr. at 1176. Mr. Parran never received any information from the FHLBB during that time indicating the FHLBB doubted the projected results of income from the subsidiary companies. Parran 3/20/07 Tr. at 1177. In fact, after the conversion, Mrs. Trump and a group of her examiners visited the Bank, reviewed each individual service corporation activity and joint venture and, in Mr. Parran's words, "blessed it." Parran 3/20/07 Tr. at 1180. They expressed no concerns. Parran 3/20/07 Tr. at 1180. Mr. Kennedy assumed that all of the projects were good projects. Kennedy 3/28/07 Tr. at 2341.

69. By the last quarter of 1988, the Bank was on track and had made a profit. Parran 3/19/07 Tr. at 1047; Parran 3/20/07 Tr. at 1202. It was the meeting of the capital benchmarks, though, not whether the Bank was profitable or unprofitable, that was important under the contract. Parran 3/20/07 Tr. at 1144. As already noted above, in June 1989 the Bank met its first capital benchmark. Parran 3/19/07 Tr. at 1064. Through the Spring and Summer of 1989, the Bank was continuing to fund its service corporation investments as it had agreed in August 1988. Parran 3/20/07 Tr. at 1125. Regulatory capital continued to increase over the next six months. Jones 3/23/07 Tr. at 1850. Mr. Parran testified that without question, the Bank absolutely would have been viable but for FIRREA. Parran 3/19/07 Tr. at 1079. Mr. Jones conceded the passage of FIRREA in August 1989 was a significant event in the Bank's viability. Jones 3/23/07 Tr. at 1839.

70. In general, there are certain financial conditions that have to be met by banks which are measured at regular time intervals, for instance, quarterly or annually. Jones 3/23/07 Tr. at 1824-26. It is common for banks to "manage their balance sheets" such that they take certain actions (e.g., buying

mortgage loans) in anticipation of one of those measurement dates to ensure that the balance sheet will meet the benchmarks being measured. Jones 3/23/07 Tr. at 1826-27, 1832. It is not illegal or improper. Jones 3/23/07 Tr. at 1832, 1833. After the benchmark is met, it is common for banks to reverse whatever action was taken to gain compliance. Jones 3/23/07 Tr. at 1827-28.

71. First Annapolis' compliance with the regulatory capital benchmarks was to be measured on specific dates and there was no term in the contract which required ongoing or increasing compliance in between periods. Parran 3/20/07 Tr. at 1224, 1225; Jones 3/23/07 Tr. at 1824. Capital could fluctuate in between benchmark dates and even though capital fell after the first benchmark was met, the Bank believed it would be able to meet the next benchmark in June 1990. Parran 3/20/07 Tr. at 1225.

72. Increasing profits is "absolutely not" the only way to meet regulatory capital compliance. Jones 3/23/07 Tr. at 1829. Another way to do it is to manage the balance sheet. Jones 3/23/07 Tr. at 1829, 1830-31.

73. The service corporation projects (for example, Bayside, White Rocks, Northapmton, and Forest Mills) were ultimately "completed and perfect." Parran 3/20/07 Tr. at 1295. Mr. Parran had actual information as to how the projects actually did over time. Parran 3/21/07 Tr. at 1360-61. <u>See also</u> Heiden Tr. 3/21/07 Tr. at 1507 (the projects were in potentially valuable locations and most have since become successful). The Government, through its trial counsel, stipulated that the real estate projects are each valuable today. 3/21/07 Tr. at 1370, 1371. The Government's attempt to isolate the viability of the projects "to a snapshot in time" was not realistic; "the realistic thing is that [Bancorp.] had a contract for five years[.]" Parran 3/20/07 Tr. at 1295. Mr. Parran testified that had Bancorp been given the full five year period, the projects would have been developed and money would have been made. Parran 3/20/07

Tr. at 1296. Mr. Parran testified that with real estate, if it is held long enough, it will not go down in value. Parran 3/20/07 Tr. at 1296.

74. It was implicit in the business plan that the Bank needed time - at least five years - to work out its real estate projects. Jones 3/23/07 Tr. at 1822-23.

75. The regulatory forbearances gave the bank the "ability to operate their loans in a way that could have given them as large an economic shot as they could get at making a profit." Heiden 3/22/07 Tr. at 1447.

76. The inclusion of goodwill in the regulatory capital calculations permitted First Annapolis to conduct its business as a viable firm and to try to make a profit. Heiden 3/22/07 Tr. at 1447.

77. As of the end of September 1989, the 13.6 million that had been invested by Bancorp at the time of the conversion had grown to 14.4 million from a regulatory capital basis. Parran 3/21/07 Tr. at 1381-82.

78. With the forbearances in place, First Annapolis had a good chance at being viable. Heiden 3/21/07 Tr. at 1477-78. Dr. Heiden testified:

> The question really is was – for purposes of economic analysis, was First Annapolis a viable firm in this period, with these forbearances? And the accounting losses, I think, have to be looked at in that context.
>
> The [FHLLB] thought that it had strong potential for viability, because it entered into a contract with them. The conservator thought that it had strong potential for viability when it indicated that there was considerable value to be had in what here is presented as a real loser but which is not a loser in the sense of having a great deal of promise in the form of very, very solid, substantial loan assets it was holding for income-producing purposes after the conversion and was holding under forbearances that let it do something with those.
>
> It had very, very strong possibilities. It had high franchise value, as I said, as the conservator said, in the form of a very stable depositor base, a very hard to enter market

> in which – submarket in which it had a very dominant – not very dominant, but a very significant position in the Anne Arundel market, a wealthy – wealthy depositors and loyal depositors, and a market that the conservator though gave it a very significant overall franchise value.

Heiden Tr. 3/21/07 Tr. at 1477-78; see also Heiden Tr. 3/21/07 Tr. at 1479-80 (numbers have to be looked at within the management plan and in a regulatory context; FHLBB entered into the agreement understanding that the Bank was a viable firm that could perform); Heiden Tr. 3/21/07 Tr. at 1480 (the FHLBB "looked at the evidence of what its portfolio was and kicked the tires of its assets, as Betsy Trump did, going around to look at these things, and had extensive discussions. The regulators thought that this was a viable firm"); Kennedy 3/28/07 Tr. at 2305 (at the time of the supervisory conversion in 1988, the government believed that after the conversion the Bank would be viable); Jones 3/23/07 Tr. at 1810 (assumed that Mrs. Trump would have gone to actually look at the service corporation projects); Parran 3/21/07 Tr. at 1360 (Mr. Parran accompanied Mrs. Trump on her visit to at least five or six of the projects).

79. The losses through then end of 1989 were relatively small and were not inconsistent with First Annapolis meeting its benchmarks. Heiden Tr. 3/21/07 Tr. at 1478-79. It was always envisioned that there would be some temporary losses. Heiden Tr. 3/21/07 Tr. at 1479.

80. To enter into the deal, the FHLBB necessarily must have concluded that the Bank was "sufficiently viable to have ta reasonable certainty of pulling off recovery, and they gave them all this supervisory time and worked with them and interacted with them to come up with a forbearance plan under the assumption that that would work and that they had the – they had the juice, the assets, to make it work." Heiden Tr. 3/21/07 Tr. at 1481. See Heiden Tr. 3/21/07 Tr. at 1482 (FHLBB must have thought

it was a very viable situation), 1507-08 ("[t]he high quality service corporation assets and the other asset picture is what convinced the [FHLBB] that this was a viable company. It had to be. That was their main asset, that and the franchise value that they had from having been a historical presence for so long, with a good record of growth and – all I'm saying is that the accounting numbers don't tell the story – don't tell the real story of viability"); Jones3/23/07 Tr. at 1802 (agreeing that the FHLBB would have concluded, as of the August 1988 conversion, that First Annapolis, with the forbearances, would have been viable); Crompton 3/27/07 Tr. at 1999 (assuming that FHLLB's approval of the plan of conversion meant the Government had concluded that the plan was viable); Kennedy 3/28/07 Tr. at 2305 (at the time of the supervisory conversion in 1988, all involved, including the Government, believed that after conversion, the Bank was viable). It was anticipated that the viability of the Bank over time would be primarily driven by profits from the service corporations. Jones 3/23/07 Tr. at 1809-10.

81. If the forbearances had remained in effect, First Annapolis would not have failed and it would have made money. Heiden Tr. 3/21/07 Tr. at 1533 (testifying to opinion within a reasonable degree of certainty).

82. The Bank and the service corporation did not disburse millions of dollars into the marina in excess of its value. Cook 3/19/07 Tr. at 999-1000. As Mr. Cook explained, there is a difference between an as-is or current value and a projected (or built-out or completed) value. Cook 3/19/07 Tr. at 999-1000.

83. The January 1990 Examination Report's determination that 35 commercial loans were at least 90 days past due is not an accurate measurement of the Bank's financial condition prior to the December 7, 1989 effective date of the implementing regulations. Parran 3/21/07 Tr. at 1318-19. As Mr. Parran

explained, the Bank was, during that time period, already operating under different regulations. Parran 3/21/07 Tr. at 1319, 1320. See also DX 2276 (11/17/89 letter from Mr. Jones to Mr. Parran regarding new regulations passed November 7, 1989 and concluding that on the date the regulations go into effect, First Annapolis will fail all three capital requirements). "The reason a majority of these loans were now delinquent 90 days is because we had stopped funding the joint ventures and loans to one borrower – loans over 500,000, a majority of those loans, because of the new regulations. So come January when this report is done, ***hello, we're in a different world.*** " Parran 3/21/07 Tr. at 1320 (emphasis added).

