**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No.94-522C**
**(Judge Williams)**

---

**FIRST ANNAPOLIS BANCORP, INC.**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

---

# DEFENDANT'S INITIAL POST-TRIAL BRIEF

---

**MICHAEL HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Assistant Director**

**TIMOTHY J. ABRAHAM**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 616-0477**
**Fax: (202) 353-7988**

**Attorneys for Defendant**

**Of Counsel:**

**SCOTT AUSTIN**
**MELINDA HART**
**MARK PITTMAN**
**DELISA M. SANCHEZ**

**Trial Attorneys**

**June 4, 2007**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... iv

INTRODUCTION .......... 1

STATEMENT OF FACTS .......... 2

I. The Voluntary Supervisory Conversion .......... 2

II. The July 1988 Report Of Examination Revealed Supervisory Concerns And Risks To First Annapolis's Viability .......... 5

III. First Annapolis's Profitability, And Thus Its Viability, Depended Upon Its Ability To Convert The Projected Service Corporation Profits Into Actual Profits And Stable Economic Conditions .......... 6

IV. Contrary To Its Business Plan Projections, First Annapolis Lost Money, And As A Result, Its Viability Became Threatened .......... 8

V. First Annapolis's Regulatory Capital Decline Threatened The Thrift's Viability .......... 11

VI. First Annapolis's Poor Asset Quality Threatened The Thrift's Viability .......... 13

A. First Annapolis's Delinquent Loans And Real Estate Owned Increased Rapidly In 1989 .......... 13

B. First Annapolis's Asset Classification Policy .......... 14

C. First Annapolis's Criticized And Classified Assets Increased Rapidly In 1989 .......... 15

VII. First Annapolis Overstated Its Reported Regulatory Capital, And As A Result, Masked The Fact It Was No Longer Viable As Of The Third Quarter Of 1989 .......... 16

A. First Annapolis Had The Responsibility To Maintain Adequate Reserves .......... 16

B. First Annapolis Failed To Recognize Losses for Specific Assets Which Overstated Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

1. First Annapolis Failed To Recognize A $3,234,056 Loss On Bayside Marina Loans . . . . . . . . . . . . . . . . 18

2. First Annapolis Failed To Recognize A $947,822 Loss On Loans To The Dennis Blaeuer Entities . . . . . . . . . . . . . 20

3. First Annapolis Ignored A $1,479,051 Loss On Loans Involving The Northampton Office Park . . . . . . . . . . . . . 22

C. First Annapolis Misclassified And Under Classified Assets Resulting In Inadequate General Loan Loss Reserves And Overstated Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VIII. First Annapolis Continued To Operate With The Forbearances Until 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IX. First Annapolis's Failure Cost The Government Millions Of Dollars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

I. Bancorp Has Failed To Prove That It Is Entitled To Restitution . . . . . . . . . . . . . 27

A. Bancorp Failed To Prove A Total Breach . . . . . . . . . . . . . . . . . . . . . . . 27

1. First Annapolis Was Not Viable At The Time Of Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

a. The Court Must Examine First Annapolis's Viability On Or After December 7, 1989 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

b. First Annapolis Would Have Failed Absent The Breach . . . . . . . . . . . . . . . . . . . . . . . 32

i. First Annapolis Was Never Profitable . . . . . . . . . 32

ii. First Annapolis Had Severe Asset Quality Problems . . . . . . . . . . . . . . . . . . . . 34

iii. First Annapolis Reported Inadequate Regulatory Capital . . . . . . . . . . . . . . . . . . . . . . . . 36

iv. First Annapolis Overstated Its Regulatory Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

v. First Annapolis Could Not Have Raised Capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

vi. The Loss Of The Forbearances Did Not Harm Bancorp . . . . . . . . . . . . . . . . . . . . . . . . 40

B. Restitution Is Not Proper Because The Parties Cannot Be Returned To The Status Quo Ante . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

1. Bancorp Did Not Confer $13.6 Million On The Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

2. The Government Partially Performed The Contract . . . . . . . . . . 44

3. Bancorp Altered First Annapolis's Condition . . . . . . . . . . . . . . . 45

C. Awarding Bancorp Full Restitution Would Provide An Improper Windfall . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

II. Bancorp Is Not Entitled To A Tax "Gross-Up" Of Any Award . . . . . . . . . . . . . 48

A. Bancorp Failed To Prove The Taxability Of Any Potential Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

B. Bancorp's Available Net Operating Loss Carryforwards Shield Bancorp From Taxation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

C. A Tax "Gross-Up" Is Barred As A Matter Of Law . . . . . . . . . . . . . . . . . 52

D. Any Tax "Gross-Up" Here Would Constitute An Improper Windfall . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

Admiral Fin. Corp. v. United States,
378 F.3d 1336 (Fed. Cir. 2004) ........ passim

Admiral Fin. Corp. v. United States,
57 Fed. Cl. 418 (2003) ........ 30, 40

Admiral Fin. Corp. v. United States,
54 Fed. Cl. 247 (2002) ........ 29

Bluebonnet Sav. Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed. Cir. 2001) ........ 52

California Fed. Bank v. United States,
395 F.3d 1263 (Fed. Cir. 2005) ........ 53

Canfield v. Reynolds,
631 F.2d 169 (2d Cir. 1980) ........ 48

Carabetta Enters., Inc. v. United States,
482 F.3d 1360 (Fed Cir. 2007) ........ 49

Coast Fed. Bank, FSB v. United States,
49 Fed. Cl. 53 (2001) ........ 30

Exxon Corp. v. United States,
45 Fed. Cl. 581 (1999) ........ 32

First Annapolis Bancorp, Inc. v. United States,
75 Fed. Cl. 263 (2007) ........ passim

First Annapolis Bancorp, Inc. v. United States,
75 Fed. Cl. 280 (2007) ........ 37

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) ........ 41

Hansen Bancorp, Inc. v. United States,
67 Fed. Cl. 411 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28, 30

Hansen Bancorp, Inc. v. United States,
367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Hansen Bancorp, Inc. v. United States,
53 Fed. Cl. 92 (2002) rev'd on other grounds, 367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . 28, 29, 42

Help At Home, Inc. v. Medical Capital, L.L.C.,
260 F.3d 748 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Hi-Shear Tech. Corp. v. United States,
356 F.3d 1372 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Home Sav. of Am., FSB v. United States,
399 F.3d 1341 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Hort v. Comm'r of Internal Revenue,
313 U.S. 28 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

LaSalle Talman Bank, F.S.B. v. United States,
462 F.3d 1331 (Fed. Cir 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

LaSalle Talman Bank, F.S.B. v. United States,
45 Fed. Cl. 64 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

Library of Congress v. Shaw,
478 U.S. 310 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston,
666 F.2d 673 (1st Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Mobil Oil Exploration & Producing Southeast, Inc. v. United States,
530 U.S. 604 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Murrey v. United States,
73 F.3d 1448 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

Plaintiffs in Winstar-Related Cases v. United States,
37 Fed. Cl. 174 (1997) . . . . . . . . . . 31

Raytheon Prod. Corp. v. Comm'r,
144 F.2d 110 (1st Cir. 1944) . . . . . . . . . . 50

Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.,
272 F.3d 1335 (Fed. Cir. 2001) . . . . . . . . . . 31

Shore v. United States,
9 F.3d 1524 (Fed. Cir. 1993) . . . . . . . . . . 53

Southwest Inv. Co. v. United States,
63 Fed. Cl. 182 (2004) . . . . . . . . . . passim

Stone Forest Indus., Inc. v. United States,
973 F.2d 1548 (Fed. Cir. 1992) . . . . . . . . . . 45

United States v. Gotcher,
401 F.2d 118 (5th Cir. 1968) . . . . . . . . . . 50

**STATUTES AND REGULATIONS**

12 C.F.R. § 561.13 . . . . . . . . . . 4

12 C.F.R. Part 563b.26(b)(2) . . . . . . . . . . 3

12 C.F.R. § 567.9(a) . . . . . . . . . . 26

12 U.S.C. § 1464(t)(2)(B) . . . . . . . . . . 26

12 U.S.C. § 1464(t)(9)(c) . . . . . . . . . . 26

19 U.S.C. § 61 . . . . . . . . . . 50

26 U.S.C. § 118(a) . . . . . . . . . . 49, 50

26 U.S.C. § 172(b)(1)(A) . . . . . . . . . . 52

26 U.S.C. § 6103 . . . . . . . . . . 53

28 U.S.C. § 1491(a)(1) . . . . . . . . . . 52

28 U.S.C. §§ 2412(a), (d) . . . . . 52

54 Fed. Reg. 46,845 (11/8/89) . . . . . 32

Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") of 1989,
Pub. L. No. 101-73, 103 Stat. 183 . . . . . 26

Outer Banks Protection Act ("OBPA"),
Pub. L 101-380, 104 Stat. 555 (1990) . . . . . 41

Rev. Ruling 81-277 . . . . . 50, 51

## MISCELLANEOUS

3 Dan B. Dobbs, Law of Remedies, § 12.7(5) (2d. ed. 1993) . . . . . 48

5 A. Corbin, Corbin on Contracts § 1104 (1964) . . . . . 28

Black's Law Dictionary 208 (6th ed. 1990) . . . . . 49

Black's Law Dictionary 1313 (6th ed. 1990) . . . . . 51

Restatement (Second) of Contracts § 241 cmt. d. . . . . . 45

Restatement (Second) of Contracts § 243 . . . . . 28, 29

Restatement (Second) of Contracts § 243(4) . . . . . 44

Restatement (Second) of Contracts § 370 . . . . . 42

Restatement (Second) of Contracts § 373 (1981) . . . . . 27, 41, 42

Restatement (Second) of Contracts § 384(1)(a) . . . . . 45

Restatement (Second) of Contracts § 384, cmt. a (1981) . . . . . 41, 46

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FIRST ANNAPOLIS BANCORP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 94-522C |
| v. | ) | (Judge Williams) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S INITIAL POST-TRIAL BRIEF**

Pursuant to this Court's Order of March 30, 2007, defendant, the United States of America, respectfully submits our initial post-trial brief.

**INTRODUCTION**

After a two-week trial, Plaintiff First Annapolis Bancorp, Inc. ("Bancorp" or "plaintiff") failed to prove facts sufficient to show that it is entitled to (1) restitution of its initial investment of $13.6 million in First Annapolis, or (2) a tax gross-up of that award. First, Bancorp failed to prove that the Government's breach was total. The breach was not total because, even absent the breach, First Annapolis would have failed given its inability to be profitable, its overstated capital position, its declining asset quality and deteriorating economic conditions. Second, a restitution award would not return the parties to the status quo ante, which is the fundamental purpose of such an award, because the Government never received the $13.6 million that Bancorp now seeks; the Government partially performed the contract; and Bancorp substantially altered First Annapolis's condition. Third, awarding Bancorp $13.6 million would result in a windfall because First Annapolis lost the $13.6 million before the breach.

Bancorp is also not entitled to a tax gross-up of any award of restitution because Bancorp failed to prove with reasonable certainty that any award would be taxable upon receipt. Even if

such an award was taxable, Bancorp's net operating losses would shield it from taxation. Moreover, plaintiff's tax gross-up claim is beyond the Court's authority, and would constitute a windfall for Bancorp. Consequently, as Bancorp's tax gross-up claim is counterfactual and contrary to applicable authority, it also must be denied.

## STATEMENT OF FACTS[1]

### I. The Voluntary Supervisory Conversion

First Federal Savings and Loan Association of Annapolis ("First Federal") was a federally-chartered mutual savings and loan association doing business in Maryland. JX 89 at 0064. First Federal had reported net losses from September 30, 1981, to March 31, 1988. JX 89 at 0070. By March 31, 1988, First Federal had a $68 million deficit in retained earnings. JX 89 at 0070. As a result of these losses, First Federal planned to raise capital by converting to a federally-chartered stock savings bank, called First Annapolis Savings Bank, F.S.B. ("First Annapolis"), through a voluntary supervisory conversion. JX 89.

In November 1987, Bancorp applied to the Federal Home Loan Bank Board ("FHLBB") to become a savings and loan holding company and to acquire First Annapolis in connection with the thrift's voluntary supervisory conversion. JX 83; JX 89 at 0064, 0078. Bancorp was to use the conversion proceeds to purchase all of First Annapolis's stock. JX 89 at 0064.

On July 21, 1988, the FHLBB issued resolutions 88-602 and 88-603 approving the

---

[1] Throughout the brief, we cite numerous exhibits, some of which were admitted during the earlier 2006 trial regarding prior material breach. The Court should reject Bancorp's contention that exhibits admitted during the earlier trial may not be relied upon for the purposes of this trial. The previously admitted exhibits, like those admitted during the recent trial, are part of the record. Because the Court only admitted demonstratives for illustrative purposes, we cite them only to assist the Court.

conversion of First Annapolis and Bancorp's subsequent acquisition. JX 93; JX 94; PX 1; PX 2. The conversion approval was, in part, conditioned upon Bancorp's infusion of capital of the greater of (1) $11 million or (2) an amount sufficient to raise First Annapolis's net worth to 1 percent of total liabilities under Generally Accepted Accounted Practices (GAAP). JX 94; See 12 C.F.R. Part 563b.26(b)(2).

