**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No. 94-522C**
**(Judge Williams)**

---

**FIRST ANNAPOLIS BANCORP, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFF'S REPLY TO DEFENDANTS' POST-TRIAL BRIEF

---

**Dale A. Cooter**
**James E. Tompert**
**COOTER, MANGOLD, TOMPERT & KARAS, L.L.P**
**5301 Wisconsin Avenue, N.W.**
**Suite 500**
**Washington, D.C. 20015**
**(202) 537-0700**

**Attorneys for Plaintiff**
**First Annapolis Bancorp, Inc.**

**Dated: July 23, 2007**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. PLAINTIFF IS ENTITLED TO $22,606,959 IN RESTITUTION . . . . . . . . . . . . . . . . . . . . . . . 2

A. Bancorp Proved That There Was A Total Breach Of Contract . . . . . . . . . . . . . . . . . 2

B. Government Did Not Prove That There Was Not A Total Breach . . . . . . . . . . . . . . . 4

1. The Government's Evidence Prior To The Conversion Is Irrelevant . . . . . . . . . . . 5

2. The Government's Evidence During The Course Of Contract Performance Is Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7

3. The Government's Evidence At The Time Of The Breach Of Contract Is Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

4. The Government's Evidence After The Breach Of Contract Is Irrelevant . . . . . . 15

C. Bancorp Proved That First Annapolis Would Be Viable . . . . . . . . . . . . . . . . . . . . . . . 16

D. Restitution Is A Proper Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

E. The Government Is Not Entitled To An Offset . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

II. BANCORP IS ENTITLED TO A TAX GROSS-UP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

FEDERAL CASES

Admiral Fin. Corp v. United States, 54 Fed. Cl. 247 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Admiral Fin. Corp v. United States, 57 Fed.Cl. 418 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Admiral Financial Corp. v. United States, 378 F.3d 1336 (Fed. Cir. 2004) . . . . . . . . . . . . 2, 4, 13, 15

Amber Resources Co. v. United States, 73 Fed.Cl. 738 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

American Capital Corp. v. United States, 472 F.3d 859 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

American Capital Corp. v. United States, 65 Fed. Cl. 241 (2005) . . . . . . . . . . . . . . . . . . . . . . . 4, 11

Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271 (2005) . . . . . . . . . . . . . . . . . . . . . 18, 19

Caroline Hunt Trust v. United States, 470 F.3d 1044 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 20

Green v. C.I.R., T.C. Memo. 2003-244, 2003 WL 21940722,
86 T.C.M. (CCH) 273 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Hansen Bancorp, Inc. v. United States, 367 F.3d 1297 (Fed.Cir.2004) . . . . . . . . . . . . . . . . . . . . . . 2

Home Savings of America v. United States, 399 F.3d 1356 (Fed. Cir. 2005) . . . . . . . . . . . 21, 22, 23

Hughes v. United States. 71 Fed. Cl. 284 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Kilburg v. C. I. R., T.C. Summ. Op. 2004-36, 2004 WL 565952 (2004) . . . . . . . . . . . . . . . . . . . . 23

Lisbon Contractors, Inc. v. United States, 828 F.2d 759 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . 20

Mobil Oil Exploration & Producing Southeast, Inc. v. United States,
530 U.S. 604 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 15

Salguero v. City of Clovis, 366 F.3d 1168 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Sergeant Mechanical Systems, Inc. v. United States, 54 Fed. Cl. 636 (Fed. Cl. 2002) . . . . . . . . . . . 4

Southwest Investment Co. v. United States, 63 Fed. Cl. 182 (2004) . . . . . . . . . . . . . . . . . . . . . . 4, 12

Westfed Holdings , Inc. v. United States, 407 F.3d 1352 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . 20, 21

FEDERAL STATUTES

28 U.S.C. §172(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Taxpayer Relief Act of 1997, Pub. L. 105-34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FEDERAL REGULATIONS

12 C.F.R. §563b.26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

TREATISES

Restatement (Second) of Contracts, §349 (1979)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 94-522C** |
| | ) | **(Judge Williams)** |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFF'S REPLY TO DEFENDANT'S POST-TRIAL BRIEF**

Plaintiff, First Annapolis Bancorp, Inc. ("Bancorp"), by and through counsel, hereby submits its Reply to Defendant's Post-Trial Brief, and states as follows:

**INTRODUCTION**

During the trial of this matter in March 2007 and in its Post-Trial Brief, the Government, consistent with its *modus operandi* in this case, has submitted a barrage of irrelevant evidence and ill-founded expert testimony in an attempt to overwhelm the Court and obfuscate the real issues in this case. Despite this attempt, the real issues in this case remain the same as set forth in Plaintiff's Post-Trial Brief, and are quite simple. They are: (1) Was there a "total breach" of the contract? (2) If so, what amount of restitution has Bancorp demonstrated with reasonable certainty that it is entitled to? (3) Has the Government established with reasonable certainty that there should be an offset to that amount based on the value of any benefit retained by First Annapolis so as not to confer a windfall on Bancorp? Consideration of the appropriate legal standards discussed in detail in Plaintiff's Post-Trial Brief and recited in part below, along with a careful review of the evidence presented at trial demonstrates that Bancorp proved a total breach of contract, that Bancorp is entitled to restitution in

the amount of $22,609,959, and that the Government has not proven that there should be any offset.

## ARGUMENT

## I. PLAINTIFF IS ENTITLED TO $22,606,959 IN RESTITUTION

### A. Bancorp Proved That There Was A Total Breach Of Contract.

In its Brief, the Government agrees with the proposition that a "'total breach' is a breach that 'so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance.'" Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 608 (2000) (quoting Restatement (Second) of Contracts, §373 (1979)); Government's Brief at 28 (citing Admiral Financial Corp. v. United States, 378 F.3d 1336, 1344-45 (Fed. Cir. 2004) (citing Mobil Oil). The Government also does not dispute the proposition that "causation is not an element of restitution" because "restitution is available only if the breaching party's conduct amounts to a *total* breach of its contractual duties." Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1305 (Fed.Cir.2004).

