**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No.94-522C**
**(Judge Williams)**

---

**FIRST ANNAPOLIS BANCORP, INC.**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

---

# DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF

---

**MICHAEL HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Assistant Director**

**TIMOTHY J. ABRAHAM**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 616-0477**
**Fax: (202) 353-7988**

**Attorneys for Defendant**

**Of Counsel:**

**SCOTT AUSTIN**
**MELINDA HART**
**MARK PITTMAN**
**DELISA M. SANCHEZ**

**Trial Attorneys**

**July 23, 2007**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . iv

INTRODUCTION . . . . . 1

ARGUMENT . . . . . 3

I. Bancorp Failed To Establish A Total Breach . . . . . 3

A. First Annapolis's Viability Is An Essential Element Of Bancorp's Restitution Claim . . . . . 3

B. Bancorp Has The Burden Of Proving Its Viability At The Time Of The Breach . . . . . 9

C. Even Assuming It Was the Government's Burden To Demonstrate The Non-Viability Of First Annapolis, We Satisfied That Burden . . . . . 11

1. Bancorp Erroneously Downplays The Regulators' Assessment Of First Annapolis's Condition In December 1988 . . . . . 13

2. Bancorp Erroneously Claims That The Court Can Ignore First Annapolis's GAAP Financial Statements . . . . . 15

3. Bancorp Erroneously Claims That Our Demonstration Of First Annapolis's Failure Is Premised Upon "Paper" Losses Rather Than Economic Realities . . . . . 16

4. Bancorp Erroneously Claims That Our Analysis Concerning First Annapolis's Viability Fails To "Back-out The FIRREA Factor" . . . . . 18

5. The Contract Required That First Annapolis Meet The Capital Benchmarks Continuously . . . . . 23

D. Bancorp Failed To Demonstrate First Annapolis's Viability At The Time Of The Breach . . . . . 27

1. Bancorp Places Unwarranted Reliance Upon The Government's Finding, At The Time Of The Conversion, That First Annapolis Could Potentially Be A Viable Thrift . . . . . . . . . . 27

2. Bancorp Erroneously Relies Upon Mr. Parran's Unsupported, Conclusory Testimony That First Annapolis Would Have Survived . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

3. Bancorp Improperly Relies Upon The Irrelevant Fact That First Annapolis's Service Corporation Projects "Have Value Today" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

4. Bancorp Incorrectly Relies Upon The Purported Satisfaction Of Its June 1989 Benchmark And The Purported Growth In Its Initial Investment As Of September 1989 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

5. Dr. Heiden's Testimony Does Not Demonstrate That First Annapolis Was Viable At The Time Of The Breach . . . . . . . . . . . . . . . . 33

E. Bancorp's Attempts To Factually Distinguish <u>Admiral</u> And <u>Southwest</u> Are Unavailing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

F. The Breach Was Not The Entire FIRREA Legislation, The Announcement Of The FIRREA Legislation, Or The Enactment Of FIRREA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

1. The Earliest Date Of The Breach Is December 7, 1989 . . . . . . . . . . . . . . 43

2. The Breach Is Not The Entire FIRREA Legislation . . . . . . . . . . . . . . . . 45

3. FIRREA Did Not Breach The Service Corporation Forbearance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

4. Bancorp Did Not Prove That FIRREA's "Shadow" Harmed First Annapolis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

II. The Contract Cannot Be Unwound . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

III. Awarding Bancorp Restitution Would Be An Unfair Windfall . . . . . . . . . . . . . . . . . . . . 56

IV. Bancorp Is Not Entitled To A Tax "Gross-Up" Of Any Damages Award . . . . . . . . . . . 59

A. Bancorp Failed To Show The Taxability Of A Damages Award For Restitution With Reasonable Certainty . . . . . . . . . . 60

1. There Is No Evidence Demonstrating That Bancorp's Capital Contribution To First Annapolis "Changed" To Income After The Thrift's Dissolution . . . . . . . . . . 60

2. Bancorp's Damages Are Not Taxable Under The Tax Benefit Rule . . . . . . . . . . 62

B. Even If Bancorp Incorrectly Reports The Award As Taxable Income, Bancorp Will Not Likely Be Taxed On That Award . . . . . . . . . . 64

C. A Tax "Gross-Up" Award Is Speculative And Would Result In A Windfall To Bancorp . . . . . . . . . . 64

CONCLUSION . . . . . . . . . . 65

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

Admiral Fin. Corp. v. United States,
378 F.3d 1336 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Admiral Fin. Corp. v. United States, ("Admiral I")
57 Fed. Cl. 418 (2003), aff'd, 378 F.3d 1336 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . 38, 39, 40

Amber Resources v. United States, ("Amber II")
73 Fed. Cl. 738 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Amber Resources v. United States, ("Amber I")
68 Fed. Cl. 535 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8

American Capital Corp. v. United States,
472 F.3d 859 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Ankenbauer v. Sec'y of Dept. of Health & Human Servs.,
31 Fed. Cl. 637 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Argus, Inc. v. Eastman Kodak Co.,
801 F.2d 38 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Bank of America, FSB v. United States,
70 Fed. Cl. 246 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Bank of America, FSB v. United States,
51 Fed. Cl. 500 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Barron Bancshares, Inc. v. United States,
53 Fed. Cl. 310 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Bluebonnet Sav. Bank, FSB v. United States,
339 F.3d 1341 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Canfield v. Reynolds,
631 F.2d 169 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Citizens Fed. Bank v. United States,
59 Fed. Cl. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 65

Comm'r v. Glenshaw Glass Co.,
348 U.S. 426 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Exxon Corp v. United States,
45 Fed. Cl. 581 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

First Annapolis Bancorp, Inc. v. United States,
75 Fed. Cl. 263 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

First Nationwide Bank v. United States,
51 Fed. Cl. 762 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Freeman v. Comm'r,
33 T.C. 323 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Hansen Bancorp, Inc. v. United States, ("Hansen III")
67 Fed. Cl. 411 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Hansen Bancorp, Inc. v. United States, ("Hansen II")
367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Hansen Bancorp, Inc. v. United States, ("Hansen I")
53 Fed. Cl. 92 (2002), rev'd on other grounds, 367 F.3d 1297 (Fed. Cir. 2004) . . . . . . . . . . . . . 42

Hi-Shear Tech. Corp. v. United States,
356 F.3d 1372 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Hughes v. United States,
71 Fed. Cl. 284 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 65

LaSalle Talman Bank, FSB v. United States,
317 F.3d 1363 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

LaSalle Talman Bank, FSB v. United States,
45 Fed. Cl. 64 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Local Okla. Bank, N.A. v. United States,
59 Fed. Cl. 713 (2004), aff'd, 452 F.3d 1371 (Fed. Cir. 2006) . . . . . . . . . . 60

Loesch v. United States,
227 Ct. Cl. 34, 645 F.2d 905 (1981) . . . . . . . . . . 53

Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston,
666 F.2d 673 (1st Cir. 1981) . . . . . . . . . . 9

Mobil Oil Exploration & Producing Southeast, Inc. v. United States,
530 U.S. 604 (2000) . . . . . . . . . . passim

Mola Dev. Corp. v. United States,
74 Fed. Cl. 528 (2006) . . . . . . . . . . 44

Murrey v. United States,
73 F.3d 1448 (7th Cir. 1996) . . . . . . . . . . 45

Plaintiffs in Winstar-Related Cases v. United States,
37 Fed. Cl. 174 (1997) . . . . . . . . . . 44

Raytheon Prod. Corp. v. Comm'r,
144 F.2d 110 (1st Cir. 1944) . . . . . . . . . . 61

Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.,
272 F.3d 1335 (Fed. Cir. 2001) . . . . . . . . . . 45

Rydzewski v. Sec'y of Dept. of Health & Human Servs.,
2007 WL 949759 (Fed. Cl. 2007) . . . . . . . . . . 49

Senza-Gel Corp. v. Seiffhart,
803 F.2d 661 (Fed. Cir. 1986) . . . . . . . . . . 63

Slattery v. United States,
73 Fed. Cl. 527 (2006) . . . . . . . . . . 65

Southwest Inv. Co., Inc. v. United States,
63 Fed. Cl. 182 (2004), aff'd, 158 Fed. Appx. 283 (Fed. Cir. 2005),
cert. denied, 126 S. Ct. 2321 (2006) . . . . . . . . . . passim

State of Washington v. United States,
214 F.2d 33 (9th Cir. 1954) . . . . . . . . . . 53

United States v. Gotcher,
401 F.2d 118 (5th Cir. 1968) . . . . . . . . . . 60

United States v. Johnson Controls, Inc.,
713 F.2d 1541 (Fed. Cir. 1983) . . . . . . . . . . 27, 48

United States v. Winstar Corp.,
518 U.S. 839 (1996) . . . . . . . . . . 18, 45

Watt v. Sec'y of Dept. of Health & Human Servs.,
2001 WL 166636 (Fed. Cl. 2001) . . . . . . . . . . 49

Westfed Holdings, Inc. v. United States,
407 F.3d 1352 (Fed. Cir. 2005) . . . . . . . . . . 48

Yoakum v. Comm'r,
2004 WL 1902974 (2004) . . . . . . . . . . 59

**STATE CASES**

Fisher v. Jones,
816 S.W.2d 865 (Ark. 1991) . . . . . . . . . . 54

**FEDERAL STATUTES AND REGULATIONS**

12 C.F.R. § 545.74(d) . . . . . . . . . . 47

12 C.F.R. § 561.16c(d)(3) . . . . . . . . . . 12, 17, 32

12 C.F.R. § 563.23-3(c) . . . . . . . . . . 15

12 C.F.R. § 563b.26 . . . . . . . . . . 27

12 C.F.R. § 563b.26(b)(2) . . . . . . . . . . 24, 25

26 U.S.C. § 61 . . . . . . . . . . 61

26 U.S.C. § 111(a) . . . . . . . . . . 62

26 U.S.C. § 118(a) . . . . . . . . . . 61

54 Fed. Reg. 46,845 (11/8/89) . . . . . . . . . . 44

Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") of 1989,
Pub. L. No. 101-73, 103 Stat. 183 . . . . . . . . . . 1

Rev. Rul. 81-277, 1981 WL 165965 (IRS RRU) (1981) . . . . . . . . . . 60, 61

**MISCELLANEOUS**

3 Dan B. Dobbs, Law of Remedies § 12.7(5) (2d ed. 1993) . . . . . . . . . . 58

3 E. Allen Farnsworth, Farnsworth on Contracts 193 (2d ed. 1998) . . . . . . . . . . 59

5 A. Corbin, Corbin on Contracts § 1104 (1964) . . . . . . . . . . 9

George E. Palmer, The Law of Restitution, § 4.5 (1978) . . . . . . . . . . 4

Henry Mather, Restitution as a Remedy for Breach of Contract: The Case
of the Partially Performing Seller, 92 Yale L.J. 14 (1982) . . . . . . . . . . 55

Restatement (Second) of Contracts § 243 . . . . . . . . . . 4

Restatement (Second) of Contracts § 373 (1981) . . . . . . . . . . 4, 9

Restatement (Second) of Contracts § 384 cmt. a (1981) . . . . . . . . . . 55

Restatement (Second) of Contracts § 384(1)(a) . . . . . . . . . . 55

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 94-522C** |
| **v.** | ) | **(Judge Williams)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF**

Pursuant to this Court's Order of March 30, 2007, defendant, the United States of America, respectfully submits this response to the post-trial brief filed by plaintiff, First Annapolis Bancorp, Inc. ("Bancorp"). For the reasons stated in our opening brief and below, the Court should enter judgment for the Government.

**INTRODUCTION**

Bancorp contends that it is entitled to a restitution award of its $13,665,907 investment in First Annapolis Savings Bank, FSB ("First Annapolis"), plus a tax gross-up to compensate Bancorp for its total loss, for a $22,609,959 total award. The evidence, however, demonstrates that Bancorp is not entitled to restitution, or a tax gross-up of that award.

In order to be entitled to restitution, the Federal Circuit in Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1345 (Fed. Cir. 2004), mandates that a thrift be viable at the time of the breach. The contemporaneous evidence demonstrates that First Annapolis was not viable at the time of the Government's breach, and, thus, Bancorp is not entitled to restitution.

In the face of the overwhelming evidence of non-viability presented at trial, Bancorp now contends that the Government's breach really began in late 1988 or early 1989 because the "shadow" or anticipation of the Financial Institutions Reform, Recovery, and Enforcement Act of

1989 ("FIRREA") caused First Annapolis's non-viability. Bancorp errs because the Government's breach, by definition, arises only when the Government took actions inconsistent with Bancorp's contract. Here, the alleged breach is the loss of the regulatory forbearance related to First Annapolis's regulatory capital requirements, not the entire FIRREA legislation, nor that legislation's "shadow." Moreover, the contemporaneous evidence demonstrated that First Annapolis's losses upon its loans and other investments were not caused by FIRREA's announcement, enactment, or enforcement.

Bancorp also contends that some of First Annapolis's losses were merely "paper losses," and thus should not count towards viability. These losses, however, were economic realities that were required to be recognized by law and by First Annapolis's own internal accounting policies. First Annapolis's refusal to recognize those losses in its reporting to regulatory authorities did not make those losses any less real, nor did it make First Annapolis more viable.

Even assuming First Annapolis was viable at the time of the breach, Bancorp has failed to show this contract could be unwound. The Court should not award Bancorp "restitution" of $13,665,907 because Bancorp did not pay this or any amount to the Government, but instead infused the money into First Annapolis, which the thrift then used to enter into various investments with third parties. Awarding Bancorp its investment in this case would not return the parties to the status quo ante. Moreover, because First Annapolis lost Bancorp's investment before the breach and for reasons unrelated to the breach, returning this investment would be a "windfall," placing Bancorp in a better position than it would have been in absent the breach.

Finally, even assuming Bancorp was entitled to restitution, it is not entitled to a tax gross-

up because Mr. Daugherty's testimony failed to prove its award would be taxable.[1]

## ARGUMENT

### I. Bancorp Failed To Establish A Total Breach

In our opening brief, we demonstrated that (1) Bancorp is not entitled to restitution unless the Government's breach was a "total breach," and (2) the breach here was not a "total breach" because First Annapolis was not viable at the time of the breach. Gov't Br. 27-41. In its brief, Bancorp presents numerous arguments, some legal and some factual, challenging the correctness of our demonstration. All of Bancorp's arguments are meritless.

#### A. First Annapolis's Viability Is An Essential Element Of Bancorp's Restitution Claim

Bancorp (Pl. Br. 35-36) does not dispute our demonstration that a breach must constitute a "total breach" for restitution to be available as a remedy. Gov't Br. 27; Hansen Bancorp, Inc. v. United States ("Hansen II"), 367 F.3d 1297, 1309 (Fed. Cir. 2004) ("Significantly, relief in

---

[1] Bancorp's post-trial brief has 110 post-trial findings of "fact" which contain numerous misstatements and errors regarding the evidence introduced at trial. Pl. Br. 1-35. For example, Bancorp alleges that other than the forbearance, the "Government did not give any other consideration or anything of value" for the formation of the contract. Pl. Br. 6, ¶ 6. In support of this, Bancorp cites the testimony of our expert, David Kennedy. At trial, however, Mr. Kennedy actually testified that in addition to the three forbearances, the Government allowed Bancorp to acquire the thrift. Tr. 2330 (Kennedy). Alan Shapiro, our other expert, also testified on this point when he explained that through its initial investment in First Annapolis, Bancorp was "getting the opportunity to own and operate First Annapolis, as long as they met their regulatory capital benchmarks. And effectively, what this means is they got to keep the upside, namely, realize all the profits associated with First Annapolis, while their downside was limited to the loss of their initial investment." Tr. 2465 (Shapiro).

