**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**No.94-522C**
**(Judge Williams)**

---

**FIRST ANNAPOLIS BANCORP, INC.,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S SUPPLEMENTAL POST-TRIAL BRIEF

---

**MICHAEL HERTZ**
**Deputy Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**KENNETH M. DINTZER**
**Assistant Director**

**SCOTT D. AUSTIN**
**Trial Attorney**
**Commercial Litigation Branch**
**Department of Justice**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tel: (202) 616-0317**
**Fax: (202) 353-7988**

**Attorneys for Defendant**

**Of Counsel:**

**MELINDA HART**
**BRIAN A. MIZOGUCHI**
**DELISA M. SANCHEZ**

**August 24, 2007**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I. FIRREA Regulations Precluding Plaintiff From Counting Supervisory Goodwill Toward Regulatory Capital Requirements Do Not Constitute A "Total Breach". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. Bancorp's $13.6 Million Infusion Into First Annapolis Was Fully Lost By The Time Of Seizure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III. Bancorp Must Demonstrate Its Viability To Receive An Award Of Restitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV. The Absence Of Documentary Evidence That First Annapolis Borrowers Stopped Paying Their Loans Because Of The Breach Undermines Bancorp's Claim To The Contrary. . . . . . . . . . . . . . . . . . . . . . . . . . 15

V. The *1st Home* Court Erred By Failing To Consider *Admiral* And *Hansen*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

1st Home Liquidating Trust v. United States,
76 Fed. Cl. 731 (2007). . . . . . . . . . 1, 17, 19

Admiral Fin. Corp. v. United States, ("Admiral II")
378 F.3d 1336 (Fed. Cir. 2004). . . . . . . . . . *passim*

Admiral Fin. Corp. v. United States, ("Admiral I")
57 Fed. Cl. 418 (2003), aff'd, 378 F.3d 1336 (Fed. Cir. 2004). . . . . . . . . . 6

Ankenbauer v. Sec'y of Dept. of Health & Human Servs.,
31 Fed. Cl. 637 (1994). . . . . . . . . . 4, 15

Argus, Inc. v. Eastman Kodak Co.,
801 F.2d 38 (2d Cir. 1986).. . . . . . . . . . 4, 15

Bluebonnet Sav. Bank, FSB v. United States,
339 F.3d 1341 (Fed. Cir. 2003). . . . . . . . . . 14

First Annapolis Bancorp, Inc. v. United States,
75 Fed. Cl. 263 (2007). . . . . . . . . . 2, 5

Hansen Bancorp, Inc. v. United States, ("Hansen III")
67 Fed. Cl. 411 (2005). . . . . . . . . . 8, 13, 14, 20

Hansen Bancorp, Inc. v. United States, ("Hansen II")
367 F.3d 1297 (Fed. Cir. 2004) .. . . . . . . . . . *passim*

Hansen Bancorp, Inc. v. United States, ("Hansen I")
53 Fed. Cl. 92 (2002), rev'd on other grounds, 367 F.3d 1297 (Fed. Cir. 2004).. . . . . . . . . . 18

Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston,
666 F.2d 673 (1st Cir. 1981). . . . . . . . . . 13

Mobil Oil Exploration & Producing Southeast, Inc. v. United States,
530 U.S. 604 (2000).. . . . . . . . . . 3, 5, 10, 19

Rydzewski v. Sec'y of Dept. of Health & Human Servs.,
2007 WL 949759 (Fed. Cl. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15

Southwest Inv. Co., Inc. v. United States,
63 Fed. Cl. 182 (2004), aff'd, 158 Fed. Appx. 283 (Fed. Cir. 2005),
cert. denied, 126 S. Ct. 2321 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19

United States v. Winstar Corp.,
518 U.S. 839 (1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## FEDERAL STATUTES AND REGULATIONS

12 C.F.R. § 561.16c(d)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") of 1989,
Pub. L. No. 101-73, 103 Stat. 183. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## MISCELLANEOUS

5 A. Corbin, Corbin on Contracts § 1104 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

George E. Palmer, The Law of Restitution, § 4.5 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

Restatement (Second) of Contracts § 243 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10

Restatement (Second) of Contracts § 384 cmt. a (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **FIRST ANNAPOLIS BANCORP, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 94-522C** |
| **v.** | ) | **(Judge Williams)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S SUPPLEMENTAL POST-TRIAL BRIEF**

Pursuant to this Court's request at the August 3, 2007 closing argument, defendant, the United States of America, respectfully submits this supplemental post-trial brief to address issues discussed at closing argument and this Court's recent decision in 1st Home Liquidating Trust v. United States, 76 Fed. Cl. 731, 743-44 (2007). For the reasons stated in our post-trial and post-trial response briefs, at closing argument, and below, the Court should enter judgment for the Government.

