# EXHIBIT A

H
Amber Resources Co. v. U.S.
C.A.Fed.,2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,Federal Circuit.
AMBER RESOURCES COMPANY, Aera Energy LLC, Delta Petroleum Corporation, Ogle Petroleum, Inc., Olac Resources, LLC, Poseidon Petroleum LLC, Total E & P USA, Inc., Plains Exploration & Production Co., Noble Energy, Inc., Anadarko E & P Company LP, and Devon Energy Production Company, L.P., Plaintiffs-Cross Appellants,
andNycal Offshore Development Corporation, Plaintiff,
v.
UNITED STATES, Defendant-Appellant.
**Nos. 2007-5047, 2007-5082.**

Aug. 25, 2008.

Appeal from the United States Court of Federal Claims in 02-CV-30, 04-CV-1822, and 05-CV-249, Senior Judge Eric G. Bruggink.

Steven J. Rosenbaum, Covington & Burling LLP, of Washington, DC, argued for plaintiffs-cross appellants. With him on the brief were E. Edward Bruce, Thomas J. Cosgrove, and Gina L. Paik.
Thomas G. Hungar, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. On the brief were Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Allison Kidd-Miller and Gregg M. Schwind, Trial Attorneys.

Before LOURIE, BRYSON, and GAJARSA, Circuit Judges.

BRYSON, Circuit Judge.
*1 Over a period of years between 1968 and 1984, the federal government granted a number of leases to private entities to explore for and develop oil and gas resources in the outer continental shelf off the California coast. Because of court decisions construing a 1990 statute that was enacted after the leases were in place, the government took action that had the effect of preventing the lessees from continuing exploratory activities on the leased properties, at least temporarily. The owners of the leases then filed suit in the Court of Federal Claims claiming that the government had breached the lease agreements. The Court of Federal Claims agreed with the leaseholders, held that they were entitled to a restitutionary award as damages for the breach, and awarded them restitution in the amount of the funds that had been paid for the leases at the time the leases were executed. The government has appealed the finding of liability and the damages award. *See Amber Res. Co. v. United States,* 68 Fed. Cl. 535 (2005) ("*Amber I* "). The lessees have cross-appealed the trial court's denial of their request for additional damages attributable to costs incurred during the development of the leases. *See Amber Res. Co. v. United States,* 73 Fed. Cl. 738 (2006) ("*Amber II* "). We affirm the trial court's judgment in all respects.

I

Under the Outer Continental Shelf Lands Act ("OCSLA"), the federal government has jurisdiction and control over the outer continental shelf, which is defined as including all submerged land that is beyond the outer limits of state jurisdiction (ordinarily three nautical miles from shore) and within the limits of national jurisdiction (ordinarily 200 miles from shore).*See*43 U.S.C. §§ 1331(a), 1332; *see also id.* § 1301 (defining navigable waters). The OCSLA allows the Secretary of the Interior to grant leases for the development of various natural resources in those submerged lands. *Id.* §§ 1337, 1344-46.

Once the Interior Department has granted a lease for the extraction of oil and gas resources in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

outer continental shelf, the lessee must submit an exploration plan to the Secretary for approval before beginning exploration on the leased property. 43 U.S.C. § 1340(c)(1). After successful exploration, the lessee may submit a development and production plan, which is also subject to the Secretary's approval pursuant to statute. *Id.* § 1351. The leases are ordinarily set to expire in five years, unless they begin to produce oil or gas within that period, in which case the leases continue for as long as oil or gas is produced in paying quantities, or approved drilling or well reworking is continuing on the properties. *Id.* § 1337(b)(2).

If production has not started within the original term of the lease, the lessee can request that the Secretary of the Interior grant a suspension of the lease. As the trial court explained, "[l]essees frequently request suspensions to prevent lease expiration in the face of ongoing exploration or development activities that have not yet resulted in the production of oil in paying quantities."*Amber I,* 68 Fed. Cl. at 538. Because the lessee is entitled to continue preparatory activities on the leased property during a granted suspension, the lessees in this case refer to granted suspensions as "green light" suspensions. The effect of such a granted suspension is to extend the expiration date of the lease for a period equal to the length of the suspension. *See*30 C.F.R. §§ 250.174, 250.180.

***2** The Interior Department also has the authority to direct suspensions under circumstances specified by regulation, such as when the lessees' activities "pose a threat of serious, irreparable, or immediate harm or damage."30 C.F.R. § 250.172(b). During such "directed" suspensions, no offshore activity on the leases is permitted. For that reason, the lessees refer to directed suspensions as "red light" suspensions.

In 1972, Congress enacted the Coastal Zone Management Act ("CZMA"), which is directed to conservation within the coastal zone. Pub.L. No. 92-583, 86 Stat. 1280, codified at 16 U.S.C. § 1451 *et seq.* The coastal zone is defined as including the coastal waters and the adjacent shorelands. In the Great Lakes, it includes all waters extending to the international boundary between the United States and Canada, and in other areas it includes all waters under state jurisdiction, generally up to three miles from the shore.

The CZMA directs the federal government to encourage coastal states to develop coastal management plans. 16 U.S.C. § 1452. Once a state adopts a coastal management plan, section 307(c)(1) of the CZMA sets forth the obligation of federal agencies to act consistently with that plan. *Id.* § 1456(c)(1). At the time the leases at issue in this case were granted, section 307(c)(1) required each federal agency "conducting or supporting activities directly affecting the coastal zone" to do so "in a manner which is, to the maximum extent practicable, consistent with approved state management programs."16 U.S.C. § 1456(c)(1) (1982).

A separate section of the CZMA, section 307(c)(3), provides that after the Secretary of Commerce approves a state's coastal management plan, any applicant for a federal permit to conduct an activity that affects land or water uses in the state's coastal zone is required to certify that its activity complies with the enforceable policies of the state's approved program. 16 U.S.C. § 1456(c)(3). If the state objects to the applicant's certification, the activity can go forward only if the Secretary of Commerce determines that the activity is consistent with the objectives of the CZMA or is otherwise necessary in the interest of national security. Section 307(c)(3) applies to the approval of lessees' exploration plans and to their development and production plans, but not to the processing of requests for lease suspensions.

In the series of transactions from which this case arose, the Mineral Management Service ("MMS") of the Department of the Interior granted a total of 40 leases off the coast of California to a number of separate operators. Thirty-five of those leases are at issue in this appeal. With one exception, the leases were all granted between 1979 and 1984; the one

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

exception was a lease granted in 1968. The leases authorized the grantees to explore and develop oil and gas resources under the OCSLA. In consideration for their exploration and development rights, the lessees paid upfront "bonuses" to the government. Approximately $1.1 billion was paid as consideration for the leases at issue in this case. In addition, the lease agreements provided that the lessees would make annual rental payments and would pay royalties to the federal government on any resources produced. The plaintiffs in this case are either the original lessees or their successors-in-interest. Section 1 of each lease agreement incorporated by reference those statutes that were in effect at the time the lease agreements were executed. Except for the one lease granted in 1968, the incorporated statutes included the CZMA and the National Environmental Policy Act ("NEPA"), Pub.L. No. 91-190, 83 Stat. 852 (1970), codified at 42 U.S.C. § 4331 *et seq.*

*3 The Interior Department initially held auctions for the oil and gas leases without making a determination under the CZMA that the sales were consistent to the maximum extent practicable with California's coastal management program. The Department did so because it regarded the sales of leases in the outer continental shelf as not "directly affecting" the coastal zone and therefore not triggering the provisions of the then-applicable version of section 307(c)(1) of the CZMA. The State of California filed suit in federal court challenging the Department's interpretation of the statute. That issue ultimately reached the Supreme Court, and in 1984 the Court upheld the Department's position in *Secretary of the Interior v. California*, 464 U.S. 312 (1984).

