# In the United States Court of Federal Claims

**No. 94-522C**
**(Filed: October 26, 2009)**

```
* * * * * * * * * * * * * * * * * * * * * *
                                          *
FIRST ANNAPOLIS BANCORP,                  *
INC.,                                     *
                                          *
                      Plaintiff,          *
                                          *
           v.                             *
                                          *
THE UNITED STATES,                        *
                                          *
                      Defendant.          *
                                          *
                                          *
* * * * * * * * * * * * * * * * * * * * * *
```

**Breach of Contract; <u>Winstar</u> Damages; Shifting of Regulatory Risk; Forbearance Allowing Excess Investment in Service Corporations; Material Breach; Date of Breach; Judicial Estoppel; Restitution; Partial Performance; Unfair Windfall; Tax Gross-Up.**

<u>Dale A. Cooter</u>, Cooter, Mangold, Tompert & Karas, LLP, 5301 Wisconsin Avenue, N.W., Suite 500, Washington, D.C., for Plaintiff.

<u>Scott D. Austin</u>, Commercial Litigation Branch, Civil Division, Department of Justice, 1100 L Street, N.W., Washington, D.C., for Defendant; Brian A. Mizoguchi, Delisa M. Sanchez, Civil Division, Department of Justice, Washington, D.C., Of Counsel.

---

## POST-TRIAL OPINION ON DAMAGES

---

<u>WILLIAMS</u>, Judge

      This <u>Winstar</u>-related case comes before the Court after a trial on damages. In an earlier decision addressing liability, the Court determined that Defendant breached its contract with Plaintiff, First Annapolis Bancorp ("Bancorp"), by enacting the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") and enforcing new capital standards. <u>First</u>

Annapolis Bancorp, Inc. v. United States, 75 Fed. Cl. 263 (2007).[1]  At issue here is whether, in light of the breach, Plaintiff may recover the capital invested in the thrift under a theory of money-back restitution.[2]

Because the Government agreed to give First Annapolis five years of regulatory forbearances and FIRREA eliminated those forbearances after roughly one year of performance -- completely depriving First Annapolis of the benefit of its bargain -- the Government committed a material breach of the contract.  As such, Bancorp is entitled to recover the $13,665,907 in contributed capital as money-back restitution damages.  Bancorp also seeks $8,944,052 for a tax gross-up.  The Court denies Bancorp's tax gross-up claim without prejudice pending resolution of its income tax liability by the Internal Revenue Service ("IRS").[3]

### Findings of Fact[4]

The thrift crisis of the 1980s and the subsequent enactment of FIRREA have been thoroughly explained in United States v. Winstar Corporation, 518 U.S. 839 (1996) and its progeny.  Rising interest rates during the 1980s led to the insolvency of many savings and loan institutions which threatened to exhaust the insurance fund of the Federal Savings and Loan Insurance Corporation (FSLIC), the agency charged with regulating the federally insured thrift industry and insuring consumer deposits in thrifts.  Winstar, 518 U.S. at 846-47.  To deal with this crisis, the Federal Home Loan Bank Board ("FHLBB"), the agency authorized to charter and regulate federal savings and loan associations, encouraged healthy thrifts to purchase insolvent thrifts in supervisory mergers and permitted the acquiring institution to allocate any shortfall between liabilities and assets to an intangible asset known as "supervisory goodwill."  Barron Bancshares Inc. v. United States, 366 F.3d 1360, 1380 (Fed. Cir. 2004).  The FHLBB would then allow the new thrift to count supervisory goodwill toward its regulatory capital requirements and to amortize the goodwill over a period of time that frequently exceeded the life of the underlying asset.  Winstar, 518 U.S. at 849-50.

---

[1]  Plaintiff also claims that FIRREA breached its contract by preventing it from continuing to invest in its subsidiary service corporations.  In its liability decision, the Court found that the Government had granted a forbearance allowing excess investments in service corporations, but did not deem the record sufficient to adjudicate whether FIRREA breached this contractual forbearance.  Based upon the record developed at the damages trial, the Court finds that FIRREA breached this aspect of the contract as well.

[2]  Plaintiff elected not to seek lost profits or reliance damages.

[3]  Should the IRS treat the award in this case as taxable income, this Court will entertain a motion under Rule 60(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") for recovery of the tax gross-up.

[4]  These findings of fact are based on the record developed during a two-week trial on damages.

**First Federal Savings & Loan Association of Annapolis ("First Federal")**

First Federal, a federal mutual savings and loan association organized in 1903, joined the Federal Home Loan Bank system in 1933 and was chartered by the FHLBB in 1941.  PX 8 at 6.[5] First Federal was headquartered in Annapolis, Maryland with 25 branch offices in Maryland.  Id.

In addition to operating a standard thrift, First Federal also owned a number of service corporation subsidiaries, which could "do things that a commercial bank [could not] do," including directly investing in real estate projects.  Tr. 967-68.  As the bank's head of lending, David Cook, explained:

> A thrift could directly own real estate, acquire real estate.  It could acquire real estate with the purpose of obtaining a zoning change or zoning upgrade and enhance the value of the real estate. It could . . . invest directly in real estate for entrepreneurial purposes or for the purpose of deciding a piece of real estate that would become a loan, ultimately a construction loan or development loan or income property loan on the books of the bank.

> It was . . . something that a lot of commercial banks wish they had, but the thrifts by and large over time had used it in a fairly responsible way, taking a small piece of land, investing several hundred thousand dollars getting it -- the zoning changed or upgraded or zoning -- sewer and water infrastructure available.  And then they could do home construction loans on that site and make both a profit on the ultimate disposition of the land, plus have an income-producing development and construction loan in the interim.

> And it generally worked fairly well as long as thrifts stayed within the balance of what they understood, principally residential development, small tract development, small home building development.  And thrifts did understand that market very well.

Tr. 968-69.  Delta Financial Corporation ("Delta") was the main service corporation through which First Federal invested in real estate development projects.  These investments usually took the form of a joint venture structure in which the developer or builder functioned as the general partner, and Delta functioned as a passive limited partner.  PX 8 at 43-44.  Delta typically made equity contributions to the projects and arranged financing to initiate, develop, and complete the projects. Id. at 43.

---

[5]  At the time of its organization, the association was called the Annapolis and Eastport Building and Loan Association.  PX 8 at 6.

**The Supervisory Agreement**

First Federal reported net losses for each fiscal year from September 30, 1981, to March 31, 1988, and had a deficit in retained earnings of approximately $68 million as of March 31, 1988. JX 89 at 0070.

On July 8, 1987, First Federal and the FHLBB entered into a Supervisory Agreement. DX 20. The agreement was signed by directors of First Federal and Betsy Brown Trump, the Supervisory Agent for First Federal at the Federal Home Loan Bank ("FHLB") of Atlanta. The basis for the Supervisory Agreement was that First Federal had engaged in certain financial transactions in interest rate futures and financial options (hedge transactions) and had failed to account for related losses in violation of FSLIC regulations and Generally Accepted Accounting Principles ("GAAP"). Id. at 0828. The Supervisory Agent was of the opinion that, had First Federal properly accounted for these losses, it would have not met its minimum regulatory capital requirement. Id. The Supervisory Agent also maintained that First Federal's investment in service corporations exceeded regulatory limitations. Id. These violations provided grounds for the FHLBB to initiate cease and desist proceedings against First Federal, but the FHLBB agreed to forbear from initiating formal enforcement proceedings so long as First Federal remained in compliance with the Supervisory Agreement. Id. at 0828-29.

Under the Supervisory Agreement, First Federal agreed, inter alia, not to engage in any transactions in interest rate futures or financial options without having received written notice of the FHLBB's acquiescence. In addition, First Federal agreed to recognize losses incurred in connection with the hedge transactions as directed by the FHLBB Supervisory Agent and to submit a business plan to the Supervisory Agent that would maintain First Federal's minimum regulatory capital. First Federal also agreed to develop and submit to the Supervisory Agent a business plan for First Federal and its subsidiaries through December 31, 1990. Id. at 0831-32. First Federal agreed to incorporate in its business plan a provision to increase First Federal's level of capital on a GAAP basis and to meet and maintain the minimum level of regulatory capital required by 12 C.F.R. § 563.13. The thrift further agreed to incorporate a plan to divest its investments in service corporations that exceeded the regulatory limitations without incurring losses. Id. at 0832-33.[6]

---

[6] The governing regulation at the time of the Supervisory Agreement, 12 C.F.R. § 545.74(c), set forth "Permitted Activities," i.e., investments in service corporations that Federal associations were permitted to make, and § 545.74(d) set forth the limitations on investments. Section 545.74(d)(1) set forth a limitation in aggregate investments by Federal associations in service corporations of up to three percent of assets. Section 575(d)(2) permitted significant additional aggregate investments in service corporations by a Federal association that met its minimum regulatory capital requirement as set forth in then § 563.13(b) and satisfied other conditions not relevant here. According to thrift regulator, Greg Jones, who served as First Annapolis' Supervisory Agent, the regulations limited the ability of thrifts to invest in service corporations because such investments were riskier than the core operations of a thrift, e.g., loans for single-family housing, investments in safe securities, and deposit operations to fund such activities. Tr. 1729-30.

4

First Federal was also required to submit to the Supervisory Agent periodic variance reports, budgets, and monthly reports describing the efforts of the thrift to increase its capital and to divest its investments in service corporations. Id. at 0833. The Supervisory Agreement further provided that "[t]he terms and provisions of this agreement shall be binding upon, and inure to the benefit of, the parties hereto and their successors in interest." Id. at 0834.

## Negotiations between First Federal and the Regulators

In 1987, First Federal and the regulators entered into negotiations which ultimately led to the conversion of First Federal from a mutual form to a stock-owned corporation. Douglas Parran, First Federal's executive vice president and subsequently its president, led negotiations on behalf of First Federal, and Betsy Brown Trump led negotiations on behalf of the FHLB of Atlanta. Tr. 1036.[7] At the time the conversion took place, the existing regulations required the thrift to raise capital in the amount of 1.0 percent of assets which represented "approximately about $7-1/2 million" for First Federal. Tr. 1037. However, the FHLB of Atlanta did not believe that was a sufficient capital base for the conversion. Therefore, Ms. Trump negotiated that the thrift infuse $11 million, or 1.5 percent of capital, whichever was greater at the time. For that concession, Ms. Trump agreed that the thrift would receive forbearances. Tr. 1037.

One forbearance concerned First Federal's investments in its service corporations. In this regard, both First Federal and the regulators recognized that the thrift required income generated from development projects undertaken by its subsidiary companies in order to offset losses from the banking operation. Under this forbearance, the government allowed investment in service corporations beyond that allowed by regulation and permitted conforming loans from the bank to the service corporations to complete the development projects. During contract negotiations, Mr. Parran and the thrift regulators agreed that "the continued viability of First Federal would only be possible with the income generated from the service corporations." Tr. 1150, 1170-71.

The thrift also received a forbearance concerning the amortization of the goodwill resulting from the conversion. As Mr. Parran recounted:

> The second . . . item would be the amortization of goodwill. Again, because of the fact that the bank was going to lose money for a period of time, until the subsidiary companies' income could come in, offset those losses. And the probability and the thought was at the end of the five-year period, the bank would be either healthy enough to be recapitalized or it would be healthy, meet its benchmarks. Because

---

[7] Mr. Parran was also the president of Bancorp. Tr. 1082. At the time of negotiations, he was also in charge of First Federal's subsidiary corporations. Tr. 1036. Neither Ms. Trump nor any other regulator personally involved with the 1987 Supervisory Agreement or with the supervisory conversion process testified about the events that led up to the supervisory conversion. As such, the Court relies on the testimony of Mr. Parran and documentary evidence in its findings of fact.

>at the end of that five-year period, under the forbearance, we were
>going to have a franchise value of 25 branches there and a bank that
>had improved its net worth and regulatory capital.  So knowing that,
>they allowed us to amortize . . . the goodwill, over a 25-year period
>. . . .  That was straight line, and it was only like 2.4 million a year.
>But that was an expense that we had to amortize, not a cash expense
>but an expense that we had to put on our books.

Tr. 1042-43.

The thrift and the regulators also agreed to relaxed capital benchmarks which Mr. Parran viewed as key.  He testified: "And then obviously, the largest -- I shouldn't say that, because they were all important.  Without one, you didn't have a viable operation.  The last was the forbearance of the regulatory capital benchmark, and that was approved over a five-year period, with gradual steps up in that."  Tr. 1043.  Under this forbearance, the thrift could meet the relaxed capital benchmarks set forth in its business plan for a five-year period, in lieu of the higher benchmarks required by regulation.

In exchange for these forbearances, it was agreed that $11 million would be infused into the thrift, representing 1.5 percent of the thrift's assets, exceeding the 1.0 percent required under existing regulations.  Tr. 1043.

## The Supervisory Conversion, Merger and Business Plan

Bancorp was formed "to act as a savings and loan holding company" for the purpose of acquiring the stock of the merged institution, thereby infusing capital in the converted thrift.  PX 11 at 18055.  First Federal applied to the FHLBB and the Federal Savings and Loan Insurance Corporation ("FSLIC") for supervisory approval to convert First Federal, then a mutual savings and loan association, into a federal stock savings bank.  Appended to the application was a business plan. JX 87 at 0515; PX 8.

The Business Plan laid out relaxed capital benchmarks below normal regulatory capital requirements that the new entity (First Annapolis) would have to meet for five years after conversion. PX 8 at 5; First Annapolis, 75 Fed. Cl. at 268.  The Business Plan recognized, as part of the supervisory conversion, that (a) Bancorp would infuse at least $11 million into First Annapolis through the purchase of First Annapolis shares, (b) First Annapolis would be allowed to meet lower regulatory capital benchmarks for five years after the conversion, (c) the conversion would be accounted for using the purchase method of accounting, thus creating $61,830,000 in goodwill, (d) the resulting goodwill could be amortized over 25 years on a straight-line basis, and (e) First Annapolis would have the ability to invest in service corporations to the limited extent set forth in the Business Plan.  PX 8 at III-1-3; First Annapolis, 75 Fed. Cl. at 268.

6

**Approval By the FHLBB: Resolutions 88-602 and 88-603 and Related Correspondence**

On July 21, 1988, in Resolutions 88-602 and 88-603, the FHLBB approved the conversion of First Federal from a mutual to a federal stock savings bank, as well as the formation of First Annapolis, First Annapolis' merger with First Federal, and Bancorp's acquisition of the newly merged entity First Annapolis.  PX 1, 2.  In Resolution No. 88-603, the FHLBB expressly found that (1) First Federal's liabilities exceeded its assets, (2) "there would be no value realizable by the mutual accountholders of [First Federal] upon liquidation," (3) "severe financial conditions exist which threaten the stability of [First Federal] and conversion from mutual to stock form of organization is likely to improve the financial condition of [First Federal]," (4) "[First Annapolis] would be a viable entity following conversion, as determined under 12 C.F.R. § 563b.26," and (5) the conversion would be a "supervisory conversion within the meaning Subpart C of 12 C.F.R. Part 563b."  PX 2 at 2.  Additionally, Resolution 88-603 required that Bancorp and First Annapolis execute a Regulatory Capital and Dividend Agreement with the FSLIC as a condition of approval. Id. at 12, ¶ 18.

In connection with the resolutions, the FHLBB issued a series of letters dated July 21, August 5, August 11, and August 12, 1988.  PX 3-6.  These letters granted Bancorp the following regulatory forbearances: (1) the right to amortize supervisory goodwill resulting from the merger over a 25-year period, and (2) the ability to invest in service corporations up to the regulatory limit allowed for capital-compliant institutions for up to five years.  PX 3.  The FHLBB's August 5, 1988 letter specified:

> The Business Plan establishes certain benchmarks for each year of the five year period and reaches a regulatory capital level of 3% at the end of the fifth year. Accordingly, it is First Annapolis' obligation to increase its regulatory capital in order to achieve <u>each annual benchmark</u> and to achieve the regulatory capital amount specified (in the Business Plan) at the end of the fifth year.

PX 4 at 1 (emphasis added).

The August 11 and 12, 1988 letters also addressed First Annapolis' investments in its service corporations.  In its August 11, 1988 letter, the FHLBB advised First Annapolis that the FHLBB would not take any supervisory action against First Annapolis for failure to comply with the regulatory limitations on service corporation investments identified in a schedule dated July 31, 1988, so long as First Annapolis complied with its Business Plan and First Federal's Supervisory Agreement, as long as the Agreement remained in effect.  PX 5.[8]

---

[8]  The July 31, 1988 schedule is Exhibit E to the Minutes of the Board of Directors Meeting dated August 17, 1988.  JX 33 at 0655.  The minutes noted that "Mr. Parran has had numerous meetings with the FHLB examiners and with the Supervisory Agent to discuss the over-investment in the conforming loan category.  The Supervisory Agent has agreed to grandfather all projects on

The August 12, 1998 letter revised the service corporation forbearance in what it termed a "technical amendment" stating:

> For a period of five years from the date of conversion, First Annapolis shall, solely for purposes of complying with the service corporation investment limitations set forth in Federal Regulation 545.74(d), be deemed to be in compliance with its minimum regulatory capital requirement.

PX 6.

## The Service Corporation Projects

The majority of investments and loans that the thrift made through its main service corporation, Delta, were acquisition and development loans to acquire land and create residential subdivisions or commercial or light industrial properties. Tr. 1055.[9] Many of these developments were located on waterfront properties with marinas attached. Id. Among the service corporation investments included in the July 31, 1988 schedule were the Northampton Park (Northampton), White Rocks Marina (part of what is referred to as the "Dennis Blaeuer entities"), Forest Mills, and Solomons Landing. JX 33 at 0655. Northampton was a development for commercial office buildings in Prince George's County, located at the intersection of Central Avenue and the Capital Beltway. Tr. 1057. Mr. Parran estimated that the Northampton would take three to five years to complete. Id. White Rocks Marina, in which Delta had invested, was a project of Dennis Blaeuer to develop an office building at a marina at Spa Creek in Annapolis, Maryland. Tr. 996-98. Forest Mills was a light industrial development in Prince George's County located at the intersection of Pennsylvania Avenue and the Capital Beltway. Tr. 1056. This development also was estimated to take three to five years to complete. Id. Solomons Landing was a 200-300 unit development with a marina in Solomons, Maryland. Tr. 1058. Solomons Landing was expected to take seven to eight years to develop. Id.

In addition to these service corporation projects, the thrift participated in a real estate investment project called Bayside Marina. Bayside Marina was a project on Kent Island in Queen Anne's County, Maryland, for the acquisition of land and construction of 288 townhouse or

---

the books as of August 10, 1988, and allow them to be completed. In addition, Mr. Parran is working with the Supervisory Agent to establish guidelines for the conforming loan category." Id. at 0647.

[9] In addition to the projects listed on the July 31, 1988 Schedule, on December 15, 1988, First Annapolis and its service corporation, Delta, granted loans to Pelican's Pouch Limited Partnership. In return, Delta was to receive 50 percent of the net profits or $500,000 whichever was greater. DX 397 at 4. The Pelican's Pouch project was to develop a 36-lot oceanfront residential community in Bethany Beach, Delaware. DX 397 at A-13.2.

condominium units and the development of an adjacent 293-slip marina.  DX 397 at A-12.1.  On April 6, 1987, First Federal agreed to extend a loan in the amount of $12.7 million for the Bayside Marina project to a partnership in which Delta was a limited partner and the general partner was controlled by Mr. Sterling Leppo.  DX 2041 at 0921.  One of the special conditions for the loan was the approval of a joint venture agreement with Delta.  Id. at 0922.  The Bayside loan was structured so that if it was successfully completed, the thrift would receive a financial benefit.  Tr. 1358-59.  According to Mr. Parran, the loan for Bayside had an equity or profit "kicker" in it.  Tr. 1155, 1321.  On April 6, 1987, First Federal further agreed to extend a line of credit in the amount of $4 million to a Leppo-controlled entity, Sterling Properties Associates III, Inc., for the building of 288 housing units at Bayside Marina.  DX 2042 at 0937.  No First Federal/First Annapolis service corporation appears to have been involved in this loan.  However, on August 5, 1987, First Federal granted three loans totaling $16,860,000 for the acquisition, development, and construction of Bayside Marina to Bayside Marina Associates Joint Venture and Sterling Properties Associates III, Inc.  DX 118 at A-13.1.