84. To determine whether, but for FIRREA, the Bank would have been viable, it would be appropriate to measure viability between August 1988 and, at the very latest, December 7, 1989. Jones 3/23/07 Tr. at 1802.

85. The Government never formally determined that the Bank was not viable during the period from August 1988 through December 1989. Jones 3/23/07 Tr. at 1803; Kennedy 3/28/07 Tr. at 2305-06. The Government never took any enforcement action during that period. Kennedy 3/28/07 Tr. at 2305-06.

86. Mr. Kennedy, the Government's witness, did not conduct a study to determine on which date the Bank became non-viable. Kennedy 3/28/07 Tr. at 2322. To determine such a date, it would be necessary to perform a liquidation analysis on a line-by-line basis of the assets at different points in time to determine the specific date. Kennedy 3/28/07 Tr. at 2322; see also Transcript of March 27, 2007 Trial Testimony of David Kennedy ("Kennedy 3/27/07 Tr.") at 2122-23 (testifying that in the Southmark bankruptcy case, he did undertake such a study) .

87. In preparing his report, Mr. Kennedy relied in part on post-FIRREA economic events. Kennedy 3/28/07 Tr. at 2310. When asked "[w]hat, if anything, does the fact that First Annapolis incurred

losses after FIRREA tell you about the cause of those losses, " Mr. Kennedy answered that one could not know "unless you look at the losses and see what they relate to." Kennedy 3/28/07 Tr. at 2380.

88. Mr. Kennedy conceded that it was Mr. Cook, not Mr. Kennedy, who had more information on the actual operations of what was going on in the Bank in the 1989 calendar year. Kennedy 3/28/07 Tr. at 2376.

89. Mr. Shapiro, also the Government's witness, did not make any study to determine why the Bank suffered losses in the last part of 1989 and not in the first part of 1989. Shapiro 3/29/07 Tr. at 2503, 2504-05. Mr. Shapiro did not undertake a detailed analysis to reach his conclusion that that the Bank was not viable. Shapiro 3/29/07 Tr. at 2505. He did not evaluate the market value of the assets. Shapiro 3/29/07 Tr. at 2483-85, 2494-95.

90. Mr. Shapiro's conclusions regarding loan classifications was based solely on Mr. Crompton's analysis. Shapiro 3/29/07 Tr. at 2510-11.

91. Mr. Shapiro testified that he did not "see any evidence in the record as to any impact of FIRREA," but he also testified that he could not point to any testimony by Mr. Cook or Mr. Parran (both of whom testified that FIRREA did have an impact and that it was negative) was untrue. Shapiro 3/29/07 Tr. at 2513-14. Mr. Shapiro did not attempt to correlate the fact that borrowers had stopped paying their loans with the pending legislation. Shapiro 3/29/07 Tr. at 2498-99.

**VIII. <u>RAP versus GAAP Accounting</u>**

92. First Annapolis' compliance with its contractual obligations was to be reported and measured on a regulatory accounting basis ("RAP") rather than on a Generally Accepted Accounting Practices ("GAAP") basis. Parran 3/20/07 Tr. at 1148. A GAAP statement showing a loss did not mean that there

would be an equivalent loss on a RAP statement. Parran 3/20/07 Tr. at 1148. GAAP statements reflect a grossly exaggerated loss compared to RAP accounting. Parran 3/20/07 Tr. at 1202. The GAAP statements were based on a fifteen year amortization schedule; the RAP statements were based on a twenty-five year amortization schedule. Parran 3/20/07 Tr. at 1202, 1209, 1227.

93. The thrift maintained GAAP statements in its records because it had to have GAAP statements available for its shareholders and for auditors, among others. Parran 3/20/07 Tr. at 1227. However, the thrift was not required to report to the FHLBB on a GAAP basis; it was only required to report to the Board on a RAP basis. Parran 3/20/07 Tr. at 1202-03, 1205. There are numerous differences between GAAP accounting and RAP accounting. Parran 3/20/07 Tr. at 1227. The accounting standards for the two methods of accounting are completely different. Parran 3/20/07 Tr. at 1227.

94. The Government's reliance on GAAP statements to attempt to demonstrate the losses of First Annapolis is erroneous because those statements are irrelevant to measuring the Bank's performance on a RAP basis. Parran 3/20/07 Tr. at 1209.

**IX. Damages Sustained By Bancorp**.

95.As a consequence of the breach of contract by the Government, Bancorp sustained damages in the amount of its $13,665,907 investment in First Annapolis, plus a tax gross-up to compensate Bancorp for its total loss. Daugherty 3/22/07 Tr. at 1598-99; PX 44 at 2 (Report of Edward J. Heiden, August 3, 1999); PX 45 at 2 (Report of Edward J. Heiden, October 29, 1999). Bancorp is entitled to a total damage award of $22,606,959. Daugherty 3/22/07 Tr. at 1597.

96. Mr. Shapiro, the Government's expert, testified that his opinion that the damages suffered by First Annapolis were zero was a ***guess***. Shapiro 3/29/07 Tr. at 2514-15.

97. When Plaintiff's counsel presented a hypothetical to Mr. Shapiro as to based on the "lottery ticket" hypothetical in the Mobil Oil case, Mr. Shapiro agreed that the seller of the lottery ticket should give the purchaser's money back. Shapiro 3/29/07 Tr. at 2515-18.

98. The Government acknowledged that the lost monies which the award would be compensation for would not themselves have been taxable. Transcript of March 27, 2007 Trial Testimony of Grant M. Clowery ("Clowery 3/27/07 Tr.") at 2102. However, an award of restitution damages in this case would be taxable as gross income to Bancorp and Bancorp intends to report it as such. Daughtery 3/22/07 Tr. at 1597, 1622, 1623, 1633-34. As Mr. Daugherty explained, a damage award would not be a recovery of capital because the investment has been changed by the dissolution of First Annapolis. Daugherty 3/22/07 Tr. at 1622. The appropriate rate of a tax gross-up to compensate Bancorp for restitution or reliance damages would be in the minimum amount of 39.55%. Daughtery 3/22/07 Tr. at 1597-98. Mr. Clowery, the Defendant's witness, did not offer an opinion regarding Mr. Daugherty's tax gross-up rates or calculations. Clowery 3/27/07 Tr. at 2060.

99. Section 61 of the tax code provides that taxable income is all income, without regard to the source of the income. Clowery 3/27/07 Tr. at 2075-76.

100. Bancorp's tax returns indicate that it incurred its $58,714,667 in net operating loss ("NOL") in the tax year ending December 31, 1990. Clowery 3/27/07 Tr. at 2079, 2093-94, 2095-96, 2106. Bancorp took the claim that resulted in the NOL as a deduction on its 1990 tax return. Clowery 3/27/07 Tr. at 2106. Clowery testified that he has no basis to challenge the propriety of Bancorp's tax return. Clowery 3/27/07 Tr. at 2097.

101. Bancorp was advised that its loss carry overs were only available for 15 years and Bancorp would not claim them now. Daugherty 3/22/07 Tr. at 1632.

102. An NOL that was incurred in 1990 that has a useful life of 15 years would expire in 2005 and could not be used to offset income received in a year after 2005. Clowery 3/27/07 Tr. at 2080-81.

103. Clowery conceded that he is not aware of any revenue ruling tor treatise or tax court opinion that supports his opinion that the 20 year rather than the 15 year time frame is applicable here. Clowery 3/27/07 Tr. at 2101.

**X. <u>Procedural Status of the Defendant's Defenses</u>**

104. On August 10, 1994, Bancorp filed its Complaint herein, alleging claims for breach of contract, violation of law, breach of implied-in-fact contract, promissory estoppel, failure of consideration and Fifth Amendment taking.

105. To date, the Government has not filed an answer to the Complaint.

106. To date, the Government has never alleged any affirmative defenses to the claim for compensatory damages by Bancorp, including any affirmative defense for a set-off.

107. To date, the Government has not filed any Counterclaim against Bancorp in this case.

108. On the same day that the discovery deadline expired, August 5, 1999, Plaintiff filed its Motion for Entry of Partial Summary Judgment on Damages. Plaintiff sought a ruling by the Court that it was entitled as a matter of law to recover the amount of its investment in First Annapolis in the amount of $13,665,907.

109. The Government did not file an opposition to Plaintiff's Motion. Instead, on August 31, 1999, the Government filed a Motion to Stay Briefing on Plaintiff's Motion for Entry of Partial Summary Judgment on Damages. In that Motion, the Government requested that "this Court stay Defendant's briefing requirements until both a decision on liability is rendered and after the Defendant has the opportunity to depose Mr. Heiden regarding his final expert report." Defendant's Motion to Stay Briefing on Plaintiff's Motion for Entry of Partial Summary Judgment on Damages, filed August 31, 1999, at 3. To date, the Government has never filed an opposition to Plaintiff's Motion for Entry of Partial Summary Judgment on Damages.

110. On December 27, 2006, at the joint meeting of counsel pursuant to paragraph 13 of Appendix A of the Rules of this Court, the Government disclosed, for the first time, that its defense to the claim by Bancorp for restitution or reliance damages is that an award of such damages would constitute a "windfall" to Bancorp.