In its resolutions, the FHLBB approved First Federal's Plan of Conversion, which contained a business plan dated October 1987. JX 134. This October 1987 Business Plan set forth First Federal's capital benchmark requirements for the first 3 years after its conversion at 1.8 percent, 2.1 percent, and 2.4 percent of liabilities, respectively. JX 134 at 0521.

Bancorp ultimately purchased all of First Annapolis's stock for a $13,665,907 capital investment. DX 397 at 0156. On July 21, 1988, the FHLBB sent a letter ("Forbearance Letter") to First Annapolis outlining the regulatory forbearances granted in connection with the conversion. These were (1) the ability to amortize supervisory goodwill for 25 years, and (2) the ability to invest in service corporations up to the regulatory limit allowed for capital-compliant institutions for up to five years. PX 3.

On August 5, 1988, the FHLBB responded to an inquiry from First Federal's outside counsel regarding First Federal's post-conversion regulatory capital obligations pursuant to the approved business plan. JX 94 at 0984. The FHLBB informed First Federal that "it [was] First Annapolis's obligation to increase its regulatory capital in order to achieve each annual benchmark and to achieve the regulatory capital amount specified (in the Business Plan) at the end of the fifth year." JX 94 at 0984.

On August 12, 1988, Bancorp and the Federal Savings and Loan Insurance Corporation ("FSLIC") entered into a Regulatory Capital Maintenance/Dividend Agreement ("RCMDA"),

which defined First Annapolis's Regulatory Capital Requirement as "capital increased on a scheduled basis for five years as set forth in the Business Plan of the Plan of Conversion, and, thereafter, at any given time, thereafter, computed in accordance with 12 C.F.R. § 561.13, or any successor regulation thereto." JX 99 at 1446.[2]

On August 13, 1988, First Annapolis completed its conversion and opened for business. JX 99. Under the purchase method of accounting, First Annapolis adjusted all acquired assets and liabilities to fair market value as of the acquisition date. First Annapolis then booked the resulting decrease in the assets' fair market value as compared to the liabilities as approximately $65 million of supervisory goodwill. JX 3 at 0834.

In its decision regarding liability, the Court found that the Government entered into a contract with Bancorp, pursuant to which the Government granted First Annapolis: (1) the ability to meet the relaxed capital benchmark requirements specified in its business plan for a five-year period; (2) the ability to amortize its supervisory goodwill for 25 years; (3) the ability First Annapolis to invest in certain service corporation investments to a certain extent for a five-year period. PX 7; See First Annapolis Bancorp, Inc. v. United States, 75 Fed. Cl. 263 (2007).[3]

---

[2] Pursuant to section II.A of the RCMDA: "As long as [Bancorp] controls the New Institution, [Bancorp] will cause the Regulatory Capital of the New Institution to be maintained at a level at or above the Regulatory Capital Requirement and as necessary, will infuse sufficient additional capital, in a form satisfactory to the Supervisory Agent, to effect compliance with such requirement and cure a Regulatory Capital Deficiency during the first quarter after which the New Institution fails to meet its Regulatory Capital Requirement." JX 99 at 1447.

[3] We reserve our right to challenge the Court's prior decisions, including the liability decision, on appeal.

## II. The July 1988 Report Of Examination Revealed Supervisory Concerns And Risks To First Annapolis's Viability

The FHLB of Atlanta was conducting a regular examination of First Federal at the time of the thrift's conversion. The examination commenced on July 11, 1988, and concluded on August 19, 1988. DX 118 at 0002. According to the examiners' report ("July 1988 ROE"), a review of18 major loans totaling $49.7 million disclosed deficiencies. The examiners noted that First Federal's underwriting and disbursement deficiencies indicated "imprudent lending practices." DX 118 at 0025.

The July 1988 ROE also noted that First Federal's recent poor operating performance was a "result of a severely mismatched asset/liability structure, large losses from hedging activities, and losses from service corporations." DX 118 at 0034. After both the July 1988 examination and the conversion, the regulators informed First Annapolis's Board of Directors that "[t]he volume and nature of supervisory concerns reflect unfavorably upon the overall administration of the institution and pose a risk to First Annapolis's long-term viability." DX 267 at 0112. The FHLBB "strongly suggest[ed] that the board perform an internal assessment" and determine if the thrift could restore its viability. DX 267 at 0112.

In response to the criticism, First Annapolis hired David Cook, a commercial banker, to be the head of lending. Tr. 956-59 (Cook). Mr. Cook told regulators that First Annapolis "may have serious problems with several of its loans and management which does not have the support or expertise to handle some of its problems." Tr. 1763 (Jones); DX 301 at 1467; see also DX 294. Mr. Cook explained that First Annapolis had no loan review function to classify problem assets, it did not historically establish reserves for expected loan losses, and that neither the Board nor Mr. Parran realized the seriousness of First Annapolis's problems. Tr. 1763 (Jones); DX 301; see also Tr. 963, 984 (Cook).

## III. First Annapolis's Profitability, And Thus Its Viability, Depended Upon Its Ability To Convert The Projected Service Corporation Profits Into Actual Profits And Stable Economic Conditions

In connection with the conversion, First Annapolis prepared a business plan, which Bancorp included with its holding company application. This October 1987 Business Plan projected total net income of $12.6 million over the three years ending December 1990. JX 134 at I-5 and 0516. The plan's success depended upon First Annapolis realizing $16.7 in projected income on its service corporation investments, to offset a $4.1 million loss on the thrift's core operations. JX 134 at 0631; see also DX 4011 (Demonstrative); Tr. 2237-38 (Kennedy).

First Annapolis's service corporations were its subsidiaries that enabled it to engage in activities outside of traditional thrift lending. For example, while First Annapolis could loan money with real estate as collateral, the thrift could not invest directly in real estate. Tr. 1916 (Crompton). First Annapolis's service corporations, however, could invest directly in real estate subject to certain limitations. Tr. 1916 (Crompton).

As a result of poor earnings on traditional lending, the regulators noted that the thrift was "substantially dependent upon service corporation, fee, and other sources of income to overcome the earnings deficit inherent in the balance sheet." DX 118 at 0036; DX 2457; Tr. 1179-81 (Parran). The thrift's management acknowledged that First Annapolis's viability "would only be possible with the income generated from the service corporations." DX 634 at ¶10; Tr. 1150, 1170-71 (Parran); see also DX 2074 at 0758.

First Annapolis's main service corporation was Delta Financial Corporation, Inc ("Delta"). JX 89 at 0080. Delta invested directly in the acquisition, development, and construction of real estate. JX 89 at 0080. The October 1987 business plan projected Delta to make $14 million in profits over the three years ending December 1990. JX 134 at 0516 and

0565. As of March 31, 1988, Delta had committed $37.9 million to 35 investments in real estate development. JX 89 at 0081. Delta's real estate investment projects carried higher risk than First Annapolis's traditional lending because Delta often invested directly as a partner and Delta's profits depended on the completion and sale of the projects. JX 89 at 0083. Furthermore, when First Annapolis provided first mortgage financing of certain real estate projects, Delta would provide second mortgage financing in an amount up to the project's full appraised value. JX 89 at 0080-81. Delta would also generally make loans which required developers to repay only interest during the life of the loan, and pay the principal at the maturity date. JX 89 at 0083. Repayment of the principal would depend upon the success of the real estate project. Id.

Prior to the conversion, regulators expressed concern over the projected profits from these investments. DX 2457. In response, First Federal reassured the regulators on July 25, 1988, that the projected service corporation profits would "be accomplished" and that "a majority of the projects have existing contracts of sale, which justify the conservative projections." DX 2458; Tr. 1181-82 (Parran).

Recognizing the service corporation profits were the key to First Annapolis's future viability, the examiners reviewed ten of First Federal's service corporations 38 joint ventures as part of the July 1988 report of examination. The examiners, prophetically, noted that "considering the speculative nature of these real estate ventures, any change in market conditions can have a substantial negative impact on profits booked." DX 118 at 0035 (emphasis added); Tr. 1915-16 (Crompton).

## IV. Contrary To Its Business Plan Projections, First Annapolis Lost Money, And As A Result, Its Viability Became Threatened

First Annapolis's actual operations fell substantially below projections.[4] During the nine-month period ending June 1989, First Annapolis lost nearly $8 million on its core operations, which was $2.7 million more than it projected to lose. DX 2120 at 1550, 0704, and 0486; Tr. 2250-51 (Kennedy); DX 4017 (Demonstrative). Mr. Kennedy, our accounting and damages expert, explained that this was mostly because of lower interest income and higher overhead than expected. Tr. 2251 (Kennedy); DX 4017 (Demonstrative).

First Annapolis's interest income was consistently lower than expected because its asset quality significantly deteriorated after the conversion. Tr. 2251 (Kennedy). The thrift, moreover, had a poor ratio of interest-earning assets to interest-bearing liabilities. DX 118 at 0006; Tr. 2450 (Shapiro); Tr. 2250-51 (Kennedy). First Annapolis's ratio was approximately 80 percent as of June 1989, in contrast to an expected 90 percent ratio for a healthy thrift. Tr. 2262-63 (Kennedy); DX 4023 (Demonstrative).[5] In the July 1988 ROE, the regulators said First Annapolis's poor ratio of interest-earning assets to interest-bearing liabilities was the primary cause of the thrift's marginal core operations. DX 118 at 0035-36; Tr. 1917 (Crompton). Put simply, First Annapolis's asset base was not generating enough money to cover the thrift's

[4] With the exception of the quarter ended December 1988, First Annapolis lost money every single quarter. The only reason First Annapolis was profitable during that quarter was because of a non-recurring $2 million gain it realized. DX 4015 (Demonstrative); DX 4016 (Demonstrative); Tr. 2248-49 (Kennedy); DX 2146 at 0864-65.

[5] Thus, a thrift with an 80 percent ratio only has $80 in loans to every $100 in deposits. Even if lenders are paying on average 2 percent more to the thrift than the thrift is paying to its depositors, an 80 percent ratio hurts its operations because the thrift pays out interest on a larger balance than the balance from which it collects interest. See Tr. 2261 (Kennedy); Tr. 2458 (Shapiro).

operations. At trial, Mr. Crompton, a FHLBB examiner, explained that this poor asset ratio meant that First Annapolis was more dependent on its service corporation investments to make up the difference. Tr. 1918 (Crompton).

First Annapolis's core operation problems were further compounded by the significant decline in market conditions that occurred after the conversion. Tr. 2243-46 (Kennedy). These market conditions also affected the thrift's service corporations, which produced over $1.4 million (44 percent) less income than was expected for the nine-month period ended June 1989. DX 2120 at 1550, 0704, and 0486; DX 4017 (Demonstrative); Tr. 2250-51 (Kennedy). Mr. Crompton explained that these investments – mostly real estate ventures – were particularly sensitive to a decline in market conditions. Tr. 1916 (Crompton); Tr. 1916 (Crompton); Tr. 2243-46 (Kennedy). Given the importance of the service corporation income to First Annapolis's viability after the conversion and the sensitivity of that income to economic conditions, the deterioration in economic conditions in 1989 alone was enough to cause First Annapolis to fail. Tr. 2243-46 (Kennedy).

The combination of higher than expected losses from core operations and lower than expected profits from service corporation investments resulted in First Annapolis losing $6.1 million (before gains on asset sales) through the nine months ending June 30, 1989, which was $4.1 million more than it projected to lose. DX 2120 at 1550, 0704, and 0486; DX 4017 (Demonstrative); Tr. 2250-51 (Kennedy).[6]

To offset this $4.1 million shortfall, First Annapolis sold $90 million worth of assets,

---

[6] Excluding goodwill amortization and gains from asset sales, First Annapolis still lost $2.4 million for that period. DX 2120 at 1550, 0704, and 0486.

resulting in a nearly $4.4 million profit.[7] DX 4017 (Demonstrative); Tr. 2251 (Kennedy). While these gains allowed First Annapolis to reduce its losses from $6.1 million to $1.7 million through June 30, 1989, these gains were nonrecurring and could not be counted on to offset future losses. DX 4017 (Demonstrative); Tr. 2252-54 (Kennedy). Effectively, the thrift was selling the equivalent of the family silver to buy time.[8]

After June 30, 1989, First Annapolis continued to lose money on its operations and its real estate investments. For example, during the quarter ended September 1989, while First Annapolis projected to earn nearly $1.2 million, it actually ended up losing $84,415. DX 2120 at 0129; DX 4018 (Demonstrative); Tr. 2254-55. This was mainly the result of a $1 million dollar shortfall in net interest income and higher than expected overhead, or non-interest expense. DX 2120 at 0128-29; DX 4018 (Demonstrative). During October 1989, First Annapolis reported a loss on core operations of nearly $1.2 million (before goodwill amortization) and a loss on service corporations of $43,896. JX 58 at 1543-44. As Mr. Kennedy explained, First Annapolis was losing so much money on its core operations that it simply could not afford to continue missing its profit projections on service corporation investments and remain viable. Tr. 2254-55 (Kennedy).