As set forth in detail in Plaintiff's Brief, Bancorp proved by a preponderance of the evidence that the enactment of FIRREA substantially impaired the value of its contract with the Government. Plaintiff's Brief at 7-22, 35-38. As Douglas A. Parran ("Parran") testified, the passage of FIRREA "completely and totally broke the contract" by and between Bancorp and the Government. 3/19/07 Tr. at 1045-46. At trial, Parran, Gregory B. Jones ("Jones") and David A. Kennedy ("Kennedy") all testified that FIRREA completely took away the three regulatory forebearances of the contract, namely, the goodwill forbearance, the capital ratio forbearance and the investment in service corporations

forbearance. Parran 3/19/07 Tr. at 1046 (FIRREA took away all of the forbearances; the Bank did not "keep one item, not a hint of one item"); Jones 3/23/07 Tr. at 1805-06 (FIRREA took away each and every forbearance); Kennedy 3/28/07 Tr. at 2330 (as a result of FIRREA, the government took away all of the forbearances). These "forbearances were the heart and soul of the operation of Bancorp." Heiden 3/21/07 Tr. at 1558; see also 3/21/07 at 1430 (same); see also DX 406 (2/27/90 letter from John E. Ryan to the First Annapolis Board of Directors and its attached Consent Agreement (subjecting Bank to restrictions on activities); Parran 3/19/07 Tr. at 1074-75 (under restrictions of letter, Bank would not sell, refinance, extend, modify, purchase, invest in, letters of credit; except for making single-family loans, the Bank's management had to now obtain permission for any growth activity). The fact that FIRREA took away the forebearances was not disputed by the Government in its Brief. Indeed, it was confirmed by the Government witnesses who testified at trial.

Bancorp submits that its evidence of a total breach of contract is dispositive. As Bancorp argued in its Brief, because the Government committed a total breach of the contract, Bancorp is entitled to restitution, with a tax gross-up, without regard to whether or not the contract would ultimately have proven beneficial. Plaintiff's Brief at 35-37, 47-51; Mobil Oil 530 U.S. at 623-24 (the "law entitle[d] the [plaintiffs] to that restitution whether the contracts would, or would not, ultimately have produced a financial gain or lead them to obtain a definite right to explore."); Amber Resources Co. v. United States, 73 Fed.Cl. 738, 745, 747 (2006) ("Amber II) ("[A]s Professor Kull explains, rescission is not concerned with inquiries into the profitability of the now-cancelled contract. [citation omitted]. The possibility that the injured party may benefit from the breach by being spared

performance of a losing contract is accepted and immaterial").[1] As such, the evidence of the financial performance of First Annapolis submitted by the Government and recited in its Brief is irrelevant to determining whether Bancorp is entitled to restitution.

**B. Government Did Not Prove That There Was Not A Total Breach.**

Even if the evidence submitted by the Government is considered by the Court, at the very least considering the foregoing, Bancorp proved a prima facie case that there was a total breach of contract. As such, the burden of persuasion shifted to the Government to prove that there was not a total breach of contract. See Sergeant Mechanical Systems, Inc. v. United States, 54 Fed. Cl. 636, 638 (Fed. Cl. 2002) (once contractor established the requisite elements, thereby making its prima facie case, the burden shifts to the government); Salguero v. City of Clovis, 366 F.3d 1168, 1174 (10th Cir. 2004) ('Because the city established its prima facie case, the burden shifts to Salguero to proffer controverting facts"). The Government did not submit any controverting facts to show that there was not a total breach of contract. Instead, the Government submitted evidence of the financial performance of First Annapolis, which it recites in its Brief.

Moreover, if the viability of First Annapolis is an issue, it is the burden of the Government to prove with **reasonable certainty** the amount of loss Bancorp, as the injured party, would have suffered had the contract been performed. American Capital Corp. v. United States, 65 Fed. Cl. 241, 248-49, 252 (2005); see also American Capital Corp. v. United States, 472 F.3d 859, 867, 869

---

1 As explained at length in Plaintiff's Brief, the cases relied upon by the Government, Admiral Financial Corp. v. United States, 378 F.3d 1336 (Fed. Cir. 2004) and Southwest Investment Co. v. United States, 63 Fed. Cl. 182 (2004) for a contrary conclusion are distinquishable both in law and fact. Plaintiff's Brief at 38-47.

(2006) (reh'g and reh'g en banc den., 2007) (the Court adopted the position in Restatement (Second) Contracts §349 that the injured party is entitled to damages, including expenditures in performance, "'less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.'").

Even if the Government's evidence of financial performance is considered, however, the Government has not sustained its burden because the evidence is irrelevant. A review of the evidence reveals that it falls into four categories, namely: (1) evidence prior to the conversion, August 13, 1988, (2) evidence during the course of contract performance from August 13, 1988 until August 9, 1989; (3) evidence at the time of the breach of contract, August 9, 1989, and (4) evidence after the breach of contract, after August 9, 1989. As explained below, the evidence presented by the Government in each of these four categories is irrelevant.[2]

**1. <u>The Government's Evidence Prior To The Conversion Is Irrelevant</u>.**

The evidence of the financial performance of First Annapolis, prior to the conversion, August 13, 1998, is irrelevant. This includes the 1998 Report of Examination ("1988 ROE"), made as of July 11, 1988, based upon the financial condition of the Bank as of June 1988. DX 118. It also includes the December 28, 1988 transmittal letter for the 1988 ROE, quoted in the Government's Brief. Although the transmittal letter is dated December 28, 1988, the criticisms noted in the letter are not as of

---

[2] To make matters worse, in its Brief the Government repeatedly cites to the demonstrative exhibits it presented at trial. These exhibits, DX 401, DX 4015, DX 4016, DX 4017 and DX 4018, were not admitted into evidence during the trial, are not substantive evidence and, in many instances, the underlying evidence which is used as the basis for the exhibits is defective or irrelevant. As such, these exhibits should not be considered by the Court.