In the interest of judicial economy, we do not address every misstatement in Bancorp's post-trial brief, but only those relevant to controlling legal issues in this case.

restitution is 'available only if the breach gives rise to a claim for damages for total breach and not merely a claim for damages for partial breach.'") (quoting Restatement (Second) of Contracts § 373 (1981)) ("Restatement"). Bancorp also does not dispute (Pl. Br. 35-36) our demonstration that, in order to constitute a "total breach," a breach must "so substantially impair[] the value of the contract to the injured party at the time of the breach that it is just under the circumstances to allow him to recover damages based on all his remaining rights to performance." Gov't Br. 28; Admiral, 378 F.3d at 1345 (citing Mobil Oil Exploration & Producing Southeast, Inc. v. United States ("Mobil"), 530 U.S. 604 (2000)); Restatement § 243. As Bancorp correctly notes, the Hansen II court explained that, to be a "total breach," the breach "must be of a relatively high degree of importance." Hansen II, 367 F.3d at 1312 (quoting George E. Palmer, The Law of Restitution, § 4.5 (1978)); Pl. Br. 48; see also Hansen Bancorp, Inc. v. United States ("Hansen III"), 67 Fed. Cl. 411, 422 (2005).

Bancorp does adamantly dispute, however, our explanation (Gov't Br. 28) that, if First Annapolis was not viable at the time of the breach, the Government's breach, as a matter of law, was not a "total breach." Bancorp erroneously claims that "[w]hether or not First Annapolis may ultimately have succeed [sic] is irrelevant to determining whether Bancorp is entitled to restitution." Pl. Br. 51.

Contrary to Bancorp's claim, First Annapolis's viability at the time of the breach is *essential* to Bancorp's restitution claim. If First Annapolis was not viable at the time of the breach, the breach would not "substantially impair[] the value of the contract" to Bancorp as a matter of law – and thus would not constitute a "total breach" – because the breach would have *no* impact on the value of the contract to Bancorp. Similarly, if First Annapolis was not viable at

the time of the breach, the breach was not "of a relatively high degree of importance" (Hansen II, 367 F.3d at 1312), because, in such circumstances, the breach would be of *no* import to Bancorp.

The Federal Circuit in Admiral could not have been more clear, that for purposes of a restitution award, in the Winstar context, the viability of a thrift at the time of breach is an essential element of "total breach." The Federal Circuit approved the trial court's finding that "at the time of the breach Admiral was in such dire straits that it would not have been able to recover, even absent a breach." 378 F.3d at 1345. As a result of this factual finding, the Federal Circuit agreed with the trial court that the breach "had no practical effect on Admiral's ability to find the necessary additional funding for the thrift" and that the breach "'did not substantially impair[] the value of the contract to the injured party at the time of the breach.'" Admiral, 378 F.3d at 1345 (quoting Mobil, 530 U.S. at 608). Accordingly, the appellate court determined that restitution was not an appropriate remedy. Id. at 1345.

Following the Federal Circuit's decision in Admiral, this Court has reaffirmed the rule that a thrift's non-viability at the time of the breach precludes an award of restitution. In Southwest Inv. Co., Inc. v. United States, 63 Fed. Cl. 182, 195 (2004), aff'd, 158 Fed. Appx. 283 (Fed. Cir. 2005), cert. denied, 126 S.Ct. 2321 (2006), this Court noted that, in Admiral, the Federal Circuit affirmed the trial court's holding that "[b]ecause Admiral was not harmed by FIRREA, restitution damages were inappropriate." Finding the facts before it analogous to Admiral, the Court concluded that the thrift's condition at the time of breach precluded an award of restitution because the thrift was "insolvent notwithstanding the promises." Id. at 196. Similarly, this Court, in Hansen III, upon remand from the Federal Circuit, concluded that an award of restitution was inappropriate because the thrift was not viable at the time of the breach.

67 Fed. Cl. at 434. In Hansen III, the Court agreed with the Government's contention that, at the time of the breach, the thrift would have failed to meet its capital requirements, even had there been no breach, and that, therefore, no "total breach" had occurred. Id.

To support its claim, that First Annapolis's viability is irrelevant, Bancorp (Pl. Br. 49-50) erroneously relies upon Mobil and two decisions of this Court in Amber Resources v. United States ("Amber I"), 68 Fed. Cl. 535 (2005), and Amber Resources v. United States ("Amber II"), 73 Fed. Cl. 738 (2006). Bancorp claims these cases "found immaterial any inquiry to how the injured party may have ultimately fared had the contract been fully performed." Pl. Br. 50. Bancorp incorrectly ignores that: (1) Admiral construed Mobil in a completely contrary manner to its preferred interpretation; and (2) this Court is bound by Admiral and cannot rely upon statements in Amber I and Amber II that conflict with Admiral.

Although Bancorp recognizes that Admiral cited to Mobil (Pl. Br. 44), it fails to reconcile its (erroneous) interpretation of Mobil with the holding in Admiral. Bancorp does not dispute – nor could it – that, in Admiral, the Federal Circuit affirmed the trial court's finding that the breach "had no practical effect on Admiral's ability to find the necessary additional funding for the thrift" and that, therefore, the breach was not a "total breach" as it "'did not substantially impair[] the value of the contract to the injured party at the time of the breach.'" Id. at 1345 (quoting Mobil, 530 U.S. at 608). Yet, Bancorp does not, and cannot, explain how its position – that, under Mobil, it is irrelevant, for purposes of determining the existence of a "total breach," how the non-breaching party would have fared absent the breach – can be reconciled with Admiral. Indeed, Admiral rejected Bancorp's interpretation of Mobil, and the Admiral court's rejection was followed by this Court in Southwest and Hansen III. Certainly, this Court cannot

reject Admiral's holding and adopt Bancorp's preferred – but contradictory – interpretation of Mobil.

Mobil is different from Admiral – and the instant case – because, in Mobil, the Government received $156 million in cash from the plaintiffs. In contrast, in Admiral and here, the plaintiffs never provided the Government with the money sought in restitution. Tr. 1080-81 (Parran). In this case, Bancorp infused the $13.6 million it seeks in restitution into its own thrift subsidiary. See Gov't Br. 42-43; Tr. 1082-83 (Parran). Additionally, unlike Mobil, where the Government never conducted any performance, in Admiral and here, the Government allowed the thrift to convert and then performed the contract for a significant period. See Gov't Br. 44; Tr. 1101-02, 1106 (Parran).

Bancorp improperly requests this Court to rely upon a discussion of restitution principles from Amber II, which conflicts with Admiral and other Federal Circuit law. See Amber II, 73 Fed. Cl. at 746 n.6; Amber I, 68 Fed. Cl. at 553. Bancorp (Pl. Br. 50) highlights that portion of the Amber II restitution discussion stating that, in rescission (restitution): (1) there is "room for the possibility that the injured party will benefit from the breach" and (2) "the government has no standing to make a 'windfall' argument." 73 Fed. Cl. at 747.

The Amber II Court explicitly acknowledged that the Federal Circuit has held directly contrary to this portion of the discussion. Amber II, 73 Fed. Cl. at 746 n. 6 ("The Federal Circuit has held that restitution may be inappropriate if 'relief would result in an 'unfair windfall' to the non-breaching party . . . . [T]he non-breaching party should not be placed in a better position through the award . . . than if there had been no breach.' [Hansen II], 367 F.3d at 1315.') (quoting Bluebonnet Sav. Bank, FSB v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003); see also

Admiral, 378 F.3d at 1345 ("this court has noted restitution should not be awarded if it would result in a windfall to the nonbreaching party . . . . Allowing Admiral to rescind the contract and obtain full restitution would afford it a windfall, contrary to the equitable principles on which the remedy of restitution is based.").

Similarly, in Amber I, the Court explicitly recognized that, under Admiral, there is no repudiation or "total breach" – and therefore the plaintiff is not entitled to the remedy of restitution – when a breach "does not place the private party in a worse position than it was in prior to the breach:"

> The Admiral court stated that a government breach does not repudiate a contract *if the breach does not place the private party in a worse position than it was in prior to the breach*. [378 F.3d at 1343]. Admiral, a failing thrift, was unable to comply with financial regulations. Id. at 1337. Admiral entered into an agreement with the government that improved its chance for regulatory compliance. Id. at 1338. The government subsequently breached this agreement with the enactment of new legislation. Id. at 1338-39. The court concluded that the government's violation of the agreement was not a repudiation because it did not leave the thrift in a worse position and was therefore immaterial. Id. at 1343. The thrift was not harmed by the violation merely because the thrift was already traveling down a self-induced road to failure and seizure, independent of the government's breach. Id. Admiral did not have the capital to revive its investment, irrespective of the legislation that happened to be enacted briefly before its failure. Id.

Amber I, 68 Fed. Cl. at 553 (emphasis added). The Amber Court's subsequent efforts to distinguish Admiral, are difficult to understand and certainly do not affect, Admiral's direct applicability in this case. Thus, there is no basis whatsoever for this Court to follow the Amber decisions in their departure from established and binding Federal Circuit caselaw.

**B. Bancorp Has The Burden Of Proving Its Viability At The Time Of The Breach**

Bancorp, relying upon inapplicable authority, erroneously claims that the Government has the burden of proving that First Annapolis was not viable. Pl. Br. 56-62. Contrary to Bancorp's contention, it must demonstrate the viability of First Annapolis in order to set forth a *prima facie* case for restitution.

Bancorp (Pl. Br. 35-36) does not dispute that "[a]bsent a total breach, there can be no [restitution] damages." Hansen II, 367 F.3d at 1309; see Restatement § 373. Thus, to demonstrate entitlement to an award in restitution, plaintiffs must not only prove that the Government breached the contract, but that the Government's breach was a "total breach;" rather than a partial breach. See Hansen II, 367 F.3d at 1309; Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston, 666 F.2d 673, 677 n. 1 (1st Cir. 1981) (citing 5 A. Corbin, Corbin on Contracts § 1104 (1964)). As we demonstrated in the preceding section and in our opening brief (Gov't Br. 27-29), a breach does not constitute a "total breach" if First Annapolis was not viable at the time of the breach. E.g., Admiral, 378 F.3d at 1345. Accordingly, Bancorp must prove First Annapolis was viable at the time of the breach or it has not demonstrated a *prima facie* case for restitution.

This Court's analysis in Hansen III illustrates that it is the plaintiff's burden to prove a thrift's viability in the Winstar context when seeking restitution. In Hansen III, on remand from the Federal Circuit to determine whether a "total breach" occurred. This Court noted that "FIRREA's law on restitution imposes the requirement on the non-breaching party to demonstrate that the breach was material . . . ." 67 Fed. Cl. at 429. After concluding that the

thrift would not have satisfied capital requirements even if the breach had not eliminated or phased-out the thrift's goodwill, the Court concluded that "*plaintiffs have not proved by a preponderance of evidence* that the Government's breach of contract by dishonoring its commitment to allow HSB to count goodwill toward regulatory capital requirements constituted a material breach of contract." Id. at 434 (emphasis added). Thus, the Court in Hansen III held that the plaintiffs failed to meet *their burden* of demonstrating that the thrift was viable even absent the breach and, thus, were not entitled to an award of restitution.

Bancorp (Pl. Br. 57-58) improperly relies upon American Capital Corp. v. United States, 472 F.3d 859 (Fed. Cir. 2006) to support its claim that it does not have the burden to demonstrate First Annapolis's viability. American Capital is inapposite. There was no claim for restitution in American Capital; instead, American Capital involved a claim for "reliance damages." 472 F.3d at 862. As a result, because "total breach" is not an element of a claim for reliance damages, the entire analysis in American Capital has no applicability here. E.g., Hansen III, 67 Fed. Cl. at 429 ("material [total] breach is a bar to recovery for restitution, but not reliance"). It obviously makes no sense to rely upon a case involving a cause of action that does *not* require a "total breach" for the proposition that a party seeking restitution does not have the burden to demonstrate a critical element of "total breach," i.e., whether the thrift was viable at the time of the breach.

In a similar vein, Bancorp makes the curious argument that the Government "failed to prove there should be an offset to Plaintiff's award." Pl. Br. 53. Although unclear, this argument appears to be an additional effort by plaintiff to place the burden of proof upon the Government to show the non-viability of First Annapolis, this time upon the theory that although "[a]

restitution award may be offset by benefits already received from the defendant, . . . [i]t is not the plaintiff's burden to disprove the government's claimed offset." Id.

Bancorp's argument is misplaced because we are not claiming any offset. Instead, we contend that Bancorp did not demonstrate a *prima facie* case for entitlement to restitution because it did not prove "total breach." Whether our breach is "total" is unrelated to which party bears the burden of proof in a hypothetical scenario in which we claim offset.

### C. Even Assuming It Was The Government's Burden To Demonstrate The Non-Viability Of First Annapolis, We Satisfied That Burden

Assuming *arguendo* the law places upon us the burden to demonstrate the non-viability of First Annapolis, a position with which we disagree, the evidence we proffered at trial more than establishes that First Annapolis was, in fact, *not* viable at the time of the breach. See Gov't Br. at 32-40. As we demonstrated:

- In stark contrast to its business plans, which projected that it would make money every quarter, First Annapolis lost money. Gov't Br. 8-11; JX 134 at I-5; Tr. 1170 (Parran); JX 135 at 0882; Tr. 1174-75 (Parran); JX 136 at 0556; Tr. 2246 (Kennedy); DX 4011 (Demonstrative); DX 4012 (Demonstrative); DX 4017 (Demonstrative); Tr. 2249-51 (Kennedy); DX 4018 (Demonstrative); Tr. 2254-55 (Kennedy); DX 4019 (Demonstrative); Tr. 2257-58 (Kennedy).

- First Annapolis was not able to generate profits from its core banking operations. Gov't Br. 8-10; Tr. 2258-65 (Kennedy).

- First Annapolis's viability depended upon profits from its service corporation investments which never materialized. Gov't Br. at 6, 9; DX 634 at ¶5; Tr. 1150, 1170-71 (Parran); Tr. 2248 (Kennedy); DX 4014 (Demonstrative); Tr. 2247-48, 2258 (Kennedy).

- First Annapolis's asset quality significantly deteriorated after the conversion. Gov't Br. 13-16; Tr. 2265 (Kennedy).

- Economic conditions and the real estate market significantly deteriorated after the conversion. Gov't Br. 9; Tr. 2234-44 (Kennedy).

- First Annapolis lost money on its real estate portfolio because of the deterioration in asset quality and economic conditions. Gov't Br. 34-36; Tr. 2188-216 (Kennedy).

- First Annapolis could not raise capital without establishing a "twelve to twenty-four month period of positive earnings . . ." DX 2471 at 1486; Tr. 1191 (Parran); see Gov't Br. 39-40. Prior to the conversion, First Annapolis's predecessor had not been profitable since fiscal 1981, JX 89 at 0070; Tr. 1192 (Parran), and after the conversion First Annapolis remained unprofitable. Gov't Br. 8-11. Even if First Annapolis could have raised capital, it would have needed to raise nearly $17 million to meet its June 30, 1990, 2.1 percent benchmark requirement, even absent the breach, DX 4029 (Demonstrative); Tr. 2278 (Kennedy), and nearly $100 million "to just break even." Tr. 2278-79 (Kennedy); see Gov't Br. 39-40.