**INTRODUCTION**

We demonstrated in our post-trial briefs, and at closing argument, that we are entitled to judgment because: (1) First Annapolis Bancorp, Inc. ("Bancorp") failed to establish a "total breach;" (2) the contract between the parties cannot be unwound; and (3) awarding Bancorp restitution would result in an unfair windfall.

As we demonstrated, under Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1345 (Fed. Cir. 2004) ("Admiral II"), the breach was not a "total breach" because First Annapolis Savings Bank, FSB ("First Annapolis") was not viable at the time of the breach.

The contract cannot be unwound because the Government partially performed the contract by allowing Bancorp to operate First Annapolis for at least 16 months with full

utilization of all of its forbearances – from August 1988 to December 1989 – and First Annapolis, during this period, entered into various transactions and experienced mounting operating losses. Tr. 1145 (Parran); Tr. 1795-96 (Jones); see Tr. 1966-69 (Crompton); DX 397 at 0160; DX 438 at 0005, 0015. Indeed, while First Annapolis's liabilities exceeded its assets by $65 million as of August 13, 1988, the Government was forced to pay $118.76 million after the thrift failed. JX 3 at 0834; DX 635 at 0003.

Finally, as the $13.6 million that Bancorp infused into First Annapolis was *not* provided to the Government, but was instead completely lost by First Annapolis for reasons unrelated to the breach, it would be a windfall for Bancorp to receive a restitution award of the $13.6 million infusion. Should it receive the restitution award it seeks, Bancorp would be placed "in an overall better position than if the breach of contract had not occurred." Hansen Bancorp, Inc. v. United States, 367 F.3d 1297, 1318 (Fed. Cir. 2004) ("Hansen II").

In response to the Court's invitation to address certain matters raised at closing argument, we discuss four issues below.

First, we discuss the Court's concern that "the deal was let's give it five years, and they didn't get five years." Tr. 2642; see 2640; 2623 (Cooter). The Court has already found that the promulgation of regulations pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, which precluded First Annapolis from counting supervisory goodwill towards reduced regulatory capital requirements for the full five years for which it contracted, constitutes a breach of contract. First Annapolis Bancorp, Inc. v. United States, 75 Fed. Cl. 263, 264 (2007). A breach of contract, however, may be either a "partial breach" or a "total breach." Pursuant to Admiral II and Hansen II, the breach

here was a partial one, and not a total one, because, at the time of the breach, First Annapolis did not meet reduced capital requirements, even counting goodwill toward capital requirements, and was not viable.

Second, we address Bancorp's erroneous contention that Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604 (2000), is analogous to this case because the $156 million paid to the United States in Mobil is equivalent to the $13.6 million Bancorp infused into First Annapolis here. Tr. 2686. As we explain below, the two situations are completely different because, in Mobil, we received $156 million from the plaintiff while, here, the $13.6 million Bancorp infused into the thrift was completely gone by the time First Annapolis was seized by the Government.

Third, in response to the Court's inquiry, Tr. 2663, we explain below why it makes sense that Bancorp, in a Winstar context, should have the burden of proving its viability as part of a *prima facie* case of total breach. Bancorp does not dispute that it must prove a "total breach" to be entitled to restitution and that, to constitute a "total breach," a breach "must be of a relatively high degree of importance." Hansen II, 367 F.3d at 1312 (quoting George E. Palmer, The Law of Restitution, § 4.5 (1978)); Pl. Post-Trial Br. at 35-36, 48. The breach cannot be said to be "of a relatively high degree of importance" to Bancorp if First Annapolis was not viable at the time of the breach because, in such circumstances, the breach would *not* have placed Bancorp in a significantly worse position than it was in prior to the breach. Accordingly, to prove that the breach was of "a relatively high degree of importance," Bancorp must demonstrate, among other things, that First Annapolis was viable at the time of the breach or "that it would . . . . have been able to recover, even absent [the] breach." Admiral II, 378 F.3d at 1345.

In any event, as we demonstrated, Gov't Br. 32-40; Gov't Response Br. 11-27, assuming *arguendo* the law places upon us the burden to demonstrate the non-viability of First Annapolis, a position with which we disagree, the evidence we proffered at trial more than establishes that First Annapolis was, in fact, *not* viable at the time of the breach.