In 1990, Congress amended section 307(c)(1) of the CZMA, changing the statute in ways that are of central importance to this case. First, Congress altered the coverage of the statute from applying to activity that "directly affect[s]" the coastal zone to applying to "each ... activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone."16 U.S.C. § 1456(c)(1). The Conference Report on the amendments indicated that the change was designed to overturn the Supreme Court's decision in the *California* case and "to make clear that the outer Continental Shelf oil and gas lease sales are subject to the requirements of section 307(c)(1)."H.R.Rep. No. 101-964, at 970 (1990) (Conf.Rep.), *as reprinted in* 1990 U.S.C.C .A.N. 2374, 2675. The Conference Report added: "The amended provision establishes a generally applicable rule of law that *any* federal agency activity (regardless of its location) is subject to the CZMA requirement for consistency if it will affect any natural resources, land uses, or water uses in the coastal zone. No federal agency activities are categorically exempt from this requirement."*Id.* (emphasis in original).

The 1990 amendments also required each federal agency carrying out an activity subject to section 307(c)(1) to provide a "consistency determination" to the relevant state agency before final approval of the federal activity. 16 U.S.C. § 1456(c)(1)(C). Under regulations promulgated pursuant to the 1990 amendments, the state agency has 60 days within which to submit a response to the federal consistency determination, detailing any objections the state may have to that determination. 15 C.F.R. §§ 930.36(b)(1), 930.41, 930.43. If the state agency objects, the federal agency must attempt to reconcile the differences, *id.* §§ 930.43(d), 930.44 (mediation mechanisms), but in any event the federal agency can ultimately submit a final notice explaining its conclusion that the activity in question is consistent with the state's coastal management plan, *id.* § 930.43(d). At that point, the state's recourse, if it is dissatisfied with the federal agency's response, is to sue to enjoin the federal agency from proceeding with the federal activity in question. The court must then determine whether the federal activity is in compliance with the statutory requirement that the federal activity in question be carried out in a manner consistent with state management programs to the maximum extent practicable. If the court finds that the federal activity does not satisfy

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

that requirement, the activity can continue only if the President, upon written request from the Secretary of the Interior, exempts the challenged elements of the federal agency activity from compliance with the statutory requirement. That override procedure can be employed only if the President determines that the proposed activity in question "is in the paramount interest of the United States."16 U.S.C. § 1456(c)(1)(B).

*4 Following the enactment of the 1990 CZMA amendments, both MMS and the lessees took the position that, although consistency determinations were now required prior to the sale of leases authorized by the OCSLA, consistency determinations were not required before granting lease suspensions under the OCSLA. Accordingly, in the early 1990s the lessees continued their development activities on the leased properties, which included preparing and submitting both exploration plans and development and production plans to MMS for its approval. Throughout the period following the execution of the leases, the terms of the leases were extended by numerous suspensions, some requested by the operators and some directed by MMS. In 1992, MMS directed suspensions in order to conduct the California Offshore Oil and Gas Energy Resources ("COOGER") study, which was designed to help MMS evaluate the operators' exploration and development plans, as well as to provide local governmental entities in California with information regarding activities on the leased properties. The lessees paid two-thirds of the cost of that study, and MMS paid the rest. When the COOGER study was nearing completion in December 1998, MMS informed the lessees that the directed suspensions would end on June 30, 1999, and it instructed them to submit any further requests for suspensions by May 15, 1999.

The operators submitted suspension requests for each of the leases, and on November 12, 1999, MMS granted suspensions for most of the leases that are at issue in this case. The suspensions ranged from 19 to 45 months in length. MMS determined that four of the leases had expired by 1999. That decision was challenged through an administrative appeal to the Interior Board of Land Appeals, and those four leases are therefore not involved in this appeal. According to the trial court, none of the leases at issue here have produced oil or gas in paying quantities. *Amber I*, 68 Fed. Cl. at 540.

Immediately after MMS granted the requested suspensions, the State of California filed suit against the Secretary of the Interior in the United States District Court for the Northern District of California. The state alleged that the Secretary could not lawfully grant lease suspensions under the OCSLA without first performing the consistency determination required by the 1990 amendments to section 307(c)(1) of the CZMA. On June 20, 2001, the district court ruled that the 1990 CZMA amendments required the Secretary of the Interior to perform a consistency determination prior to granting the requested suspensions. *California v. Norton*, 150 F.Supp.2d 1046, 1053 (N.D.Cal.2001) ("*Norton I*"). The court also held that MMS was required to provide an explanation of why it did not have to prepare an environmental assessment or an environmental impact statement under NEPA. *Id.* at 1057.As a remedy, the district court in *Norton I* ordered MMS to set aside its approval of the requested suspensions of the 36 leases as to which MMS had issued suspensions and to direct suspensions of those leases "for a time sufficient for it to provide the State of California with a consistency determination in compliance with CZMA § 1456(c)(1) and its implementing regulations."*Id.* at 1057-58.The court also ordered that "before again granting these lease suspensions, MMS shall provide a reasoned explanation for its reliance on the categorical exclusion [from the provisions of NEPA] and the inapplicability of the extraordinary circumstances exceptions."*Id.* at 1058.

*5 MMS complied with the district court's order on July 2, 2001, by revoking the granted suspensions and replacing them with directed suspensions,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

which resulted in the cessation of all activities at the lease locations. Notwithstanding that action, MMS maintained that it was not required to perform consistency determinations and issue NEPA explanations before granting the requested lease suspensions, and it undertook to appeal the district court's ruling to the Ninth Circuit.

MMS informed the lessees by letter that it would begin work on the consistency determinations and that, given the 90-day notice requirement under the regulations before an agency can take final action, the earliest it could expect the process to be completed was by December 2001. MMS subsequently reconsidered its position, however, and decided not to prepare the consistency determinations and the NEPA explanations pending resolution of the appeal of the *Norton I* decision. The lessees protested that course of action by letter on August 31, 2001, and again on September 21, 2001. Over the lessees' objections, however, MMS decided that it would not take those steps until the appeal was resolved.

On January 9, 2002, the lessees filed this action in the Court of Federal Claims, asserting that the application of the 1990 CZMA amendments to their leases constituted a material breach of the lease agreements that entitled them to rescission of the leases and restitution of the payments they had made under the lease agreements. Several months after that action was filed, the Ninth Circuit affirmed the district court's decision in *Norton I. California v. Norton,* 311 F.3d 1162 (9th Cir.2002) ("*Norton II* "). Following the appellate court's decision, the case was remanded to the district court. After additional briefing, the district court issued an injunction requiring MMS to perform the consistency determinations that the Ninth Circuit had held to be required under the CZMA before granting the requested suspensions. At MMS's request the lessees provided the requisite information for the consistency determinations that MMS was ordered to perform in the *Norton I* case.