From the time of the contract, the Bayside project was marred by delays in obtaining sewer permits from the Queen Anne's County Department of Public Works until the county expanded its existing sewer capacity.  DX 118 at A-13.2.[10]

The thrift and the regulators were aware that there would be peaks and valleys in the receipt of income from service corporation projects.  Tr. 1145; 1815-16.  Both parties were aware that income would only come in from service corporations once the projects were completed and that it might take years before any income was received.  Tr. 1145; 1815.  Mr. Parran also testified that Ms. Trump and her examiners had "blessed" every service corporation activity and joint venture after reviewing them at the thrift's office.  Tr. 1180.

## The Regulatory Capital Maintenance/Dividend Agreement

On August 12, 1988, Bancorp and the FSLIC, under the direction of the FHLBB, entered into a Regulatory Capital Maintenance/Dividend Agreement ("RCMDA").  PX 7.  The RCMDA defined "Regulatory Capital" as "capital increased on a scheduled basis for five years set forth in the Business Plan of the plan of conversion, and, thereafter, regulatory capital as defined in accordance with 12 C.F.R. § 561.13 or any successor regulation."  PX 7 at 2.  The RCMDA also required Bancorp to infuse sufficient capital to maintain First Annapolis' regulatory capital at a level at or above the regulatory capital requirement.  Id. at 3.

---

[10]  The county had sewer capacity for only 10 out of the 288 units planned, and the expansion of sewer capacity to cover the remainder of the project was estimated to take up to 20 months.  DX 118 at A-13.2; Tr. 1059.

**The Conversion**

On August 12, 1988, Bancorp sold 14,165,907 shares of First Annapolis' holding company, Bancorp, at $1 per share, thereby raising $14,165,907. Bancorp then purchased 100 percent of First Annapolis stock for $13,665,907. DX 397 at 18; Tr. 1045, 1587. First Federal thereby converted from a mutual savings and loan, and merged into First Annapolis, a federal stock savings bank. PX 2. On October 28, 1988, Deloitte, Haskins, and Sells, First Annapolis' independent certified public accounting firm, reported to First Annapolis that goodwill would be amortized over a 15.2-year period in accordance with Financial Accounting Standard Board ("FASB") Opinion #72. PX 9.[11] The effective date of the conversion was August 13, 1988. PX 10.

**Condition of First Federal/First Annapolis at the Time of Conversion and the Federal Home Loan Bank's July 11, 1988 Examination**

The Federal Home Loan Bank of Atlanta conducted a regular examination of First Federal between July 11 and August 19, 1988, covering First Federal's condition from 1987, to a few days after the merger. DX 118. Mr. William Crompton was the Federal Home Loan Bank Board's field manager for this examination. Tr. 1882.[12]

The Report of Examination ("ROE") indicated that First Federal had failed to meet its minimum capital requirements for three consecutive quarters (December 31, 1987, March 31, 1988, and June 30, 1988). As of June 30, 1987, First Federal had negative capital, as measured according to GAAP, in the amount of $65,668,575. Id. at 25.

The ROE also indicated that the FHLBB's approval of the application of conversion stipulated that the "new institution," First Annapolis, had to operate within the Business Plan that set forth targets for the regulatory capital to liability ratios as follows: 1.8 percent for Fiscal Year (FY) 1989; 2.1 percent for FY 1990; 2.4 percent for FY 1991; 2.7 percent for FY 1992; and 3.0 percent for FY 1993. Id. The ROE stated that the Business Plan projected that First Annapolis would earn net income in the amount of $12,555,200 over a three-year period to meet the 2.4 percent capital benchmark for FY 1991. Of that three-year income, $16,720,000 or 133 percent was projected to be generated by operations of First Annapolis' service corporation subsidiaries. Id.; see also PX 8 at I-5 (showing $16.7 million in projected income on service corporations' investments offsetting a $4.1

---

[11] FASB Opinion #72 reflects GAAP reporting and measurement. Notwithstanding the fact that goodwill would be amortized over a 15.2- year period under GAAP, First Annapolis was entitled to utilize the 25-year amortization period for purposes of reporting to the FHLBB. Mr. Parran testified that First Annapolis in fact amortized its goodwill on a 25-year basis under Regulatory Accounting Principles ("RAP") for purposes of reporting to the FHLBB. Tr. 1202, 1209, 1227.

[12] The examiner-in-charge for First Federal's July 11, 1988 examination was Rossana Santarpia who did not testify. However, Mr. Crompton who did testify, supervised the examiner-in-charge's work and reviewed the report of examination. Tr. 1882, 1890.

million loss on thrift's net income).  Both the regulators and management noted that the thrift was substantially dependent upon service corporation income for the success of the bank.  DX 118 at 30-31.

In the July 1988 ROE, the regulators examined 10 of the 38 joint ventures of First Federal's service corporations.  This examination "did not reveal material weaknesses with management's assumptions upon which the total profit projections were based," but found that "some projected profits [might] be realized later than originally estimated."  Id. at 30.

Although the July 11, 1988 ROE did not assign First Federal a composite MACRO ["management, asset quality, capital, risk management, operating results"] rating, the December 31, 1989 Regulatory Plan indicates that First Federal received a composite MACRO rating of "4" as a consequence of the July 11, 1988 examination.  DX 392; Tr. 1890-92.  Although a rating of "4" indicates "a very poor rating," no regulatory or enforcement action was taken with respect to the findings of this ROE.  Tr. 1892.

In the December 28, 1988 letter transmitting the July 11, 1988 ROE, the regulators noted "First Annapolis' present weak overall financial condition . . . continues to be aggravated by regulatory violations and operating deficiencies throughout the organization."  DX 267 at 0112.  The letter continued: "the volume and nature of supervisory concerns reflect unfavorably upon the overall administration of the institution and pose a risk to First Annapolis' long-term viability."  Id.  While this letter was written post conversion, the report it transmitted covered a period leading up to and concluding just after the date of the conversion.  The FHLBB suggested that First Annapolis' Board of Directors conduct an "internal assessment of itself, the institution's management team and the current organizational structure, and determine the capability of existing resources to successfully implement the recapitalization plan and restore the institution to a satisfactory condition."  Id.  According to FHLBB Supervisory Agent Jones, the December 28, 1988 letter was intended "to make sure that the board was committed to correcting the problems that [the July 1988] examination identified."  Tr. 1749.  Supervisory Agent Jones acknowledged that "some of these [problems] were carried forward, probably, from the previous examination of First Federal."  Id.

Supervisory Agent Jones described First Annapolis' response to the July 1988 ROE and transmittal letter: "They were cooperative.  They did a lot of the things we asked them to do in the letter, in terms of performing assessments and changing management.  So there was a cooperative level that was taking place there."  Tr. 1750.

## Events Subsequent to the Conversion

As part of its effort to address the problems identified in the July 1988 ROE and meet its capital benchmarks, First Annapolis hired David F. Cook, a commercial banker, to be head of lending as of December 24, 1988.  Tr. 956-59; DX 301 at 1.  Mr. Cook had worked in a series of thrifts and assisted in turning around insolvent banks.  Tr.  957-58.  In January 1989, First Annapolis' management underwent reorganization, and all senior managers reported to Mr. Cook,

who in turn, reported to First Annapolis' President, Douglas Parran. DX 301 at 2. In addition to Mr. Cook, First Annapolis brought in three new employees: a chief financial officer ("CFO"), a banker to establish an internal loan review function, and a commercial banker who had past success turning around a failing bank. Tr. 964-65.

With respect to the viability of First Annapolis pre-FIRREA, Mr. Cook noted, "it was interesting, and I had never been in a situation like this before. Every situation I have been in before with a troubled bank, things had to happen very quickly. But in this instance, there was a five-year window to create a bank that had minimum regulatory capital." Tr. 973-74. When Mr. Cook reviewed First Annapolis' Business Plan in late 1988, he felt that the thrift "could certainly gain complete regulatory capital compliance within five years." Tr. 960. Mr. Cook elaborated on the significance of the "five-year window":

> So it was an interesting scenario in that to me, five years is a very long time to deal with the problems of a loan portfolio, the problems of a branch network, the problems of appropriate policies and procedures, the problems of the right mix of loan officers, the right mix of staff people. And once you put those things together in a meaningful way, then that interests investors, that interests people who invest in banks, and additional capital, in my view, could have been obtained.

Tr. 974.

**First Annapolis' Post-Conversion Performance**

    August - December 1988

During the last quarter of 1988, First Annapolis was "right on track" and made a profit. Tr. 1047. According to First Annapolis' Statement of Operations, the thrift's actual net income on a consolidated basis from October 1, 1988, to March 31, 1989, was $995,734 -- $55,750 more than expected. DX 2120 at 1550, 0704.[13] According to a September 1989 Independent Auditors' Report, First Annapolis and its subsidiaries improved their financial condition between June 30, 1988, and June 30, 1989. JX 3 at 0824. The Auditors' Report found that First Annapolis had $742,321,828 in assets in June 1988 and $771,541,879 in June 1989 -- an increase of $29,220,051. Id.

---

[13] First Annapolis' net income on a consolidated basis included a $2,053,727 loss for the amortization of goodwill on a 15-year GAAP basis. DX 2120 at 1550, 0704. The goodwill forbearance, however, allowed First Annapolis to amortize its goodwill over a 25-year period by straight-line method. Tr. 1202-03; see also PX 3 at 7904. According to Mr. Parran, First Annapolis' goodwill amortization losses as reported on its Statement of Operations were inflated, which in turn substantially reduced its reported net income on a consolidated basis. Tr. 1202-3; DX 2120 at 1550 (showing reported 15 year/2 month amortization of goodwill on a GAAP basis).

12

Additionally, First Annapolis had $814,243,071 in liabilities in June 1988, and $760,436,785 in liabilities in June 1989 -- a $53,806,286 decrease. Id. In June 1988, First Annapolis' liabilities had exceeded its assets by $71,921,243, but by June 1989, First Annapolis' assets exceeded its liabilities by $11,105,094. Id.; see also JX 46 at 1030.

During the quarter ending December 1988, First Annapolis earned $390,000 in income from service corporations, although it had projected earning $1,272,000 in income from its subsidiaries. DX 2120 at 1550.

Early 1989

On February 13, 1989, First Annapolis reported to the FHLBB that it was closing and/or merging unprofitable service corporations in an effort to "rid the institution of unprofitable operations and exert more board-control over First Annapolis' activities." DX 392 at 0542.

The FHLBB attended First Annapolis' March 15, 1989 Board of Directors meeting, and on March 27, 1989, the FHLBB acknowledged First Annapolis' efforts to resolve the problems identified in the July 1988 ROE. DX 302 at 1424-25. The FHLBB stated:

> We encourage and support efforts to enhance the capital base, thereby providing the necessary financial support for existing and future operations, for identified and potential risks within the asset portfolio, and for the long-term viability of the institution. Please keep us apprised of such plans as well as any formal actions taken in this regard.

DX 301 at 1425. The FHLBB requested that "the board continue to formally and regularly assess itself and management by analyzing the effectiveness of resolving the institution's problems." Id. at 1424.

In the quarter ending March 31, 1989, First Annapolis earned $1,335,060 in net income from service corporations. The thrift had projected earning $1,500,000 from service corporations for the quarter. JX 46 at 1035. However, First Annapolis' Board of Directors noted in March 1989, that profits from Delta, its largest service corporation, were "on target and every indication is that we will stay on target." JX 44 at 0953.

The First Capital Benchmark: June 30, 1989

On June 30, 1989, prior to enactment of FIRREA, First Annapolis satisfied its first capital benchmark of 1.80 percent as set forth in the Business Plan. PX 8; Tr. 1064, 1144, 1225, 1823-24. On June 30, 1989, First Annapolis had a net worth-to-liabilities ratio of 2.15 percent calculated in

accordance with RAP, according to the July 19, 1989 Board of Director Minutes.  DX 2200 at 1251.[14]

Supervisory Agent Jones testified that First Annapolis was required to continue to meet the June 30, 1989 1.8 percent benchmark on July 1, 1989, and not fall below it.  Tr. 1779.  However, Supervisory Agent Jones conceded that, at no time prior to December 1989, did OTS conclude that First Annapolis was not viable, and acknowledged:

> Q.     And it's also true, is it not, that benchmark compliance was to
>        be measured at specific times?
>
> A.     If you read the wording of that, it looks like it's to be done at
>        that date.
>
> Q.     All right.  The wording does not require a steady upward
>        progress each and every month between benchmark dates,
>        does it?
>
>        . . . .
>
> THE WITNESS:  It doesn't say that in the actual forbearance or the plan.

Id. at 1824, 1803.  According to Supervisory Agent Jones, banks are normally required to meet certain financial conditions measured at regular time intervals, such as on a quarterly or annual basis. Id. at 1824-26.  In Supervisory Agent Jones' view, banks commonly "manage their balance sheets" and take certain actions in anticipation of measurement dates to ensure that the balance sheet will satisfy the measurements of benchmarks.  Tr. 1826-27, 1832.[15]

---

[14]  Defendant's expert, Mr. Kennedy, calculated First Annapolis' regulatory capital ratio on June 30, 1989, as 1.99 percent on a GAAP basis, based on First Annapolis' audited financial statements dated June 30, 1989.  JX 3 at 0824, 0846;  Tr. 2171.

[15]  Supervisory Agent Jones testified:

> Q.     . . . This phenomenon that you grow and shrink your asset
>        base so as to meet the requirements of the government is
>        pretty common, is it not?
>
> A.     Not for institutions that are -- that have significant capital
>        issues, I don't believe.
>
> Q.     You've certainly seen it before, haven't you?

Mr. Parran believed that capital could fluctuate between benchmark dates and that the contract did not require ongoing or continuous compliance between the dates when benchmarks were measured.  Tr. 1224-25.  According to Mr. Parran, meeting the capital benchmark was more important under the contract than profitability.  Tr. 1144.

Although First Annapolis met its capital benchmark for June 30, 1989, it missed its projected income from service corporations for the quarter ending June 1989.  While it projected earning $549,000 in income from subsidiaries, it only earned $133,335 for the quarter.

**FIRREA Looms**

First Annapolis first heard about the concept of FIRREA during the last quarter of 1988, both from the FHLBB and an article by the United States Savings and Loan League and Maryland Savings and Loan League.  Tr. 1047.  By early 1989, the news that FIRREA was coming was well publicized. Tr. 960-61, 1812-13, 2012.  President Bush's announcement of the pending FIRREA legislation cast a "negative cloud over the bank" in the spring of 1989.  Tr. 965.  When Mr. Cook first heard about the potential legislation, he "thought it could have a serious negative impact . . . and [] could have a chilling effect on potential investors in the thrift industry." Tr. 962.

At the March 15, 1989 Board of Directors meeting, representatives of the FHLB of Atlanta came to speak.  Ms. Trump, who had negotiated the supervisory conversion with First Federal, recognized that "[t]he FHLBB granted a forbearance on meeting capital requirements," but "could not guarantee what will happen to that forbearance with the new legislation pending before Congress."  JX 44 at 0952.  The minutes reflect that "[First Annapolis] will have higher capital requirements so the Board should act prudently to meet it as soon as possible."  Id. (emphasis in original).  The Board minutes also stated that "First Annapolis needs the profits from Delta to accomplish the Business Plan.  We are on target and every indication is that we will stay on target. Mr. Parran noted that in this respect the service corporation forbearance is extremely important." Id. at 0953.

---

| | |
|---|---|
| A. | I've seen it before.  I worked at a bank that did it. |
| Q. | You did? |
| A. | Yes. |
| Q. | Okay.  Good. Nothing illegal, improper, fattening about it? |
| A. | Not as long as you follow the accounting rules. |

Tr. at 1832.

First Annapolis continued to receive information about the imminent legislation throughout the spring of 1989. Tr. 1048. Supervisory Agent Jones discussed the pending legislation with his colleagues in Atlanta and with managers of the banks he was supervising. Tr. 1813-14. According to Mr. Parran's credible testimony, he discussed the pending legislation with Supervisory Agent Jones on between six and eight occasions. Tr. 1051. Supervisory Agent Jones informed Mr. Parran that passage of FIRREA was likely and would be effective in August, and that First Annapolis' forbearances would be rescinded, and he suggested that Bancorp should submit a new business plan to the FHLBB early. Tr. 1053-54; see also Tr. 1047-48. The thrift submitted a new business plan in June 1989. Tr. 1380, 1051-54.

The forthcoming FIRREA legislation had a negative impact on First Annapolis' relationships with borrowers. Tr. 966. Mr. Cook testified:

> Well, the general premise that existed was our weaker borrowers stayed, our stronger borrowers went away, to the extent that they could, new [prospective], stronger borrowers didn't come on board, they went somewhere else, because they had a premonition that any thrift with the cloud of FIRREA over us might not survive. Particularly in real estate development, when you're talking about a construction loan or development loan that might be two or three years' duration, it would be folly for a seasoned developer to go into a bank and get into that kind of a development loan if he's not sure that that bank is going to be around for the full three years that he needs to have development money available to develop whatever real estate property he's putting through development. So it was a -- it choked off the right kind of growth, and those borrowers that we might otherwise want to get rid of didn't have anywhere else to go.

Tr. 971-72; see also Tr. 1821. Mr. Cook further explained:

> Over time, [the proposed FIRREA legislation] cast a negative cloud over the bank. It was something that no one quite understood what would happen, but there was a premonition that it would just scare away all potential good customers, additional sources of capital, the thrifts - possibly our thrift was not looked upon as a growth institution any longer, because we were cast in that definition of a bank that could be dealt severely with under the FIRREA proposal. . . . It affected core deposits.

Tr. 965.

Due to the uncertainty as to First Annapolis' future prospects, stronger borrowers shifted their business away from First Annapolis to commercial banks which were not the subject of the proposed

legislation.  Tr. 966, 971.  Mr. Cook testified:

> Well, borrowers that had the need to have a relationship where they
> could come back and reborrow, pay down, reborrow, they weren't
> sure that the bank would be there a year later or six months later or
> what was going to happen.  It also had the effect of enhancing the
> competitive ability of commercial banks who were not affected by
> this legislation. . . . [Commercial banks] . . . were already
> well-capitalized, and they didn't have to -- they didn't have any
> negative PR hovering over their heads.  So the strongest borrowers
> would gravitate away from a thrift over to a commercial bank.  It
> created a mismatch of competitive environment between a thrift that
> might be under a cloud and a commercial bank that was not under
> that same cloud.

Tr. 966-67.

According to Mr. Cook, the pending FIRREA legislation also negatively impacted the service corporation loans because FIRREA would revoke First Annapolis' right to own real estate, thus requiring it to quickly sell off the real estate at a deep discount.  Tr. 969-70.[16]  First Annapolis was aware that if FIRREA passed it would have to revert back to maximum loan amounts of $500,000 to a single borrower, which would mean that the thrift would be unable to finish 90 percent of the projects it had in subsidiary companies from which it anticipated most of its income.  Tr. 1049.[17] Mr. Parran informed each of First Annapolis' joint venture partners in the service corporation projects of the pending FIRREA legislation and how it might prohibit the thrift from continuing to fund the projects.  Tr. 1061.  He recommended that they try to obtain outside financing or even sell the property "as is" because if the projects remained unfunded, they could go into foreclosure.  Id.