**SUMMARY OF LEGAL ARGUMENT**

As discussed below, the proper analytical paradigm applicable to this case is really quite simple: (1) Did FIRREA constitute a "total breach" of its contract with Bancorp? (2) If it did, what amount of restitution has Bancorp demonstrated with reasonable certainty that it is entitled to? (3) Has the Government established with reasonable certainty that there should be an offset to that amount based on the value of any benefit retained by First Annapolis so as not to confer a windfall on Bancorp? Applying this analysis to the above facts would result in a finding that FIRREA constituted a total breach of contract; that Bancorp has demonstrated it is entitled to restitution in the amount of $22,606,959; and that the Government has not proven that there should be any offset.

By contrast, the legal framework which the Government urges, as articulated in its pre-trial filings and during its arguments at trial, seeks to impose on the analysis inapplicable legal doctrines having to do with the viability of First Annapolis. Some of the confusion which results from the Government's analysis is the imprecise discussion having to do with "windfall." Windfall may arise in Winstar cases (indeed, in any contract case) in two ways - (1) the windfall that is comprised of a value the Government proves with reasonable certainty was conferred on a plaintiff and should be offset from a restitution award and (2) windfall resulting from an award of reliance damages where the Government has proven with reasonable certainty that venture would have failed. Because Bancorp did not retain any benefit of the contract, the Government cannot demonstrate the first category of windfall. Because Bancorp seeks only restitution and not reliance damages, the notion of windfall in the second category has no relevance to the legal analysis in this case. However, even if the Court were to entertain consideration of the concept of the second category of windfall, the facts demonstrate that the Government has failed to demonstrate a windfall. Accordingly, even using the Government's analysis, Bancorp is still entitled to restitution in the amount of $22,606,959 and there should be no offsets.

## ARGUMENT

### I. PLAINTIFF IS ENTITLED TO $22,606,959 IN RESTITUTION

#### A. FIRREA Constituted a Total Breach of the Government's Agreement With Bancorp.

Where there is a total breach of contract, the injured party is entitled to his money back, without regard to whether or not the contract would ultimately have proven beneficial. Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 608 (2000). A "'total breach' is a breach that

'so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance.'" Mobil Oil, 530 U.S. at 608 (quoting Restatement (Second) of Contracts, §373 (1979)). See Amber Resources v. United States, 68 Fed. Cl. 535, 548 (2005) ("Amber I") ("[t]o constitute a total breach, the government must have substantially impaired the value of the leases); Admiral Financial Corp. v. United States, 378 F.3d 1336, 1344-45 (Fed. Cir. 2004) (citing Mobil Oil to describe "total breach" as one which so "substantially impairs" the value of the contract at the time of breach that it is just to allow the injured party to recover); Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1309, 1312 (Fed.Cir.2004) ( quoting the Restatement (Second) of Contracts §243(4), definition of "total breach" as one that "'so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance").[2] In other words, the breach "'must be of a relatively high degree of importance.'" Hansen Bancorp., 367 F.3d at 1312 (quoting George E. Palmer, The Law of Restitution, §4.5 (1978)).[3] "[C]ausation is not an element of restitution" because "restitution is available only if the breaching party's

---

[2] Because the concept of "total breach" focuses on the impairment of the value of the contract at the time of breach, there may be a total breach even if the defendant has rendered some performance. "In finding a material breach, the court is mindful that ' . . . it is not a requirement of 'total breach' that the defendant have failed to render ***any part*** of the promised contractual performance; such a misinterpretation of the expression 'total breach' would seriously distort the meaning of the present Section.'" Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271, 309 (2005) (emphasis in original) (quoting Restatement (Third) of Restitution and Unjust Enrichment, §37 (Tentative Draft No. 3, 2004)).

[3] The Hansen Court also describes "total" breach in terms of the "materiality" of the breach, 367 F.3d at 1313, as does the Southwest Court. 63 Fed. Cl. at 194-95.

conduct amounts to a *total* breach of its contractual duties." Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1305 (Fed.Cir.2004).

In Mobil Oil, the plaintiffs sought restitution of their initial payments to the government. Mobil Oil, 530 U.S. at 623. The Court found a total breach:

> We find that the oil companies gave the United States $156 million in return for a contractual promise to follow the terms of pre-existing statutes and regulations. The new statute prevented the Government from keeping that promise. The breach "substantially impair[ed] the value of the contract[s].' [citations omitted]. And therefore the Government must give the companies their money back.

Mobil Oil, 530 U.S. at 624 (brackets in original). Similarly, the Amber I Court also found a total breach. "The new procedures and standards imposed on the grant of lease suspensions by §307(c)(1) did [substantially impair the value of the leases] by increasing the lessees' procedural burden, halting what had been ongoing exploration and development, and increasing the risk of lease termination." Amber Resources v. United States, 68 Fed. Cl. at 548. In Amber, the fact that upon the commitment of the breach the lessees were immediately deprived of the previously granted suspensions was a factor in finding total breach. 68 Fed. Cl. at 548-49.

Here, the trial evidence overwhelmingly demonstrated that FIRREA constituted a total breach of the Government's contract with Bancorp. The three regulatory forbearances were, as Dr. Heiden testified, the "heart and soul" of the Bank's operations. Heiden 3/21/07 Tr. at 1430, 1558. In fact, as both the Plaintiff's and the Defendant's witnesses testified, there was no other consideration given by the Government. Kennedy 3/28/07 Tr. at 2330; Parran 3/19/07 Tr. at 1044, 1045 Compare Hughes v. United States, 71 Fed. Cl. 284, 292 (2006) ("[t]he material, substantial and primary consideration (indeed a condition precedent) was the long-term amortization of supervisory goodwill"). Messrs. Parran, Jones

and Kennedy all testified that FIRREA completely took away all of the forebearances. Jones 3/23/07 Tr. at 1805-06 (FIRREA took away each and every forbearance); Parran 3/19/07 Tr. at 1046 (FIRREA took away all of the forbearances; the Bank did not "keep one item, not a hint of one item"); Kennedy 3/28/07 Tr. at 2330 (as a result of FIRREA, the government took away all of the forbearances). As Mr. Parran testified, the Bank did not "keep one item, not a hint of one item." Parran 3/19/07 Tr. at 1046. Accordingly, the Plaintiff has proven a total breach of contract.

**B. The Government's Total Breach Cases- *Admiral* and *Southwest* - are Distinguishable**

At trial, the Government contended that the instant case is factually similar to both Admiral and Southwest. As the discussion below reflects, there are significant factual differences between Admiral and Southwest on the one hand, and the instant case, on the other. The overriding difference is that in both Admiral and Southwest, the thrifts had not only come under the Government's radar as troubled institutions long before there was any announcement that FIRREA would be enacted, but the Government had also taken affirmative action - by way of examinations, inspections, and formal conclusions (by way of a notice of default and safety and soundness rating of 4 in the case of Admiral, and by way of a "Troubled" institution designation and safety and soundness rating of 5 in the case of Southwest) - over a several year period ***prior*** to the enactment of FIRREA. By the third quarter of 1989, the Government had already undertaken enough formal examinations to conclude, and had already documented those conclusions, that the efforts to save Old Haven (the thrift in Admiral) and First Louisiana (the thrift in Southwest) through the supervisory conversions and the protections of the forbearances had failed. In the instant case, by contrast, there were no such examinations or contemporaneous documents evidencing any conclusion that

the supervisory conversion of First Annapolis was failing. The only thing the Government has its litigation contrived conclusions twenty years later.

### 1. ***Admiral* is factually distinguishable**.

At trial, the Government contended that the Federal Circuit's opinion in Admiral Financial Corp. v. United States, 378 F.3d 1336 (Fed. Cir. 2004) should control because, according to the Government, the facts of Admiral are similar to the facts in the instant case. Closing Argument of Richard Evans, 3/29/07 Tr. at 2584-2585, 2613. The Government's conclusions regarding any factual similarity between Admiral and the instant case are indefensible. As detailed below, after conversion, Old Haven Federal Savings & Loan Association ("Haven"), the thrift in Admiral, unlike First Annapolis, failed to meet even its first regulatory capital benchmark, was formally in default, and was unable to even pay the full consideration due under its contract.

One of the terms in Admiral's approved business plan was that it liquidate its real estate holdings according to a schedule; the liquidation proceeds were to constitute the bulk of Admiral's consideration.[4] Admiral Financial Corp. V. United States, 54 Fed. Cl. 247, 251 (2002). Haven was out of regulatory compliance by the first quarter of 1989[5] because the proceeds from the sale of its properties were "far

---

[4] By contrast, Bancorp's consideration was in the form of cash and there is no dispute that the entire amount was, in fact, invested in First Annapolis.