The profits from First Annapolis's service corporation investments were not sufficient to save the thrift. Tr. 2249 (Kennedy). During the quarter ended December 1989, First Annapolis

---

[7] Dr. Shapiro, our economics expert, explained that this practice of selling appreciated assets off the balance sheet, which he characterized as "cherry-picking" was common among troubled institutions. Tr. 2450-52 (Shapiro).

[8] After June 1989, First Annapolis failed to record significant nonoperating income from asset sales. DX 2120 at 0128-29; JX 61 at 1647. At that point, First Annapolis had no further assets to sell at a gain. JX 3 at 0835; Tr. 2252-54 (Kennedy). Certainly, if First Annapolis had had any more appreciated assets, it would have sold them. Tr. 2484-85 (Shapiro).

again failed to meet its updated projections. JX 61 at 1646-47. At that time, First Annapolis was $3.4 million under its quarterly projection: it lost $2.6 million more than expected on its core operations and made $1.4 million less than it expected on its service corporations. JX 61 at 1646-47; Tr. 2257 (Kennedy); DX 4019.

First Annapolis faired no better during the first four months of calendar 1990. In January 1990, it reported a net loss of nearly $1.1 million, which – as expected – was due to significant losses from core operations. JX 65 at 1730. In February 1990, First Annapolis recorded a $13.3 million loss. JX 65 at 1730. This loss was due in large part to the nearly $8 million in credit or loan losses and the $4.9 million in service corporations losses that First Annapolis recorded during the month. JX 65 at 1729-30. In both March and April 1990, First Annapolis reported approximately $1.3 million in additional losses which, again, were primarily due to negative earnings on its core operations. Contrary to the thrift's business plan projections, the service corporations' profits were not sufficient to offset these losses. JX 68 at 0013.

In total, between August 12, 1988, and April 30, 1990, First Annapolis realized losses of nearly $16.4 million (before the amortization of goodwill) and $23.7 million (after the amortization of goodwill). JX 68 at 0016. Thus, First Annapolis's losses after the conversion exceeded Bancorp's $13.6 million capital infusion into the thrift.

## V. First Annapolis's Regulatory Capital Decline Threatened The Thrift's Viability

Under the terms of the resolutions approving Bancorp's acquisition of First Annapolis, the thrift was required to maintain and increase its regulatory capital ratio to 1.8 percent on June 30, 1989; 2.1 percent on June 30, 1990; 2.4 percent on June 30, 1991; 2.7 percent on June 30, 1992; 3.0 percent on June 30, 1993. JX 135 at 0889; JX 134. As of September 30, 1988, First

Annapolis's regulatory capital ratio was 2.42 percent, which was in excess of its June 1990 benchmark requirement. JX 42 at 0733. The thrift's losses after the conversion (rather than profits as it projected), dissipated the thrift's regulatory capital rather than increasing it as required. JX 94 at 0984; PX 4.

By June 1989, First Annapolis's regulatory capital ratio had declined to 1.99 percent. JX 3 at 0824, 0846; DX 4003 (Demonstrative); Tr. 2170-71 (Kennedy). When the fact that First Annapolis was losing money, which had depleted its regulatory capital since the conversion, is combined with the significant economic downturn that occurred after June 1989, "there was no way [First Annapolis] could recover." Tr. 2245 (Kennedy); Tr. 2469-70 (Shapiro); DX 5014 (Demonstrative). As such, by the third quarter of 1989, First Annapolis was no longer a viable entity. Tr. 2150 (Kennedy).

Given First Annapolis's failure to successfully implement its business plan and the rapidly deteriorating economic environment, First Annapolis's regulatory capital ratio continued to decline after June 1989. More specifically, due to its continuing losses, by September 30, 1989, First Annapolis's regulatory capital (including all of the goodwill) to total liabilities ratio had fallen to 1.88 percent. DX 365 at 1422. By October 31, 1989, First Annapolis's regulatory capital ratio (including all the goodwill) had fallen to 1.77 percent, thus dropping the thrift out of compliance with its 1.8 percent capital requirement. JX 58 at 1545. The thrift's capital was in a state of free fall. By the end of November 1989, First Annapolis's reported regulatory capital ratio fell to 1.65 percent, DX 2294 at 1612, and by the end of December 1989, its reported ratio was 1.55 percent. JX 61 at 1645.

## VI. First Annapolis's Poor Asset Quality Threatened The Thrift's Viability

As Mr. Kennedy explained, there is a relationship between a thrift's viability and its asset quality. Tr. 2153 (Kennedy). After the conversion, for reasons unrelated to the breach, First Annapolis's asset quality significantly deteriorated. Tr. 2243-45; 2283 (Kennedy). The deterioration in market conditions that occurred in 1989 dragged down the thrift's performance. Thus, the number of First Annapolis's delinquent loans and non-performing assets rapidly increased during that year. Delinquent loans were those that were more than 30 days past due. Nonperforming assets included loans that are more than 90 days past due, as well as, foreclosed properties, or real estate owned. Tr. 1948 (Crompton).

### A. First Annapolis's Delinquent Loans And Real Estate Owned Increased Rapidly In 1989

By the end of March 1989, First Annapolis's delinquent loans totaled approximately $13.1 million. JX 46 at 1012. By July 1989, the delinquent loans increased by $45.2 million to nearly $58.3 million. DX 2210 at 0517. By September 1989, delinquent loans increased another $24 million to $82.3 million. DX 365 at 1410; DX 4025 (Demonstrative).[9] Although not all of these delinquent loans were considered nonperforming, the regulators believed that the existence of the delinquent loans was a clear indication that First Annapolis's nonperforming assets would soon increase as well. Tr. 1950 (Crompton).

Mr. Kennedy explained that a decline in market conditions caused the increase in delinquent loans, and that the increase dramatically reduced First Annapolis's interest income.

---

[9] Mr. Kennedy explained that in early 1990, the level of delinquent loans would have been far higher than $82.3 million but for the loan losses that were recognized at that time. Tr. 2267 (Kennedy); DX 4025.

Tr. 2268 (Kennedy).[10] As Mr. Kennedy further explained, the increase in borrowers not paying back their loans caused First Annapolis to lose more money from core operations than the thrift had originally projected. Tr. 2268 (Kennedy).

### B. First Annapolis's Asset Classification Policy

During its June 15, 1988 Board of Directors meeting, First Federal's Board approved an "Asset Classification Policy" pursuant to the Competitive Equality in Banking Act. JX 23 at 0461; Tr. 1909 (Crompton). This policy required that: "Once a problem asset has been identified, it will be classified 'special mention,' 'substandard,' 'doubtful,' or 'loss.'" JX 23 at 0466. Based on these asset classifications, First Annapolis was required to create valuation allowances, or loss reserves, to provide for likely future losses. Tr. 1908 (Crompton). Under First Federal's (and subsequently First Annapolis's) Asset Classification Policy, assets that were classified special mention did not require valuation allowances, while assets classified substandard and doubtful required valuation allowances of 10 percent and 30 percent, respectively. JX 23 at 0461; DX 397 at 0150-51. Assets could also be classified as a loss, which meant that First Annapolis had to write that specific amount off the books.

The total assets classified as substandard, doubtful, and loss, which required adjustments to the reserves under First Annapolis's policy, are called classified assets. As the level of classified assets increases, a thrift should increase its reserves, which lowers earnings and capital. Tr. 1908, 1921-22 (Crompton); Tr. 2269-72 (Kennedy). Criticized assets, include classified assets and special mention assets, and are defined as loans that are not performing and

---

[10] First Annapolis's interest income declined from $5.8 million in September 1989, to $5.1 million in October 1989, and First Annapolis missed its projected interest income target by $800,000. DX 365 at 1420; JX 58 at 1543. Interest income continued to decline in October 1989 resulting in a a $1.2 million loss on its core operations. JX 58 at 1544.

exhibit credit deficiencies. DX 397 at 0170; Tr. 1900 (Crompton).

The decision as to whether or not to classify an asset is based upon many factors including, but not limited to, the default and/or bankruptcy of the debtor, payment delinquency, and updated or new appraisals. JX 23 at 0466; Tr. 1340 (Parran); Tr. 2162-63 (Kennedy). As asset quality deteriorates or economic conditions decline, a thrift would usually classify more assets because it would be expecting to incur greater losses.

### C. First Annapolis's Criticized And Classified Assets Increased Rapidly In 1989

By First Annapolis's own accounting, its total criticized assets increased from $31.9 million at the end of June 1989 to $78.8 million at the end of December 1989. Tr. 2269 (Kennedy); DX 4026 (Demonstrative); DX 2200 at 1239; DX 397 at 0150 and 0170. Consistent with First Annapolis's own records, the Office of Thrift Supervision's 1990 Examination Report ("1990 ROE") also found that First Annapolis's criticized assets had significantly increased since the conversion.[11] More specifically, the examiners identified $126.5 million of total criticized assets, a significant increase from the $43.8 million that were identified in the previous examination. DX 118 at 0023; DX 397 at 0150. According to First Annapolis, while "a substantial amount of the examiner's $126 million of criticized assets had [been] identified [by First Annapolis] . . ., the magnitude of the 500% increase in delinquencies during 1989 had placed additional stress upon the self classification process as well as upon management

[11] During the 1990 ROE the examiners discovered for the first time that First Annapolis had failed to follow its own asset classification policy. DX 397 at 0150-51; Tr. 2269-72 (Kennedy). As such,"[o]nce on site, it became evident that the true level of classified assets was much higher than what was being reported on the Thrift Financial Reports, and thus, the scope of the examination was expanded to include a review of the larger classifiable assets." DX 397 at 0139; Tr. 1920-21 (Crompton).

resources." DX 397 at 0163.

The $126.5 million in criticized assets equaled 16.9 percent of First Annapolis's total assets and 1,821.6 percent of GAAP capital. DX 397 at 0170. Mr. Crompton explained that such a high level of criticized assets caused the regulators extreme concern and had a huge negative impact on First Annapolis's viability. Tr. 1951-52 (Crompton).

## VII. First Annapolis Overstated Its Reported Regulatory Capital, And As A Result, Masked The Fact It Was No Longer Viable As Of The Third Quarter Of 1989

First Annapolis failed in its ongoing duty to identify impaired assets and set aside reserves to cover the possible loss they might engender.

### A. First Annapolis Had The Responsibility To Maintain Adequate Reserves

In the July 21, 1988 forbearance letter, the Government noted that it was not relieving First Annapolis from "continuing obligations to maintain records of its reserve and regulatory capital condition and to report its financial condition in accordance with applicable regulatory requirements." PX 3.

Financial Accounting Standards No. 5 required thrifts to establish a loan loss reserve when it was probable that a loss would be incurred and the loss could be reasonably estimated. Tr. 2155 (Kennedy). The regulations also require a thrift's management to establish and maintain adequate loan loss reserves. Tr. 2156 (Kennedy); DX 118 at 0031; DX 267 at 0114. Loan loss allowances are allocated into two buckets: specific valuation allowances and general valuation allowances. Tr. 2156 (Kennedy). Specific allowances represent loan loss allowances that have been established on specific assets. General valuation allowances represent the portion of the total loan loss allowance that has not been assigned to a specific asset. Tr. 2156

(Kennedy). A loan loss provision is the amount that a thrift expects to lose on its loan portfolio or, in other words, the portion of the outstanding loan balance that it does not expect to collect. Tr. 2154 (Kennedy). The amount of loss provision a thrift must set aside is based upon the economy, asset quality, the type of portfolio, the risk inherent in the portfolio; "higher reserves are generally required for higher risk assets. Tr. 2154 (Kennedy).

It is necessary, and required, that a thrift maintain adequate loan loss allowances. Tr. 2156-57 (Kennedy). If a thrift does not correctly record loan loss reserves, it will have misstated income and capital on its financial records. Tr. 2156-57 (Kennedy). Typically, thrifts in the late 1980s should have reviewed and adjusted their loan loss reserves at least quarterly. During times of great economic change, however, thrifts should have been continuously monitoring reserves and the need for loan losses. Tr. 2157-58 (Kennedy). First Annapolis was far from diligent in maintaining its loan loss reserves.