December 1988; they are as of July 1988. DX 267. Such evidence, however, does not demonstrate that First Annapolis would have failed if FIRREA had not been enacted. The letter does not **require** the Bank to take any specific action; it made suggestions. The letter also does not make a "Troubled" institution designation or advise of a default. At best, the letter is a snapshot of the Bank's progress one month before the conversion.

What is relevant though is the significant fact that in its contract with Bancorp, the Government made the express finding that First Annapolis **"would be a viable entity following conversion, as determined under 12 C.F.R. §563b.26."** PX 2 at 2 (Resolution No. 88-603) (emphasis supplied); accord Heiden 3/21/07 Tr. at 1481 (to enter into the deal, the FHLBB necessarily must have concluded that the Bank was "sufficiently viable to have to reasonable certainty of pulling off recovery"); Heiden 3/21/07 Tr. at 1482 (FHLBB must have thought it was a very viable situation); Jones 3/23/07 Tr. at 1802 (agreeing that the FHLBB would have concluded, as of the August 1988 conversion, that First Annapolis, with the forbearances, would have been viable); Crompton 3/27/07 Tr. at 1999 (assuming that FHLLB's approval of the plan of conversion meant the Government had concluded that the plan was viable); Kennedy 3/28/07 Tr. at 2305 (at the time of the conversion, all involved, including the Government, believed that after conversion, the Bank was viable). Since the Government had determined at the time of the conversion that First Annapolis would be viable, it cannot use evidence of the financial performance of the Bank prior to the conversion to support its current contention that the Bank was not viable. Moreover, the fact that the 1988 ROE came before the Government made its finding that the Bank would be viable, if anything **shows that the Government assumed the risk of a breach of contract if it revoked the forebearances and the Bank failed.**

**2. The Government's Evidence During The Course Of Contract Performance Is Irrelevant.**

The evidence presented by the Government and recited in its Brief of the financial performance of First Annapolis after the conversion during the course of contract performance is irrelevant for four reasons. First, it is irrelevant for the simple reason that the only contractual requirement First Annapolis had to meet during the course of contract performance was to comply with the first capital benchmark on June 30, 1989. PX 8. There was no term in the contract which required ongoing or increasing compliance in between the annual benchmarks. Parran 3/20/07 Tr. at 1224, 1225; Jones 3/23/07 Tr. at 1824. Capital could fluctuate in between the annual benchmark dates and even though capital fell after the first benchmark was met, the Bank believed it would be able to meet the next benchmark in June 1990. Parran 3/20/07 Tr. at 1225. Also, there were no requirements in the contract that First Annapolis had to make a profit or even that First Annapolis had to be a viable entity during the term of the contract. It was the meeting of the annual capital benchmarks, not whether the Bank was profitable or unprofitable, that was important under the contract. 3/20/07 Tr. at 1144. As such, since there is no realistic dispute that First Annapolis met its first capital benchmark on June 30, 1989, then all of the other evidence of the financial performance of First Annapolis presented at trial is irrelevant. Parran 3/19/07 Tr. at 1064; Parran 3/20/07 Tr. at 1144, 1225; Heiden 3/21/07 Tr. at 1478-79; Jones 3/23/07 Tr. at 1823-24, 1850; Kennedy 3/28/07 Tr. at 2307.

The second reason why the evidence presented by the Government of the financial performance of First Annapolis is irrelevant is that the Government does not take into account the adverse effect of FIRREA prior to its enactment. As set forth in great detail in Plaintiff's Brief, FIRREA had an adverse

effect on First Annapolis beginning in the Spring of 1989. Plaintiff's Brief at 8-15, 20 (Findings of Fact ¶¶ 23, 25, 26, 27, 28, 29, 30, 31, 33, 35, 37, 39 and 59). The specter of FIRREA adversely affected lending relationships, real estate loans, the service corporation projects, growth in savings, etc. Cook 3/19/07 Tr. at 966, 969-70, 1049, 1054-55; Parran 3/19/07 Tr. at 1061-1063; Parran 3/20/07 Tr. at 1295; Parran 3/21/07 Tr. at 1328-30, 1373; DX 2467. For instance, in anticipation of FIRREA, in the Spring of 1989, First Annapolis had begun to implement a policy of a maximum loan to one borrower of $500,000 and did not enter into any additional projects in 1989. Parran 3/21/07 Tr. at 1373-77; JX 54 at 0053739. As a consequence of the foregoing, as Cook testified, the Bank was not profitable in the Spring and Summer of 1989. Cook 3/19/07 Tr. at 972.

At trial, and in its Brief, the Government did not refute any of the foregoing evidence. It just ignored it. It made no adjustment whatsoever to any of the financial data it submitted to the Court to account for the adverse effect of FIRREA prior to its enactment. As such, the financial data it submitted and its experts relied upon is inherently defective and cannot serve as the basis to prove that First Annapolis, but for FIRREA, was not viable prior to the enactment of FIRREA.