- Based on First Annapolis's own records, it fell below the 1.8 percent benchmark requirement in October 1989 even including all of the goodwill, JX 58 at 1545; Tr. 1221-24 (Parran), and excluding the loan losses that it had incurred but failed to record in violation of its own policies and the regulations. Gov't Br. 11-13, 16-26, 36-38; Tr. 2189-92, 2272-76 (Kennedy); DX 397 at 0140, 0150 and 0162; Tr. 1925-26, 1958, 1964 and 1975-76 (Crompton); DX 439 at 1301; Tr. 1788-89 (Jones); 12 C.F.R. § 561.16c(d)(3).

- If First Annapolis had recorded the loan losses when they were actually incurred as required by the regulations and classified its assets in accordance with its own policies, First Annapolis would have fallen below the 1.8 percent benchmark requirement even before October 1989. Gov't Br. 37-39; Tr. 2191-92, 2275-76 (Kennedy).[2]

Bancorp claims, nonetheless, that, for five separate reasons, our evidence is inadequate to demonstrate First Annapolis's non-viability at the time of the breach. Pl. Br. 56-62. None of its arguments have merit.

---

[2] The regulators directed First Annapolis to remove all shareholder related loans from its books, including loans that had been swapped for other loans. DX 439 at 1301; Tr. 1790 (Jones). Mr. Kennedy testified that including shareholder loans in capital was a violation of the accounting rules and the regulations and that if the thrift excluded the $1.6 million in shareholder related loans from its capital, First Annapolis would have failed to meet the June 30, 1989, 1.8 percent benchmark requirement. Tr. 2184-85 (Kennedy).

**1. Bancorp Erroneously Downplays The Regulators' Assessment Of First Annapolis's Condition In December 1988**

Bancorp criticizes our reliance upon the December 28, 1988 letter from Supervisory Agent Greg Jones to First Annapolis's Board of Directors (DX 267) in which Mr. Jones transmitted the July 11, 1988 report of examination (DX 118). Pl. Br. 58-59. Bancorp claims that Mr. Jones' letter is not probative of whether First Annapolis would have failed absent the breach because the letter: (1) only "made suggestions" and did not require "any specific action" on First Annapolis's part; and (2) did not advise the bank it was "troubled" or in default. Id.

Bancorp improperly dismisses the significance of Mr. Jones' letter. It is significant both because of its content and the regulators' follow-up to the letter. As Mr. Jones explained in his letter: (1) First Annapolis needed to correct the regulatory violations noted in the July 1988 examination; and (2) management needed to be strengthened because the "current team that was in there didn't seem to be doing the job that was necessary to run the institution in a profitable manner." Tr. 1748-49 (Jones). Mr. Jones also advised First Annapolis that "[t]he volume and nature of supervisory concerns reflect unfavorably upon the overall administration of the institution and *pose a risk to First Annapolis' long-term viability.*" DX 267 at 0112 (emphasis added). Finally, Mr. Jones further advised in his letter that, as a result of the July 1988 examination, the regulators took the "very rare" step of asking First Annapolis's Board to "perform an internal assessment of itself, the institution's management team and the current organizational structure, and determine the capability of existing resources to successfully implement the recapitalization plan and restore the institution to a satisfactory condition." DX 267 at 0112; Tr. 1749 (Jones).

Bancorp also ignores the extensive follow-up to Mr. Jones' letter and the ominous findings of the attached July 1988 examination. In early 1989, First Annapolis responded to the regulators' criticism of its management by hiring, among others, David Cook and David Vorel in early 1989. Tr. 1753 (Jones). Mr. Cook studied First Annapolis's condition and, in February 1989, contacted Mr. Jones "to give him his take on where things stood and some things that he expected to see [First Annapolis] do." Tr. 1759 (Jones). Mr. Cook explained to Mr. Jones that he was "fully aware of the volume and severity of problems facing First Annapolis and spoke rather candidly about them." DX 294 at 1540; Tr. 1758-60 (Jones).

On March 8, 1989, Mr. Cook, Mr. Jones, and Supervisory Analyst Leslie E. Hoover met to "discuss some of the recent organization and operational changes which have been effected at First Annapolis in response to the institution's July 11, 1988 report of examination." DX 301 at 1467. Mr. Cook told regulators that "[b]ased on [his] analysis of the organization/operational structure of First Annapolis since joining the staff, he concluded that the institution may have serious problems with several of its loans and management which does not have support or expertise to handle some of the institution's problems." DX 301 at 1467; Tr. 1762-63 (Jones). Furthermore, Mr. Cook told regulators that it was "his belief that President, Douglas Parran, does not realize the seriousness of First Annapolis' problems." DX 301 at 1467; Tr. 1763 (Jones).

In March 1989, Mr. Jones also met with the First Annapolis Board and explained that First Annapolis was facing problems with regard to its management structure, low capital, earnings performance, regulatory violations, and problem assets. Tr. 1755 (Jones). First Annapolis's Board and management recognized "the need to improve upon the current weaknesses of a low capital ratio; low interest earning assets/interest bearing liability ratio; and

[its] limited borrowing capacity." DX 291 at 1188; Tr. 1754 (Jones).

In follow-up to that March meeting, the regulators sent a letter to First Annapolis's Board, dated March 27, 1989, stressing that it was "essential that each board member individually assess his/her involvement and dedication to First Annapolis, along with that of senior management, in attempting to resolve regulatory violations and operating deficiencies throughout the organization and *returning the institution to satisfactory long-term viability.*" DX 302 at 1424 (emphasis added).

Similarly, after Paul Jones and Patrick Cole joined First Annapolis's Board in April 1989, Mr. Cook spoke with them about First Annapolis's financial condition. Messrs. Jones and Cole were "shocked at the condition of" First Annapolis. Tr. 1017-18 (Cook); JX 46 at 1016; see also DX 263; DX 313; DX 2214; DX 2470.

**2. Bancorp Erroneously Claims That The Court Can Ignore First Annapolis's GAAP Financial Statements**

Bancorp next argues that our reliance upon Bancorp's generally accepted accounting principle ("GAAP") financial statements to demonstrate First Annapolis's non-viability is erroneous because: (1) "the thrift was not required to report to the [Federal Home Loan Bank Board ('FHLBB')] on a GAAP basis; it was only required to report to the Board on a [regulatory accounting principle ('RAP')] basis;" and (2) "a GAAP statement showing a loss did not mean that there would be an equivalent loss on a RAP statement." Pl. Br. 59-60. Both of Bancorp's arguments are incorrect.

First, the regulators required thrifts, including First Annapolis, to prepare their financial statements in accordance with GAAP. 12 C.F.R. § 563.23-3(c). Moreover, as Mr. Parran

ultimately admitted, First Annapolis, as required, *did* report its financial results to the regulators on a GAAP basis. Tr. 1343-45 (Parran). Any contrary testimony from Mr. Parran was simply in error.

Second, even if it were true that First Annapolis "was only required to report to the Board on a RAP basis" (i.e., a 25-year amortization period instead of a 15-year amortization period for goodwill), and it is not, the results would not have changed – *First Annapolis still would have lost money*. During fiscal 1989 (the period August 12, 1988, through June 30, 1989), First Annapolis lost $1,019,420 on a RAP basis. JX 58 at 1545. During the period July 1989 through October 1989, First Annapolis lost another $1,281,731 on a RAP basis.[3] JX 58 at 1545. During the month of November 1989, First Annapolis lost an additional $1,046,845 ($2,328,576 - $1,281,731) on a RAP basis. DX 2294 at 1612; JX 58 at 1545. Thus, whether calculated upon a GAAP or RAP basis, First Annapolis still significant amounts of money, and those losses demonstrate its non-viability.

### 3. Bancorp Erroneously Claims That Our Demonstration Of First Annapolis's Failure Is Premised Upon "Paper" Losses Rather Than Economic Realities

Citing purported testimony from Greg Jones, Bancorp erroneously claims that our evidence demonstrating the non-viability of First Annapolis is inadequate because "a conclusion of failure based on a 'paper' loss ignores the economic realities of a bank's operations." Pl. Br. at 60.

As an initial matter, there is no evidence in the record supporting Bancorp's claim.

[3] During the four month period ending October 1989, First Annapolis improperly recorded negative loan losses of $600,000, which incorrectly reduced its loss during this period by a similar amount. JX 58 at 1543; DX 4027 (Demonstrative); Tr. 2271 (Kennedy).

Although Bancorp relies solely upon Mr. Jones' testimony, Mr. Jones never testified that "paper" losses are unrelated to economic losses; that First Annapolis incurred only "paper" losses; or that the Government's conclusions regarding the causes of First Annapolis's failure are based upon these alleged "paper" losses. In fact, nowhere in Mr. Jones's entire testimony does he even mention so-called "paper" losses.

Although unclear, Bancorp apparently is referring to the loan losses that First Annapolis incurred as "paper" losses. See Pl. Br. 60. If so, Bancorp incorrectly ignores the fact that the regulations required First Annapolis to maintain adequate loan loss reserves in accordance with GAAP (12 C.F.R. § 561.16c(d)(3)), and that those reserves reduced First Annapolis's regulatory capital and its profitability. Tr. 2155 (Kennedy). There is no forbearance that allowed First Annapolis to record only those losses that, in its view, reflected the "economic realities of a bank's operations" and enabled it to ignore applicable regulations and accounting rules. See Tr. 1865 (Jones). In addition, regulators assessed a thrift's safety and soundness based upon the regulations and the thrift's accounting profits and losses, not a thrift's subjective belief as to "economic realities of a bank's operations." See Tr. 1884-85 (Crompton).

In any event, the loan losses that First Annapolis recorded were not merely "paper" losses, but instead constituted First Annapolis's "economic realities" in 1989. For example, the nearly $1 million loss on the Dennis Blaeuer loan was based upon the sales price of the underlying collateral, Tr. 2213-14 (Kennedy); DX 2289 at 0760, while the nearly $1.5 million loss on the Northampton loan and the $3.2 million loss on the Bayside loan were both based upon the appraised value of the underlying collateral. Tr. 2208-09, 2204-05 (Kennedy).

### 4. Bancorp Erroneously Claims That Our Analysis Concerning First Annapolis's Viability Fails To "Back-out The FIRREA Factor"

Bancorp's argument that our witnesses "wholly failed to back-out the FIRREA factor," Pl. Br. 60-61, fails for two reasons. First, the analysis of First Annapolis's viability, absent the breach, requires only that, the Court "back out" FIRREA's breaching provisions, not the entirety of the statute. Second, Bancorp is simply incorrect that our proffered analysis and testimony failed to account for the breach's effects.

As we have demonstrated, all of FIRREA did not breach Bancorp's contract. See, e.g., Tr. 2513 (Shapiro); see also United States v. Winstar Corp., 518 U.S. 839, 846-47 (1996). The only provision of FIRREA which constituted a breach under the Court's analysis is the phase-out of First Annapolis's goodwill. First Annapolis Bancorp, Inc. v. United States, 75 Fed. Cl. 263, 278-79 (2007). Thus, the question is not whether FIRREA impacted First Annapolis, but whether FIRREA's *breaching provisions*.

Our expert Mr. Kennedy, testified that First Annapolis was no longer viable by the third quarter of 1989. Tr. 2150 (Kennedy). Bancorp's claim that Mr. Kennedy "failed to back-out the FIRREA factor" is completely wrong.

Mr. Kennedy carefully explained the causes of First Annapolis's *operating losses*. The breach was not one of them.

Indeed, there is simply no evidence – and Bancorp cites to none – that suggests that the breach caused First Annapolis's higher than expected operating expenses and lower than expected interest income (the primary factors causing its operating losses). Mr. Kennedy traced First Annapolis's operating losses from the October 1988 through June 1989, to $1.6 million in

additional overhead expenses that had not been budgeted for and a $2.2 million shortfall in interest income due to declining asset quality. DX 4017 (Demonstrative); Tr. 2250-51 (Kennedy). Mr. Kennedy explained that First Annapolis's operating losses during the quarter ending September 1989 were due to higher than expected operating expenses and a shortfall in interest income. Id.

The sale of interest earning assets (in order to book gains to offset losses) and the continuing deterioration in asset quality caused this shortfall. DX 4018 (Demonstrative); Tr. 2256 (Kennedy). Further, First Annapolis's operating losses for the quarter ending December 1989 were due, once again, to higher than expected operating expenses and lower than projected interest income (because of First Annapolis's asset quality problems). Id. Finally, First Annapolis's loss during the fourth quarter of 1989 was further due to the fact that, while First Annapolis projected nearly $1.5 million in service corporation income for the quarter, the thrift only earned $38,832. DX 4019 (Demonstrative); Tr. 2257-58 (Kennedy).[4]

Likewise, Mr. Kennedy testified that the breach did not cause First Annapolis's *loan losses*, including the losses incurred on the Bayside Marina, Northampton, and Dennis Blaeuer loans. DX 4005-4008 (Demonstrative); Tr. 2192-93, 2199-2216 (Kennedy). Mr. Kennedy based this opinion on a detailed study of the facts related to each loan. Id.

Mr. Kennedy also identified the amount of loan losses that First Annapolis should have

---

[4] As we have noted (Gov't Br. at 33-35), it is undisputed that First Annapolis's viability depended upon its ability to realize the projected service corporation profits. DX 634 at ¶ 5; Tr. 1150, 1170-71 (Parran); Tr. 2237-38 (Kennedy). As the service corporation's profitability depended upon market conditions, DX 118 at 0035; Tr. 1915-16 (Crompton); Tr. 1187 (Parran); Tr. 2243 (Kennedy), the deterioration in economic conditions in 1989 was sufficient, in itself, to cause First Annapolis to fail. Gov't Br. 9; Tr. 2343-46 (Kennedy).

recorded based upon either a contemporaneous valuation of the underlying collateral or an agreed upon sales price for the collateral. Tr. 2204-05, 2208-09; 2213-14 (Kennedy). The loan losses were due to a deterioration in the value of the loans as manifested by the contemporaneous valuations or agreed upon sales price. Tr. 2205-06, 2208-09, 2283-84 (Kennedy).

First Annapolis offered no evidence that the breach, the loss of the regulatory forbearances, caused the value of the underlying collateral to deteriorate. Indeed, Mr. Kennedy testified that many of the losses on the collateral should have been recorded prior to the breach. Certainly, First Annapolis's lost forbearances did not cause the loan losses that should have been recorded prior to the breach. Mr. Kennedy also testified that the loan losses recorded after the breach had nothing to do with the loss of the regulatory forbearances. Tr. 2199-2216 (Kennedy).

Mr. Kennedy based his opinions upon the accounting rules, the regulations, and First Annapolis's own policies. Tr. 2155, 2205-06, 2210, 2214, 2276 (Kennedy). First Annapolis did not have a forbearance that allowed it to disregard the accounting rules or regulations as to when a loan loss had to be recognized. See Tr. 1865 (Jones).

Bancorp argues that Mr. Kennedy failed to consider the impact of the breach upon First Annapolis. Pl. Br. 61. First, Bancorp cites to testimony from Mr. Kennedy that reflects nothing more than his agreement that his analysis incorporates post-FIRREA data. Id. (citing Tr. 2310 (Kennedy)). Second, Bancorp relies upon testimony in which Mr. Kennedy merely explains that he did not pinpoint the precise day within the third quarter of 1989 in which First Annapolis became non-viable. Id. (citing Tr. 2322 (Kennedy)). As Mr. Kennedy explained, in order to pinpoint the exact day in the third quarter of 1989 that First Annapolis became non-viable, one would have to perform a very expensive line-by-line by liquidation analysis of First Annapolis's

assets at different points in time. Tr. 2321-22 (Kennedy). Finally, in the third portion of Mr. Kennedy's testimony upon which Bancorp relies, Mr. Kennedy was responding to a cross-examination question concerning the cause of First Annapolis's post-FIRREA losses. Tr. 2380 (Kennedy). Mr. Kennedy responded, correctly, that one cannot determine the causes of these losses absent a study of the cause of the losses. Id. Of course, Mr. Kennedy performed exactly such a study and identified various factors that caused the failure of First Annapolis – none of which had anything to do with the breach.