Fourth, at closing argument, Bancorp erroneously dismissed this Court's correct observation (Tr. 2626) that "there's no documentary evidence in the record of why these people stopped paying their loans" to First Annapolis. Accordingly to Bancorp, the uncorroborated testimony of its witnesses must be accepted because "the absence of a piece of paper is not a smoking gun. It's not a gun. It's not even a slingshot." Id. Contrary to Bancorp, the absence of supporting documentary evidence is fatal to its claim that First Annapolis's borrowers stopped paying their loans as a result of the breach. E.g., Rydzewski v. Sec'y of Dept. of Health & Human Servs., 2007 WL 949759, *8 (Fed. Cl. 2007) ("Usually, records created contemporaneously to the event being memorialized are the most probative.") (citations omitted); Ankenbauer v. Sec'y of Dept. of Health & Human Servs., 31 Fed. Cl. 637, 640 (1994) (the "principle that contemporaneous written documents are entitled to greater weight as evidence than later conflicting oral testimony is well established and long has been recognized by the Supreme Court, the Court of Claims, the Federal Circuit, and this court."); see also Argus, Inc. v. Eastman Kodak Co., 801 F.2d 38, 42 (2d Cir. 1986) ("[t]he failure of a business' management to note at the time what is later claimed by its lawyers to have been a mortal commercial wound weighs heavily against such a claim.").

Finally, we address below this Court's decision in 1st Home. 1st Home, we respectfully submit, was incorrectly decided. As a result, we currently have a motion pending before the

Court requesting it to reconsider its decision. In 1st Home, the Court erroneously rejected our contention that plaintiffs were not entitled to restitution because that the breach was not "total" (material). The Court in 1st Home failed to consider, or even cite to, Admiral II and Hansen II. The Court adopted a construction of Mobil that, while championed by Bancorp, is flatly inconsistent with Admiral II and Hansen II. Indeed, the Court in 1st Home made an error similar to the one made by the trial court in Hansen II that led to the reversal in that case.

## ARGUMENT

### I. FIRREA Regulations Precluding Plaintiff From Counting Supervisory Goodwill Toward Regulatory Capital Requirements Do Not Constitute A "Total Breach"

The current issue before the Court is *not* whether we breached the contract. This Court has already found that the parties entered a contract which permitted First Annapolis to count supervisory goodwill toward reduced capital requirements for five years and that the Government breached this contract by passing legislation prohibiting such goodwill accounting. First Annapolis, 75 Fed. Cl. at 265.

Instead, the current issue, based upon completely different criteria, is whether the breach found by the Court constitutes a "total breach."

Bancorp (Pl. Br. 35-36) does not dispute that a breach must constitute a "total breach" for restitution to be available as a remedy. See Hansen II, 367 F.3d at 1309. Bancorp also does not dispute that, in order to constitute a "total" breach, a breach must "so substantially impair[] the value of the contract to the injured party at the time of the breach that is just under the circumstances to allow him to recover damages based on all his remaining rights to performance," Admiral II, 378 F.3d at 1344-45 (citing Mobil,, 530 U.S. at 608, Restatement

(Second) of Contracts § 243 (1979)), or that a "total breach "must be of a relatively high degree of importance," Hansen II, 367 F.3d at 1312 (quoting George E. Palmer, The Law of Restitution, § 4.5 (1978)). Pl. Post-Trial Br. at 35-36, 48.

Thus, the question of "total breach" becomes whether eliminating First Annapolis's right to count its supervisory goodwill toward regulatory capital requirements after 16 months, rather than five years, "substantially impair[ed] the value of the contract" to Bancorp "at the time of the breach" or, similarly, whether the breach was "of a relatively high degree of importance." The answer to that question is "no."

Depriving First Annapolis of its ability to count supervisory goodwill toward regulatory capital requirements, as of the time of the breach, did not "substantially impair" the value of its contract, and was not "of a relatively high degree of importance" to the thrift, because, as of that time, *even counting all of its contracted-for supervisory goodwill*, First Annapolis failed to meet its pre-FIRREA reduced capital requirements and was non-viable. See Admiral II, 378 F.3d at 1345; Admiral Fin. Corp. v. United States, 57 Fed. Cl. 418, 435 (2003)("Admiral I"), aff'd, 378 F.3d 1336 (Fed. Cir. 2004). As we have demonstrated, based upon First Annapolis's own records, it fell below the 1.8 percent reduced capital benchmark requirement in October 1989 *counting all of its goodwill*. JX 58 at 1545; Tr. 1221-24 (Parran); Tr. 1772-74 (Jones); Tr. 2184 (Kennedy); DX 4004 (Demonstrative); Gov't Br. 36; Gov't Resp. Br. 23. When properly adjusted for loan losses that it was required to record by applicable regulations and accounting rules, as well as its own policies, First Annapolis failed to meet its reduced 1.8 regulatory capital requirement in June of 1989, again *counting all of its goodwill toward regulatory capital requirements.* Tr. 2156-57, 2171-72, 2184, 2306-07 (Kennedy); 12 C.F.R. § 561.16c(d)(3); JX

23 at 0465. First Annapolis also missed its June 1989 reduced regulatory capital requirement – again including all of its goodwill – if its regulatory capital is properly reduced to exclude $1.6 million in shareholder loans as required by regulators. DX 439 at 1301; Tr. 1790 (Jones); Tr. 2184-85 (Kennedy); Gov't Resp. Br. 32 n.7.