In 2005, MMS determined that the updated suspension requests were consistent with California's coastal management plan. However, California objected to MMS's consistency determinations and pointed out a number of alleged deficiencies underlying those determinations. During the same year, MMS prepared environmental assessments in response to the district court's ruling on the NEPA challenge to the granted suspensions. In those environmental assessments, MMS found that the requested suspensions had no significant impact on the environment. Several environmental groups challenged the adequacy of the analysis in the environmental assessments, and in August 2005 the district court held MMS's analysis to be insufficient and required MMS to conduct an "adequate NEPA analysis on lease suspension," which the trial court in this case interpreted to require MMS to prepare an environmental impact statement relating to the granting of the requested suspensions.

*6 Shortly after the district court's ruling in August 2005, the Court of Federal Claims granted partial summary judgment of liability with respect to 36 of the offshore leases at issue in this case. The court ruled that Congress's enactment of the 1990 amendments to the CZMA constituted an anticipatory repudiation of the lease agreements. The court reached that conclusion because it found that the 1990 amendments established new statutory requirements that deviated significantly from the procedures and standards that were in effect when the leases were executed, and that the statutory imposition of new procedures and standards violated section 1 of the lease agreements.

According to the court, the government breached the lease agreements in 2001 when it revoked the requested suspensions and replaced them with directed suspensions. That breach was material, the court found, because the effect of the new procedures and standards was to order an indefinite suspension of the lessees' activities on the leased properties, with no indication as to when, if ever, exploratory and preparatory activities could resume under the lessees' requested suspensions. Although the court acknowledged that, "even before the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Norton* decisions, the lessees were not guaranteed every suspension they requested," the court explained that the lessees "were entitled to have such requests acted upon by MMS pursuant to the OSCLA and its implementing regulations," as set forth in section 1 of the leases. *Amber I,* 68 Fed. Cl. at 547.

Because it found that the 1990 CZMA amendments constituted a repudiation of the contracts, the trial court invoked the general rule in repudiation cases that the non-repudiating party is entitled to restitution "for any benefit that he has conferred on the repudiating party."*Amber I,* 68 Fed. Cl. at 544, quoting *Restatement (Second) of Contracts* § 373 (1981). As a remedy, the trial court ordered the government to pay restitution to the plaintiffs in the amount of more than $1.1 billion dollars. The judgment represented the return of the funds the plaintiffs or their predecessors-in-interest had paid in the form of upfront bonus payments as consideration for the rights associated with the offshore leases. The trial court, however, denied the lessees' request to recover additional sums representing the sunk costs that the plaintiffs or their predecessors-in-interest had paid to exploit the leases before work was stopped by the directed suspensions that were ordered following the district court's ruling in the *Norton* litigation. The court ruled that those costs did not confer any benefit on the government and could be recovered, if at all, only on a reliance or expectancy theory of damages, which the plaintiffs had chosen not to advance. *Amber II,* 73 Fed. Cl. at 747-52.[FN1]

FN1. Although the trial court entered summary judgment relating to 36 of the 40 leases on which this action was brought, the government subsequently moved for reconsideration as to one of the leases, and administrative proceedings are still pending as to the remaining four. A final judgment under Rule 54(b) of the Rules of the Court of Federal Claims was therefore entered only as to 35 leases.

II

The government does not dispute that MMS entered into commercial contracts with the lessees, and it does not invoke any special rule applicable to government contract cases, such as the "sovereign acts doctrine," that would entitle the government to treatment different from that accorded to private contracting parties. Accordingly, the government's rights and duties under its contracts with the lessees in this case "are governed generally by the law applicable to contracts between private individuals."*Mobil Oil Exploration & Producing Se., Inc. v. United States,* 530 U.S. 604, 607 (2000), quoting *United States v. Winstar Corp.,* 518 U.S. 839, 895 (1996) (plurality opinion). Nonetheless, the government contends that under the law applicable to contracts between private individuals, (1) Congress's enactment of the 1990 CZMA amendments did not constitute a repudiation of the existing lease agreements regarding oil and gas rights off the California coast, and (2) no governmental conduct constituted a breach of the lease agreements that entitles the plaintiffs to restitution of the entirety of the funds that they or their predecessors paid for the leases.[FN2]

FN2. The leases at issue in this case have not been affected by the moratoriums on offshore drilling because they do not apply to existing leases. *See, e.g.,*Pub.L. No. 110-161, Div. F, Title I, §§ 104-05, 121 Stat. 1844, 2118 (2007); *Statement on Outer Continental Shelf Oil and Gas* Development, 26 Weekly Comp. Pres. Doc. 1006 (June 26, 1990).

*7 Repudiation is defined as a "statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach."*Restatement (Second) of Contracts* § 250. "Total breach," in turn, is defined as a breach that "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

based on all his remaining rights to performance."*Id.* § 243; *see Mobil Oil,* 530 U.S. at 608.

In finding that the enactment of the 1990 CZMA amendments effected a repudiation of the government's obligations under the lease agreements, the trial court followed the reasoning of the Supreme Court in *Mobil Oil,* which involved offshore oil and gas leases similar to those at issue here. In *Mobil Oil,* two oil companies that had leases off the coast of North Carolina sought restitution of their upfront bonus payments of about $156 million, contending that the enactment of the Outer Banks Protection Act ("OBPA") constituted a repudiation of their lease agreements. 530 U.S. at 607, 613. Under the original agreements, the Department of the Interior had to approve any exploration plan that satisfied the OCSLA's requirements within 30 days. The OBPA, however, placed a temporary moratorium on any further offshore work for at least 13 months and required new analysis reports to be completed.*Id.* at 614.The Supreme Court ruled that section 1 of the lease agreements constituted a promise by the government not to impose any requirements on the exploitation of the leases beyond those contained in the statutes that were in effect when the leases were executed and regulations were promulgated under those statutes. *Id.* at 616.Because the OBPA imposed new requirements inconsistent with the terms to which the parties had agreed in section 1 of the lease agreements, the Supreme Court held that the lease agreements had been breached. *Id.* at 618.The breach was material, the Court held, because it constituted a "modification" of the procedures incorporated by reference into the lease agreements that was "not technical or insubstantial." *Id.* at 621.

Section 1 of the lease agreements at issue in this case is identical to section 1 of the lease agreements at issue in *Mobil Oil.*Consequently, applying the Supreme Court's analysis of that provision of the leases, we treat the lease agreements as incorporating by reference any statutes or regulations that were in effect at the time of the leases' execution and any regulations promulgated pursuant to those statutes. Because the last of the subject leases was executed in 1984, all of the leases (except for the one executed in 1968) incorporated the CZMA by reference, but none of them incorporated the 1990 CZMA amendments. With reference to the Supreme Court's analysis in *Mobil Oil,* we therefore must determine whether the 1990 CZMA amendments are sufficiently similar to the provisions of the OBPA that were at issue in *Mobil Oil* so as to render the 1990 CZMA amendments, and MMS's conduct pursuant to those amendments, either a repudiation of the lease agreements at the time of enactment or a total breach of those agreements at the time MMS revoked the granted suspensions in July 2001.