Some of the joint venture partners were able to obtain financing elsewhere, but others were unable to do so because the projects were in the initial or middle stages of development.  Tr. 1062. Specifically, the developer of the Solomons Landing project, which was halfway through its development stage, ceased repaying its loans because FIRREA, as proposed, would have prevented First Annapolis from funding the loan because the loan exceeded $500,000 and the borrower had to go elsewhere to borrow funds.  Tr. 1328-30.  Similarly, Mr. Parran testified that First Annapolis ceased granting extensions to the delayed Northampton project because of the new loans-to-one-borrower limitation.  Tr. 1320.  Although in April 1989, First Annapolis granted an extension of the bank loans to Northampton to July 20, 1989, and August 7, 1989, it declined to extend the maturity

---

[16]  "[R]eal estate is an asset that the quicker you try to return real estate into cash, the deeper the discount, the more difficult it is to do it."  Tr. 970.

[17]  According to Mr. Parran, First Annapolis had loaned up to $13-$14 million dollars to a single person or entity.  Tr. 1050.

dates of the loans any further.  DX 2210 at 1618; Tr. 1301-02; DX 2162.

Mr. Parran testified that these problems of First Annapolis' joint venture partners had a negative effect on the thrift's ability to generate income in the summer and fall of 1989:

> [I]t had a severe impact, because, first off, we stopped the origination of larger loans.  And one of the major sources of income is fee income, the points you charge on those loans.  We didn't try to generate additional savings, and obviously, the less savings accounts you have or deposits you have, the less amount of money you have to leverage out and produce income on.
>
> And then I guess the major effect was really going back to what everybody counting on as the subsidiary income from these joint ventures.  We basically went into a very slow, slow period . . . But not that we predicted a tremendous amount of income in '89 from those subsidiary companies anyway, but when this happened, it just cut off the future.  You know, it -- again, not to say devastating, but it didn't -- it wasn't possible for us to ever think about obtaining earnings from those subsidiary companies  again.  And that's what the financial future of the bank was based on.

Tr. 1062-63.

According to Mr. Parran, FIRREA affected the thrift's service corporation investments as early as spring of 1989:

> [Y]ou have to realize in the real world that FIRREA had an effect as early as the spring of 1989 because we realized that -- the bank's management realized that they could not continue with overinvestment in subsidiary companies, joint ventures, loans to one borrower, and we started pulling back on those investments. This is a good example, Bayside, White Rocks joint ventures, Northampton, Forest Mills and all of those loans that you just were speaking about, all were -- at a future date were built out, completed and perfect. . . . The realistic thing is that we had a contract for five years . . . .  All I'm saying is that if given the opportunity, the chance, that these would have proceeded, been developed, money would have been made.

Tr. 1295-96.

18

With the prospect of FIRREA looming and First Annapolis' efforts to prepare for this legislation, First Annapolis was not profitable in the spring and summer of 1989.  Tr. 972. While First Annapolis had realized gains of nearly $1 million in net income on a consolidated basis in the six months ending March 31, 1989, it realized losses of $2,828,506 in the following six months ending September 30, 1989.  DX 2120 at 1550, 0704, 0486, 0129.[18]

## The April 1989 Board of Directors' Meeting

First Annapolis' Board of Directors met to discuss and plan for FIRREA in April 1989.  JX 46.  Supervisory Agent Jones recommended that Bancorp submit a new business plan to the FHLBB and suggested that First Annapolis not provide millions of dollars in loans in the Spring that would become illegal in August.  Tr. 1053-54.  Mr. Cook and Senior Vice President Vorel presented a revised business plan to the Board containing assumptions showing that the Board was cognizant of FIRREA's impact on its relaxed capital benchmark and service corporation forbearances.  JX 136 at 0544;  JX 46 at 1013.  Mr. Vorel explained that an assumption of no growth was an attempt to comply with the "new capital adequacy guidelines."  JX 46 at 1013.  Assumption No. 5 stated: "Profits currently scheduled for the service corporations of First Annapolis are in the first three years of the projections.  In addition, during the term of the business plan, a substantial decline in direct investments is expected due in large part to proposed capital requirements."  JX 136 at 0544 (emphasis added).  Assumption No. 7 stated that First Annapolis had been successful generating income through service corporation activities, and if FIRREA's regulatory changes allowed it, First Annapolis would continue subsidiary operations.  Id.  On June 21, 1989, the Board approved a revised Business Plan, but this revised Business Plan was not approved by the FHLBB.  JX 48 at 1132;  Tr. 1117.

## The Passage of FIRREA: August 9, 1989

On August 9, 1989, FIRREA came into effect.  The legislation abolished the FHLBB, created the Office of Thrift Supervision (OTS), and directed OTS to promulgate new regulatory capital requirements to replace those that had been in effect.  12 U.S.C. § 1464(t).  These regulations were issued on November 7, 1989, and became effective on December 7, 1989.  54 Fed. Reg. 46845 (Dec. 7, 1989).

The legislation had several provisions which breached the contract.  First, thrifts were required to maintain "tangible" capital equal to 1.5 percent of assets, and tangible capital under FIRREA did not include supervisory goodwill.  12 U.S.C. § 1464(t)(2)(B).

Second, thrifts were required to maintain "core" capital equal to 3.0 percent of total assets. 12 U.S.C. § 1464(t)(2)(A).  The amount of supervisory goodwill that could be counted toward core capital would be phased out over several years.  Specifically, thrifts could count supervisory

---

[18] The reported gains and losses taken from First Annapolis' Statement of Operations included goodwill amortization costs on a 15-year GAAP basis.  See e.g., DX 2120 at 1550.

19

goodwill up to 1.5 percent of total assets through 1991, 1.0 percent through 1992, 0.75 percent through 1993, and 0.375 percent through 1994. After December 31, 1994, thrifts could not count any supervisory goodwill towards core capital.

Third, FIRREA imposed a new "risk-based" capital requirement, in which the thrifts were required to maintain "risk-based" capital equal to 6.4 percent of "risk-based" assets. 12 U.S.C. § 1464(t)(2)(C). The risk-based requirement would escalate to 7.2 percent on December 31, 1990, and then to 8.0 percent on December 31, 1992. 12 U.S.C. §§ 1464(t)(2), (t)(3)(A), (t)(5)(D) (1989); 12 C.F.R. § 567.6 (1990). The risk-based capital requirements also restricted the inclusion of supervisory goodwill.

FIRREA also limited the amortization of "qualifying supervisory goodwill" when calculating core capital and risk-based capital to 20 years or the remaining amortization period in effect on April 12, 1989, whichever period was shorter. 12 U.S.C. § 1464(t)(9)(B)-(C). In addition, FIRREA subjected thrifts to the same $500,000 limitation on loans to one borrower that applied to national banks. 12 U.S.C. § 1464(u)(1), (2)(A)(i).[19] The upshot of this statutory change was that because First Annapolis could not meet its capital requirements, it was restricted to lending a maximum of $500,000 to one borrower. Tr. 1806; see also Tr. 1374-75.

FIRREA also mandated that a savings association's investments in subsidiaries engaged in activities not permitted by national banks had to be deducted from capital, and be phased out over a five-year period starting on July 1, 1990. 12 U.S.C. § 1464(t)(5).

---

[19] The statute provided:

> **(u) Limits on Loans to One Borrower**.
>     **(1) In general**.
>         Section 5200 of the Revised Statutes shall apply to savings associations in the same manner and to the same extent as it applies to national banks.
>
> **(2) Special Rules**
>
> **(A)** Notwithstanding paragraph (1), a savings association may make loans to one borrower under one of the following clauses:
>
>     **(i)** for any purpose, not to exceed $500,000
>
> 12 U.S.C. § 1464(u)(1), (2)(A)(i). Section 5200 of the Revised Statutes is codified as 12 U.S.C. § 84.

According to Mr. Cook, the passage of FIRREA in August 1989, "only solidified everything that had preceded and was tending towards a perfect storm. And the bill was enacted, and there was a perception and a recognition that the bank was likely to not be able to pull itself out." Tr. 973. Mr. Parran testified that FIRREA was "devastating" to First Annapolis, and that the breach of the goodwill amortization promise alone was sufficient to doom First Annapolis. Tr. 1045. As Mr. Parran elaborated:

> We were down to $500,000 loan limit. We couldn't increase our savings, couldn't add any branches, couldn't buy and sell loans. FIRREA said we're going to expense you, you can't have goodwill at 25 years anymore, which came out to about 2.4 million expense a year, you have to do it over five years, so that's like 12 million a year. So you've got almost $10 million hit because the contract was broken, just on that one item. Nobody can survive that. That's why we had a contract, that's why we had a business plan. The contract was based on that business plan.

Tr. 1065; see also Tr. 1080, 1068 (describing the increase in amortization expenses as "an impossible situation").

In the fall of 1989, Mr. Cook left First Annapolis in part for personal reasons, but also because it appeared that First Annapolis would not survive. Tr. 975.

Mr. Parran described management's role after FIRREA's passage, stating "[w]e became baby-sitters for a physical structure that was there." Tr. 1065. According to Mr. Parran, prior to the effective date of FIRREA's implementing regulations, the regulators advised First Annapolis to cease exceeding the regulatory limit on service corporation investments. Tr. 1102. Between the enactment of FIRREA and implementation of the regulations, OTS required First Annapolis to propose a new capital plan. Tr. 1840, 1843.

At the end of March 1989, First Annapolis had $13.1 million in delinquent loans. JX 46 at 1012. In July 1989, First Annapolis' loan delinquencies increased to $58.3 million. DX 2210 at 0517. By September 1989, delinquencies increased again to $82.3 million. DX 365 at 1410. The regulators believed that this increase in delinquent loans indicated an increase in nonperforming assets, i.e., loans that were more than 90 days past due. Tr. 1950.[20]

## Counsel's September 1989 Advice to First Annapolis on the Impact of FIRREA

In September 1989, First Annapolis sought legal advice to determine how FIRREA affected the forbearances. JX 54 at 1394; DX 392 at 0543; Tr. 1128, 1373. First Annapolis wanted "to

---

[20] Mr. Crompton defined "nonperforming assets" as the sum total of loans on nonaccrual plus repossessed assets, which are foreclosed properties. Tr. 1948.

ensure that we weren't going to continue or make any loans that would be in conflict with the new regulations. We wanted to make sure that we were going to try and abide by the new FIRREA laws." Tr. 1373.

In a memo dated September 25, 1989, the law firm of Blumenthal, Wayson, Downs and Offutt, P.A. ("Blumenthal, Wayson"), advised First Annapolis on the impact of FIRREA's loans-to-one-borrower provision. DX 2467. Counsel noted that, as a legal matter, First Annapolis "was and remained technically insolvent" in the absence of counting goodwill towards capital, but this was "of no great surprise" as a thrift was required to have its liabilities exceed its assets (pre-conversion), along with satisfying a post-conversion viability test, in order to qualify for a supervisory conversion. Id. at 0419-20.

"Pending clarification as to the status of supervisory conversion agreements," counsel made several recommendations with respect to loan limitations to one borrower. First, counsel informed the thrift that the $500,000 loan limit applied to new loans or commitments issued after the enactment of FIRREA. Id. at 0420. Second, with respect to extensions and renewals of loans of pre-existing customers, counsel concluded that First Annapolis would likewise be limited to $500,000 per borrower. Id. However, this position was subject to two conditions. Id. First, there was the practical necessity for transitional relief from the old regulatory and statutory scheme to the new one. DX 2467 at 0420-21. Second, there was "the effect of the Supervisory Agreement which we must conclude has viability until specifically rejected by OTS or by regulatory announcement of how supervisory agreements are to be treated. This situation is compounded by the apparent uncertainty as to whether OTS has power to grant waivers of the loans to one borrower limitation in special circumstances." Id. at 0421.

Finally, with respect to additional anticipated loans in connection with the Delta transactions, counsel noted that, pursuant to the August 12, 1988 forbearance letter, the FHLBB had agreed that, for a five-year period, investments in service corporations would not be deemed in violation of the service corporation investment limitation set forth in Section 545.75(d), and, therefore, First Annapolis should presume that the forbearance remained in effect until OTS specifically rejected it or otherwise indicated how such investments should be treated. "Accordingly, it seems reasonable to presume the continued validity of the Order[21] and Supervisory Agreement including the August 12, 1988 technical amendment until the OTS specifically rejects the Order and Supervisory Agreement or prescribes by transitional rule or otherwise how the same is to be treated." Id. at 0422. Thus, counsel recommended that First Annapolis should continue to fund the Delta transactions. Id.[22]

---

[21] The "Order" is defined in this letter as "the July 21, 1988 order conditionally approving the supervisory conversion." DX 2467 at 0422.

[22] Although counsel advised that First Annapolis could continue to fund loans through its service corporations, Mr. Parran testified that several projects were not funded starting in the fall of 1989, including Solomons Landing, Bayside Marina, and Pelican's Pouch. Tr. 1125-26; see Tr.

**The September 1989 Board Meeting**

On September 25, 1989, First Annapolis' Board of Directors met and discussed the advice given by counsel on the effect of the loans-to-one-borrower limitations imposed by FIRREA. The Board noted it was uncertain what the precise effect of FIRREA was on the Supervisory Agreement and the forbearances. JX 54 at 1395.

Pursuant to counsel's letter, the Board sought further information on whether the most profitable loans were greater or lower than $500,000 and, in the case of new customers, agreed to limit loans to $500,000. Id. at 1396. With respect to extensions or renewals, the Board decided that "[l]oans to extend credit or renew credit to customers with existing loans, including both performing loans as well as work-out or problem loans will be granted." Id. The Board decided that First Annapolis should work with customers to complete homes or projects and not to call loans in the middle of development or construction. Id. The Board decided that First Annapolis would gradually reduce the amount of aggregate loans issued to one borrower whenever possible. Id. With respect to loans to Delta partnerships, the Board decided, pursuant to the service corporation investment limitation forbearance, to continue the funding of existing Delta projects "for their completion when necessary to protect the collateral." Id. at 1396-97. According to Mr. Parran, "protecting the collateral," meant protecting "the guaranty of repayment, some type of asset, the personal guaranty, land, whatever the asset might be." Tr. 1377. The Board further noted that no additional projects had been entered into in 1989 in anticipation of FIRREA. JX 54 at 1397.

**The October 12, 1989 Special Meeting of First Annapolis' Board of Directors**

According to the minutes of a special Board of Directors Meeting on October 12, 1989, the Board unanimously passed a resolution providing in pertinent part:

> WHEREAS, On August 9, 1989, [FIRREA] was enacted which completely restructured the regulatory supervision of savings institutions and imposed new capital standards. Although the full impact of FIRREA will not be known until the adoption of new Federal regulations, [First Annapolis] recognizes that it must take immediate, drastic action to improve its capital position. With deep regret, the Bank believes it is necessary, as a result of FIRREA, to substantially reduce its number of employees thereby reducing expenses.

1155, 1325 ("This loan to Bayside was in excess of $500,000."). The Bayside Marina project continued to be marred by delays in sewer permits. DX 397 at 0172. The loans on the Bayside project had been placed on nonaccrual status on December 31, 1988. Tr. 988; DX 2145. On August 9, 1989, the date of the enactment of FIRREA, counsel for First Annapolis sent demand letters to Bayside's developer seeking full payment on its loans. Tr. 1265-67; DX 2215 at 0005; DX 2213.

23

JX 55 at 1399-1400 (emphasis added). That same day, the Board prepared a letter to stockholders outlining the impact of FIRREA, and voted to send the letter at the earliest possible date. JX 57 at 1942. First Annapolis' assets decreased by $24,626,091 during the month of October 1989. JX 58 at 1541.

## FIRREA's Implementing Regulations

On November 7, 1989, OTS issued FIRREA's implementing regulations, including those regulations that imposed minimum capital standards for the thrift industry. DX 2276 at 0181. The regulations were to become effective on December 7, 1989. Id.

## The November 13, 1989 Board of Directors' Meeting

As discussed in the November 1989 Board of Directors' meeting, "[d]eposit balances were reduced by $22 million during October 1989, due to lower rates, notice of branch closings and related publicity." JX 58 at 0966. In addition, during this meeting the Board approved a service corporation investment limitation report reducing current investment levels in order to comply with regulatory limitations. Id. at 968-69.

Mr. Parran also distributed a sample letter that was mailed to every limited partner of Delta Financial, which outlined "the effect that FIRREA has had on First Annapolis and disclose[d], that the bank will be required to gradually curtail all investments in service corporations. It was suggested to these partners that they should look for alternative financing." Id. at 0969.

## Supervisory Agent Jones' Letter Advising First Annapolis It Would Fail FIRREA's New Capital Requirements

On November 17, 1989, Supervisory Agent Jones of OTS sent First Annapolis a letter stating that OTS issued new minimum capital standards on November 7, 1989, that would take effect on December 7, 1989 and that, based on available financial information, First Annapolis would fail all three of the new capital requirements under FIRREA. DX 2276 at 0181. The letter warned that an institution that failed to meet its capital requirements would be subject to certain limitations, including limitations on growth and a prohibition from accepting brokered deposits. Id. at 0182. Such institutions were also required to submit a "capital restoration plan" by January 8, 1990. Id. The letter also indicated that OTS was currently developing policies which would "further address the inclusion of supervisory goodwill in capital calculations and the status of outstanding regulatory forbearances." Id. Accordingly, Supervisory Agent Jones asked First Annapolis to submit, in its capital plan, two separate financial capital projections, one including supervisory goodwill and forbearances, and the second excluding supervisory goodwill and forbearances. Id.

On January 5, 1990, First Annapolis submitted its Capital Plan to OTS which assumed that the regulatory forbearances would remain in force. PX 32; Tr. 1133-34.

**OTS Thrift Bulletin 38-2**

On January 9, 1990, OTS issued Thrift Bulletin 38-2, which indicated that all capital and accounting forbearances had been eliminated by FIRREA.[23] Thrifts were directed to eliminate the forbearances in determining compliance with the new regulatory minimum capital standards. OTS further advised that it would not approve capital plans that included the continuation of previously granted capital and accounting forbearances.

**First Annapolis' Declining Levels of Regulatory Capital Post-FIRREA**

First Annapolis had exceeded its June 30, 1989 capital benchmark with a RAP net worth ratio of 2.15 percent. However, its regulatory capital declined after the enactment of FIRREA. By September 30, 1989, First Annapolis's regulatory capital had fallen to 1.88 percent on a RAP basis. DX 365 at 1422. On October 31, 1989, First Annapolis' regulatory capital ratio fell below the June 30, 1989 1.80 percent benchmark to 1.77 percent. JX 58 at 1545. On November 30, 1989, the regulatory capital ratio was 1.65 percent, and on December 31, 1989, First Annapolis' regulatory capital ratio was 1.55 percent. DX 2294 at 1612; JX 61 at 1645.

**The January 1990 ROE**

As a result of First Annapolis' inability to meet the new capital benchmarks, OTS conducted a special limited examination of First Annapolis between January 16, 1990, and February 16, 1990. DX 397. First Annapolis was given a MACRO rating of "5," indicating an extremely high probability of failure. In the cover letter accompanying the January 1990 Report of Examination ("ROE"), the regulators identified $6.2 million in loan losses that First Annapolis was directed to charge off immediately, and also identified the need for an additional $5.8 million to be added to its general loan loss reserves. DX 439 at 1300-01; Tr. 1787. OTS instructed First Annapolis to develop an "asset classification policy." Id. at 1302. The regulators also asked First Annapolis to "develop and implement strategies for removing the basis of criticism on all criticized and classified assets." Id. Finally, OTS requested First Annapolis to develop a detailed plan which would demonstrate the elimination of all investments in service corporations no later than December 31, 1991. Id.

OTS directed First Annapolis to charge off assets classified as losses identified in the January 16, 1990 ROE in the amount of $6,186,116. Id. at 1300. These charge-offs included: (a) loans to the Bayside Marina Associates Joint Venture and Sterling Properties Associates III, Inc., in the amount of $3,234,056; (b) loans to Dennis Blaeuer entities in the amount of $947,882; and (c) Northampton Business Park, in the amount of $1,479,051. Id. The regulators also directed First Annapolis to "immediately increase its general loan loss reserve by $5.8 million, consistent with the institution's loan loss reserve policy and with the level of criticized and classified assets identified by the OTS examiners at the January 16, 1990 examination." Id. at 1301.