[5] "As early as December 1988, ***well before any real estate had to be sold, and before FIRREA was even proposed*** by the newly-elected President, the bank examiner in charge of the Admiral-Old Haven transaction concluded that the bank was already running operational deficits, and would continue to do so in the future. After two early sales, the total regulatory capital value of the contributed real estate had decreased to approximately $5 million as of December 31, 1988. [record citation omitted]. The sales resulted in only 5 percent of the total value of contributed real estate." Admiral, 57 Fed. Cl. at 434 (Emphasis added).

short of the appraised value that had been previously accepted by the FHLBB in calculating the new institution's regulatory capital." Admiral, 54 Fed. Cl. at 252.[6] See Admiral Financial Corp. v. United States, 329 F.3d 1372, 1376 (Fed. Cir. 2003) ("From its inception, however, Haven lost money and fell out of capital compliance on March 31, 1989, causing Admiral to be in default on its obligations under the RCMA"). As Judge Baskir noted in his July 2003 opinion:

> Because the contributed assets were made up largely of Admiral's real estate holdings, the Government insisted that those properties be liquidated on a timely basis so their capital value could be realized and be used to fund the thrift. Admiral was soon confronted with two very sharp horns of a dilemma: sell the real estate at a loss and face a capital shortfall; or hold onto the properties, maintaining the appraised value for regulatory capital requirements, but risk running up against the deadlines for liquidating the contributed assets. Walking this tight-rope proved too challenging for Admiral. It soon found its investment in a downward spiral in 1989, a period which also saw the passage of FIRREA in August, and which ended in the Fall with the formal seizure of the failed Haven.

57 Fed. Cl. 418, 421 (2003). Under the terms of its agreement with the Government, Admiral was required to cause Haven to sell 37.5 percent of its real estate by March 31, 1989 and at least 12.5 percent each succeeding quarter so that all the property would be liquidated within two years of the approval of the conversion. 57 Fed. Cl. at 425. A cure notice was sent to Admiral in April 1989 which was withdrawn and sent out again on July 17, 1989. Admiral, 54 Fed. Cl. at 252. By the close of the next regulatory compliance period, September 30, 1989, Haven was still out of regulatory compliance. Admiral, 54 Fed. Cl. at 252. Haven's losses continued in the last calendar quarter of 1989 and "[i]t could not meet its minimum capital ***even with the now repealed practice*** of including supervisory goodwill in its

---

[6] "[T]he entire business operation rested on the Plaintiff's ability to convert the real estate into cash at something near the assigned values or better. The contract set forth definite time lines for this conversion, and the success of the bank was conditioned - but not guaranteed - on the Plaintiff's ability to effect this." 57 Fed. Cl. at 422.

calculation." Admiral, 54 Fed. Cl. at 252. See Admiral, 57 Fed. Cl. at 435 ("we are persuaded by the plethora of evidence showing that the thrift was in such dire straits that it was failing under pre-FIRREA capital requirements . . . . Had all its goodwill been counted toward its regulatory capital, Haven would still have been insolvent"). Although Admiral met its deadlines for the timing of the sales of its real estate, the real estate was sold far below the real estate valuations on which its approved business plan was based, with a negative impact on capital resulting in Haven's failure to meet its minimum regulatory capital requirement. 57 Fed. Cl. at 425.[7] Under its RCMA, Admiral had 90 days after the close of the quarter in which it was non-compliant within which to make up any shortfall. 57 Fed. Cl. at 426. If it did not make up the shortfall, it would be in default. 57 Fed. Cl. at 426. Haven lost $500,000 in each of the first two quarters following the June 1988 merger. 57 Fed. Cl. at 426. By February 1989, Admiral was already projecting "quarterly losses for the next three years and a regulatory capital deficiency - including goodwill - of $3.5 million. These projections did not even consider inevitable losses resulting from the sale of real estate at lower values than the appraisals. [record citation omitted]. Repeatedly, bank examinations uncovered the flaws built into Admiral's business plan . . . ." 57 Fed. Cl. at 427. In Admiral, there was ongoing supervisory oversight after the conversion and the supervisory agents were concluding that Haven continued to be unstable. See 57 Fed Cl. at 428 (Haven received a 4 (with a 5 being the worst) rating for safety and soundness both in December 1988 and March 31, 1989; an April 1989 examination report concluded Admiral was not operating Haven in accordance with the business plan; the FSLIC supervisory agent met with Haven's principals in April 1989 to discuss the 4-rating and the continuing worsening

---

[7] Unlike the present case, Haven's regulatory capital benchmarks were quarterly benchmarks. 57 Fed. Cl. at 426.

conditions including lack of tangible capital and capital deficiency and the fact that after 40% of the properties had been liquidated, only 6% of the projected equity had been realized). At the April 1989 meeting, one of Haven's principals stated that Admiral did not have the "'financial wherewithal to capitalize Haven.'" 57 Fed. Cl. at 428. As described by Judge Baskir, the April meeting was a "wake-up call" at which the supervisory agent was telling the parties that their investment was in jeopardy and the points made at that meeting were "repeated in the weeks and months heading up to August as Haven's condition worsened." 57 Fed. Cl.at 429. In May 1989, the Haven's CFO's cover letter accompanying Haven's revised business plan stated that "'significant changes in the interest rate environment have not only created a dramatic adverse effect upon our anticipated operations, but also our ability to sell the contributed property at values that were based upon a lower interest and mortgage rate environment. It is also apparent to us that we will have no alternative but to raise additional capital or be merged in the near future . . . and any additional capital will necessarily be supplied from other sources.'" 57 Fed. Cl. at 429 (quoting CFO's Mary 22, 1989 letter to supervisory agent) (italics omitted). By June 30, the regulatory shortfall from the quarter ended March 31, 1989 had not been made up and Admiral was in default (although the formal letter of default was not sent until July). 57 Fed. Cl. at 430.

There are significant differences between the foregoing scenario and what transpired at First Annapolis after conversion. First, as noted, *supra* at n.4, Bancorp fully paid its $13,665,907 in cash consideration when it invested that amount in First Annapolis. Admiral, by contrast, failed to fully pay its consideration because of the failure of the shortfall in the proceeds from the liquidation of the real estate holdings. Second, while Haven failed to meet its first (and subsequent) regulatory capital benchmarks, First Annapolis did meet its benchmark. Parran 3/19/07 Tr. at 1064; Parran 3/20/07 Tr. at 1144, 1225;

Heiden 3/21/07 Tr. at 1478-79; Jones 3/23/07 Tr. at 1823-24, 1850; Kennedy 3/28/07 Tr. at 2307. Third, Haven received a formal default notice from the Government. Although the Regulatory Capital Maintenance/Dividend Agreement entered into by Bancorp ("RCMDA") , like the agreement in Admiral, also contained a notice of default and ninety day cure provision (PX 7 at §V), the provision was never invoked by the Government.[8] Fourth, in Admiral, unlike here, there were ongoing supervisory examinations prior to FIRREA and those examinations were uncovering ongoing problems. Fifth, in Admiral, there was evidence that by February 1989, even before the announcement of the pending FIRREA legislation was made, Haven was already failing. By contrast, First Annapolis, met its first capital benchmark. Parran 3/19/07 Tr. at 1064; Parran 3/20/07 Tr. at 1144, 1225; Heiden 3/21/07 Tr. at 1478-79; Jones 3/23/07 Tr. at 1823-24, 1850; Kennedy 3/28/07 Tr. at 2307. Thus, the factual differences between Admiral and the instant case could not be more striking.

The Government's post-hoc trial conclusions that First Annapolis was failing before FIRREA are in marked contrast to the contemporaneous activities of Haven's supervisory agents who in 1988 were making examinations, discovering instabilities, and advising Admiral of its findings and directing actions - all before the enactment of FIRREA and certainly long before trial. By contrast, here, the FHLBB's March 27, 1989 (following up its December 28, 1988 letter which in turn referenced the July 1988 examination) to the First Annapolis Board of Directors reflects ongoing communication and cooperation - not dire findings or even predictions of a failing bank. DX 302. In pertinent part, the letter states: "We

---

[8] The default provision in Bancorp's RCMDA is written in mandatory terms: "If the FSLIC ***shall*** determine that a Default has occurred, it ***shall*** give notice of such Default to [Bancorp]." PX 7 at §V.1. Because the FSLIC never sent Bancorp such a notice, the FSLIC necessarily never determined that a Default had occurred.

encourage and support efforts to enhance the capital base . . . Please keep us apprised of [plans to do so] . . . Please keep us apprised of all aspects of the service corporation activity . . . We feel the [March 15, 1989] meeting proved mutually beneficial and we look forward to a continuing cooperative relationship in the examination and supervision of your institution." Even the first special supervisory examination of First Annapolis took place in January 1990, after the enactment of both FIRREA and its implementing regulations and the only other complaints by the Government regarding First Annapolis' performance are the ones that have been lodged in this litigation, almost twenty years after the conversion. As Dr. Heiden testified:

> [T] report of the conservator[9] in the initial proceedings of receivership, in the initial rounds of it, that talked about the franchise value of First Annapolis in its current condition, which was then the condition of being a complete wreck in terms of the ratio of liabilities to assets and net losses.
>
> And it addressed the issue of what the assets of the branches were at that time. And I found it very interesting that it raised the concept that – of franchise value, that these assets, even amidst all of the red ink that was – that had drowned, that caused FIRREA to shut down – or the ink that they poured that caused them to shut down the operation, that even in the midst of all that, this conservator was talking about the value that an economist recognizes as a very, very important component of a firm's value, namely, its franchise value, the value it has as an established entity to do business.

Heiden 3/21/07 Tr. at 1458-59 (footnote added). Thus, while the Government had already documented the demise of Haven well before the threat of FIRREA was even on the horizon, the conservator appointed for First Annapolis found that even after FIRREA, First Annapolis had retained its franchise value.

Although the facts in Admiral are easily distinguishable, the legal analysis of Admiral is actually in conformance with, and relies on, the reasoning of Mobil Oil. See Admiral, 378 F.3d at 1344-45 (citing

---

[9] Dr. Heiden was referencing DX2378, the July 27, 1990 Conservatorship Operating Plan.