### B. First Annapolis Failed To Recognize Losses For Specific Assets Which Overstated Capital

During both the July 1988 ROE and the 1990 ROE, regulators determined that First Annapolis failed to account for prior losses, in violation of regulations and its own internal policies. Tr. 1910-12 (Crompton). As a result, First Annapolis severely overstated both its capital and its overall financial condition. Tr. 1911 (Crompton). The review performed by the examiners in connection with the 1990 ROE, "identified $6.2 million of loss classifications and a $5.8 million increase to the general valuation allowance" that were required under First Annapolis's own asset classification policy. DX 397 at 0139. As of December 31, 1989, First Annapolis's reported GAAP capital was $6.9 million. DX 397 at 0139. When booked, these additional loss classifications and general valuation allowances made First Annapolis insolvent

on a GAAP basis. DX 397 at 0139, 0150, 0156.

Based upon the results of the 1990 ROE, the OTS directed First Annapolis to "immediately charge-off those assets, or portions thereof, classified as loss by the OTS examiners at the January 16, 1990 examination and aggregating $6,186,116." DX 439 at 1300. The specific assets and dollar amounts of the charge-offs included: (a) Bayside Marina Associates Joint Venture and Sterling Properties Associates III, Inc. ("Bayside Marina"), $3,234,056; (b) Dennis Blaeuer entities, $947,822; and (c) Northampton Business Park, $1,479,051. DX 439 at 1300. These three large investments accounted for $5.7 million of the $6.1 million write-down that was required. Indeed, the losses First Annapolis suffered on these three loans alone, all of which were unrelated to the breach, were enough to cause First Annapolis to fail. Tr. 2280, 2283 (Kennedy).

**1. First Annapolis Failed To Recognize A $3,234,056 Loss On Bayside Marina Loans**

First Annapolis failed to recognize millions of dollars in losses on Bayside Marina prior to the breach.

On August 5, 1987, First Federal granted three loans totaling $16.9 million to Bayside Marina. As Mr. Cook previously testified, First Annapolis "overbooked" the loan the day it was made, meaning that First Annapolis was going to incur some loss even if the project was completed. Tr. 1016-17 (Cook). Within one year of being granted, examiners classified the Bayside Marina loans as special mention, due to the lack of sewer allocations and the existing marina's poor operating results. DX 118 at 0064. First Annapolis stopped recording interest income on the Bayside Marina loans in December 1988, and these loans remained in default throughout 1989. DX 2145 at 1505; DX 397 at 0171.

First Annapolis recorded a $2.5 million loss during 1989 on one of the Bayside Marina loans; however, according to the accounting rules, First Annapolis was able to add this loss to goodwill rather than taking a direct reduction to capital. JX 3 at 0834; Tr. 1022-23 (Cook). First Annapolis considered foreclosing on the loans as early as April 1989. JX 46 at 1012; DX 2195; Tr. 1024-25 (Cook). On August 9, 1989, First Annapolis sent separate letters to the borrowers, Mr. Sterling Leppo and Bayside Marina Associates Joint Venture, demanding full payment within 15 days on all three Bayside Marina loans. DX 2213. First Annapolis stated that, absent full repayment, it would proceed with suit and/or foreclosure proceedings. DX 2213.

On October 27, 1989, First Annapolis reached an agreement with Mr. Leppo, whereby First Annapolis would take possession of the remaining condominiums and undeveloped land through a deed-in-lieu of foreclosure and refinanced the marina loan with a new $5 million loan. DX 2261. The foreclosure was completed on December 12, 1989. DX 2314 at 0150.

When the underlying collateral securing a loan is either deemed to be "insubstance foreclosure" or actually foreclosed upon, the thrift must write-down the asset to fair value. Tr. 2202 (Kennedy). Prior to the 1990 ROE, First Annapolis had designated $10.2 million of the Bayside Marina loans as special mention and had established specific reserves totaling $4.1 million (including $1.6 million of uncollected interest). DX 397 at 0171. The regulators found that a July 1989 appraisal report which valued the property at $10.3 million had significant deficiencies. DX 397 at 0172. The District Appraiser estimated the projected value was actually $7 million. DX 397 at 0171-72. Because the total loan balance outstanding was $12.7 million, and the projected value was only $ 7 million, the regulators classified the difference, $7.3 million, as a loss. DX 397 at 0171-72. Based upon that classification, an increase of $3.2

million was required to First Annapolis's prior loss reserve of $ 4.1 million. DX 397 at 0171-72.

Based upon a review of First Annapolis's records, Mr. Kennedy determined that this $3.2 million loss should have been recorded in July 1989, when it was "estimable and probable" under the accounting standards, and certainly no later than October 1989 when the borrower agreed to the foreclosure of the underlying collateral. Tr. 2205 (Kennedy). First Annapolis's failure to properly set aside loan losses for this project in mid 1989, meant that the thrift substantially overstated its regulatory capital to the Government. Tr. 2191-92, 2171-72 (Kennedy).

### 2. First Annapolis Failed To Recognize A $947,822 Loss On Loans To The Dennis Blaeuer Entities

First Annapolis failed to recognize at least $947,822 in losses on the loans to the Dennis Blaeuer entities, which were secured by marinas and boatyards in Maryland, prior to the breach. DX 397 at 0174.

As of December 31, 1989, these ten loans were seriously delinquent (from three to six months), as the borrower had stopped making payments as early as June 30, 1989. DX 397 at 0174; DX 2242 at 1327; DX 2246 at 0812-0813; Tr. 2211 (Kennedy). On September 26, 1989, First Annapolis demanded that the Blaeuer entities pay their $10.7 million outstanding balance by October 10, 1989. DX 2246 at 0812. In November 1989, First Annapolis restructured these loans so that Mr. Blaeuer could "avoid bankruptcy." DX 2256 at 0076; DX 2272 at 1567.

In September 1989, because of a decline in the real estate market, one of the marina projects received construction bids for several million dollars in excess of what the project could support. Tr. 2212 (Kennedy). Mr. Cook conceded that the downturn in the economy affected these investments. Tr. 1004. Regarding the investments in developing marinas, generally, Mr. Cook testified that "there was a thought that marina investments always turned to gold, you

couldn't make more marinas, it was too hard to develop them, you had all the Army Corps of Engineers issues, it was too hard to develop them, and a marina was simply a property that couldn't decline in value or go south. That premise turned out to be not true." Tr. 1004-1005 (Cook).

Mr. Cook admitted that the loans for the Spa Creek Marina project specifically turned out to be a "giant pyramid scheme," Tr. 1005 (Cook), because First Annapolis and its subsidiary disbursed millions of dollars into the project in excess of the marina's value. Tr. 1003 (Cook). Mr. Cook explained that this investment failed because the "market narrowed" and the anticipated lease market did not materialize because marine tenants found cheaper rents out of town. Tr. 997-98, 1004 (Cook).

On October 31, 1989, Mr. Cook told the Board of Directors that:

> The major issue for our company is the substantial loss in the Spa Creek Marina ([First Annapolis's] first – $2,160,000; Delta's second – $2,232,752 plus $368,446 in additional notes, for a company exposure of $4,761,198). The marina value is in the 3,000,000 to 4,000,000 range; we hope to achieve a minimum of $3,500,000 through a well-publicized owner's auction.

DX 2265 at 0776.

According to Mr. Cook's December 1, 1989 memorandum to file, the thrift agreed to accept $3.5 million to release its $4.7 million liens on two marinas, as part of their sale to a third party. DX 2289 at 0760. In that memorandum, Mr. Cook noted that, "[t]hat transaction will result in a loss of up to $1.2MM to [First Annapolis]." DX 2289 at 0760. At that time, the $1.2 million loss was clearly estimated and probable. Accordingly, First Annapolis should have recognized the loss and set aside reserves to cover it. Tr. 2214 (Kennedy). Indeed, under its own policy, First Annapolis should have classified these loans as substandard once they were

delinquent in June 1989. Tr. 2211-12 (Kennedy). This it failed to do.

In connection with the 1990 ROE, the examiners classified $947,882 of the Spa Creek related loans as a loss. DX 397 at 0174. The loss was equal to the difference between the expected future sale amount of Spa Creek ($3.50 million) and First Annapolis's net exposure on Spa Creek ($4.45 million as of December 31, 1989). DX 397 at 0174.

### 3. First Annapolis Ignored A $1,479,051 Loss On Loans Involving The Northampton Office Park

First Annapolis failed to recognize at least $1,479,051 on the loans involving the Northampton Office Park prior to the breach.

On October 1, 1986, First Federal granted a $6.1 million dollar first trust loan to the Northampton partnership. DX 397 at 0173. On that same date, Delta, First Federal's subsidiary, granted various unsecured loans to finance Northampton's development costs. DX 397 at 0173. In April 1989, First Annapolis extended the loan's due date three months, to July 20, 1989. DX 2162 at 2237. On July 20, 1989, First Federal sent a letter to Northampton stating that the $6.1 loan matured that day and that "[n]o further modification or extension is contemplated." DX 2461 at 0171. On August 2, 1989, First Annapolis's Board of Directors declined further funding for the Northampton loan with the exception of $224,000 in ground improvements to protect the collateral. DX 2210 at 0496; DX 2462 at 1623; Tr. 2208 (Kennedy).

As of August 20, 1989, appraisers valued the Northampton Business Park Subdivision at $6.7 million, even though the borrower owed $9.1 million. DX 397 at 0173. Therefore, Northampton was worth $2.4 million less than the current balance of the loans outstanding ($9.1 million less $6.7 million). As of August 31, 1989, First Annapolis had classified the entire $9.1 million loan as special mention. DX 2242 at 1341.

By December 1989, First Annapolis had only recognized a loss of $1.3 million on an outstanding balance of $9.4 million. DX 397 at 0173. During the 1990 ROE, the examiners classified $6.7 million of the Northampton loan as substandard, based upon the August 20, 1989 appraisal report in the bank's possession and First Annapolis's own asset classification policy. DX 397 at 0173; Tr. 1955 (Crompton). The $2.7 million difference between the outstanding balance and the appraised value was classified as a loss. DX 397 at 0173. Therefore, First Annapolis was required to recognize an additional loss of nearly $1.5 million. DX 397 at 0173. The loss should have been recognized no later than August 20, 1989. This was the date of the appraisal and was when the loss would have been probable and could be estimated. Tr. 2210 (Kennedy).

First Anapolis incurred losses on the Bayside Marina, Dennis Blaeuer, and Northampton Business Park loans by at least the third quarter of 1989, and the thrift should have recognized the losses no later than the fourth quarter of 1989. Tr. 2190 (Kennedy). If First Annapolis had recognized this $5.7 million loss by December 1989, the thrift would have been at least $7.6 million out of capital compliance at that time. Tr. 2191-2192.

### C. First Annapolis Misclassified And Under Classified Assets Resulting In Inadequate General Loan Loss Reserves And Overstated Capital

Based upon the results of the 1990 ROE, regulators directed First Annapolis to "immediately increase its general loan loss reserve by $5,800,000, consistent with the institution's loan loss reserve policy and with the level of criticized and classified assets identified by the OTS examiners at the January 16, 1990 examination." DX 439 at 1301.[12]

---

[12] First Annapolis had inadequate general loan loss reserves at the time of the July 1988 ROE as well. The examination revealed that, between March 31, 1988, and April 30, 1988, First Federal's level of classified assets increased by more than $12 million; however, its level of

First Annapolis overstated its capital and its financial condition because it had grossly inadequate general loan loss reserves. These were inadequate because: (1) First Annapolis understated the amounts of total classified assets; (2) when First Annapolis did classify assets, it classified most of its assets special mention to avoid booking losses; and (3) First Annapolis actually changed some assets from substandard to special mention in order to reverse losses and book gains in the latter half of 1989.

First Annapolis understated the amount of assets that should have been classified under its own asset classification policy, and this contributed to inadequate general loan loss reserves. While First Annapolis reported total criticized assets, which included all classified assets and special mention assets, as $78.8 million by the end of December 1989, the regulators found $126.5 million in total criticized assets. DX 4026 (Demonstrative); DX 397 at 0150 and 0170. Furthermore, the regulators found that $87.6 million of those total criticized assets should have been classified assets, which were the assets that required some level of a loan loss reserve. DX 397 at 0170. While First Annapolis had only classified $5.2 million in assets as substandard, the regulators determined that $69.9 million in assets should have been classified substandard. DX 397 at 0170.

Not only did First Annapolis fail to follow its own asset classification policy, which caused it to classify significantly fewer assets than the examiners, by designating assets as special mention, which required no loss reserve, rather than substandard, which required a 10 percent loss reserve, it was able to overstate its capital and financial condition. DX 4028

---

general valuation allowances remained the same. DX 118 at 0031. Consequently, the July 1988 ROE explained that: "Given the level of substandard and doubtful assets, the present level of general valuation allowances is inadequate and, thus, the association is in violation of section 561.16c(d)(3) of the insurance regulations." DX 118 at 0031.