The third reason why the evidence presented by the Government of the financial performance of First Annapolis is irrelevant is that the vast majority of the financial data submitted by the Government and recited in its Brief is inaccurate in several other significant respects. First, it is inaccurate because the Government did not differentiate between GAAP and RAP accounting. The compliance by First Annapolis with its contractual obligations was to be reported and measured on a RAP basis, not on a GAAP basis. Parran 3/20/07 Tr. at 1148. A GAAP statement showing a loss did not mean that there would be an equivalent loss on a RAP statement. Parran 3/20/07 Tr. at 1148. GAAP statements

reflect a grossly exaggerated loss compared to RAP accounting. Parran 3/20/07 Tr. at 1202. The reliance by the Government on GAAP statements to attempt to prove losses of the Bank is erroneous because those statements do not measure the Bank's performance on a RAP basis. Parran 3/20/07 Tr. at 1209. Second, the financial data submitted by the Government for the Bank, and relied upon by Kennedy, is inaccurate because more often than not the Government referred to financial statements for the Bank, and not to the consolidated financial statements for the Bank and its subsidiaries, including not only Delta Financial Corporation, Inc., but also all of the other subsidiaries owned by the Bank. This is a very important distinction that the Government ignored in its Brief. Third, the Government's Brief is replete with incorrect citations to the exhibits admitted at trial. For instance, in its Brief, the Government states that "[d]uring the nine-month period ending June 1989, First Annapolis lost nearly $8 million on its core operations, which was $2.7 million more than it projected to lose" citing "DX 2120 at 1550, 0704, and 0486." Government's Brief at 8. DX 2120 though does not support the foregoing statement by the Government. Instead, DX 2120 shows that: (1) the budget for consolidated net income for the quarter ending 12/31/88 was $1,257,884, while the actual amount was $1,047,568; (2) the budget for consolidated net income for the quarter ending 3/31/89 was ($317,900), while the actual amount was ($51,834),and (3) the budget for consolidated net income for the quarter ending 6/30/89 was $1,019,400, while the actual amount was $1,607,812. DX 2120 at 1550, 0704, 0486. The Government's Brief is replete with other misstatements and incorrect citations, which could take hours and hours, and another 50 pages[3] in this Reply Brief for Bancorp to refute.

---

3 Bancorp is cognizant that there is a page limit of 20 pages for a reply brief in the Rules of this Court. Although the Court stated that it would not require the parties to adhere to the page limits in the

The fourth reason why the evidence presented by the Government of the financial performance of First Annapolis is irrelevant is that it misconstrues the investments in the service corporations. The attempt by the Government in its Brief to isolate the viability of the projects "to a snapshot in time" was not realistic; "the realistic thing is that [Bancorp] had a contract for five years[.]" Parran 3/20/07 Tr. at 1295; see also Cook 3/19/07 Tr. at 999-1000 (Cook explained that there is a difference between an as-is or current value and a projected (or built-out or completed) value). Parran testified that had Bancorp been given the full five year period, the projects would have been developed and money would have been made. Parran 3/20/07 Tr. at 1296. In its Brief, the Government even admitted that "Delta's profits depended on the completion and sale of the projects." Government's Brief at 7. Parran testified that with real estate, if it is held long enough, it will not go down in value. Parran 3/20/07 Tr. at 1296. The service corporation projects (i.e, Bayside,[4] White Rocks, Northampton, and Forest Mills) were ultimately "completed and perfect." Parran 3/20/07 Tr. at 1295; see also Heiden Tr. 3/21/07 Tr. at 1507 (the projects were in potentially valuable locations and most have since become successful). The Government, through its trial counsel, even stipulated that the real estate projects are each valuable today. 3/21/07 Tr. at 1370, 1371. One of the effects of the regulators imposing their control over the bank as a result of FIRREA was that it deprived management of the ability to ride out the real estate slump. Kennedy 3/28/07 Tr. at 2337. When the RTC took control of the Bank's assets, it liquidated them when the real estate market was a buyers' market. Kennedy 3/28/07 Tr. at 2338. Moreover, the

---

Rules, Bancorp has endeavored to keep this Brief as succinct as possible.

4 Contrary to the contention by the Government in its Brief, the Bank and the service corporation did not disburse millions of dollars into the marina in excess of its value. Cook 3/19/07 Tr. at 999-1000.

fact that certain loans for the projects were written off does not mean that the loans are worthless, as the Government contends, or that the Bank no longer has an interest in the underlying real estate. Jones 3/23/07 Tr. at 1835-38 (Jones agreed that just because a loan is written of the books - even if it reflects a loss and diminution in capital - does not mean that the loan is worthless or that the Bank no longer had an interest in the real estate). See American Capital Corp. v. United States, 65 Fed. Cl. 241, 248-49, 251-52 (2005) (the Court noted the significance of the difference between an accounting loss and an actual economic out-of-pocket loss).

In addition to the foregoing, it is also significant is that at no time during the course of contract performance, did the Government ever determine that First Annapolis was not a viable entity or revoke the determination it made under 12 C.F.R.§563b.26 that it would be a viable entity. Jones 3/23/07 Tr. at 1803; Kennedy 3/28/07 Tr. at 2305-06. Indeed, the Government never even took any enforcement action during that period of time. Kennedy 3/28/07 Tr. at 2305-06. Likewise, the Government did not give any notice to Bancorp pursuant to the default provision in the Regulatory Capital Maintenance/Dividend Agreement, or otherwise, that it was no longer a viable entity. As such, the Government should be bound to its determination that First Annapolis would be a viable entity, and its *post hoc construct* eighteen years later that First Annapolis was not a viable entity should be ignored.