In an effort to discredit Mr. Kennedy (and Dr. Shapiro), Bancorp relies upon purported "facts" that First Annapolis's regulatory capital increased from September 1988 through March 1989; that the thrift was in capital compliance through the end of the third quarter of 1989; and that capital significantly dropped at the end of 1989. Pl. Br. 61-62. Bancorp's reliance is misplaced.

The only reason First Annapolis's regulatory capital "increased" from September 1988 through March 1989 was because of First Annapolis's acknowledged error in making its regulatory capital calculations. Specifically, during the quarter ended March 1989, First Annapolis established a $1.75 million general valuation allowance on the Bayside loan. Tr. 1349-50 (Parran); DX 2474. This had the effect of erroneously *increasing* First Annapolis's regulatory capital. DX 2474; Tr. 1350 (Parran). First Annapolis has since admitted that it should have classified the $1.75 million as a specific valuation allowance, not a general valuation allowance. Tr. 1350-51 (Parran); DX 2474. Properly accounting for this loss would have *actually decreased* First Annapolis's regulatory capital by $1.75 million, instead of increasing it. DX 2474; Tr. 2171 (Kennedy); see also Tr. 1787-88 (Jones). Thus, with proper accounting, First

Annapolis's regulatory capital *decreased* between September 1988 and March 1989.

Similarly, Bancorp's claim that First Annapolis was in capital compliance through the third quarter of 1989 improperly depends upon First Annapolis's failure to record loan losses and classify problem assets. Tr. 2189-90, 2276 (Kennedy); DX 397 at 0150 and 0162; Tr 1958, 1975-76 (Crompton); see also Tr. 1787-88 (Jones). Had First Annapolis properly recorded its loan losses and classified its problem assets, as required by GAAP and the regulations, it would have been out of compliance by the third quarter of 1989. Tr. 2191, 2276 (Kennedy).

To support its claim that our expert did not consider the breach's impact on First Annapolis's viability, Bancorp attempts to make much of the fact that "most of the losses which impacted Mr. Kennedy's report were in late 1989 or early 1990." Pl. Br. 62. While technically correct, Bancorp's argument misses the point. The reason that most of the losses occurred in late 1989 or early 1990 is because a significant portion of those losses were related to First Annapolis's loan portfolio, and, as Mr. Kennedy testified, these losses should have been recorded by at least the third quarter of 1989. Tr. 2189-92 (Kennedy). In addition, while First Annapolis was able to reduce its losses during the fiscal year ended June 1989 by $4.4 million due to gains from asset sales, it could not do the same thing after June 1989, because it did not have assets remaining that it could sell for a profit. Tr. 2251-54 (Kennedy). In other words, after June 1989, First Annapolis was no longer able to mask its true operating deficits. Tr. 2450-52 (Shapiro).

### 5. The Contract Required That First Annapolis Meet The Capital Benchmarks Continuously

As we demonstrated, under the contract, First Annapolis was required to increase its regulatory capital to at least 1.8 percent of liabilities by June 30, 1989, and 2.1 percent by June 30, 1990. Gov't Br. 36; JX 134 at 0521. Even by its own inaccurate reporting, First Annapolis failed this capital requirement (including all of the goodwill) on or before October 31, 1989. Gov't Br. 36; JX 58 at 1545; Tr. 1772-74 (Jones). By December 31, 1989, First Annapolis's reported capital ratio was 1.55 percent, $1.9 million less than the benchmark requirement. JX 61 at 1645. In addition, we further demonstrated that, if First Annapolis had correctly classified losses on loans, it would have fallen out of capital compliance far earlier than its reported October 31, 1989 failure and would have been non-viable by June 1989. Gov't Br. at 38-39; Tr. 2189-91, 2276 (Kennedy); see also Tr. 1797 (Jones) (even absent FIRREA, First Annapolis "clearly was not a viable institution").

Unable to demonstrate it was in capital compliance as of October 31, 1989, Bancorp claims that it was not required to satisfy any capital requirement as of that date. Specifically, Bancorp contends that "First Annapolis's compliance with the regulatory capital benchmarks [1.8 percent, 2.1 percent, 2.4, 2.7 percent, and 3.0 percent of liabilities] was to be measured on specific dates [June 30, 1989, June 30, 1990, June 30, 1991, June 30, 1992, and June 30, 1993], and there was no term of the contract which required ongoing or increasing compliance in between periods." Pl. Br. 25 (emphasis added). Thus, according to Bancorp, the contract only required First Annapolis to meet the five annual regulatory capital benchmarks for *one* day a year, on June 30th. Id. Bancorp's claim lacks merit for several reasons.

First, Bancorp's claim is nonsensical. Bancorp's "one day out of the year" interpretation of the capital benchmarks would essentially require *no* maintenance of a regulatory capital to cushion First Annapolis, its depositors, or the Federal Savings and Loan Insurance Corporation ("FSLIC") from any risk of loss, and would eliminate any requirement upon Bancorp to operate First Annapolis in a safe and sound manner. For example, Bancorp's preferred interpretation would be akin to saying that the contract allowed Bancorp to infuse $11 million into the thrift on day one of the conversion, and then to pay a "dividend" of $11 million back to Bancorp on the next day. Of course, this would not be permissible.

Capital is so important to the health of thrift that the regulators would not have – and could not have – agreed to forbear from any requirement at all for all but five days out of a five year period, as they would have been derelict in their duty to ensure that the thrift was operated in a safe and sound manner. See Tr. 2178-80 (Kennedy). Mr. Kennedy testified that he had never seen a thrift with a "one day a year" capital requirement. Tr. 2118-2119, 2179-80 (Kennedy). Similarly, Mr. Jones testified that Bancorp's claim that a thrift can meet its one-day-a-year capital requirement by "managing its balance sheet" (Pl. Br. 25), or manipulating its accounts by selling off assets to meet the capital benchmark is not a "safe and sound" manner to operate a thrift "if it calls for radical chances in particular balances." Tr. 1871 (Jones). In the case of First Annapolis, "managing the balance sheet" to meet regulatory capital requirements would not be considered a safe and sound practice. Tr. 1832, 1871 (Jones).

Second, Bancorp's claim is contrary to the applicable regulations. The conversion regulation, 12 C.F.R. § 563b.26(b)(2), requires that thrifts meet their capital benchmark "*on or before*" the due date. The regulation further provides that as part of the plan of conversion the

prospective acquirer shall "agree in writing with the [FSLIC] that the acquirer will infuse additional capital as necessary to enable the institution to increase its regulatory capital on a scheduled basis . . . and agree that upon failure to achieve scheduled regulatory capital on or before the date or to adhere in all material aspects to the business plan" shall be subject to sanction by FHLBB.[5] 12 C.F.R. § 563b.26(b)(2). Bancorp's contention that it could maintain capital below the benchmark for all days except for the June 30th "due date," is clearly inconsistent with both the spirt and letter of the regulation, requiring the benchmark to be met "on or before" the due date.

Third, Bancorp's narrow interpretation of the dates in which it is required to maintain compliance with its capital requirements is contrary to the unrebuttted testimony as to how its capital requirements actually operated. Supervisory Agent Jones testified that the benchmarks had to be met "all of the time." Tr. 1736, 1779 (Jones). Dr. Shapiro also confirmed that the capital benchmarks did not just have to be met on June 30th of each year, but had to be met on "every other date in between." Tr. 2488 (Shapiro). In other words, from July 1, 1989 – the day after First Annapolis's first benchmark – until June 29, 1990, First Annapolis was required to have a capital ratio of at least 1.8 percent of its liabilities. Tr. 1779 (Jones) (confirming that on July 1, 1989, First Annapolis "would have been required to meet the benchmark of 1.8" percent);

---

[5] Bank Board regulation 12 C.F.R. § 563b.26(b)(2) is incorporated into the contract in the FHLBB's August 5, 1988 forbearance letter, and the Government's acceptance was conditioned upon Bancorp's compliance. PX 4. Further, Bank Board Resolution 88-603, which is also part of the contract, specifically conditions the approval of the supervisory conversion upon Bancorp infusing capital into First Annapolis "as specified in 12 C.F.R. Part 563b.26(b)(2)." PX 2 at 7927 (condition 13); see also First Annapolis Bancorp, Inc. v. United States,75 Fed. Cl. 263, 272 (2007).

JX 135; DX 2253. Moreover, not only was it First Annapolis's obligation to meet its benchmark, but it was also their obligation to "increase its regulatory capital in order to achieve each annual benchmark . . . ." Gov't Br. 3; JX 94 at 0084.

Fourth, Bancorp's interpretation is contrary to the very purpose of having a capital requirement in the first place. The very reason that the capital benchmarks were stair-stepped, was to "allow the institution to steadily progress and improve its core operations during the time frame contemplated." Tr. 1871 (Jones); see also Tr. 1736 (Jones) (the capital benchmarks were "meant to allow the institution to have some time to progress toward whatever the ultimate last requirement there is."). The stair-stepped benchmarks were put in place as a means to "reflect progress being made toward resolving these problems that led to the forbearance in the first place." Tr. 1823 (Jones). Clearly, a capital requirement that only had to be met one day of the year would not reflect progress being made to resolving First Annapolis's delinquent capital balance.

Finally, the language of the "Regulatory Capital Maintenance and Dividend Agreement" makes it clear that Mr. Jones and Dr. Shapiro's commonsense understanding of the capital requirements under the contract is the proper interpretation. Section II.A of the RCMDA required Bancorp to cause First Annapolis's regulatory capital "to be maintained at a level *at or above* the Regulatory Capital Requirement" for "as long as" Bancorp controlled First Annapolis, and, moreover, "Regulatory Capital Requirement" was defined by agreement as "*capital increased on a scheduled basis.*" JX 99 at 1447 (emphasis added). Indeed, Bancorp's narrow interpretation would not seem to require any "maintenance" of the regulatory capital at all, notwithstanding the title of the Regulatory Capital Maintenance and Dividend Agreement, which

Bancorp signed. See United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983) ("[A]n interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions . . . meaningless").

**D. Bancorp Failed To Demonstrate First Annapolis's Viability At The Time Of The Breach**

The Court should reject Bancorp's efforts to also makes several arguments in its brief purportedly demonstrating First Annapolis's *viability* at the time of the breach. See Pl. Br. 62-63. As we demonstrate below, Bancorp's unsupported arguments do not come close to meeting its burden of demonstrating First Annapolis's viability at the time of the breach.

**1. Bancorp Places Unwarranted Reliance Upon The Government's Finding, At The Time Of The Conversion, That First Annapolis Could Potentially Be A Viable Thrift**

Bancorp places unwarranted weight upon the fact that, in FHLBB Resolution No. 88-603, Government regulators made a finding that First Annapolis "would be a viable entity following the conversion, as determined under 12 C.F.R. § 563b.26." See Pl. Br. 62 (citing PX 2 at 2). The regulators' finding, as stated in the Resolution, in no way proves that First Annapolis was viable at the time of the breach.

First, Bancorp ignores that the regulators' Resolution finding was made at the time of conversion and *not* at the time of the breach. There is simply no language from the Resolution that can be construed as implying the Government's belief as to First Annapolis's viability at the time of the breach on December 7, 1989. Bancorp's own expert, Dr. Heiden, admitted that multiple factors affecting a thrift's viability can change over time, including asset quality, economic conditions, and real estate market conditions. Tr. 1519. Obviously, the regulators'

pre-conversion assessment of viability did not – and could not – have taken into account the real world impact of the *post*-conversion deterioration in First Annapolis's asset quality, economic conditions, and the real estate market. Accordingly, *any* pre-conversion determination concerning the potential viability of First Annapolis is not probative of First Annapolis's viability at the time of the breach.

Second, the regulators' conclusion that First Annapolis satisfied the relevant "viability criteria" was premised upon: (1) the proposed capital infusion; *and* (2) the assumption that, in the future, there would be "*successful implementation of [First Annapolis's] proposed business plan*." DX 69 at 0403 (emphasis added); see Tr. 1741, 1767-68 (Jones). As we have demonstrated, First Annapolis failed to successfully implement its October 1987 business plan after the conversion. E.g., Gov't Br. 8-11; DX 2200 at 1249-50; JX 46 at 1034-35; JX 134 at I-5; Tr. 1170 (Parran); DX 4017-4019, 4024 (Demonstratives); Tr. 2243-45, 2249-51, 2254-58, 2265-66, 2189-90 (Kennedy).

Finally, Dr. Heiden's testimony precludes Bancorp's argument that First Annapolis's purported viability at the time of conversion equates to the existence of viability at the time of breach. Bancorp's expert defined viability as a firm "being in a market position to be able to mobilize its energy and resources to make a profit." Tr. 1484-85 (Heiden). Thus, Dr. Heiden's definition requires an assessment of whether First Annapolis is in "a market position," *at the time of breach*, "to make a profit." First Annapolis's viability at the time of conversion – assuming it existed – is simply not relevant in making that determination.

**2. Bancorp Erroneously Relies Upon Mr. Parran's Unsupported, Conclusory Testimony That First Annapolis Would Have Survived**

The Court should reject Mr. Parran's unsupported and conclusory testimony. Bancorp argues that "Mr. Parran testified unequivocally that the Bank would have survived, but for FIRREA." Pl. Br. 63. There is, however, absolutely no factual foundation – and Bancorp proffers none – for this testimony.

Mr. Parran undertook no analysis of the causes of First Annapolis's losses or the causes of its failure. All he did was "simply testify" (see Pl. Br. 61) – 18 years after the fact and without providing any support or reason – that First Annapolis would have survived absent the breach. Mr. Parran never explained, analyzed, or addressed: (1) how or when First Annapolis was going to stop losing money; (2) how it was going to meet the June 30, 1990 benchmark in the but-for world; (3) how it was going to resolve its asset quality problems, or (4) how it was going to be able to complete the service corporation projects given the reduction in the loan to one borrower ("LTOB") limits that would have occurred even in the but-for world. Any analysis of First Annapolis's ability to survive in the but-for world would need to address each one of these issues, which is exactly what our experts did.

In addition to the absence of any foundation for his testimony, Mr. Parran's opinion that First Annapolis would have survived absent the breach is undermined by Mr. Cook's observation that "President, Douglas Parran, does not realize the seriousness of First Annapolis's problems." DX 301 at 1467; Tr. 1763 (Jones). Finally, Mr. Parran's testimony is additionally compromised by his admission that testimony in his sworn affidavit was false. Tr. 1098, 1105, 1143-44 (Parran). Indeed, there are numerous inconsistencies between his testimony and the undisputed

contemporaneous evidence.[6]

### 3. Bancorp Improperly Relies Upon The Irrelevant Fact That First Annapolis's Service Corporation Projects "Have Value Today"

We stipulated at trial that First Annapolis's service corporation projects "have value today." Tr. 1371. Based upon this stipulation, Bancorp incorrectly argues that, because the service corporation projects "ultimately did succeed," First Annapolis would have survived absent the breach. Pl. Br. 63. Contrary to Bancorp, our agreement that First Annapolis's service corporation projects have value today is in no way probative of the viability of First Annapolis at the time of the breach.