Bancorp's assertion that "we were promised five years' worth of time to work this bank out" (Tr. 2623; see Tr. 2679) incorrectly assumes that the regulators would not have been able to take action again First Annapolis if it failed its benchmark requirements counting its goodwill toward the reduced capital requirements. The evidence demonstrates the fallacy in Bancorp's assumption. The Federal Home Loan Bank Board ("FHLBB") and Federal Savings and Loan Corporation ("FSLIC") did not agree to forbear, in the July 21, 1988 forbearance letter, from enforcing regulatory requirements if First Annapolis failed to meet its reduced regulatory capital requirements counting all of First Annapolis's goodwill toward its regulatory requirements. PX 3; Gov't Resp. Br. at 45-46. To the contrary, under the terms of the contract found by this Court, if First Annapolis failed to meet its reduced regulatory capital requirements, counting all of its goodwill, during the five years that the forbearance was in effect, the FHLBB and FSLIC "expressly reserve[d] their statutory rights and powers" to take those regulatory actions deemed appropriate. PX 3; see Tr. 1094, 1086-87 (Parran); Tr. 1557-58 (Heiden).

As of June 1989, even counting all of its goodwill, First Annapolis was not viable. First Annapolis was not going to survive regardless of whether it was permitted to count its goodwill toward its regulatory capital. In June 1989, First Annapolis was in a downward spiral for the same reasons it could not meet its capital requirements. The thrift had suffered huge operating losses, it had significant and growing asset quality problems, and it was operating in a rapidly

deteriorating economic environment and real estate market. Thus, by the third quarter of 1989, First Annapolis was on an "irreversible course to failure." Tr. 2150 (Kennedy); see DX 4017 (Demonstrative); Tr. 2243-46, 2250-51, 2265 (Kennedy); see Tr. 1797 (Jones) (even absent FIRREA, First Annapolis "clearly was not a viable institution").

The duration of the contract (here five years) is not probative of whether the breach "substantially impair[ed] the value of the contract . . . at the time of the breach . . . ." For example, in Hansen, the Court found that the plaintiff had a contract to count goodwill towards regulatory capital for *25 years* beginning in 1988, but nonetheless concluded that the breach was not material or total. Hansen Bancorp, Inc. v. United States, 67 Fed. Cl. 411, 415, 434 (2005) ("Hansen III").

Bancorp's claim (see Tr. 2643) that its service corporations would somehow have bailed it out during the last couple of years of its five-year forbearance period is erroneous for two major reasons.

First, as First Annapolis failed to meet its June 1989 reduced 1.8 capital requirement, even counting its goodwill, it had no forbearance permitting it to operate for the full five years.

Second, the record evidence belies Bancorp's claim. The contemporaneous evidence contradicts the unsupported assertion that the service corporation profits were not going to be realized until the last couple of years of the five year contract. The October 1987 business plan projected that $12.9 million of the $16.7 million in total projected service corporation profits would be realized by 1989. JX 134 at 0565 and 0631 (I-5); see also DX 4011 (Demonstrative); Tr. 2237-38 (Kennedy). The January 1989 business plan projected that $12.3 million of the total $14.8 million in total projected service corporation profits would be realized between December

1988 and December 1990. JX 135 at 0882; See also DX 2458 at 0336; Tr. 1197-99 (Parran); DX 2471 at 1485. Moreover, as of July 1988, 10 of the 13 service corporation projects were expected to be completed *prior* to 1990. JX 33 at 0655; Tr. 1335-36 (Parran). In other words, prior to and shortly after the conversion, First Annapolis' own records projected that a significant portion of the service corporation profits would be realized within the *first* two years after the conversion, not the last two.

In addition, while First Annapolis "bet" its future on its service corporation investments, the failure of those investments to perform up to expectations during the 16 months that First Annapolis operated under the forbearances was largely responsible for the thrift's non-viability. Gov't Br. 6, 9; DX 634 at ¶ 10; Tr. 1150, 1170-71 (Parran); DX 4014 (Demonstrative); Tr. 2247-48, 2258 (Kennedy). The regulators' pre-conversion determination that First Annapolis met the "viability criteria" was dependent upon "successful implementation of [First Annapolis's] proposed business plan," DX 69 at 0403; see Tr. 1741, 1767-68 (Jones), and the business plan's success depended upon First Annapolis satisfying its projected income targets on its service corporation investments. JX 134 at 0631 (I-5); see DX 4011 (Demonstrative); Tr. 2237-38 (Kennedy). First Annapolis, however, failed miserably in meeting its business plan projections for its service corporation investments. For example, from October 1988 through June 1989 First Annapolis missed its service corporation net income projections by 44 percent; for the quarter ended September 1989 by 30.5 percent; and for the quarter ended December 1989 by 97.4 percent. JX 46 at 1034-35; JX 61 at 1646-47; DX 2146 at 0864-65; DX 2200 at 1249-50; DX 2120 at 0128-29; DX 4017 (Demonstrative); DX 4018 (Demonstrative); DX 4019 (Demonstrative); see Tr. 2254-55 (Kennedy) (First Annapolis was losing so much money on its

core operations that it simply could not afford to continue missing its profit projections on service corporation investments and remain viable).