A

***8** The government first contends that the 1990 CZMA amendments did not constitute a repudiation of the lease agreements because the parties did not treat the amendments as such immediately upon their enactment. For that proposition, the government cites *Dingley v. Oler,* 117 U.S. 490 (1886), which characterized repudiation as a "distinct and unequivocal absolute refusal to perform the promise" that "must be treated and acted upon as such by the party to whom the promise was made."*Id.* at 503;*see also United States v. DeKonty Corp.,* 922 F.2d 826, 828 (Fed.Cir.1991). The government points out that both MMS and the lessees took the position throughout the 1990s that the 1990 CZMA amendments did not apply to the lessees' suspension requests, and thus this case does not satisfy the requirements that the repudiation must be an unequivocal refusal to perform and must be treated as such by the promisee.

Reasoning by analogy from the Supreme Court's decision in *Mobil Oil,* the trial court viewed the 1990 CZMA amendments as a repudiation of the lease agreements, just as the Supreme Court in *Mobil Oil* treated the enactment of the OBPA as a re-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

pudiation of the lease agreements in that case. In *Mobil Oil,* the Supreme Court pointed out that the OBPA required the Department of the Interior "to impose the contract-violating delay." 530 U.S. at 618. Moreover, promptly after the enactment of the OBPA, the Department of the Interior advised the lessees that it intended to follow the prescriptions of that Act, thereby expressly "communicating its intent to violate the contracts."*Id.* at 620.

With regard to the issue of repudiation by legislation, this case is different from *Mobil Oil* in an important respect. Not only had the parties in this case been performing under the lease agreements for years before the 1990 CZMA amendments were enacted, but they continued to perform under the lease agreements for another 11 years after the enactment of the 1990 amendments on the assumption that the 1990 amendments did not apply to lease suspensions.

Unlike in *Mobil Oil,* where the effect of the new statute was obvious and was recognized by the government immediately, in this case it was not until the district court entered its injunction in *Norton I* that MMS responded (as it was compelled to do) by revoking the granted suspensions. That was the first time the 1990 CZMA amendments had any effect on the parties' performance under the lease agreements. In fact, in their complaint in this case, the plaintiffs allege that the 1990 enactment "did not clearly communicate the Government's intent to deviate significantly from the existing procedures and standards so as to materially delay or interfere with the lessees' operations."To the contrary, according to the complaint, "[w]hen the 1990 amendments were enacted, neither the Government nor the Lessees believed that the Amendments had such an effect, or that the Amendments would have any impact on the Lessees' right to obtain lease suspensions."For that reason, it would be unrealistic to treat the 1990 CZMA amendments as a governmental repudiation of the lease agreements as of the time of enactment.

*9 The government-in the person of MMS-continued to perform under the lease agreements as if the CZMA amendments did not apply to the suspensions at all. The trial court made essentially the same point when it observed that it "would have been absurd for the plaintiffs to have treated the adoption of the amendments as a breach in 1990" because even MMS "agreed with plaintiffs through at least 1999 that the amendment should not be construed to apply to lease extensions."*Amber II,* 73 Fed. Cl. at 750. Because the parties to the lease agreements all treated the agreements as unaffected by the 1990 CZMA amendments, we conclude that the 1990 enactment itself did not constitute either a breach or an anticipatory repudiation that gave the lessees a right to restitution at that time. It was not until the court's decisions in the *Norton* litigation that the effect of the 1990 amendments became clear and that MMS began treating the amendments as affecting its suspension decisions. It was only at that point that the government can be said to have repudiated the lease agreements by putting into practice the new rules applicable to the availability of requested suspensions.

While court decisions construing statutes are typically viewed as not changing the law but merely announcing what the law has meant since its enactment, that characterization of a court's role in statutory interpretation does not provide useful practical guidance in a case such as this one. It would ignore the reality of the situation in this case to suggest that the interpretation of the 1990 CZMA amendments, as ultimately announced by the courts more than a decade later, was clear to the parties from the moment of enactment or that the governing principles of contract law should be applied as if it were. The fact of the matter is that, right or wrong, the parties interpreted the 1990 CZMA amendments in a way that would not have resulted in a breach. Only after the rulings of the district court and the court of appeals in the *Norton* litigation did it become apparent to the parties that the 1990 CZMA amendments applied to requests for suspensions of the leases at issue in this case. Therefore, we think the best characterization of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

sequence of events is that the central act on which this case turns is not the enactment of the 1990 CZMA amendments, but the injunction entered by the district court effectively requiring MMS to apply the provisions of the 1990 CZMA amendments to the leases in question and MMS's implementation of the decision of the district court, as affirmed by the court of appeals. For that reason, we disagree with the trial court that the enactment of the 1990 CZMA amendments constituted a repudiation of the lease agreements by the government and that the lessees are entitled to the remedy of restitution because of that act of repudiation.

That conclusion does not, however, establish that the remedy of restitution was unjustified. The trial court based its decision to grant restitution as a remedy at least in part on its conclusion that the government's subsequent conduct, in July 2001, when it revoked the requested suspensions and replaced them with directed suspensions, constituted a repudiation or a total breach of the lease agreements. If that is so, the trial court's restitution remedy could be justified on that ground without regard to the correctness of the court's ruling on the issue of anticipatory repudiation in 1990. We therefore now turn to the question whether MMS's conduct in July 2001 constituted a repudiation of the lease agreements or a total breach of the government's obligations under those agreements.

B

***10** The trial court held that the post-agreement statutory requirement that MMS perform consistency determinations before granting suspension requests resulted in a total breach of those agreements when, as a result of the decision in *Norton I,* MMS revoked the requested suspensions and imposed directed suspensions in their place. The government advances several arguments as to why the 1990 statutory change, as construed and implemented by the courts, did not have that effect, and why there was no breach of the lease agreements in this case.

The linchpin of each of the government's arguments is that the lessees had no "clear, unqualified right" to be granted suspensions before the 1990 CZMA amendments, and that the 1990 amendments did not abrogate any such right. *See Cienega Gardens v.. United States,* 331 F.3d 1319, 1334 (Fed.Cir.2003). The lessees had no clear, unqualified right to the requested suspensions, the government argues, because from the time the lease agreements were entered MMS had discretion to deny requests for suspensions if it concluded that the suspensions were not "in the national interest." 43 U.S.C. § 1334(a)(1); *see also*30 C.F.R. § 250.12(b)(3)(i) (1980) (requiring MMS to determine if a lease suspension was in the national interest after considering "[a]ll known significant national benefits and national costs"); 30 C.F.R. § 250.110 (1999) (permitting lease suspensions at the request of the lessee if the suspension "is in the national interest" and is necessary (1) to "facilitate proper development of a lease"; (2) to allow lessees reasonable time for construction, drilling, and arrangement of sales contracts; (3) to avoid the requirement of continued operations that would result in premature abandonment of a well; or (4) to ensure that the operation is economical). Because MMS had discretion to deny lease suspensions even before 1990, the government claims that the lessees cannot demonstrate that the 1990 CZMA amendments voided any clear, unqualified right to such suspensions, even if the 1990 amendments added significantly to the burdensomeness of the procedure necessary to obtain the requested suspensions. The government contends that, unlike in the instant case, the breach in *Mobil Oil* concerned just such a "clear" right, i.e., the lessees' right to have MMS issue "within thirty days" an approval of a submitted exploration plan that satisfied the OCSLA's requirements. Because the lessees in this case had no such clear right to have their suspension requests granted, the government argues, the breach analysis in *Mobil Oil* is inapplicable here.