---

[23] The Court takes judicial notice of OTS Thrift Bulletin 38-2. Fed. R. Evid. 201.

In the January 1990 ROE, the examiners noted that when the additional loan losses booked for January 1990 of $1,069,725 and examination adjustments were made, the bank was insolvent on a GAAP basis.  DX 397 at 0156.  The ROE continued: "As a result of the impact of deducting both goodwill and the increased investment in Delta Financial Corporation (i.e., a non-includable subsidiary) since April 12, 1989, from stockholder's equity, the bank was failing, before examiner adjustments, both requirements by $69,668,093 as of December 31, 1989.  Once the examiner loss classifications and increases to the general valuation allowances are booked, these shortages are increased to $81,671,637, an amount equal to 10.9 percent of total assets."  Id.  The examiners further "identified $6.2 million of loan loss classifications and a $5.8 million increase to the general valuation allowance" that were required under First Annapolis' asset classification policy.  DX 397 at 0139.  As of December 31, 1989, First Annapolis' reported GAAP capital was $6.9 million.  Id.  When these additional loan classifications and general valuation allowances were booked, First Annapolis was insolvent on a GAAP basis.  Id. at 0139, 0150, 0156.

The examiners also determined that 35 commercial loans were at least 90 days past due. However, Mr. Parran testified that "the reason a majority of these loans were now delinquent 90 days is because we had stopped funding the joint ventures and loans to one borrower - - loans over $500,000, a majority of those loans, because of the new regulations.  So come January when this report is done, hello, we're in a different world."  Tr. 1320.

**Criticized Assets**

First Annapolis had an "Asset Classification Policy" that identified problem assets and classified them as "special mention," "substandard," "doubtful," or "loss."  JX 23 at 0461, 0466. Depending on the asset classification, First Annapolis created valuation allowances, or loss reserves, to provide for likely future losses.  Tr. 1908.[24]  "Special mention" assets did not require valuation allowances, but "substandard" or "doubtful" assets required valuation allowances of 10 percent and 30 percent, respectively.  JX 23 at 0461; DX 397 at 0150-51.  Assets classified as losses would result in write-offs.  When classified assets increase, the resulting increase in reserves lowers earnings and capital.  Tr. 1908, 1921-22.  Classified assets and special-mention assets are called "criticized assets." Tr. 1900.  First Annapolis recorded an increase in total criticized assets from $31.9 million in June 1989 to $78.8 million at the end of December 1989.

In the January 1990 ROE, which examined data as of December 31, 1989, the examiners found that there were criticized assets of $126.5 million.  First Annapolis stated that while "a substantial amount of the examiner's $126 million of criticized assets had [been] identified by [First Annapolis] . . . , the magnitude of the 500 percent increase in delinquencies during 1989 had placed additional stress upon the self classification process as well as upon management resources."  DX 397 at 0163.  Such assets represented 16.9 percent of First Annapolis' total assets.  Id. at 0170.  The

---

[24] First Annapolis' asset classification policy, originally adopted before the formation of the contract, stated that the loss allowance was "an estimate partly based on subjective judgment."  JX 23 at 0472.

regulators found that $87.6 million of the $126.5 million in total criticized assets identified during the examination should have been classified assets, requiring some level of loan reserve.  Id.

**OTS' Rejection of First Annapolis' Capital Plan and Proposed Consent Agreement For Appointment of Receiver: February 27, 1990**

On February 27, 1990, OTS rejected First Annapolis' Capital Plan in part, because the plan was based upon the continuation of the institution's regulatory capital and service corporation forbearances which FIRREA had removed.  DX 406 at 1039-40; see also Tr. 1785.  OTS also forbade First Annapolis from exceeding the $500,000 loans-to-one-borrower limit, stating:

> The institution has indicated that in certain circumstances the loan committee will approve violating the loans-to-one-borrower limitations.  The institution cannot exceed the loans-to-one-borrower lending limit, which for this institution, is limited to $500,000.  It should be noted that a deliberate violation of the aforementioned limitations could result in civil monetary penalties being assessed against the directors individually.

DX 406 at 1040.

Attached to the OTS letter was a proposed Consent Agreement providing for the appointment of a receiver or conservator.  Id. at 0974-92.  Mr. Parran perceived the Consent Agreement as a "cease and desist order."  Tr. 1383-84.  Mr. Parran also characterized this letter as "basically put[ting] the bank into receivership.  We had no control of what happened after the end of February."  Tr. 1237; see also Tr. 1854.  Under the Consent Agreement, First Annapolis could not "grow the bank" or increase its assets and could not manage or sell real estate or modify or fund loans without permission of the government.  Tr. 1855-58.  As of February 27, 1990, First Annapolis was immediately subject to the restrictions in the Consent Agreement, and "the bank's management was powerless to control this bank, it was in the control of the government."  Tr. 1858.

**First Annapolis' Shareholder Information Package: March 5, 1990**

On March 5, 1990, First Annapolis' Executive Vice President, David Vorel, submitted to OTS a set of documents relating to a special meeting of Bancorp stockholders, including a shareholder information package.  DX 412.  This shareholder information package stated that, pursuant to FIRREA, First Annapolis would have to phase out investments in service corporations over a five-year period starting on July 1, 1990.  Id. at 1542.  This shareholder information package quoted OTS Thrift Bulletin 38-2 noting that previously granted forbearances on minimum regulatory capital standards and limitations on investments in service corporations were "eliminated" by FIRREA.  Id. at 1543; see OTS TB 38-2, 1990 WL 309397 (O.T.S.) at 1.

The shareholder information package continued:

> It is now apparent that OTS considers the 1988 forbearances granted by FHLBB to the Bank to be presently invalid and of no effect based on OTS' interpretation of FIRREA.   OTS has also orally communicated this conclusion to the Bank's management.  The Bank's management and board of directors disagree with the OTS' position in this regard, especially since the Bank has conducted its operations in reliance upon the presumed continued validity of the forbearance agreements and in accordance with the prior assurances of certain personnel at the Federal Home Loan Bank of Atlanta that the same would be honored.  Furthermore, the effective date of OTS' termination of the Bank's forbearances remain[s] utterly unclear.
>
> While the Bank's management and board of directors do not concede the authority of OTS to summarily terminate these regulatory forbearances (particularly in the absence of a clear Congressional mandate to that effect), the Bank intends to cooperate fully with OTS and to proceed on the assumption that prior forbearances are no longer effective, at least for purposes of calculating the Bank's compliance with now-applicable minimum regulatory capital requirements.

DX 412 at 1543-44.

On March 19, 1990, First Annapolis' Board ratified a service corporation investment limitation report, which indicated:

> Based on TB 38-2, issued 1/9/90, it is the opinion of OTS that the forebearance agreement with respect to investments in service corporations is no longer valid.  Therefore, the conforming loan category has been removed from allowable investments on this report and all [First Annapolis] loans to Delta partnerships are now being reported in the 2% category.

JX 65 at 1735.

On March 22, 1990, Mr. Parran resigned as officer and director of First Annapolis, and was replaced by David Vorel, as acting chief executive.  DX 438 at 0019.  At an April 1990 Board of Directors meeting, Supervisory Agent Jones advised that whether signed or not, the Consent Agreement effectively had been enforced as of February 1990.  Tr. 1855.

28

**First Annapolis' Increasing Losses**

First Annapolis had projected approximately $1.2 million in earnings during the quarter that ended September 30, 1989, but instead lost $84,415. DX 2120 at 0129. For the quarter ending September 30, 1989, the income from service corporations was $631,513, which was less than the $909,000 in subsidiary income that First Annapolis had projected to earn. Id.[25]

In the following quarter ending December 31, 1989, First Annapolis lost $3,635,752 in net income on a consolidated basis, nearly $3.5 million more than expected. Id. at 1741. First Annapolis' losses continued in 1990, including $1,069,725 in January 1990, $13,326,238 in February 1990, $1,267,938 in March 1990, and $1,341,064 in April 1990. Id.; JX 65 at 1730; JX 68 at 0013.

For the quarter ending December 31, 1989, First Annapolis earned only $38,832 in income from service corporations. The thrift had projected $1,488,000 in service corporation income for the same period. JX 61 at 1647.

**The OTS' "S Memorandum" of April 16, 1990**

On April 16, 1990, OTS concluded in its "S Memorandum" that adequate grounds existed for the appointment of a conservator or receiver for First Annapolis. DX 438 at 0005. OTS determined:

> The institution has failed to meet its regulatory capital requirement since December 1987. The institution has experienced severe operating losses which have adversely affected its capital position. Such losses have averaged approximately $2 million per quarter during the past year. It is expected that the institution will require government assistance to be resolved due to its large deficit of tangible capital, and there are no reasonable prospects for recovery or recapitalization.

Id.[26]

In the S Memorandum, OTS determined that First Annapolis suffered "from a high level of non-earning and non-performing assets, insufficient net interest margin, an unfavorable operating

---

[25] However, the income from service corporations for this quarter was a significant increase from that earned from service corporations in the previous quarter, which was $133,355. Id. at 0486.

[26] OTS' view that First Annapolis had not met its regulatory capital requirement since December 1987 appears to refer to the higher regulatory capital requirements under the regulations, not the relaxed capital benchmarks under the contract, since it is clear that First Annapolis met the June 1989 contractual capital benchmark.

structure, as well as an extremely high level of goodwill." Id. at 0011; see Tr. 1794. Specifically, OTS found that First Annapolis failed to meet all of FIRREA's capital requirements, and First Annapolis had a tangible and core capital deficiency of $61,168,000 and a risk-based capital deficiency of $84,844,000 as of September 30, 1989. DX 438 at 0014.

On or about May 31, 1990, OTS placed First Annapolis in receivership, and the Resolution Trust Corporation ("RTC") took possession of First Annapolis. After First Annapolis went into receivership, Government officials functioned as senior management for the thrift. Tr. 1862. The FDIC incurred a $103.3 million loss on First Annapolis' liquidation, and First Annapolis' receivership had a deficit of $187.6 million as of December 31, 2006. DX 635 at 0008.[27]

**Disposal of Troubled Developments**

First Annapolis had scheduled a foreclosure sale on the entire Bayside Marina project on November 16, 1989. DX 397 at A-12.1. On October 27, 1989, however, First Annapolis reached an agreement with Mr. Leppo to accept a deed in lieu of foreclosure for the land on the Bayside project and refinanced the marina with a $5 million loan with a modified note with a maturity date of November 1, 1990. DX 2261 at 0615; DX 397 at A-12.1. The agreement was reached in order to preclude Mr. Leppo from filing for bankruptcy. DX 397 at A-12.1. Although Mr. Leppo remained in ownership and control of the marina and the operating income for the interim period, the nature of the modified note to Mr. Leppo constituted an in-substance foreclosure. Id. at A-12.1-12.2. The foreclosure was completed on December 12, 1989. DX 2314 at 0150.

On December 1, 1989, First Annapolis agreed to a sale of the White Rocks/Spa Creek Marina to the Annapolis Yacht Club, resulting in a $1.2 million loss to the thrift. Tr. 1297; DX 2289 at 0760. The loans on the White Rocks/Spa Creek project had been in default as of September 26, 1989, and Mr. Blaeuer agreed to the foreclosure and sale of the project to avoid bankruptcy. Tr. 995, 1004; DX 2272 at 1567. At the time that the loans on White Rocks/Spa Creek Marina went on nonaccrual and the property was foreclosed upon and sold, the cash flow from the marina was insufficient to carry the debt service of the combined loans from the thrift and the equity investments from Delta. Tr. 997, 1003-04. Mr. Cook testified that the reason for this was that the market for leasehold interests at the Spa Creek Marina narrowed beyond what was anticipated by the parties at the outset. Tr. 998. The property was sold at its "as-is" value, but because the project was not

---

[27] This is reflected in the March 31, 2006 "Goodwill Financial Reporting Package," admitted as an exhibit in this case subsequent to the trial on prior material breach. DX 635 at 0008. This exhibit was admitted over the objection of Plaintiff. The exhibit was not discussed or admitted in the damages trial. Plaintiff objects to the use of this exhibit in the damages phase. The Court overrules that objection on the ground that the exhibit is part of the record in this action. The procedural techniques employed in this case to manage proceedings -- bifurcating proceedings on liability and damages, and holding a separate trial limited to the prior material breach defense -- do not preclude the Court from considering evidence adduced in one phase of the case in another phase, absent an order to the contrary, demonstrated prejudice, or other good cause.

completed by the developer as originally contemplated, the thrift was deprived of the full value of the completed project. Tr. 999-1000. However, Mr. Parran testified that the White Rocks/Spa Creek Marina was now a "prime piece of marina commercial waterfront property." Tr. 1255. On January 22, 1990, First Annapolis reached an agreement with the developer for the transfer of the developer's partnership interest in Northampton to Delta. DX 397 at A-12.3; Tr. 1947-48.

The parties have stipulated that Bayside Marina, Northampton Park, Forest Mills, and Solomons Landing all had value as of the trial date. Tr. 1365, 1372. Mr. Parran testified that the Bayside, White Rocks, Northampton, and Forest Mills projects were ultimately "completed and perfect." Tr. 1295; see also Tr. 1254-55.

**Expert Opinions**

Dr. Heiden's Expert Opinion

Dr. Edward Heiden was admitted as an expert on behalf of Plaintiff in the field of economics, specifically, microeconomics and the impact of regulation and lost profits. Tr. 1419.[28]

According to Dr. Heiden, Bancorp lost $13,665,907 as a consequence of the Government's breach of its contractual promises to Bancorp. Tr. 1429; PX 44. Dr. Heiden described the regulatory forbearances as the "heart and soul" of what First Annapolis needed to be a profitable firm. Tr. 1430. Recognizing that Bancorp had funded an institution which "came to the table" with some $68 million in losses, Dr. Heiden characterized the forbearances as follows:

> The forbearance was in the form of capitalizing the excess of liabilities over assets for the extended history that this was an issue, and in the form of goodwill, and then amortizing that under an exceptional condition of an allowance of 25 years, so that the paying for that large liability, which turned out to be 60 million, would not unduly impede the financial condition and successful pursuit of its business by Bancorp as it moved forward.
>
> Second was the very important issue of the forgiveness of the regulatory capital requirement, or a modification of it, in terms of giving enough latitude in terms of time, five years, for them to get

---

[28] Dr. Heiden received a Bachelor of Arts degree from St. Louis University and a doctorate in industrial organization economics from Washington University in St. Louis. Tr. 1404-05. Dr. Heiden is the president of Heiden Associates, an economic and statistical risk assessment consulting firm in Washington, DC. Tr. 1403. Dr. Heiden's work involves analyzing issues related to regulation and risk assessment in antitrust, commercial and business contracts, and product safety. Id.

healthy and meet the regulatory benchmark of 3 percent that was a target goal, and to do it in an interim set of steps that would happen over this five-year period, starting with 1.8 percent of liabilities -- regulatory capital being at 1.8 percent of liabilities and moving up by 3/10 of 1 percent with every successive year.

The third . . . condition was that they could continue with and move to completion on the projects . . . of their subsidiary service corporations, and would not be restricted by regulations on those service investments and could move an agreed-upon list of projects to completion.

This was an agreement that was negotiated, really, in an interactive partnership arrangement between the Home Loan Bank Board and Bancorp, and the forbearances were negotiated there and in that way, and it seems to me it was basic . . . they went to the three areas that were needed for Bancorp to be successful, eliminating the baggage of its past, giving it enough flexibility with a five-year chance to meet its benchmarks and giving -- one of the key ways it was going to meet them, namely its loan -- the obtaining of profitability from its loan portfolio, giving that more flexibility and the flexibility for them -- for Bancorp to pursue that.

So these three benchmarks, I think, went to the heart of what financial health was all about.

Tr. 1430-32.

In Dr. Heiden's opinion, no reasonable investor would have invested in Bancorp if the forbearances had not been part of the contract. Tr. 1434, 1437-38. Dr. Heiden explained:

No investor that handles that kind of money, 13.6 -- actually, 14.6 -- I'm sorry, 14.1, would invest in this venture with those three conditions not being a part of the agreement, or conditions like it. They might not have been the very same ones, but something that allowed them to remove the burden of past regulatory deficits that prevented them from being a valid operating firm.

Second, that would not have allowed them to work with their major asset, their loan portfolio, in a way that could make it a part of normal business operations.

32

> And third, that would give it some latitude and space to get its act together with respect to meeting relevant regulatory benchmarks in a five-year period.  They absolutely needed all three of those.  The failure of any one of them would have made this an invalid -- an investment that I think any reasonably prudent man would have walked away from, whether savvy or not.

Tr. at 1437-38.

Dr. Heiden testified that had the Government performed for the full five-year term, First Annapolis would have had a "good chance" at being a profitable firm.  Tr. 1477-82.  Dr. Heiden based his opinion on the following: (1) FHLBB must have thought First Annapolis had "strong potential for viability" because it entered into the contract, (2) First Annapolis held substantial loan assets after the conversion and was granted five years to produce income with them, and (3) First Annapolis retained high franchise value with a very stable depositor base and a dominant position in a submarket.  Tr. 1477-78.

In Dr. Heiden's view,  FIRREA impacted First Annapolis as follows:

> [It created] a situation of a complete imbalance in profit and loss and assets and liabilities for Bancorp, and these benchmarks with new requirements that completely superseded and invalidated those benchmarks and prevented . . . Bancorp from being a profitable - from the opportunity to be a profitable savings and loan . . . .

Tr. 1432.  Dr. Heiden further assessed FIRREA's impact on goodwill:

> [T]hey could still include goodwill as an asset . . . in calculating capital requirements, but they didn't honor the 25 years.  And so with a new five-year amortization of what was basically a $60 million goodwill number, they were immediately putting 10 million more dollars on the expense side of the balance -- of the income statement of the thrift.

Tr. 1463-64.  Dr. Heiden explained FIRREA's impact on the other forbearances as follows:

> FIRREA introduced new benchmarks to replace the five-year interim -- interim and five-year regulatory capital requirement that was -- that Bancorp was operating under.  There were new ratios for I believe tangible . . . capital, core capital and risk-based capital benchmarks, which upped the ante, were considerably more draconian than what Bancorp was operating under with its agreement with the Federal Home Loan Bank Board.

33

> Plus, most importantly, they were operating in an environment where they could no longer manage their projects, their loan projects, under the service subsidiaries, and any -- and other projects as well were subject to not being able to go forward, which was not under a benchmark, but it was just -- it's what FIRREA did essentially and what OTS did with -- but it would have -- it would have immediately incurred $10 million more of losses, just with this change, the simple change in the goodwill benchmark. But it repudiated -- big time -- every one of them.

Tr. 1557. Dr. Heiden further testified that FIRREA negatively affected the thrift's ability to manage its real estate development projects through its service corporations in the following manner:

> And what happened was that FIRREA did not let the normal process of dealing with defaulted loans, which is trying to work them out, putting them in a special assets category for workout, it didn't let that happen for First Annapolis, when First Annapolis had every reason to believe that under the forbearances it had, it could have done that kind of thing.

Tr. 1448. In addition, Dr. Heiden testified that, in general, FIRREA had the following effects on non-performing assets:

> I haven't done any analysis of specific -- of specific projects. But in a general way, in a general sense, what was done was that FIRREA -- OTS implementing FIRREA closed these assets down and went to a complete write-off situation for them, without recognizing another part of the process for many loans that are in trouble, which is the part of the process of working out the problems, by putting them in a special asset group. These were good underlying assets. They might have had temporary problems. They had temporary situations where they weren't generating income. They were well collateralized by the presence of the Beltway, by marinas, by other factors that made them potentially valuable. They became non-performing because -- in large part because FIRREA wasn't having any of this patience that was needed for working out some of these situations with these assets, in a situation where they were problems. And where they weren't problems, they weren't creating any flexibility for the firm to make them -- to put them in a situation where they would be able to perform later. They couldn't -- some of these couldn't perform because they were lumpy capital, if you want to put it that way. They were at the time being built. They weren't going to generate income for a while.