Mobil Oil to describe "total breach" as one which so "substantially impairs" the value of the contract at the time of breach that it is just to allow the injured party to recover).[10] The Federal Circuit in Admiral, again citing Mobil Oil, states that in "the event of such a breach, the non-breaching party is entitled to restitution whether the contract 'would, or would not, ultimately have proved financially beneficial' to the non-breaching party." 378 F.3d at 1345. Because of the particular facts of Admiral, the Circuit Court determined that given Haven's already pre-FIRREA deteriorated condition, FIRREA itself did not "substantially impair [ ] the value" of the contract to Admiral at the time of the breach. 378 F.3d at 1345. Essentially, the Court determined that by the time FIRREA was enacted in August 1989, there was no contract value left to impair because Haven was already, demonstrably, failing. The Bancorp contract, by contrast, did still have value in August 1989.

**2. *Southwest* is factually distinguishable.**

The other case which the Government contends should guide the Court's deliberations is Southwest Investment Company, Inc. v. United States, 63 Fed. Cl. 182 (2004), aff'd, 158 Fed.Appx. (Fed. Cir. 2005) , cert. denied, 126 S. Ct. 2321 (2006) . In Southwest, the merger was approved by the FHLBB in July 1985. 63 Fed. Cl. at 185. Although the merged institution showed a profit in 1985, there was a disasterous economic downturn in the community in 1986. 63 Fed. Cl. at 185-86. Between 1986 and 1989, the financial condition of the bank deteriorated, reaching losses of over $9 million in 1988. 63 Fed. Cl. at 186. The FHLBB conducted examinations in February 1986 (63 Fed. Cl. at 186), January 1987 (63 Fed. Cl. at 186-87), October 1987 (63 Fed. Cl. at 187-88), and January 1989. The reports

---

[10] Similarly, Judge Baskir discussed "total breach" in terms of the materiality of the breach. Admiral, 57 Fed. Cl. at 432 .

of each of these examinations documented the deteriorating condition of the bank. On October 7, 1988, the bank was deemed to be a "Troubled Institution" by the FHLB and was directed to file a capital restoration plan. 63 Fed. Cl. at 189. The plan was submitted in February 1989 and stated that the bank "had accumulated almost $11 million in losses and conceded it was 'nearing insolvency' ***notwithstanding the merger forbearances*** *[.]"* 63 Fed. Cl. at 189. The bank attributed its losses to the declining local and national economies (including, specifically, plummeting oil prices). 63 Fed. Cl. at 189. A month later, in March 1989, outside auditors expressed "'substantial doubt about First Louisiana's ability to continue as a going concern.'" 63 Fed. Cl. at 190. The auditors determined that the bank was insolvent on both a regulatory accounting basis and on a GAAP basis. 63 Fed. Cl. at 190-91, 196. The June 5, 1989 Report of Examination assigned the institution a rating of 5, meaning that it was "in imminent danger of failure and needing immediate correction, with regulatory action necessary." 63 Fed. Cl. at 191, 196. On November 1, 1989, the bank was finally seized "for reasons that existed from early 1989, if not earlier, and which had nothing to do with the changes being wrought by the new statute." 63 Fed. Cl. at 194.

The facts of Southwest are more closely aligned with those of Admiral than they are of the instant case.[11] Unlike First Annapolis but like Haven (the thrift in Admiral), First Louisiana was in dire straights well before the proposed FIRREA legislation was even announced. Southwest, 63 Fed. Cl. at 196 ("First Louisiana never had a profitable year after 1985, which was profitable only due to the sales of Union's best loans). First Louisiana, like Haven (but again, unlike First Annapolis) had been the subject, prior to the

[11] As Judge Baskir observed in his opinion in Southwest, "[b]oth Admiral and First Louisiana experienced financial difficulties from early on. . . .A review of the facts relied upon in Admiral III illustrates just how similar the situation of the two institutions was at the time of FIRREA's enactment." 63 Fed. Cl. at 196.

Spring of 1989, of numerous supervisory examinations. The examinations revealed evidence of a downward spiral of the bank's financial condition over a three year period preceding the enactment of FIRREA. Unlike First Annapolis, which never received a notice of default or a safety and soundness enforcement action, First Louisiana, almost one full year before FIRREA's enactment, was declared to be a "Troubled" institution.

The Southwest Court, like Admiral, adopted Mobil Oil's definition of "total breach" as being the a substantial impairment of the value of the contract. 63 Fed. Cl. at 195. Also like the Admiral decision, the Southwest Court determined that FIRREA did not constitute a total breach because at the time of breach, "the promises [that First Louisiana could operate in accordance with the forbearances] were worth nothing because First Louisiana was already insolvent, having a negative net worth ***even giving full effect to the Union promises*** ." 63 Fed. Cl. at 195, 196.[12] As already discussed, at the time of FIRREA, the forbearances granted to Bancorp still had value. Accordingly, the breach, which took away those forbearances and thereby substantially impaired the value of the agreement, was total.

### C. Bancorp Is Entitled to $22,606,959 in Restitution

Because Plaintiff has proven total breach of contract, it need prove nothing else except for the amount of damages its seeks - it need not prove causation. "[C]ausation is not an element of restitution" because "restitution is available only if the breaching party's conduct amounts to a *total* breach of its contractual duties." Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1305 (Fed.Cir.2004).

[12] Therefore, although recognizing that money-back restitution is an appropriate remedy for total breach, 63 Fed. Cl. at 194, no such damages would be awarded because the Government's breach was not total. Id.

Hansen, quoting the Restatement (Second) of Contracts §243(4), defines "total breach" as one that "'so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance.'" 367 F.3d at 1309, 1312. In other words, the breach "'must be of a relatively high degree of importance.'" 367 F.3d at 1312 (quoting George E. Palmer, The Law of Restitution, §4.5 (1978)).[13] Restitution restores the injured party to the position it would have been in had there never been a contract. 367 F.3d at 1309 (citing Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001)). The Hansen Court agreed with the Court of Claims that reimbursement via restitution of an initial cash contribution is an appropriate remedy. 367 F.3d at 1317 n. 14.

**1. Bancorp is entitled to recover its $13, 665,907 investment.**

Because the Government committed a total breach of the contract, Bancorp is entitled to a return of its initial investment of $13,665,907 without regard to whether or not the contract would ultimately have proven beneficial. Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. at 608. In Mobil Oil, the Court found that because the government's total breach of the contracts amounted to a repudiation, the "law entitle[d] the [plaintiffs] to that restitution whether the contracts would, or would not, ultimately have produced a financial gain or lead them to obtain a definite right to explore." Mobil Oil, 530 U.S. at 623-24. Analogizing the Government's action to a lottery retailer's failure to deliver a purchased ticket, the Court wrote:

[13] The Hansen Court also describes "total" breach in terms of the "materiality" of the breach. 367 F.3d at 1313.

> If a lottery operator fails to deliver a purchased ticket, the purchaser can get his money back - whether or not he eventually would have won the lottery. And if one party to a contract, whether oil company or ordinary citizen, advances the other party money, principles of restitution normally require the latter, upon repudiation, to refund the money.

Mobil Oil, 530 U.S. at 624 (citing Restatement (Second) Contracts at §373). Here, too, it does not matter whether or not First Annapolis would have ultimately have been a profitable institution. Bancorp purchased regulatory forbearances for a five year term and when the Government failed to give Bancorp the opportunity to operate under the protection of those forbearances for the full five years, Bancorp became entitled to its money back.[14]

There are two Amber Resources decisions (Amber I and Amber Resources Co. v. U.S., 73 Fed.Cl. 738, 745 (Fed.Cl.,2006) ("Amber II")[15]) which both discuss Mobil Oil. It was the Amber I

---

[14] That Bancorp bargained for a five-year window is an important consideration to evaluating FIRREA's substantial impairment of the value of the contract. As noted by the Court in Caroline Hunt, "[i]n analyzing the materiality of breach and the issue of whether the breach harmed [plaintiff], it must be noted that a ten-year plan was envisioned, and the capital credit would be a credit for the full ten years. Ten years was provided to transform the consolidated failed thrifts into a profitable financial institution. The forbearance letter granted several ten-year restraints. . . . This ten-year term was important to [plaintiff]." Caroline Hunt I, 65 Fed. Cl. at 302-03. Similarly, in Hughes v. United States, 71 Fed. Cl. 284, 308 (2006), the Court observed:

> [I]f the importance of the government's contractual forbearance did not dissipate due to economic downturn and other conditions preventing the thrift from selling or developing its real estate assets during economic downturns, the forbearance remains material and substantial. Indeed, to the extent a regulatory capital cushion would buy time, that cushion could become more important as economic strictures tighten.

Here, too, the importance of the five-year term to Bancorp is well - established. See e.g., Heiden 3/21/07 Tr. at 1431-32; Heiden 3/22/07 Tr. at 1447; Cook 3/19/07 Tr. at 960, 974-75, 1024; Parran Tr. at 3/19/07 Tr. at 1065; Jones 3/23/07 Tr. at 1805; Kennedy 3/28/07 Tr. at 2338.

[15] Amber Resources is on appeal. According to the information available on Westlaw, the Government's brief has been filed in that case but not the plaintiffs.