(Demonstrative); Tr. 2161, 2273 (Kennedy). Therefore, First Annapolis overstated its earnings and its capital by failing to maintain adequate loan loss reserves as required by the regulations. Examiners explained that, "[h]ad management properly classified its non-performing assets, reported earnings during 1989 would have been substantially worse due to the increased charges to the loan loss provisions resulting from the establishment of general valuation allowances." DX 397 at 0162. Examiners concluded that First Annapolis's failure to maintain adequate general valuation allowances was considered an "unsafe and unsound banking practice." DX 397 at 0140.

First Annapolis also reclassified assets from substandard to special mention in the last half of 1989. DX 4028 (Demonstrative). As of June 1989, First Annapolis's special mention assets totaled $4.5 million and its classified assets totaled $27.4 million, resulting in total criticized assets of $31.9 million. DX 2200 at 1239. By September 1989, First Annapolis's special mention assets had increased to nearly $32.3 million while its classified assets declined to $23.4 million, resulting in total criticized assets of over $55.6 million. JX 58 at 1549. By October 1989, First Annapolis's special mention assets had increased to over $44.9 million while its classified assets had declined to $11.8 million, resulting in total criticized assets of nearly $56.8 million. JX 58 at 1549; DX 4026 (Demonstrative).

The reduction in First Annapolis's classified assets between June 1989 and October 1989 allowed First Annapolis to record "negative" loan loss provisions of $401,350 during the quarter ending September 1989 and $600,000 for the four month period ended October 1989. DX 2120 at 0128; JX 58 at 1543; Tr. 2270-2272 (Kennedy). Despite deteriorating asset quality and economic conditions, First Annapolis's reclassification reduced its loan loss provisions to book accounting gains and increase capital. Tr. 2271 (Kennedy); DX 4027. Indeed, capital was

overstated by at least $600,000 in October 1989, when First Annapolis's management reduced its reserves by that amount. Tr. 2272 (Kennedy).[13]

## VIII. First Annapolis Continued To Operate With The Forbearances Until 1990

On August 9, 1989, Congress enacted the Financial Institutions Reform and Recovery Enforcement Act ("FIRREA"). FIRREA of 1989, Pub. L. No. 101-73, 103 Stat. 183. FIRREA and its implementing regulations (which were promulgated on November 8, 1989 and became effective on December 7, 1989) required a savings institution to maintain tangible capital in an amount not less than 1.5 percent of the institution's adjusted total assets. 12 U.S.C. § 1464(t)(2)(B); 12 C.F.R. § 567.9(a). Pursuant to the regulatory requirements put in place as of December 7, 1989, tangible capital did not include any intangible assets, such as goodwill. 12 U.S.C. § 1464(t)(9)(c).

After FIRREA was implemented, First Annapolis continued to operate under the assumption that it could continue to use the forbearances. On January 4, 1990, as required by regulations, First Annapolis submitted a capital restoration plan, which assumed all of the regulatory forbearances would continue in force. PX 32.

---

[13] A review of 35 commercial loans which were 90 or more days delinquent as of December 31, 1989, resulted in the examiners classifying over $3.9 million of the loans substandard. First Annapolis "agreed with the examiner's comments." DX 397 at 0176.

The examiners classified $3.2 million of real estate owned by First Annapolis as substandard. "The majority of these [real estate] properties are single family townhouses and condominiums located in Texas." DX 397 at 0177. First Annapolis failed to classify the entire $3.2 million in REO as substandard. Id. First Annapolis "agreed with the examiners comments." Id.

The examiners classified 70 mortgage loans with aggregate outstanding balances totaling over $8.9 million as substandard. DX 397 at 0177-78. These loans were classified substandard because the loans were delinquent by 90 days or more as of December 31, 1989. First Annapolis "had classified the majority of these loans as special mention." Id. First Annapolis "acknowledged that the classification of these loans as special mention rather than substandard was inconsistent with bank policy." DX 397 at 0177-78.

## IX. First Annapolis's Failure Cost The Government Millions Of Dollars

By April 16, 1990, the OTS concluded that adequate grounds existed for the appointment of a conservator or receiver for First Annapolis. DX 438 at 0005. The OTS found that First Annapolis suffered "from a high level of non-earning and non-performing assets, insufficient net interest margin, an unfavorable operating structure, as well as an extremely high level of goodwill." DX 438 at 0011; see also Tr. 1794 (Jones). The OTS further believed that this structure negatively impacted First Annapolis's efforts to recapitalize. DX 438 at 0011. On May 31, 1990, the OTS appointed the Resolution Trust Corporation as receiver for First Annapolis. First Annapolis Bancorp, Inc. v. United States, 75 Fed. Cl. 263, 272 (2007); see also Tr. 1791 (Jones). According to the March 31, 2006 "Goodwill Financial Reporting Package," as of June 30, 2004, the FDIC had incurred a $103.3 million loss on First Annapolis's liquidation, DX 635 at 0008, and First Annapolis's receivership had a deficit of $187.6 million as of December 31, 2005. DX 635 at 0005.

# ARGUMENT

## I. Bancorp Has Failed To Prove That It Is Entitled To Restitution

Bancorp failed to prove that the breach it alleges constitutes a total breach. Because proving a total breach is a fundamental requirement for restitution, the Court should deny Bancorp's claim in its entirety.

### A. Bancorp Failed To Prove A Total Breach

A breach must be a "total breach" for restitution to be available. Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1309 (Fed. Cir. 2004) ("Significantly, relief in restitution is 'available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach.'") (citing Restatement (Second) of Contracts §373(1981)

("Restatement")). Thus, in order to be entitled to restitution, Bancorp must prove that the Government's breach was total.

A non-breaching party must make "a predicate showing that the character of the breach is such as to entitle him to restitution . . ." Hansen Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 101 (2002) rev'd on other grounds, 367 F.3d 1297 (Fed. Cir. 2004); see also Hansen Bancorp Inc. v. United States, 67 Fed. Cl. 411, 434 (2005) (on remand finding that "plaintiffs have not proved by a preponderance of evidence" that the breach was total); Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston, 666 F.2d 673, 677 n. 1 (1st Cir. 1981) (plaintiff seeking restitution has burden to establish "breach was total") (citing 5 A. Corbin, Corbin on Contracts § 1104 (1964)). In any event, even if Bancorp did not have the burden, the preponderance of the evidence supports the finding that the breach was not total.

The Federal Circuit has clearly stated that to prove total breach, a plaintiff has to prove that the breach "so substantially impair[ed] the value of the contract" at the "time of the breach" that it is "just in the circumstances to allow [them] to recover damages based on all [their] remaining rights to performance." Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1345 (Fed. Cir. 2004) (citing Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604 (2000)); Restatement (Second) of Contracts §243; accord Southwest Inv. Co. v. United States, 63 Fed. Cl. 182, 195 (2004). In Admiral, the Federal Circuit found that the breach did not "substantially impair the value of the contract" to the injured party because the trial court found that "Admiral was in such dire straits that it would not have been able to recover, even absent a breach." 378 F.3d at 1345 (Fed. Cir. 2004).

There is no total breach in this case because the evidence showed, as it did in Admiral, that at the time of the breach, First Annapolis would not have been able to recover, even absent

the breach. First, before the breach, First Annapolis was in dire financial condition because it failed to become profitable as it projected. Second, by the third quarter of 1989, if not sooner, First Annapolis's was actually several millions of dollars out of regulatory capital compliance. Even accepting First Annapolis's own grossly overstated regulatory capital results, the thrift still fell out of regulatory capital compliance by October 31, 1989 with the benefit of all of its forbearances. Tr. 2150 (Kennedy); JX 58 at 1545; DX 2253. Therefore, even if capital was not overstated, First Annapolis would have failed, absent the breach, given that the evidence showed they were losing money, regulatory capital was declining, and asset quality and economic conditions were deteriorating. Tr. 2150 (Kennedy). Thus, because First Annapolis would have failed absent the breach, "the promises were irrelevant" at the time of the breach and the breach was not total. Southwest, 63 Fed. Cl. at 196; see also Admiral, 378 F.3d at 1345; Admiral Fin. Corp. v. United States, 54 Fed. Cl. 247, 434 (2002).

### 1. First Annapolis Was Not Viable At The Time Of Breach

Bancorp failed to establish that the breach "substantially impair[ed] the value of the contract," because it did not prove that First Annapolis was viable at the time of the breach. See Admiral, 378 F.3d at 1345 (citing Mobil, 530 U.S. at 608); Restatement (Second) of Contracts §243; accord Southwest, 63 Fed. Cl. at 195.

#### a. The Court Must Examine First Annapolis's Viability On Or After December 7, 1989

Because the totality of the breach must be measured only at the time of the breach, before the Court determines whether First Annapolis was viable, it must determine what the breach was and when the breach occurred. See Hansen, 53 Fed. Cl. at 103 (citing Mobil, 530 U.S. at 609) (assess totality of breach by the impact on a plaintiff's contractual rights at the time

of the breach); see Southwest, 63 Fed. Cl. at 195 (looking at value of the contract to thrift at the time of breach).

First, the Court must define what the breach was. It is clear that only those provisions of FIRREA which abrogated the terms of plaintiff's alleged contract can be viewed as the "breach." See Coast Fed. Bank, FSB v. United States, 49 Fed. Cl. 53, 55 (2001) ("The proper distinction here . . . is between the breaching provisions as applied to plaintiff and the rest of FIRREA, including the same provisions as applied to other thrifts."); See Admiral, 57 Fed. Cl. at 435 (finding that other factors "independent of the supervisory forbearance" led to thrift's seizure). Here, the only parts of FIRREA that abrogated terms of the alleged contract were those that were inconsistent with its regulatory forbearances, so the alleged breach was the loss of the forbearances.

Second, the Court must identify when the breach occurred, a task made simple by the Court's previous decision on liability. Specifically, the Court has already determined that the Government's breach of plaintiff's alleged contract was December 7, 1989, when the new capital requirements were first applied to First Annapolis in abrogation of First Annapolis's forebearances. First Annapolis Bancorp, Inc. v. United States, 75 Fed. Cl. 263, 279 (2007). Thus, the Court should look to that date as the earliest possible point in determining whether the thrift was viable at the time of breach.

Indeed, the evidence at trial did not demonstrate that First Annapolis lost the forbearances before December 7, 1989. PX 32; Tr. 1868 (Jones); see also Hansen, 67 Fed. Cl. at 423 (analyzing total breach on remand based on the thrift's capital position at year-end 1989 when the new capital requirements were to be implemented). In November 1989, the regulators had not dishonored the forbearances but instead told First Annapolis to include a scenario in its

capital plan with the forbearances still in place. DX 2276; Tr. 1129-32 (Parran). First Annapolis did, in fact, submit such a plan dated January 5, 1990, which relied upon the continuing forbearances. PX 32; see also DX 406 at 1043. Therefore, First Annapolis continued to operate assuming the forbearances were in place until early 1990. Tr. 1868 (Jones) (testifying that First Annapolis's forbearances were in effect until February 27, 1990); DX 406. For this reason alone, the Court should conclude that the breach occurred after December 7, 1989.

At trial, Bancorp for the first time argued that the date of the breach was August 9, 1989, the date FIRREA was enacted. This argument, while expedient, conflicts with Bancorp's previous position. Indeed, Bancorp has taken the position throughout this litigation that the breach occurred on December 7, 1989, when regulators issued the first regulations under FIRREA. For example, in its November 21, 1997 reply memorandum in support of its "short form" motion for partial summary judgment Bancorp stated: "the government breached its contract less than a year and a half later, when FIRREA's regulations went into effect on December 7, 1989." Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 184 (1997). Pl. Reply Mem. in Supp. of "Short Form" Mot. for Partial Summ. J. and in Opp'n to Def. Cross-Mot. for Summ. J. (Nov. 11, 1997) at 16 (emphasis added); see also Pl. "Short Form" Mot. for Partial Sum. J. (May 23, 1997) at short form liability sheet page 9, § G ("On December 7, 1989, the OTS Regulations issued by the Government pursuant to FIRREA became effective, thereby placing the Government in breach of contract.") (emphasis added). The Court should conclude, therefore, that Bancorp has made a judicial admission regarding the date of breach. See Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp., 272 F.3d 1335, 1353 (Fed. Cir. 2001) (citing Help At Home Inc. v. Medical Capital, L.L.C., 260 F.3d 748 (7th Cir. 2001) ("Pleadings are judicial admissions and a party may use them to render facts indisputable."); see also Murrey

v. United States, 73 F.3d 1448, 1455 (7th Cir. 1996) ("A judicial admission trumps evidence."); Exxon Corp v. United States, 45 Fed. Cl. 581, 656 (1999) (assertions in briefs may act as judicial admissions).[14] For all these reasons, the Court should conclude that the date of the breach was on or after December 7, 1989.

### b. First Annapolis Would Have Failed Absent The Breach

The evidence at trial demonstrated that First Annapolis would not have been able to recover, even absent the breach.