**3. The Government's Evidence At The Time Of The Breach Of Contract Is Irrelevant.**

As a preliminary matter, there is a dispute as to whether the breach of contract was on the date of the enactment of FIRREA, August 9, 1989, or the date that the regulations issued by the OTS under FIRREA became effective on December 7, 1989. Bancorp submits, based on the evidence it submitted

at trial and the admissions by the Government in other cases, that the date as to when there was a total breach of contract, i.e., when the value of the contract was substantially impaired, is August 9, 1989 when FIRREA was enacted.[5]

As explained above and recited in great detail in Bancorp's Brief, FIRREA had an adverse effect on First Annapolis beginning in the Spring of 1989 and continuing up until the time of the enactment of FIRREA on August 9, 1989. The expectation that FIRREA was going to be enacted caused First Annapolis to undertake actions which substantially impaired the value of its contract prior to the enactment of FIRREA . See Parran 3/19/07 Tr. at 1100 (the effect of FIRREA took place long before the implementing regulations). Moreover, Parran testified that the passage of FIRREA in August 1989 was "devastating" to the Bank and put the Bank out of business. Parran 3/19/07 Tr. at 1045, 1065, 1080. Parran, Jones and Kennedy all testified that FIRREA (not the regulations issued under FIRREA) completely took away the three regulatory forebearances of the contract. Parran 3/19/07 Tr. at 1046; Jones 3/23/07 Tr. at 1805-06; Kennedy 3/28/07 Tr. at 2330. Furthermore, in its Brief, the Government did not dispute the admissions that it made in other cases that the date of the breach should be August 9, 1989, the date of the enactment of FIRREA, as agreed to by the Government. See Southwest Investment Co. v. United States, 63 Fed. Cl. 182, 194 (2004), aff'd, 158 Fed.Appx. (2005) ("The Defendant's position is that, assuming arguendo it breached the contract, the date of the breach

---

[5] Bancorp also submits that its prior proposed finding and the determination by the Court that the date of the breach was December 7, 1989 cannot serve as collateral estoppel against Bancorp because the precise issue of when there was a total breach of contract was not before the Court, it was not actually litigated in the trial on liability, its determination was not essential to the decision of the Court at that time and no final judgment has been entered in this case.

would be August 9, 1989, the date of FIRREA's enactment"); see also Admiral Fin. Corp v. United States, 57 Fed.Cl. 418, 423-24 (2003) (the Court discussed the issue of whether in date of the breach was the enactment of FIRREA on August 9, 1989 or when regulations became effective on December 7, 1989, and concluded "in the course of this case we have treated the critical date [of the breach] as the enactment [August 9, 1989], and the Government 'agrees'"), aff'd, Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1339 (Fed. Cir. 2004) (acknowledging the ruling by the trial court in Admiral Fin. Corp v. United States, 54 Fed.Cl. 247 (2002), that the Government breached the contract with the enactment of FIRREA). As such, Bancorp submits that the date of the total breach of contract should be August 9, 1989.

The Government did not submit any evidence that First Annapolis was not viable on August 9, 1989. Even if the date of December 7, 1989 is used, the Government still did not prove that First Annapolis was not viable on that date. The Government did not even present any specific evidence of what the financial condition of First Annapolis was, but for FIRREA, as of either August 9, 1989 or December 7, 1989. Kennedy, the Government's supposed expert witness on this issue, did not conduct a study to determine on which date the Bank became non-viable. Kennedy 3/28/07 Tr. at 2322. He even testified that to determine such a date, it would be necessary to perform a liquidation analysis on a line-by-line basis of the assets at different points in time to determine the specific date, which he did not do. Kennedy 3/28/07 Tr. at 2322; see also 3/2707 Tr. at 2122-23 (where Kennedy testified that in the Southmark bankruptcy case, he did undertake such a study). Moreover, in preparing his report, Kennedy relied in part on post-FIRREA economic events. Kennedy 3/28/07 Tr. at 2310; see also Kennedy 3/28/07 Tr. at 2318, 2319 (most of the losses which impacted Kennedy's report were in late

1989 or early 1990). When asked "[w]hat, if anything, does the fact that First Annapolis incurred losses after FIRREA tell you about the cause of those losses, Kennedy answered that one could not know "unless you look at the losses and see what they relate to." Kennedy 3/28/07 Tr. at 2380. He conceded that Cook had more information on the actual operations of the Bank in the 1989. Kennedy 3/28/07 Tr. at 2376. He even agreed that the passage of FIRREA significantly impacted the thrift industry, including First Annapolis. Kennedy 3/28/07 Tr. at 2304.

Similarly, Shapiro, another expert witness for the Government, did not make any study to determine why the Bank suffered losses in the last part of 1989 and not in the first part of 1989, did not undertake a detailed analysis to reach his conclusion that the Bank was not viable and did not evaluate the market value of the assets. Shapiro 3/29/07 Tr. at 2483-85, 2494-95, 2503, 2504-05; see also Shapiro 3/29/07 Tr. at 2499 (agreeing that the magnitude of the Bank's losses increased substantially in the last quarter of 1989 and the first quarter of 1990). Indeed, Shapiro even agreed with the "lottery ticket" hypothetical posed by counsel for Plaintiff. Shapiro 3/29/07 Tr. at 2515-18. Moreover, neither Kennedy nor Shapiro considered the franchise value of First Annapolis as of August 9, 1989 or any other date, which as Heiden explained was a significant factor in determining the viability of the Bank. Heiden 3/21/07 Tr. at 1448, 1533 and 1534.

The critical error in the Government's attempt to prove that First Annapolis was not viable is that the Government's witnesses wholly failed to back-out the FIRREA factor. It is not sufficient for the witnesses to simply testify, as they did, that FIRREA had no impact on the data or conclusions. This same approach, also based on Kennedy's testimony, was rejected by the Court in Hughes v. United States. 71 Fed. Cl. 284, 313 (2006) ("Kennedy's opinion was based on the assumption that the growth

and other operational restrictions following FIRREA had no impact on New El Paso, an assumption that the court rejects). A review of the testimony by Kennedy, Shapiro and Crompton reveals that they undertook no study of the cause of the losses and made no causation analysis regarding ultimate failure and FIRREA. Kennedy 3/28/07 Tr. at 2310, 2322, 2380; Shapiro 3/29/07 Tr. at 2483-85, 2494-95, 2498-99, 2503, 2504-05, 2513-14; Crompton 3/27/07 Tr. at 2004-05, 2006-07. Accordingly, the Government did not prove at the time of the breach that, but for FIRREA, First Annapolis was not viable.