As an initial matter, there is no evidence as to *what* the value of the service corporation projects is today, how much in additional funds had to be invested in order to complete these projects, when these projects were completed, or how the development of these projects compares to what was originally contemplated back in the late 1980s. Without this information, it is impossible to determine whether First Annapolis would ultimately have made, or lost,

[6] For example, Bancorp alleges that "First Annapolis was not permitted to operate from the August 12, 1988 conversion through the December 7, 1989 enactment of the implementing regulations with the advantage of the forbearances" and cites Mr. Parran's testimony. Pl. Br. 14. Mr. Parran offered similar testimony in his affidavit. DX 634 at ¶13. During trial, however, he admitted that this testimony was not true. Tr. 1105 (Parran). In fact, Mr. Parran admitted that the Government honored the forbearance for at least 16 months (i.e., through the end of December 1989). Tr. 1105-06 (Parran).

Likewise, Bancorp argues that "[b]y Spring 1989, the Bank had begun to implement a policy of a maximum loan to one borrower of $500,000." Pl. Br. 12. Bancorp's sole support for this statement is Mr. Parran's testimony. First Annapolis's Executive Committee, however, did not adopt a new loan limit policy until August 24, 1989. DX 349. This new policy permitted First Annapolis not only to make individual loans over $500,000, but it also allowed the Bank to make loans that were in excess of $2 million if it received approval from the Board of Directors. DX 349 at 1309-10. When presented with this evidence, Mr. Parran agreed that in August 1989 the Bank adopted a policy that allowed it to make loans in excess of $500,000. Tr. 1395-96 (Parran).

money on these projects even assuming it could have raised $100 million to prevent itself from failing absent the breach.

Even more importantly, whether these projects were *ultimately* successful is irrelevant to the question of whether First Annapolis was viable at the time of the breach. By the third quarter of 1989, First Annapolis was not viable and "did not have the capital to be able to hold onto those assets and ride it out or develop them or not develop them." Tr. 2382 (Kennedy); see Tr. 2522-24 (Shapiro). Even if the service corporation projects did *ultimately* succeed at some point in the 1990s, that does not change the fact that First Annapolis did not have enough capital to meet the June 30, 1990 benchmark, let alone "ride out" the real estate slump until whenever it was that these projects finally obtained some value. See DX 4010 (Demonstrative); Tr. 2232-36 (Kennedy); DX 4029 (Demonstrative); Tr. 2278-79 (Kennedy); Tr. 2366-67, 2381-83 (Kennedy).

As we demonstrated, the only way First Annapolis would have been viable in the but-for world and, thus, able to "ride out" the real estate slump, was if it raised $100 million in capital. Tr. 2278-79, 2338, 2381-83 (Kennedy). Bancorp fails to point to any evidence that suggests that it could have raised $100 million. To the contrary, First Annapolis's own investment bankers advised it that they could not raise any capital until First Annapolis established a twelve to twenty-four month track record of positive earnings, which is something First Annapolis had not done after before fiscal 1981. DX 2471 at 1486; Tr. 2279 and 2383 (Kennedy).

### 4. Bancorp Incorrectly Relies Upon The Purported Satisfaction Of Its June 1989 Benchmark And The Purported Growth In Its Initial Investment As Of September 1989

Bancorp incorrectly claims that First Annapolis's viability at the time of the breach is demonstrated by the facts that (1) First Annapolis purportedly met its first capital requirement in June 1989; and (2) Bancorp's initial $13.6 million investment had purportedly grown to $14.4 million as of September 1989. Pl. Br. 63. The accounting figures upon which Bancorp relies for its claim are erroneous and, in any event, do not establish viability.

The sole reason that First Annapolis can claim, albeit erroneously, that it was able to meet its June 1989 benchmark is because it improperly failed to classify assets and record loan losses, as was required by the applicable regulations and accounting rules and First Annapolis's own policies.[7] Tr. 2156-57, 2171-72, 2184 (Kennedy); 12 C.F.R. § 561.16c(d)(3); JX 23 at 0465. If it had properly classified its assets and recorded loan losses, First Annapolis would *not* have met its June 1989 benchmark. Tr. 2306-07 (Kennedy).

Moreover, even assuming First Annapolis did actually meet its June 1989 benchmark, that does not mean it was viable. Tr. 2167 (Kennedy); Tr. 1542 (Heiden). If a thrift was "in a downward spiral, based on losses, and they don't have enough capital to turn those losses around, they could be nonviable or really headed to failure, even if they meet their requirements." Tr. 2167 (Kennedy). In June 1989, First Annapolis was in such a downward spiral. Given First

[7] First Annapolis also only met its benchmark because it included $1.6 million in shareholder related loans in regulatory capital. After the regulators discovered the existence of the shareholder loans, they instructed First Annapolis to remove these loans from capital including shareholder loans that had previously been swapped. DX 439 at 1301; Tr. 1790 (Jones). Excluding just the shareholder loans from regulatory capital would have caused First Annapolis to fail to meet its June 1989 benchmark. Tr. 2184-85 (Kennedy).

Annapolis's losses, its asset quality problems and the deteriorating economic environment, by the third quarter of 1989, First Annapolis was on an "irreversible course to failure." Tr. 2150 (Kennedy); See DX 4017 (Demonstrative); Tr. 2243-46, 2250-51, 2265 (Kennedy). The thrift's purported compliance with capital requirements as of June 1989 resulting from its failure to classify assets and loan losses does not change that irreversible course.

Finally, Bancorp's assertion that its $13.6 million original investment had grown to $14.4 million by September 1989 is factually incorrect. First, the $14.4 million is significantly overstated because First Annapolis failed to properly classify its problem assets and to record loan losses. Tr. 2189-91; 2276 (Kennedy). Second, the $14.4 million is inflated because it includes general valuation allowances, whereas the $13.6 million does not. Excluding general valuation allowances of $1,838,686 ($2,745466 minus $906,780) from the $14.4 million reflects that First Annapolis's original investment had decreased to $12,562,072 by September 1989 even before taking into account the losses it failed to recognize. DX 365 at 1422.

**5. Dr. Heiden's Testimony Does Not Demonstrate That First Annapolis Was Viable At The Time Of The Breach**

Bancorp (Pl. Br. 28, 62-63) cites the testimony of its expert, Dr. Heiden, in support of its contention that First Annapolis was viable at the time of the breach. But Dr. Heiden's opinions are so flawed that they cannot form the basis for a reasonable conclusion that First Annapolis was viable at the time of the breach.

Indeed, Dr. Heiden's primary opinion that, had the forbearances remained in effect, First Annapolis would not have failed and would have made money (Pl. Br. 28; Tr. 1533 (Heiden)),

was formed without conducting anywhere near the analysis that is required.[8] Dr. Heiden completely failed to analyze: (1) the causes of First Annapolis's real world losses, Tr. 1500 (Heiden); (2) its service corporation projects, Tr. 1415, 1507 (Heiden); or (3) the causes of the increase in its non-performing assets. Tr. 1525 (Heiden). Dr. Heiden also did not analyze First Annapolis's classified assets, Tr. 1535 (Heiden), or its ability to meet whatever capital requirements First Annapolis would have been subject to at the end of the five year period (i.e., June 1993). Tr. 1454-56 (Heiden). Additionally, Dr. Heiden conducted no analysis to determine whether or not the conclusions reached in the January 1990 Report of Examination were incorrect. Tr. 1533 (Heiden). Given Dr. Heiden's absolute failure to analyze the critical realities of First Annapolis's financial condition, his unsupported testimony that First Annapolis would not have failed absent the breach is speculative and unreliable. Tr. 2143, 2285-86 (Kennedy).

Consideration of the multiple aspects of First Annapolis's financial condition that Dr. Heiden failed to consider dramatically alters the results of his "analysis." For example, Dr. Heiden erroneously calculates First Annapolis's but-for profits from 1994 to 1999 by assuming First Annapolis's interest income and all of its expenses would grow at the average rate of interest income growth for all thrifts in the United States. Tr. 2286 (Kennedy). Such an assumption is completely improper. Tr. 2294-95 (Kennedy); see also Tr. 2448-50 (Shapiro) (explaining that First Annapolis has systematic problems with its core operations, failures to realize it service corporation income as projected, and properly account for credit losses); Tr.

[8] Furthermore, with respect to periods when the forbearance actually was in effect, although Dr. Heiden testified that he "sensed" that the implementation of FIRREA or the "specter" of FIRREA impacted First Annapolis, he failed to perform an economic analysis to measure that alleged impact. Tr. 1471-72 (Heiden).

1864 (Jones) (First Annapolis's "problems never seemed to go away. They continued to persist, and in some cases they seemed to get worse."). As Mr. Kennedy explained, correcting for the errors in Dr. Heiden's own calculation proves that First Annapolis "would not have been profitable and would not have been viable." Tr. 2286 (Kennedy); see 2292-95 (Kennedy); DX 4037 (Demonstrative).

One of the more glaring errors in Dr. Heiden's "analysis" that completely undermines his opinions is the absence of any analysis whatsoever of First Annapolis's ability to meet its benchmark capital requirements through June 1993. Mr. Kennedy testified, that, under Dr. Heiden's calculations, First Annapolis would *not* have met any of its benchmark capital requirements as of June 1990, June 1991, June 1992, or June 1993, missing each one of these requirements by millions of dollars. DX 4033 (Demonstrative); Tr. 2288-89 (Kennedy); see DX 4032 (Demonstrative); Tr. 2286-87 (Kennedy).

Another very significant flaw in Dr. Heiden's analysis is that his calculation "ignores the severe recession" that the thrift industry as a whole was required to endure, "and as a result he creates a profitable 'bridge' over the recession." DX 4032; Tr. 2286-87 (Kennedy). Stated differently, although thrifts operating in the real world had to endure the severe recession, Dr. Heiden's but-for First Annapolis does not.

Although Dr. Heiden acknowledged, as he must, that a real estate recession occurred in the early 1990s, Tr. 1519-20 (Heiden), his profit calculation improperly fails to take into account the impact of that recession on First Annapolis's loan portfolio. Tr. 1544 (Heiden). Dr. Heiden's profit calculation assumes that First Annapolis would have incurred no more than $61,000 in loan losses in any given quarter, Tr. 1560; 1567 (Heiden), despite the fact that the $8 million in

loan losses that First Annapolis recorded in February 1990 were completely unrelated to the breach.[9] Tr. 2283 (Kennedy); JX 65 at 1729-30. Dr. Heiden's failure to adjust his profits calculation to account for the $8 million in losses First Annapolis incurred as a result of the real estate recession renders his opinion speculative and unreliable.

Indeed, even though First Annapolis was not profitable in any year after fiscal 1981, Dr. Heiden's opinion assumes that First Annapolis would be more profitable than the average thrift in the United States that survived the recession during every year of his profit projections. Tr. 2286-87, 2289-90 (Kennedy); DX 4032 (Demonstrative). Specifically, Dr. Heiden's calculation of the profits First Annapolis would have earned absent the breach assumes that First Annapolis's interest income would have *increased* between 1990 and 1992, whereas the interest income for the average thrift in the United States significantly *declined.* Tr. 2291-92, (Kennedy); DX 4035 (Demonstrative). While Dr. Heiden's calculation does reflect that First Annapolis's interest income would have declined by 5 percent in 1993, that hardly validates Dr. Heiden's opinion because the average decline in 1993 for all United States thrifts was 15 percent. DX 4035 (Demonstrative); Tr. 2291-92 (Kennedy). Dr. Heiden's implicit assumption that First Annapolis would outperform the United States thrift industry "by this degree in this period of time is completely unreasonable." Tr. 2291 (Kennedy).

Another example of the speculative nature of Dr. Heiden's calculation is the fact that his calculation results in First Annapolis's operating income margin significantly exceeding the

---

[9] Losses on the Bayside Marina, Northampton and Dennis Blaeuer loans accounted for $5.7 million of the $8 million in losses that First Annapolis recorded in February 1990 and should have been recorded by First Annapolis during the third quarter of 1989, not February 1990. Tr. 2189-90 (Kennedy).

average operating margin of all United States thrifts. For example, in 1990 the average margin for United States thrifts was less than *negative* 0.20 percent. DX 4036 (Demonstrative). Dr. Heiden's calculation, however, results in an operating margin for First Annapolis greater than *positive* 0.40 percent. DX 4036 (Demonstrative); see Tr. 2291-92 (Kennedy). Once again, Dr. Heiden's implicit assumption that First Annapolis, a thrift that had been losing money for almost a decade prior to being seized, would have had a higher operating income margin than the average thrift is completely unreasonable. Tr. 2290-92 (Kennedy).

Finally, Bancorp improperly places reliance upon Dr. Heiden's testimony that, in his view, "even after FIRREA, First Annapolis retained its franchise value in the community." Pl. Br. 63 (citing Tr. 1477-78 (Heiden)). Even assuming that First Annapolis had "retained its franchise value" after FIRREA as Bancorp claims, that retention does not demonstrate that First Annapolis was viable. See Tr. 2148-50; 2344-45 (Kennedy); DX 4001 (Demonstrative). Franchise value simply does not equate to viability as demonstrated by the fact that First Annapolis's own predecessor also retained franchise value in 1988 but, nonetheless, still failed. PX 2 at 7918. The existence of First Annapolis's franchise value did not prevent the thrift from losing money (something it had been doing since fiscal 1981), incurring losses on its real estate portfolio, suffering deterioration of its asset quality, or falling and remaining below its 1.8 percent regulatory capital ratio level by no later than October 31, 1989. Tr. 2282-84 (Kennedy); DX 4020 (Demonstrative); DX 4030 (Demonstrative). Moreover, regulators are permitted to seize a thrift regardless of whether or not it has franchise value. DX 438 at 0013.

### E. Bancorp's Attempts To Factually Distinguish Admiral And Southwest Are Unavailing

Bancorp devotes a significant portion of its brief to a detailed dissection of the factual differences between Admiral and Southwest and this one. Pl. Br. 38-47. Despite Bancorp's extensive effort to distinguish these cases, however, the purported factual differences between Admiral, Southwest, and this case are unremarkable and of no legal significance.

What is significant – and in fact dispositive – is that the underlying rationale for the decisions in Admiral and Southwest applies equally here.

Indeed, the central thread throughout all three cases is the existence of the "dire straits" of the respective thrifts at the time of the breach. For example, in Admiral, the trial court explained that:

> Notwithstanding [the plaintiff's] efforts to describe the impact of FIRREA on the supervisory goodwill capital, we are persuaded by the plethora of evidence showing that the thrift was in such dire straits that it was failing under pre-FIRREA capital requirements. The failed capitalization plan, overvalued real estate holdings, and lack of a financial commitment by the Initial investors "contributed to the thrift's decline and led ultimately - and independent of the supervisory forbearance - to its seizure."

Admiral Fin. Corp. v. United States ("Admiral I"), 57 Fed. Cl. 418, 435 (2003), aff'd, 378 F.3d 1336 (Fed. Cir. 2004) (quoting Barron Bancshares, Inc. v. United States, 53 Fed. Cl. 310, 326 (2002).

Similarly, in Southwest, this Court rejected the plaintiff's attempt to factually distinguish Admiral and held:

> [T]here can be no conclusion other than that the breached Union promises were worth nothing when FIRREA was enacted. At most, FIRREA constituted a technical breach, and we doubt even that.

> Both Admiral and First Louisiana experienced financial difficulties from early on. We have already rejected Plaintiff's attempt to dispute this fact. First Louisiana never had a profitable year after 1985, which was profitable only due to the sales of Union's best loans . . .
>
> It is thus clear that no matter how central the Union forbearance may have been at the time the contract was formed, a point stressed by the Plaintiff's counsel, at the time of the breach, these promises were irrelevant. First Louisiana was insolvent notwithstanding the promises. And not only was the breach not material, it was not even technical. Like the *Admiral* bank, FIRREA caused First Louisiana no harm at all either at enactment or a seizure.