It was simply not the case that First Annapolis projected and anticipated the dismal performance by its service corporation investments during these initial periods, but somehow knew that subsequent results would be stellar. Indeed, Bancorp has offered no evidence that First Annapolis could ever have regained its financial footing even absent the breach.

The only way that First Annapolis would have been viable in the but-for world and, thus, would be able to "ride-out" its financial difficulties, was if it raised $100 million in capital. Tr. 2278-79, 2338, 2381-83 (Kennedy). Bancorp has not pointed to any evidence that suggests it could have raised $100 million. To the contrary, First Annapolis's own investment bankers advised the thrift that it could not raise any capital until First Annapolis established a 12 to 24 month track record of positive earnings,[1] which is something First Annapolis had not done since fiscal 1981.[2] DX 2471 at 1486; Tr. 2279, 2383 (Kennedy).

It is "just under the circumstances," Admiral II, 378 F.3d at 1344-45 (citing Mobil, 530 U.S. at 608, Restatement (Second) of Contracts § 243 (1979)), that a thrift that it is not viable at

---

[1] While the advice from First Annapolis' investment bankers was provided in February 1989, that does not change the fact that it would take one to two years of consistent profitability before First Annapolis would have been able to raise additional capital. In other words, even if First Annapolis were profitable prior to FIRREA, which it was not, it still would not have been able to raise capital. See Tr. 2641-42 (Court question).

[2] During closing argument, the Court posed the following question: "How do I know they were going to survive or not? The rug was pulled out from under them before an entire year even elapsed." Tr. 2646. First Annapolis would not have survived because its survival was dependent upon the service corporation projected profits, which, in turn, were wholly dependent upon economic conditions remaining stable. Gov't Br. at 7; Tr. 1187 (Parran). The deterioration in economic conditions in 1989 "alone was enough to cause First Annapolis to fail." Govt. Br. at 9; Tr. 2243-46 (Kennedy); Gov't Resp. Br. at 12.

the time of the breach should not be entitled to an award of restitution. In Hansen II and Admiral II, the court of appeals, relying upon Mobil, held that, while restitution provides an alternative measure of relief when a plaintiff has incurred, but cannot prove, expectancy damages, restitution is available only in cases of "total breach" and is not an appropriate remedy when it would result in a windfall to the plaintiff. See Hansen II, 367 F.3d at 1309, 1315; Admiral II, 378 F.3d at 1344-45. A thrift – like First Annapolis – which is not viable (i.e., is in such dire straits that it cannot recover) at the time of the breach is not a plaintiff that incurred expectancy damages but cannot prove them. Instead, First Annapolis is a thrift that suffered $0 in expectancy damages as a result of the breach. An award of restitution is unavailable in such circumstances because of the absence of a "total breach" and because such an award would result in a windfall to Bancorp.[3]

## II. Bancorp's $13.6 Million Infusion Into First Annapolis Was Fully Lost By The Time Of Seizure

Bancorp is simply wrong in its claim that, because "we gave [the $13.6 million infusion] to the bank and [the Government] took our bank and didn't give it back," Tr. 2686, this case is analogous to Mobil. Instead, the distinction between (1) paying money to the Government (Mobil) and (2) infusing money into a thrift that completely lost the money prior to the Government's seizure (this case) is critical and demonstrates Mobil's inapplicability.

It is beyond dispute that "the objective [of restitution] is to return the parties, as nearly as practicable, to the situation in which they found themselves before they made the contract." Hansen II, 367 F.3d at 1309 (quoting Restatement (Second) of Contracts § 384 cmt. a (1981)). In

---

[3] In fact, correcting for the errors contained in Dr. Heiden's own calculations proves that First Annapolis' expectancy damages are $0. Gov't Resp. Br. at 35; Tr. 2288, 2292-95 (Kennedy).