We reject the government's argument because it is based on what we regard as an incorrect interpreta-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tion of *Mobil Oil.*The Supreme Court in *Mobil Oil* acknowledged that the lease agreements in that case did not give the lessees any ultimate rights to develop the leases or produce oil and gas, and that granting permission for ongoing exploration and development was clearly a matter subject to the discretion of the Department of the Interior. *See*530 U.S. at 620. Nonetheless, the *Mobil Oil* Court concluded that section 1 of the leases in that case, which was identical to section 1 of the leases in this case, contained a guarantee as to what procedures the Interior Department would follow in exercising that discretion, and that a change in those procedures deprived the lessees of an important benefit of their bargain.

***11** The *Mobil Oil* Court observed that section 1 of the leases provided that the lease agreement would not be "subject to future regulations promulgated under other statutes, such as new statutes like OBPA."530 U.S. at 616. Otherwise, the Court explained, "[w]ithout some such contractual provision limiting the Government's power to impose new and different requirements, the companies would have spent $158 million to buy next to nothing."*Id.* Section 1 of the lease agreements at issue in this case promised the same thing. Because the 1990 CZMA amendments, as interpreted by the courts in the *Norton* litigation, imposed significantly more burdensome requirements for granting lease suspensions, the new statute in this case breached the lease agreements in the same way as the new statute in *Mobil Oil.*

It is true, as the government contends, that the Court in *Mobil Oil* devoted considerable attention to the requirement of the OCSLA that the government act on the lessees' exploration plans within 30 days. That requirement, which the Court characterized as in effect incorporated into the lease agreements, was identified as a right of the lessees that was clearly breached by the enactment of the OBPA. The government is incorrect, however, in asserting that the Supreme Court's analysis of the breach in *Mobil Oil* focused solely on the 30-day approval provision, or that the Court suggested that without the violation of that right there would have been no breach.

By itself, the 30-day approval requirement in *Mobil Oil* was not what the lessees bargained for. Instead, they bargained for a right to explore for and extract oil and gas from the leases, subject to a particular statutory regime. It was the overall change in that regime, not just the overriding of the 30-day approval provision, that the Court regarded as the breach, as the Court's opinion makes clear.

In *Mobil Oil,* the government made an argument closely analogous to the one it is making in this case, and the Supreme Court rejected that argument for reasons that are equally applicable here. The government argued that even before the enactment of the OBPA, MMS could have invoked its broad regulatory authority to postpone consideration of the lessees' exploration plans, notwithstanding the 30-day approval period set forth in the OCSLA. The Court explained that the contracts in *Mobil Oil* contained "certain other statutory provisions and regulations that, in the Government's view, granted Interior the legal authority to refuse to approve the submitted Exploration Plan, while suspending the leases instead."530 U.S. at 615. However, the Court refused to view those other sources of statutory and regulatory authority broadly and in the abstract, so as to negate the pre-OBPA right to a prompt decision on the lessees' exploration plans. In particular, the Court pointed out that the "fatal flaw" in the government's argument arose out of the Interior Department's determination that the exploration plan "fully complies" with pre-OBPA legal requirements, including the requirements of the OCSLA. *Id.* at 618.Moreover, the Court observed that, when it imposed the lengthy approval delay in *Mobil Oil,* the Interior Department "did not rely upon any of the regulations to which the Government now refers."*Id.*

***12** This case is like *Mobil Oil* in both of those respects. Although the government cites the OCSLA and its regulations as authorities on which it could

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

have based its refusal to grant the lessees' requested suspensions, the revocation of the suspensions was in fact based on the 1990 CZMA amendments, not on the preexisting version of the OCSLA. And, as in *Mobil Oil,* the Interior Department had already determined that the suspensions in this case satisfied the "national interest" requirements of the OCSLA because MMS had granted the suspensions under the OCSLA, and it revoked those suspensions only after the district court held that the 1990 CZMA amendments applied to the grant of suspensions. Thus, the Supreme Court's analysis in *Mobil Oil* compels us to conclude that the hypothetical authority of MMS to invoke other grounds to deny requested suspensions is not sufficient to avoid a finding of breach. That is so at least where the actual ground for revoking the granted suspensions and imposing directed suspensions in their place was the 1990 CZMA amendments which, like the provisions of the OBPA in *Mobil Oil,* were not incorporated into the lease agreements.

There is a further problem with the government's argument that the decision in *Mobil Oil* turned on the breach of the "clear, unqualified right" to have the agency approve a compliant exploration plan within 30 days. The Supreme Court justified its conclusion that the enactment of the OBPA resulted in a breach not only because of the violation of the 30-day approval provision of the OCSLA, but also because the OBPA "changed pre-existing contract-incorporated rights in several ways."530 U.S. at 619. In particular, the court wrote that the OBPA

> delayed approval, not only of an Exploration Plan but also of Development and Production Plans; and it delayed the issuance of drilling permits as well. It created a new type of Interior Department environmental review that had not previously existed, conducted by the newly created Environmental Sciences Review Panel; and, by insisting that the Secretary explain in detail any differences between the Secretary's findings and those of the Panel, it created a kind of presumption in favor of the new Panel's findings.

*Id.* Those changes, the Court wrote, "were changes of a kind that the contracts did not foresee. They were changes in those approval procedures and standards that the contracts had incorporated through cross-reference."*Id.*

The changes effected by the 1990 CZMA amendments are of the same kind and had the same effect of creating a more burdensome regime for obtaining granted suspensions, even though granted suspensions were potentially of great importance to preserving the value of the leases. First, the CZMA amendments required the Interior Department to conduct consistency determinations in connection with requested suspensions under a new and more exacting standard (consistency "to the maximum extent practicable with the enforceable policies of approved State management programs"). Moreover, even if the Interior Department could readily complete the consistency determinations, the Department would have had no control over whether California would object to the consistency determinations and ultimately pursue its rights to contest the grant of suspensions by bringing suit under the Administrative Procedure Act, thereby completely derailing the lessees' ability to apply for and receive lease suspensions. The government counters that California has always had the option to sue under the Administrative Procedure Act to seek to enjoin the granting of the requested suspensions. The point, however, is that before the 1990 CZMA amendments, California could not have sued to block the lease suspensions on the ground that the consistency determinations were contrary to the state's coastal management plan. The 1990 CZMA amendments therefore effectively gave California significantly greater substantive rights in challenging the suspensions based on alleged inconsistency with its coastal management plan. By enhancing California's right to challenge the requested suspensions, the 1990 amendments limited the lessees' prospects of obtaining those suspensions. The procedures put into place by the 1990 CZMA amendments thus altered the lessees' rights in a way that, when put into effect by the injunction in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Norton* case, resulted in a breach of the original lease agreements.