34

Tr. 1523-24.

In Dr. Heiden's words, the $13,665,907 that Bancorp invested in First Annapolis "went away." Tr. 1438. He continued:

> It was dissipated in the failure of Bancorp, and putting it into reorg -- into a receivership kind of situation, with no capital left and, in fact, a lot of negative capital on the books and its assets in a shambles of reorganization.

Id.

### Mr. Kennedy's Expert Opinion

Mr. David A. Kennedy, CPA, testified as an expert for Defendant in the fields of damages, general accounting, financial institutions, and the causes of failure of financial institutions. Tr. 2135.[29]

Mr. Kennedy's overarching opinion was that that First Annapolis was in such dire financial condition that it would have failed even absent the breach. Tr. 2148. Mr. Kennedy articulated six sub-opinions that formed the basis of this opinion:

1.   First Annapolis failed its regulatory capital benchmark requirement in October 1989.

2.   First Annapolis' survival was dependent on receiving income from its service corporation projects.

3.   The service corporation profits did not materialize as expected, and First Annapolis lost money on its core operations as expected.

4.   First Annapolis "could never be profitable given its failure to realize the service corporation profits combined with its financial structure."

---

[29]   Mr. Kennedy received a Bachelor of Science degree in Business Administration, with a major in accounting from the University of Georgia. Tr. 2117. Mr. Kennedy has served as an auditor, consultant, expert witness and advisor to clients in the financial industry since 1985. DX 2450 at 1.

The Court admitted Mr. Kennedy's documents, DX 4000-4037, as illustrative as a roadmap to facilitate understanding his testimony. The documents are not used to support findings of fact. See Tr. 2301-02.

5.      First Annapolis' asset quality declined drastically in the latter half of 1989.

6.      First Annapolis would not have been able to meet its June 1990 capital benchmark unless it generated positive earnings, shrunk, or raised substantial sums of capital.

Tr. 2148-50. Mr. Kennedy further opined that First Annapolis became "non viable during the third quarter of 1989 [July - September], and at that point [it was] on an irreversible course to failure." Tr. 2150; see also DX 2450 at 3 (stating that First Annapolis "would have failed absent enactment of FIRREA"). Mr. Kennedy based his opinion on First Annapolis' "pre-conversion and post-conversion financial performance, its asset quality and the impact of service corporation investments on its performance." DX 2450 at 5; Tr. 2310, 2322; DX 2450 at 4-10.

Mr. Kennedy's first sub-opinion was that, even with its forbearances, First Annapolis failed its modified regulatory capital benchmark, insofar as First Annapolis' capital fell below 1.8 percent of total liabilities in October 1989. Tr. 2170. He based his opinion on First Annapolis' own unadjusted books and records, citing a regulatory capital deficit of $192,000 on October 1989, and a regulatory capital deficit that increased to $13.743 million as a result of loan losses recorded in February 1990. Tr. 2167, 2184, 2188; see also DX 4004.[30]

Mr. Kennedy testified that First Annapolis' losses on Bayside Marina of $3.2 million were incurred as early as April 1989, when the thrift began to consider foreclosing on the loan. Tr. 2205; JX 46 at 1012; DX 2195, 4005. The July 1989 appraisal on the project suffered from "significant deficiencies," "improper assumptions," and "erroneous facts." Tr. 2002; DX 397 at 0172; DX 2335 at 2024; DX 4005. The loan was restructured in 1989, including a refinancing of the Marina in the amount of $5,000,000, and the developer and guarantor, Mr. Sterling Leppo, agreed to the foreclosure of the undeveloped land and unsold units. DX 2261 at 0615; DX 2335 at 2024. According to Mr. Kennedy, under accounting standards, First Annapolis could have written down this asset as early as April 1989, but it was required to write it down no later than October 1989. Tr. 2205.

While the foreclosure of Bayside Marina actually took place on December 12, 1989, Mr. Kennedy testified that this was but the conclusion of a process that began in the spring of 1989. Tr.

---

[30]   The thrift regulators directed First Annapolis to charge off $6.2 million in loan losses. DX 439 at 1300. These loan losses resulted from Bayside Marina, in the amount of approximately $3.2 million, Dennis Blaeuer, in the amount of approximately $948,000, and Northampton Business Park, in the amount of $1.5 million. Tr. 2189; DX 439 at 1300. According to Mr. Kennedy, these losses were incurred in the third quarter of 1989, i.e., no later than October 1989, and should have been recorded no later than fourth quarter 1990. None of these loan losses, Mr. Kennedy claims, had anything to do with the breach.

2204; DX 2314 at 0150.  Moreover, the fact that only 19 of 288 units planned for construction were built at this time as a result of sewer permit issues indicates, in Mr. Kennedy's view, that the problems with Bayside were unrelated to the breach.  First Annapolis would have had to hold onto the property for a long period of time while waiting to obtain sewer permits and would have incurred carrying costs.  Tr. 2204; DX 2314 at 0150.  Mr. Kennedy testified that the losses on Bayside would have occurred but for the breach, and could not have been prevented because of a downturn in economic and real estate conditions in 1989 and in subsequent years.  Tr. 2206.

Similarly, with respect to Northampton, Mr. Kennedy testified that the loss of $1,479,051 was not due to the breach.  Tr. 2006.  Mr. Kennedy pointed out that a three-month extension on the loans was granted in April 1989, suggesting that the borrowers had difficulty paying back the loan prior to FIRREA.  Tr. 2207; DX 2162 at 2237.  Also prior to FIRREA, the loan matured on July 20, 1989, and was not repaid, and First Annapolis planned no further extensions or modification.  Tr. 2207; DX 2461 at 0171.  On August 2, 1989, First Annapolis decided to stop funding the loan with the exception of an additional $224,000 for ground improvements, which Mr. Kennedy characterized as a loan to protect the collateral.  In Mr. Kennedy's view, this limited funding demonstrates that, as of that date, First Annapolis believed that it could continue extending money to service corporation projects.  Tr. 2208.  By August 20, 1989, the Northampton property was appraised at $6.7 million.  Id.; DX 2218 at 1659.  Mr. Kennedy testified that, under Financial Accounting Standard No. 5, as soon as a loss was probable and capable of being estimated, First Annapolis was required to estimate the loss and book it no later than the August 20, 1989 appraisal.  Tr. 2210-11.

Finally, Mr. Kennedy stated that the losses incurred by First Annapolis for the loans to the Dennis Blaeuer entities, in the amount of $947,882, were not due to the breach, and should have been recorded earlier than February of 1990.  Specifically, he testified that as of December 31, 1989, the loans were three to six months delinquent, meaning that there were problems as least as early as June 1989.  Tr. 2211.  As of September 1989, construction bids for Mr. Blaeuer's White Rocks Marina project were in excess of what the project would economically support.  Tr. 2212; DX 2464 at 0302.  This, Mr. Kennedy states, was indicative of problems in the real estate market, and there was a decrease in demand for marina projects.  Tr. 2212.  He also noted that First Annapolis agreed to restructure the Dennis Blaeuer loans in November 1989 so that Mr. Blaeuer could avoid bankruptcy.  DX 2256 at 0076; DX 2272 at 1567; Tr. 2213.  Mr. Kennedy testified that First Annapolis should have booked the loss as of December 1, 1989, when it agreed to the sale of the White Rocks/Spa Creek Marina for $3.5 million and the release of $4.7 million in loans, which the thrift calculated at the time as resulting in a $1.2 million loss.  Tr. 2214.

Mr. Kennedy opined that the loss of the service corporation forbearance did not cause the losses for these three loans, noting that Bayside Marina was not a service corporation investment, but a loan on the books of the thrift, that Northampton was in default as of July 20, 1989, and funding stopped on August 2, 1989, and that the Dennis Blaeuer loans were restructured in November 1989, to avoid bankruptcy.  Tr. 2215-16.

Mr. Kennedy's second sub-opinion was that First Annapolis' survival was dependent on receiving income from its service corporation projects because First Annapolis was projected to lose money on its core thrift operations. Tr. 2237. However, by January 1989, First Annapolis was projecting larger core bank losses through December 1990, and not becoming positive until March 1991, with further delays in receiving service corporation income. JX 135 at 0882; Tr. 2239. Mr. Kennedy opined that if First Annapolis did not obtain the service corporation income that it projected in January 1989, the thrift would not be viable. Tr. 2240.

Mr. Kennedy's third sub-opinion was that "[t]he service corporation profits did not materialize and First Annapolis lost money on its core banking operations as projected." Tr. 2240. Mr. Kennedy testified that in July 1988, shortly before the contract was formed, the thrift and banking market was stable in the North, Northeast, and Southeast. Tr. 2242. However, previously, there were large gains on real estate that had leveled off, and similar gains in real estate might not be possible because the Tax Act of 1986 had already passed which had an impact on real estate investments and real estate related assets. Id.[31] Mr. Kennedy noted that in July 11, 1988, the examiners reviewed 10 of the 38 joint ventures, which represented 48 percent of the thrift's investments in joint ventures and 49 percent of the projected profits and found that "considering the speculative nature of these real estate ventures, any change in market conditions can have a substantial impact on profits booked." DX 118 at 0035; Tr. 2243.[32] Mr. Kennedy stated that in 1989, there was a real estate recession, that continued through 1990 and 1991. Tr. 2243-44. By the time the downturn started, First Annapolis was losing so much money on core businesses, more than projected, that when the service corporation profits did not materialize, the thrift was further in the hole. Tr. 2245; DX 4013; DX 4014. First Annapolis lost money overall between March and December of 1989 because the core bank lost money and the service corporation revenue was not being realized. Tr. 2249; DX 4016.[33]

For the quarter ending December 1989, First Annapolis projected a loss of $1.7 million in core operations, but its actual losses were approximately $3.7 million, while the thrift earned only

---

[31] By "Tax Act of 1986," the Court interprets Mr. Kennedy as referring to the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085, which eliminated certain tax benefits associated with real estate investments. "It's pretty widely accepted that the Tax Act of 1986 started [the real estate recession that began in 1989]. It phased out deductibility of losses on real estate projects for investors. And there was a tremendous outflow of cash, and the inflow of cash into real estate projects started to stop as those -- as the Tax Act of '86 started kicking in during the latter half of 1986." Tr. 2283-84.

[32] The July 11, 1988 ROE also stated that "this review disclosed that some projected profits may be realized later than originally estimated." DX 118 at 0035.

[33] However, with respect to service corporation income, Mr. Kennedy's demonstrative shows that, while the service corporation income was always less that projected, the sharp decline in service corporation income took place in the quarter ending December 1989. See DX 4014.

$38,832 from its service corporations when it was projecting nearly $1.5 million in income.  Tr. 2257.  Mr. Kennedy opined that the loss in income from core operations was due to non-performing loans and First Annapolis' sale of interest-earning assets.  Tr. 2258.

Mr. Kennedy's fourth sub-opinion was that "First Annapolis could never be profitable, given its failure to realize the service corporation profits combined with its financial structure."  Tr. 2258.  Mr. Kennedy testified that even if First Annapolis had received its projected income from service corporations, it could not have survived with net interest income that covered less than 50 percent of operating expenses without a significant flow of income.  Tr. 2261.

Moreover, Mr. Kennedy opined that First Annapolis' interest-bearing assets were declining due to selling assets to cover operating losses and having fewer assets to generate income, as well as poorer asset quality.  Tr. 2263.  In Mr. Kennedy's view, the only way that First Annapolis could generate additional assets was by increasing deposits or by trying to convert nonperforming assets into performing assets.  Tr. 2264.  However, Mr. Kennedy stated that increasing deposits was not possible as of June 1989, because First Annapolis had only $500,000 in capital.  Mr. Kennedy also opined that converting non-interest earning assets to interest-earning assets was not possible as a result of generally deteriorating economic conditions and skyrocketing nonperforming loans.  Tr. 2264-65.

Mr. Kennedy's fifth sub-opinion was that "First Annapolis' asset quality deteriorated significantly in 1989, which greatly contributed to its dire financial condition."  Tr. 2265.  First Annapolis' delinquent loans increased from $13,100 from March 1989 to $58,300 in July 1989, and to $82,300 in September 1989.  The delinquent loans appeared to remain stable through March 1990.  Tr. 2267.[34]  Mr. Kennedy opined that the increasing loan losses had nothing to do with FIRREA because they were consistent with asset quality deterioration at banks unaffected by FIRREA and that the loan files and board minutes of First Annapolis did not discuss FIRREA as the cause of these loan losses.  Tr. 2268-69.

Despite the deteriorating assets, in Mr. Kennedy's view, First Annapolis was reversing loan loss provisions and booking gains in the accounts -- not something that a thrift would be expected to do -- resulting in misstated financial statements.  Tr. 2270-73.  From July 1989 through December 1989, the number of substandard loans decreased while "special mention" assets were "spiking."  Tr. 2273; DX 4028.  As of September 1989, First Annapolis had $582,000 in excess regulatory capital and $32 million in special mention loans.  Tr. 2275; DX 4004; DX 4028.  Mr. Kennedy testified that if $6 million in special mention loans had been reclassified as substandard loans, the amount of capital would necessarily have been reduced by 10 percent or $600,000, which would

---

[34]  Despite the apparent leveling off of delinquent loans, Mr. Kennedy opined that in fact there would have been write-offs of loans, making the delinquency loan rate higher than  actually shown.  Tr. 2267.

have wiped out the excess regulatory capital.  Tr. 2275-76.[35]

Mr. Kennedy's sixth sub-opinion was that First Annapolis would have had to shrink, raise capital, or generate income from service corporations or its core operations in order to meet its raised regulatory benchmark from 1.8 percent to 2.1 percent by June 30, 1990.  Tr. 2277.  Mr. Kennedy opined that between April 30, 1990, and June 30, 1990, First Annapolis would have had to raise $16.9 million to meet its regulatory benchmark, but that First Annapolis could not have generated sufficient income from its assets and the general real estate market was sufficiently poor that generating such income was "unrealistic." Tr. 2278.[36]

According to Mr. Kennedy, Bancorp lost its investment as a result of factors unrelated to FIRREA, and by the end of the first quarter of 1990, "First Annapolis was insolvent." DX 2450 at 16; Tr. 2283.[37]  He also found that the majority of the large losses incurred during the first quarter of 1990 ($19 million), were not caused by the phase-out of goodwill from regulatory capital, but rather that a $12 million loss was caused by loan losses that should have been booked earlier.  Tr. 2285; DX 4031.

However, Mr. Kennedy admitted that FIRREA affected First Annapolis and had a significant impact on the thrift industry as a whole.  Tr. 2304, 2323-24.  Mr. Kennedy testified that he first saw

---

[35]  Specifically, Mr. Kennedy testified that loans to Dennis Blaeuer with a balance of $11 million and the Northampton loan with a balance of $9 million should have been classified as substandard.  Tr. 2276.

[36]  Mr. Kennedy testified that Mr. Parran rejected the tactic of shrinking of First Annapolis to meet its June 30, 1990 benchmark.  JX 44 at 0952.  The Court has been unable to locate in the record specific support for this statement.  In contrast, according to the March 15, 1989 Board of Director minutes, Mr. Parran stated that "First Annapolis will not be able to grow to $1 billion as anticipated and may even have to reduce the size of the company to obtain its best capital position." JX 44 at 0952.

[37]  Mr. Kennedy opined:

> [T]he breach did not cause First Annapolis to lose more money on its core banking operations than it expected.  The breach did not cause the service corporations to fail to achieve their projected profits.  The breach did not cause the loan losses that First Annapolis recorded in February of 1990.  The breach did not cause First Annapolis's asset quality to deteriorate.  And of course, the breach did not cause the real estate market to fall into a deep recession, which had a dramatic impact on that investment.

Tr. 2283.

evidence of the impact of FIRREA on First Annapolis in its June 1989 Revised Business Plan. Tr. 2311-12. Mr. Kennedy agreed that most of the losses that led to his opinion occurred in late 1989 and early 1990. Tr. 2319. Mr. Kennedy did not determine on what date First Annapolis became a failed thrift. Tr. 2322. Mr. Kennedy agreed that after FIRREA was enacted, the bank was controlled by the Government, and the Government took the option of riding out the real estate recession away from First Annapolis. Tr. 2337. Mr. Kennedy further opined that the recession was over by 1991, but that real estate values came back at a slower pace. Tr. 2336-67.

Dr. Shapiro's Expert Opinion

Dr. Alan C. Shapiro testified as an expert for Defendant in the area of financial economics, banking, and economic valuation.[38]

Dr. Shapiro provided an expert opinion on the economic damages, if any, suffered by First Annapolis owing to FIRREA. DX 2452 at 1. Dr. Shapiro's overall opinion was that at the time of the passage of FIRREA, First Annapolis' regulatory forbearances "were essentially worthless" at the time they were lost. DX 2452 at 5; see also Tr. 2455. Dr. Shapiro reached this conclusion based on his opinion that even with the forbearances, First Annapolis would not have remained open and made a profit. Id. According to Dr. Shapiro, First Annapolis fell out of regulatory capital compliance as early as October 31, 1989, even taking the forbearances into account. Tr. 2450; DX 2452 at 6, 10. He testified: "By the March 31, 1990 measurement date, the bank was GAAP insolvent and was almost $14 million short of its minimum capital requirement . . . . It is clear that First Annapolis would have failed to meet its capital benchmarks even if its regulatory forbearances had remained in place." DX 2452 at 10. Dr. Shapiro "saw no prospect for a turnaround." Tr. 2455.

Dr. Shapiro did not do a detailed analysis of the impact of FIRREA on First Annapolis' operations. Tr. 2503-05, 2510-11. Even though First Annapolis suffered much greater losses in the last part of 1989 and early 1990 -- after FIRREA's enactment -- Dr. Shapiro opined that FIRREA had no impact on the thrift. "[F]rom what I saw, I didn't think that . . . [First Annapolis] had much hope for survival, with or without the regulatory forbearances." Tr. 2504-05.

## Discussion

## The Government Breached Its Contract With Bancorp in Failing to Honor the Forbearance Allowing Excess Investments in Service Corporations

In the opinion on liability, this Court found that the Government granted service corporation investment forbearances in connection with the supervisory conversion of First Federal, but did not

---

[38]   Dr. Shapiro is the Ivadelle and Theodore Johnson professor of banking and finance emeritus at the Marshall School of Business, University of Southern California. Tr. 2391-92. Dr. Shapiro received this bachelor's degree in mathematics from Rice University, and a PhD in economics from Carnegie-Mellon University in 1971. Tr. 2393.

determine whether FIRREA breached these obligations.  The Court stated:

> Bancorp alleges that the regulatory changes wrought by FIRREA breached the Government's promise to recognize the favorable regulatory treatment of First Annapolis' investment levels in service corporations.   While it is clear that forbearances regarding investments in service corporations were granted in connection with the regulators' approval of the supervisory conversion and acquisition, it is unclear on this record whether or how FIRREA impacted this aspect of the agreement.

First Annapolis, 75 Fed. Cl. at 279, n.18.  Based upon the fuller record developed during the damages trial, the Court concludes that FIRREA prevented First Annapolis from availing itself of this forbearance.