Court that awarded the plaintiffs their "money-back" restitution damages. The Court granted the plaintiffs' motion for partial summary judgment on damages, awarding the plaintiff $1.1 billion in damages as restitution for the bonus payments the plaintiffs had paid for the leases. 68 Fed. Cl. at 560. It was in Amber Resources Co. v. U.S., 73 Fed.Cl. 738 (Fed.Cl.,2006) ("Amber II) that the Court addressed additional restitution damages. The Amber II Court, like Mobil Oil, found immaterial any inquiry to how the injured party may have ultimately fared had the contract been fully performed. "[A]s Professor Kull explains, rescission is not concerned with inquiries into the profitability of the now-cancelled contract. [citation omitted]. The possibility that the injured party may benefit from the breach by being spared performance of a losing contract is accepted and immaterial." Amber II, 73 Fed. Cl. at 745. The Court stated further: "It is our view that in a rescission context, the government has no standing to make a 'windfall' argument.[16] Unlike the reliance remedy, rescission leaves room for the possibility that the injured party will benefit from the breach. ***In this case, one of the two parties will be left with the windfall. In our view there is no reason it should be the party in breach***." Amber II, 73 Fed.Cl. at 747 (emphasis added) (footnote added). [17] Thus, contrary to the Government's arguments at trial, whether or

[16] Plaintiff submits that the Amber Resources Court's use of the term "windfall" refers to windfall in the sense of the windfall that a party seeking reliance damages might obtain if the venture would have ultimately failed.

[17] At trial, the Court commented that "the facts of Amber are different. The facts – you know, Amber, there was no performance at all, so it was easy to apply." 3/30/07 Tr. at 2549. Plaintiff's counsel responded "[A]nd I concede that much difference, I suppose." It appears that both the Court and Plaintiff's counsel mis-remembered the facts of Amber. There was performance in Amber, by both the plaintiffs and the defendants; in fact, the performance spanned a number of years. 68 Fed. Cl. at 540 (one of the leases at issue was formed in 1968; all others were formed between 1979 and 1984). In Amber, at various periods through 1999, various regulatory approvals were sought and obtained for lease suspensions. 68 Fed. Cl. at 541. "Performance" in Amber was not just actual drilling for oil some day; it encompassed the lease suspension process as well. Thus, although the applicability of

not First Annapolis may ultimately have succeed is irrelevant to determining whether Bancorp is entitled to restitution.

**2. The Plaintiff is entitled to a tax gross-up on the award.**

In addition to an award equal to Bancorp's initial investment of $13,665,907, an additional amount should be awarded for a tax gross-up (such that the total award would be $22,606,959). The restitution award should be adjusted to reflect the tax consequences of the award. Home Savings of America v. United States, 399 F.3d 1341, 1356 (Fed. Cir. 2005) ("The Court of Federal Claims properly adjusted the damages award to reflect tax consequences . . . We adopt the rule of other courts that a tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable"). Mr. Clowery, the Government's expert, acknowledged that the transaction by which Bancorp invested the $13,665,907 in First Annapolis was not taxable. Clowery 3/2907 Tr. at 2102. However, because, a litigation damage award returning that $13,665, 907 would be taxed as gross income of Bancorp (Daughtery 3/22/07 Tr. at 1597, 1622, 1623, 1633-34), the award should be adjusted by a "tax gross-up." Home Savings, 399 F.3d at 1356.

As the Government's expert, Mr. Clowery, acknowledged, Section 61 of the tax code provides that taxable income is "all income," without regard to the source of the income. Clowery 3/27/07 Tr. at 2075-76. Mr. Daugherty, in his capacity as the President of Bancorp, has determined that a damage award to Bancorp as a result of this litigation would be fully taxable. Daugherty 3/22/07 Tr. at 1596-97,

---

Amber would not be any less even had there been no performance, the perceived factual difference (as it relates to performance) does not, as it turns out, exist.

1622-23. As Mr. Daugherty explained, a damage award would not be a recovery of capital because the investment has been changed by the dissolution of First Annapolis. Daugherty 3/22/07 Tr. at 1622. Mr. Daugherty also testified that his conclusion in this regard has been confirmed by the advice he received from his tax advisers. Daughtery 3/22/07 Tr. at 1597, 1623. Mr. Daugherty intends to report any award on Bancorp's tax returns as income, in conformance with the conclusions he reached and the advice he received from his tax consultants. Daughtery 3/22/07 Tr. at 1597, 1622, 1623, 1633-34.

Mr. Clowery offers no support for his contrary opinion that a damage award would constitute a return of capital and would not, there fore, be taxable. Clowery 3/27/07 Tr. at 2076. He acknowledged that the tax code is not the functional equivalent of GAAP. Clowery 3/27/07 Tr. at 2075. Moreover, his expert opinion on the taxability of damages (DX 2479; Clowery 3/27/07 Tr. at 2058-61) ignored the impact of the tax benefit rule. As he admitted on cross-examination, if a taxpayer takes a deduction in one year due to a loss, and in a subsequent year receives compensation for that loss, the compensation is taxable as income in the year received. 3/27/07 Tr. at 2098-99, 2105-06.

There is no net operating loss carry forward to apply against the $13,665,907 to reduce the amount on which the tax gross-up calculation would be based. The losses which Bancorp incurred in 1990 could be carried forward for only 15 years. 28 U.S.C. §172(b)(1). The change from 15 years to 20 years which was made by the Taxpayer Relief Act of 1997, Pub. L. 105-34, sec. 1082(a)(1), applied only to net operating losses incurred in taxable years beginning after August 5, 1997. Kilburg v. C. I. R., T.C. Summ. Op. 2004-36, 2004 WL 565952 (2004); Green v. C.I.R., T.C. Memo. 2003-244, 2003 WL 21940722 , 86 T.C.M. (CCH) 273 (2003). In both Kilburg and Green, the loss was incurred in a year prior to August 5, 1997 and could be carried forward only 15 years. Mr. Clowery admitted that the CCH Tax

Guide provides that NOLs which arose in a tax year prior to August 6, 1997 can be carried forward only 15 years. Clowery 3/27/07 Tr. at 2086, 2089. Indeed,

Clowery conceded that he is not aware of any revenue ruling tor treatise or tax court opinion that supports his opinion of that the 20 year rather than the 15 year time frame is applicable here. Clowery 3/27/07 Tr. at 2101. Thus, here too, because the loss was incurred in a year prior to August 5, 1997, the loss may be carried forward only 15 years. Daugherty 3/22/07 Tr. at 1632; Clowery 3/27/07 Tr. at 2080-81. Thus, there is no net operating loss carry over available to offset a damages award in this case.

The appropriate rate of the tax gross-up to compensate Bancorp for the restitution award would be in the minimum amount of 39.55%. Daughtery 3/22/07 Tr. at 1597-98. Mr. Clowery, the Defendant's witness, did not offer an opinion regarding Mr. Daugherty's tax gross-up rates or calculations. Clowery 3/27/07 Tr. at 2060.

**3. The Government has failed to prove that there should be an offset to Plaintiff's award.**

A restitution award may be offset by benefits already received from the defendant. Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1315 (Fed.Cir.2004). Otherwise, the award may result in an "unfair windfall" to the non-breaching party. 367 F.3d at 1315. In this case, however, the Government has not demonstrated that such an offset is required. Accordingly, Plaintiff is entitled to an award of the entire amount it seeks.

It is the government's burden to prove with reasonable certainty the quantum of benefit retained by the plaintiff despite the government's breach. Caroline Hunt Trust v. United States, 470 F.3d 1044, 1052 (2006) (Caroline II). It is not the plaintiff's burden to disprove the government's claimed offset.

Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 769 (Fed. Cir. 1987 (cited by Caroline Hunt, 470 F.3d at 1052). The Caroline II Court affirmed the trial court's conclusion that the government bore the burden of proving the offset.

The Government argued in Caroline I, like it did at trial here (see Opening Statements, 3/19/07 Tr. at 931-32), that there can be no restitution because it is impossible to "unscramble the egg." Caroline I, 65 Fed. Cl. at 314. In essence, the Government asks the Court to deny Plaintiff all relief because it is too difficult for the Government - the breaching party - to value the benefits allegedly retained by Plaintiff and therefore a restitution award would constitute a windfall. Plaintiff requests this Court to reject this argument as soundly as the Caroline I Court did:

> Related to the foregoing defenses, the government also complains that the transactions cannot be unwound; therefore [plaintiff] would receive a windfall if awarded damages without having to return the millions in assistance the government paid to its subsidiary. In many *Winstar* cases, the transaction simply cannot be unwound. *Restatement (Third) of Restitution and Unjust Enrichment* §37 cmt. e. (Tentative Draft No. 3, 2004) discusses mutuality of rescission generally:
>
> > "a plaintiff seeking to be restored to the status quo ante must likewise restore to the defendant whatever the plaintiff has received int the transaction." *Landmark Land Co. v. FDIC*, 256 F.3d 1365, 1372 (Fed. Cir. 2001) (stating that the value of benefits received by the nonbreaching party are an offset to the value of benefits received by the government.). *See Am. Sav. Bank* , 62 Fed. Cl. at 19. However, when defendant's performance cannot be unwound ***due to no fault of the plaintiff: "[t]o preserve the availability of the remedy in a proper case, and to avoid hardship to the plaintiff, the requirement of counter-restitution by the plaintiff may be relaxed.*** *See* §51, Comment ___. The result in the context of breach of contract is usually that a plaintiff may be entitled to recover a prepaid price without deduction for incidental and nonreturnable benefits. See Illustrations 11 and 12. *Id*. at cmt. e."