First, the thrift constantly ran operational deficits and never became profitable. Second, like Admiral and Southwest, by the third quarter of 1989 at the latest, First Annapolis's actual regulatory capital was actually millions of dollars out of compliance. Third, First Annapolis's own reported capital levels were below the regulatory capital requirement before the breach. Therefore, First Annapolis would have failed absent the breach and, by the third quarter of 1989, was not a viable business.

#### i. First Annapolis Was Never Profitable

First Annapolis never met its earnings projections or became profitable. Indeed, the thrift did not earn a profit in any quarter from fiscal 1981 up until the time of the breach, aside from the fourth quarter of 1988 after a one-time asset sale. See DX 4015 (Demonstrative). These

---

[14] Indeed, as recently as June 6, 2006, in its contentions of fact and law filed before the June 2006 trial on our prior material breach defense, Bancorp alleged:

> On December 7, 1989, the regulations issued by the OTS under FIRREA became effective. 54 Fed. Reg. 46,845 (11/8/89). **As such, as a consequence of FIRREA and the OTS regulations, on or about, December 7, 1989, the Government breached its contract with Bancorp.**

Pl. Contentions of Fact and Law (Jun. 6, 2006) at 10 (emphasis added).

results demonstrate a fundamentally flawed institution.

First, the thrift's core operations suffered from a mismatch of interest earning assets to interest earning liabilities, meaning the thrift paid out interest on a larger balance than the balance from which it collected interest. Tr. 2262-63 (Kennedy). Therefore, despite a positive spread between its borrowing and lending, First Annapolis was unable to generate retained earnings from traditional thrift lending. Id.

Given the shortcomings of the thrift's core operations, First Annapolis was dependent upon its investments in service corporations, which were mostly real estate ventures, to cover its costs of operation. Tr. 2236-40 (Kennedy); Tr. 1734 (Jones); Tr. 1918 (Crompton); Tr. 1150 (Parran). The profits from these service corporation investments required static or improving economic conditions. DX 118 at 0035. For reasons entirely unrelated to the breach, in 1989 economic conditions tumbled precipitously: the country "entered into one of the worst real estate recessions in a very long time or in history" which had a devastating impact on First Annapolis and specifically its service corporation investments. Tr. 2243-46 (Kennedy); see also Tr. 1533-34 (Heiden).

First Annapolis acknowledged that "Delta has experienced a delay in selling joint venture projects due to the soft real estate markets." JX 61 at 1636. Indeed, for the first nine months after the conversion, First Annapolis's operating income was $4.1 million less than expected. DX 2120 at 1550, 0704, and 0486. In February 1989, First Annapolis tried to raise capital from outside investors but was told that it needed a track record of profitability. DX 2471 at 1486; see also Tr. 1753 (Jones). Therefore, First Annapolis had few options to maintain capital compliance.

First Annapolis sold $90 million in assets to realize gains of $4.4 million. DX 313; DX

2146; DX 2200. This was a non-recurring gain, however, that could not be relied upon in the future to offset First Annapolis's continuing losses. Tr. 2251-52 (Kennedy). Indeed, the asset sale did nothing to cure First Annapolis's unprofitable operations, and the thrift's capital continued to decline. See, e.g. DX 438 at 0005, 0011-0012, 0014. In the last half of 1989, First Annapolis's core operations lost money. This put increased pressure on the thrift's service corporation investments. Tr. 2254-55 (Kennedy). The decline in market conditions, however, caused many of First Annapolis's real estate investments to fail and forced many borrowers into financial ruin. DX 2272 at 1567-68; Tr. 2203 (Kennedy).

By 1990, First Annapolis continued to lose about $1 million per month, mostly due to its core operations. JX 65 at 1711, 1730; JX 68 at 0013; Tr. 2459-60 (Shapiro). By April 1990, First Annapolis had lost nearly $16.4 million (excluding goodwill amortization) from the time of the supervisory conversion, which was more than Bancorp's initial $13.6 investment. JX 68 at 0016; Tr. 2465-66 (Shapiro). Based on First Annapolis's failure to convert its service corporation investments into its projected profits, and its inability to minimize or offset its core operating losses, the thrift never became profitable. DX 2146 at 0864-65; DX 2200 at 1249-50; DX 2120 at 0128-29; JX 46 at 1034-35; JX 61 at 1646-47; Tr. 2240-65 (Kennedy); DX 4001, 4017-19 (Demonstratives). Indeed, plaintiff has offered no evidence that First Annapolis could ever have regained its financial footing even absent the breach. For this reason, the Court should reject plaintiff's restitution claim.

#### ii. First Annapolis Had Severe Asset Quality Problems

Along with poor earnings, First Annapolis had severe asset quality problems in 1989. Throughout 1989, increasing numbers of the thrift's borrowers were having difficulty paying

back their loans.[15] From March 1989 to September 1989, First Annapolis's delinquent loans skyrocketed from $13.1 million to $82.3 million. JX 46 at 1012; DX 365 at 1410; DX 4065 (Demonstrative). This poor asset performance contributed significantly to the thrift's core operating losses. Tr. 2268 (Kennedy). The borrowers' difficulties were unrelated to FIRREA or the breach, but, instead, were caused by First Annapolis's business practices and the declining economy. Tr. 2243-46, 2281-82 (Kennedy); Tr. 1533-34 (Heiden).

Most of First Annapolis's problem assets were in the thrift's higher risk portfolios which consisted of large real estate development loans. DX 397 at 0149-0155; Tr. 1729 (Jones); Tr. 2522-24 (Shapiro). As the examiners noted, many of these loans suffered from poor underwriting practices, inadequate appraisals of collateral, inadequate financial analysis of borrowers, and no loan-review function. DX 118 at 0006, 0023 and 0025; Tr. 1894-95 (Crompton); Tr. 986 (Cook); see also DX 439. Therefore, many large real estate investments were made without proper due diligence. Indeed, the lending officer, Mr. Cook, agreed that one of these investments turned out to be a "giant pyramid scheme." Tr. 1005 (Cook).

As market conditions deteriorated in late 1989, the situation worsened and many of these high-risk investments failed. Tr. 2243-45; 2268-69 (Kennedy). With further development stalled by declining demand and overvalued collateral securing these loans, First Annapolis was not getting the return on its investments it anticipated. Id.; see also Tr. 2527 (Shapiro). Indeed, increased asset-quality problems led to lower interest income, higher loan losses, and greater costs for handling the troubled loans. Tr. 2265 (Kennedy). As a result of these factors, First

---

[15] As Mr. Kennedy testified, the deterioration in asset quality was unrelated to FIRREA or the breach. Tr. 2230-31, 2283-84 (Kennedy); see also Tr. 1869 (Jones) (confirming that First Annapolis's asset quality problems had nothing to do with FIRREA).

Annapolis's earnings, capital, and viability all declined. See, e.g. DX 438 at 0005, 0011-0012, 0014. For this reason as well, First Annapolis would have failed absent the breach.

**iii. First Annapolis Reported Inadequate Regulatory Capital**

Because First Annapolis lost money after the conversion, its capital decreased and, by June 1989, was no longer adequate to support the thrift's viability, even absent the breach. Tr. 2245-46 (Kennedy.) In fact, according to First Annapolis's own financial records, at the time of the breach the thrift was out of capital compliance, even counting the supervisory goodwill. JX 58 at 1545. This fact alone demonstrates the breach was not total. See Admiral, 378 F.3d at 1343; Southwest, 63 Fed. Cl. at 196.

Under the alleged contract, First Annapolis was required to increase regulatory capital to at least 1.8 percent of liabilities by June 30, 1989, and 2.1 percent by June 30, 1990. JX 134 at 0521. Even by its own inaccurate reporting, First Annapolis failed these capital requirements on or before October 31, 1989. JX 58 at 1545; Tr. 1772-74 (Jones). By the end of November 1989, First Annapolis's reported that its regulatory capital ratio (including all of the goodwill) had fallen to 1.65 percent, which was $1.1 million below the contractually required capital requirement. DX 2294 at 1612. Therefore, as of the date of the breach, December 7, 1989, First Annapolis was losing money and, by its own admission, was out of capital compliance by at least $1.1 million.

In other total breach cases, the thrift's capital compliance at the time of the breach has been a determining factor for the Court's conclusion that the breach did not substantially impair the contract's value. See Admiral, 378 F.3d at 1343 (no total breach because "even if Admiral had been able to replace all of Haven's goodwill with cash on September 30, 1989, Haven would

still have been formally below its minimum capital requirement"); Southwest, 63 Fed. Cl. at 196 (no total breach because the thrift was out of capital compliance with goodwill restored, or "insolvent not withstanding the promises").

In this case, First Annapolis's noncompliance is also key because it helps to demonstrate that they were unlikely to recover absent the breach. Furthermore, First Annapolis's admitted October 31, 1989 capital deficiency was just the "tip of the iceberg" for the thrift's actual capital deficiency.

**iv. First Annapolis Overstated Its Regulatory Capital**

Although First Annapolis reported to the regulators that it was in regulatory capital compliance until October 31, 1989, the thrift overstated its regulatory capital by several million dollars.[16]

A properly run thrift will identify problem assets and set aside reserves to cover anticipated loan losses. Tr. 2156 (Kennedy). Whether intentionally or carelessly, First Annapolis overstated its capital because it failed to properly recognize losses. The regulators did not discover this overstatement until the 1990 ROE when they required First Annapolis to take a $12 million write-down to regulatory capital. DX 397 at 0156-57; DX 439 at 1300-1301; see also Tr. 1785-88 (Jones). This writedown is significant for several reasons.

First, the writedown demonstrates that First Annapolis was a poorly run institution. By

---

[16] In the prior material breach trial, the Court concluded that Bancorp made $1.6 million in loans to shareholders and that that was a breach of the contract. First Annapolis Bancorp, Inc. v. United States, 75 Fed. Cl. 280, 292 (2007). During the most recent trial, Mr. Kennedy explained that including the shareholder loans in capital is inappropriate. Tr. 2184-85 (Kennedy). If the shareholder loans are deducted form the reported regulatory capital of 1.99 percent, First Annapolis would have failed their first capital benchmark requirement of 1.8 percent requirement on June 30, 1989. Id.

misclassifying its problem assets and refusing to account for losses on specific loans, the thrift overstated its financial health to regulators. When First Annapolis's classification practices were discovered, the regulators concluded that the thrift's actions constituted an "unsafe and unsound banking practice" that represented a "deficiency in management and an overstatement of the condition of the institution." Tr. 1925-26 (Crompton); see also DX 438 at 0007, 0014-0016..

Second, along with First Annapolis's earnings and asset quality problems, the writedown shows that First Annapolis had effectively failed and was not viable by the third quarter of 1989, before the Government's breach. Tr. 2150, 2281 (Kennedy). Certainly, by the third quarter of 1989, First Annapolis was on an irreversible course to failure. Tr. 2150 (Kennedy). At that time, the thrift was both out of capital and hemorrhaging money. Therefore, as in Admiral, there is no total breach because First Annapolis would not have been able to recover absent the breach. 378 F.3d at 1343; see Tr. 1797-98 (Jones) (even absent FIRREA, First Annapolis "clearly was not a viable institution.")

Bancorp essentially argues that because these losses are based on accounting rules and regulations, that the Court can choose to simply disagree with the 1990 ROE's conclusions. Mr. Kennedy, however, an expert qualified in general accounting and financial institutions, did an independent analysis of First Annapolis's records, including the loan files, appraisals, other information about the collateral, and the borrowers' financial status. Tr. 2193 (Kennedy). After this independent analysis, Mr. Kennedy calculated the losses from the Bayside Marina, Dennis Blauer, and the Northampton loans, and also determined when First Annapolis should have recorded those losses. DX 4005 (Demonstrative); DX 4006 (Demonstrative); DX 4007 (Demonstrative); Tr. 2199-2216 (Kennedy). The losses on these three loans alone totaled $5.7 million, and, had they been properly recognized, would have demonstrated First Annapolis's

nonviability by June 1989. Tr. 2189-91 (Kennedy).

More importantly, Bancorp has not introduced any evidence to disprove or conflict with Mr. Kennedy's conclusions as to the amount of the loss and the timing of when First Annapolis should have recognized the losses. Indeed, there is no indication that First Annapolis's management even disagreed with these writedowns.

Mr. Kennedy also gave specific examples of how First Annapolis failed to follow its own asset classification policy which resulted in it both under reporting and misclassifying problem assets. He testified that the $20 million in loans involving Northampton Office Park and the Blauer entities should have been classified as substandard not special mention, which would have lowered capital by $2 million and taken First Annapolis out of compliance by September 1989. Tr. 2276 (Kennedy). Therefore, it is clear from the evidence at trial that First Annapolis's regulatory capital was deficient earlier than the reported October 31, 1989 failure, and it was deficient by several million dollars even with the benefit of all of its forbearances.

v. **First Annapolis Could Not Have Raised Capital**

Aside from capital noncompliance, Courts also examine the thrift's ability to address that problem by raising capital. In Admiral and Southwest, plaintiffs contended that even though they were out of capital compliance, they could have raised capital absent the breach. Admiral, 378 F.3d at 1345; Southwest, 63 Fed. Cl. at 196-97. The Courts rejected that contention based on a lack of evidence. Id. Here, Bancorp never even alleged that it could have raised capital to cure this deficiency. Moreover, the evidence demonstrated that they tried and failed to raise capital.