**4. The Government's Evidence After The Breach Of Contract Is Irrelevant.**

The evidence of the financial condition of First Annapolis after the breach of contract by the Government is irrelevant because the Court only determines whether or not there was a total breach of contract as of the date of the breach. Admiral Financial Corp.v. United States, 387 F.3d 1336, 1345 (Fed. Cir. 2004) (citing Mobile Oil, 530 U.S. at 608). As such, even if the date of December 7, 1989 is used for the date of the breach, the 1990 Examination Report, which was conducted in January 1990 based upon the financial condition of First Annapolis as of December 31, 1989, is irrelevant. Crompton 3/27/07 Tr. at 2004-05 (the January 1990 Examination was a snapshot of the Bank and its assets as of December 31, 1989 and no other date, with the possible addition of some events after December 31, 1989 that came to Crompton's attention); see also Jones 3/23/07 Tr. at 1846-47 (Crompton's January 1990 examination report probably evaluated the Bank on a post-FIRREA basis). Also, the determination in the January 1990 Examination Report that 35 commercial loans were at least 90 days past due is not an accurate measurement of the Bank's financial condition prior to the December 7, 1989. Parran 3/21/07 Tr. at 1318-19. As Parran explained, the Bank was, during that time period,

already operating under different regulations. Parran 3/21/07 Tr. at 1319, 1320; see also DX 2276 (11/17/89 letter from Jones to Parran regarding the regulations passed November 7, 1989 and concluding that on the date the regulations go into effect, First Annapolis will fail all three capital requirements). "The reason a majority of these loans were now delinquent 90 days is because we had stopped funding the joint ventures and loans to one borrower – loans over 500,000, a majority of those loans, because of the new regulations. So come January when this report is done, ***hello, we're in a different world.*** " Parran 3/21/07 Tr. at 1320 (emphasis added).

**C. Bancorp Proved That First Annapolis Would Be Viable.**

As explained in Bancorp's Brief and mentioned again above, the issue of the viability of First Annapolis should not be an issue in this case. Even if it were an issue, under the case law the Government has the burden to prove that First Annapolis was not viable at the time of the breach, but for FIRREA. Even if the Court were to place on the burden on Plaintiff to prove viability, at trial Bancorp proved that First Annapolis would have been viable, but for FIRREA.

The evidence of viability starts with FHLBB Resolution No. 88-603, in which the Government made a specific finding that First Annapolis would be viable. PX 2 at 2. The witnesses at trial all confirmed this fact. Heiden 3/21/07 Tr. at 1481- 1482; Jones 3/23/07 Tr. at 1802; Crompton 3/27/07 Tr. at 1999; Kennedy 3/28/07 Tr. at 2305. As mentioned above, at no time during the course of contract performance did the Government ever revoke this finding. Thereafter, by the last quarter of 1988, the Bank was on track and had made a profit. Parran 3/19/07 Tr. at 1047; Parran 3/20/07 Tr. at 1202. First Annapolis met its first capital benchmark in June 1989 (Parran 3/19/07 Tr. at 1064; Parran 3/20/07 Tr. at 1144, 1225; Heiden 3/21/07 Tr. at 1478-79; Jones 3/23/07 Tr. at 1823-24, 1850;

Kennedy 3/28/07 Tr. at 2307)) and as of the end of September 1989 the $13.6 million initial investment had grown to $14.4 million. Parran 3/21/07 Tr. at 381-82. The losses through the end of 1989 were relatively small and were consistent with First Annapolis meeting its benchmarks. Heiden Tr. 3/21/07 Tr. at 1478-79.

The testimony by Cook, who had previous experience in turning around other banks, who was at the Bank at the relevant time and who now is a disinterested party in this case, is particularly instructive, if not dispositive on this issue. Cook testified that, especially with the five-year time schedule to which the Government had agreed, First Annapolis would gain complete regulatory compliance and could have survived. Cook 3/19/07 Tr. at 960, 1029. While he was at the Bank, Cook undertook affirmative steps to improve the operations of the Bank and enhance its viability. Cook 3/19/07 Tr. at 964-65. He testified that during his tenure, First Annapolis did not lose any customers, it did not lose deposits and the customers stood by the Bank. Cook 3/19/07 Tr. at 1029. He explained that the infusion of the $13 million and the Government's commitment to give First Annapolis five years to meet its regulatory capital requirements provided a rescue plan to cure the Bank's problems. Cook 3/19/07 Tr. at 1024.

Parran testified unequivocally that the Bank would have survived, but for FIRREA. Parran 3/19/07 Tr. at 1064, 1079, 1125; Parran 3/20/07 Tr. at 1296. Heiden explained that the inclusion of goodwill in the calculation of regulatory capital calculations permitted First Annapolis to conduct its business as a viable firm and to try to make a profit. Heiden 3/22/07 Tr. at 1477-78. He testified that, if the forbearances had remained in effect, First Annapolis would not have failed and it would have made money. See, e.g., Heiden Tr. 3/22/07 Tr. at 1543.