Southwest, 63 Fed. Cl. at 196.

In this case, like the thrifts in Admiral and Southwest, the plethora of evidence presented at trial demonstrated that First Annapolis "was in such dire straits that it was failing under pre-FIRREA capital requirements" by no later than the third quarter of 1989. Gov't Br. at 12; Tr. 2150 (Kennedy); see Admiral, 57 Fed. Cl. at 435. By its own reporting, First Annapolis failed its pre-FIRREA capital requirement by October 31, 1989. JX 58 at 1545; Tr. 1772-74 (Jones); see Gov't Br. at 12. Indeed, as we have shown, had First Annapolis properly classified its assets and recorded loan losses as it was required to do, First Annapolis would have failed to meet its June 30, 1989 capital benchmark requirement. Tr. 2306-07 (Kennedy); see also Tr. 2510-11 (Shapiro). In addition, First Annapolis's recapitalization plan failed, and it overvalued or overestimated the profitability of its service corporation investments, which were the sole basis of its viability. Tr. 1732-35 (Jones); Tr. 2236-40 (Kennedy); Gov't Br. 9, 12. Finally, in a manner strikingly similar to what occurred in Admiral, there was a lack of financial commitment from First Annapolis's investors to infuse the additional capital needed to cure its $17 million

regulatory capital shortfall. Tr. 2279 (Kennedy); DX 4029 (Demonstrative).

Bancorp's argument that the facts of Admiral, Southwest, and this case are distinguishable also misses perhaps the most critical similarity between the three cases. In all three cases, the respective thrift's failures were due to unexpectedly unfavorable market conditions that resulted in the thrifts' non-viability prior to the implementation of FIRREA. In Admiral, the trial court explained the thrift's failure as follows:

> . . . . [T]he evidence makes it quite clear that the entire business operation rested on the Plaintiff's ability to convert the real estate into cash at something near the assigned values or better. The contract set forth definite time lines for this conversion, and the success of the bank was conditioned - but not guaranteed - on the Plaintiff's ability to effect this. Considering the healthy real estate market at the time of the negotiations, this was a bet that the market would be just as strong when time came to sell. It was, in short, an investment - one is tempted to say, a speculation - on the state of the southern Florida real estate market over the 2-year period in which these new assets of Haven would be sold. In this respect, the risk was all on the Plaintiff. A bad outcome meant that only that the FSLIC would get back a bank that had failed again, and they would be little the worse for the poor outcome. For the Plaintiff, of course, it meant, at the minimum, loss of the real estate and their other investments.

Admiral I, 57 Fed. Cl. at 422.

Similarly, the health of the thrift in Southwest was dependent upon a healthy domestic oil-industry:

> And then disaster struck. First Louisiana's oil-dependent community suffered a severe economic downturn in 1986. During the first half of 1986, oil prices dropped by almost 50%. Oil-related businesses suffered and failed. Unemployment in Louisiana increased to 13.2%, compared to 6.7% nationally. Homeowners were increasingly unable to repay their mortgages. In its 1987 Annual Report, FLHC characterized the situation as a "near-depression economy."

> After 1985, First Louisiana never had a profitable year. Between 1986 and 1989, the bank's financial condition deteriorated.

Southwest, 63 Fed. Cl. at 185-86. Due in large part to the collapse of the regional economy, the thrift in Southwest, like the thrift in Admiral, became nonviable before FIRREA's implementation. Id.

The scenarios described in Admiral and Southwest closely resemble what occurred here. First Annapolis's viability was completely dependent upon converting the projected service corporation profits into actual profits. Tr. 2236-37 (Kennedy); Tr. 1732-35 (Jones); Gov't Br. 6. Bancorp's contract with the Government provided definite time lines that First Annapolis had to meet in order to demonstrate its road to recovery. JX 94 at 0984; see Gov't Br. 3. When Bancorp was considering the healthy real estate market at the time of the conversion, Bancorp was betting that the market would be just as strong when the projected profits from First Annapolis's service corporation investments were expected to be realized. DX 118 at 0035; Tr. 1915-16 (Crompton); Tr. 1187 (Parran); Tr. 2243 (Kennedy); see Gov't Br. 7.

Contrary to expectations, however, in 1989, the country "entered into one of the worst real estate recessions in a very long time." Tr. 2243-44 (Kennedy); see Tr. 1519-20 (Heiden). As such, just as the thrift in Admiral was not able to convert the "real estate into cash at something near the assigned value or better," and the thrift in Southwest could not recover from a regional downturn in the oil industry, First Annapolis's "service corporation profits did not materialize as projected." Tr. 2240, 2246 (Kennedy); Gov't Br. 9. Bancorp's bet that market conditions would not change turned out to be wrong. Tr. 2472-73 (Shapiro). As a result, Bancorp lost its investment, and the Government was forced to take over a thrift that failed for

the second time, which is exactly what happened in Admiral and Southwest.

Finally, as in Admiral and Southwest, Bancorp's expectancy damages are zero. Tr. 2285-86 (Kennedy); Tr. 2455-56 (Shapiro). Other than Mr. Parran's and Dr. Heiden's unsupported statements – there is no evidence, certainly no contemporaneous evidence, that First Annapolis suffered any expectancy damages. Cf. Admiral, 378 F.3d at 1344 ("the trial court had ample evidence to conclude that Admiral's expectancy damages . . . were zero"); Southwest, 63 Fed. Cl. at 197-98 (restitution not warranted because the plaintiff made no showing that the thrift would have made a profit absent the Government's breach).

**F. The Breach Was Not The Entire FIRREA Legislation, The Announcement Of The FIRREA Legislation, Or The Enactment Of FIRREA**

As we have noted, for the purposes of determining whether there was a "total breach" entitling Bancorp to damages, it is well-established that the totality of the breach must be determined at the time of the breach. See Hansen Bancorp, Inc. v. United States ("Hansen I"), 53 Fed. Cl. 92, 103 (2002) (citing Mobil, 530 U.S. at 609) (assessing "totality" of the breach based upon the impact on plaintiff's contractual rights at the time of the breach), rev'd on other grounds, 367 F.3d 1297 (Fed. Cir. 2004); Southwest, 63 Fed. Cl. at 195 (examining the value of the contract to thrift at the time of breach). Thus, the Court must examine First Annapolis's viability, or ability to recover absent the breach, at the time of the breach, not before. See Hansen III, 67 Fed. Cl. at 423 (analyzing total breach on remand based upon the thrift's viability at the year-end 1989 when FIRREA's new capital requirements were implemented).

Now, after thirteen years of litigation, Bancorp's counsel and witnesses contend for the first time that FIRREA caused a "shadow" or "negative cloud" to be cast over First Annapolis's

finances at some point in the late 1988 or the spring or summer 1989. See, e.g., Tr. 949 (Cooter); Tr. 1445 (Heiden); Tr. 965 (Cook)). Bancorp contends that the breach was the entire FIRREA legislation and that the Court should consider First Annapolis's alleged anticipatory reaction to the impending legislation in determining the totality of the breach. Tr. 2565 (Cooter); Pl. Br. 10-13; see also Pl. Br. 7. In its brief, Bancorp dedicates multiple pages to its misguided quest to establish total breach by distorting the nature and timing of the breach. Pl. Br. 7-22.

The Court should reject Bancorp's efforts to confuse the timing and nature of the breach. First, as we have demonstrated, Bancorp has judicially admitted, and this Court has found, the date of the breach is December 7, 1989, the date the capital regulations under FIRREA were implemented. Second, the breach is not the entire FIRREA legislation, but only those provisions of FIRREA inconsistent with the contract. Third, the breach did not include the service corporation forbearance. Fourth, even assuming, incorrectly, that the breach included the entire FIRREA legislation and that the Court could consider First Annapolis's "anticipatory reaction" to FIRREA as part of the breach, the contemporaneous evidence does not demonstrate that the "shadow" of FIRREA negatively affected First Annapolis in 1988 or the spring or summer of 1989.

### 1. The Earliest Date Of The Breach Is December 7, 1989

Bancorp erroneously alleges that "the date of the breach of the contract by the Government should be at least as early as August 9, 1989, the date of the enactment of FIRREA." Pl. Br. 13. At trial, we established that FIRREA became effective, and began to be applied to the thrift industry, on December 7, 1989, when the regulations accompanying the legislation became effective. Tr. 1769 (Jones); DX 2276. Thus, FIRREA's requirements were applied to First

Annapolis on December 7, 1989. Tr. 1769-70, 1780 (Jones); DX 2276.[10]

Indeed, this Court has already determined that the breach occurred in December 1989, when the Government began to *enforce* FIRREA's new minimum capital requirements against First Annapolis. First Annapolis, 75 Fed. Cl. at 279; see also Mola Dev. Corp. v. United States, 74 Fed. Cl. 528, 542-43 (2006); Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. 174, 184 (1997).

Even if this Court had not already determined that the breach occurred in December 1989, Bancorp, as we explained (Gov't Br. 31-32), is judicially estopped from claiming an earlier date of breach because it has long claimed that December 1989 is when the breach occurred. See, e.g., Pl. Reply Mem. in Supp. of "Short Form" Mot. for Partial Summ. J. and in Opp'n to Def. Cross-Mot. for Summ. J. (Nov. 11, 1997) at 16 ("the government breached its contract less than a year and a half later, when FIRREA's regulations went into effect on December 7, 1989"); Pl. "Short Form" Mot. for Partial Sum. J. (May 23, 1997) at short form liability sheet page 9, § G ("On December 7, 1989, the OTS Regulations issued by the Government pursuant to FIRREA became effective, thereby placing the Government in breach of contract."); Pl. Contentions of Fact and Law (Jun. 6, 2006) at 10 ("On December 7, 1989, the regulations issued by the OTS under FIRREA became effective. 54 Fed. Reg. 46,845 (11/8/89). As such, as a consequence of FIRREA and the OTS regulations, on or about, December 7, 1989, the Government breached its

[10] There is no evidence that FIRREA's requirements were applied to First Annapolis before they were imposed upon the thrift industry in general. Cf. Bank of America, FSB v. United States, 51 Fed. Cl. 500, 510 (2002) (holding that a Winstar plaintiff's claim for the breach of the goodwill contract accrued on October 6, 1989, rather than December 7, 1989, because the OTS, by letter dated October 6, 1989, accelerated the application of FIRREA's capital requirements to the plaintiff before the thrift industry in general).

contract with Bancorp."). Bancorp's judicial admissions preclude it from now attempting to change the date of the breach. Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp., 272 F.3d 1335, 1353 (Fed. Cir. 2001); Murrey v. United States, 73 F.3d 1448, 1455 (7th Cir. 1996); Exxon Corp v. United States, 45 Fed. Cl. 581, 656 (1999).

**2. The Breach Is Not The Entire FIRREA Legislation**

Throughout the trial, Bancorp alleged that FIRREA breached the contract, (see, e.g., Tr. 2565-66 (Cooter)), and Bancorp's post-trial brief emphasizes that FIRREA was "devastating" to the thrift. Pl. Br. 17; Tr. 1556 (Heiden) ("every one of [the contract's] provisions was breached by FIRREA"); Tr. 1555-56 (Heiden) ("FIRREA made other changes and made . . . it impossible for First Annapolis to manage its assets"); see generally Pl. Br. 7-22. However, the "breach," as determined by the Court, is only the loss of the regulatory forbearance related to First Annapolis's regulatory capital requirements. First Annapolis, 75 Fed. Cl. at 279. Thus, only those portions of FIRREA that caused the loss of the regulatory capital forbearance constitute the breach. Id.

FIRREA was a wide ranging remedial statute that recovered and redesigned the entire thrift regulation process. See Winstar, 518 U.S. at 846-47; see also First Annapolis, 75 Fed. Cl. at 265. In order for Bancorp to persuade the Court that all of FIRREA was a breach – a finding no other court has made in 15 years of Winstar litigation – Bancorp would have to prove that the contract guaranteed no regulatory changes in the entire thrift industry. Of course, Bancorp proffered no such proof. In fact, the FHLBB's July 21, 1988 forbearance letter expressly reserved the Government's statutory and regulatory enforcement powers outside the scope of the named forbearance:

> This letter does not and shall not be construed to constitute forbearance or waiver by the Bank Board or the Federal Savings and Loan Insurance Corporation with respect to any regulatory or other requirements other than those encompassed within the preceding paragraphs 1 through 3. Other than the actions to enforce the regulatory requirements waived in accordance with paragraphs 1 through 3 and the statutory provisions authorizing imposition of the waived requirements, insofar as such requirements are waived, the [FHLBB] and [FSLIC] **expressly reserve all of their statutory rights and powers** with respect to First Annapolis, including, without limitation, those under Section 5 of the Home Owners' Loan Act of 1933 and Sections 406 and 407 of the National Housing Act.

PX 3 (emphasis added).

Even Mr. Parran even admitted that the Government did not promise that the regulators would forbear from applying additional or more restrictive regulations upon First Annapolis, outside of the enumerated forbearance. Tr. 1094 (Parran); see also Tr. 1086-87 (Parran) (admitting, that outside of the three forbearance, First Annapolis had to comply with all applicable regulations). Dr. Heiden was forced to admit that, the forbearance aside, First Annapolis would have been subject to all of the other provisions of FIRREA. Tr. 1557-58 (Heiden).

Because the breach is limited to the loss of the forbearances related to the regulatory capital requirements, Bancorp's claims of harm caused by unrelated aspects of FIRREA cannot form the basis for an award of restitution. For example, the Court should reject Bancorp's claim (Pl. Br. 9-10) that FIRREA's new provisions regarding limitations on loans to a single borrower harmed the thrift. Not a single Bancorp witness could identify any contractual provision in which the Government promised that limitations on loans to single borrowers would not be implemented. Indeed, no such provision exists. Indeed, Mr. Parran admitted that First

Annapolis was subject to loan to one borrower ("LTOB") limits prior to FIRREA and did not have a LTOB forbearance. Tr. 1248-51; 1323 (Parran).

To the extent Bancorp claims that the loss of its forbearances was the cause of the limitations on loans to single borrowers, Mr. Kennedy explained that this was not the case. Absent the breach and even with the inclusion of all of its goodwill toward regulatory capital, First Annapolis still had inadequate capital, and thus, would still have been limited by FIRREA's LTOB regulations. Tr. 2226-28 (Kennedy).

### 3. FIRREA Did Not Breach The Service Corporation Forbearance

Bancorp further contends that FIRREA breached the contract because it did not "permit First Annapolis to invest in its service corporation at the agreed upon levels." Pl. Br. 14-15. Bancorp, however, failed to prove that FIRREA breached the forbearance regarding First Annapolis's excessive investments in service corporations.

In determining liability, the Court only held that the Government breached the forbearance related to regulatory capital, and determined that it was not clear whether FIRREA also breached Bancorp's service corporation investment forbearance. First Annapolis, 75 Fed. Cl. at 279. The evidence now shows that the Government did not breach the service corporation forbearance because, like other provisions of FIRREA unrelated to regulatory capital requirements, Bancorp bore the risk of regulatory change under the contract. PX 3.

The July 21, 1988 forbearance letter, which granted First Annapolis a forbearance regarding its investments in service corporations beyond that allowed in 12 C.F.R. § 545.74(d), provides that:

> In the event any regulation or statute referred to herein is amended

> or succeeded by another statute, regulation or rule, then any reference to any such regulation or statute shall be deemed to refer to such regulation or statute as amended or the statute, regulation or rule which succeeds any such regulation or statute.