Mobil, this objective of restitution was satisfied because both parties were returned to their *status quo ante* as a result of the restitution award. The Mobil plaintiffs lost the exploration and development rights that they had obtained through the contract but received back from the Government the $156 million they had paid to the Government. Similarly, the Government in Mobil had the same amount of money it possessed prior to the contract, because it was required to return the $156 million the plaintiffs paid to it. In contrast, in this case, should the court award the restitution sought by the plaintiff, the Government would be required to pay to the plaintiff $13.6 million that the Government never received. Accordingly, the Government would be placed in a far worse position than we occupied *status quo ante.*

Bancorp's argument that our seizure of the thrift into which it had previously infused $13.6 million functionally equates to our receipt of the $156 million in Mobil is wrong because, when First Annapolis was seized, Bancorp's $13.6 million had already been completely lost as a result of First Annapolis's operations. Indeed, by April 1990, First Annapolis had lost, for reasons unrelated to the breach, nearly $16.4 million (excluding goodwill amortization) from the time of the supervisory conversion, which was more than Bancorp's initial $13.6 million investment. JX 68 at 0016; Tr. 2465-66 (Shapiro); see Gov't Br. at 43. Thus, the Government never received Bancorp's $13.6 million infusion when it seized the thrift, or at any other time. Accordingly, this case is completely unlike Mobil.

## III. Bancorp Must Demonstrate Its Viability To Receive An Award Of Restitution

First Annapolis's viability at the time of the breach is an essential element of Bancorp's claim for restitution, and Bancorp has the burden to demonstrate it was viable when the breach occurred.

Bancorp has the burden of demonstrating not only that the Government breached its contract, but that the breach was a "total breach" rather than a "partial breach." See Hansen II, 367 F.3d at 1309; Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston, 666 F.2d 673, 677 n. 1 (1st Cir. 1981) (citing 5 A. Corbin, Corbin on Contracts § 1104 (1964)). A breach is only a "total breach" if it "substantially impair[s] the value of the contract" and "is of a relatively high degree of importance." Hansen II, 367 F.3d at 1311-12.

As Bancorp cannot prove the breach was a "substantial impair[ment]," or was of "relatively high . . . importance," if First Annapolis was non-viable as of the time of the breach, Bancorp is required, by the very definition of "total breach," to demonstrate, in a Winstar context, that the thrift was viable when the breach occurred. The breach here cannot be said to be sufficiently important to Bancorp to constitute a "total breach" if the presence or absence of supervisory goodwill would not alter the fact that First Annapolis was inevitably going to fail. Thus, Bancorp cannot demonstrate the existence of a "total breach" without first demonstrating it had the capacity to suffer an injury of importance from losing goodwill, i.e., by proving that it was a viable entity, when counting its goodwill toward supervisory capital. Thus, demonstrating viability is a *prima facie* element of Bancorp's claim.

This Court's analysis in Hansen III illustrates that it is the plaintiff's burden to prove a thrift's viability in the Winstar context when seeking restitution. In Hansen III, on remand from the Federal Circuit to determine whether a "total breach" occurred, this Court noted that "FIRREA's law on restitution imposes the requirement on the non-breaching party to demonstrate that the breach was material . . . ." 67 Fed. Cl. at 429. After concluding that the thrift would not have satisfied capital requirements even if the breach had not eliminated or

phased-out the thrift's goodwill, the Court concluded that "*plaintiffs have not proved by a preponderance of evidence* that the Government's breach of contract by dishonoring its commitment to allow HSB to count goodwill toward regulatory capital requirements constituted a material breach of contract." Id. at 434 (emphasis added). Thus, the Court in Hansen III concluded that the plaintiffs' failure to prove that, with the full use of goodwill, their thrift would have met capital requirements (or was viable), meant that the plaintiffs had not satisfied *their* burden of demonstrating a material or total breach sufficient to be awarded restitution.

Bancorp also had the burden of showing that the restitution award it seeks would not create a windfall. See Hansen II, 367 F.3d at 1315. Specifically, Bancorp has the burden to show that an award of restitution is appropriate, and the law in this Circuit is clear that such an award is not appropriate when the result is that the non-breaching party receives a windfall from being "placed in a better position through the award of damages than if there had been no breach." Hansen II, 367 F.3d at 1315 (quoting Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1345 (Fed. Cir. 2003)). Bancorp, therefore, has the burden of proving that the restitution award it seeks will not improve the position it would have been in had there been no breach.

In any event, we have proffered overwhelming evidence that (1) Bancorp was not viable at the time of the breach, and (2) Bancorp, if it receives the restitution award it seeks, will be placed in a better position than it would have been in had there been no breach (in which case First Annapolis would have failed). Accordingly, even if we had the burden of proof on these issues, which, respectfully, we do not, we have more than satisfied any such burden.

## IV. The Absence Of Documentary Evidence That First Annapolis Borrowers Stopped Paying Their Loans Because Of The Breach Undermines Bancorp's Claim To The Contrary

Bancorp admitted at closing argument that it is "true" that there is no documentary evidence to support its claim that borrowers stopped paying off their loans to First Annapolis because of the breach. Tr. 2626.