*13 There is some appeal to the government's contention that because the lessees had no enforceable right to granted suspensions before the 1990 CZMA amendments, that enactment did not deprive the lessees of any rights and thus did not breach the lease agreements. That argument, however, is not only contrary to the approach employed by the Supreme Court in *Mobil Oil*, but reflects an overly formalistic view of the value of the lease agreements to the lessees. As the government made clear at oral argument, it would take the same position if the 1990 CZMA amendment made it essentially impossible to obtain granted suspensions under any circumstances, even though the likelihood of obtaining suspensions under the pre-1990 administrative regime may have been a significant consideration inducing the lessees to enter into the leases. It does not reflect the realities of the situation to say that the lessees were not worse off with respect to their interest in obtaining suspensions after the 1990 CZMA amendments than they were before. We think the trial court put the matter well when it summarized the effect of the 1990 statute as follows:

> We recognize that, even before the *Norton* decisions, the lessees were not guaranteed every suspension they requested. At that time, however, the lessees were entitled to have such requests acted upon by MMS pursuant to the OCSLA and its implementing regulations. The lessees bargained for these procedures and standards by incorporating them into the leases via Section 1.... Section 1 erects the gateway through which the lessees must pass in order to suspend their leases and preserve their rights. The applicability of the amendments to § 307(c)(1) has narrowed this gateway.

*Amber I*, 68 Fed. Cl. at 547-58.

The 1990 CZMA amendments thus made it more difficult for the lessees to continue the exploration and development of their leases. As the *Mobil Oil* Court explained, "under the contracts, the incorporated procedures and standards amounted to a gateway to the companies' enjoyment of all other rights. To significantly narrow that gateway violated material conditions in the contracts."530 U .S. at 621. The gateway here has likewise been narrowed because the procedure for obtaining the granting of lease suspensions was made subject to another environmental assessment standard-the consistency determinations required by CZMA. For that reason, we agree with the trial court that the 1990 CZMA amendments, as applied at the time of the revocations of the requested suspensions in July 2001 and thereafter, amounted to a breach of the lease agreements at issue in this case.

C

The government next argues that even if it breached the lease agreements, the breach was not sufficiently material to justify the remedy of restitution because the lessees would have experienced the same delays that they faced in this case even if section 307(c)(1) of the CZMA had never been amended. The government's argument focuses on its obligations under NEPA, which provided part of the rationale for the courts' rulings in the *Norton* litigation. The delays in this case, according to the government, "are just as attributable to NEPA as they are to the amended section 1456(c)(1)."

*14 The government points out that MMS is authorized under its regulations to direct lease suspensions where such suspensions are necessary to complete NEPA environmental impact statements or to implement judicial decrees. 30 C.F.R. §§ 250.110(b)(4), (7). Because the decision in *Norton I* was predicated not only on the 1990 CZMA amendments but also on the requirements of NEPA, which MMS had not satisfied, the government contends that the lessees would have been no better off in 2001 even if the 1990 CZMA amendments had never been enacted.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The trial court rejected the government's NEPA-based argument, concluding that the government had "failed to demonstrate any meaningful redundancy between the procedures of consistency determinations and NEPA analysis for lease suspension requests."*Amber I,* 68 Fed. Cl. at 553. Although acknowledging that the procedures required by amended section 307(c)(1) of the CZMA and by NEPA both require "some type of environmental assessment," 68 Fed. Cl. at 553, the trial court noted that NEPA does not require compliance with state coastal management plans. Thus, according to the court, despite the preexisting requirements of NEPA, the enactment of amended section 307(c)(1) of the CZMA created "new 'procedures and standards' that 'deviate significantly' from those already in existence" at the time the leases were executed, and therefore gave rise to a material breach under the analysis used by the Supreme Court in *Mobil Oil. Id.* That conclusion is further supported by regulations promulgated by the Department of Commerce, which state that "a Federal agency's federal consistency obligations under the [CZMA] are independent of those required under NEPA and are not necessarily fulfilled by the submission of a NEPA document."15 C.F.R. § 930.37.

With respect to the government's argument that the requirements of NEPA have been as responsible as amended section 307(c)(1) of the CZMA for the revocation of the requested suspensions and the ensuing delay, the trial court stated that even assuming the delay resulting from the section 307 procedures is no longer than the delay caused by NEPA, any parallel delay "does not lessen the material impact of § 307(c)(1) on lease suspension procedures."*Amber I,* 68 Fed. Cl. at 553. The trial court noted that under amended section 307(c)(1), the MMS, before granting a suspension request, "must now comply with new consistency determination procedures."*Id.* Furthermore, the court observed, "the agency's decision to grant a suspension request is subject to a stricter standard-whereas the decision to suspend was once solely the agency's, now such a decision is subject to the scrutiny of the relevant coastal state."*Id.* Finally, the court stated that the change in procedures resulting from the 1990 CZMA amendments "has created a new risk for lease cancellation."*Id.* Therefore, even though the decisions of the courts in the *Norton* litigation were based on NEPA as well as on section 307(c)(1), the court concluded that "the applicability of § 307(c)(1) has created an additional impediment to the grant of a requested suspension" and for that reason the application of section 307(c)(1) materially breached the lease agreements.*Id.*

***15** The government's argument is essentially one of causation. The breach in issue cannot be material, according to the government, because there is no showing that it would have led to more adverse consequences for the lessees than the NEPA requirements imposed by the courts in *Norton.*There are two problems with that argument, however. First, there is no showing that the burdens imposed on the lessees by the NEPA requirements identified by the courts in the *Norton* case are equivalent to (or more restrictive than) the burdens imposed by section 307(c)(1). In fact, as the trial court pointed out, NEPA on its face imposes significantly fewer restrictions on the agency than the amended version of section 307(c)(1). As noted, NEPA is merely a procedural statute-it requires the agency to consider the environmental effects of its actions, but does not grant rights to the states or anyone else to affect or alter agency action. By contrast, section 307(c)(1) accords states the right to object to the granting of a requested suspension on substantive grounds, as it gives the states the right to a judicial remedy under the Administrative Procedure Act if the agency's activity has not been "carried out in a manner which is consistent to the maximum extent practicable" with state coastal management programs. 16 U.S.C. § 1456(c)(1)(A).

Second, the government's causation argument is quite similar to the causation analysis that this court employed in its decision in the *Mobil Oil* case and that the Supreme Court rejected when it reversed this court's judgment in that case. In our opinion,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

we held in part that the lessees in that case were not entitled to relief because we concluded that the enactment of the OBPA had essentially no effect on the lessees. That was because the lessees did not establish that they would have been able to obtain the necessary approvals for drilling and production even in the absence of the OBPA. *Marathon Oil Co. v. United States,* 177 F.3d 1331, 1338 (Fed.Cir.1999). The Supreme Court in *Mobil Oil* expressly rejected that analysis, holding that because the oil companies were not seeking damages for breach of the lease agreements, but instead were seeking restitution of their initial payments based on the government's repudiation of the agreements, "the law entitles the companies to that restitution whether the contracts would, or would not, ultimately have produced a financial gain or led them to obtain a definite right to explore."530 U.S. at 623-24.

Applying that aspect of the Supreme Court's analysis to this case, we reach the same conclusion: because the decisions in the *Norton* litigation, and MMS's conduct pursuant to those decisions, constituted a governmental repudiation of the lease agreements, and because the lessees are seeking restitution of their initial payments, not expectancy damages, it is irrelevant that other causes may also have prevented them from obtaining the requested suspensions. As the Supreme Court explained, in this context the lessees are not required to show that they would have been successful in obtaining the right to drill and would ultimately have profited from the leases.