**The Government Entered into a Contract with Bancorp Granting a Service Corporation Forbearance to First Annapolis**

Bancorp entered into a contract with the Government for favorable regulatory treatment of First Annapolis' investments in service corporations.  Bancorp made an offer to the Government to convert First Federal to a federal stock savings bank and merge it into First Annapolis, and have Bancorp acquire First Annapolis, immediately infusing the merged institution with capital.  The offer was premised on the regulators' approval of the Business Plan, which disclosed the thrift's investments in service corporations and other affiliates, in which it would  continue investing for a five-year period.  This offer was accepted by the Government through the issuance of FHLBB Resolutions 88-602 and 88-603 approving the conversion, as well as the July 21, 1988 and the August 11, 1988 FHLBB letters and the "technical" amendment dated August 12, 1988.[39]

The FHLBB forbearance letter dated July 21, 1988, as amended by the August 12, 1988 letter, expressly provided that First Annapolis would, for purposes of complying with service corporation investment limitations in Federal regulation 545.74(d), be deemed to be in compliance with its minimum capital requirement.  PX 3; PX 6.  In addition, the FHLBB promised First Annapolis that it would not take any supervisory action against First Annapolis with respect to then-existing service corporation investments, so long as First Annapolis complied with the Business Plan.  PX 5.  The August 12, 1988 forbearance letter assured that, for the five-year period of relaxed capital benchmarks, First Annapolis would be allowed to maintain higher investments in service corporations permitted by regulation for those Federal associations which met their regulatory minimum capital requirements.  The upshot of the service corporation forbearance was that the

---

[39]  The original forbearance required approval by the Supervisory Agent in order for First Annapolis to continue making investments in service corporations up to the higher amounts permitted to thrifts that met the minimum capital requirements.  The requirement for approval by the Supervisory Agent was deleted in the "technical" amendment.

FHLBB promised, as explained by Mr. Parran, "to allow an overinvestment in the service corporations which . . . the bank presently had, and to continue and build out those projects. And in conjunction with that, it was a forbearance allowing conforming loans from the bank to be made to the service corporations so that that could happen, so there would be no illegal activity or criticism involving the build-out and finishing of those projects." Tr. 1042.

First Annapolis' consideration for the service corporation investment forbearance was identical to that for the other contractual promises in the conversion. In exchange for the merger of the failing First Federal with First Annapolis, and the infusion of $13.6 million of capital from Bancorp, the Government permitted First Annapolis to be deemed in compliance with regulatory capital requirements. This permitted the thrift to over-invest in service corporations without taking any supervisory action, so long as First Annapolis complied with the relaxed capital benchmarks in its Business Plan and with the July 8, 1987 Supervisory Agreement governing First Federal.[40]

The Government argues that "FIRREA's provisions that limited investments in service corporations did not breach the contract" because Bancorp bore the risk of regulatory change under the contract. Defendant maintains that the following language in the July 21, 1988 FHLBB Forbearance Letter shifted the risk of regulatory change to Bancorp:

> In the event that any regulation or statute referred to herein is amended or succeeded by another statute, regulation or rule, then any reference to any such regulation or statute shall be deemed to refer to such regulation or statute as amended or the statute, regulation or rule which succeeds any such regulation or statute.

PX 3 at 2; Def.'s Reply Br. at 47-48.

The above-quoted language clearly did not shift the risk of regulatory change to Bancorp. Rather, this routine provision simply acknowledged that if statutes and regulations were updated, the updated versions would apply. This provision did not effect a radical alteration of the fundamental premise of the agreement by permitting Defendant to abandon its forbearances after Bancorp had infused cash and acquired First Federal. Rather, under the contractually established five-year window of relaxed benchmarks here, "successor" regulations purporting to be updates or amendments could not displace the terms of the bargain which acknowledged that those same regulations would not be enforced.

Unlike other successor-regulation provisions that <u>were</u> found to have shifted the risk of regulatory change away from the Government and onto private contracting parties, the provision in

---

[40] For the same reasons that the FHLBB had actual authority to bind the Government to contractual forbearances and relaxed capital benchmarks in this conversion, it had the actual authority to bind the Government to the service corporation investment limitation forbearance. <u>See</u> <u>First Annapolis</u>, 75 Fed. Cl. at 276-77.

the July 21, 1988 Forbearance Letter does not purport to give notice to Bancorp that the thrift's obligations under the contract could change due to successor regulations. In <u>Admiral Financial Corporation v. United States</u>, the Federal Circuit found such notice citing language which explicitly provided that regulatory amendments could increase the thrift's obligations. 378 F.3d 1336, 1339, 1342-43. The language in the <u>Admiral</u> agreement stated: "All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, <u>it being expressly understood that subsequent amendments to such regulations may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement</u>." <u>Id.</u> at 1339. (emphasis added). In <u>Guaranty Financial Services, Inc. v. Ryan</u>, the Eleventh Circuit found the following similar language sufficient to shift the risk of regulatory change:  "All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being <u>expressly understood</u> that subsequent amendments to such regulations may be made and that such amendments may <u>increase or decrease the Acquiror's obligation</u> under this Agreement."  928 F.2d 994, 999-1000 (emphasis added).

Here, the provision regarding statutory and regulatory amendments makes no mention of altering Bancorp's obligations.  The sentence in the July 21, 1988 letter does not use what the Supreme Court characterized as "clearer language" necessary to permit the Government to change the bargain by altering capital requirements and shift the risk of such regulatory change to the private contracting parties.  <u>See</u> <u>Winstar</u>, 518 U.S. at 869 n.15.  Rather, the successor-regulation language here is akin to that found in assistance agreements or regulatory capital maintenance agreements that were deemed <u>not</u> to have shifted the risk of regulation onto private contracting parties.

In <u>Winstar</u>, the Supreme Court found the following language from an Assistance Agreement insufficient to shift the risk of regulatory change: "[T]he governing regulations and the accounting principles shall be those in effect on the Effective Date or as subsequently clarified, interpreted, or amended by the Bank Board or the Financial Accounting Standards Board ("FASB"), respectively, or any successor organization to either." 518 U.S. at 864-70.  Additionally, the Court found that a Regulatory Capital Maintenance Agreement obliging a thrift purchaser to maintain the regulatory capital of the acquired thrifts "at the level . . . required by § 563.13(b) of the Insurance Regulations . . . or any successor regulation" likewise did not shift the risk of future contrary regulation away from the Government.  <u>Id.</u> at 867-70; <u>see also</u>, <u>S. Cal. Fed. Sav. & Loan Ass'n v. United States</u>, 52 Fed. Cl. 531, 545 (2002), <u>vacated on other grounds</u>, 422 F.3d 1319 (Fed. Cir. 2005) (concluding regulatory capital maintenance agreement did not shift risk where it required "'regulatory capital' to be 'maintained at the level required by § 561.13(b) of the Insurance Regulations' in effect at that time (1986) or 'any successor regulations, as now or hereafter in effect'"); <u>Cal. Fed. Bank v. United States</u>, 39 Fed. Cl. 753, 778 (1997), <u>rev'd on other grounds sub nom.</u> <u>Suess v. United States</u>, 535 F.3d 1348 (Fed. Cir. 2008).

**The Government Breached Its Contractual Obligation to Honor the Service Corporation Forebearance**

Because FIRREA precluded First Annapolis from meeting its capital requirements  and only

capital-compliant thrifts could exceed the loans-to-one-borrower limitation, the thrift was restricted to lending a maximum of $500,000 to one borrower or entity. This had the domino effect of breaching the Government's agreement to allow First Annapolis to exceed regulatory limits governing investments in its service corporations.

In response to FIRREA, on September 25, 1989, the Board of Directors took two actions consistent with the assumption that FIRREA's new loans-to-one-borrower limitation of $500,000 applied to First Annapolis.[41] First, on the advice of its counsel, the Board of Directors decided to cease funding new loans above $500,000 to any single borrower.[42] Second, the Board of Directors scaled back First Annapolis' funding of existing service corporation projects, except as necessary "to protect the collateral." JX 54 at 1396. The Board of Directors' determination to reduce the funding of existing service corporations is consistent with Mr. Parran's testimony that First Annapolis did not, in fact, continue to fund Solomon's Landing, Pelican's Pouch, and Bayside Marina in the fall of 1989.[43]

Defendant argues that, even if there were a breach of the service corporation forbearance, the breach did not harm First Annapolis because the thrift continued to fund existing service corporation investments at its post-FIRREA September 25, 1989 Board Meeting, and it did not account for the loss of the forbearance until its March 1990 Board of Directors Meeting. However, regardless of when First Annapolis ultimately ceased funding these loans, it is clear that the limitation on loans-to-one-borrower adversely impacted the thrift. Although there was some restructuring of loans to protect collateral or to avoid bankruptcy for the borrowers, First Annapolis never fully renewed the loans so that the projects could be completed. All of the restructuring took place before November 17, 1989, when First Annapolis was told by OTS that it would fail the FIRREA capital requirements. Mr. Parran testified that the loans-to-one-borrower limitation prevented Bayside from bringing its projects to completion. Tr. 1325. Had the capital forbearances

---

[41]   In addition, beginning at an earlier point in 1989, in anticipation of FIRREA, First Annapolis did not enter into any new development projects with Delta. JX 54 at 1397.

[42]   The basis of its counsel's advice was an OTS Statement of Policy, dated August 29, 1989, which imposed the $500,000 loans-to-one-borrower limit on new loans or commitments made after the enactment of FIRREA on August 9, 1989. JX 54 at 1396; DX 2467 at 0420.

[43]   The loans to Bayside Marina were not listed as an investment in a service corporation at the time First Federal entered into its contract with the Government. This was because these loans were structured differently than First Annapolis' direct investments in service corporations -- the thrift was to receive an equity or profit kicker if the Bayside project was successful. Tr. 1358. In 1987, First Federal loaned approximately $16 million for the acquisition, development, and construction of a 300-slip marina and 288 housing units on Kent Island, Queen Anne's County, Maryland, to Bayside Marina Associates Joint Venture. The breach caused the $500,000 limit to apply to the Bayside loan, which made the loan substandard, making it impossible for the thrift to see this project through to completion.

been honored, the $500,000 loan limit would not have kicked in, and there is no suggestion that First Annapolis would have departed from its goal of securing income from its real estate investments, even if that meant extending or renewing loans for Bayside or service corporation joint ventures. The fact that income from service corporations, while below expectations, significantly increased between the quarters ended June 30, 1989, and September 30, 1989, but totally collapsed in the quarter ending December 31, 1989, the quarter after FIRREA was enacted, indicates that FIRREA played a key role in the decline of the service corporations' and Bayside's development projects.[44]

In addition, although First Annapolis did continue to fund some of its loans into September 1989, it is clear that the breach of the service corporation forbearance impacted the thrift well before that.  Prior to the enactment of FIRREA, Mr. Parran consulted with Supervisory Agent Jones, who thought that the legislation probably would be enacted by August, and Supervisory Agent Jones advised First Annapolis not to make loans over $5 million in the spring, knowing that they would become illegal in August.  Tr. 1050-51, 1054.  As Mr. Parran credibly testified:

> And the closer we got to the culmination of that act, obviously, the more worried we became.  We . . . felt responsibility to go out and share this information with a lot of our joint venture partners, which is the service corporations, where the income was coming from. Some of our large loan individuals . . . .  And the basis for that, the reasoning for that, is that based on what we knew in the early summer/late spring is that if the regulation actually was passed as suggested at that time, we'd be back to the maximum loan of a half a million dollars.  We couldn't finish 90 percent of the projects we had in the subsidiary companies, where all of our income was supposed to come from.
>
> We suggested to . . . the joint venture partners . . . that this was a high probability . . . we would try to help them so that they could go out and refinance these loans somewhere else or pay them off, or we would do the best we could to continue up until a drop-dead date, if that happened.

Tr. 1048-50.

Mr. Parran personally informed the developers that the passage of FIRREA might prevent First Annapolis from continuing the joint venture operations:

---

[44] The weight of the evidence does not support Mr. Kennedy's opinion that causes other than FIRREA were responsible for the losses First Annapolis suffered as a result of not being able to complete its service corporation projects.

> I told them -- I was very blunt I said it may prohibit us from continuing to fund your project.  I said you should at least go out and try to obtain outside financing from another bank or institution or entity, or maybe we should just try to sell the property or you should try to sell the property as-is, because it -- there is a possibility that unfunded it could just go into foreclosure.

Tr. 1061.

First Annapolis' inability to continue funding its loans to service corporations had a deleterious effect on the financial future of the bank.  Both First Annapolis and the FHLBB regulators expected that there would be peaks and valleys in First Annapolis' profitability until the service corporation projects matured.  Tr. 1145, 1815-16. Most of First Annapolis' service corporation projects were just getting started in 1989, and First Annapolis expected to lose money during the first two-to-three years of the Contract until the service corporation projects were completed. Tr. 1043, 1056-58, 1145.  As Mr. Parran expressed it, the "major effect" of FIRREA was that:

> [E]verybody was counting on . . . the subsidiary income from these joint ventures . . . . But not that we predicted a tremendous amount of income in '89 from those subsidiary companies anyway, but when [FIRREA] happened, it just cut off the future . . . it wasn't possible for us to ever think about obtaining earnings from those subsidiary companies again.  And that's what the financial future of the bank was based on.

Tr. 1063.  In Mr. Parran's view, had Bancorp been given the full five years of performance, the service corporation projects would have been developed and made money.  Tr. 1296.  As Plaintiff's expert, Dr. Heiden, testified, in light of the five-year deal, even though some of the development projects were under water or severely delayed, it would have been rational, absent the breach, for the thrift to extend or otherwise work out its pending loans so that the development projects could be completed, and the thrift could receive the real estate investment income that it needed to improve its capitalization.  Tr. 1448 ("And what happened was that FIRREA did not let the normal process of dealing with defaulted loans, which is trying to work them out, putting them in a special assets category for workout, it didn't let that happen for First Annapolis, when First Annapolis had every reason to believe that under the forbearances it had, it could have done that kind of thing."); see also Tr. 1431, 1457.

Accordingly, the Court finds that in enacting FIRREA, the Government breached its contractual obligation to allow First Annapolis to exceed regulatory limitations on investing in its service corporations and that this breach harmed First Annapolis.

47

**Plaintiff's Theory of Damages: Restitution**

Plaintiff seeks $13,665,907 in money-back restitution that Bancorp infused into First Annapolis. The restoration of a monetary contribution a bank made in exchange for regulatory forbearances in taking over a failing thrift, has been recognized to be a proper remedy in the Winstar context, denominated as restitution. See Republic Savings Bank v. United States, No. 08-5075, slip op. at 8 (Fed. Cir. Oct. 21, 2009); Glendale Fed. Bank, FSB v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004); Hansen Bancorp v. United States, 367 F.3d 1297, 1314-15 (Fed. Cir. 2004); Landmark Land Co. v. FDIC, 256 F.3d 1365, 1372 (Fed. Cir. 2001) ("Restitution is available to a private party to remedy a contract breach or repudiation by the government."); Far W. Fed. Bank v. OTS, 119 F.3d 1358, 1367 (9th Cir. 1997); Resolution Trust Corp. v. Fed. Sav. and Loan Ins. Corp., 25 F.3d 1493, 1505 (10th Cir. 1994); La Van v. United States, 56 Fed. Cl. 580, 583-84 (2003), aff'd in relevant part, 382 F.3d 1340; see also Old Stone Corp. v. United States, 450 F.3d 1360, 1371 (Fed. Cir. 2006) ("[I]nitial contributions of both stock and cash in Winstar transactions may be allowable because both forms of contribution confer a benefit on the government.") (citing Landmark, 256 F.3d at 1372-73; Hansen, 367 F.3d 1317).

Although restitution has also traditionally been employed to prevent the unjust enrichment of the breaching party, the Federal Circuit has not viewed this articulation of the remedy as being inconsistent with restorative restitution. See Republic Savings, No. 08-5075, slip op. at 6 (stating that restitution may be measured by either "'the value of the benefits received by the defendant due to plaintiff's performance' or 'the cost of the plaintiff's performance, which includes both the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its performance under the contract'") (quoting Landmark, 256 F.3d at 1372). As the Federal Circuit explained in LaSalle Talman Bank v. United States:

> We take note that this court in Glendale, 239 F.3d at 1379-80, did not deem these classical views incompatible, for the applicability of restitution damages varies with the particular case. See Restatement of Restitution § 1 cmt. e ("The amount of recovery, however, is not invariably determined by the value of what is received. In some cases the value of what is given is determinative. . . .").

317 F.3d 1363, 1376 (Fed. Cir. 2003). As Senior Judge Merow recognized, "[i]rrespective of theoretical underpinnings, the Federal Circuit counsels against focus on doctrinal damage labels; rather the task is, in appropriate cases, to return nonbreaching parties to their pre-contract position and not quibble about the analytical construct." Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271, 299 (2005), aff'd in relevant part, 470 F.3d 1044 (Fed. Cir. 2006). See generally, Andrew Kull, Rescission and Restitution, 61 BUS. LAW. 569 (2006).

In Glendale Federal Bank v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001), the Federal Circuit endorsed the recovery of restitutionary damages as a "fall-back" measure where expectancy damages such as lost profits are incapable of being proven. In recognizing this type of damages

48

recovery, the Federal Circuit harkened back to longstanding precedent in this and other circuits, stating:

> When proof of expectancy damages fails, the law provides a fall-back position for the injured party -- he can sue for restitution.  The idea behind restitution is to restore -- that is, to restore the non-breaching party to the position he would have been in had there never been a contract to breach.  See Acme Process Equip. Co. v. United States, 171 Ct. Cl. 324, 347 F.2d 509, 528 (1965); Far West Fed. Bank, S.B. v. Trinity Ventures, Ltd., 119 F.3d 1358, 1367 (9th Cir. 1997); In re First Penn Corp., 793 F.2d 270, 272 (10th Cir. 1986) ("The object of restitution is to return the parties to the position that existed before the transaction occurred."); 5 Arthur Linton Corbin, Corbin on Contracts § 1102, at 548 (1964); John D. Calamari & Joseph M. Perillo, The Law of Contracts, § 15.4 (4th ed. 1998) ("The basic aim of restitution is to place the plaintiff in the same economic position as the plaintiff enjoyed prior to contracting."); . . .  In other words, the objective is to restore the parties to the status quo ante.  See Acme Process, 347 F.2d at 528; Far West Fed. Bank, 119 F.3d at 1367; First Penn, 793 F.2d at 272.  This is typically not as good as lost profits, from the viewpoint of the non-breacher, but a lot better than nothing.

Id.; see also Cal. Fed. Bank, FSB v. United States, 245 F.3d 1342, 1350-51 (Fed. Cir. 2001).

In order to receive restorative restitution as a fall-back remedy to expectancy damages, a plaintiff must establish two requisites: (1) that the breach was total or material, and (2) that expectancy damages were warranted but incapable of determination. See Hansen, 367 F.3d at 1309 (restitution is only available as a remedy if the breach gives rise to a claim for total breach of the contract); La Van v. United States, 382 F.3d 1340, 1351 (Fed. Cir. 2004) (quoting Glendale Fed. Bank, 239 F. 3d at 1380; Sw. Inv. Co. v. United States, 63 Fed. Cl. 182, 197 (2004), aff'd, 158 Fed. Appx. 283 (Fed. Cir. 2005) ("[M]oney-back restitution is a subset of expectancy or lost profits. It is to be employed when there has been a finding that expectancy damages are warranted but prove incapable of determination.").

## Did the Government Commit a Total or Material Breach Here?

"A total breach is defined as one that 'so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance.'" Hansen, 367 F.3d at 1309 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 243(4) (1981)).  The Federal Circuit in Hansen equated the totality of the breach with the breach's degree of importance to the overall contract:

> We start from the premise that a "total breach" is a breach that "so
> substantially impairs the value of the contract to the injured party at
> the time of the breach that it is just in the circumstances to allow him
> to recover damages based on all his remaining rights to performance."
> RESTATEMENT (SECOND) OF CONTRACTS § 243(4). For our purposes,
> the critical part of this formulation is the statement that the breach
> "substantially impairs the value of the contract to the injured party at
> the time of the breach." For all intents and purposes, this is a way of
> saying that the breach "must be of relatively high degree of
> importance." George E. Palmer, The Law of Restitution § 4.5 (1978).

367 F.3d at 1312 (emphasis added). To establish a total breach, a plaintiff is not required to prove
that defendant rendered no performance whatsoever. RESTATEMENT (THIRD) OF RESTITUTION AND
UNJUST ENRICHMENT § 37, cmt. d (Tentative Draft No. 3, 2004). Rather, the defendant's breach
must be "material, substantial, essential, or vital; it must go to the root of the defendant's obligation,
or be tantamount to a repudiation." Id. (internal quotation marks omitted).