> Here, the government benefitted by avoiding liquidation costs and depletion of the overburdened FSLIC fund. On the other hand, the benefits conferred by the government, assistance payments, yield maintenance and loss coverage, did not result in any tangible payment or delivery of assets to CHTE. SSA was benefited, but it is no more. In short, there is nothing for CHTE to give back.

Caroline I, 65 Fed. Cl. at 313.

Here, too, there is no offsetting benefit because there is no consideration that was retained by Bancorp which is available to give back. As the court explained in Hughes, in rejecting the Government's request that any restitution be offset by "benefits" the Government asserted it had conferred on the plaintiff:

> Finally, the "benefits" cited by the government – even assuming the benefits as suggested – were not established as appropriate offsets to recovery. Consideration is bargained for and received from the other contracting party at the time of contract formation – not derived from subsequent favorable results inherent in that bargain. The thrift's business decision to pay off the debts on the contributed properties may have resulted in a "benefit" to Hughes or the Holding Company, but payment was neither bargained for nor required. Rather debt payment was a collateral consequence of the transaction. Accordingly, as *Hansen Bancorp* informs, to the extent Hughes and/or the Holding Company benefitted from the thrift's payment of debt on the property or from interest payments on the debentures, those benefits were neither received from the government nor paid as a requirement of the contract and are not benefits to be deducted from the return of agreed-upon value of contributions awarded here. *Hansen Bancorp.* , 367 F.3d at 1316-17.

Hughes, 71 Fed. Cl. 284,306 (2006). The Federal Circuit, using a similar analysis, reached the same conclusion in Westfed Holdings , Inc. v. United States, 407 F.3d 1352, 1370 (Fed. Cir. 2005). Holding that the Government bore the burden, as the breaching party to prove with reasonable certainty the amount of any offsetting loss that the injured party would have sustained if the contract had been performed, the Court stated:

> The government articulates no persuasive rationale, much less cites any legal authority, for its assertion that it is the aggrieved party, not the breaching party, that "bears the burden of proving the value ... of [the breaching party's] undisputed performance." If the government wanted an offset, ***it was the government's burden to prove with reasonable certainty the quantum of***

> ***benefit retained by Westfed*** despite the government's breach. According to the government, "Westfed received the benefit of the use of the Government's **assistance payments** for its own purposes during the five-year period that Westfed owned and operated Western." In particular, the government highlights the assistance payments and other reimbursements it made to New Western. The government provides no analysis, however, of how its expenditures translate into any retained quantifiable benefit by Westfed. Instead, the government relies on largely conclusory claims that its entire expenditure should be effectively treated as a benefit retained by Westfed. The government ignores the fact that it put most of its money into New Western, which it eventually seized from Westfed, and that it prevented Westfed from reaping any dividends from New Western during most of the period that Westfed held New Western. Stripped of New Western and the opportunity for benefits that Westfed hoped to achieve under the agreed upon RCMA, the government cannot, based on the evidence and arguments presented, claim its breach on the whole was harmless. ***We find no clear error in the trial court's factual determination that the government failed to sustain its burden in showing that any offset from the damage award is appropriate.***

407 F.3d at 1370-71 (emphasis added).

The Government has failed to identify or prove the amount of any benefit still retained by Bancorp as a result of the contract. Indeed, the benefits conferred on Bancorp prior to breach - the forbearances - were already taken back by the government long ago when FIRREA was enacted.[18]

## III. EVEN ASSUMING THAT THE BANK'S VIABILITY IS RELEVANT, THE GOVERNMENT HAS NOT SUSTAINED ITS BURDEN OF PROOF ON VIABILITY

The Government wrongly analyzes the outcome of this case as being dependent on predicting whether or not First Annapolis ultimately would have failed, even if FIRREA had never been passed. The reason this is the wrong analysis is that such an argument has no relevance where a Plaintiff seeks pure

[18] The Hughes Court also observed that the forbearances "were of value ***only if the thrift was open*** . Regulatory capital was the 'gateway.' The elimination of that 'gateway' eviscerated the other forbearances. [footnote omitted]. Remove the goodwill forbearance from the bundle of forbearances and there is no bundle at all." 71 Fed. Cl. at 307 (emphasis in original).

restitution (as opposed, for instance, to reliance or expectancy damages).[19] Not only is this the wrong analysis, the Government also would have Plaintiff shoulder the burden of proving that it would have succeeded, rather than having the Government bear the burden of proving it would have failed. Even if the Court accepts the Government's legal framework rather than the Plaintiff's, the Plaintiff submits that the outcome would be the same - an award of restitution in Plaintiff's favor in the amount $22,609,959.

### A. The Burden of Proof is the Defendant's And It Has Failed to Meet It

If the Bank's ultimate viability were an issue, it would be the Government's burden as the breaching party, to prove with ***reasonable certainty*** the amount of loss Bancorp, as the injured party, would have suffered had the contract been performed. American Capital Corp. v. U.S., 65 Fed. Cl. 241, 248-49, 252 (2005). In American Capital, the government failed to sustain its burden to "establish with reasonable certainty that [the $15 million amortization losses in fiscal year 1991] would have been incurred by Transohio Savings irrespective of the breach." 65 Fed. Cl. at 251. The bank in American Capital had incurred $13 million in losses in the first half of fiscal 1992 but it could not be determined with reasonable certainty the cause of those losses. 65 Fed. Cl. at 252. The Court explained: "Because Transohio Savings in effect was subject to the control of the regulators by that time, the court determined [in its earlier decision at 63 Fed. Cl. at 711-12] that the particular facts and circumstances of this case made it exceedingly

[19] There is an important analytical difference between the issues of (1) whether a thrift *was actually* failing and the government had determined it was failing (as in Admiral and Southwest) and (2) whether a thrift *might have* ultimately failed sometime *after* August 1989 even if FIRREA had not been enacted. The first issue is relevant to determining whether, for restitution purposes, total breach has occurred because it looks to whether at the time of breach the forbearances still had value. The second issue is relevant only for the purpose of establishing whether a damage award based on reliance would constitute a windfall or whether a lost profits award would be speculative. Because Plaintiff does not seek such damages here, the inquiry (the second issue) is irrelevant.

difficult to ascertain the cause of the 1992 losses with any degree of reasonable certainty. [citation omitted]. Indeed, the Government admitted as much at the post hearing argument as did the Government's expert." 65 Fed. Cl. at 252.

The Federal Circuit did not disturb this allocation of burden. In American Capital Corp. v. U.S., 472 F.3d 859, 867 (2006) (reh'g and reh'g en banc den., 2007) the Court adopted the position in Restatement (Second) Contracts §349 that the injured party is entitled to damages, including expenditures in performance, "'less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.'" Where, because of the breach, it was not possible to determine what the bank's gains or losses might have been absent the breach, the government was liable for the plaintiff's $42.2 million investment. 472 F.3d at 868. It is not the plaintiff's burden to prove that its expenditures would not have been lost in spite of the breach. 472 F.3d at 869. The Court explained the burden shifting as follows:

> Essentially, the injured party may not be able to prove with reasonable certainty what it would have made if the contract was performed; however, it may be able to prove what expenditures it made relying on the contract. Here, [plaintiff] demonstrated that its $42.2 million loss in reliance on the contract was foreseeable. ***At that point, we shift the burden to the breaching party*** and allow it to prove what expenditures would have been lost despite the breach. If the government can show with reasonable certainty that [the plaintiff] would have lost the $42.4 million regardless of its breach, then [the plaintiff] could not recover.

472 F.3d at 869 (emphasis added).

At best, the Government has offered evidence that First Annapolis continued to have some operational difficulties near the time of conversion. For instance, the Government relied at trial on DX 267, the December 28, 1988 transmittal of the regular report of examination made ***as of July 11, 1988 - prior***

***to the August 13, 1988 conversion*** . Although the transmittal letter is dated December 28, 1988, the criticisms noted in the letter are not as of December 1988; they are as of the July 1988 - the date of the examination. See DX 267. Such evidence, however, does not demonstrate that First Annapolis would have failed even had FIRREA never been enacted. The letter does not ***require*** the Bank to take any specific action; it made suggestions. The letter also does not make a "Troubled" institution designation or advise that the Bank was in default. At best the letter is a snapshot of the Bank's progress one month after conversion. The Government's strategy in this case is not unlike what the Government did in Hughes and the Plaintiff submits that the strategy is no more convincing here than it was in that case. The Hughes Court found little value in the Government's attempt to nit-pick the thrift's performance as a predictor of "what might have been" had FIRREA not been enacted:

> To be sure, the government has pointed out a myriad of other problems and criticisms of the thrift. True, new El Paso's first year performance was not as projected; true, the amount of supervisory goodwill increased . . . from . . .the original application [by approximately $25 million]. This $25 million increase reduced [its] earnings . ... . [Its] actual losses [also] exceeded those projected. The federal subsidy on [one real estate project] was lost; the project abandoned, resulting in a one-time loss of $2.6 million. A rise in interest rates led to lower than anticipated sales of real estate owned. Real estate values fell even further. However, as recognized in the Business Plan, neither immediate profits nor a sudden turn-around were expected or planned. Time was necessary for the economy to strengthen and real estate prices to return. Regulatory capital was the recognized cushion from which continued losses could be absorbed until the economy improved.