In February 1989, First Annapolis tried to raise capital. DX 2471 at 1486; see also DX 291 at 1188. The thrift's investment bankers, however, told First Annapolis that the thrift would

need to make positive earnings for 12 to 24 months before it could raise capital. DX 2471 at 1486; Tr. 2279 (Kennedy). First Annapolis had not had positive earnings since fiscal year 1981. JX 89 at 0070. At the time of the breach, the thrift's losses had continued and the situation had deteriorated. Tr. 2465-68 (Shapiro). Mr. Kennedy testified that the thrift would have needed approximately $17 million of new capital as of April 1990, just to meet the second benchmark of 2.1 percent on June 30, 1990. Tr. 2279 (Kennedy); DX 4029 (Demonstrative). Moreover, Mr. Kennedy found that, given its ongoing losses, First Annapolis would have needed to raise $100 million to become profitable. Tr. 2278-79 (Kennedy). Thus, because of First Annapolis's inadequate and declining regulatory capital, and inability to raise new capital, the thrift would not have survived, even absent the breach. Accordingly, the breach was not total.

vi. **The Loss Of The Forbearances Did Not Harm Bancorp**

Because First Annapolis would not have recovered absent the breach, the loss of the regulatory forbearances did not harm Bancorp. Tr. 2455 (Shapiro).

Not only did Bancorp fail to prove total breach, it failed to prove that the breach harmed it. Thus, restitution is clearly inappropriate. See Southwest, 63 Fed. Cl. at 195 (finding that regardless of the value of the forbearances at the time of contract, restitution is inappropriate because the breached promises were worth nothing at the time of the breach); see also Admiral, 57 Fed. Cl. At 434.

The regulatory forbearances were not inherently valuable. Instead, they only had potential value to the extent they could enable First Annapolis to stay open or hold more assets. Tr. 2454-55 (Shapiro). Because First Annapolis would have failed absent the breach given its asset quality, earnings, capital position, and the deteriorating economic conditions, the regulatory forbearances provided no value in protecting the thrift from seizure. Tr. 2455-56 (Shapiro).

Therefore, First Annapolis would have been seized even absent the breach just as it was in the real world. First Annapolis had systemic problems generating profits, the regulatory forbearances provided no value in allowing the thrift to hold more assets. Tr. 2462-63 (Shapiro). Indeed, more assets likely would have simply meant more losses. Because the forbearances had no potential value to the thrift, they also had no potential value to its shareholder Bancorp. Tr. 2463-64 (Shapiro).

### B. Restitution Is Not Proper Because The Parties Cannot Be Returned To The Status Quo Ante

Restitution is not a proper remedy because unwinding this contract would not return Bancorp and the Government to their status quo ante.

Courts award restitution "to return the parties, as nearly as is practicable, to the situation in which they found themselves before they made the contract." Glendale Fed. Bank, F.S.B. v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (citing Restatement (Second) of Contracts § 384, cmt. a (1981). In other words, the Court must be able to "unscramble the egg" and return each party's contribution to the contract. LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 77 (1999). As a result, restitution, as a remedy for breach of contract, is most appropriate in the classic case in which the parties' performance can be easily unwound, as in Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604 (2000). See also Restatement (Second) of Contracts § 373.

In Mobil, plaintiffs paid the Government $156 million in "up-front cash" in exchange for oil leases with exploration rights. 530 U.S. at 611. The United States agreed to review and act on any exploration plan within 30 days. Id. at 610. Two days after the plaintiffs submitted their exploration plans, Congress passed the Outer Banks Protection Act ("OBPA"), Pub. L 101-380,

104 Stat. 555 (1990), which effectively prohibited approval of the plans and suspended all leases off North Carolina's shore. Id. at 612-13. The Supreme Court found that the OBPA repudiated the contracts. Id. at 621. Subsequently, North Carolina objected to the plaintiffs' application for a lack of information about the exploration's possible environmental impact. Id. at 613.

In Mobil, the Government argued that the $156 million should not be returned to the plaintiffs in restitution because a third party, North Carolina, had objected to their applications, and "they could not have explored (or ultimately drilled) for oil in any event." Id. at 623. The Supreme Court rejected that argument, ruling that the law entitled the companies to restitution whether the "contracts would, or would not, ultimately have produced a financial gain or led them to obtain a definite right to explore." Id. at 623-24.

The Supreme Court then provided the following analogy, which Bancorp's counsel cited in his opening statement. "If a lottery operator fails to deliver a purchased ticket, the purchaser can get his money back – whether or not he eventually would have won the lottery." Id. at 624; see Tr. 911 (Cooter). Similarly, "if one party to a contract . . . advances the other party money, principles of restitution normally require the latter, upon repudiation, to refund that money." Mobil, 530 U.S. at 624 (citing Restatement (Second) Contracts § 373).

Mobil does not support Bancorp's restitution claim because: (1) the Government never received $13.6 million from Bancorp; (2) the Government partially performed the contract, and (3) Bancorp substantially altered the condition of the thrift before it was returned to the Government.

### 1. Bancorp Did Not Confer $13.6 Million On The Government

Bancorp failed to prove that it conferred a $13.6 million benefit upon the Government in performing the contract. See Hansen, 53 Fed. Cl. at 99; LaSalle, 45 Fed. Cl. at 115; Restatement

§ 370. Unlike Mobil, where the Government received $156 million in cash, in this case, Bancorp never gave the Government the money sought in restitution. Instead, Bancorp infused the $13.6 million into its own thrift subsidiary. Thus, the Government need not make restitution to Bancorp.

Recognizing that Bancorp never paid any money to the Government, Mr. Parran testified that the Government"kept the money" when it took over the thrift. Tr. 1082. The evidence, however, actually demonstrated that while Bancorp infused $13.6 million into First Annapolis in August 1988, Bancorp maintained control over the thrift – and the investment – until well into 1990. Long before First Anapolis was seized, the thrift had lost Bancorp's entire investment. JX 68 at 0016; Tr. 2282-85 (Kennedy); DX 4031 (Demonstrative).

In August 1988, First Annapolis's tangible net worth deficit, with the $13.6 million infusion, was $51.4 million. JX 68 at 0016. By April 30, 1990, First Annapolis's tangible net worth deficit was $67.8 million. JX 68 at 0016. In total, between August 12, 1988, and April 30, 1990, First Annapolis's own financial reports indicate that it realized losses of $16.4 million (excluding the amortization of goodwill). JX 68 at 0016; Tr. 2284 (Kennedy); DX 4031 (Demonstrative).[17] Thus, First Annapolis cumulative losses were greater than Bancorp's initial investment. Tr. 2467-69 (Shapiro); DX 5013 (Demonstrative). In fact, First Annapolis lost Bancorp's initial investment before it lost its regulatory forbearances because its adjusted GAAP capital was negative 5 million. Tr. 2464-65 (Shapiro); DX 397 at internal page 19.

Moreover, the United States ultimately bore a larger amount of liabilities than if it had

[17] These calculations underestimate the actual losses because the Government did not seize First Annapolis until June 1, 1990. See First Annapolis Bancorp, Inc. v. United States, 75 Fed. Cl. 263, 272 (2007); see also Tr. 1791 (Jones).

simply paid off First Annapolis's liabilities rather than let Bancorp acquire the thrift. JX 3 at 0834; DX 635 at 003. When Bancorp acquired First Annapolis on August 13, 1988, First Annapolis's tangible net worth deficit stood at $65 million (before the capital was infused). JX 3 at 0834. After First Annapolis failed, the receivership deficit was $187.6 million. DX 635 at 0003. This deficit included $177 million that the FDIC paid to First Annapolis's depositors. DX 635 at 0005. In fact, the Government did not make any profit of the resolution of the thrift but instead lost $103 million on the liquidation of First Annapolis's assets. DX 635 at 0008.

Mobil does not require restitution in these circumstances. In an analogy to Mobil's lottery ticket example, Bancorp purchased a lottery ticket from First Annapolis, received the ticket, played the lottery and lost, then tore up the ticket, and now seeks to sue another player who lost even more in the lottery. Bancorp had its chance to run the thrift. It succeeded only in dissipating its investment, falling out of capital compliance even with the goodwill, and running the thrift into insolvency. Certainly, an award of restitution in this case would be contrary to the well-established principle that restitution should only be awarded when "it is just in the circumstances." Restatement (Second) Contracts § 243(4); see Mobil Oil, 530 U.S. at 608.

Because the Government did not get any of the $13.6 million Bancorp infused into First Annapolis, restitution, if awarded, would not return the parties to their *status quo ante.*

### 2. The Government Partially Performed The Contract

It would be improper to unwind this contract because the Government partially performed. See Tr. 1101-05 (Parran).

In Mobil, the Government did not begin to perform. Thus, the court had no trouble unwinding the contract. Here, the Government allowed the thrift to convert and then performed the contract for at least 16 months. After Bancorp infused its initial investment into First

Annapolis, Bancorp controlled and managed the newly-converted thrift, subject, of course, to industry-wide safety and soundness requirements. Tr. 1093-96 (Parran); see generally Tr. 1865-66 (Jones); JX 134. Mr. Parran admitted that Bancorp owned and operated First Annapolis, with the benefit of the three forbearances, from August 1988 to December 1989. Tr. 1101-05 (Parran).

Bancorp also significantly benefitted from the Government's performance by being allowed to keep any resulting profits from operating First Annapolis. Tr. 2465 (Shapiro) (Bancorp had the "opportunity to own and operate First Annapolis, as long as they met their regulatory capital benchmarks. And effectively, what this means is they got to keep the upside, namely, realize all the profits associated with First Annapolis, while their downside was limited to the loss of their initial investment."). Courts have been disinclined to find a "total" breach and order rescission where there has been partial performance by the breaching party. See Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1551 (Fed. Cir. 1992); Restatement (Second) Contracts § 241 cmt. d.; Hansen, 367 F.3d at 1309 n.10 ("The goal of restitution, to return the parties to their precise state before the contract, is incompatible with the situation of partial breach, where the non-breaching party has, to some extent, benefitted from the transaction."). Because the Government has partially performed, restitution is inappropriate.

### 3. Bancorp Altered First Annapolis's Condition

Restitution is inappropriate because Bancorp did not return First Annapolis in substantially as good condition as when it acquired control over the thrift. See Hansen, 367 F.3d at 1315 (quoting Restatement (Second) Contracts § 384 (1)(a)).

Restitution is generally unavailable if the property obtained by the non-breaching party has "been used, destroyed or substantially altered in character while in his possession."

Restatement § 384, cmt. a. Bancorp acquired First Annapolis as part of the contract found by the Court, but it failed to return the thrift in substantially as good condition. Tr. 1797 (Jones) (even absent FIRREA, First Annapolis "clearly was not a viable institution"); Tr. 2281 (Kennedy) (First Annapolis was not a viable institution by the third quarter of 1989); see generally DX 438. Indeed, First Annapolis changed markedly under Bancorp's ownership, making it impossible to return the thrift to the Government in its original condition. Due to poor management and a decline in market conditions, First Annapolis's condition deteriorated between the July 1988 ROE and the 1990 ROE. Tr. 1922-24 (Crompton). Therefore, it is impossible to return the Government to its position before the contract.

It is also undisputed that, from August 1988 until December 1989, while First Annapolis received the full benefit of the forbearances, First Annapolis experienced operating losses, excluding gains from assets sales, for each and every quarter. Tr. 1145 (Parran); Tr. 1794-96 (Jones); DX 397 at 0160; DX 438 at 0005 ("The institution has experienced severe operating losses which have adversely affected its capital position. Such losses have averaged approximately $2 million per quarter during the past year."); DX 438 at 0015 ("for the year ended December 31, 1989, the institution reported net operating losses of $11.3 million"); see Tr. 1966-69 (Crompton). First Annapolis's deteriorating financial condition clearly illustrates this point. As of August 13, 1988, First Annapolis's liabilities exceeded its assets by $65 million. JX 3 at 0834. After the thrift failed, the Government was forced to pay $177 million. DX 635 at 0005.