The evidence also demonstrated that the service projects ultimately did succeed. Parran 3/20/07 Tr. at 1295; see also Heiden Tr. 3/21/07 Tr. at 1507 (the projects were in potentially valuable locations and most have since become successful). The Government, through its trial counsel, stipulated that the real estate projects are each valuable today. 3/21/07 Tr. at 1370, 1371. It was FIRREA that deprived management of the ability to ride out the real estate slump. Kennedy 3/28/07 Tr. at 2337. The Bank knew that it might lose money during the first two or three years because the majority of the income was going to come in from the service corporations in the last 3, 4 or 5 years. Parran 3/20/07 Tr. at 1145; Parran 3/19/07 Tr. at 1056, 1057 (it would take about 3 to 5 years to develop the Northampton Park project). At least one of the projects, Solomons Landing, was expected to take about 7-8 years to develop. Parran 3/19/07 Tr. at 1058. In 1989, most of these projects were just getting started. Parran 3/19/07 Tr. at 1056, 1057, 1058. One of the projects, Bayside, encountered unexpected water and sewer problems that would cause a time delay of about 18 months. Parran 3/19/07 Tr. at 1059. The Bank and its regulators knew there would be peaks and valleys. Parran 3/20/07 Tr. at 1145; Jones 5/23/07 Tr. at 1815. Subsidiary income comes in only when a project is completed. Parran 3/20/07 Tr. at 1145; Jones 5/23/07 Tr. at 1815-16. A project might not result in any income for three years and then suddenly it results in millions of dollars of income. Parran 3/20/07 Tr. at 1145; see also Heiden Tr. 3/21/07 Tr. at 1507 (initially projects, by their very nature, would not earn very much and would not produce income until completion); Jones 3/23/07 Tr. at 1816 (acknowledging that it might take years before some of the service corporation projects resulted in earnings).

**D. Restitution Is A Proper Remedy.**

The contention by the Government that restitution is not a proper remedy was rejected by the Court in Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271, 313-14 (2005) ("Caroline I"). The Government argued in Caroline I, as it does in its Brief, that there can be no restitution because it is impossible to undo the transaction. The Government asks the Court to deny all relief to Bancorp because Bancorp allegedly retained benefits from the transaction and therefore a restitution award would constitute a windfall. This argument should be rejected just as it was by the Court in Caroline I. Also, in this transaction neither Bancorp nor First Annapolis received any assistance payments or delivery of tangible assets from the Government.[6] The benefits received were the forebearances. As such, there is nothing for Bancorp to give back to the Government. Moreover, as noted by the Court in Caroline I, the Government's performance cannot be unwound due to no fault of Bancorp. Id. At all relevant times, Bancorp abided by the terms of its contract with the Government. By contrast, the Government never revoked the determination it made under 12 C.F.R.§563b.26 that First Annapolis would be a viable entity, never took any enforcement action during the course of contract performance, never gave any notice to Bancorp that it was in default as required in the RCMA, revoked the forebearances by the enactment of FIRREA, and then **seventeen years later**, on December 27, 2006, at the joint meeting of counsel pursuant to paragraph 13 of Appendix A of the Rules of this Court, disclosed, for the first time, that its defense that Bancorp is not entitled to restitution because an award of such damages would

---

6 By contrast in Caroline I, the bank received "assistance payments, yield maintenance and loss coverage," yet the Court determined that these benefits "did not result in any tangible payment or delivery of assets to" the holding company, and held that restitution was a proper remedy Id. at 313. As such, the facts in this case are even more compelling that the facts in Caroline I.

constitute a "windfall" to Bancorp. As such, the equities of what actually happened in this case weigh heavily in favor of Bancorp. Therefore, to preserve the remedy of restitution, and to avoid hardship to Bancorp, any requirement of counter-restitution by Bancorp should be excused. Id. Furthermore, even if the Government was entitled to undo the transaction and receive the benefits allegedly retained by Bancorp, as discussed below, it is the burden of the Government to prove the amount of the benefits retained by Bancorp. The Government did not submit any evidence at trial of the amount of any benefits retained by Bancorp. Since it did not do so, it cannot now contend that restitution is not a proper remedy.

**E. The Government Is Not Entitled To An Offset.**

It is the Government's burden to prove with reasonable certainty the quantum of benefit retained by Bancorp. Caroline Hunt Trust v. United States, 470 F.3d 1044, 1052 (Fed. Cir. 2006) (Caroline II); accord Westfed Holdings , Inc. v. United States, 407 F.3d 1352, 1370 (Fed. Cir. 2005) ("it was the government's burden to prove with reasonable certainty the quantum of benefit retained by Westfed"). It is not the burden of Bancorp to disprove an offset claimed by the Government. Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 769 (Fed. Cir. 1987) (cited by Caroline Hunt, 470 F.3d at 1052).

As mentioned above, at the trial of this matter, the Government did not submit any evidence of the amount of any benefits retained by Bancorp. Instead, in its Brief the Government refers to the "Goodwill Financial Reporting Package," as evidence that the FDIC had incurred a $103.3 million loss on the liquidation of First Annapolis. Government's Brief at 27; DX 635. It is completely disingenuous for the Government to refer to this exhibit as substantive evidence in its Brief. This exhibit was never

entered into evidence during the trial in March. As counsel for the Government well knows, Bancorp expressly refused to stipulate to the admissibility of any exhibit that was previously admitted during the trial last summer on shareholder loans. Morever, even during the last trial the exhibit was admitted, but only for a very limited purpose, and subject to the objection of relevance by counsel for Bancorp. As such, this exhibit should not even be considered by the Court. Even if DX 605 is considered, however, it does not establish the value of any benefits retained by Bancorp.

Accordingly, the Government has not sustained its burden to prove with reasonable certainty the amount of any benefit retained by Bancorp. Westfed Holdings, 407 F.3d at 1370-71 **("**We find no clear error in the trial court's factual determination that the government failed to sustain its burden in showing that any offset from the damage award is appropriate").

## II. BANCORP IS ENTITLED TO A TAX GROSS-UP.

In its Brief, the Government does not dispute the fact that the appropriate rate for a tax-gross-up in this case is 39.55%. Daughtery 3/22/07 Tr. at 1597-98. Grant M. Clowery ("Clowery"), the Government's expert witness, did not offer an opinion regarding the rate for a tax gross-up. Clowery 3/27/07 Tr. at 2060. Nor does the Government dispute the calculation that the amount of the tax gross-up is $8,941,052, for a total award of $22,606,959.