PX 3. Therefore, FIRREA's provisions that limited investments in service corporations did not breach the contract because Bancorp bore the risk of regulatory change with regard to the regulations or statutes referenced in the forbearance letter. Cf. United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983) ("[A]n interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions ... meaningless") (cited in Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1359 (Fed. Cir. 2005)).

Moreover, even assuming the Court finds a breach of the service corporation forbearance, the breach caused Bancorp no harm because First Annapolis continued funding its service corporation investments in the fall of 1989. JX 136 at 0546 (First Annapolis's June 1989 business plan projection of "a slight *increase* [in service corporation investments] over the short-term . . .") (emphasis added).

In addition, on September 22, 1989, First Annapolis's Board asked its outside counsel, a month and a half after the passage of FIRREA, to advise it "[w]ith respect to the *additional funds* anticipated to be loaned pursuant to the Delta transactions . . . ." DX 2467 at 0422; Tr. 1121-22 (Parran) (emphasis added). First Annapolis's outside counsel advised the Board that, until the forbearance was "specifically rejected" by the OTS, "it would seem reasonable for FASB to continue to fund the Delta transactions in the manner submitted to the FHLBB in connection with the August 12, 1988 technical amendment to the Order." DX 2467 at 0422; Tr. 1122-24 (Parran). Consistent with the advice it received from its outside counsel, First Annapolis's Board

agreed to continue funding the service corporation investments at its September 25, 1989 meeting. JX 54 at 1396; Tr. 1128-29 (Parran).

In fact, First Annapolis did not even account for the loss of the service corporation forbearance until its *March 1990* board of directors meeting, nine months after the passage of FIRREA. JX 65 at 1735. Therefore, First Annapolis submitted no competent evidence demonstrating that FIRREA breached the service corporation forbearance, and the Court should accordingly not consider FIRREA's change in the regulations regarding investments in service corporation's in determining total breach. See Watt v. Sec'y of Dept. of Health & Human Servs., 2001 WL 166636 * 6 (Fed. Cl. 2001) ("It is well-established that information recorded contemporaneously to the time in which the events occurred is more believable than that produced years later at trial.") (citations omitted).

**4. Bancorp Did Not Prove That FIRREA's "Shadow" Harmed First Annapolis**

Following-up on allegations made for the first time at trial, Bancorp, in its post-trial brief, attempts to distort the nature and timing of the breach by arguing that anticipation of FIRREA cast a "shadow" over First Annapolis's finances, and devastated the thrift at some unidentified point in late 1988 or early 1989. Pl. Br. 7-14. The evidence in the record offers no support for Bancorp's newly minted claim. If FIRREA's "shadow" were truly as devastating as Bancorp suggests, it logically follows that First Annapolis would have at least mentioned this "shadow," in the plethora of documents that the thrift generated daily. The documents, however, are silent on the alleged "shadow." The absence of such evidence is devastating to Bancorp's "shadow" claim. Rydzewski v. Sec'y of Dept. of Health & Human Servs., 2007 WL 949759 *8 (Fed. Cl.

2007) ("Usually, records created contemporaneously to the event being memorialized are the most probative.") (citations omitted); Ankenbauer v. Sec'y of Dept. of Health & Human Servs., 31 Fed. Cl. 637, 640 (1994) (the "principle that contemporaneous written documents are entitled to greater weight as evidence than later conflicting oral testimony is well established and long has been recognized by the Supreme Court, the Court of Claims, the Federal Circuit, and this court."); see also Argus, Inc. v. Eastman Kodak Co., 801 F.2d 38, 42 (2d Cir. 1986) ("[t]he failure of a business' management to note at the time what is later claimed by its lawyers to have been a mortal commercial wound weighs heavily against such a claim.").

At trial, Supervisory Agent Greg Jones was asked whether he was aware that First Annapolis went to certain borrowers when it "found out about this pending thing out there called FIRREA" and told them that it could no longer funds its development projects. Mr. Jones testified: "*I did not see anything to that effect. I didn't get any written correspondence from the institution. I don't recall anybody there calling me, telling me that that's what they were telling borrowers* . . . ." Tr. 1816-17 (Jones) (emphasis added). Similarly, William Crompton, examiner-in-charge of First Annapolis's 1990 examination, confirmed that, if First Annapolis had told its borrowers that FIRREA was going to prevent it from funding a loan, that documentation would have been found in First Annapolis's loan files, which he reviewed as part of the examination. Tr. 2042-43 (Crompton). This documentation was not found. Id.

Dr. Shapiro testified that, other than speculative testimony from Messers. Cook and Parran, he "just didn't see any evidence in the record as to the impact of FIRREA [on First Annapolis], much less the . . . specific breaching provisions of FIRREA." Tr. 2513 (Shapiro); see also Tr. 2495-98 (Shapiro). According to Dr. Shapiro, who has served on the boards of a

variety of companies for 30 years, if the "shadow" of FIRREA were as significant an event as described by Bancorp's witnesses, it would "show up in the board minutes. You have to talk about it." Tr. 2496 (Shapiro). Yet, as with the rest of the record, First Annapolis's board minutes are silent regarding the "shadow's" negative impact upon the thrift. Tr. 2495-96 (Shapiro).

Bancorp fares no better with the testimony its witnesses proffered concerning the purported "shadow" of FIRREA because the testimony is unsupported and, in many instances, the witnesses effectively retracted their testimony. For example, although Chief Loan Officer David Cook testified generally regarding the "negative cloud" of the impending FIRREA legislation and its impact on First Annapolis's loan portfolio (Tr. 965, 969-70 (Cook)); see also Pl. Br. 8), he admitted it was his responsibility to keep records of the activities of First Annapolis regarding its loan portfolio, and he could not identify a *single* document discussing the impact of FIRREA on First Annapolis, generally, or upon its loan portfolio, specifically. Tr. 978-79 (Cook).

Similarly, Mr. Parran testified at trial that he "suggested" to First Annapolis's joint venture partners to "refinance the[ir] loans somewhere else" because First Annapolis would not be able to fund their investments after the pending legislation was enacted (Tr. 1049 (Parran); Tr. 1329 (Parran)), he was unable to identify a *single* document in which he discussed the pending FIRREA legislation and its potential impact upon the thrift in late 1988 or the spring or summer of 1989. Tr. 1356 (Parran). Mr. Parran also proffered no (1) letters to regulators discussing the impact of FIRREA; nor (2) any documents or board minutes discussing First Annapolis's inability to fund projects as a result of FIRREA. Tr. 1356-57 (Parran).

Further, while Mr. Parran *originally* testified that borrowers stopped paying on their loans because of the "shadow" of FIRREA, (Tr. 1049 (Parran)), he later conceded that borrowers "didn't stop paying because of FIRREA, generally." Tr. 1330 (Parran). Indeed, First Annapolis's Board minutes demonstrate that it was economic conditions – not FIRREA– that caused First Annapolis's borrowers to stop paying their loans: "Delta has experienced a delay in selling joint venture projects due to the *soft real estate market*." JX 61 at 1636 (emphasis added).

The only document Mr. Parran could identify concerning First Annapolis's efforts to address the pending FIRREA legislation was its June 1989 business plan, which forecasted its operations from June 1989 through May 1994. Tr. 1397 (Parran); JX 136. This business plan – far from showing FIRREA's alleged devastating effects – forecasts *positive* net income for First Annapolis during every single quarter from June 1989 to May 1994 for a total profit of *$37 million*. JX 136 at 0556; Tr. 1398-99 (Parran); see also Tr. 1020-21 (Cook). In fact, the projected $37 million total profit is *4.5* times higher than First Annapolis's projected three year net income of *$8.5 million* in its January 1989 business plan, which was (1) adopted six months earlier covering basically the same time period, and (2) was not identified by Mr. Parran as having contemplated FIRREA's "shadow." Tr. 1398-99 (Parran); JX 135 at 0882.

Mr. Parran's suggestion that FIRREA somehow caused borrowers to stop paying their loans also defies common sense. First Annapolis's borrowers had entered into contracts to repay loans. The pending FIRREa legislation did not change that contractual obligation. As Mr. Kennedy confirmed, if a borrower stopped paying his or her loan, First Annapolis could foreclose upon the loan's collateral. Tr. 2281-82 (Kennedy). The borrowers that stopped paying their

loans with First Annapolis did so simply because they no longer had the money to pay them, not because of FIRREA. Tr. 2213, 2281 (Kennedy).[11]

Plaintiff's expert, Dr. Heiden, relied upon Mr. Parran's cursory statements regarding FIRREA's "shadow" to opine, for the first time at trial, that the effects of the pending FIRREA legislation negatively affected First Annapolis in the spring or summer of 1989. Tr. 1467 (Heiden). Of course, "[o]pinion evidence is only as good as the facts upon which it is based." Loesch v. United States, 227 Ct. Cl. 34, 645 F.2d 905, 915 (1981); see also State of Washington v. United States, 214 F.2d 33, 43 (9th Cir. 1954).

Here, Dr. Heiden admitted that his previously drafted expert witness reports indicate that FIRREA did not affect First Annapolis until 1990. Tr. 1464-66 (Heiden). Further, his reports contained *nothing* regarding the effects of the impending legislation on First Annapolis. Tr. 1468 (Heiden). Moreover, Dr. Heiden could identify no documents that "specifically talk about [the impending impact of FIRREA], and I don't--I don't think the word 'shadow' was used in any of [First Annapolis's] characterizations." Tr. 1469 (Heiden). Additionally, Dr. Heiden did not perform economic analysis to measure the effects of FIRREA's implementation on First Annapolis or how the thrift changed its behavior in the spring or summer of 1989 due to the pending legislation. Tr. 1471-72 (Heiden). Finally, Dr. Heiden even confirmed that for problem loans, First Annapolis borrowers "did not stop paying because of the brief [sic] [breach]." Tr. 1534 (Heiden) .

---

[11] Dr. Shapiro also saw no correlation between the pending FIRREA legislation and First Annapolis borrowers ceasing to pay their loans. Tr. 2498 (Shapiro).

## II. The Contract Cannot Be Unwound

Bancorp's 65 page post-trial brief, like its arguments at trial, fatally fails to mention, much less demonstrate, how the Court can unwind the contract and return the parties to their status quo ante, a necessary prerequisite for an award of restitution. See Gov't Br. 41-47.

Unlike expectancy damages, restitution seeks to place the non-breaching party in the position it occupied prior to the contract, as if there had never been a contract to breach. Hansen II, 367 F.3d at 1309; Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001). Stated differently, the Court must be able to "'unscramble the egg' and return the parties to the position they would have been in absent the contract." LaSalle Talman Bank, FSB v. United States, 45 Fed. Cl. 64, 77 (1999); accord Hansen II, 367 F.3d at 1318-19 ("We agree that the commingling of assets as a result of the Raritan-Hammonton merger and the subsequent activities of Hansen Savings may make it difficult to 'unwind' the transaction between the Hansens and the government for purposes of determining the appropriate amount, if any, that can be restored through restitution.").

As we demonstrated (Gov't Br. 41-42), restitution is generally only available in cases like Mobil, where one party advances the other party money and upon repudiation, the money is refunded and the parties are returned to their status quo ante. See First Nationwide Bank v. United States, 51 Fed. Cl. 762, 765 (2002) (restitution "fits best when the breaching party wholly fails to perform and when the injured party has paid up front for that non-performance"); Fisher v. Jones, 816 S.W.2d 865, 868 (Ark. 1991) (holding the plaintiff did not meet his "burden of proof so as to entitle him to restitution and conclud[ing] that the circumstances had been so altered by part execution that the parties could not even be closely restored to status quo"). That

result is appropriate because, in entering into the contract, the nonperforming party implicitly agreed not to keep the money if it failed to perform at all. See Henry Mather, Restitution as a Remedy for Breach of Contract: The Case of the Partially Performing Seller, 92 Yale L.J. 14, 36-37 (1982).

The corollary is that restitution is generally unavailable if the property obtained by the non-breaching party has "been used, destroyed or substantially altered in character while in his possession." Restatement § 384, cmt. a; see also Hansen II, 367 F.3d at 1315 (restitution is precluded when the non-breaching party cannot return "any interest in property that he has received in exchange in substantially as good condition as when it was received by him.") (quoting Restatement § 384 (1)(a)).

Here, it is impossible to return the parties to their pre-contract positions. One way in which this case differs from Mobil is that, as the undisputed facts establish, the Government partially performed the contract. Tr. 1101-05 (Parran). Bancorp controlled and operated First Annapolis with the benefit of the three forbearance for at least 16 months, from August 1988 to December 1989. Tr. 1101-05 (Parran); but see Tr. 1868 (Jones) (testifying that First Annapolis's forbearance were in effect until February 27, 1990); DX 406. In addition, Bancorp increased First Annapolis's investments in service corporations and real estate investments, and entered numerous contracts with third-parties. See, e.g., DX 439; JX 54; Tr. 1123-24 (Parran); see also Tr. 2465 (Shapiro).

During the time Bancorp was operating the thrift and entering into various transactions, First Annapolis experienced mounting operating losses. Tr. 1145 (Parran); Tr. 1795-96 (Jones); see Tr. 1966-69 (Crompton); DX 397 at 0160; DX 438 at 0005; DX 438 at 0015. As of August

13, 1988, First Annapolis's liabilities exceeded its assets by $65 million. JX 3 at 0834. After the thrift failed, the Government was forced to pay $118.76 million. DX 635 at 0003.

Unwinding the contract at this point would require unwinding the effects of the supervisory conversion and Bancorp's 16 months operating the thrift. See Hansen II, 367 F.3d at 1318-19 (acknowledging the inherent difficulty in unwinding the thrift's merger, conversion, and subsequent activities). In Mobil, the plaintiffs paid the Government "up front cash." Here, of course, Bancorp never paid the Government any money as part of the contract, let alone "up front cash." Instead, Bancorp contributed $13.6 million in funds to First Annapolis, which Bancorp then owned after the acquisition. Tr. 1081-82 (Parran). So, unlike the plaintiffs in Mobil, who parted with their cash as part of the acquisition, First Annapolis owned and controlled First Annapolis after the acquisition. Tr. 1081-82 (Parran). In addition, due to the bad business decisions by First Annapolis's management and board of directors, the thrift lost Bancorp's $13.6 million investment before the contract was breached. Tr. 2464-67 (Shapiro) ("First Annapolis had lost Bancorp's initial investment before it lost its regulatory forbearance[s].").

Accordingly, restitution is improper because the contract cannot be unwound, and the parties cannot be returned to their pre-contract positions.

## III. Awarding Bancorp Restitution Would Be An Unfair Windfall

As we demonstrated in our opening brief (Gov't Br. 47-48), following the Federal Circuit's decisions in Hansen II and Admiral, when a party in this Circuit seeks restitution, a fundamental consideration is that "restitution should not be awarded if it would result in a windfall to the nonbreaching party." Admiral, 378 F.3d at 1345 (citing Hansen II, 367 F.3d at 1315; see Southwest, 63 Fed. Cl. at 197 ("The Federal Circuit has held that restitution damages

should not be awarded if the award would result in a windfall to the non-breaching party.") (citing Admiral, 378 F.3d at 1345, Hansen II, 367 F.3d at 1315; Hi-Shear Tech. Corp. v. United States, 356 F.3d 1372, 1382 (Fed. Cir. 2004)). The Federal Circuit has explained that a restitution award *does* result in a windfall if, as a result of the award, the nonbreaching party is placed "in an overall better position than if the breach of contract had not occurred." Hansen II, 367 F.3d at1318.