Unable to support its claim with documentary evidence, Bancorp resorted to the strained argument that it simply does not matter that there is no documentary evidence – contemporaneous or otherwise – to support its claim because "the absence of evidence is not evidence," and the Court has no choice but to accept Bancorp's unsupported testimony. Tr. 2626. Not surprisingly, the law clearly indicates that the absence of contemporaneous evidence supporting Bancorp's representatives' testimony[4] "weights heavily" against accepting such testimony. Argus, Inc., 801 F.2d at 42; see, e.g., Rydzewski, 2007 WL 949759 at * 8; Ankenbauer, 31 Fed. Cl. at 640.

The absence of contemporaneous evidence supporting its contention is particularly harmful to Bancorp here because First Annapolis's own documents demonstrate that other factors – and not FIRREA, let alone the breach – caused First Annapolis's borrowers to stop paying their loans. For example, a loan is placed on non-accrual status when it is delinquent 90 days or more. Tr. 1945-46 (Crompton); JX 46 at 1013; DX 397 at 0149. Bayside Marina was placed on non-accrual status on December 31, 1988, indicating that the borrower had stopped paying not only well before FIRREA was ever announced, but also long before it ever became an

[4] Significantly, while Mr. Parran *originally* testified that borrowers stopped paying on their loans because of the "shadow" of FIRREA, Tr. 1049, he later conceded that borrowers "didn't stop paying because of FIRREA generally." Tr. 1330.

alleged "shadow." DX 2145 at 1505. The Dennis Blaueur Spa Creek loan is another example of a problem loan that was impacted by non-breach related factors.[5] According to Mr. Cook, the "Achilles Heel" of this loan was not the shadow of FIRREA or the borrower's refusal to repay the loan because of the breach, but rather, it was the fact that the "only tenant you could put in the building were those associated with the marine industry, and they all could find cheaper rents outside of town." Tr. 1004 (Cook); see Tr. 2213, 2281-82 (Kennedy) (the borrowers that stopped paying their loans with First Annapolis did so because they no longer had the money to pay them, not because of FIRREA); Tr. 2497-98 (Shapiro) (no correlation between pending FIRREA legislation and First Annapolis borrowers ceasing to pay their loans).

## V. The *1st Home* Court Erred By Failing To Consider *Admiral* And *Hansen*

1st Home, which is not final and, in any event, is not binding upon this Court, was, we respectfully submit, incorrectly decided. The 1st Home Court failed to consider – in fact, failed to even cite – Hansen II and Admiral II, both of which are decisions that are (1) critical to the issues before the Court in 1st Home, and (2) binding upon this Court.

We respectfully submit that, had the Court in 1st Home properly considered Hansen II and Admiral II the outcome in 1st Home would have been different and, indeed, would have been similar to the outcomes in Admiral II, Hansen III, and Southwest Inv. Co., Inc. v. United States, 63 Fed. Cl. 182 (2004), aff'd, 158 Fed. Appx. 283 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 2321 (2006). We have filed a motion for reconsideration in 1st Home respectfully requesting the Court to reconsider its decision.

---

[5] Based upon his review of the contemporaneous evidence, Mr. Kennedy concluded that First Annapolis should have recorded a nearly $1 million loss on this loan by no later than December 1, 1989. DX 2289 at 0769; DX 2265 at 0776; Tr. 2213-14 (Kennedy).

In 1st Home, the Court held that FIRREA constituted a material (total) breach because the inability of the thrift, 1st Home Federal, to count approximately $17 million in goodwill as tangible capital "deprived 1st Home Federal of the benefit of its bargain." 1st Home, 76 Fed. Cl. at 744. The Court, we respectfully submit, erred because there was no contract or "bargain," and, even assuming there was, 1st Home Federal did receive what it had bargained for, namely the use of goodwill to assist compliance with regulatory capital requirements for a number of years. In any event, even if depriving 1st Home Federal of the use of goodwill prematurely is viewed as a breach of contract, which we dispute, that deprivation would only establish that there was *a breach.* The elimination or phase-out of goodwill does not establish whether the breach was "partial" or "total (material)," because it does not establish how *important* the breach was to 1st Home Federal or whether the thrift would have failed even with the goodwill. Much more analysis is needed to make that determination, and there is no indication in 1st Home that the Court performed the required analysis.

The Court concluded, erroneously, that the breach "substantially impaired the value of the contract" because, in United States v. Winstar Corp., 518 U.S. 839, 870 (1996), the Supreme Court held that FIRREA-related regulatory requirements that limited the use of supervisory goodwill constituted a breach. 1st Home, 76 Fed. Cl. at 743. The Court explained that "because of the breach, 1st Home was required to deduct $17 million immediately from its tangible capital. But for the breach, 1st Home would have been stronger by $17 million which, at the very least, would have lessened the impact of 1st Home's loan losses on its capital." Id. at 743-44.