D

***16** The government further argues that the lessees elected to continue performance under the lease agreements despite the enactment of the 1990 CZMA amendments and the initial ruling in the *Norton I* litigation, and therefore have waived their right to sue for restitution. As we have noted, the breach did not occur until after the decision in *Norton I.* Consequently, any actions taken by the lessees between 1990 and the 2001 ruling in *Norton I* cannot be understood as reflecting continued post-breach performance by the lessees or constituting an election to continue performance in spite of a breach.

Immediately after *Norton I,* the lessees sent MMS several letters asking the agency to perform the consistency analyses ordered by the district court, but MMS did not do so. That conduct also does not constitute an election, because it is well established that merely requesting assurance from the other party that it does not intend to breach the agreement does not constitute an election to continue performance and to forgo the right to sue the other party for breach. *Restatement (Second) of Contracts* § 257 ("The injured party does not change the effect of a repudiation by urging the repudiator to perform in spite of his repudiation or to retract his repudiation.").

The government next contends that the lessees made an election through their actions after the Ninth Circuit affirmed the district court's ruling in *Norton I.* On remand, the State of California and other plaintiffs in that case sought to force the Department of the Interior to perform the consistency analyses required by the 1990 CZMA amendments. Several of the lessees who had previously intervened in that case on the side of the Interior Department filed a motion in response to the government's opposition to the injunction, explaining their position that the Department "should have expeditiously issued" the consistency analysis required by the 1990 CZMA amendments "upon the Court's June 2001 decision."The government argues that the position the lessees took in their briefs at that time amounted to an election. The government's position is that the lessees were essentially asking the district court in the *Norton* litigation to order continued performance under their lease agreements. The district court subsequently entered the injunction, and MMS sent further requests to the lessees for information MMS claimed it needed in order to perform the analyses. The lessees submitted the in-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

formation under protest.

The trial court found that the lessees' actions did not constitute an election, and we agree. The lessees maintained a consistent position throughout the proceedings in the *Norton* litigation. They explained in their response to the Department's opposition to the injunction that they "allege that the United States is in material breach, and seek relief that the Leases be rescinded, and the United States provide restitution to the lessees."None of those filings manifested an intention to continue performance under the leases. The subsequent cooperation of the lessees after the *Norton I* injunction also does not qualify as continued performance, given that the lessees made clear that they were cooperating under protest. The doctrine of election does not allow court-ordered performance to count as an election, because the term "election" connotes a voluntary acceptance of a change in the contract.

E

*17 At the end of the day, we are persuaded that the *Mobil Oil* case is sufficiently similar to this one that the Supreme Court's analysis in that case governs this case and requires that we affirm the trial court's judgment. To be sure, as the government has pointed out and as we have discussed above, there are differences between this case and *Mobil Oil* that in some ways make this case a stronger case for the government and, correspondingly, a less compelling one for the lessees. In particular, the breach in *Mobil Oil* was at least somewhat more clear-cut, and unlike in *Mobil Oil* the parties in this case had performed for many years under the lease agreements before the statutory interpretation that led to the breach. Nonetheless, we are persuaded that the Supreme Court's analysis in *Mobil Oil* extends to the circumstances of this case. If we are wrong, and the differences between this case and the Supreme Court's decision in *Mobil Oil* are significant enough to call for a different result, we think it is preferable for the members of that Court to distinguish or limit the scope of their precedent than for us to do it for them.

III

In a challenge to the amount of the restitution award, the government argues that the trial court's order requiring the return of the full amount of the upfront lease bonus payments should be overturned. The government argues that restitution is a "limited remedy" that exists primarily to make "the non-breaching party whole." *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001). Accordingly, the government contends that the restitutionary award in this case should be limited to the amount of money that the current lessees paid to purchase the lease agreements rather than the amount the original lessees paid as upfront bonus payments. To award the current lessees the upfront bonus payments, according to the government, would be an unfair "windfall," contrary to this court's precedent in *Admiral Financial Corporation v. United States,* 378 F.3d 1336 (Fed.Cir.2004); *Hansen Bancorp, Inc. v. United States,* 367 F.3d 1297 (Fed.Cir.2004); and *LaSalle Talman Bank, F.S.B. v. United States,* 317 F.3d 1363 (Fed.Cir.2003).

The return of upfront payments is ordinarily appropriate in cases of repudiation and was explicitly endorsed in *Mobil Oil:*"The oil companies do not seek damages for breach of contract. They seek restitution of their initial payments. Because the Government repudiated the lease contracts, the law entitles the companies to that restitution...."530 U.S. at 623;*see also* E. Allan Farnsworth, *Farnsworth on Contracts* § 12.19 (3d ed. 2004) ("Restitution as remedy for breach ... is limited to cases in which the injured party has a claim for damages for total breach."); John E. Murray, Jr., *Corbin on Contracts* § 1104 (rev. ed. 2007) ("In the case of a repudiation there is no doubt that the injured party has a choice of remedies: (1) an action for damages ... [or] (2) restitution of such value as he may have already conferred upon the repudiator."). The only question before us is whether restitution of the en-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tire upfront bonus award is improper for plaintiffs who were not the original purchasers of the leases.

***18** The trial court ruled, and we agree, that the new leaseholders "stand in the shoes" of the original lessees. *See Farnsworth on Contracts* § 11.8; *Corbin on Contracts* § 51.1 ("Among the axiomatic phrases in contract law, the clear victor in the law of assignments is, 'The assignee stands in the shoes of the assignor.' "). The government argues, however, that the new leaseholders do not deserve restitution of the full amount of the upfront bonuses because they bought leases at a discount, and restitution would award them significantly more than they paid for the leases. That argument carries no weight, however, if the new leaseholders stand in the shoes of the original lease owners, as general principles of contract law dictate that they do.

The cases on which the government relies to support its "windfall" argument are not to the contrary, because they do not address the impact of a prior assignment on an award of restitution. *See Admiral Financial,* 378 F.3d at 1345 (noting that restitution would be a "windfall" where there were indications that the non-breaching party would have failed financially regardless of the breach); *Hansen,* 367 F.3d at 1318 (directing lower court to consider whether an award of restitution would make the non-breaching party better off than if the breach had not occurred); *LaSalle,* 317 F.3d at 1376-77 (affirming trial court's refusal to award damages on a restitution theory when the benefits to the breaching party were alleged to include accounting costs). Because we agree with the trial court that any benefits that would not have been a windfall to the original lessees cannot be considered a windfall to the assignees who are entitled to assert all the rights of the original lessees, we do not need to reach the lessees' argument that it would be an impermissible windfall to the government to allow it to retain a portion of the upfront bonus payments simply because the original lessees had transferred their interests in the leases for less than the amount they had originally paid for them.

The government makes the further argument that the trial court did not have jurisdiction to award restitution because equitable remedies against the government are not available under the Tucker Act, 28 U.S.C. § 1491(a). We have held, however, that because an award of restitution in a breach of contract case is a standard contract-based remedy, the Court of Federal Claims has jurisdiction to grant that form of relief. *See Acme Process Equip. Co. v. United States,* 347 F.2d 509, 530 (Ct.Cl.1965), *rev'd on other grounds,*385 U.S. 138 (1966) (restitution characterized as "an alternative remedy for breach of contract in an effort to restore the innocent party to its precontract status quo, and not to prevent the unjust enrichment of the breaching party").