The Restatement indicates that this form of restitution was designed in the Nineteenth
Century to "compensate plaintiffs for damages that are merely hard to prove: breach-created injuries
that ordinary-damages rules . . . might otherwise fail to reach." Id. at 538. In this regard, both the
history of this damages' model and the Restatement's explanation of total breach is consonant with
the Federal Circuit's recognition of restorative restitution as a fall-back remedy when expectancy
damages are incapable of determination. Glendale, 239 F.3d at 1380; Hansen, 367 F.3d at 1312.

**The Date of the Breach**

In disputing whether FIRREA constituted a total or material breach here, the parties disagree
on the timing of the breach. While First Annapolis submits that the date of the breach was August
9, 1989, because the enactment of FIRREA "substantially impaired" the value of the Contract at that
point in time, the Government contends that the breach did not occur until December 7, 1989, when
OTS' implementing regulations became effective and First Annapolis fell out of capital compliance.
The parties deem this a significant issue because First Annapolis' condition worsened considerably
in the fall and winter of 1989, and the thrift reached insolvency in practical terms by February 1990.
By pushing back the date of "total breach" to December 1989, the Government posits that, at that
point, First Annapolis was already failing due to problems unrelated to FIRREA -- losses on core
banking operations, failure of service corporation projects, loan losses, deterioration of asset quality,
the decline in the real estate market and a poor ratio of interest-earning assets to interest-bearing
liabilities. See Tr. 2283.

This Court is convinced, however, that regardless of which date is deemed the date of breach
here, it was FIRREA, and not some problem of the thrift's own making, that ultimately caused its
demise. This is because, using either August 1989, or December 1989, as the date the gauntlet fell,
the thrift had far too short a time to avail itself of the five years of regulatory forbearances the parties

50

agreed First Annapolis would have to turn around the extremely troubled First Federal. Whether FIRREA pulled the plug on the thrift one year into performance or one year and four months into performance, it is clear that the withdrawal of the forbearances so early in the contemplated contractual performance period devastated the thrift and prevented it from gradually gaining strength and improving its performance over five years as contemplated.

In August 1988, Bancorp, as part of a federally approved acquisition and as obligated to do under its contract, infused $13.6 million into First Annapolis which acquired the failing First Federal -- an institution with a MACRO rating of "4" -- in very poor condition. The only reason Bancorp expected to improve First Federal's performance was the Government's agreement to allow it to: (1) count supervisory goodwill toward regulatory capital; (2) meet reduced capital benchmarks for five years; and (3) exceed the regulatory limitation on investments in service corporations. These three forbearances were the sole consideration the Government provided Bancorp and were in the words of Plaintiff's expert, Dr. Heiden, "the heart and soul" of what Bancorp "absolutely needed" to turn the failing thrift into a profitable one. Tr. 1430, 1437, 1558.[45] In exchange for these forbearances, the Government received significant value -- the takeover of a failing bank, which saved it from the expense of a bailout at that juncture, and the infusion of cash and know-how into the management of a troubled institution which both parties expected would lead to its financial soundness in five years.[46] Only some nine months into the contract, Bancorp was put on notice that FIRREA was on the drawing board and likely to derail months of decent progress for the troubled thrift. In August 1989, 12 months into the contract, FIRREA was a fait accompli, and Bancorp had no choice but to alter its method of both measuring and achieving capital regulatory compliance. In short, FIRREA substantially impaired the value of Bancorp's contract by prohibiting Bancorp from achieving capital compliance using goodwill and lowered benchmarks and preventing it from pursuing its key strategy for increasing profitability via its service corporations. There is no question that the Government's breach here was "of a relatively high degree of importance" -- it eliminated everything the Government had given to Bancorp and everything Bancorp had counted on to turn what had been a "very poor," if not disastrous, First Federal into a renewed and stable First Annapolis. See Hansen, 367 F.3d at 1312.

In this case, an essential part of what the Government was affording its rescuer entity, Bancorp, was time -- a five-year period with relaxed capital benchmarks to turn around the failing thrift, using regulatory forbearances geared toward improving the thrift's capital position and profitability. In enacting FIRREA and breaching the contract, the Government took away this

---

[45] As the Government's expert, Mr. Kennedy, admitted, other than the forbearances, the Government provided Bancorp with nothing of value -- other than approving the acquisition. Tr. 2330.

[46] First Annapolis reorganized its management in January 1989, bringing on Mr. Cook, a seasoned commercial banker with experience in turning around insolvent banks, as well as a new CFO, a banker to establish internal loan review function and another commercial banker with success in improving a troubled bank.

essential consideration of time.  Up until FIRREA, First Annapolis had been making progress -- meeting its first regulatory benchmark two months prior to FIRREA's enactment.  As such, the Government's elimination of its consideration after one year -- or one year and four months -- of performance, certainly was a "relatively high degree of importance" in the parties' overall bargain, and substantially impaired Bancorp's ability to improve First Annapolis' condition.  As First Annapolis' head of lending testified, five years was a "long time" to achieve the turnaround that regulators and First Annapolis counted on in entering the Contract.  One year or one year and four months (with FIRREA looming on the horizon) was not a "long time" and clearly not long enough to achieve a turnaround of First Federal.[47]  See Caroline Hunt, 65 Fed. Cl. at 302-03 ("[I]n analyzing the materiality of breach and the issue of whether the breach harmed [plaintiff], it must be noted that a ten-year plan was envisioned, and the capital credit would be a credit for the full ten years. . . . This ten-year term was important to [plaintiff].").

That said, while the exact date of breach is difficult to pinpoint in this case, the weight of the evidence supports a finding that the enactment of FIRREA on August 9, 1989, was the date of the breach.  With the enactment of FIRREA, the Government informed First Annapolis, in no uncertain terms, that it would no longer be able to count supervisory goodwill for regulatory capital purposes, it would have to meet more onerous regulatory capital benchmarks than those in the approved Business Plan in less than five years, and that it would likely not be able to invest in its service corporations at the agreed-upon levels.  In OTS' words, FIRREA "mandated" that the forbearances would no longer be in effect.  DX 406 at 1039-40.  Specifically, in its February 27, 1990 letter disapproving First Annapolis' proposed Capital Plan, OTS stated:

> The success of the capital plan is based upon the continuation of the institution's regulatory capital and service corporation forbearances which were granted in connection with the voluntary supervisory conversion which became effective on August 31, 1988.  As mandated by FIRREA, these forbearances are no longer in effect.

DX 406 at 1039 (emphasis added).

Moreover, Plaintiff presented credible testimony that the legislation's breaching provisions negatively impacted First Annapolis well before the enactment of FIRREA in August 1989.  As FIRREA took shape during the spring of 1989, First Annapolis expected that its regulatory capital forbearances would no longer be honored -- Supervisory Agent Jones recommended that First Annapolis stop issuing large development loans that would become illegal in August.  Tr. 1053-54.

---

[47]  The evidence in this case established FIRREA's cascading effect on First Annapolis beginning before its enactment -- prompting loan policies impeding its service corporation projects, and continuing with the reduction of regulatory capital due to the loss of goodwill and heightened regulatory capital requirements.

The enactment of FIRREA was, in the words of Mr. Parran, "devastating." Tr. 1080. Mr. Cook explained that the passage of FIRREA "only solidified everything that had preceded and was tending towards a perfect storm. And the bill was enacted, and there was a perception and a recognition that the bank was likely to not be able to pull itself out." Tr. 973.

By October 12, 1989, First Annapolis was closing branch offices, downsizing staff, and eliminating officer positions -- all before FIRREA's implementing regulations were promulgated. JX 55 at 1398. As reflected in the minutes of its October 12, 1989 meeting, the Board passed a resolution stating:

> WHEREAS, On August 9, 1989, [FIRREA] was enacted which completely restructured the regulatory supervision of savings institutions and imposed new capital standards. Although the full impact of FIRREA will not be known until the adoption of new Federal regulations, [First Annapolis] recognizes that it must take immediate, drastic action to improve its capital position. With deep regret, the Bank believes it is necessary, as a result of FIRREA, to substantially reduce its number of employees thereby reducing expenses.

JX 55 at 1399-1400 (emphasis added). That same day, the Board prepared a letter to all stockholders outlining the impact of FIRREA. JX 57 at 1942.

During the month of October 1989, First Annapolis' assets decreased by $24,626,091. JX 58 at 1541. As explained in the November 1989 Board of Directors meeting, during October 1989, "[d]eposit balances were reduced by $22 million during the month due to lower rates, notice of branch closings and related publicity." JX 58 at 0966. By comparison, from October 31, 1988, through September 30, 1989, First Annapolis' assets had increased by $19,579,547. See JX 58 at 1541. On October 31, 1989, First Annapolis fell below the 1.8 percent capital benchmark for the first time. JX 58 at 1545.

On November 7, 1989, the OTS issued FIRREA's implementing regulations imposing minimum capital standards for the thrift industry. DX 2276 at 0181. On November 17, 1989, the OTS sent First Annapolis a letter explaining that in light of the new regulations, "it is apparent that First Annapolis will fail all three of the capital requirements imposed on December 7, 1989." DX 2276 at 0181.

In sum, the record shows that beginning in the spring of 1989, Government regulators warned First Annapolis that FIRREA would impose higher capital requirements than the agreed-upon forbearances and that First Annapolis took immediate and drastic action in reliance on those warnings.

The Court recognizes that it was unclear at the time of FIRREA's enactment precisely what the statute did to the service corporation forbearance.  This confusion arises in part because it was unclear what effect FIRREA would have on the Supervisory Agreement -- to which First Annapolis, as the successor to First Federal, remained bound.  However, when FIRREA wiped out goodwill and the relaxed benchmarks forcing First Annapolis to fall out of capital compliance, First Annapolis was no longer eligible to overinvest in its service corporations.[48]  Although the regulators did not finally pull the plug on the service corporation forbearance until February 1990, both the specter of FIRREA in the spring of 1989, and its enactment in August of 1989, had a severe impact, as a practical matter, on the ongoing loans to service corporations for real estate development.  Due to FIRREA's $500,000 loans-to-one-borrower limitation, First Annapolis' president advised its service corporations that the bank would not be able to fund their loans and that they needed to look elsewhere for financing, and the bank did not enter into any new service corporation projects in 1989.

Even if the Court were to find that the service corporation forbearance was breached later and did not "substantially impair" that aspect of the contract until February 1990, the breach of the remaining forbearances -- goodwill and the relaxed benchmarks -- were sufficient in and of themselves to "substantially impair" the value of the contract at the time FIRREA was enacted. As Mr. Parran credibly testified, the breach of the goodwill forbearance was sufficient in itself to "put [First Annapolis] out of business."  Tr. 1080.  Mr. Parran elaborated:

> FIRREA said we're going to expense you, you can't have goodwill at 25 years anymore, which came out to about 2.4 million expense a year, you have to do it over five years, so that's like 12 million a year. So you've got almost $10 million hit because the contract was broken, just on that one item.  Nobody can survive that.

Tr. 1065.

In conclusion, for purposes of assessing whether restitution is an appropriate remedy, the Court holds that FIRREA "substantially impaired" the value of the Contract and effected a material breach as of the date of the statute's enactment on August 9, 1989.

## Judicial Estoppel: Plaintiff Is Not Estopped from Claiming Breach Occurred on August 9, 1989

The Government argues that First Annapolis should be judicially estopped from claiming that the enactment of FIRREA breached the Contract because First Annapolis did not argue that the breach occurred on August 9, 1989, until its pretrial statement in the damages phase of this case and had earlier argued that the breach occurred in December 1989, when FIRREA's implementing

---

[48]   The governing regulation, 12 C.F.R. § 545.74 only permitted overinvestment in service corporations if a bank met its regulatory capital requirements.

regulations became effective.  Def.'s Reply Br. at 44.

Under the equitable doctrine of judicial estoppel, "[w]here a party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."  New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (citing Davis v. Wakelee, 156 U.S. 680, 689 (1895)).  "It is within the trial court's discretion to invoke judicial estoppel and preclude an argument."  SanDisk Corp. v. Memorex Prods., Inc., 415 F.3d 1278, 1290 (Fed. Cir. 2005) (citing Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir. 1996)).  Although there is no precise formula governing the application of judicial estoppel, certain factors inform the court's decision.  High QBPO, LLC v. United States, 84 Fed. Cl. 360, 364-65 (2008) (citing New Hampshire, 532 U.S. at 750-51).  These factors include: (1) the party's later position must be "clearly inconsistent" with its earlier position; (2) the party must have succeeded in persuading a court to accept the earlier position; and (3) the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  New Hampshire, 532 U.S. at 750-51.

Defendant asks this Court to invoke judicial estoppel based on three statements made by Plaintiff in briefs.  See Def.'s Reply at 44 (citing Pl.'s May 23, 1997 "Short Form" Mot. for Partial Summ. J. at 9; Pl.'s Dec. 11, 1997 Reply Mem. in Support of Its "Short Form"Mot. For Partial Summ. J. at 16; Pl.'s June 6, 2006 Contentions of Fact and Law at 10).  In all three briefs in which the Plaintiff made such statements, however, the date of the breach was not at issue.

The issue presented in the motion for partial summary judgment was whether a contract existed, not when the Government breached the Contract.  Likewise, Plaintiff's June 6, 2006 Contentions of Fact and Law addressed whether Plaintiff had committed a prior material breach, not whether or when the Government committed a breach.  Finally, in its December 11, 1997 Reply Memorandum, Plaintiff stated "the government breached its contract less than a year and a half later, when FIRREA's regulations went into effect on December 7, 1989," but the date of the breach was not an issue raised for adjudication.  Rather, Plaintiff mentioned the December 7, 1989 date in the context of citing Plaintiffs in Winstar-Related Cases v. United States, 37 Fed. Cl. at 174, 184 (1997), which had held that December 7, 1989 was the date of breach.[49]

_____

[49] Historically, the Government has identified both August 1989 and December 1989 as the date of breach.  In Plaintiffs in Winstar-Related Cases, the Government argued unsuccessfully that the breach occurred upon enactment in order to trigger the statute of limitations at the earlier date. 37 Fed. Cl. at 184.  In two restitution cases, the Government successfully argued that when determining if a total breach occurred -- the identical issue presented here -- the Court should use the date of enactment as the date of breach.  See Sw. Inv. Co., 63 Fed. Cl. at 194 ("The Defendant's position is that, assuming arguendo it breached the contract, the date of the breach would be August 9, 1989 . . . ."); Admiral Fin. Corp., 57 Fed. Cl. at 423-24 ("[I]n the course of this case we have treated the critical date [of the breach] as the enactment [August 9, 1989], and the Government

In sum, Plaintiff did not, in any prior phase of this litigation, succeed in maintaining that December 7, 1989, was the date of breach. To the extent Plaintiff can be deemed to have argued that position, this Court did not accept it. As such, the Court does not invoke judicial estoppel to preclude Plaintiff from arguing that enactment of FIRREA was the date of breach.

## Did Plaintiff Prove that Expectancy Damages Were Warranted But Incapable of Determination?

In order to obtain restitution as a fall-back measure of damages, Plaintiff must also prove that "expectancy damages are warranted but prove incapable of determination." Sw. Inv. Co., 63 Fed. Cl. at 197. Given that the Government breached the essence of its contact with First Annapolis by vitiating its forbearances and causing First Annapolis to fail in short order, there is no question that the breach harmed First Annapolis -- making expectancy damages a logical remedy. Quantifying such harm, however, in terms of the profit First Annapolis would have earned absent the breach is another matter. Because First Annapolis received only one year of the forbearances and had four more years of performance remaining, it is impossible to predict First Annapolis' profitability had the forbearances remained in play, especially in light of the service corporation development projects which required three to five years to take hold. The limited history of the merged bank's performance and the short tenure of its revitalized management before FIRREA "put [First Annapolis] out of business," makes this case a quintessential situation where expectancy damages are warranted, but incapable of determination.

## First Annapolis Did Not Need To Prove Future Profitability To Recover Restitution Damages

The parties dispute whether Plaintiff must overcome yet another hurdle in order to recoup restitution damages. Defendant, citing Admiral Financial Corp., 378 F.3d at 1345, argues that in order to be entitled to restitution, a thrift must have been viable at the time of the breach -- a criterion it claims First Annapolis did not meet. See Hansen, 367 F.3d 1297; LaSalle, 317 F.3d 1363. Stated differently, Defendant argues that if First Annapolis had already failed prior to FIRREA, then the "government's action did not 'substantially impair[] the value of the contract to the injured party at the time of the breach.'" Admiral, 378 F.3d at 1345 (alteration in original) (quoting Mobil Oil, 530 U.S. at 608); see also Sw. Inv. Co., 63 Fed. Cl. at 195-96 (holding that where evidence showed that thrift had failed or was insolvent at the time of the breach, the defendant's performance was without value and no total breach occurred).

In contrast, Plaintiff argues that it need not prove viability because when a breach is a "total" breach, the injured party is entitled to money-back restitution, without regard to whether the contract would have ultimately been beneficial to it, citing Mobil Oil, 530 U.S. at 608; Amber Res. Co. v. United States, 538 F.3d 1358, 1375-76 (Fed. Cir. 2008); Mann v. United States, 86 Fed. Cl. 649, 664 (2009). The Federal Circuit in Amber recognized that because the plaintiff-lessees were seeking restitution of their initial payments, not expectancy damages, they were not required to show that

'agrees.'").

they would have been successful in obtaining the right to drill and would ultimately have profited from the leases. Amber, 538 F.3d at 1376. Specifically, restitution was proper "whether the contracts would, or would not, ultimately have produced a financial gain or led them to obtain a definite right to explore." Id. (quoting Mobil Oil, 530 U.S. at 623-24).

Both parties are correct to a point: under Amber a plaintiff need not prove future profitability to recover restitution damages, but under Admiral a plaintiff thrift cannot recover restitution damages if it is clear that the thrift was already failing or nonviable at the time of breach.

Admiral does not preclude recovery here. While First Annapolis was not profitable at the time of the breach, it was not in such dire straits as to be deemed nonviable at this time. Just two months prior to the enactment of FIRREA, First Annapolis had met its capital benchmark and was maintaining its course. In contrast, the thrift in Admiral, Old Haven, did not meet its regulatory capital benchmark on March 31, 1989, over four months prior to the enactment of FIRREA. The FHLBB gave Old Haven a "4" rating for safety and soundness in December 1988 and March 1989, and in an April 1989 examination report concluded that Old Haven was not operating in accordance with the approved business plan -- all prior to enactment of FIRREA. Id. at 428. The FSLIC issued Old Haven a formal default notice under the RCMDA stating that Admiral had to infuse capital into Old Haven for capital compliance purposes on June 30, 1989, again prior to FIRREA. Id. None of these glaring deficiencies plagued First Annapolis in the months prior to FIRREA's enactment. First Annapolis exceeded its first contractually required capital benchmark on June 30, 1989. The FHLBB did not make any adverse findings or take any enforcement action concerning First Annapolis between its conversion in August 1988, and the enactment of FIRREA in August 1989. The Government never retreated from its July 21, 1988 finding that, with the granted forbearances, First Annapolis "would be a viable entity following the conversion, as determined under 12 C.F.R. § 563b.26. . . ." PX 2 at 7918. Nor did the Government provide notice to Bancorp or First Annapolis pursuant to the default provision in the RCMDA that First Annapolis was no longer a viable entity prior to FIRREA or that First Annapolis was not in capital compliance at that time.[50] Unlike in Admiral, the Government here did not issue a cure notice to Bancorp or First Annapolis prior to FIRREA's enactment.