71 Fed. Cl. at 313-14.

A critical fault of the evidence the Government relies on to show that the Bank would have failed is its reliance on the Bank's GAAP financial statement. As explained in the Findings of Fact, the Bank's performance must be evaluated under RAP, not GAAP because the thrift was not required to report to the

FHLBB on a GAAP basis; it was only required to report to the Board on a RAP basis. Parran 3/20/07 Tr. at 1148, 1202-03, 1205. Because GAAP statements reflect a grossly exaggerated loss compared to RAP accounting, a GAAP statement showing a loss did not mean that there would be an equivalent loss on a RAP statement. Parran 3/20/07 Tr. at 1148, 1202. The GAAP statements were based on a fifteen year amortization schedule; the RAP statements were based on a twenty-five year amortization schedule. Parran 3/20/07 Tr. at 1202, 1209, 1227. The Government's reliance on GAAP statements to attempt to demonstrate the losses of First Annapolis is erroneous because those statements are irrelevant to measuring the Bank's performance on a RAP basis. Parran 3/20/07 Tr. at 1209. The Government's arguments based on GAAP accounting must fail. Similarly, a conclusion of failure based on a "paper" loss ignores the economic realities of a bank's operations, as even Mr. Jones testified. Mr. Jones agreed that just because a loan is written of the books - even if it reflects a loss and diminution in capital - does not mean that the loan is worthless. Jones 3/23/07 Tr. at 1835-38. That a loan is written off does not mean that the Bank no longer had an interest in the real estate underlying the loan. Jones 3/23/07 Tr. at 1835-38. In American Capital Corp. v. U.S., 65 Fed. Cl. 241, 248-49, 251-52 (2005), the Court noted the significance of the difference between an accounting entry loss and an actual economic out-of-pocket loss. The American Capital court quoted the following testimony of plaintiff's expert: "'[w]hen you book a loan loss . . . you are not giving up anything economically. You are making an accounting entry. And when you foreclose on that loan or rehabilitate or whatever you do and convert it to cash, you always get to conform your final accounting to the economic realization.'" 65 Fed. Cl. at 249. The Court noted that certain losses were "not actual economic out-of -pocket losses, but accounting entries." 65 Fed. Cl. at 251.

Another critical error in the Government's offer of proof on viability is that to the extent the

Government relies on post-FIRREA data (e.g., the January 1990 Examination Report), the Government's witnesses wholly failed to back-out the FIRREA factor.[20] It is no answer for the witnesses to simply testify that FIRREA had no impact on the data or conclusions.[21] In particular the testimony of Mr. Kennedy, Dr. Shapiro and Mr. Crompton reveals that they undertook no study of the cause of the losses and made no causation analysis regarding ultimate failure and FIRREA. Kennedy 3/28/07 Tr. at 2310, 2322, 2380; Shapiro 3/29/07 Tr. at 2483-85, 2494-95, 2498-99, 2503, 2504-05, 2513-14; Jones 3/23/07 Tr. at 1846-47 (Mr. Crompton's January 1990 examination report probably evaluated the Bank on a post-FIRREA basis); Crompton 3/27/07 Tr. at 2004-05, 2006-07.[22] As reflected on DX 3001, "First Annapolis Regulatory Capital Ratio As of Month's End," after about six months (from September 1988 through March 1989) of increasing regulatory capital and compliance through the end of the third quarter

[20] Even before FIRREA's enactment, the Bank began to change its policies anticipating the enactment and implementation of FIRREA. For example, the Bank instituted a policy of limiting loans to $500,000 sometime between midsummer 1989 and early September 1989. Parran 3/21/07 Tr. at 1374, 1375; JX 54 (9/25/89 Board Minutes reflecting adoption of policy to use a $500,000 loan limit). See also Parran 3/21/07 Tr. at 1374-75 regarding DX 2467 (9/25/89 letter (at page 4) to Mr. Parran from the Bank's lawyers at advising that any loan issued after FIRREA's enactment would be limited to $500,000).

[21] This very approach (and also based Mr. Kennedy's testimony) was rejected by the Hughes court. "Moreover, Kennedy's opinion was based on the assumption that the growth and other operational restrictions following FIRREA had no impact on New El Paso, an assumption that the court rejects. While the immediate impact of FIRREA was the elimination of goodwill, the secondary consequences of capital deficiency were severely restricting). 71 Fed. Cl. at 313.

[22] Moreover, the Government cannot sustain its burden by relying on operations of First Annapolis which are unrelated to the contract. LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1373 (Fed. Cir. 2003) ("The general rule is as articulated by Justice Holmes, that unrelated events and remote consequences do not reduce the liability of the wrongdoer for the losses caused by the wrong") (citing Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531 (1918)); 1 *Dobbs Law of Remedies* , § 3.8 (2) (2d ed. 1993) ("One effect of a market damages measurement then is to ignore later events, whether they are favorable to the plaintiff or unfavorable").

of 1989 , there was significant drop in capital at the end of 1989. Jones 3/23/07 Tr. at 1849-51. See Kennedy 3/28/07 Tr. at 2318, 2319 (most of the losses which impacted Mr. Kennedy's report were in late 1989 or early 1990); Shapiro 3/29/07 Tr. at 2499 (agreeing that the magnitude of the Bank's losses increased substantially in the last quarter of 1989 and the first quarter of 1990). The most precipitous drop was in December 1989 after the FIRREA regulations became effective. Jones 3/23/07 Tr. at 1849-52. Mr. Jones agreed that the most significant event for the Bank in December 1989 was the implementation of FIRREA. Jones 3/23/07 Tr. at 1852.

Thus, assuming *arguendo* that the Bank's viability is an issue, the Government has not sustained is burden in demonstrating that the Bank was not viable and would have failed even absent FIRREA.

**B. Even If It Was the Plaintiff's Burden To Demonstrate Viability, It Did So**

As already discussed, the Bank's viability post-August 1989 in a FIRREA-free world is not even an issue in this case. Even if it were an issue, the case law is clear that it would be the Government's burden to demonstrate non-viability. However, even if the Court were to place on Plaintiff the burden of proving that the Bank would have been viable, the Plaintiff's evidence was sufficient.

The viability analysis has to start with FHLBB Resolution No. 88-603 itself in which the Government made a specific finding that First Annapolis would be viable. PX 2 at 2. Mr. Kennedy testified that at the time of the conversion, all involved, including the government, would have believed that the Bank was viable. Kennedy 3/28/07 Tr. at 2305. Mr. Cook, who had had previous experience with turning around other banks, testified that, especially with the five-year time schedule to which the Government had agreed, First Annapolis wold gain complete regulatory compliance. Cook 3/19/07 Tr. at 960. The evidence demonstrates that as the Bank began to operate under the protection of the

regulatory forbearances, success was likely. Mr. Parran testified unequivocally that the Bank would have survived, but for FIRREA. Parran 3/19/07 Tr. at 1064, 1079, 1125; Parran 3/20/07 Tr. at 1296. Mr. Jones testified that the passage of FIRREA was a significant event in the Bank's viability. Jones 3/23/07 Tr. at 1839. The Bank met its first capital benchmark in June 1989 ( Parran 3/19/07 Tr. at 1064; Parran 3/20/07 Tr. at 1144, 1225; Heiden 3/21/07 Tr. at 1478-79; Jones 3/23/07 Tr. at 1823-24, 1850; Kennedy 3/28/07 Tr. at 2307)) and as of the end of September 1989 the 13.6 million dollar initial investment had grown to $14.4 million. Parran 3/21/07 Tr. at 381-82. Dr. Heiden testified that even after FIRREA, First Annapolis retained its franchise value in the community. Heiden Tr. 3/21/07 Tr. at 1477-78. The evidence also demonstrated that the service projects ultimately did succeed. Parran 3/20/07 Tr. at 1295. Mr. Parran had actual information as to how the projects actually did over time. Parran 3/21/07 Tr. at 1360-61. See also Heiden Tr. 3/21/07 Tr. at 1507 (the projects were in potentially valuable locations and most have since become successful). The Government, through its trial counsel, stipulated that the real estate projects are each valuable today. 3/21/07 Tr. at 1370, 1371. One of the effects of the regulators imposing their control over the bank as a result of FIRREA was that it deprived management of the ability to ride out the real estate slump. Kennedy 3/28/07 Tr. at 2337. When the RTC took control of the Bank's assets, it liquidated the assets when the real estate market was a buyers' market. Kennedy 3/28/07 Tr. at 2338. Mr. Kennedy testified that in hindsight, the Bank, with enough capital, might have been able to ride out the real estate slump to the point where the loans turned around. Kennedy 3/28/07 Tr. at 2338.

## CONCLUSION

For all the foregoing reasons, the Plaintiff respectfully requests the Court to find in its favor and to award it damages in the amount of $22,606,959.

June 4, 2007

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
& KARAS, L.L.P.

s/Dale A. Cooter
Dale A. Cooter
James E. Tompert
5301 Wisconsin Avenue, NW
Suite 500
Washington, DC 20015
Tel: (202)537-0700
Facsimile: (202)364-3664
*Attorneys for Plaintiff*
*First Annapolis Bancorp, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of June 2007, a copy of the foregoing PLAINTIFF'S PROPOSED POST-TRIAL CONTENTIONS OF FACT AND LAW REGARDING DAMAGES was filed electronically pursuant to the Electronic Case Filing procedures of the United States Court of Federal Claims, with service by Notice of Electronic Filing to the designated attorneys and parties of record.

s/Dale A. Cooter
Dale A. Cooter