In addition, Bancorp's mismanagement diminished the thrift's value. See Hansen at 1319. The thrift's management refused to recognize significant credit losses, improperly classified problem assets, and did not sufficiently underwrite its assets. See, e.g., Tr. 1920-27

(Crompton); Tr. 2266-68 (Kennedy); DX 397; DX 439; DX 438; DX 301; DX 313. In fact, on December 28, 1988, Supervisory Agent Greg Jones took the "very rare" action of asking First Annapolis's board of directors to perform an "internal assessment of itself" to correct various problems at the institution. Tr. 1748-49 (Jones); DX 267; see also DX 302. Mr. Jones found that First Annapolis "needed strengthening of management" because "the current team that was there didn't seem to be doing the job that was necessary to run the institution in a profitable manner." Tr. 1748-49 (Jones); DX 267.

During Bancorp's ownership, First Annapolis's problems grew significantly. Tr. 1922-24 (Crompton) (First Annapolis's mismatched asset/liability structure "worsened significantly" between the 1988 and 1990 exams); DX 397 at 0139; Tr. 2510 (Shapiro); see also DX 438; DX 4023 (Demonstrative). According to Greg Jones, although First Annapolis's management "talked a good talk" "they weren't walking the walk," and First Annapolis's "problems never seemed to go away. They continued to persist, and in some cases they seemed to get worse." Tr. 1864 (Jones).

Clearly, Bancorp made bad management decisions prior to the breach, and it cannot avoid the consequences of its mismanagement by obtaining a full return of its investment. DX 267 at 0112 ("The volume and nature of supervisory concerns reflect unfavorably upon the overall administration of the institution and pose a risk to First Annapolis's long-term viability."). Based on the thrift's changed condition and Bancorp's mismanagement, restitution is inappropriate.

### C. <u>Awarding Bancorp Full Restitution Would Provide An Improper Windfall</u>

The Court should reject Bancorp's restitution claim because such an award would place Bancorp in a better position than it would have been in absent the breach, and, therefore, would be an improper windfall.

"The Federal Circuit has held that restitution damages should not be awarded if the award would result in a windfall to the non-breaching party." Southwest, 63 Fed. Cl. at 197 (citing Hansen, 367 F.3d at 1315; Admiral, 378 F.3d at 1345; Hi-Shear Technology Corp. v. United States, 356 F.3d 1372, 1382 (Fed. Cir. 2004) ("the recovery of damages must not serve as a windfall to the non-breaching party")). Returning $13.6 million to Bancorp would clearly be a windfall to it because, as described above, the evidence demonstrated that First Annapolis lost the entire investment before the breach and for reasons unrelated to the breach.[18] Bancorp, should it receive the restitution it seeks, would be placed in a far better position than it would have been had the breach never occurred.

## II. Bancorp Is Not Entitled To A Tax "Gross-Up" Of Any Award

The Court should conclude that Bancorp's claim for a tax "gross-up" is unsupported and contrary to law.

As we established at trial, Bancorp's claim fails for several reasons. First, any recovery by Bancorp would be a return of a capital item and excluded from taxable income. Second, even if a restitution award was taxable, Bancorp could shield itself from any taxation using net operating loss carryforwards. Third, awarding a tax gross-up is beyond the Court's authority. Fourth, a tax gross-up would constitute an unfair windfall to Bancorp.

---

[18] Bancorp got what it paid for – the opportunity to obtain control of the thrift, deploy the $13.6 million in capital, and keep any profits made by the thrift. See Tr. 2464-65 (Shapiro). The Government never promised to insure Bancorp's initial investment if it was lost as a result of First Annapolis's own investments. Under these circumstances, an award of Bancorp's investment in First Annapolis is an improper windfall because it would improperly reallocate the risks that the parties had allocated for themselves. See 3 Dan B. Dobbs, Law of Remedies § 12.7(5) (2d ed. 1993). See Canfield v. Reynolds, 631 F.2d 169, 178 (2d Cir. 1980) (declining to order rescission because it would give plaintiff a windfall in a setting in which there was "no reason to relieve [plaintiff] of his investment's downside risks").

## A. Bancorp Failed To Prove The Taxability Of Any Potential Damages Award

Federal Circuit precedent holds that "a tax gross-up is [only] appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable." Carabetta Enterprises, Inc. v. United States, 482 F.3d 1360, 1367 (Fed. Cir. 2007) (tax gross-up claim denied for failure to prove entitlement to a tax gross-up of alleged damages). Accordingly, when a plaintiff fails to prove with reasonable certainty that a monetary award would be treated as taxable upon receipt, the Court must deny any request for a tax gross-up. Home Sav. of Am., FSB v. United States, 399 F.3d 1341, 1355-56 (Fed. Cir. 2005) (taxability of a damages award must be established with reasonable certainty); LaSalle Talman Bank, F.S.B. v. United States, 462 F.3d 1331, 1337 (Fed. Cir. 2006). Here, Bancorp failed to establish the taxability of any restitution award with reasonable certainty, thus making a tax gross-up contrary to law.

Capital is defined as the "[o]wners' equity in a business." Black's Law Dictionary 208 (6th ed. 1990). As a general rule, "[i]n the case of a corporation, gross income does not include any contribution to. . . capital . . ." 26 U.S.C. § 118(a). Because capital items are excludable from financial statement income – the starting point for taxable income – capital items are also excludable from taxable income. Tr. 2057 (Clowery).

Bancorp concedes that its requested restitution award equates to the "costs of its capital contribution to First Annapolis [] in the amount of $13,665,907." Pl. App. A at 4-5. Therefore, Bancorp's restitution claim is admittedly based upon its ownership interest in First Annapolis which represents a capital item. Tr. 2101-2106 (Clowery). As Dr. Clowery explained, because Bancorp's $13.6 million investment in First Annapolis was a nontaxable event, any recovery of this lost investment would be recorded as a capital item on its balance sheet, and excluded from

both financial statement and taxable income. Tr. 2102-2106 (Clowery); see 26 U.S.C. § 118(a).

Legal authority distinguishes between court awards that replace lost profits and awards that represent a capital recovery. See, e.g., Hort v. Comm'r of Internal Revenue, 313 U.S. 28 (1941); Raytheon Prod. Corp. v. Comm'r, 144 F.2d 110, 113 (1st Cir. 1944). While a recovery of lost profits represents ordinary income taxable to the recipient, a capital recovery is not taxable. Id. This long-standing distinction has its genesis in the Internal Revenue Code and basic economic principles, as the Internal Revenue Service ("IRS") has recognized:

> Inherent in [19 U.S.C. § 61] of the Code is the concept of economic gain. For a taxpayer to have income under section 61, there must be an economic gain that benefits the taxpayer personally.

Rev. Ruling 81-277. Thus, when a monetary recovery merely restores a taxpayer to his original economic status, there is no accession to wealth, and any recovery is non-taxable. United States v. Gotcher, 401 F.2d 118 (5th Cir. 1968).

To determine whether an award is taxable income or a non-taxable return of capital, courts look to the nature of the claim and the underlying basis for recovery. See Hort, 313 U.S. at 28. This process has come to be known as the origin of the claim test. See id. In determining the origin of the claim, "[t]he test is not whether the action was one in tort or contract but rather the question to be asked is 'In lieu of what were the damages awarded?'" Raytheon Prod. Corp., 144 F.2d at 113.

In this case, the underlying basis for Bancorp's alleged restitution is its $13.6 million capital investment in First Annapolis. Tr. 2060-2061 (Clowery). Indeed, Bancorp's characterization of this award as "restitution," rather than expectancy damages, proves it's a

return of capital and not income. By definition, restitution restores a plaintiff to "his or her original position prior to loss or injury" and no economic gain results. Black's Law Dictionary 1313 (6th ed. 1990); see also, Rev. Ruling 81-277. Therefore, pursuant to the origin of the claim test and Bancorp's own admission, an award of Bancorp's restitution would be a non-taxable, capital recovery.

Bancorp presented no evidence refuting Dr. Clowery's testimony that its claim represents a capital item. Indeed, resting solely on the testimony of Mr. G. Thomas Daugherty, a Bancorp officer with no expertise in either accounting or corporate taxation, Bancorp failed to provide any substantive evidence to support its tax gross-up claim. See Tr. 1596; 1606-1607 (Daugherty). Mr. Daugherty admitted that he does not know whether an award based upon a return of capital is taxable. Tr. 1622-28 (Daugherty). Further, Mr. Daugherty did not engage in any analysis to determine the nature of restitution, or even ascertain whether his understanding of the taxability of any potential award is accurate. Tr. 1611-16; 1628 (Daugherty). Therefore, the Court should reject Bancorp's tax gross-up claim.

### B. Bancorp's Available Net Operating Loss Carryforwards Shield Bancorp From Taxation

The Court should reject Bancorp's tax gross-up claim because even assuming a taxable recovery, Bancorp's net operating loss carryforwards far exceed any potential damages award, and shield Bancorp from taxation.

In 1990, on its tax returns, Bancorp reported approximately $58 million in net operating losses. DX 2496. These losses, which have a 20 year useful life, will be available to shelter any restitutionary award in this case made before December 31, 2010. Specifically, after a two year carryback period, net operating losses may be carried forward for 20 years following the year in

which the net operating losses were incurred. Tr. 2071-2072 (Clowery); 26 U.S.C. § 172(b)(1)(A). The current law, codified at 26 U.S.C. § 172(b)(1)(A), permits Bancorp to utilize any net operating losses reported on its tax returns for up to 20 years after the year of loss. Tr. 2071-2072 (Clowery).

Because Bancorp has millions of dollars in unused net operating losses with which it can shield any award from taxation, Bancorp is not entitled to a tax gross-up.

### C. A Tax "Gross-Up" Is Barred As A Matter of Law

Awarding a tax "gross-up" is beyond the trial court's authority because, under 28 U.S.C. § 1491(a)(1), the jurisdictional basis upon which Bancorp premises this action, the United States has not waived sovereign immunity for tax "gross-up" claims.

A breaching party is not liable for damages or restitution not directly caused by the breach. Myerle v. United States, 33 Ct. Cl. 1, 18-19 (1897); see also Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001). For any indirect award to be recoverable against the United States, a separate waiver of sovereign immunity is necessary, especially where the indirect award is incurred as a result of the plaintiff's initiation of litigation. See 28 U.S.C. §§ 2412(a), (d) (separate waiver of sovereign immunity for costs and attorney fees against the Government); Library of Congress v. Shaw, 478 U.S. 310, 311, 315-17 (1986).

For a tax "gross-up" to compensate a plaintiff for harm it has suffered, the plaintiff must be forced to actually pay taxes upon the award. This only happens if three conditions are met: (1) the Court awards a recovery as a result of plaintiff's decision to initiate litigation; (2) Congress has enacted laws making the award taxable; and (3) the plaintiff does not shelter the award from taxes. Because these three steps necessarily exist between the breach and the

recovery, taxation of the award is not compensable as a direct effect of the breach, and a separate waiver of sovereign immunity is necessary for the Court to entertain this claim.[19]

Even if this Court has the authority to entertain a tax "gross-up" claim, the Court should deny the claim because the breach did not cause taxation of any award. See Myerle, 33 Ct. Cl. at 18-19; California Fed. Bank v. United States, 395 F.3d 1263, 1267-68 (Fed. Cir. 2005) (plaintiff must prove that claimed damages would not have been lost "but for the breach;" the claimed damages must "inevitably and naturally, not possibly nor even probably flow from the defendant's breach," and this causal connection between the breach and the claimed losses must be "definitely established") (internal marks and citation omitted)).

**D. Any Tax "Gross-Up" Here Would Constitute An Improper Windfall**

Finally, a tax "gross-up" in this case will undoubtedly constitute a windfall because it will place Bancorp in a better position than it would have occupied absent the breach. A tax "gross-up" guarantees Bancorp a rebate now for a tax that will likely never be paid, and there is no way for the Court or defendant to monitor whether Bancorp will ever pay taxes upon any award, or receive a refund of any such payment. Tr. 2061-2062 (Clowery); see 26 U.S.C. § 6103 (barring IRS disclosure of taxpayer return information). Given Bancorp's inability to prove taxability with reasonable certainty, a tax gross-up at this juncture would be speculative and an impermissible windfall for Bancorp.

---

[19] This Court also lacks the authority to entertain Bancorp's claim because a tax "gross up" represents a pre-emptive tax refund, and this Court only has jurisdiction over refund suits if the tax has been paid in full. See Shore v. United States, 9 F.3d 1524, 1526 (Fed. Cir. 1993).

**CONCLUSION**

Because Bancorp failed to prove it was entitled to restitution or tax-gross up, we respectfully request that the Court enter judgment in our favor on all of Bancorp's claims.

Respectfully submitted,

MICHAEL HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director

s/Timothy J. Abraham
TIMOTHY J. ABRAHAM
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 616-0477
Facsimile: (202) 353-7988
Attorneys for Defendant

OF COUNSEL:
SCOTT AUSTIN
MELINDA HART
MARK PITTMAN
DELISA M. SANCHEZ
Trial Attorneys

June 4, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of June 2007, a copy of the foregoing "DEFENDANT'S INITIAL POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Timothy J. Abraham

Timothy J. Abraham