Instead, in its Brief, the Government merely repeats arguments that were previously rejected by this Court and the Court in Home Savings of America v. United States, 399 F.3d 1356 (Fed. Cir. 2005). In Home Savings, the Federal Circuit held that a tax gross-up is appropriate when "a taxable award compensates a plaintiff for lost monies that would not have been taxable." In so doing the Court explained:

> The Court of Federal Claims properly adjusted the damages award to reflect tax consequences. The parties cite to no Federal Circuit authority that deals specifically with this issue, and we have found none. We adopt the rule of other courts that a tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable.

Id (citations omitted). The Court then affirmed the tax gross-up of the damage award to compensate for taxes that the parent company of the thrift, Washington Mutual, would have to pay on the award. Id. at 1346, 1356.[7]

As in Home Savings, a tax gross-up is appropriate in this case because an award of damages to Bancorp compensates Bancorp for lost monies that would not have been taxable. Clowery, the Government's expert, acknowledged that the transaction by which Bancorp invested the $13,665,907 in First Annapolis was not taxable. Clowery 3/27/07 Tr. at 2102.

The contention by the Government that a damage award in this case is not taxable because it would constitute a return of capital is without merit. The Government ignores the testimony of G. Thomas Daughtery, Jr. ("Daugherty"), in his capacity as the President of Bancorp, that a damage award to Bancorp as a result of this litigation would be fully taxable. Daugherty 3/22/07 Tr. at 1596-97, 1622-23. As Daugherty explained, a damage award would not be a recovery of capital because the investment has been changed by the dissolution of First Annapolis. Daugherty 3/22/07 Tr. at 1622. Daugherty also testified that his conclusion in this regard has been confirmed by the advice he received from his tax advisers. Daughtery 3/22/07 Tr. at 1597, 1623. Daugherty intends to report any award on Bancorp's tax returns as income, in conformance with the conclusions he reached and the advice he

[7] In Home Savings, the damage "award of $80,936,00 was 'grossed up' to $134,045,000 to compensate for taxes Ahmanson's present parent company, Washington Mutual would have to pay on the award." Id. at 1346.

received from his tax consultants. Daughtery 3/22/07 Tr. at 1597, 1622, 1623, 1633-34. Indeed. Clowery, even acknowledged, Section 61 of the tax code provides that taxable income is "all income," without regard to the source of the income. Clowery 3/27/07 Tr. at 2075-76.

Clowery, and the Government, have also ignored the impact of the tax benefit rule. As Clowery admitted on cross-examination, if a taxpayer takes a deduction in one year due to a loss, and in a subsequent year receives compensation for that loss, the compensation is taxable as income in the year received. 3/27/07 Tr. at 2098-99, 2105-06.

The argument by the Government that Bancorp has a net operating loss carry forward for twenty years is also without merit. Instead, the losses which Bancorp incurred in 1990 can be carried forward for only 15 years, not 20. 28 U.S.C. §172(b)(1). The change from 15 years to 20 years which was made by the Taxpayer Relief Act of 1997, Pub. L. 105-34, sec. 1082(a)(1), applied only to net operating losses incurred in taxable years beginning after August 5, 1997. Kilburg v. C. I. R., T.C. Summ. Op. 2004-36, 2004 WL 565952 (2004); Green v. C.I.R., T.C. Memo. 2003-244, 2003 WL 21940722 , 86 T.C.M. (CCH) 273 (2003). In both Kilburg and Green, the loss was incurred in a year prior to August 5, 1997 and could be carried forward only 15 years. Clowery admitted that the CCH Tax Guide provides that NOLs which arose in a tax year prior to August 6, 1997 can be carried forward only 15 years. Clowery 3/27/07 Tr. at 2086, 2089. Clowery conceded that he is not aware of any revenue ruling or treatise or tax court opinion that supports his opinion of that the 20 year rather than the 15 year time frame is applicable here. Clowery 3/27/07 Tr. at 2101. Here, because the loss was incurred in a year prior to August 5, 1997, the loss may be carried forward only 15 years. Daugherty 3/22/07 Tr. at 1632; Clowery 3/27/07 Tr. at 2080-81. Thus, there is no net operating loss carry over

available to offset a damages award in this case.

The additional arguments by the Government that a tax gross-up is barred as a matter of law and that it would constitute an impermissible windfall were rejected by the Court in Home Savings and the other cases upon which the Court relied. Home Savings, 399 F.3d at 1356. Also, as Daugherty testified, Bancorp intends to report any award on its tax returns as income. Daughtery 3/22/07 Tr. at 1597, 1622, 1623, 1633-34. Moreover, the contention by the Government that Bancorp could get a windfall because "there is no way for the Court or defendant to monitor whether Bancorp will ever pay taxes," is silly. It is belied by the simple fact that the defendant in this case is the Government, and the Internal Revenue Service obviously is part of the Government.

## CONCLUSION

For all the foregoing reasons, and for the reasons set forth in Plaintiff's Post-Trial Brief, First Annapolis Bancorp, Inc. respectfully requests the Court to find in its favor and award damages in the amount of $22,606,959.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
& KARAS, L.L.P.

s/Dale A. Cooter
Dale A. Cooter
James E. Tompert
5301 Wisconsin Avenue, NW, Suite 500
Washington, D.C. 20015
Tel: (202) 537-0700
Facsimile: (202)364-3664

*Attorneys for Plaintiff*
*First Annapolis Bancorp, Inc.*

July 23, 2007

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 23th day of July 2007, a copy of the foregoing PLAINTIFF'S PROPOSED POST-TRIAL CONTENTIONS OF FACT AND LAW REGARDING DAMAGES was filed electronically pursuant to the Electronic Case Filing procedures of the United States Court of Federal Claims, with service by Notice of Electronic Filing to the designated attorneys and parties of record.

s/Dale A. Cooter
Dale A. Cooter