Returning $13.6 million to Bancorp would clearly result in a windfall to Bancorp. As we demonstrated in our opening brief and above, First Annapolis lost the entire $13.6 million it infused into the thrift before, and for reasons unrelated to, the breach. Thus, absent the breach, the $13.6 million was gone.

Bancorp presents no argument in its brief explaining why it would not be a windfall to it to receive back its $13.6 million investment when it had already lost all of that money before, and for reasons unrelated to, the breach. Indeed, Bancorp hardly discusses *at all* the fundamental consideration that it is not entitled to a windfall except to raise the issue in the context of its confusing discussion (which we address above) concerning "the government's claimed offset." Pl. Br. 53. As we previously explained, Bancorp's offset argument is completely inapposite: we are not – and have never – claimed an offset in this case.

Bancorp (Pl. Br. 49) attempts to analogize its position to a purchaser of a lottery ticket that was not delivered by the lottery operator who, under Mobil, is entitled to a refund of his money. See Mobil, 530 U.S. at 624. Clearly, Mobil did not require a refund to the purchaser of a lottery ticket *after* the lottery had been held. Tr. 2473 (Shapiro) ("You play the lottery and you don't have the winning ticket, you don't get to ask for your money back."). Bancorp *did* initially

receive the "lottery ticket," but lost the "lottery" during the time it had full possession and control of the "lottery ticket."[12] More specifically, the $13.6 million that Bancorp infused into First Annapolis was *not* provided to the Government, but what Bancorp received for its infusion – control of the thrift, the forbearance, and the other things described above – was used by First Annapolis to gamble on various investments and enter into contracts and business relationships with third-parties. Tr. 1081-1082, 1101-02, 1106 (Parran). Ultimately, as we have demonstrated, the thrift completely lost the money before the breach, and First Annapolis was not a viable institution by the third quarter of 1989. Tr. 2281 (Kennedy); see also Tr. 1795-97 (Jones) (First Annapolis's unprofitability had "nothing" to do with FIRREA); Tr. 2455 (Shapiro) (Bancorp's forbearances were "worthless" at the time of the breach").

Because Bancorp had the benefit of the operation of First Annapolis from August 13, 1988 until May 31, 1990, awarding it $13.6 million in restitution would improperly provide the thrift with "insurance" for losses from business decisions and economic conditions that were *unrelated* to the breach. Tr. 2464-65 (Shapiro). Such an award would constitute a windfall because it improperly reallocates the risks that the parties had allocated for themselves. See 3 Dan B. Dobbs, Law of Remedies § 12.7(5) (2d ed. 1993); see also Tr. 1094-96 (Parran) (confirming that the Government never promised Bancorp that First Annapolis would be profitable or viable after the conversion or that Bancorp would not lose its investment). It would allow Bancorp to bear none of the downside risk of its investment in First Annapolis, contrary to the equitable principles on which the remedy of restitution is based. See Canfield v. Reynolds,

[12] Of course, as we have stated, the Government never received any money from Bancorp for the "lottery ticket." Tr. 1081-82 (Parran).

631 F.2d 169, 178 (2d Cir. 1980) (declining to order rescission because it would give plaintiff a windfall in a setting in which there was "no reason to relieve [plaintiff] of his investment's downside risks").

Accordingly, a return of the alleged value of Bancorp's contribution would put it in a superior position to the position Bancorp would have held if the contract had never been breached. See LaSalle Talman Bank, FSB v. United States, 317 F.3d at 1371 (citing 3 E. Allen Farnsworth, Farnsworth on Contracts 193 (2d ed.1998). The Court should accordingly reject Bancorp's restitution claim.

## IV. Bancorp Is Not Entitled To A Tax "Gross-Up" Of Any Damages Award

As established at trial and in our brief, Bancorp's claim for a tax "gross-up" fails because: (1) any recovery by Bancorp would be a capital item and excluded from taxable income,[13] (2) awarding a tax gross-up is beyond the Court's authority; and (4) a tax gross-up would result in an unfair windfall to Bancorp. Gov't Br. 48-53.

As anticipated, Bancorp argues that any damages award for restitution should be subject to a tax gross-up. Pl. Br. 51-53. Bancorp relies almost exclusively upon the unsupported testimony of its president, Mr. G. Thomas Daugherty, a fact witness with admittedly no expertise in either accounting or corporate taxation. Pl. Br. 51-53; Tr. 1596,1606-1607 (Daugherty). Bancorp's argument fails because Mr. Daugherty's cursory testimony fails to demonstrate Bancorp's entitlement to a tax gross-up.

---

[13] Since filing our opening brief, we have determined that the net operating losses reported by Bancorp on its tax returns would be subject to a three year carryback and 15 year carryforward period. See Yoakum v. Comm'r, T.C. Memo 2004-191, *3 n.2, 2004 WL 1902974 (2004). As such, $350, 289 of Bancorp's net operating loss carryforwards would be available as of December 31, 2006. DX 2496.

### A. Bancorp Failed To Show The Taxability Of A Damages Award For Restitution With Reasonable Certainty

Bancorp erroneously asserts that a tax gross-up is appropriate for an award of restitution because such a recovery would be taxable as gross income. Pl. Br. 51.

Trial courts "generally do not gross-up damage awards to take into account the plaintiff's tax liability on the award unless a plaintiff can show with reasonable certainty that the gross-up is necessary to make plaintiff whole, the award will be subject to taxation and, for purposes of calculating the gross-up, that the award will be taxed at a certain rate." Hughes v. United States, 71 Fed. Cl. 284, 320 (2006); Citizens Fed. Bank v. United States, 59 Fed. Cl. 507, 521 (2004). Here, Bancorp has failed to show with "reasonable certainty" that either a tax gross-up is necessary to make it whole or that the restitution damages it seeks would be treated as taxable upon receipt. See Citizens, 59 Fed. Cl. at 521-23 (rejecting "gross-up" as a matter of law in part due to uncertainty regarding taxability); see also Local Okla. Bank, N.A. v. United States, 59 Fed. Cl. 713, 720-21 (2004), aff'd, 452 F.3d 1371 (Fed. Cir. 2006) (same).

#### 1. There Is No Evidence Demonstrating That Bancorp's Capital Contribution To First Annapolis "Changed" To Income After The Thrift's Dissolution

As demonstrated in our initial brief, Bancorp's tax gross-up claim is untenable because Bancorp seeks to recover the $13,665,907 capital contribution it made to the thrift. Thus, Bancorp can exclude any judgment from its gross income as nontaxable because the return of capital is not an economic gain to Bancorp. Gov't Br. 49-51; see United States v. Gotcher, 401 F.2d 118, 121 (5th Cir. 1968); Freeman v. Comm'r, 33 T.C. 323, 327 (1959); see also Rev. Rul.

81-277, 1981 WL 165965 (IRS RRU) (1981). As a general rule, "[i]n the case of a corporation, gross income does not include any contribution to. . . capital . . ." 26 U.S.C. § 118(a). For a corporation to have income under 26 U.S.C. § 61, it must have benefitted from an economic gain. 26 U.S.C. § 61; see also Rev. Rul. 81-277, 1981 WL 165965 (IRS RRU) (1981). It is well-settled that where a recovery replaces capital and provides no economic gain to the taxpayer, the resulting damage award is viewed as a return of capital, and is not taxable as income. See, e.g., Raytheon Prod. Corp. v. Comm'r, 144 F.2d 110, 113 (1st Cir. 1944). Here, it is undisputed that the return of this capital would not be an economic gain for Bancorp. Pl. Br at 51.

Dr. Clowery testified that Bancorp's restitution claim, which equates to its investment and ownership interest in First Annapolis Savings Bank, represents a capital item. Tr. 2101-2106 (Clowery). As Dr. Clowery explained, because Bancorp's $13.6 million investment in First Annapolis was a nontaxable event, any recovery of this lost investment would be recorded as a capital item on its balance sheet, which is excludible from both financial statements and taxable income. Tr. 2102-2106 (Clowery); see 26 U.S.C. § 118(a).

Bancorp erroneously claims that a "damage recovery would not be a recovery of capital because the investment has been changed by the dissolution of Bancorp." Pl. Br. 32 (citing Tr. 1622 (Daugherty)). The sole support for Bancorp's claim, however, is Mr. Daugherty's conclusory statement that "I know that this is not a recovery of capital, because the manner - or the investment had been changed by the dissolution of the institution, *by the evil FIRREA*." Tr. 1622-23 (Daugherty) (emphasis added). Mr. Daugherty's conclusory statement is simply wrong.

First, the Supreme Court has expressly rejected this conclusion. See Comm'r v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955) (when a monetary recovery merely restores a

taxpayer to his original economic status, there is no "accession to wealth," and any recovery is non-taxable). Second, there is no expert testimony supporting Mr. Daugherty's conclusion that the "evil FIRREA" somehow changed long-standing federal tax laws. See Tr. 1595-96 (this Court's refusal to qualify Mr. Daugherty as an expert witness). In any event, Mr. Daugherty freely admitted that he does not know whether a damages award that is a capital recovery has any impact on its taxability. Tr. 1622-1628 (Daugherty). Further, he engaged in no analysis to determine the nature of restitution damages, or even to ascertain whether his understanding of the taxability of any potential damages award is accurate. Tr. 1610-12; 1628 (Daugherty).

**2. Bancorp's Damages Are Not Taxable Under The Tax Benefit Rule**

At trial, Bancorp's counsel argued that Bancorp's investment in First Annapolis would be taxable based upon a $41.1 million loss Bancorp wrote off on its 1990 tax return. Tr. 2094-2095; 2098 (Cooter). This claim was only suggested by Mr. Cooter and was never addressed by Mr. Daugherty. In apparent follow-up to Mr. Cooter's unsupported suggestion, Bancorp asserts in its post-trial brief that Dr. Clowery "ignored the impact of the tax benefit rule." Pl. Br. 52.

Contrary to Bancorp, Dr. Clowery did not ignore the "tax benefit rule." Because Dr. Clowery recognized that Mr. Cooter's unsupported suggestion was an attempted application of the "tax benefit rule," Tr. 2098, Dr. Clowery explained why the "tax benefit rule" is inapplicable here. Tr. 2100 (Clowery).

Dr. Clowery explained that a necessary prerequisite for the tax-benefit rule is that a tax "benefit [must] ha[ve] been conferred." Tr. 2100 (Clowery); see 26 U.S.C. § 111(a). If a taxpayer has "not realized a benefit because the loss has not been offset against other income," then notwithstanding the previous tax write-off, no benefit has been conferred, and the tax

benefit rule would not apply. Id.

Consequently, Bancorp's attempted application of the tax benefit rule fails for several reasons. First, there is no evidence that Bancorp wrote-off its $13.6 million investment in First Annapolis on any tax return. The statements and arguments of Bancorp's counsel regarding the tax benefit rule are not evidence. See Senza-Gel Corp. v. Seiffhart, 803 F.2d 661, 667 n. 7 (Fed. Cir. 1986). Second, the $41.1 million loss referred to by Bancorp's counsel was reported by Bancorp on IRS Form 4797, which is entitled "Sales of Business Property." DX 2481 at 0324. IRS Form 4797 is typically used to report property disposals, making it impossible to determine whether the $13.6 million investment was included on the form. Tr. 2109-2110 (Clowery). Third, even assuming that the $41.1 million loss on IRS Form 4797 included Bancorp's $13.6 million investment in First Annapolis, despite the absence of any evidence demonstrating this, Bancorp's inability to fully apply this write-off (i.e., as a net operating loss carryforward) to future income means that no tax benefit has been fully conferred upon Bancorp. Tr. 2100 (Clowery); see also DX 2496 at 0084. Thus, Bancorp never realized the full tax benefit of these losses, even assuming a tax write-off of its $13.6 million investment on IRS Form 4797.

While Bancorp may have anticipated that its net operating loss carryforwards would be applied against future income, the evidence demonstrates that Bancorp's expectations never materialized. Tr. 2100 (Clowery). Because Bancorp failed to prove that a tax benefit was conferred through any write-off of its investment in First Annapolis, any potential recovery of this investment would be a non-taxable, capital item.

**B. Even If Bancorp Incorrectly Reports The Award As Taxable Income, Bancorp Will Not Likely Be Taxed On That Award**

Even if Bancorp files an inaccurate tax return unnecessarily reporting an award from this case as taxable income, when such an award is a non-taxable capital recovery, this error would not likely result in a tax liability for Bancorp.

As Dr. Clowery explained, the IRS employs special computerized formulas to monitor the differences in a taxpayer's income from year to year. Tr. 2064-2065 (Clowery). Consequently, a large change in income causes a tax return to be flagged for review and potential audit. Id. While all flagged returns are not audited by the IRS, Dr. Clowery believes that a change in Bancorp's income from its 2005 level of a mere $526 dollars to approximately $13.6 million would result in the tax return being flagged. Id.; DX 2496 at 0080. Should the IRS audit Bancorp's tax return, it would, as Dr. Clowery testified, undoubtedly discover a capital recovery was incorrectly reported as taxable income, and any resulting tax payment would be refunded to Bancorp. Tr. 2065 (Clowery).[14] Consequently, even if an inaccurate tax return is filed by Bancorp, no tax liability will likely result.

**C. A Tax "Gross-Up" Award Is Speculative And Would Result In A Windfall To Bancorp**

As we demonstrated (Gov't Br. 53), a tax "gross-up" in this case will undoubtedly constitute a windfall because it will place Bancorp in a better position than it would have occupied absent the breach.

[14] Dr. Clowery explained that while meeting with a client, a large corporation, he personally witnessed his client's receipt of such a refund due to a computer programming error. Tr. 2069 (Clowery).

Because a tax "gross-up" would guarantee Bancorp a rebate now for a tax that will likely never be paid, courts in analogous situations have rejected tax "gross-ups" as too speculative. See Citizens Fed., 59 Fed. Cl. 507, 523 (rejecting a claim for gross-up as "too speculative to be awarded because the Court [did] not know that the award will be taxed nor the rate at which it would be taxed."); Slattery v. United States, 73 Fed. Cl. 527, 531 (2006) (because the "tax liability on the damages award is unknown at this time," no tax gross-up awarded to the plaintiffs, unless and until, they actually paid taxes on the damages award, and "[i]f the Government assesses taxes on Plaintiffs' award, the Court will ultimately return the tax assessment amount to Plaintiffs in the form of a tax gross up."); accord Hughes v. United States, 71 Fed. Cl. 284, 320 (2006) (declining to entertain a tax-gross-up, until the damages award is "ultimately found to be taxable"); see also Bank of America, FSB v. United States, 70 Fed. Cl. 246, 253-55 (2006). This Court should similarly reject Bancorp's claim.

Given Bancorp's inability to prove taxability with reasonable certainty, a tax gross-up at this juncture would be speculative and would constitute an impermissible windfall for Bancorp.

## CONCLUSION

For the forgoing reasons as well as those stated in our post-trial brief, we respectfully request that the Court grant judgment for the defendant.

Respectfully submitted,

MICHAEL HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Kenneth M. Dintzer by Jeanne E. Davidson
KENNETH M. DINTZER
Assistant Director

s/Timothy J. Abraham
TIMOTHY J. ABRAHAM
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 616-0477
Facsimile: (202) 353-7988
Attorneys for Defendant

OF COUNSEL:
SCOTT AUSTIN
MELINDA HART
MARK PITTMAN
DELISA M. SANCHEZ
Trial Attorneys

July 23, 2007

**CERTIFICATE OF FILING**

I hereby certify that on July 23, 2007, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Timothy J. Abraham