The Court's analysis is simply insufficient to reach the conclusion that a total breach occurred. The question in determining whether a "total breach" occurred is not whether existing

supervisory goodwill could be counted toward tangible capital after FIRREA – certainly it was eliminated or phased-out – but, instead, the *importance* of the elimination or phase-out of supervisory goodwill to 1st Home Federal *at the time of the breach*. The Court, erroneously, failed to address this question. If the 1st Home Court were correct that the sole question for determining whether a "total breach" occurred was whether capital was reduced as a result of not counting supervisory goodwill toward regulatory capital requirements as a result of FIRREA, Admiral II, Hansen II, Hansen III, and Southwest would have to be considered as having been decided incorrectly.

In Hansen II, the Federal Circuit reversed the trial court's finding that the breach in that case constituted a "total breach." Similar to the Court in 1st Home, the trial court in Hansen II relied upon Winstar to conclude that the breach constituted a "total breach," reasoning that the Supreme Court in Winstar concluded that goodwill treatment was "essential to supervisory merger transactions . . ." Hansen II, 367 F.3d at 1309, quoting, Hansen Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 110-11 (2002)("Hansen I"), rev'd on other grounds, 367 F.3d 1297 (Fed. Cir. 2004).

The court of appeals in Hansen II rejected the trial court's analysis, concluding that Winstar "does not answer the question of whether the actions of the United States amounted to a total breach of contract." Id. at 1311. The Court explained, as we have repeatedly mentioned, that, when making the "total breach" determination, a court must determine whether the breach "so substantially impairs the value of the contract to the injured party *at the time of the breach*" that it is just under the circumstances to award restitution and whether the breach is "of a relatively high degree of importance." 367 F.3d at 1311-12 (emphasis).

The Court in 1st Home failed to perform the analysis, required by Hansen II, that is necessary to make a proper determination of whether a "total breach" occurred. Indeed, there is no analysis in 1st Home as to whether, *at the time of the breach*, the purported breach in 1st Home was of significant importance to the thrift. Accordingly, 1st Home conflicts with Hansen II.

The 1st Home Court cites Mobil as a basis for rejecting our argument that the breach was not "total" or "material" because it had no effect on 1st Home's ability to meet its capital requirements. 1st Home, 76 Fed. Cl. at 731. The 1st Home Court's reading of Mobil simply cannot be reconciled with Admiral II, Southwest, and Hansen III, as we have explained. See Gov't Resp. Br. at 5-6.

The Federal Circuit in Admiral II could not have been more clear that, for purposes of a restitution award in a Winstar context, the viability of a thrift at the time of breach is an essential element of "total breach." As we explained, Gov't Resp. Br. 5, in Admiral II, the Federal Circuit approved the trial court's finding that "at the time of breach Admiral was in such dire straits that it would not have been able to recover, even absent a breach." 378 F.3d at 1345. As a result of this factual finding, the Federal Circuit agreed with the trial court that the breach "had no practical effect on Admiral's ability to find the necessary additional funding for the thrift" and that the breach "'did not substantially impair[] the value of the contract to the injured party at the time of the breach.'" Admiral II, 378 F.3d at 1345 (quoting Mobil, 530 U.S. at 608). Accordingly, the appellate court determined that restitution was not an appropriate remedy. Id. at 1345; see Southwest, 63 Fed. Cl. at 195-96 (describing Admiral as holding that "because Admiral was not harmed by FIRREA, restitution damages were inappropriate," and concluding that the thrift at issue's condition at the time of breach precluded an award of restitution because

the thrift "was insolvent notwithstanding the promises"); Hansen III, 67 Fed. Cl. at 434 (concluding that an award of restitution was inappropriate because the thrift was not viable at the time of breach and that the thrift would have failed to meet its capital requirements even counting the contractual goodwill).

## CONCLUSION

For the forgoing reasons, as well as those stated in our post-trial brief, our post-trial response brief, and at closing argument, we respectfully request that the Court grant judgment for the defendant.

Respectfully submitted,

MICHAEL HERTZ
Deputy Assistant Attorney General

JEANNE E. DAVIDSON
Director

KENNETH M. DINTZER
Assistant Director

SCOTT D. AUSTIN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 616-0317
Facsimile: (202) 353-7988
Attorneys for Defendant

OF COUNSEL:
MELINDA HART
BRIAN A. MIZOGUCHI
DELISA M. SANCHEZ
Trial Attorneys

August 24, 2007

**CERTIFICATE OF FILING**

I hereby certify that on August 24, 2007, a copy of the foregoing "DEFENDANT'S SUPPLEMENTAL POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Scott D. Austin