Finally, the government argues that the original lessees could not have assigned the "right" to restitution because no breach occurred prior to the assignment of the contracts. The Restatement of Contracts acknowledges that it may not be permissible to assign "future" rights not yet possessed by the assignor. *Restatement (Second) of Contracts* § 321(2) ("a purported assignment of a right expected to arise under a contract not in existence operates only as a promise to assign the right when it arises and as a power to enforce it."). That principle does not apply in this context, however, because the right to enforce a contract does not come into existence upon breach. Even if breach is regarded as a condition precedent to the existence of the right to seek contract enforcement, such a conditional right is considered to pass along with the assignment. *See, e.g., Nashville Lodging Co. v. Fed. Deposit Ins. Corp.,* 934 F.Supp. 449, 456 (D.D.C.1996); *Restatement (Second) of Contracts* § 320 ("The fact that a right is ... conditional does not prevent its assignment before the condition occurs."). Thus, the assignment of a contract includes the assignment of the right to enforce the contract, which entitles the assignee to pursue all available contract remedies.

IV

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*19 In their cross-appeal, the appellees argue that the trial court erred by ruling that they could not recover any damages beyond the upfront bonus payments. The lessees sought return of their "sunk costs" of approximately $727 million that they expended in developing the offshore leases. We agree with the trial court that lessees cannot receive compensation for those "sunk costs" under a restitution theory of recovery.

The trial court initially denied recovery of the lessees' sunk costs on the ground that such a remedy would amount to recovery under a "reliance" theory. If the lessees elected that remedy, the court held, the government would be entitled to defend by showing that the leases would not have been profitable. The lessees accordingly elected not to pursue any damages based on their expectancy interests. *Amber II,* 73 Fed. Cl. at 740. After surveying various sources that describe the ways in which the restitution interest can be measured, the trial court concluded that it would be appropriate to grant restitution to the extent that the government received a "benefit." The court found that none of the sunk costs qualified as a benefit to the government, however, because even though those costs were "foreseeable and incurred pursuant to the contract," they "did not directly benefit the government in the same way as the upfront [lease bonus] payments."*Id.* at 746.The trial court reasoned that without knowing whether the leases would ultimately be revenue-generating, there would not be any way of knowing whether the exploratory activities actually conferred a benefit on the govern- ment.

On appeal, the lessees urge us to adopt a more expansive approach to the concept of "benefit." They argue that sunk costs "do constitute benefits to the Government for purposes of restitution by a breaching party, because they were incurred in fulfillment of contractual obligations."The contractual obligations that the lessees identify are those provisions of their leases that required them to act with "due diligence" in developing the oil and gas resources. *See*43 U.S.C. §§ 1337(b)(4) (describing "due diligence" requirements), 1344(b)(4); 30 C.F.R. subpart 250B. Failure of a lessee to act with due diligence could have resulted in lease cancellation or ineligibility to obtain future leases. 43 U.S .C. §§ 1334(c), 1334(a)(2)(C)(ii)(II), 1337(d). The lessees argue that their efforts to satisfy the due diligence requirements benefited the government because, if the efforts had been successful, the government would have received royalties from the resulting production.

The government responds that the due diligence requirements of the leases are not a sufficient basis for a restitution award because they do "not require the performance of any specific tasks or the expenditure of any specific amounts for exploration."The government argues that "at most, 'due diligence' requires only efficient and orderly exploration of a lease upon an agreed-upon schedule, as opposed to contractually required tasks and costs."

*20 This court has previously explained that "restitution is proper only where the contribution that the non-breaching party is seeking to recover was made in exact conformity with the literal terms of the contract; recovery may not be had where the plaintiff acted voluntarily, even if the action was taken with the intent to effectuate the spirit of the agreement."*Hansen,* 367 F.3d at 1306, describing *Landmark Land Co. v. Fed. Deposit Ins. Corp.,* 256 F.3d 1365, 1375 (Fed.Cir.2001). It appears clear that due diligence was a contractual obligation of the leases, and that the lessees' performance was therefore not strictly voluntary. The lessees had to perform ongoing exploratory activities pursuant to the requirements of the lease. Consequently, they can attempt to recover those costs even though the leases themselves did not specify precisely what actions the lessees were required to take. *See Landmark,* 256 F.3d at 1373 (where contract specified that plaintiffs had to make an initial contribution of "not less than" $20 million to the trust, plaintiffs were allowed to collect entire amount of initial contribution, not just the $20 million explicitly men-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

tioned in the contract).

Nonetheless, while the lessees may have been required to perform due diligence activities under their leases, the question remains as to how to value those activities. The lessees argue that restitution should be measured by the costs of the due diligence activities. As the trial court noted, however, there are different ways to measure restitution, including two methods that this court has recognized as appropriate. *See, e.g., Landmark,* 256 F.3d at 1372 (describing "two alternative measures of relief in restitution," either the "value of the benefits received by the defendant due to the plaintiff's performance," or "the cost of the plaintiff's performance"); *see also Restatement (Third) of Restitution* § 49(2) (Tentative Draft No. 5, 2007) (listing four alternative measures of restitution where property has been transferred, including market value and value based on agreement); *Restatement (Second) of Contracts* § 344(c) (defining "restitution interest" as "having restored ... any benefit ... conferred on the other party").

While in some cases actual cost would be an appropriate measure of restitution, the facts of this case do not support such an award. To return the sunk costs to the lessees would be an attempt to restore them to the status quo ante, which is one purpose of restitution. The trial court explained, however, that a return to the status quo ante in this case is impossible given that the lessees cannot return the leases to the government in the same condition in which they received them. *See, e.g., Hansen,* 367 F .3d at 1315 ("[S]ection 384 of the [Second] Restatement [of Contracts] precludes restitution when the non-breaching party cannot return 'any interest in property that he has received in exchange in substantially as good condition as when it was received by him....' "). Moreover, both the government and the lessees invested a significant amount of time and resources in developing the leases before the implications of the 1990 CZMA amendments became clear. Under these circumstances, where both parties have participated in apparent good faith for the better part of 20 years, the purpose of restitution is adequately served by having the government return the initial payments; it is not clear that the net effect of the parties' performance during the pendency of the leases has been to confer a benefit on the government at the expense of the lessees.

***21** The only benefit even arguably received by the government for the lessees' due diligence activities was informational in nature. In a similar situation where the non-breaching party sought restitution damages but the valuation of allegedly conferred benefits was too uncertain, this court remanded for a determination of actual costs under a reliance theory of damages. *See Glendale Fed. Bank, FSB,* 239 F.3d at 1382-83 (denying restitution on the basis that the only benefit arguably conferred on the government-time-was not amenable to valuation); *see also LaSalle Talman Bank,* 317 F.3d at 1376 (noting that "when restitution damages are based on recovery of the expenditures of the non-breaching party in performance of the contract, the award can be viewed as a form of reliance damages"). In this case, however, the lessees have already elected not to pursue reliance damages by choosing to forgo any damages based on their expectancy interests. Thus, the lessees are left with only the option of pursuing damages under a restitution theory. Given the inherently uncertain nature of calculating the benefit conferred by the lessees' due diligence activities, we conclude that the trial court did not err in denying any additional award of damages attributable to the lessees' activities in seeking to develop the leases.

Each party shall bear its own costs for these appeals.

*AFFIRMED.*

C.A.Fed.,2008.
Amber Resources Co. v. U.S.
--- F.3d ----, 2008 WL 3891567 (C.A.Fed.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.