The Government argues that First Annapolis was not viable at the time of the breach citing three categories of evidence -- pre-conversion evidence, post-breach evidence, and expert testimony. First, Defendant contends that the July 1988 ROE demonstrates that First Annapolis was not a viable thrift. However, the July 1988 ROE findings were directed toward the problems of First Federal, not First Annapolis, and that ROE referenced the essence of the bargained-for performance -- the

---

[50] The Government's failure to invoke the RCMDA's default provision here is telling given the mandatory nature of the provision. Section V of the RCMDA stated that if the FSLIC determined that First Annapolis fell below its regulatory capital requirement, "it shall give notice of such Default to [Bancorp] and [First Annapolis] and afford [Bancorp] an opportunity to cure such Default" by infusing "additional capital in a form satisfactory to the Supervisory Agent, in an amount equal to 100 percent of the Regulatory Capital Deficiency." PX 7 at 6330.

supervisory conversion and influx of capital as a means of improving the predecessor bank's situation. Specifically, First Federal's response to the problems in the July 1988 ROE were outlined in its 1987 Business Plan and included the conversion and merger of First Federal into First Annapolis and the $13.6 million capital infusion by Plaintiff. The FHLBB regulators concluded that First Federal's Business Plan addressed the problems identified in the July 1988 ROE. On July 21, 1988, the FHLBB expressly found that despite First Federal's problems, after the conversion and capital injection, and with the granted forbearances, First Annapolis "would be a viable institution, as determined under 12 C.F.R. § 563b.26." PX 2 at 2; see also Tr. 1156-80, 1482, 1802, 1999, 2305. As Mr. Cook explained, First Federal's problems were "cured and fixed by the infusion of the [$13.6 million in capital], and its five-year contractual ability to get to regulatory capital." Tr. 1024.

Defendant also points to the FHLBB's December 28, 1988 letter to First Annapolis and follow-up correspondence as evidence that the thrift was not viable. See DX 267; DX 294; DX 301. The December 28, 1988 letter, however, served merely to transmit the July 1988 ROE, which applied primarily to First Federal for a period prior to the formation of the contract. As such, the letter did not address First Annapolis' performance after the approved conversion and merger or illuminate whether First Annapolis was a failed thrift on August 9, 1989.[51] In contrast, the deleterious condition of First Federal reflected in that ROE highlighted how beneficial Bancorp's ensuing injection of capital was to this troubled thrift and how much First Annapolis' acquisition of First Federal benefitted the Government. At the time of that ROE, First Federal was assigned a composite MACRO rating of "4," a very poor rating which normally would have required enforcement action. Instead, First Annapolis' acquisition and Bancorp's infusion of cash allowed the regulators to avoid the high cost of bailing out First Federal.

In addition to pre-conversion evidence, Defendant cites First Annapolis' financial condition after the breach to argue it lacked viability. Defendant contends that First Annapolis failed to reach its projected earnings in the quarter ending December 1989, and "[fared] no better during the first four months of calendar 1990." Def.'s Brief at 11. Defendant also points to the fact that First Annapolis fell below the 1.8 percent reduced capital benchmark in October 1989. See Def.'s Supp. Br. at 6. According to Defendant, "between August 12, 1988, and April 30, 1990, First Annapolis realized losses of nearly $16.4 million (before the amortization of goodwill) and $23.7 million (after the amortization of goodwill)." Def.'s Br. at 11 (citing JX 68 at 0016). From this, Defendant posits that First Annapolis' losses "exceeded Bancorp's $13.6 million capital infusion into the thrift." Def.'s Br. at 11.

However, Defendant's evidence regarding First Annapolis' financial condition months after the breach -- through April 1990 -- does not establish its nonviability as of the date of breach, the enactment of FIRREA in August 1989. Of course, the thrift's condition worsened in the months following FIRREA once the Government removed the forbearances. First Annapolis was "right on

---

[51]   Moreover, First Annapolis responded to the December 1988 transmittal letter, and the Government concluded that "[t]he response to the examination report was received and deemed satisfactory." DX 392 at 0543.

track" and made nearly $1 million in profit from October 1, 1988 through March 31, 1989.  In addition, the record shows that First Annapolis' realized losses through September 30, 1989, totaled $1.8 million, a more meaningful benchmark -- one month post FIRREA -- and far less than the $23.7 million loss as of April 30, 1990, -- four months post-FIRREA -- cited by Defendant.  DX 2120 at 1550, 0704, 0486, 0129.  Defendant's claim that First Annapolis lost $23.7 million is based on the enormous losses that First Annapolis incurred <u>after</u> September 30, 1989 -- $3,635,752 in the quarter ending December 31, 1989, $1,069,725 million in January 1990, most significantly, $13,326,238 million in February 1990, $1,267,938 million in March 1990, and $1,341,064 in April 1990.  DX 2120 at 1741; JX 65 at 1730; JX 68 at 0013.  This post-breach evidence demonstrates that after the Government made it clear to Bancorp that it would not continue to honor the agreement, First Annapolis took a serious turn for the worse.

Outside of the pre-conversion and post-breach evidence, Defendant's case rests primarily on the opinion of its two experts: Mr. Kennedy and Dr. Shapiro.  Mr. Kennedy opined that First Annapolis became nonviable during the third quarter of 1989 and "would have failed absent enactment of FIRREA."  DX 2450 at 3; Tr. 2150.  Dr. Shapiro concluded that at the time of the passage of FIRREA, First Annapolis' forbearances were worthless.  Tr. 2455; DX 2452 at 5.

The record as a whole does not support the assumptions underlying either of Defendant's expert opinions.  By their own admission, neither of these experts did an analysis of when First Annapolis became nonviable.  Mr. Kennedy admitted that FIRREA negatively affected First Annapolis and the thrift industry as a whole, and that he saw documentary evidence of FIRREA's impact on First Annapolis as early as June 1989.  Tr. 2304, 2323-24.[52]  Mr. Kennedy agreed that most of First Annapolis' losses occurred in late 1989 and early 1990, after FIRREA's enactment.  Tr. 2319.  Nonetheless, Mr. Kennedy cited losses incurred in late 1989 and early 1990 -- after FIRREA's enactment and implementation -- to support his opinion that First Annapolis was on an irreversible course toward failure.  Tr. 2150, 2310, 2322; DX 2450 at 4-10.  For example, Mr. Kennedy included post-FIRREA profit and loss statements and balance sheets from the first two quarters of 1990 in his report, and cited criticized asset figures and substandard loans from June 1989 through December 1989.  Tr. 2269-73, 2311.  Similarly, Dr. Shapiro cited post-FIRREA financial data as the basis for his opinion, such as First Annapolis' failure to meet its 1.8 percent capital benchmark on October 31, 1989, and the fact that "by March 31, 1990, the bank was GAAP insolvent and was almost $14 million short of its minimum capital requirement."  Tr. 2450; DX 2452 at 10.  Because Defendant's experts relied on post-breach financial and economic information, their testimony that First Annapolis was nonviable at the time of the breach is not persuasive.

In addition, Mr. Kennedy's opinion that First Annapolis would have failed even absent FIRREA was speculative.  Mr. Kennedy opined that First Annapolis' thrift operations would not have been sufficient to meet its June 30, 1990 benchmark, and that, therefore, to make up the

---

[52]  Although Dr. Shapiro admitted that he did not do a detailed analysis of the impact of FIRREA on First Annapolis, he nonetheless asserted that FIRREA had no impact on the thrift.  Tr. 2503-05; DX 2452 at 10.

shortfall, First Annapolis would have relied on investment income from its subsidiaries -- income that was expected, but did not materialize as a result, in large measure, of an unanticipated downturn in the real estate market. In Mr. Kennedy's view, that loss of income, combined with what he asserted were loans that First Annapolis improperly classified so as not to require loan loss reserves, would have doomed First Annapolis even without the breach. Although Defendant endeavored to suggest a myriad of other causes for First Annapolis' demise, it has not established that any of these other causes had nearly as dramatic an effect on First Annapolis as FIRREA. As First Annapolis' counsel colorfully put it, FIRREA was the "elephant in the room" that cannot be ignored in evaluating First Annapolis' swift demise. Tr. 2624.

Contrary to Mr. Kennedy's speculation, Plaintiff presented credible evidence showing that First Annapolis was not a failed thrift on August 9, 1989, and was meeting its contractually required capital benchmarks until FIRREA put it on an unavoidable course to insolvency. First Annapolis' Statement of Operations showed that the thrift's net income on a consolidated basis during the only full six-month reporting period pre-FIRREA, from October 1, 1988, through March 31, 1989, was $995,734 -- $55,750 more than the thrift expected to make. See DX 2120 at 1550, 0704. In March 1989, First Annapolis' Board of Directors noted that profits from Delta, its largest service corporation, were "on target and every indication is that we will stay on target." JX 44 at 0953. According to a September 1989 Independent Auditors' Report, First Annapolis and its subsidiaries improved their financial condition between June 30, 1988, and June 30, 1989. JX 3. The Auditors' Report found that First Annapolis' assets increased by $29,220,051 from June 1988 to June 1989, and its liabilities decreased by $53,806,286 over the same period. JX 3 at 0824; see also JX 46 at 1030.

Finally, Defendant's expert opinions are not supported by contemporaneous documentary evidence or the testimony of Messrs. Parran and Cook, both of whom had direct personal knowledge of First Annapolis' condition and operations during 1988 and 1989 and witnessed FIRREA's impact on the thrift. This evidence shows that: (1) First Annapolis was profitable at least through March 31, 1989; (2) First Annapolis met its first required capital benchmark in June 1989; (3) the Government believed that First Annapolis was on track through the spring and summer of 1989; (4) First Annapolis changed its operations to prepare for and adjust to FIRREA's enactment, leading to losses; (5) First Annapolis had $1.8 million in net losses on a consolidated basis through September 30, 1989, -- including goodwill amortization costs calculated on a 15-year GAAP basis; (6) First Annapolis fell below the 1.8 percent capital benchmark for the first time on October 31, 1989, nearly three months after FIRREA's enactment;[53] and (7) the majority of First Annapolis' losses occurred during the December 1989 to April 1990 time frame, (in particular in February 1990), after the enactment and implementation of FIRREA destroyed First Annapolis' ability to operate according

---

[53] The regulators' letter of August 5, 1988, made it clear that "each" discrete annual benchmark was to be met -- not continuing compliance. The letter stated: "Accordingly, it is First Annapolis' obligation to increase its regulatory capital in order to achieve each annual benchmark and to achieve the regulatory capital amount specified (in the Business Plan) at the end of the fifth year." PX 4 at 1 (emphasis added).

to the approved Business Plan.

In sum, the Government has failed to establish that First Annapolis was nonviable at the time of breach.  So too, as <u>Amber</u> teaches, Plaintiff was not required to prove it would have been profitable in order to receive restitution.[54]

**<u>Defendant's Further Arguments Against Restitution Are Unavailing</u>**

Defendant contends that restitution is improper because "unwinding this would not return Bancorp and the Government to their status quo ante." Def.'s Br. at 41.  Defendant makes three arguments in support of its position: (1) the Government never received $13.6 million from Bancorp; (2) the Contract cannot be unwound because the Government partially performed; and (3) "Bancorp did not return First Annapolis in substantially as good condition as when it acquired control over the thrift." Def.'s Br. at 42, 44, 45.  Defendant's arguments are not persuasive.

It is undisputed that Bancorp injected $13.6 million in cash into First Annapolis, thereby rescuing First Federal and allowing the Government to avoid substantial liquidation costs. Defendant argues, however, that restitution is improper because Plaintiff never gave any money directly to the Government, but instead infused money into a troubled thrift that ultimately failed. Defendant, however, cites no supporting precedent, and both the Federal Circuit and the Court of Federal Claims have held repeatedly that restitution damages may be awarded where the rescuing thrift invested money or assets into a troubled thrift and not directly to the Government.  <u>See</u> <u>e.g.</u>, <u>Old Stone Corp.</u>, 450 F.3d at 1371 ("[I]nitial contributions of both stock and cash in <u>Winstar</u> transactions may be allowable because both forms of contribution confer a benefit on the government." ) (citing <u>Landmark</u>, 256 F.3d at 1372-73; <u>Hansen</u>, 367 F.3d 1317); <u>Hansen</u>, 367 F.3d at 1314-15; <u>Landmark</u>, 256 F.3d at 1372-73; <u>Caroline Hunt</u>, 65 Fed. Cl. at 298-300 (awarding damages for the value of certain assets that Plaintiff was required to contribute under the contract) (citing <u>Glendale</u>, 378 F.3d at 1313); <u>La Van</u>, 56 Fed. Cl. at 583-84.

The Government next contends that restitution is inappropriate because the Contract cannot be unwound in light of Government's partial performance.  The Government partially performed the contract for roughly 12 months by allowing Bancorp to operate First Annapolis from August 1988 to August 1989 with the bargained-for forbearances.  The fact that Defendant rendered <u>some</u> performance, however, does not change the fundamental nature of Defendant's material breach. "In finding a material breach, the court is mindful that ' . . . it is not a requirement of 'total breach' that the defendant have failed to render any part of the promised contractual performance; such a misinterpretation of the expression 'total breach' would seriously distort the meaning of [§ 37 Restatement of Restitution] the present Section.'"  <u>Caroline Hunt</u>, 65 Fed. Cl. at 309 (quoting

---

[54]  Imposing a requirement that a plaintiff must prove future profitability in order to obtain restitution would cast that plaintiff back into the same dilemma that the fall-back theory of restitution was designed to avoid -- the difficulty of proving expectancy damages in the form of lost profits where such damages are incapable of proof.

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 37 (Tentative Draft No. 3, 2004)); see Landmark, 256 F.3d at 1370-71 (affirming the return of the plaintiff's capital contributions made pursuant to a 1982 Assistance Agreement where the government had partially performed).

It is well established that restitution is available where one or both parties partially performed. See e.g., RESTATEMENT (SECOND) OF CONTRACTS § 374 cmt. a (stating that "this Section applies where a party, after having rendered part performance, commits a breach by either non-performance or repudiation that justifies the other party in refusing further performance"); Amber, 538 F.3d at 1381 (awarding restitution and returning the non-breaching party's up-front payments despite the fact that both parties performed in good faith "for the better part of 20 years"); Am. Sav. Bank, F.A. v. United States, 62 Fed. Cl. 6, 15 (2004), rev'd on other grounds, 519 F.3d 1316 (Fed. Cir. 2008) (explaining that in order to remedy the unjust enrichment of either party, the court must take the "entirety of the context surrounding the contractual agreement" into account, "especially when both parties *perform at least partially before and after the breach of contract*.") (emphasis added).

Additionally, the Government points out that under the RESTATEMENT (SECOND) OF CONTRACTS § 384(1) restitution may not be granted unless the non-breaching party returns or offers to return any interest in property that he received "in substantially as good condition" as when he received it. Where a contract is difficult to unwind, the breaching party should not benefit. See Caroline Hunt, 65 Fed. Cl. at 313-14. As Judge Merrow explained, "when defendant's performance cannot be unwound due to no fault of the plaintiff," the ordinary requirement of counter-restitution may be relaxed "[t]o preserve the availability of the remedy in a proper case, and to avoid hardship to the plaintiff." Id. at 313 (quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 37 (Tentative Draft No. 3, 2004)).

Here, the Government did not provide Bancorp or First Annapolis with any assistance payments or tangible assets. The Government's sole consideration came in the form of three regulatory forbearances and the approval of Bancorp's ownership of First Annapolis. The Government revoked those forbearances through FIRREA and subsequently took control of First Annapolis. Thus, there was nothing for Bancorp to return to the Government. In contrast, First Annapolis clearly lost the benefit of its bargain when the Government passed legislation revoking its forbearances and causing its cash infusion to become valueless by depriving First Annapolis of the opportunity to continue its turnaround. The Government bears the "burden to prove with reasonable certainty the quantum of benefit retained by [the Plaintiff] despite the government's breach." Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1370 (Fed. Cir. 2005); see also Caroline Hunt Trust Estate v. United States, 470 F.3d 1044, 1052. Defendant failed to provide any evidence demonstrating with reasonable certainty the amount of any benefit retained by Bancorp.

Finally, Defendant submits that restitution is not proper here because it would represent an unfair windfall for Plaintiff. Restitution damages are "inappropriate where relief would result in an 'unfair windfall' to the non-breaching party." Old Stone Corp., 450 F.3d at 1378 (Fed. Cir. 2006);

see also Hansen, 367 F.3d at 1315 (noting that an unfair windfall represents "compensation above and beyond the losses suffered under the breached agreement") (citing LaSalle, 317 F.3d at 1371).

In determining whether Plaintiff would receive an unfair windfall, the Court must assess "whether an award of restitution would place [Bancorp] in an overall better position than if the breach of contract had not occurred." Hansen, 367 F.3d at 318. Prior to FIRREA, First Annapolis had made strides improving the thrift's condition. Bancorp has demonstrated that the Government repudiated the Contract thereby preventing First Annapolis from continuing on the path to becoming a successful thrift. Given First Annapolis' swift failure following FIRREA, Bancorp and the shareholders did not receive any benefit from the Government's truncated performance. First Annapolis was a work in progress, which could not be finished because of the Government's early breach. As such, a return of Bancorp's capital investment would not put Bancorp in a better position than performance -- it would return Bancorp to the status quo ante without giving Bancorp the benefit of any profit its investors anticipated after five years of operating with the forbearances. Restitution in this context is a modest recovery especially considering that Bancorp cannot recover any interest on its investment, and the Contract was breached in 1989.[55]

## Tax Gross-Up

Plaintiff argues that it is eligible for a tax gross-up which would increase the amount of the $13,655,907 money-back restitution damages to $22,606,659 in order to reflect the tax consequences of an award of damages. Plaintiff's President, George Thomas Daughtery, testified that a damages award of $13,665,907 would be taxed as gross income even though the transaction through which Bancorp invested that sum was not taxable. Tr. 1596-97. The appropriate tax gross-up rate, according to Daughtery, would be 39.55 percent. Tr. 1598. However, the Government offered the expert opinion of Grant Clowery that a damages award would constitute a return of a capital contribution or an investment and ownership interest in First Annapolis, and therefore would not be taxable. Tr. 2101-06. However, Daughtery testified that the damages award would not be a recovery of capital because the investment was changed by the dissolution of First Annapolis. Tr. 1622. Daughtery testified that he received this advice from tax advisors and intended to report any award in this case as taxable income in conformance with such advice. Tr. 1597, 1623. Plaintiff also argues that the investment in First Annapolis would be taxable based upon a $41.1 million loss

---

[55] There is no statutory waiver of sovereign immunity permitting recovery of interest when a plaintiff establishes a breach of an implied-in-fact contract, as opposed to a breach of an express contract as under the Contract Disputes Act, 41 U.S.C. § 601, et seq. See Library of Congress v. Shaw, 478 U.S. 310, 314 (1986); Granite Mgmt. Corp. v. United States, 55 Fed. Cl. 164, 166 (2003).

As then Chief Judge Smith opined in Suess, simply awarding the plaintiff the value of the seized franchise, despite 12 years passing between the breach and the award, "provides [plaintiff] with far less in economic terms than it is owed." Suess v. United States, 52 Fed. Cl. 221, 232 (2002), vacated on other grounds, 535 F.3d 1348 (Fed. Cir. 2008). Here, as in Seuss, Plaintiff "is prevented under the law from being made whole because it cannot obtain interest on its damages caused by the government's breach." Id.

Bancorp wrote off on its 1990 tax return.  DX 2481.

Trial courts "generally do not gross-up damage awards to take into account the plaintiff's tax liability on the award unless a plaintiff can show with reasonable certainty that the gross-up is necessary to make the plaintiff whole, the award will be subject to taxation and, for the purposes of calculating the gross-up, that the award will be taxed at a certain rate."  Hughes v. United States, 71 Fed. Cl. 284, 320 (2006) (quoting Citizens Fed. Bank v. United States, 59 Fed. Cl. 507, 521 (2004)). The Court is not in a position to prognosticate how the Internal Revenue Service will treat the damages award in this case.

Accordingly, the Court denies, without prejudice, Plaintiff's claim for a tax gross-up.

### Conclusion

Plaintiff has proven that it is entitled to money-back restitution damages.  The Clerk of the Court is directed to enter judgment in favor of Plaintiff in the amount of $13,665,907.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**